UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAYMOND ASSELIN, SR., et al.<br><br>Defendants. | Criminal No. 04-30033-MAP |

**MEMORANDUM IN SUPPORT OF DEFENDANT PETER DAVIS'S MOTION TO COMPEL GOVERNMENT TO DISCLOSE *BRADY* MATERIAL**

In recent correspondence defendant Peter Davis has requested that the government turn over several specific categories of *Brady* material. The government has in large part refused to turn over the requested information, citing various reasons. Defendant Davis submits this memorandum in support of his motion requesting that the Court order the government to turn over the requested exculpatory information.

**ARGUMENT**

**I. THE GOVERNMENT'S OBLIGATIONS TO TURN OVER EXCULPATORY INFORMATION**

It is beyond dispute that the Government is constitutionally obligated to disclose favorable evidence to the accused where such evidence is material to guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Supreme Court has held that evidence is "material" to guilt or punishment, and thus subject to *Brady's* discovery obligations, if there is a "reasonable probability" that such evidence could have an effect on the outcome of the trial. *Kyles v. Whitley*, 514 U.S. 419, 434 (1994). Further, because the "reasonable probability" test is to be applied based on the totality of the circumstances, the failure to turn over exculpatory evidence in the face of a specific

request can be far more likely to trigger the "reasonable probability" requirement because of the possibility that the denial of such evidence can alter the defense counsel's pre-trial strategy. *United States v. Bagley*, 473 U.S. 677, 682-83 (1985). This District's Local Rules confirm the government's disclosure obligations. Local Rules 116.2(B)(1) & (B)(2) identify several specific categories of *Brady* material, and require that all exculpatory material must be disclosed 21 days before trial.

With respect to certain of Mr. Davis's requests, the government responded by disagreeing that the requested information was exculpatory, but stating that if such evidence did exist, it was available at the FBI. Given the sheer volume of open file discovery in this case, the impending trial date, and the fact that Mr. Davis has made specific, detailed requests for certain categories of *Brady* material,[1] the government is obliged to specifically identify any known material it has responsive to Mr. Davis's requests. The government should not be permitted to skirt its *Brady* obligations by burying known *Brady* information, responsive to specific requests, in a mountain of irrelevant material in the hopes that Mr. Davis will not be able to find the few

---

[1] In two recent letters counsel for Mr. Davis requested that the Government produce, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), several specific categories of exculpatory material: (a) all *Brady* material related to the obstruction of justice charge; (b) any information suggesting that there were contractors doing business with the SHA who were not involved in the alleged "pay-to-play" system; (c) any information suggesting alternative reasons that the SHA may have "steered" contracts to P.J. Richfield; (d) information regarding the Springfield Housing Authority's use of minority subcontractors and procedures regarding "filed sub bids"; (e) any information suggesting that Peter Davis did not contribute to Chris Asselin's campaign prior to the alleged 1999 payment you have previously identified; (f) any information suggesting that Peter Davis was unaware of alleged co-conspirators' actions other than the actions that he is personally alleged to have taken; (g) information suggesting that P.J. Richfield was commended or complimented for its performances on any Springfield Housing Authority contracts; and (h) interview memoranda of witnesses identified as CW-9 and CW-10 in Agent Hedges's search warrant affidavits. *See* Letter from Rehnquist to Welch, dated 7/13/06, at 1-2 (attached as Exhibit A); Letter from Rehnquist to Welch, dated 7/20/06, at 1-2 (attached as Exhibit C). In large part, the government has refused to turn over information responsive to such requests. *See* Letter from Welch to Rehnquist, dated 7/19/06, at 2. (attached as Exhibit B); Letter from Welch to Rehnquist, dated July 30, 2006, at 1 (attached as Exhibit D).

exculpatory needles in the haystack. *See United States v. Hsia*, 24 F. Supp. 2d 14, 42 (D.D.C. 1998) ("Open-file discovery does not relieve the government of its *Brady* obligations. The government cannot meet its *Brady* obligations by providing [defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack. To the extent that the government knows of any documents or statements that constitute *Brady* material, it must identify that material to [defendant].").

## II.  DEFENDANT'S SPECIFIC REQUESTS

### A.  Requests Relating to The Obstruction of Justice Charge

The indictment charges Mr. Davis with obstruction of justice in violation of 18 U.S.C. § 1503. The charge alleges that in an interview with FBI agents on April 10, 2003, Mr. Davis falsely stated that he had not paid for any home improvements for any members of the Asselin family. Indictment at ¶ 124.

In order to convict a defendant for obstruction of justice in violation of 18 U.S.C. § 1503, the government is required to prove that the allegedly false statements were made "with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." *United States v. Aguilar*, 515 U.S. 593, 599 (1995). Furthermore, the Supreme Court has held that the government must prove that the statements "have the 'natural and probable effect' of interfering with the due administration of justice." *Id.* This additional element of a § 1503 violation—sometimes called the "nexus requirement—requires proof that the allegedly obstructive act "have a relationship in time, causation, or logic with the judicial proceedings." *Id.* (citations and

quotations omitted). In *Aguilar*, the Supreme Court affirmed the Ninth Circuit's reversal of a § 1503 conviction. In finding that the evidence was insufficient to amount to a § 1503 violation, the Court emphasized that the investigating agent to whom the false statements were made had not been under grand jury subpoena. *Id.* at 601. It held that "false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury . . . cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice." *Id.* at 601.

The government, in the face of Mr. Davis's specific requests, has admitted that the agents who conducted the interview with Mr. Davis were <u>not</u> under subpoena from the grand jury. *See* Exhibit D at 2.[2] It has also admitted that the substance of Mr. Davis's allegedly false statements to the FBI on April 10, 2003, was not presented to the grand jury until June 29, 2004, fourteen months after the interview and a mere 10 days before the grand jury returned a 148-page, 122-count indictment.[3] *Id.* These admissions are critical, as they tend to demonstrate (a) that the obstruction charge is defective under *Aguilar*, where the Court found the "nexus requirement" could not be met where the interviewing agents had not been subpoenaed by the grand jury, even though the defendant was aware of the existence of the grand jury investigation; and (2) it appears

---

[2]  The exculpatory nature of this information could hardly be more obvious, given the "nexus" requirement articulated in *Aguilar*. Under the Local Rules, this information, which "tends directly to negate the defendant's guilt" on the obstruction charge, should have been disclosed to defendant within 28 days of arraignment. *See* Local Rule 116.1(c)(1), 116.2.

[3]  Given the timing, the information was undoubtedly presented to the grand jury as the basis for the obstruction charge in a draft indictment — *i.e.*, as information that was false — and thus had no conceivable effect on the "due administration of justice" under § 1503. By this motion, Mr. Davis further requests that the government be ordered to turn over the transcripts and exhibits reflecting the presentation of this evidence to the grand jury on June 29, 2004.

4

the government may have had no intention of presenting the information the FBI gathered from Mr. Davis to the grand jury. Still, the government has refused to turn over additional exculpatory evidence related to this charge.

Specifically, Mr. Davis requests any information tending to show, based on the evidence actually before the grand jury, that the grand jury itself was not actually investigating the subject matter of the FBI interview. The defendant also seeks information suggesting that a purpose of the FBI interview of Mr. Davis was something other than to gather information for, and on behalf of, the grand jury. The requested information is both necessary and highly exculpatory, as it appears that the purpose of the Davis interview was not to develop information on the underlying conduct for presentation to the grand jury, but rather to attempt to elicit false statements from the defendant in order to develop an obstruction claim and a predicate racketeering act against Mr. Davis that occurred within the statute of limitations period. The indictment contains no allegations against Mr. Davis of any kind after 1997, when he retired and moved from the Springfield area to Eastern Massachusetts. Accordingly, in order to indict him on the substantive RICO charge, the government would have to demonstrate a predicate act committed by Mr. Davis within the statute of limitations period of five years, and the only such act charged against Mr. Davis is the obstruction of justice.

Given the clear definition from the Supreme Court of conduct punished by § 1503, any information tending to suggest that Mr. Davis's alleged statements did not "have the natural and probable effect of interfering" with the grand jury, or that they were not made "in a manner that is likely to obstruct justice" would be plainly exculpatory. What the grand jury knew and was investigating at the time of Mr. Davis's interview is

highly relevant to whether his statements would be likely to have obstructed their investigation, and to whether there was a "nexus" — *i.e.* "a relationship in time, causation, or logic" — between the statements and the grand jury investigation. Furthermore, as *Aguilar* clearly implies, if the purpose of the government in conducting the interview was not to gather information for, and at the behest of, the grand jury, then the nexus requirement cannot be demonstrated. As such, any information (including meeting notes and communications between the investigating team and the interviewing agents or any other information) tending to show a purpose other than gathering information for and at the behest of the grand jury is highly exculpatory and must be produced.

### B.     Requests Relating to the Alleged "Pay-to-Play" Rigged Bidding System

Counsel for Mr. Davis also requested any information tending to show that there were SHA contractors and vendors that were <u>not</u> part of the alleged conspiracy, *i.e.*, who did not pay bribes, kickbacks or other "things of value" in exchange for contracts or other benefits, and therefore who were not involved in any alleged "pay-to-play system." *See* Exhibit A at 1-2. In response, the government did not state that such evidence did not exist; rather it refused to turn over such evidence on the ground that "it is not in the nature of a *Brady* request, but rather more like a bill of particulars seeking the Government's affirmative evidence and theory of the case." *See* Exhibit B at 2.

It is indisputable that information that tends to refute the government's theory of the case is classic *Brady* material. *See Mendez v. Artuz*, 303 F.3d 411, 414 (2d Cir. 2002) ("[I]nformation is exculpatory and thus 'favorable' to the defense for *Brady* purposes when it directly contradicts the motive theory testified to by prosecution witnesses.")

6

The indictment charges Mr. Davis with a RICO conspiracy, which includes a charge that he conducted the affairs of a RICO enterprise (here the Springfield Housing Authority (SHA)) by engaging in a pattern of activity whereby he and other contractors would be required to give kickbacks to SHA authorities in exchange for contracts and other benefits.  In response to Mr. Davis's motion for a bill of particulars outlining what if any benefits the government alleges he received in exchange for kickbacks, the government has repeatedly *already* made clear that its theory of the case is that "this is a pay to play system," wherein "*each* one of these contractors have become part of a rigged system." *See* Transcript of April 26, 2006 Hearing at 14 (emphasis added) (attached as Exhibit E). Under this theory of the case (which the government has explicitly adopted in response to defendant's motion for a bill of particulars) information that other contractors did not pay bribes or kickbacks tends to refute the government's theory of the case and is thus exculpatory.

An examination of the government's exhibit list underscores its "pay-to-play" theory.  The government intends to offer evidence of other contractors' bids, contracts, and allegedly illegal payments on projects that Mr. Davis did not even bid on or have any relationship with whatsoever.  *See* Government's Exhibit List pp. 31-51 (attached as Exhibit F).  A clear purpose of offering such evidence is to show that the system for awarding contracts at SHA was a rigged, "pay-to-play" system, as inferential evidence that Mr. Davis, as someone who bid on and was awarded SHA contracts, joined such a conspiracy.  But if in fact there is information suggesting that some contractors who bid on and were awarded SHA contracts that are not implicated in any "pay-to-play" activity

7

(and the government has not denied that this evidence exists), such evidence would clearly refute that inference.

The exculpatory nature of such evidence is heightened by the fact that some evidence already produced by the government through automatic discovery suggests that Mr. Davis was *not* one of the contractors who gave kickbacks in exchange for contracts. For instance, in an affidavit supporting a search warrant issued as a part of this investigation, the government refers to the statements of two employees of the SHA who identified several contractors that gave cash and gifts to defendant Sotirion, including, *inter alia*, Gary Baribeau of G&R Construction, as well as defendants Bannick and Spano, but neither of whom implicated Mr. Davis or P.J. Richfield in any way. *See* 10/4/02 Search Warrant Affidavit at 29-31 (Attached as Exhibit G). A recently received witness interview memorandum of an interview with these employees confirms that they did not implicate Mr. Davis or P.J. Richfield. (The interview memorandum is not attached hereto, but will be made available for the Court's review at the August 31 hearing if necessary). If, in fact, the government has evidence, in the form of interview memoranda, grand jury testimony, or otherwise, tending to show that the entire system was not rigged and that some contractors did business legitimately with the SHA, such evidence would allow the jury to draw the opposite conclusion and thus would tend to exculpate Mr. Davis.

### C.   Requests Relating to Motivation for "Steering Contracts"

Mr. Davis's *Brady* request letter also included the following:

> You state on p.11 in the Government's Response to Defendant Davis's Motion for Severance that "[t]he reason that defendant Asselin, Sr., initially steered contracts to defendant Davis was to reduce joint debts that they had incurred from real estate deals that

8

>had gone south in the late 1980s." Any information as to this
>motivation for awarding contracts to Davis is potentially
>exculpatory, and we request that it be disclosed, as it indicates that
>Davis received contracts not because of any "things of value" he
>may have provided to Asselin, Sr. or Sotirion.

*See* Exhibit A at 2. In response, the government simply stated that "[t]he reduction of a debt obligation is a 'thing of value.'" *See* Exhibit B at 2.

The government's response is a complete non-sequitur. The indictment is based on allegations of bribery under 18 U.S.C. § 201, which proscribes offering, promising, or giving "things of value" to public officials with the intention of influencing official action. If, as the government has alleged, Asselin, Sr. steered contracts to Mr. Davis to reduce joint debts they incurred in the late 1980s, this suggests that Mr. Davis was not awarded these contracts because of anything that he offered, promised or gave to public officials. The government contends that every contract Mr. Davis received was tainted by his participation in the "pay to play" system, and this information indicates a different reason why Mr. Davis may have received contracts. That Asselin, Sr.'s actions may have been inculpatory as to him, or that they conferred a benefit on Mr. Davis, does not mean that they are not also exculpatory as to Mr. Davis given the government's theory of the case. Any information regarding such "joint debts" and "real estate deals," or that Asselin Sr. awarded contracts or benefits to Mr. Davis because of this previous relationship, is exculpatory and should be disclosed.

### D.    Requests Relating to Minority Subcontractors and "Filed Sub Bids"

Mr. Davis requested any information regarding SHA procedures for, or requirements surrounding, the use of minority subcontractors, as well as the procedures regarding "filed sub bids." *See* Exhibit C at 1. This information is *Brady* material, as both in its initial bill of particulars, as well as in a supplement to that bill of particulars

9

sent July 30, 2006, the government has stated its intention to offer evidence that the SHA steered a subcontract under a P.J. Richfield contract to alleged co-conspirator Frank Ware, an African-American subcontractor. *See* Letter from Welch to Rehnquist, dated July 30, 2006, at 1 (attached as Exhibit H). The government alleges that part of the benefit of the "pay-to-play" system was that SHA would require certain contractors to use subcontractors that SHA steered to them.

But Mr. Davis believes that there are certain legal requirements as to use of minority subcontractors for state-granted contracts. Thus, if the SHA "steered" a subcontract on a P.J. Richfield job to Mr. Ware, an African-American, in order to satisfy state law minority subcontractor requirements, rather than for some nefarious "benefit" to Mr. Ware as part of the alleged pay-to-play system, it would be exculpatory. Furthermore, Mr. Davis believes that for many contracts, the SHA requires subcontractors to file "sub bids" in order to obtain subcontracts, the result of which is that the general contractor has no control over which subcontractors to use. Thus, Mr. Davis is entitled to any material in the government's possession concerning the SHA's procedures surrounding minority contractors and "filed sub bids" as these could provide perfectly lawful and exculpatory explanations for Mr. Davis's use of certain subcontractors that the government alleges were part of the RICO conspiracy.

### E. Requests Relating to Mr. Davis's Knowledge of Co-conspirators Actions

Mr. Davis has requested any information tending to suggest that Mr. Davis was unaware of the alleged actions of his alleged co-conspirators. Exhibit C at 1. Such information, which would presumably exist in witness interview memoranda, is plainly exculpatory in view of the breadth of the indictment's conspiracy charges. Both the

10

government's averments and evidence already produced through automatic discovery suggests both that Mr. Davis's relationship with the SHA was different in kind from that of other alleged co-conspirator contractors, and that Mr. Davis was not one of the contractors engaged in the government's so called "pay-to-play system." If in addition there is evidence that Mr. Davis was unaware that other contractors were giving bribes in exchange for contracts, this would tend not only to refute that Mr. Davis ever agreed to join the sprawling conspiracy charged in the indictment, but would also be relevant to, *inter alia*, the admissibility of evidence and liability for the actions of alleged co-conspirators. Such information is heartland *Brady* material and should be disclosed.

### F.     Requests Relating to Substandard Performance Allegations

The indictment charges, *inter alia*, that Mr. Davis received "preferential treatment" and "other SHA resources" in exchange for the payment of bribes and kickbacks. Indictment at ¶ 40. In its bill of particulars, the government stated that this preferential treatment included "permitting use of P.J. Richfield as a subcontractor despite substandard work"; "certifying the completion of work that had not been completed"; and "causing more lenient enforcement of site inspections and wage compliance for P.J. Richfield, Inc." *See* Letter from Welch to Rehnquist, dated 9/19/05, at 2 (attached as Exhibit I). Relatedly, the government has stated in its bill of particulars letter that SHA resources were directed to P.J. Richfield insofar as SHA employees completed work for P.J. Richfield and SHA supplies were used by P.J. Richfield. *Id.* Mr. Davis has requested any information in the government's possession suggesting that P.J. Richfield was commended or complimented for its work on SHA contracts, which would be exculpatory in that it would cast doubt on the credibility or accuracy of the

evidence the government intends to offer with respect to allegedly substandard work. Mr. Davis also requests by this motion any information indicating that other contractors and subcontractors received similar "preferential" treatment as that outlined in the bill of particulars letter, which would be exculpatory in that it would rebut the idea that Mr. Davis was receiving any extraordinary benefit.  For example, if other contractors performed "substandard" work, received "assistance" from SHA employees, or were subject to "lenient" site inspections, Mr. Davis's treatment may not have been preferential at all.

## CONCLUSION

For the foregoing reasons, Mr. Davis respectfully requests that this Court order the government to provide defendant with the requested exculpatory information.

Respectfully submitted,

PETER DAVIS

By his attorneys,

 /s/ **James C. Rehnquist**
James C. Rehnquist (BBO # 552602)
Kathleen Luz (BBO # 643278)
William J. Trach (BBO #661401)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated: August 16, 2006

**CERTIFICATE OF SERVICE**

      I, James C. Rehnquist, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants, on August 16, 2006.

                                          **/s/ James C. Rehnquist**
                                          James C. Rehnquist

LIBA/1717710.1