FILED
'K'S OFFICE

UNITED STATES DISTRICT COURT                            2006 SEP -6  P 5: 4-
DISTRICT OF MASSACHUSETTS U.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-N-04-30033-MAP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| PETER DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT DAVIS'S
## MOTIONS IN LIMINE NOS. 7, 9. AND 10

The United States of America, by and through Michael J.
Sullivan, United States Attorney for the District of Massachusetts,
Steven H. Breslow, Assistant United States Attorney, and Kevin
O'Regan, Assistant United States Attorney, hereby files this
response to defendant Peter Davis's Motions in Limine Nos. 7, 9, and
10.

These motions seek to exclude evidence that: from approximately
1993 to 1997, Springfield Housing Authority ("SHA") leaders Raymond
Asselin, Sr. and Arthur Sotirion permitted the defendant to avoid
paying the required prevailing wage on several SHA jobs, and that
the defendant falsified payroll wage forms to conceal this scheme
(Motion No. 7); in 1993-94, Asselin, Sr. and Sotirion provided
preferential treatment to the defendant, including paying him fully
for work that he simply did not do, in exchange for a kickback that

1

included an equal share of the defendant's profits on that job (Motion No. 9); and in 1997, the defendant received a written communication from Sotirion that explicitly referred to the payment of a kickback to Asselin, Sr. (Motion No. 10). Because the defendant's motions are, quite understandably, addressed to much of the government's most incriminating evidence against the defendant, they should be denied since the contested evidence proves essential elements of the charged crimes.

I.    The Government's Charges

This is a bribery and racketeering case. In brief, the Superseding Indictment (the "Indictment") alleges that Asselin, Sr. and Sotirion operated the SHA as a corrupt enterprise, in which they provided preferential treatment to a range of contractors, including the defendant, in exchange for kickbacks.

The Indictment charges the defendant in Count 1 with RICO (spanning from 1988 through 2003, ¶ 36), in Count 2 with RICO Conspiracy (spanning from 1988 to 2003, ¶ 36), and in Count 3 with Conspiracy to Commit Federal Bribery (spanning from 1993 to 2003, ¶ 58).[1] Count 1 alleges that the defendant committed numerous predicate racketeering acts of federal bribery in violation of Title 18, United States Code, Section 201. Count 3 alleges that the defendant conspired with others to violate Section 201.

---

[1]    The defendant also has been charged in Count 107 with Obstruction of Justice, in which the defendant falsely denied some of his bribery conduct.

2

The essential elements of Section 201 require the United States to prove, among other things, that:

. . .

(2) the defendant did directly and indirectly give, offer, and promise anything of value to a public official; and,

(3) the defendant did so with the corrupt intent to influence the public official in the performance of an official act or to commit a fraud on the United States or to perform acts in violation of his lawful duty.

Sands, Modern Federal Jury Instructions, ¶ 16-10.

The "corrupt" intent necessary to a bribery conviction is in the nature of a *quid pro quo* requirement." United States v. Sun-Diamond, 526 U.S. 398, 404 (1999). There must be "a specific intent to give ... something of value *in exchange* for an official act." Id. See also United States v. Alfisi, 308 F.3d at 149 (2nd Cir. 2002); United States v. Mariano, 983 F.2d 1150, 1159 (1st Cir. 1993). Putting it only slightly differently, bribery involves the giving of value to procure a specific official action from a public official. Alfisi, 308 F.3d at 149.

Even though this is a bribery case, the defendant now seeks to bar the United States from introducing evidence between approximately 1990 and 1995 that proves both of the essential elements of the bribery statute: the official acts performed for the defendant as well as the defendant's return payment of bribes. Not only are the defendant's factual arguments misleading and

3

distorted, but his legal arguments cannot withstand Rule 403 scrutiny.

II.  Overview

Although the defendant claims that the "crux of the Indictment's charges" is only thirteen payments made by him in 1996 and 1997,[2] the indictment plainly alleges RICO and bribery conspiracies among the defendant, Asselin, Sr. and Sotirion that began in approximately 1988 and 1993, respectively.

As described more fully in the Government's Motion in Limine to Admit Certain Evidence, dkt. 203, in the late 1980s, the defendant formed P.J. Richfield with Joseph Asselin, a son of Asselin, Sr.: they named the company to illustrate the partnership between Peter and Joseph. Asselin, Sr. loaned his son $20,000 to invest in the new company. By October 1990, the defendant began obtaining contracts for P.J. Richfield at SHA despite this clear conflict of interest.

As set forth in greater detail below, the illicit relationship between Asselin, Sr. and defendant Davis continued into 1993 and 1994. During those years, Asselin, Sr. and Sotirion awarded the defendant an approximately $630,000.00 contract to make handicap-accessible renovations at various housing projects ("the ADA/504 contract"). Asselin, Sr. and Sotirion also caused SHA to pay the defendant in full even though he had not nearly completed his

---

[2]  See Motion No. 9, at 2.

4

contract, and provided substantial SHA resources to perform the extensive work that the defendant simply did not complete. During this time frame, Asselin, Sr. and Sotirion also steered to the defendant a lucrative subcontract including "supervision" fees under a parallel contract awarded to Gary Baribeau, another co-conspirator and racketeering enterprise member, for the same handicap modernization project. In exchange, the defendant agreed to pay Asselin, Sr. and Sotirion each a one-third share not only of his own profits, but of Baribeau's as well.

The corrupt involvement of Asselin, Sr., Sotirion, and the defendant continued into 1996, 1997, and 1998. During those years, Asselin, Sr. and Sotirion steered a $1.2 million contract, among other contracts, to the defendant. In return, the defendant wrote thirteen checks for home improvement projects at the residences of Christopher Asselin and Joseph Asselin.

In an exercise of its charging discretion, the government opted to specify the defendant's thirteen checks as both the defendant's RICO predicate acts and his overt acts in furtherance of the RICO and bribery conspiracies.[3] Nonetheless, as set forth in greater detail below, the defendant engaged in a broad range of misconduct in furtherance of his charged crimes in the early to mid-1990s.

---

[3] The government also specified the defendant's false statements to the FBI on April 10, 2003 as a RICO predicate act and overt act. Indictment, ¶ 54.

5

III. The Defendant's Offense Conduct Prior to 1996

Mistakenly insisting that the defendant did not engage in any bribery conduct before 1996, the defense claims that it cannot see any relevance to evidence pre-dating the defendant's first check written on September 30, 1996. To the contrary, evidence from this period is highly probative of the charged RICO enterprise (commencing in 1988), the RICO conspiracy (commencing in 1988), and the bribery conspiracy (commencing in 1993). This evidence (only a portion of which is set forth below) is not merely relevant, but central, to the defendant's charged offenses.

First, the defendant was awarded several SHA contracts between 1990 and 1993, during which he had a clear non-disclosed conflict of interest based upon his business relationship with Joseph Asselin, the son of Asselin, Sr. Indeed, after P.J. Richfield encountered business difficulties in 1990, the Bank of Boston sued P.J. Richfield, the defendant, and Joseph Asselin, obtaining a default judgment of approximately $77,000 in 1992.[4] This joint debt remained until approximately May 1993, when the Bank of Boston forgave approximately $45,000 of the debt and the defendant paid the remainder on behalf of Joseph Asselin and himself. Thus, in 1993, Joseph Asselin and/or Asselin, Sr. (who had given his son $20,000 to invest in P.J. Richfield), owed the defendant thousands of dollars.

---

[4] See Government Exhibit ("GX") 7, attached hereto as Exhibit A.

6

All bidders on SHA projects must submit a series of signed HUD certifications with their bids.   In particular, Certification 4 states that "no actual or apparent conflict exists with regard to my possible performance of this procurement" (Certification 4). Similarly, Certification 2(b)(2) affirms that the bidder "has not paid or agreed to pay . . . any person . . . any commission, percentage, brokerage, or other fee contingent upon or resulting from this contract."

When submitting his winning bid for the Christopher Court Apartments on June 21, 1993, the defendant did not disclose his conflict based upon the Asselins' participation in P.J. Richfield. Instead, the defendant simply declined to certify Certification 4, as well as Certification 2(b)(2).[5]

The defendant's payments on this contract further demonstrate that he was colluding with Asselin, Sr. and Sotirion well before 1996. All contractors must submit to the SHA periodic estimates for partial payment, known as requisitions, before they can be paid. Such requisitions provide percentage estimates of the completed work, which SHA must approve before authorizing payment.   SHA typically scrutinizes these payment requests, since SHA needs to ensure that it is paying for work actually done rather than merely claimed to be done.   Similarly, the contractor must prepare and

---

[5]   See Government Exhibit ("GX") 43 (excerpted), attached hereto as Exhibit B.

7

submit a Certificate of Completion, certifying that all of the contracted work is finished and that the contractor should be completely paid pursuant to the contract and released from any further obligations.

Here, however, Sotirion himself drafted the defendant's own payment requisitions, which he and Asselin, Sr. duly approved.[6] Sotirion's secretaries will testify that the defendant's payment requisitions were written by Sotirion, and that Sotirion routinely performed this task for a few other contractors, such as Baribeau and other racketeering enterprise members.   Indeed, even the defendant's Certificate of Completion was drafted by Sotirion, who then naturally approved the defendant's release.[7]

On June 25, 1993, the defendant submitted his winning bid for the exterior site work of SHA's ADA/504 modernization project, which was designed to bring certain SHA housing complexes into compliance with the Americans with Disabilities Act.[8]  As with his earlier bid, the defendant failed again to complete both the certifications for commission-sharing (2(b)(2)) and conflict of interest (4).

On October 14, 1993, G&R Associates submitted its winning bid for the interior work of the ADA/504 modernization project.[9]   The

---

[6]  See, e.g., GX 48 and 49, attached hereto as Exhibits C.

[7]  GX 52 and 53, attached hereto as Exhibit D.

[8]  GX 59 (excerpted),attached hereto as Exhibit E.

[9]  GX 76 (excerpted), attached hereto as Exhibit F.

8

president of G&R Associates, Gary Baribeau, will testify that Sotirion provided him with the completed bid paperwork, which Baribeau simply signed. Sotirion's secretaries will testify that Sotirion handwrote much of Baribeau's bid. Baribeau will also testify that Sotirion directed him to use the defendant as a subcontractor, to whom he had to pay a "supervision fee" as well. Baribeau will testify that Sotirion also either monitored or controlled the expenses of G&R Associates, and the government will introduce Sotirion's handwritten accounts payable spreadsheet for G&R Associates, listing payments from G&R to the defendant for approximately $157,000 (or nearly a quarter of the SHA money that G&R received on its contract).

While the defendant was receiving a steady flow of SHA money from Sotirion through G&R Associates, however, his own company's performance on the ADA-504 project was foundering. Nonetheless, as with the defendant's earlier project, Sotirion handwrote the defendant's final payment request, stating that no work remained on the job, which the defendant, Sotirion, and Asselin, Sr. certified on October 17, 1994.[10] The defendant and Asselin, Sr. also executed an accompanying Certificate of Release, affirming that "all work covered by this contract . . . was actually completed on 07/08/94."[11]

---

[10] GX 65 and 66, attached hereto as Exhibit G.

[11] Exhibit G (GX 66).

9

Contrary to the signed certifications of the defendant, Sotirion, and Asselin, Sr., the defendant's work was far from completed on July 8, 1994 or even October 17, 1994.  Indeed, the defendant's performance was so incomplete that SHA's project architect, James Bright, felt compelled to send him a formal request for a status report on October 12, 1994 - just five days before the defendant certified that he had finished his job.[12]  On November 3, 1994, Bright wrote another letter to Asselin, Sr., stating that after a site visit to only two apartment complexes, "[t]here is enough work which is not completed to make it impossible for me to prepare a punch list. . . . I understand your desire to have a punch list from me so this project can be completed, but I cannot provide that punch list until the project is closer to completion."[13]

On or about December 6, 1994, the defendant wrote Bright a letter that falsely stated, "Please be advised punch list items have been completed for ADA/504 site improvements."[14]  On January 6, 1995, Bright sent Asselin, Sr. a "partial punch list for P.J. Richfield," indicating forty-three items, including missing curb cuts required for wheelchair access, at only five of the fourteen complexes covered by the defendant's contract.[15]  Finally, on January 16, 1995,

---

[12] GX 64, attached hereto as Exhibit H.

[13] GX 68, attached hereto as Exhibit I.

[14] GX 69, attached hereto as Exhibit J.

[15] GX 70, attached hereto as Exhibit K.

10

Bright sent Asselin, Sr. another letter indicating his "estimate of the percentage of the work which has been completed" at six other complexes; Bright estimated that three of these complexes were only 20%, 30% and 40% complete, respectively.[16]  Thus, substantial work remained on the defendant's own contract more than three months after he, Asselin, Sr. and Sotirion certified that the work was complete.

Indeed, with Sotirion's knowledge, the defendant never completed certain aspects of his ADA-504 site work.  For example, the defendant was required to install handicap ramps by building them above a four-foot foundational wall and footings, which would prevent frost heaves in the earth from cracking the ramps.  On November 30, 1993, Sotirion annotated a list of the defendant's proposed changes to his project, including a "credit" to P.J. Richfield for "reduce footing depth to 12"-18"."[17]  In 2006, after discovering that many of the defendant's ramps at one apartment complex had cracked, SHA hired another contractor to remove the cracked ramps but leave the existing foundations behind, so that the new ramps could be installed on top of the foundations that the defendant had previously installed.  When the new contractor removed the cracked ramps, they were surprised to learn that the ramps had

---

[16]  GX 71, attached hereto as Exhibit L.

[17]  GX 61, attached hereto as Exhibit M.

11

simply been poured onto the earth, without any foundational wall or footing.

The defendant's performance on the ADA-504 interiors, which had been sub-contracted by G&R Associates at the direction of Sotirion, fared little better. In an effort to reduce costs and hasten the job's completion, throughout 1994, the defendant resorted to hiring SHA laborers and others, whom he paid at either low hourly rates or on a piecemeal basis, in violation of the prevailing wage rate requirements required by SHA and HUD.[18]

Moreover, Asselin, Sr. and Sotirion diverted substantial SHA resources to finish the defendant's work. On or about September 28, 1994, Sotirion sent Asselin, Sr. an extensive annotated list of work at one of the fourteen apartment complexes, apportioning work among SHA, the defendant, and two other contractors.[19]  On September 30, 1994, the defendant wrote Sotirion a note, asking him to assign SHA painters to galvanize handrails and paint certain apartments.[20]

Similarly, James Bright will testify that he once encountered the defendant on the job site, where SHA workers were loading construction debris into an SHA dumpster; when Bright challenged the

---

[18]  In addition to the HUD certifications specified above, the defendant also certified that he would abide by the prevailing wage requirements of the Davis-Bacon Act (Certification No. 9). Under the Act, contractors must pay workers pursuant to established prevailing wage hourly rates.

[19]  GX 62, attached hereto at Exhibit N.

[20]  GX 63, attached hereto as Exhibit O.

12

defendant, he simply told Bright that he "had a prior arrangement" and walked away.    Another SHA foreman will testify that after the ADA-504 contractors left in 1994, he and his crew had to complete extensive work throughout every apartment in one housing complex that the contractors had simply not done; such work included installing molding and door casings, which Sotirion directed be purchased with SHA funds.    Thus, Sotirion and Asselin, Sr. relieved a significant portion of the defendant's work, at SHA expense.[21]

By finishing much of the defendant's work, Sotirion and Asselin, Sr. also saved the defendant a significant part of his construction expenses.    In a later 1996 project at Christopher Court Apartments, for example, the defendant initially calculated his costs for regrouting bathrooms and installing shower valve access doors as $9,600 and $7,200, respectively.[22]    According to a subsequent note, the defendant opted to "eliminate" the "access door install," among other items.[23]    SHA workers will testify that after the defendant left the apartments, they discovered that the regrouting and access door installation, among other items, was simply not done.    Thus, the defendant added tens of thousands of dollars to his profit simply by not doing the contracted work.

---

[21]    The only changes to the defendant's original contract price actually increased the costs to SHA, and thus the payments to the defendant, from $586,900 to $621,737.

[22]    GX 84 (excerpted), attached hereto as Exhibit P.

[23]    Id.

13

IV.    The Defendant's Pre-1995 Conduct is Relevant and Admissible

The defendant received a broad range of preferential treatment prior to 1995: he was awarded several contracts, including the ADA-504 contract, in spite of his clear conflict of interest; Sotirion directed Baribeau to steer a $157,000 subcontract to the defendant and pay him supervision fees; Sotirion repeatedly drafted (and approved) the defendant's own requests for payment; Sotirion and Asselin permitted the defendant to be paid completely even though he left substantial work unfinished; the defendant was permitted to pay workers, including SHA's own employees, without regard to the required prevailing wage rates; and Sotirion diverted SHA resources to finish the defendant's work without seeking reimbursement from him.

Asselin, Sr. and Sotirion afforded the defendant such valuable preferential treatment for a reason: the defendant had conspired with them to share not only his ADA/504 profit equally, but Baribeau's as well.    Thus, the more money that Asselin, Sr. and Sotirion could save the defendant on this job, the more profit they stood to share.    Similarly, the quicker Asselin, Sr. and Sotirion could enable the defendant to be paid, the faster they would receive their share in kickbacks.

The government will introduce into evidence a folder containing the defendant's handwritten notes, two of which are dated December

14

23, 1994, that were seized from Sotirion's office by the FBI.[24]
These notes make clear why Asselin, Sr. and Sotirion ensured that
the defendant got paid, quickly and in full: the defendant
calculates P.J. Richfield's net profit for the ADA-504 contract
($55,612), and then divides the profit by three ($18,537), which is
"owed to Art & Ray by Pete."  The notes further calculate the "G&R
job net approx." ($28,000) and divide it also by three ($9,333),
which is "owed to Pete, Ray, Art by G&R."  The notes further
indicate other payments, including $4,479 in 1993 and 1994 checks
"due Pete by Art" and $37,051 "owed to Pete by Ray" from the
defendant's resolution of the Bank of Boston debt.  Although the
defendant weakly claims that these notes are "old, confusing" and of
slight probative value, the defendant seeks to exclude this evidence
because it is exactly not: it is instead a virtual blueprint of the
defendant's bribery scheme in 1993 and 1994.

    The defense claims that these are not SHA business records, but
they are admissible under a number of different theories, since they
are not simply SHA business records, but also the statements of a
party, and (since they were endorsed or adopted by Sotirion), the
statement of a co-conspirator in furtherance of the conspiracy.

    Contrary to the defendant's assertion, the government need not
prove that the defendant actually shared his and Baribeau's profit
with Asselin, Sr. and Sotirion.    The government has charged

---

[24]  GX 82 (excerpted), attached hereto as Exhibit Q.

racketeering and bribery conspiracies, and the defendant's notes are powerful evidence of the parties' illicit agreement to split the spoils.    In any event, a jury could reasonably infer that the payments were made, since the defendant (in spite of his poor performance) continued to enjoy SHA business on subsequently awarded contracts through 1998.

The defendant's claim that the pre-1995 evidence is not relevant is simply wrong. This evidence directly proves essential elements of the charged crimes racketeering and bribery conspiracies, commencing in 1988 and 1993, respectively. Of course, the mere fact that the government did not specify this earlier conduct does not bar its admission. See United States v. Connolly, 341 F.3d 16, 26-27 (1st Cir. 2003)(unspecified racketeering acts sufficient to find that Government proved essential elements of a RICO charge); United States v. Anguilo, 847 F.2d 956, 964 (1st Cir. 1988)(commission of overt acts is not required for a RICO conspiracy conviction); United States v. Napolitano, 340 F.2d 313, 314 (1st Cir. 1965)(stating in a conspiracy case, "the failure to specify any particular piece of conduct as an overt act does not prevent proof thereof").

The defendant's claim that this evidence regarding the defendant's contract performance before 1995 somehow relates to the 1996 and 1997 payments is nonsensical and designed solely to mislead the court.    The evidence of the defendant's contract performance

16

from 1990 through 1994 is direct evidence of the existence of the bribery scheme involving the defendant, Asselin, Sr. and Sotirion from 1990 through 1994.[25] Since the evidence relates to a central issue in this case, it is not unfairly prejudicial.

When balancing the probative value and need for evidence against its possible prejudicial effect under Rule 403, the question is always "one of `unfair' prejudice - not of prejudice." United States v. Moreno Morales, 815 F.2d 725, 740 (1st Cir. 1987). "By design, all evidence is meant to be prejudicial; it is only unfair prejudice that must be avoided." United States v. Rodriquez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989). See United States v. Lachman, 48 F.3d 586, 592 (1st Cir. 1995).

"When proffered evidence relates to the central issue in a case, it is a difficult matter indeed to show that the prejudicial effect of that evidence substantially outweighs its highly probative nature, as Rule 403 requires." Rubert Torres v. Hospital San Pablo, Inc., 205 F.3d 472, 479 (1st Cir. 2000). "[T]he more essential the evidence, the greater its probative value, and the less likely a trial court should order the evidence excluded." United States v. King, 713 F.2d 627, 631 (11th Cir. 1983). See also United States v. Cruz-Kuilan, 75 F.3d 59, 61 (1st Cir. 1996)(stating that "it would

---

[25] The government intends to introduce that, as in 1993 and 1994, the defendant was given preferential treatment with a 1996-98 contract in exchange for the specified check payments for Asselin family home improvements in 1996-97.

17

be surpassingly difficult to justify a finding of unfair prejudice" stemming from the introduction of evidence "so tightly linked to guilt as defined by" the offense's elements.). Since this evidence proves an essential element of the charged crimes, the evidence by definition is not unfairly prejudicial.

V.    Government Exhibit 90 is Relevant and Admissible

The defendant seeks to exclude Government Exhibit 90 because, like the earlier evidence, it is direct evidence of the defendant's knowing participation in the racketeering and bribery conspiracies. Several contractors, including Frank Ware, will testify that Asselin, Sr. and Sotirion used the terms "R-factor" and "A-factor" to refer to their bribe payments. Ware will also testify that he typed this document, which concerned a sub-contract that Ware received from the defendant, and that Sotirion wrote all the handwriting on the document is Sotirion's own, including the phrases "Very reasonable // Where's balance // R-Factor" and the phrases "To: Peter From Frank Ware // cc: RAS, RBA // From Faxed to Peter 9/8/97." Other witnesses, including Sotirion's secretaries, will testify that all the handwriting on the document is Sotirion's own. Thus, the document is a direct communication from Sotirion to the defendant concerning a bribe payment for Asselin, Sr.

The defendant cannot dispute that the defendant possessed this document, since the government obtained it from the defendant and since it is addressed directly to him. Nor can the defendant argue

18

that the document is from an irrelevant time frame, since it is dated September 8, 1997 - just fourteen days before the defendant wrote a check to pay for labor to frame Christopher Asselin's house.

All that remains for the defendant is to argue, wanly, that it invites the jury to speculate that he was familiar with the term "R-factor." The defendant confuses speculation with reasonable inference. It is entirely reasonable for the jury to infer that Sotirion would use the term "R-factor" precisely because the defendant understood the term to be a bribe for Raymond Asselin, Sr.. Likewise, the jury could reasonably infer that when the defendant, a mere fourteen days later, wrote a $7,400 check to pay for labor to frame Chris Asselin's home, this payment was an "R-factor" payment. Because the evidence is direct proof of the defendant's participation in the charged conspiracies, it should be admitted.

VI.  Evidence of the Defendant's Davis-Bacon Violations

Is Relevant and Admissible

As noted above, in 1993 and 1994, Asselin, Sr. and Sotirion permitted the defendant to pay SHA workers and other laborers on a low hourly rate or on a per-unit basis. An SHA employee will testify that although Sotirion directed him to scrutinize other contractors' prevailing wage practices, he was not to examine the defendant's. Similarly, a legitimate SHA contractor will testify that, if his company did not have its payroll paperwork in order, he

19

would not expect to receive payment from SHA on its requisitions, even if the work was done.

Several workers, including at least one SHA worker, will testify that the defendant himself paid them at low hourly rates or on a per unit basis, and they will be corroborated by their own invoices to the defendant, which the defendant noted that he had paid.[26]   Finally, the government will introduce evidence that in 1996, the defendant repeatedly falsified payroll wage forms for several of his employees, creating bogus subcontracting companies, fraudulently listing these employees as earning salaries rather than their true hourly and per unit rates, and forging worker signatures. Thus, it is simply false for the defendant to assert, once again now, that his company "never had any hourly workers to which it owed a prevailing wage."[27]

This evidence is relevant and highly probative for numerous reasons.  First, it indicates the defendant's receipt of favorable treatment from SHA, at a time when he was planning to pay, or paying, kickbacks.   Second, it establishes one method that the defendant employed to generate a greater profit, such that he could afford to pay bribes to Asselin, Sr. and Sotirion.   Third, it demonstrates the defendant's willingness to flout HUD requirements, since the Davis-Bacon certifications are listed in the same document

---

[26]   GX 79 (excerpted), attached hereto as Exh. R.

[27]   Motion, at 3.

as the conflict-of-interest and contingent-fee certifications. Fourth, it reflects directly on the defendant's capacity for truthfulness, which will be a central issue concerning the defendant's false statements to the FBI on April 10, 2003, when he denied paying for any Asselin family home improvements.

Nor will this evidence amount to a series of mini-trials, since the defendant's own laborers (corroborated by documents) will testify that they were paid at low hourly rates or on a per unit basis; they dealt directly with, and were paid directly by, the defendant rather than one of his sub-contractors; the defendant never mentioned prevailing wages; and the defendant's payroll forms were fraudulent.

VII. Conclusion

For the foregoing reasons, the Government respectfully asks that the court deny defendant Davis's Motions in Limine No. 7, 9, and 10.

Filed this 6th day of September, 2006.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


/s/ Steven H. Breslow
STEVEN H. BRESLOW
Assistant United States Attorney


/s/ Kevin O'Regan
KEVIN O'REGAN
Assistant United States Attorney

21

CERTIFICATE OF SERVICE

Hampden,   ss.                          Springfield, Massachusetts
                                         September 6, 2006


        I, William M. Welch, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing by mailing said
motion to:

James C. Rehnquist, Esq.
Goodwin Proctor & Hoar
Exchange Place
Boston, MA 02109


                        /s/ Steven H. Breslow
                        STEVEN H. BRESLOW
                        Assistant United States Attorney