UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAYMOND ASSELIN, SR., et al.<br><br>Defendants. | Criminal No. 04-30033-MAP |

## DEFENDANT PETER DAVIS'S RESPONSE TO GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT CERTAIN EVIDENCE

Defendant Peter Davis hereby submits this response to the government's motion *in limine* to admit evidence of (i) a prior "kickback scheme" that the government alleges Mr. Davis engaged in with Joseph Asselin ("Asselin"); (ii) statements by Raymond Asselin, Sr. ("Asselin, Sr.") that the government alleges were made in furtherance of a separate, post-indictment conspiracy to obstruct justice between Mr. Davis and Asselin, Sr, and (iii) evidence of overt acts and racketeering acts not charged in the Indictment.

As to the evidence of an alleged prior "kickback scheme," the Court should not allow such evidence under Fed. R. Evid. 404(b) because, *inter alia*, the evidence — to the extent it demonstrates the commission of a prior crime by Mr. Davis at all — is not probative of the intent element of the crimes charged and as such is merely propensity evidence, and even if somewhat relevant should be excluded for a host of Fed. R. Evid. 403 reasons. As to the evidence of an alleged post-indictment conspiracy to obstruct justice, the Court should not allow such evidence because, *inter alia*, the government cannot demonstrate, by any standard, that the alleged conspiracy actually existed. And finally, as to the evidence of overt acts and racketeering acts not charged in the

Indictment, the Court should not allow such evidence due to its lack of relevance and for the Rule 403 problems it will undoubtedly create.

## Argument

I. **Evidence of the So-Called Prior "Kickback Scheme" Should Not Be Admitted Under Rule 404(b).**

In *United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996), the First Circuit described the two-part test for determining the admissibility of evidence offered pursuant to Rule 404(b):

> First the evidence must overcome the "absolute bar" of Fed. R. Evid. 404(b) by being specially probative of an issue in the case-such as intent or knowledge-without including bad character or propensity as a necessary link in the inferential chain. Probative value "must be considered in light of the remoteness in time of the other act and the degree of resemblance to the crime charged." If the proffered evidence has "special relevance," it is nonetheless inadmissible if its probative value is "substantially outweighed by the danger of," *inter alia,* "unfair prejudice, confusion of the issues, or misleading the jury."

*Id.* (citations omitted). As is demonstrated below, the government's proffered evidence fails both parts of the test, and therefore should not be admitted.

### A. The Proffered Evidence Is Not "Specially Probative" of any Legitimate Rule 404(b) Purpose

The government intends to introduce evidence, solely in the form of testimony from a co-defendant who has elected to cooperate with the government, that in 1990 Mr. Davis was awarded contracts to develop properties by his former business partner Joseph Asselin who was working at a private bank, and that Mr. Davis paid "kickbacks" in exchange for being awarded these contracts. Notably absent from the government's proffer is any indication as to how the bid process occurred for such contracts, or even

2

whether the contracts were awarded pursuant to any bid process. There is not even a contention that Mr. Davis received these alleged contracts improperly, nevertheless illegally. Further, Asselin was not a public official at the time Mr. Davis allegedly received these contracts.

The charges in the Indictment require proof of intent to bribe a public official, through participation in a rigged, blind bidding system for public contracts. Indictment, ¶¶ 1-36; 18 U.S.C. § 201. Given that the evidence proffered by the government (even if taken as completely true) involved merely kickbacks to a private individual for granting development contracts through a process that may have been perfectly proper and lawful, this evidence is not "specially probative" of Mr. Davis's intent to bribe a public official, and therefore is merely propensity evidence forbidden by Rule 404(b).

The government practically concedes this much in its brief. The government argues that evidence of the alleged prior kickback scheme is probative of Mr. Davis's "intent, knowledge, or absence of mistake" because the government expects that Asselin will testify that Mr. Davis made the illegal payments alleged in the Indictment "with the intent to eradicate a debt owed to [Asselin, Sr.], the SHA Director, for commissions or fees that Asselin, Sr. earned by generating work for the defendant." Government's Motion in Limine to Admit Certain Evidence at 14 (hereinafter "Motion"). Putting aside for the moment the improbability of Asselin being permitted to testify as to Mr. Davis's state of mind when making these alleged payments, the intent element that the government must prove at trial is not that the payments were made "with the intent to eradicate a debt owed" to Asselin Sr. for generating work for the defendant, rather, the government must prove that Mr. Davis made the payments with the intent to influence an

official act of a public official.[1]  *See United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404 (1999).  Giving kickbacks to a private individual (perhaps completely lawfully) as a reward for having providing Mr. Davis development work is not probative of Mr. Davis's intent to bribe a public official.[2]  Thus, despite the government's averment that the proffered evidence is "highly probative of the defendant's intent, knowledge, absence of mistake," the government concedes that its only probative value is that it "outlines the defendant's ***willing involvement*** in a remarkably similar kickback scheme."  Motion at 15 (emphasis added).  In short, the evidence is probative because it demonstrates Mr. Davis's "willingness," or propensity, to give kickbacks.  This is precisely the use of such evidence Rule 404(b) is designed to forbid.

The government, without any analysis, provides a string cite to several cases in which courts of appeals have found that the district court did not abuse its discretion in admitting evidence under Rule 404(b).  Motion at 15-16.  However in each of those cases, the evidence admitted by the district court consisted of acts by a defendant that would have been in violation of the ***exact same crime*** for which the defendant was being prosecuted.  *See United States v. Zeuli*, 725 F.2d 813, 816 (1st Cir. 1984) (in trial for extortion of subcontractors on public project by general contractor and state official, evidence admitted that co-defendants were engaged in similar extortionate conduct on different public project); *United States v. Crocker*, 788 F.2d 802, 804 (1st Cir. 1986) (in trial for conspiracy to commit bank theft by cashing counterfeit checks, evidence that co-

---

[1] In fact, the government's proffer of testimony that Mr. Davis made the alleged payments "in order to eradicate debts owed to Asselin, Sr.," is not only not probative of the actual intent element for violation of 18 U.S.C. § 201, but may actually be exculpatory.  *See Sun-Diamond*, 526 U.S. at 404 ("Bribery requires an intent 'to influence' an official act" rather than merely making payments as "a reward . . . for a past act [the official] has already taken.")

4

defendants had earlier been arrested for uttering counterfeit checks); *United States v. Orlando-Figueroa*, 229 F.3d 33, 45 (1st Cir. 2000) (in trial of a public official for soliciting a bribe in exchange for a public contract, evidence that official had previously solicited a bribe in exchange for a different public contract); *United States v. Bruno*, 809 F.2d 1097, 1106 (5th Cir. 1987) (in trial for conspiracy to commit fraud and bribery in violation of § 371, co-defendant testified that defendant had engaged in prior act of bribery); and *United States v. Shields*, 999 F.2d 1090, 1099 (7th Cir. 1993) (in trial for conspiracy to bribe a state judge, evidence admitted that co-conspirator had bribed another state judge in the past). As such, the evidence in these cases was far more probative of the intent element at issue in the case, rather than being merely indicative of propensity to commit bad acts. Further, in several of the cases, the court of appeals' decision to affirm rested at least in part on the fact that defendant affirmatively made intent an issue at trial by resting on it as a defense. *See Orlando-Figueroa*, 229 F.3d at 45 (court initially denied motion to admit 404(b) evidence, but reconsidered and allowed evidence after defendant took the stand and claimed the transaction was innocent); *Bruno*, 809 F.2d at 1106 ("Both parties admit that this evidence was probative of Bruno's intent which Bruno had clearly put in issue."); *Shields*, 999 F.2d at 1099-1100 (evidence admissible because defendant's defense turned on intent of bribing party). And, of course, none of these cases involved the careful weighing of probative value versus the various Rule 403 factors required in deciding whether to admit such evidence in the first instance, rather, they simply involved a deferential finding by the court of appeals that the admission of the evidence was not an abuse of discretion.

---

2   This point is equally true for the charged RICO counts, as the racketeering acts that form the basis of the RICO charges against Mr. Davis involve the alleged violation of § 201.

5

There is simply no merit to the government's assertion that the proffered evidence is necessary to demonstrate the "development of the illegal relationships" or to understand the basis for "mutual trust" between Mr. Davis and Asselin. Putting aside the fact that the government has not even alleged that the prior "scheme" was illegal, and even if it was that it did not involve the same illegal conduct charged in the Indictment, there is simply no "illegal relationship between Joseph Asselin and Mr. Davis" charged in the Indictment. First, Asselin is not charged in either of the RICO counts. Indictment, ¶ 36, 56. Second, while Asselin is charged in the § 201 conspiracy, it is only as a distant "spoke" in the proverbial "wheel" conspiracy alleged in the Indictment. In fact, according to the Indictment, the entire extent of Mr. Davis's "relationship" with Asselin is that Mr. Davis paid for work done at Asselin's home *at the request of* Asselin, Sr. Motion at 9. Information provided by the government through discovery demonstrates that Asselin has stated that he never received any payment directly from Mr. Davis for work done at his home, rather the payment always went through Asselin, Sr.[3] *See* Excerpt of 302 Interview of Joseph Asselin (attached as Exhibit A). There is no indication, from the Indictment or the government's proffer, that Mr. Davis even spoke to Asselin during the entire time of the conspiracy charged in the Indictment. Thus, whether Mr. Davis was involved in an entirely separate "kickback scheme" with Asselin sheds no light on any fact, or any illegal relationship, at issue in the charged crimes.

Further, the government has ample evidence to show the relationship between Mr. Davis and the co-conspirators charged in the Indictment, including Asselin and Asselin,

---

[3] In fact, Mr. Davis's alleged payment for work done at Asselin's home only becomes illegal if the government can prove that the payment was made pursuant to an offer or promise from Mr. Davis to Asselin, Sr.

6

Sr. Asselin and Mr. Davis were prior business partners, and in fact Mr. Davis's business, P.J. Richfield, was started by the two of them initially. Motion at 6. The government has proffered evidence that Mr. Davis and Asselin, Sr. were friends, as part of a social group know as the "breakfast club." Motion at 6. Thus, unlike *United States v. Escobar-De Jesus*, 187 F.3d 148 (1st Cir. 1999), relied upon by the government, this is not a situation where, absent introducing evidence of prior illegal conduct, the jury will not understand the relationship between the co-conspirators. *Id.* at 169 (district court allowed limited evidence of prior bad acts to explain how the parties knew each other). *United States v. Devin*, 918 F.2d 280 (1st Cir. 1990), is also inapposite. *Devin* involved allegations that a corrupt police officer had been unlawfully providing services to a business owner in exchange for bribes. The district court admitted evidence that his behavior was in direct violation of Boston Police Department codes of conduct in order to counter the defendant's assertion that the payments were legitimate gifts for honest services rendered. *Id.* at 287. The court held that evidence of the Department's code of conduct helped the jury understand the "setting in which the charged racketeering and extortion took place." *Id.* There is simply no argument that introducing evidence of Mr. Davis's interaction with Asselin at Suffield Bank sheds any light on the "setting" in which the charges in the Indictment took place.

For similar reasons, the proffered evidence is not necessary in order to explain the "mutual trust" between Asselin and Mr. Davis. Once again, the case relied upon by the government for this proposition, *United States v. Brennan*, 788 F.2d 561 (2d Cir. 1986), is completely inapposite. There, the only relationship between the co-conspirators was through their repeated criminal activity. Thus, evidence of their prior criminal activity

7

was necessary to understand how they came to know each other, the nature of their relationship, and the setting in which the crimes charged in the Indictment occurred. *Id.* at 590. Here, as explained above, the government has ample evidence to demonstrate to the jury how Asselin and Mr. Davis knew each other, and thus why they might trust each other. Furthermore, the relationship between Mr. Davis and Asselin with respect to the charges in the Indictment is tenuous and immaterial at best, thus depriving the evidence of any probative value for any purposes other than demonstrating propensity.

### B.     The Proffered Evidence Should Be Excluded Under Rule 403.

Even if evidence of the alleged prior "kickback scheme" between Asselin and Mr. Davis is slightly probative, such probative value is vastly outweighed by a variety of Rule 403 factors, including waste of time, unnecessary presentation of cumulative evidence, and confusion of the issues.

#### 1.     Waste of Time

Introducing the proffered evidence, which is marginally probative at best, would result in a waste of time as a mini-trial would undoubtedly ensue concerning the circumstances of this alleged "kickback scheme." To begin, should the Court rule this evidence admissible, Mr. Davis might well be forced to seek a continuance in order to obtain discovery concerning these alleged development deals with Suffield Bank. At trial there would need to be extensive evidence of, *inter alia*, Asselin's role at the bank, the process for bidding on and awarding these development contracts, paperwork surrounding the alleged award of contracts to Mr. Davis, etc. The First Circuit has upheld the exclusion of evidence of prior bad acts that, if they occurred, were clearly illegal, when the occurrence of those acts was contested and would require a mini-trial to

8

determine the veracity of the evidence. *See United States v. Gilbert*, 229 F.3d 15, 22 (1st Cir. 2000). Here, not only would a mini-trial be required to show whether the kickback scheme existed, but here there would be even further waste of time in order to determine: i) whether the alleged acts were even unlawful, ii) if so, what laws did they violate, and iii) to explain to the jury the differences between the elements of those purported crimes and those charged in the Indictment. Given the low probative value of the proffered evidence, when weighed against the waste of time and confusion of the issues that would result from having to litigate the proffered evidence, the Court should disallow the testimony of Asselin as to any prior "kickback scheme."

### 2. Needless Presentation of Cumulative Evidence

The First Circuit has held that where evidence is not necessary to accomplish the legitimate Rule 404(b) purpose for which it is offered, its probative value is lower and thus Rule 403 counsels against its admission. *See United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000) ("Under Rule 403, however, that risk of an improper criminal propensity inference should be considered in light of the totality of the circumstances, including the government's need for the evidence given other available testimony, to prove the issue identified pursuant to the 404(b) special relevance analysis."). The *Varoudakis* court held that the district court abused its discretion in admitting prior bad act evidence when the government had ample evidence to demonstrate the point for which the Rule 404(b) evidence was offered. *Id.* at 123-24. The situation here is almost identical to that in *Varoudakis*. The government has ample evidence of the relationship between the co-conspirators, including the relationship between Asselin and Mr. Davis, and Asselin, Sr and Mr. Davis. More generally, the government has stated its intention to

spend four weeks presenting its case in chief, using hundreds of exhibits and more than 30 witnesses. This is simply not a case in which the government can demonstrate that it has a "strong need" for this evidence. *Gilbert*, 229 F.3d at 26. Given this, much of the beneficial effect to the government of the proffered evidence is simply that it shows Mr. Davis's propensity to commit what it will characterize as bad acts, which is impermissibly prejudicial under Rule 404(b).

### 3. Confusion of the Issues

Needless to say, both factually and legally this is a complicated case. The jury will have to be instructed on the complex elements of RICO and RICO conspiracy, including the pattern and continuity requirements, as well as the quid pro quo intent requirement for bribery of a public official. *See Sun-Diamond*, 526 U.S. at 404. These will be difficult enough for the jury to understand without, in addition, the requisite explanation to the jury of the differences between elements of the charged crimes and elements of the crime, if any, alleged by the government to have occurred in earlier scheme. Further, given the extensive litigation that would likely ensue surrounding the earlier alleged kickback scheme, even with a limiting instruction there is a real risk that the jury will confuse the issues and consider this evidence for improper purposes. *Gilbert*, 229 F.3d at 26.

Given the low value of the proffered evidence as it relates to any permissible Rule 404(b) purposes, and the fact that each of the Rule 403 factors counsels strongly against admission, the Court should deny the government's motion.

## II.  Evidence of the Alleged Post-Indictment Conspiracy Should Not Be Admitted.

The government also seeks to introduce evidence, under Rule 801(d)(2)(E), of statements made by Asselin, Sr. to Asselin, that it contends were in furtherance of a separate, post-Indictment conspiracy to obstruct justice between Asselin, Sr. and Mr. Davis. This argument fails, both factually and legally, on multiple fronts. First, the proffered statement, even as described by the government, does not demonstrate any conspiracy involving Mr. Davis. Motion at 9-10. According to the government's proffer, Asselin, Sr. told Asselin that Mr. Davis "had planned to say that the home construction payments were a return of P.J.'s profits from their earlier real estate dealings." Motion at 9-10. Notably absent from this statement is any indication that Mr. Davis actually told this to Asselin, Sr., or that the Davis and Asselin, Sr. ever had any post-Indictment conversation at all.[4] Even if it were inferable from the testimony that a conversation between Davis and Asselin, Sr. occurred, there is no indication as to <u>when</u> such conversation occurred. There is no evidence from the statement that there was any agreement by Mr. Davis to conspire in any way. At most, the conversation that ensued is evidence of a conspiracy between Asselin, Sr. and Asselin, which would not be admissible against Mr. Davis.

But even if these statements could somehow be construed as evidence of a conspiracy between Mr. Davis and Asselin, Sr., in order for them to be admissible pursuant to Rule 801(d)(2)(E), the government must demonstrate by a preponderance of the evidence, by pointing to evidence *other than the statements themselves*, that the

---

[4] In fact, counsel for Mr. Davis is concerned that Asselin, Sr.'s statement may be based upon misinterpreted conversations with his counsel, as a result of information learned in the context of the parties' joint defense agreement. If true, Asselin has breached in sharing this information with the government. Should the Court deem this statement admissible, Mr. Davis would be required to fully litigate this question at trial, providing independent Rule 403 reasons against the statement's admissibility.

alleged post-Indictment conspiracy existed. *See United States v. Sepulveda*, 15 F.3d 1161, 1182 (1st Cir. 1993) (holding that the district court improperly admitted evidence under Rule 801(d)(2)(E) because there was no "extrinsic proof" of defendant's involvement in the conspiracy).  In fact, the government has no extrinsic evidence of this purported post-Indictment conspiracy.  The government does not even have evidence of any contact or conversation between Mr. Davis and Asselin, Sr. post-Indictment, nevertheless evidence that they conspired to obstruct justice.

In attempting to overcome the "extrinsic proof" hurdle, which it concedes is a requirement for admission of any statements pursuant to Rule 810(d)(2)(E), Motion at 20, the government relies exclusively on the Indictment's charge against Asselin, Sr. (through, *inter alia*, counseling a witness to testify falsely before the grand jury in August and September 2002) and Mr. Davis (through making false statements to an investigating agent in April 2003) of separate and distinct racketeering acts of obstruction of justice, the latest of which occurred well over a year prior to the return of the Indictment.  This argument is absurd.  That Mr. Davis allegedly made a false statement to an investigating agent in April 2003, and that Asselin, Sr. committed sundry and unrelated acts of obstruction in August-September 2002, simply is not extrinsic evidence of the alleged post-Indictment conspiracy between the two men, nevertheless sufficient evidence to demonstrate the existence of such a conspiracy by a preponderance of the evidence.  For this reason alone, the proffered statements are not admissible pursuant to Rule 801(d)(2)(E).

Even if the government could somehow overcome the above hurdles, its argument that Rule 801(d)(2)(E) authorizes the admission of statements in furtherance of a

12

completely separate and distinct post-Indictment conspiracy is simply incorrect. The government is correct that courts have allowed for statements in furtherance of a conspiracy not charged in the Indictment to be admitted under Rule 801(d)(2)(E). But the Rule does not provide the government carte blanche to admit statements in furtherance of any conspiracy, rather most courts have held that only statements in furtherance of a conspiracy that is "factually intertwined" with the offenses charged in the Indictment can be admitted under the Rule. *See United States v. Ellis*, 156 F.3d 493, 497 (3d Cir. 1998). Contrary to the government's contention, "factually intertwined" does not mean "related," as a post-Indictment conspiracy to thwart the prosecution of the crimes is "related" to the conspiracy charged in the Indictment. *Ellis*, relied upon by the government, is a good example. There the Third Circuit upheld the admission of a statement in furtherance of a conspiracy by the defendant to use his business to launder the proceeds of illegal video poker machines, in the defendant's trial for conspiracy to use that same business to launder illegal drug proceeds.[5] *Id.* These conspiracies were "factually intertwined" in that they involved the exact same criminal activity conducted in the exact same manner, the only difference being the source of the laundered money. In contrast, the purported post-Indictment conspiracy to "cover up" the crimes charged in the Indictment involves completely different criminal conduct committed in a completely different manner than the conspiracies charged in the Indictment. Indeed, as the *Ellis* court held, the "factually intertwined" requirement is aimed at ensuring that evidence of a statement in furtherance of a different conspiracy is relevant to prove the crimes for

---

[5] In fact, the *Ellis* court upheld the introduction of the statements on the ground that they were in furtherance of the conspiracy actually charged in the Indictment. *Id.* at 496. It merely held in the alternative that, even if the defendant's argument that there were two separate conspiracies was

13

which the defendant is being tried. *Id.* The government has not even attempted to argue how Asselin Sr.'s statements to Asselin are relevant to proving the elements of the crimes charged against Mr. Davis in the Indictment.

As there is no basis, factually or legally, for the admission of the proffered post-Indictment statements, the Court should deny the government's motion *in limine*.

### III.    Evidence of Conduct Unspecified in the Indictment Should Not Be Admitted.

Through its Motion, the government affirmatively seeks to introduce evidence that is problematic for precisely the reasons explained in Mr. Davis's previous motions *in limine*.[6] The government states explicitly that, "[i]n addition to the acts specified in the Superseding Indictment, the government intends to introduce in its case-in-chief that the defendant participated in a *broad range of other conduct* that furthered the charged racketeering and bribery conspiracies." Motion at 3-4 (emphasis added). As an example (only) of this broad range of conduct, the government states that it seeks to admit evidence that, "in 1993, Asselin, Sr. and Sotirion awarded the defendant a valuable SHA contract (the ADA/504 contracts), permitted the defendant to pad that contract and

---

correct, the statement still would have been admissible under Rule 801(d)(2)(E) as the conspiracies were factually intertwined. *Id.* at 497.

[6]   Mr. Davis previously alerted the Court that the government intends to introduce evidence concerning pre-1995, uncharged conduct that is far afield of the specific acts charged in the Indictment and carries little or no probative value in comparison to the juror confusion, wasted time, and unfair prejudice it would cause. Thus, in his Motion *in Limine* No. 9, Mr. Davis explained that evidence of P.J. Richfield performance on SHA contracts prior to 1995, in particular the ADA/504 projects, is largely irrelevant to the acts of bribery alleged in the Indictment because the government apparently has no evidence of any improper payment by Mr. Davis prior to September 30, 1996, and therefore cannot prove a bribe during this timeframe—that is, a *quid pro quo* relationship between a thing of value given by Mr. Davis in exchange for official action by Ray Asselin, Sr. or Arthur Sotirion. And in his Motion *in Limine* No. 4, Mr. Davis explained that evidence of allegedly substandard or incomplete work on SHA contracts by P.J. Richfield—much of it involving P.J. Richfield performance on SHA contracts prior to 1995—threatened to transform this bribery case into a series of mini-trials, each in the nature of construction litigation, with fact-intensive disputes over cost overruns, construction standards, punch lists, change orders, and the like. Finally, in his Motion *in*

14

extract profits by a variety of improper means, and gave him other preferential treatment, all in exchange for receiving as a kickback an equal share of profits from the defendant's contract." *Id.* at 4. The government's witnesses are expected to testify about a number of piddling issues related to P.J. Richfield's pre-1995 contract performance:

> According to the project's architect, the project's general manager, other witnesses, and a variety of documents, the defendant's performance on the ADA/504 contract was poor, non-responsive, and incomplete, resulting in problems that require remediation even to this day. In addition, Asselin and Sotirion permitted the defendant to use SHA materials, equipment, and employees to perform certain aspects of the contract, even though the defendant never reimbursed SHA for these resources. Further, the defendant paid workers in cash for less than the prevailing wage,[7] and substituted inferior materials for specified materials. Both the architect and the general manager complained to Asselin, Sr. and Sotirion about various aspects of the defendant's performance, but the SHA directors took no corrective action.

*Id.* at 4-5.

Notwithstanding the above, from a brief filed less than two weeks ago, the government has taken the position in Court that it intends to rely only on more-or-less obvious non-completions of P.J. Richfield contracts, purporting to eliminate issues arising out of undisclosed expert testimony. *See also* Government's Response to Defendant Davis's Motion in Limine No. 4 at 9 ("[T]he evidence presented by the Government will not involve whether or not defendant Davis was a competent or incompetent contractor. Instead, the Government's evidence will focus on the fact that

---

*Limine* No. 5, Mr. Davis pointed out that most if not all of this substandard-performance evidence is necessarily the subject of expert testimony, which has not been disclosed.

[7] Mr. Davis has also moved *in limine* to exclude evidence of wage and payroll issues because of the waste of time its admission would entail in comparison to its marginal probative value. *See* Motion *in Limine* No. 7.

15

defendant Davis simply did not complete his contracts with SHA."). But even if the government does follow through on its promise to limit this evidence, avoiding any reliance on expert testimony, the risk of serial mini-trials and confusion of the issues remains, given the government's announced intention to rely on a "broad range of other conduct" and the expansive nature of the "preferential treatment" the government seeks to demonstrate. Indeed because of the breadth of the government's case-in-chief, as judged by its exhibit list, Mr. Davis has been forced to seek voluminous pretrial disclosures from non-parties pursuant to Fed. R. Crim. P. 17(c).[8]

In any event, a serious issue nonetheless remains about the relevance of evidence from the pre-1995 timeframe. Crucially, Mr. Davis is not charged with any specified predicate crimes prior to 1996, and evidence concerning the 1993-94 ADA/504 projects bears little or no logical relation to those specified crimes with which Mr. Davis is charged. The Indictment lists 13 predicate racketeering acts allegedly committed by Mr. Davis, also charged as overt acts in furtherance of the bribery conspiracy—namely, 13 bribes alleged to have been made between September 1996 and December 1997. Indictment ¶ 40. There is simply no possible link between any preferential treatment Mr. Davis received in 1993-94 and the payments alleged in the Indictment to have been made two to three years later, yet the government cannot prove bribery without establishing a link between a thing of value given and an official act. *See Sun-Diamond*, 526 U.S. at 414; *Scaccia v. State Ethics Comm'n*, 431 Mass. 351, 355 (2000).

---

[8] Mr. Davis remains highly skeptical that the government intends to so limit its evidence, judging by the numerous documents on its exhibit list that relate to performance issues, *see* Motion *in Limine* No. 5 at 3-4, and statements in its recently filed submissions such as those set forth above describing Mr. Davis's "poor" performance on the ADA/504 contract, which resulted in "problems that require remediation even to this day." Government's Motion at 4-5.

16

The government points to allegations in the Indictment that the racketeering conspiracy began in 1988, and the bribery conspiracy in 1993, but mischaracterizes the Indictment by stating that Mr. Davis is charged with *participating* in those conspiracies as of those dates. *See* Motion at 11. The earliest specific reference to Mr. Davis in the Indictment is a payment allegedly made in September 1996. *See* Indictment ¶ 40. Indeed, of the Indictment's 156 alleged racketeering acts of bribery against all defendants, only *one*—the provision of free carpet by John Spano "in or about 1993," Act 114—is alleged to have occurred before 1996.[9] *See* Indictment ¶ 41.

The government tries to establish the relevance of the pre-1995 conduct Mr. Davis seeks to exclude by vague references to two acts that are not specified in the Indictment: (1) an alleged kickback arrangement in connection with the ADA/504 projects and (2) Mr. Davis's alleged assumption of P.J. Richfield debt in 1990. *See* Government's Motion at 3-5; Government's Response to Defendant Davis's Motion in Limine No. 4 at 3; Government's Response to Defendant Davis's Brady Motion at 9. But neither of these uncharged acts bears any significant relation to the specified conduct alleged against Mr. Davis in the Indictment.

With respect to the alleged kickback arrangement on the 1993-94 ADA/504 project, it does not appear that the government intends, or is able, to prove that Mr. Davis actually made any improper payment prior to September 30, 1996. The government relies on a cluster of confusing documents including cryptic notes claimed to reference an alleged three-way division of Mr. Davis's profit on the ADA/504 project next to the

---

[9] Indeed, the earliest racketeering act of any type specified in the Indictment is from 1991—raising a substantial question about the grand jury's basis for charging that the racketeering activity began in 1988.

17

phrase "Owed to Art and Ray by Pete," allegedly in Mr. Davis's handwriting. But these messy, confusing documents, without more, do not support the inference that Mr. Davis actually made any payment to Asselin, Sr. or Arthur Sotirion in connection with the ADA/504 project. Without evidence of payment, any evidence of a kickback arrangement on the 1993-94 ADA/504 project is of limited probative value in light of the bribery statute's required link between a thing of value given and an official act.

The government also apparently seeks to introduce evidence that, in 1990, Mr. Davis agreed to assume the fifty percent share of a bank loan owed jointly by Asselin and Mr. Davis, as the original principals of P.J. Richfield. *See* Government's Response to Defendant Davis's Motion in Limine No. 4 at 3; Government's Response to Defendant Davis's Brady Motion at 9. According to the government, Asselin, Sr. also had a $20,000 investment in P.J. Richfield at that time, which raised "clear conflicts of interest" regarding Mr. Davis's obtaining work from the SHA. *Id.* But, as with the ADA/504 projects, the Indictment is silent on any 1990 assumption of debt, and the government's Bill of Particulars never mentioned that obtaining contracts despite a "conflict of interest" was a benefit received by Mr. Davis. Moreover, whether or not Mr. Davis's involvement with SHA under these circumstances was a conflict of interest in the colloquial sense is largely irrelevant; the government does not say that any pertinent statute or regulation prevented him from seeking contracts with the SHA, and the only "conflicts"-related document of which Mr. Davis is aware—the non-collusion affidavit submitted with each bid—does not specifically address such "conflicts of interest." *See* Non Collusive Affidavit (attached as Exhibit B).

The government also contends that evidence of this uncharged conduct is admissible to prove the charged RICO and bribery conspiracies. *See* Government's Motion at 11. The government relies on the First Circuit's decision in *United States v. Connolly* for the proposition that, "[a]lthough the Superseding Indictment specifies the thirteen checks written by the defendant to pay for Asselin's home construction as racketeering acts and overt acts, the government can offer evidence about other alleged uncharged acts central to these conspiracies such as the preferential treatment and profit sharing related to the ADA/504 Contracts." *Id.* (citing 341 F.3d 16, 26-27 (1st Cir. 2003)). *Connolly* does not hold that the government can prove uncharged predicate acts to establish a pattern of racketeering, however. That case simply involved whether evidence other than predicate acts specified in the indictment could be used to prove the ongoing nature of an association-in-fact enterprise—which is a subsidiary issue unlike the critical issue of which predicate crimes Mr. Davis could be held accountable. *See Connolly*, 341 F.3d at 26-27.

In sum, the government is creating a situation here where the tail is wagging the proverbial dog. Throughout the pre-trial period, the government balked at providing Mr. Davis with particulars and has consistently represented, in opposing Mr. Davis's attempt to obtain particulars, that the Indictment is detailed a road map to the automatic discovery. *See* Government's Response to Defendant Davis' Motion for a Bill of Particulars and To Compel Discovery at 2 (describing the Indictment as "very specific and detailed"); Government's Appeal of Order Granting Defendant Davis' Renewed Motion for a Bill of Particulars at 2 (same). Having taken that position, the government

19

should not be allowed now to require Mr. Davis to defend a trial in which a substantial portion of the government's proof relates to conduct never mentioned in the Indictment.

## CONCLUSION

For the reasons stated above, the Court should deny the government's Motion *In Limine* to Admit Certain Evidence.

Respectfully submitted,

PETER DAVIS

By his attorneys,

**/s/ James C. Rehnquist**
James C. Rehnquist (BBO # 552602)
Kathleen Luz (BBO # 643278)
William J. Trach (BBO #661401)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated:  September 6, 2006

## CERTIFICATE OF SERVICE

I, James C. Rehnquist, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants, on September 6, 2006.

 **/s/ James C. Rehnquist**
James C. Rehnquist

LIBA/1726524.1