UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAYMOND ASSELIN, SR., et al.<br><br>Defendants. | Criminal No. 04-30033-MAP |

### DEFENDANT PETER DAVIS'S REPLY MEMORANDUM IN FURTHER SUPPORT OF HIS MOTION *IN LIMINE* NO. 7

Defendant Peter Davis hereby submits this reply memorandum in further support of his Motion *in Limine* No. 7 Re: Evidence of "Wage Compliance." Although the government insists that the evidence it intends to submit concerning P.J. Richfield's "wage compliance" is simple and will not raise Rule 403 concerns of the non-prejudice variety, the government's own exhibits—when read together with the statutory provisions and regulations they incorporate—reveal that the government grossly understates the matter's complexity. This is especially true given that any lack of "wage compliance" by Mr. Davis is only relevant at all to the extent that it can be demonstrated that he was given "preferential treatment."[1] Given the real possibility that this evidence will distract or confuse the jury and, as this Court has acknowledged, unfairly prejudice Mr. Davis, it should be excluded.

---

[1] The issue of wage compliance is not mentioned in the Indictment, and was first mentioned in response to Judge Neiman's order that the government provide a bill of particulars as to any "benefits" Mr. Davis may have received. *See* Letter from AUSA William M. Welch II to James C. Rehnquist, Esq. of September 19, 2005 (Docket #189) at 2 ("Regarding actions taken by SHA as a result of the defendant having given, offered, and/or provided something of value, those actions consisted of … causing more lenient enforcement of site inspections and wage compliance for P.J. Richfield, Inc.").

**I.     Evidence concerning prevailing-wage issues is not as simple as the government advertises.**

The government is simply wrong when it claims that Mr. Davis's so-called wage compliance—his alleged non-adherence to the prevailing-wage requirements of the Davis-Bacon Act—will be simple to prove. The government intends to offer evidence purportedly showing that Ray Asselin, Sr. and/or Arthur Sotirion caused more lenient enforcement of prevailing-wage requirements on P.J. Richfield contracts than those of other contractors. The government maintains that it will be able to prove Mr. Davis's lack of compliance by admitting just a few documents—particularly the contract documents, which, according to the government, clearly delineate Mr. Davis's responsibilities on each project.

In reality, this Court need look no further than the contract documents to see that the prevailing-wage issue is nowhere as simple as the government represents. Attached as Exhibit A is HUD form 5370, entitled "General Conditions of the Contract for Construction." This 18-page document was part of the bid package for the ADA/504 project; a substantially similar form would be included in the bid package for other SHA projects.[2] The relevant portion of the form is paragraph 47, where HUD sets forth almost three pages of fine-print requirements relating to prevailing-wage issues. Ex. A at 13-16. It states the basic rule that prevailing wages must be paid to "laborers and mechanics employed or working upon the site of the work," *id.* at 13, and then goes on at length to explain various refinements to the rule, cross-referencing federal statutory provisions, regulations, and wage determinations made by the Secretary of Labor, *see id.* at 13-14.

---

[2]     The government only added the ADA/504 contract documents to its exhibit list two days ago. Mr. Davis uses the ADA/504 contract as an example only; it is not at all clear that the government intends to limit its evidence of wage compliance to that project.

Payroll and record-keeping requirements are set forth in subparagraph (c), again cross-referencing various statutory provisions and federal regulations. *Id.* at 14-15.

Even the wage classifications do not speak for themselves. Attached as Exhibit B are the so-called Special Conditions for the ADA/504 project. That document appends a schedule of wage-rate determinations by the Secretary of Labor for various job classifications. To learn the prevailing wage on the ADA/504 project for any given individual, one would first have to figure out his job classification. Was he a carpenter ($18.63), a plasterer ($20.25), or simply a "laborer" ($15.25)? *See id*. at 2, 3, 12. It is doubtful that the government could demonstrate the prevailing wage for a particular individual at a particular point in time without some form of expert testimony and/or instruction from the Court.

Nor is it clear that Ray Asselin, Sr. and/or Arthur Sotirion were in any way responsible for contractors' compliance with prevailing-wage requirements in the hands-on sense. In fact, Deborah Barton, SHA Account Supervisor and Data Processing Manager, testified before the grand jury that Asselin and Sotirion did not monitor whether contractors were actually being paid the prevailing wage. When Ms. Barton was asked whether Sotirion went out in the field and actually interviewed employees to make sure they were receiving the prevailing wage, she replied, "No." Grand Jury Testimony of Deborah Barton (attached as Exhibit C) at 53-54.

**II.    Numerous issues will still need to be resolved, even if the contract documents are simple.**

Even if it were simple to determine the prevailing wage for a particular individual on a particular project, there are a number of issues that will need to be resolved requiring the testimony of witnesses and instruction from the Court.

3

In each instance where the government claims that Mr. Davis failed to abide by prevailing-wage requirements, the jury will need to hear both what Mr. Davis did and what he was supposed to do. The government appears to have two different theories of how Mr. Davis circumvented prevailing-wage law. The government seems to suggest that on certain projects Mr. Davis used subcontractors who were less than diligent about complying with prevailing-wage law with respect to *their* employees. But whether Mr. Davis had a duty to monitor the wage compliance of his subcontractors is an issue that would need to be litigated. Indeed, one of the subcontractors who is expected to testify on wage issues, Nektar Papoutsakis, clearly understood that it was his responsibility to fill out wage forms for his employees—to the point that Arthur Sotirion warned him that he (Papoutsakis) would "go to jail" if he failed to turn them in. Grand Jury Testimony of Nektar Papoutsakis (attached as Exhibit D) at 35-37.

The government seems to claim, however, that on other projects Mr. Davis *himself* had employees to whom he owed a prevailing wage. More specifically, the government asserts that individuals whom Mr. Davis used as subcontractors in fact were entitled to be paid a prevailing wage. Response at 20. Proof of these allegations will be time consuming: the government plans to call "[s]everal workers, including at least one SHA worker," to testify on this subject alone. *Id.* And Mr. Davis will of course be required to litigate whether his use of subcontractors to perform this work was somehow improper.[3] But even if these individuals were governed by prevailing-wage law, a determination would have to be made as to each individual, for each project, as to their

---

[3] Two witnesses on the government's list, Jim Davis and Kevin Maroney, testified before the grand jury that Mr. Davis provided them with IRS Form 1099s for the work they performed as subcontractors. *See* Grand Jury Testimony of Demetrius Davis (attached as Exhibit E) at 24; Jury Testimony of Kevin Maroney (attached as Exhibit F) at 5.

4

job classification and thus the prevailing wage—not a straightforward task, as described above.

Also central to the government's theory is the allegation that SHA's enforcement of wage compliance was "more lenient" for PJR than for other general contractors. The government plans to show this relative leniency to establish a benefit Pete received in exchange for the things of value he provided. But this theory holds water only if the government can prove how Ray Asselin, Sr. and Arthur Sotirion treated other contractors. Such a comparison necessarily calls for additional testimony—at the price of additional trial time. Indeed, the government acknowledges that it intends to elicit testimony from at least two witnesses, an SHA employee and a "legitimate SHA contractor," on this subject. Response at 19-20.

Moreover, all of this prevailing-wage evidence is meaningless if Ray Asselin, Sr. and Arthur Sotirion had no duty to monitor the wage compliance of SHA contractors and subcontractors. Asselin's and Sotirion's duty in this regard will have to be fully understood to determine whether the alleged leniency with which they treated Mr. Davis is the type of conduct that qualifies as an "official act" or "lawful duty" under the bribery statute, a significant and potentially difficult legal question. *See* 18 U.S.C. §§ 201(b)(1)(A) and (C); *see also United States v. Valdes*, 437 F.3d 1276, 1281-82 (D.C. Cir. 2006) (concluding that a detective's use of police databases to retrieve non-public information was not an "official act" within the meaning of 18 U.S.C. § 201), *rehearing en banc granted and judgment vacated*.

### III. The government overstates its evidence of "wage compliance."

Finally, the government simply exaggerates the simplicity and clarity of its factual evidence. For example, in its Response, the government claims that, "[i]n addition to the HUD certifications specified above, the defendant also certified that he would abide by the prevailing wage requirements of the Davis-Bacon Act (Certification No. 9)." Response at 12 n.18. But paragraph 9 of the document to which the government refers, the Representations, Certifications, and Other Statements of Bidders (part of Government's Exhibit B), is not the broad certification of compliance with the Davis-Bacon Act that the government represents. Through that paragraph, Mr. Davis merely certified that neither P.J. Richfield nor any of P.J. Richfield's subcontractors was on the debarment list generated by the Comptroller General. *See* 40 U.S.C. § 3144; 29 C.F.R. § 5.12(a)(1).

As another example, the government claims that "[a]n SHA employee will testify that although Sotirion directed him to scrutinize other contractors' prevailing wage practices, he was not to examine" Mr. Davis's. Government's Response at 19. Presumably, the government is referring to the proposed testimony of Wallace Kisiel, the working foreman/modernization coordinator of the SHA, but Mr. Kisiel is nowhere near that clear or unequivocal in his testimony. When he appeared before the grand jury, Mr. Kisiel was asked directly: "Did you ever get the sense that Mr. Sotirion or Raymond Asselin, Sr. were, or was more lenient with Mr. Davis on other issues; such as, wage rate issues, versus other contractors, who did not fit in that same category as a favored contractor if you will?" Grand Jury Testimony of Wallace G. Kisiel (attached as Exhibit G) at 15-16. Mr. Kisiel responded that there was another contractor who didn't "play his

6

game" and with respect to whom Mr. Sotirion told him to "'keep an eye on because they don't play the game,'" *id.* at 16, but Mr. Kisiel never explicitly stated that Mr. Davis received preferential treatment concerning wage compliance specifically, *see id.* at 15-. Further, Mr. Kisiel was asked even more directly: "Do you know of contractors who did not pay prevailing wages?" *Id.* at 37. Rather than responding emphatically that he knew Mr. Davis was not paying prevailing wages—Mr. Kisiel *never* explicitly stated so—Mr. Kisiel launched into a convoluted discussion of the difficulties of interviewing workers on the job. *See id* at 37-38. These passages raises serious doubts about whether Mr. Kisiel will actually describe the relative leniency the government seeks to prove.

## **Conclusion**

For the foregoing reasons and those set forth in his opening memorandum, Mr. Davis respectfully requests that the Court grant his Motion *In Limine* No. 7.

Respectfully submitted,

PETER DAVIS

By his attorneys,

 /s/ **James C. Rehnquist**
James C. Rehnquist (BBO # 552602)
Kathleen Luz (BBO # 643278)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated:  September 13, 2006

**CERTIFICATE OF SERVICE**

  I, James C. Rehnquist, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants, on September 13, 2006.

               /s/ James C. Rehnquist
                James C. Rehnquist

LIBA/1729073.1