UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAYMOND ASSELIN, SR., et al.<br><br>Defendants. | Criminal No. 04-30033-MAP |

**DEFENDANT'S REPLY BRIEF IN FURTHER SUPPORT
OF HIS MOTION IN LIMINE NO. 9 RE: PRE-1995 CONTRACTS**

Defendant Peter Davis submits this reply in further support of his Motion in Limine No. 9 Re: Pre-1995 Contracts. The government contends that the evidence it intends to offer of Mr. Davis's pre-1995 contract performance is "incriminating" as to the two conspiracies charged in the Indictment, and also contends that the evidence can be presented in such a way that serial mini-trials about construction minutiae can be avoided. The government is wrong on both scores. Its proffered evidence on these ancient contracts is of marginal, if any probative value, and reveals the government's intention to turn this purported bribery trial into a series of detours about mold, rust, footings, parking place stripes, and plywood thickness.

    **1.    The Government's Allegation of Defendant's Conflict of Interest Is Meritless.**

In its Response, the government focuses on two contracts Mr. Davis's company P.J. Richfield received in 1993: one for the Christopher Court Parking and Storage Garage ("Chris Court Garage") and one for the ADA/504 project ("ADA"). The government suggests that these contracts were somehow improperly awarded to the defendant because he had a "conflict of interest" due to his former business relationship with Joseph Asselin, the son of SHA Executive Director Raymond Asselin, Sr. Response at 4, 6, 7, 8. The government's conflict argument is

specious for several reasons. First, it is undisputed that P.J. Richfield was the low bidder on both the Chris Court Garage and the ADA contracts.[1] Second, nothing in either the HUD Certifications the government relies on or the Non-Collusive Affidavit signed by Mr. Davis in connection therewith even remotely indicates that Joseph Asselin's former interest in P.J. Richfield precluded Mr. Davis from receiving an SHA contract. Mr. Davis does not deny any relationship with SHA family members in these assertions,[2] and nothing on the government's exhibit list indicates that it intends to offer into evidence any guidelines or interpretations of HUD ethics or conflicts rules. It is difficult to imagine, moreover, how those could make their way into evidence without expert testimony. Third, according to Joseph Asselin's Personal Financial Statement dated October 30, 1992, he relinquished his interest in P.J. Richfield at least by 1992, well before Mr. Davis bid on the contracts in question. Exhibit 4 (Government Exhibit 6, Personal Financial Statement of Joseph Asselin, dated October 30, 1992). In short, Mr. Davis had no business relationship with <u>any</u> Asselin by 1993, when he bid on the contracts in question.

---

[1] Exhibit 1 (SHA Meeting Minutes, dated June 21, 1993) (identifying P.J. Richfield as the low bidder on the Christopher Court Garage); Exhibit 2 (Memorandum from Mary Stuart to Raymond Asselin, dated June 25, 1993) (identifying P.J. Richfield as the low bidder on the ADA/504 site work).

[2] Indeed, the HUD certification, relied upon so heavily by the government, states only:

> The bidder certifies that to the best of its knowledge and belief and except as otherwise disclosed, he or she does not have any organizational conflict of interest which is defined as a situation in which the nature of work to be performed under this proposed contract and the bidder's organizational, financial, contractual, or other interests may, without some restriction on future activities: (a) result in an unfair competitive advantage to the bidder; or (b) impair the bidder's objectivity in performing the contract work. In the absence of any actual or apparent conflict, I hereby certify to the best of my knowledge and belief, no actual or apparent conflict of interest exists with regard to my possible performance procurement.

Exhibit 3 (Government Exhibit 59, excerpted). It is unclear how Joseph Asselin's former ownership interest in P.J. Richfield would pose a "conflict" under this language. Similarly, the language contained in the Non-Collusive Affidavit signed by Mr. Davis does not suggest any conflict exists as to Joseph Asselin's former ownership interest in P.J. Richfield. *See id.*

2

The government tries to manufacture a conflict where one did not exist by implying that Mr. Davis's relationship was actually with Raymond Asselin, Sr. and not Joseph Asselin. In Court, the government stated that the "R" in Richfield represented Ray Asselin's "silent interest" in P.J. Richfield, or "the silent R." This assertion, which did not appear to be simply a rhetorical flourish, is preposterous. Joseph Asselin, the government's own cooperating witness, has stated that the name "Richfield" was in reference to the anticipated "rich fields" in South Hadley, one of the company's original projects. Exhibit 5 (FBI Memorandum of Interview with Joseph Asselin, dated July 30, 2006 ("Joseph Asselin 302")) at 2. The government also attempts to blur the distinction between Ray Asselin and his son in its brief, stating, in connection with P.J. Richfield's misfortunes in the early 90s, that "in 1993, Joseph Asselin and/or Asselin, Sr. (who had given his son $20,000 to invest in P.J. Richfield), owed the defendant thousands of dollars." Response at 6. This assertion — that Asselin Sr. owed the defendant money — is once again flatly contradicted by Joseph Asselin's FD-302, in which he is reported as saying that he repaid the $20,000 loan from his father by 1990, when he left his job at Suffield Bank. Exhibit 5 (Joseph Asselin 302) at 1, 5.

2. **The Government's Evidence Regarding the Chris Court Garage and ADA Contracts Is Irrelevant And/Or Excludable Under Rule 403.**

(a) **Chris Court Garage**

The government's proffered evidence regarding the Chris Court Garage contract consists entirely of the aforementioned "conflict of interest," Response at 7, coupled with the fact that the SHA's Arthur Sotirion assisted the defendant in preparing and drafting the defendant's payment requisitions. Response at 8. The government does not allege that there was anything false or inaccurate in the requisitions. Nor does it explain how or why it would have been improper for Mr. Sotirion to assist a contractor in drafting the requisition forms, which are a HUD form

3

document that requires signatures not only by the contractor but also by the SHA Project Representative (Sotirion) and Contracting Officer (Asselin Sr.).[3] In short, the government's proffered evidence in its Response as to this contract is not "incriminating" whatsoever.

The government's exhibits provide a further, and perhaps more reliable, roadmap to the evidence it intends to offer regarding the Chris Court Garage contract. The government's central contention appears to be that a water damage and/or mold problem discovered in the garage in 2005 — yes, 2005 — was due to Mr. Davis's performance in 1993. Government Exhibit 58 includes: a) a 2005 Mold & Moisture Remediation Plan for the Garage, prepared by environmental consultant ECS; b) a December 2005 memorandum to the SHA from architect James Bright, a government witness, that appears to be blaming Peter Davis's 1993 work for water damage in the garage, referring sinisterly to the "reputation" of P.J. Richfield; and c) a December 2005 internal SHA memorandum regarding issues with the garage, stating that "the roof sheathing [on the garage] appears to be only ½ inch instead of ¾ inch called for by code." Exhibit 9 (Government Exhibit 58, various SHA documents regarding Christopher Court Garage, dated 2005). It appears, moreover, that all of this recent evidence about the Chris Court Garage has been enthusiastically developed by the SHA subsequent to the return of the Indictment, not to mention 13 years after the fact, during a period when the SHA itself was under scrutiny and surely looking to cast the net of blame as widely as possible.

---

[3] The government suggests darkly, and misleadingly, that "Sotirion's secretaries will testify that the defendant's payment requisitions were written by Sotirion and that Sotirion routinely performed this task for a few other contractors, such as Baribeau and other racketeering enterprise members." Response at 8. The government deliberately obscures the fact that neither of Sotirion's secretaries testified that they performed this task for Mr. Davis. Exhibit 6 (FBI Memorandum of Interview with Betsaida Torres and Verma Santiago, dated August 27, 2002 (excerpted)) at 4; Exhibit 7 (Grand Jury Testimony of Betsaida Torres, dated January 21, 2003 (excerpted)) at 22, 25-26, 30-31; Exhibit 8 (Grand Jury Testimony of Verma Santiago, dated January 21, 2003 (excerpted)) at 39-41, 45-46.

A better example of evidence that should be excluded under Rule 403 can hardly be imagined. Even if such evidence could be presented without expert testimony — the consultant's and architect's conclusions and recommendations described above are both well within Rule 702 — the jury cannot possibly be expected to focus on the true issues in the trial if it is forced to detour into the collateral and contested issue of the historical responsibility for mold in the Chris Court Garage.

### (b) ADA Contract

The government's principal contention on the ADA Contracts, in addition to the "conflict of interest" allegation and "Sotirion assistance" allegations discussed above, is that the project was certified as complete in October 1994 even though "punch list" items remained until January 1995, and that some required work was allegedly never completed. Response at 10-12. These issues, like those raised in connection with the alleged negligence on the Chris Court Garage project, create a substantial risk of contested mini-trials that will waste time and confuse and distract the jury.

The bulk of the items on the architect's punch list (Government Exhibit 70) appear to be trivial, relating to the striping of parking spaces and the placement/location of "Handicapped-Van Accessible" signs on parking places. Exhibit 10 (Government Exhibit 70, Facsimile from J.B. to Ray Asselin, dated January 6, 1995, attaching punch list). It is unclear whether the entire punch list is more than a day's work. Nor is it clear whether the punch list items were communicated to Mr. Davis prior to the time the work was certified as complete and, if not, whether this was the result of negligence by the architect.[4] It is presumably the architect's

---

[4] Government Exhibit 69 is an undated letter from Mr. Davis to the architect that refers to a conversation on December 6, 1994, about punch list items, and indicates that those items have been completed. Contrary to the government's characterization, the letter is not <u>dated</u> December 6, 1994.

5

responsibility to ensure, through site inspections, that the project is completed according to the contract drawings and specifications.

The government's proffered evidence regarding "incomplete" work on the ADA project is equally fraught with mini-trial and distraction potential. The gist of this evidence is that 12 years after the fact another contractor, a competitor of P.J. Richfield through the 1990s, has apparently formed the opinion that a handful of the handicap ramps on the ADA project were improperly installed, apparently because of the lack of a proper "foundational wall" or "footing." Response at 11. There is no suggestion by the government that this error — if it was in fact an error — was known to Davis himself or to Sotirion or Asselin. There is no suggestion that this was anything but a mistake by a P.J. Richfield subcontractor. In short, even if everything the government says about their evidence is true and admissible, it hardly shows that Davis was given any preferential treatment by the SHA.

Once again, the government's true intentions with respect to the ADA project can be gleaned from its exhibit list. For example, Government Exhibit 303 was added to the government's exhibit list on Monday, September 11, the day of jury selection, long after the government had stated in court that it would limit its use of performance-related evidence to more-or-less obvious examples of "incomplete" work. This exhibit is an internal SHA memorandum from Wallace Kisiel, a government witness, dated August 18, 2006 – less than a month ago – that claims, *inter alia*, that the handicap ramps built by Mr. Davis's subcontractors 13 years ago have "rust stains on them from the type of sleeves that were used during construction." Exhibit 11 (Government Exhibit 303, Memorandum From Wallace Kisiel to Terrence Hogan, dated August 18, 2006, Re: Handicapped Ramps). Again, this is the type of evidence that raises classic and multiple Rule 403 — not to mention Rule 702 — issues. Even

6

worse, the recent addition of this exhibit indicates that the government, notwithstanding its statements to the contrary, is determined to turn this trial into construction litigation.

> 3.   **The Government's Alleged "Kickback" Exhibit Does Not Alter The Relevance and Rule 403 Analysis Set Forth Above.**

The government makes much in its Response of Government Exhibit 82, a folder of documents, including handwritten notes, that were seized from Arthur Sotirion's office by the FBI, and allegedly demonstrate an intention on December 23, 1994, to divide the profits on the ADA contract. Response at 14-15. But even if these notes are admissible, and even if the jury is allowed to infer that payments consistent with the notes were paid to Sotirion and Asselin Sr. (the government admits it cannot <u>prove</u> payment was made), the exhibit tends to prove that the "payment" was a bribe within the meaning of 18 U.S.C. § 201 only if it can be directly linked to an official and specific benefit that Davis received, or intended to receive, in exchange. *United States v. Sun-Diamond*, 526 U.S. 398, 404 (1999). But this is the hole the government cannot fill. As explained above, it cannot seriously be disputed that P.J. Richfield was entitled to receive the Chris Court Garage and ADA contracts. And even if the alleged Certificate of Completion signed by Sotirion and/or Asselin Sr. in October 1994 could be construed as his "official act" or within his "lawful duty" under 18 U.S.C. § 201, a doubtful proposition at best, there is no evidence from which the jury could infer that the inferred payment, made some time after December 23, 1994, was made with the intention to induce the "official acts" the government relies on, which occurred earlier. As the First Circuit has recognized, the essence of bribery is "the intent of the payer, through the greasing of palms, to affect the <u>future</u> actions of a public official." *United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993) (emphasis added).

**CONCLUSION**

For the foregoing reasons, and those mentioned in Defendant's initial motion, defendant Davis's Motion in Limine No. 9 Re: Pre-1995 Contracts should be allowed.

          Respectfully submitted,

          PETER DAVIS

          By his attorneys,

          **/s/ James C. Rehnquist**
          James C. Rehnquist (BBO # 552602)
          Kathleen Luz (BBO # 643278)
          William J. Trach (BBO #661401)
          GOODWIN PROCTER LLP
          Exchange Place
          Boston, MA 02109-2881
          (617) 570-1000

Dated: September 13, 2006

**CERTIFICATE OF SERVICE**

I, James C. Rehnquist, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants, on September 13, 2006.

          **/s/ James C. Rehnquist**
          James C. Rehnquist

LIBA/1729272.1