```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )   CR-N-04-30033-MAP
                                 )
              Plaintiff,         )
                                 )
         vs.                     )
                                 )
PETER DAVIS,                     )
                                 )
              Defendant.         )
```

## GOVERNMENT'S SUR-REPLY IN FURTHER OPPOSITION TO DEFENDANT'S MOTIONS IN LIMINE NOS. 7 AND 9

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, Steven H. Breslow, Assistant United States Attorney, and Kevin O'Regan, Assistant United States Attorney, hereby files this Sur-Reply In Further Opposition to Defendant Peter Davis's Motions in Limine Nos. 7 and 9.

The defendant's Reply Memorandum ("Reply") miscasts the nature and substance of the government's evidence, which is concise, focused, and highly probative of the defendant's *quid pro quo* relationship with Raymond Asselin, Sr. and Arthur Sotirion. The government's evidence is directly probative of the charged crimes and will not delay the trial, confuse the jury, or unfairly prejudice the defendant. Thus, it should be admitted.

I.  The Government's Evidence Concisely Establishes The Illicit Relationship Among The Defendant, Sotirion, And Asselin, Sr.

At trial, the government will present simple and direct evidence demonstrating that starting in at least 1990, the defendant enjoyed an illicit, *quid pro quo* relationship with Sotirion and Asselin, Sr.

Overall, the government's evidence will establish that from 1990 to 1998, Asselin, Sr. and Sotirion afforded the defendant a wide range of preferential treatment, all in exchange for kickbacks. During the period 1990-1995, the government will establish that this preferential treatment included the following benefits: (1) improperly awarding the defendant valuable SHA contracts; (2) steering lucrative sub-contract payments through another corrupt contractor; (3) permitting the defendant to be paid for work that he did not complete and never completed; and (4) permitting the defendant to pay laborers significantly less than the prevailing wage. The net effect of these benefits was to generate large profits for the defendant, which the defendant then shared with Asselin, Sr. and Sotirion.

The defendant contends that the defendant's early contracts were not improperly awarded, but all his arguments fall short. First, it is irrelevant that the defendant was the low bidder on the SHA contracts that he was awarded, since the government's evidence will establish that the SHA bid process was rigged. The government will introduce evidence that contractors' bids, including the

2

winning low bid of G&R Associates ("G&R") for the interior ADA-504 project in 1993, were prepared and drafted by Sotirion. In addition, an SHA employee will testify that he observed the defendant and Sotirion, alone, poring over the project specifications the night before bid openings, including the bid opening where the defendant won his own ADA-504 bid.

Second, the defense wrongly claims that the defendant "had no business relationship with <u>any</u> Asselin by 1993," when he bid on the Chris Court and ADA-504 contracts.[1] Critically, the defense claim is belied by the defendant's own handwritten notes, which were annotated by Arthur Sotirion on or about December 23, 1994.[2] In these notes, the defendant plainly calculates the division of his ADA-504 profit and G&R's ADA-504 profit, with one-third of each distributed to himself, Sotirion, and Asselin, Sr. The defense also ignores the government's straightforward evidence that by 1992, the defendant and Joseph Asselin, as partners in P.J. Richfield ("P.J."),[3] were jointly liable to the Bank of Boston for

---

[1] Reply, at 2. The defendant appears not to dispute that through 1992, Joseph Asselin - the son of the SHA executive director - was a partner in the defendant's company, which began to receive contracts from SHA in 1990.

[2] See GX 82, attached as Exhibit Q to the Government's Opposition to the Defendant's Motions in Limine Nos. 7, 9, and 10.

[3] The defendant misstates the government's remarks about P.J. At oral argument, the government stated simply that Asselin, Sr. was a silent partner in the defendant's company (since he had loaned his son $20,000 to invest), not that the "R" in Richfield

approximately $77,000. This joint debt remained until approximately May 1993, when the Bank of Boston forgave approximately $45,000 of the debt and the defendant paid the remainder on behalf of Joseph Asselin and himself. Indeed, the defendant's notes calculate the amount "due from Ray" or "owed to Pete by Ray" based on the defendant's payment of this debt, even figuring out the amount "due from Ray" based upon the income tax the defendant had to pay on the bank's partial debt forgiveness. Thus, as late as December 1994, the defendant indeed had a business relationship with both Asselin, Sr. and Joseph Asselin, which the defendant sought to settle in part through kicking back one third of the P.J. and G&R ADA-504 profits.

In an effort to persuade the Court that the trial may exceed its allotted five weeks, the defense attempts to conjure up a vision of "ancient contracts" and "a series of detours." But the government's evidence of the defendant's preferential treatment (beyond the improper awarding of the contracts in the first place) will be focused and succinct.

For example, the jury will hear from the SHA modernization coordinator in charge of ensuring that the defendant's ADA-504 work was completed in accordance with the contract. This SHA official will testify that Sotirion told him not to check up on the defendant's work, nor to interview the defendant's employees to determine whether they were being paid the prevailing wage. As

---

signified Raymond.

Sotirion well knew, the defendant was neither completing his work nor paying his laborers per his contract. Sotirion's efforts were well rewarded, since the defendant was thus able to increase his profit (and thus Sotirion's one-third share).

The government's evidence will concisely establish that Sotirion and Asselin, Sr. paid the defendant for his ADA-504 work even though they (like the defendant) knew that the work had not been done. For example, the government will introduce Sotirion's handwritten draft of the defendant's own certification for final payment, a typed version of which the defendant, Sotirion and Asselin, Sr. later signed on October 17, 1994.[4] Simply put, the defendant could not be paid unless all three certified in writing that no work remained - Sotirion and Asselin, Sr. thus had an explicit duty to ensure that the defendant's work was complete before authorizing his payment. Nonetheless, weeks later, the project architect (who had no idea that the defendant had been fully paid) wrote a series of letters to Asselin, Sr., stating in part that "[t]here is enough work which is not completed to make it impossible for me to prepare a punch list."

---

[4] Sotirion repeatedly drafted the defendant's payment requests for the 1993 Christopher Court project, as well as other documents for several of the corrupt contractors the government will call as cooperating witnesses. SHA employees will testify that Sotirion's job at SHA involved ensuring that the defendant's work was completed in accordance with the contract, rather than facilitating the defendant's payments for incomplete work.

Similarly, the government will present simple and straightforward evidence that the defendant never completed certain aspects of his contracted work. For example, witnesses corroborated by documents will establish that the ADA-504 contract required the defendant to build handicap ramps on top of a four-foot foundation wall buried in the ground; Sotirion and the defendant planned to reduce and later eliminate the foundation wall; and all of the ramps excavated thus far were found to have been simply poured onto the earth, without any foundation wall. The defendant thus avoided significant construction costs, yielding greater profit that he could kick back to Sotirion and Asselin, Sr. No expert testimony is needed to clarify what lay witnesses will plainly state: the ramps should have been built on foundation walls four feet deep, and were simply not.[5]

Further, the government will introduce evidence that Sotirion steered to the defendant approximately $157,000 in ADA-504 sub-contract payments through G&R. G&R's president, Gary Baribeau, will testify that Sotirion drafted his ADA-504 bid, directed him to use the defendant as a sub-contractor, including $1,000 per week

---

[5] Although the one-page memo in GX 303 does briefly mention that the ramps have rust stains, Reply at 6, the government is offering this document because it establishes that most of the defendant's ramps have cracked and SHA estimates that it will cost approximately $450,000 to rebuild all of the defendant's ramps as he was required by his contract. The government will not be offering evidence pertaining to the defendant's flawed construction of the Chris Court garage. Reply at 4.

"supervision" fees. Baribeau will be corroborated by Sotirion's own handwritten ledgers for G&R's books, in which Sotirion approved the payment of the defendant's own invoices to G&R. Notably, many of the defendant's own invoices approved by Sotirion are themselves based upon workers' hourly rates that fall well below <u>any</u> prevailing wage.

## II. Evidence Of The Prevailing Wage Benefit Is Highly Relevant and Straightforward

The government's evidence will establish, simply and concisely, that Sotirion permitted the defendant to pad his profit by paying his laborers well below any required prevailing wage. This evidence is central to the government's case because it establishes both the <u>quid</u> and the <u>quo</u> of the defendant's illicit relationship: it shows that Sotirion permitted the defendant to expend substantially less for labor, thus yielding more profit for the defendant to share with Sotirion and Asselin, Sr.

The trial will establish that the prevailing wage requirements are not arcana reserved for lawyers parsing the Code of Federal Regulations, but are instead simple dictates that were broadly understood by the tradesmen who had to follow them. Several contractors will testify that the prevailing wage rates were listed in a few short pages of the contract documents, and that they routinely used these rates in order to estimate their bids.

Although the defendant insists otherwise, the wage classifications are easy to navigate: they simply list the required

rates of pay by county and type of worker (e.g., carpenter, electrician, bricklayer). Thus, one can simply determine that, for example, in Hampden County, soft floor layers earn a total of $25.22 an hour ($18.63 + $6.59 fringe).[6]

The government will also offer focused testimony that, aided by Sotirion, the defendant repeatedly flouted these simple requirements. First, the SHA modernization coordinator for ADA-504 will testify that Sotirion directed him not to interview the defendant's employees to determine if they were being paid the prevailing wage.

Second, several of the defendant's laborers, including an SHA employee, will briefly testify that the defendant paid them directly (not through any sub-contractor) either an hourly wage of $15 per hour or a per unit rate. Much of this work included soft floor laying (i.e., work that in Hampden County was required to be paid approximately $25 per hour).

Third, these laborers will be corroborated by their own invoices to the defendant, which were later seized from Sotirion's offices. These invoices were found stapled underneath the defendant's own handwritten invoices, which in turn were initialed as paid by none other than Sotirion himself, who entered the check payments on to G&R's general ledgers. Thus, Sotirion not only knew that the defendant was paying his workers well below the prevailing

---

[6] See Exhibit B to Reply, p. MA930003-3.

wage - he was ensuring that G&R paid the defendant for that very work.

Recognizing the importance of this evidence, the defendant seeks to cloud an otherwise clear pond by claiming the difficulties in determining a worker's wage classification. But the defendant fails to recognize that <u>none</u> of the listed prevailing wages amounts to only $15 an hour, that most are significantly higher, and that piece-meal or per unit work is expressly forbidden.

Lastly, the defendant continued to flout the prevailing wage requirements even through his later SHA contracts. For example, one of the defendant's laborers in 1997 will testify that many of the defendant's payroll wage forms were fraudulent, listing bogus subcontracting companies, describing employees as earning salaries rather than their true hourly and per unit rates, and bearing forged worker signatures.

To the extent that the Court harbors any lingering concern about unfair prejudice to the defendant, the government respectfully suggests that the Court issue a limiting instruction that the evidence not be considered as the defendant's mistreatment of his workers.

III. <u>Conclusion</u>

For the foregoing reasons, the Government respectfully asks that the Court deny the defendant's Motions in Limine Nos. 7 and 9.

Filed this 14th day of September, 2006.

>Respectfully submitted,
>
>MICHAEL J. SULLIVAN
>United States Attorney
>
>
> /s/ Steven H. Breslow
>STEVEN H. BRESLOW
>Assistant United States Attorney
>
>
> /s/ Kevin O'Regan
>KEVIN O'REGAN
>Assistant United States Attorney

CERTIFICATE OF SERVICE

Hampden, ss.                           Springfield, Massachusetts
                                       September 14, 2006

    I, Steven H. Breslow, Assistant U.S. Attorney, do hereby certify that I have served a copy of the foregoing by filing said motion by ECF to:

James C. Rehnquist, Esq.
Goodwin Proctor & Hoar
Exchange Place
Boston, MA 02109


                                        /s/ Steven H. Breslow
                                        STEVEN H. BRESLOW
                                        Assistant United States Attorney