UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 04-30033-MAP |
| RAYMOND ASSELIN, SR., et al. | |
| Defendants. | |

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S
MOTION IN LIMINE TO ADMIT CERTAIN EVIDENCE
(GOVERNMENTS EXHIBITS 82, 79, 63, 61, 67, 69, 84)**

As the fourth and perhaps final week of trial commences, the government seeks to add three witnesses and numerous documents to its witness and exhibit lists in an attempt to get into evidence certain government exhibits dating from the 1993-1996 timeframe, including Government Exhibit 82.[1] As explained below, the government's new (and novel) evidentiary theory – a last-ditch reaction to its failure to get the exhibits in question admitted as SHA business records – is legally and factually flawed, for numerous reasons. In addition, in attempting to develop its "circumstantial" theory of authentication, the government relies on unsupportable inferences and inaccurate statements about existing evidence and exhibits.

But even if the government's authentication theory were legally or factually tenable, the Court should nonetheless deny the government's attempt to change horses mid-stream and add new exhibits and witnesses at this point in the trial. Defendant has

---

[1]    In addition to GX 82, the government also seeks to authenticate the following contested exhibits: 79, 63, 61, 67, 69, and 84.

already committed to a theory of defense, which he has attempted to advance and develop

through his opening and cross-examination of government witnesses. That defense, as

explained more fully below, was fashioned based on the government's pretrial

disclosures, including Jencks material and the government's witness and exhibit lists.

Defendant justifiably relied on these materials, and other representations by the

government, in developing his theory of defense.

This district's local rules require that, absent an objection, the Court <u>must</u> order

that "at least seven (7) days before the trial date [September 11, 2006] the government

must (a) provide the defendant with the names and addresses of witnesses the

government intends to call at trial in its case-in-chief" as well as the "exhibits the

governemnt intends to offer in its case-in-chief." Local Rule 117.1(A)(8)(a) and (b). The

government must promptly notify the defendant of any witnesses or exhibits the

government subsequently forms an intent to call. *Id.* Relying on this language in the

Local Rules, the government in this case did just what the Rule required, turning over its

witness list on September 11, 2006, the day of the jury empanelment, seven days before

trial. These disclosure requirements were augmented by this Court's order of February

15, 2006, which resolved the parties' dispute over whether the government had satisfied

its Rule 16 disclosure requirements. The Court stated:

> [T]he government will provide the defense with a good
> faith, comprehensive listing of all documents it intends to
> offer during its case-in-chief, no later than July 24, 2006.

> * * *

> In obligating the government to make the good faith
> disclosure of documents it intends to offer in its case-in-
> chief by July 24, 2006, the court does not inted to suggest
> that documents not disclosed by that date will necessarily
> be barred from trial, if the government has an explanation

for the late disclosure and the defense cannot demonstrate
unfair surprise.

Order (Feb. 15, 2006). The government has ignored this order repeatedly <u>before</u> trial

even began, adding 42 exhibits on August 31, 2006, increasing its exhibit list from 255 to

297, and adding an additional 9 or 10 exhibits between then and the start of trial.

Allowing the government to introduce new witnesses and exhibits at the eleventh

hour would be especially unfair given that the government has already added several

exhibits after the trial began. These exhibits, Government Exhibits 317-319, were added

by the government on September 19, 2006, purportedly as a result of a late production of

documents to the government by the Springfield Housing Authority. Although the Court

denied defendant's motion to preclude or strike this evidence, it recognized the prejudice

or potential prejudice to defendant of such untimely addition of evidence, and precluded

the admission of other exhibits added by the government after trial began (GX 308-316).

The Court commented:

> Here's what I'm going to do. I'm going to as I said before
> deny the motion to strike these three exhibits. I have had
> an opportunity to look over the transcript of Mr.
> Rehnquist's opening and he does make some comments
> about the contracts and various other things, but I do not
> think that this evidence is of the sort that is putting the
> defense in a sufficiently unfair position that it would make
> sense to strike the exhibits, but I am going to order the
> government not to put in any of the other exhibits. I've
> been burned once. I'm not going to be burned again.
>
> * * *
>
> But the ruins has been made with regard to these
> documents [GX 317-319]. The jury has heard about them,
> and although I think perhaps if I had it to do over again, I
> might think differently. It's one of those discretionary
> areas where judgment can tip one way or another. Here
> they're in and I'm going to stick with that, but I don't want
> to mess with any more, any more of that batch of

documents. I've had enough of that and the government
can put on its case based upon the documents that they had
a week before the trial started.

Trial Transcript at 672 (Sept. 25, 2006).

That reasoning applies with even more force now, as the trial enters its fourth and

final week; accordingly, the government should not be permitted to add new exhibits and

witnesses at this late date. Moreover, as explained more fully below, the government has

not met its burden of demonstrating that circumstantial evidence warrants authentication

of these documents here. Accordingly, the government's last-ditch effort to attempt to

authenticate these documents should be rejected.

## I.     DEFENDANT WOULD BE PREJUDICED IF THE GOVERNMENT IS ALLOWED TO INTRODUCE NEW WITNESSES AND EXHIBITS AT THIS POINT IN THE TRIAL

The government seeks to add several exhibits and three new witnesses — Phillip

Lee, William Needleman, and a "records custodian" from Mr. Davis's former accountant,

Mallows, Corbin & Tapases — in an attempt to circumstantially authenticate government

exhibits.[2] Government's Motion in Limine to Admit Certain Evidence (hereinafter

"Motion") at n.1. It also seeks to introduce testimony from Special Agent Michael Brin,

apparently in some sort of forensic accounting capacity, as part of this effort.[3] *Id.* It is

_____

[2]     Indeed, since filing its motion on Friday, the government has already added three *additional* exhibits, which it has indicated that it intends to offer in conjunction with the new exhibits (GXs 321 to 324) referenced in its motion. *See* Letter from Steven Breslow to James C. Rehnquist, dated October 9, 2006 (identifying, for the first time, GXs 326 through 328) (attached at Exhibit A). The government's never-ending identification of exhibits – continuing up until the time the defendant must file its response to the government's Motion – underscores the ever-evolving nature of the government's newest theory of admissibility.

[3]     While it is true that Special Agent Brin was disclosed as a witness, it is clear that his testimony in this forensic accounting capacity was not disclosed as expert testimony as required by Fed. R. Crim. P. 16 and Fed. R. Evid. 702. It is expected that Mr. Brin will testify as some sort of forensic accountant, dredging through the numerous new exhibits recently identified by the government and offering opinions as to their supposed connection to the contested government exhibits. This testimony –

unclear exactly what records the accounting firm will attempt to introduce, or whether those records satisfy the requirements of Rule 803(6), and the expected testimony of Mr. Brin on these matters has not been disclosed.  In any event, none of these witnesses or evidence were disclosed prior to trial, and the government appears to concede — notwithstanding the significance it has long attached GX 82, among others — that this is a last-ditch effort.[4]

Allowing this evidence would significantly prejudice defendant.  In developing his defense, defendant relied not only on the Indictment, bill of particulars, and automatic discovery, but also — and most heavily — on the government's pretrial disclosures.  These included Jencks materials and the government's witness and exhibit lists.

In particular, the defense noted upon receiving and reviewing these materials that there was no government witness who identified any of the handwriting on GX 82 or any other government exhibit as belonging to Mr. Davis.  Nor was there any witness on the government's witness list who appeared to have an adequate foundation for identifying Mr. Davis's handwriting.  *See* Fed.R.Evid. Rule 901(b)(2) (requiring foundation for admission lay handwriting testimony); *see also United States v. Scott*, 270 F.3d 30, 49 (1st Cir. 2001).  Defendant was somewhat surprised by this, as the government had consistently represented to defense counsel — both in a meeting with AUSA Welch and Special Agent Hedges in 2003 and in an August 2006 "reverse proffer" designed to persuade Mr. Davis to plead guilty — that GX 82 contained Mr. Davis's handwriting.

---

obviously based on Mr. Brin's specialized knowledge and expertise, and not on any sort of first-hand knowledge – clearly falls within the scope of Rule 702.  Given the government's failure to make this required expert disclosure, Mr. Brin's testimony in this regard should be excluded.

[4]    Lee and Needleman were first interviewed by the FBI on October 2 and 3, 2006, respectively.  The materials from Mallows, Corbin & Tapases were subpoenaed on September 27, 2006.

The government represented in these sessions that GX 82 demonstrated that the bidding on the ADA/504 project had been "rigged" in advance to benefit Mr. Davis, and that the exhibit showed an "agreement" to kickback profits on that contract.

Subsequent to these pretrial disclosures, but prior to trial, the government made numerous statements in the protracted pretrial wrangling about GX 82 and other pre-1995 work by P.J. Richfield concerning the admissibility of these exhibits. The government stated, in particular, that the notes in GX 82 were "SHA business records, [and] also the statements of a party, and (since they were endorsed or adopted by Sotirion), the statement of a co-conspirator in furtherance of a conspiracy." Government's Response to Defendant Davis's Motions in Limine Nos. 7, 9 and 10, at 15. The government repeatedly stated, moreover, that GX 82 was in the defendant's own handwriting. *See, e.g., id.*; Government's Response to Defendant's Motion in Limine No. 11 at 3. In addition, the government filed a business-records certification of Deborah Barton, which identified GX 82, among other documents, as a "business record" of the Springfield Housing Authority (SHA).

In sum, prior to trial, the government had advanced three different theories for the authentication and/or admissibility of GX 82: 1) it was a document in "the defendant's own handwriting," and thus an admission; 2) it was an "adoptive admission" of Arthur Sotirion; and 3) it was a business record of the SHA. Defendant determined that none of these three theories of admissibility was likely to be viable, based on the government's pretrial disclosures (Jencks material, witness list, exhibit list), and planned its trial strategy accordingly. First, the lack of a witness who had been able to identify Mr. Davis's handwriting, as well as Rule 901(b)(2)'s foundation requirements, seemed to

preclude authentication/admissibility under Theory 1. Theory 2 was unlikely to prevail because, based on the government's disclosed witnesses and exhibits, defendant did not see how the government could introduce evidence that Arthur Sotirion, who would not be a government witness, had "manifested an adoption or belief in its truth" of any statement in GX 82 as required for an adoptive admission under Rule 801(d)(2)(B). Finally, given the "hodge podge" characteristics of GX 82, *see infra*, and the fact that the documents appeared to have been seized from the bowels of 117 Sanderson Street (where Art Sotirion's office was housed), among other things, defendant doubted the document was admissible as a business record, notwithstanding the "certification" signed by Deborah Barton.

Defendant thus made an informed and reasonable judgment that GX 82 was unlikely to be admissible. Accordingly, defendant committed to advancing the theme, in its opening and through cross-examination of government witnesses, that Mr. Davis legitimately won his contracts as the low bidder and that there is <u>no evidence</u> of bid rigging involving Mr. Davis's contracts. Defendant also made a tactical judgment not to respond in his opening to anything the government might say in its opening about GX 82. To be sure, defendant did not know whether the government would mention GX 82 in its opening. Given the infirmities of its evidentiary theories, defendant wondered whether the government had a good faith basis for mentioning the exhibit. In any event, defendant resolved not to rebut or even refer to GX 82 in its opening, regardless of what the government said about it. Accordingly, even though the government not only discussed GX 82 but published it to the jury and described it in its opening as a "blueprint of the conspiracy," the defendant was silent.

Defendant's strategic judgment could, of course, be criticized. The decision to fail to even acknowledge a piece of evidence the government describes in "smoking gun" terms might be second-guessed. And defendant certainly assumed the risk that GX 82 would somehow end up before the jury, in evidence, based on the government's witness list and exhibit list as they existed when trial began. But defendant cannot fairly be charged with assuming the risk that its strategic decision would be undermined by witnesses and evidence that the government unearthed during the course of trial, long after the government's witness and exhibit lists had (supposedly) been finalized, and long after the defendant has committed to a theory of defense to the jury.

The unfair prejudice of these new exhibits and witnesses is heightened by the timing of their disclosure. This new attempt to get these contested exhibits into evidence comes directly on the heels of the government's submission of the false certification of Deborah Barton stating that certain of these contested exhibits were business records. The infirmity of Ms. Barton's certification was due, in substantial part, to the government's failure to advise Ms. Barton that the exhibits she certified were seized from the recesses of 117 Sanderson Street. Indeed, only one day after the Court conducted its *voir dire* of Ms. Barton and concluded that the documents were not in fact SHA business records, the government caused a subpoena to be issued on Mallows, Corbin & Tapases as a means of obtaining additional evidence in an attempt to "circumstantially authenticate" the contested exhibits. Stated simply, after the government falsely certified these as business records, they are now attempting to add new witnesses and exhibits during the fourth (and possibly final) week of trial in a last-ditch effort to get the contested exhibits into evidence. The government's questionable conduct in respect to

the Barton certification should not be rewarded by permitting it, at the eleventh hour, to

attempt to authenticate these documents through peripheral evidence and witnesses which

had not been previously disclosed. *See United States v. Gasparik*, 141 F. Supp. 2d 361

(S.D.N.Y. 2001) (precluding government from adding a witness to its witness list during

the trial when to do so would prejudice the defendant).

In short, to allow the government to introduce these new exhibits would

profoundly prejudice the defense that Mr. Davis had pursued during the trial's first three

weeks, and would unfairly and severely penalize the defendant for making reasonable

strategic decisions. Accordingly, the government should be precluded from introducing

additional witnesses and exhibits as a means of authenticating the contested exhibits.

## II.    THE GOVERNMENT'S "CIRCUMSTANTIAL" AUTHENTICATION THEORY IS LEGALLY AND FACTUALLY UNTENABLE

The government seeks to admit certain handwritten portions of the seven

identified exhibits as "non-hearsay statements of the defendant." Motion at 9, *see also*

Motion at 10, 18-25. The government seeks to authenticate these documents through

Fed. R. Evid. 901(b)(4), which allows for the party offering a piece of evidence to

demonstrate that it is what the offering party purports it to be (here, handwritten

statements of the defendant) through the document's "appearance, contents, substance,

internal patterns, or other distinctive characteristics, taken in conjunction with

circumstances." Further, because (as the government concedes) Rule 901 authenticity

determinations are governed by Fed. R. Evid. 104, in order to meet its prima facie burden

of authenticating these documents, the government must demonstrate by a preponderance

of the evidence that the documents are in fact handwritten statements of the defendant.[5]

*See United States v. Garza*, 435 F.3d 73 (1st Cir. 2005) ("Questions of admissibility are decided by the court, Fed. R. Evid. 104(a), using the preponderance of the evidence standard.").

Notably, while the government cites to several different First Circuit cases involving the review of Rule 901(b)(4) authentication determinations, its motion has no substantive discussion of the actual facts of those cases. This absence is notable because, as explained below, in each of the First Circuit cases holding that the district court did not abuse its discretion in finding that the government met its burden under Rule 901(b)(4) to authenticate a document as being the statement of the defendant, the link between the admitted document and the defendant was far greater than exists for any of the documents the government seeks to admit here.

For instance, in *United States v. Newton*, 891 F.2d 944 (1st Cir. 1989), the district court found that the government, under Rule 901(b)(4), had properly authenticated as a statement of the defendant a three-page unsigned and undated typed document that provided instructions on handling financial affairs. *Id.* at 946-47. The court pointed to numerous facts and circumstances linking the document directly to the defendant, Newton, in finding no abuse of discretion as to the authentication, including:

- The document was found in defendant's possession when he was arrested;

---

[5] Because the government purports these documents to be handwritten statements of the defendant, the entire line of cases cited by the government in part 1(c) of its motion are inapposite. In each of those cases, the statements were admitted under Rule 801(d)(2)(e) as statements of a co-conspirator. Thus, in order to authenticate those documents, the government needed to demonstrate only that the documents were the statement of a co-conspirator. In contrast, here the government does not purport the offered documents to be statements of a co-conspirator, rather it purports the documents to be "non-hearsay statements of the defendant." Motion at 9. Unlike in the cases cited in part 1(c) of the government's motion, the burden of authenticating these documents can only be met by showing by a preponderance of the evidence that these documents are statements of the defendant.

- The document refers to "Laura Newton," the defendant's wife, and says that his possessions should be split between "<u>my</u> family and Laura;"

- The document refers to various aliases proven to be used by the defendant ("<u>my</u> lawyer Milton Shapiro ... knows <u>me</u> as Joseph Jaffee");

- The document states call "Tom" at a telephone number that it was proven was registered in a co-conspirator's long-time girlfriend's name;

- The document lists bank account numbers next to proven aliases of the defendant.

*Id.* (emphases added). Furthermore, the district court found that other evidence in the case corroborated statements in the letter and confirmed that it was the defendant's. *Id.* at 947. Finally, while the defendant argued that the information in the document could have been known by other co-conspirators, the Court found that the fact that the document instructed money to be split with Laura, the defendant's wife, made it unlikely the document was written by anyone other than the defendant. *Id.*

In *United States v. McMahon*, 938 F.2d 1501 (1st Cir. 1991), the district court allowed testimony about the contents of a note that the defendant, McMahon, allegedly passed to a man named Salisbury during a meeting, over the defendant's objection that the author of the note had not been sufficiently authenticated. *Id.* at 1508. In finding no abuse of discretion, the district court noted the following circumstances linking the note to the defendant McMahon:

> McMahon was observed passing the note. The document repeated nearly verbatim the content of a conversation conducted between McMahon and Salisbury in a "soft tone of voice" and overheard only moments before by a different board member. Salisbury was hard of hearing, so there was some basis for thinking that the conversation needed repeating. The handwritten note twice employed the personal pronoun "I," saying "I need your help" and "I believe," suggesting in the absence of a signature that the passer of the note was its author. The note described the

11

> planned Proko site as within 2,000 feet of another
> dealership, an issue raised by McMahon later in the
> meeting. Finally, there was no basis for thinking the note
> originated with any other author, in part because no one
> else raised the issue of the 2,000-foot ordinance, and in part
> because McMahon allegedly passed the note himself and
> never contended that he merely passed a note authored by
> another; he instead denied the existence of any note.

*Id.* at 1509.

Further, in *United States v. Bello-Perez*, 977 F.2d 664 (1st Cir. 1992), the district

court had admitted an anonymous letter, not written in Bello-Perez's handwriting, urging

a government witness, Murley, not to implicate the letter's author in drug dealing. *Id.* at

671. In finding no abuse of discretion, the district court noted the following

circumstances linking the note to the defendant, Bello-Perez:

> The given name of the addressor on the envelope, though
> unclear, appears to be "ANDREWS" or "ANDREUS",
> similar to Bello-Perez' first name "Andres." The return
> address inside the letter gives the post office box of the
> state prison where Bello-Perez was incarcerated pending
> trial. The author identifies himself as an Hispanic; Bello-
> Perez was the only Hispanic state-prison inmate known to
> Murley. The author plainly implies that he is facing drug
> charges and that Murley might be asked to testify against
> him. Finally, the letter includes statements about family
> problems known to Bello-Perez.

*Id.* at 672.

Further, in *United States v. Thompson*, 449 F.3d 267 (1st Cir. 2006), the district

court admitted as a statement of the defendant, Thompson, an anonymous, handwritten

note that was received by the defendant's co-conspirator, Canney, while the latter was in

jail. *Id.* at 274. In finding no abuse of discretion in determining the document's

authenticity under Rule 901(b)(4), the First Circuit wrote:

> The anonymous letter's content precisely fits Thompson's
> circumstances and predicament in May 2004. Coming only

> one week after the Thompson and Canney joint arrests, the
> letter's author stated that "the target letter they gave me still
> has me losing sleep at night," a plain reference to the target
> letter sent to Thompson after Canney admitted, to law
> enforcement agents, Thompson's complicity in his drug
> distribution. *See* Fed. R. Evid. 901, advisory committee
> note example (4) (noting that a document "may be shown
> to have emanated from a particular person by virtue of its
> disclosing knowledge of facts known peculiarly to him").
> The author stated that "they let me go . . . because I didn't
> say anything," a clear reference to the fact that Thompson
> was released from custody after his arrest on May 3, 2004
> for lack of evidence, whereas Canney was not.
> Finally, Canney testified that he recognized the return
> address, provided in the letter, as Thompson's residence.
> *See* 5 Jack B. Weinstein and Margaret A. Burger,
> *Weinstein's Evidence* ¶ 901(b)(4)[02], at 901-67 (1991)
> (noting that "return address" is valid indicium for
> authentication purposes).

*Id.*

Finally, in *United States v. Garcia*, 452 F.3d 36 (1st Cir. 2006), the district court

had admitted during the defendant's trial an affidavit found in his Alien Registration File,

containing the following handwritten statement: "My true [and] complete name is

Roberto García. I was born on May 10, 1969 in Colombia and I am a citizen of

Colombia. I entered the U.S. from Mexico in 1989 illegally. I did not present myself for

inspection because I did not have a Visa." *Id.* at 39. Below the statement was the

signature, "Roberto G." *Id.* The affidavit also indicated that the defendant appeared

before a Spanish-speaking officer of the INS, was read his *Miranda* rights, and that the

defendant willingly made the above statement. *Id.* Further, the affidavit contained a

typewritten statement below the handwriting indicating that the handwritten statement

"had been read to the affiant, that the answers made therein were true and correct, and

that the affidavit was a full, true, and correct record of the affiant's interrogation by the

INS officer." *Id.* The typewritten portion was also signed "Roberto G." *Id.* While it is

unclear exactly what grounds the district court used to find authentication, the First

Circuit pointed to several facts and circumstances in finding no abuse of discretion:

- The affidavit was found in defendant's Alien Registration file, which included a photograph of the defendant and several unchallenged examples of his signature;

- The district court compared the signature on the affidavit to the signature the defendant signed in open court that very day waiving his presence for jury selection, and noted that the signatures appeared identical;

- The general content of the document and circumstances surrounding its creation suggested it was authentic.

*Id.* at 40.

Thus, above there are five First Circuit cases finding no abuse of discretion in

authenticating a document, under Rule 901(b)(4), as the statement of the defendant.[6]

Common circumstances in each of these cases link the document in question to the

defendant in ways that are largely lacking here.  First, the circumstances of delivery or

seizure of the document in each case linked the document directly to the defendant.

- In *Newton*, the document was in the defendant's possession when he was arrested. 891 F.2d at 946.

- In *McMahon*, the defendant was seen passing the note in question to another during a meeting.  938 F.2d at 1508.

- In *Bello-Perez*, the letter was sent from the state prison at which the defendant was an inmate, and was delivered to a person the defendant knew well.  977 F.2d at 671.

---

[6]     Mr. Davis notes that there are at least two other cases in which the First Circuit reviewed authentication determinations under Rule 901(b)(4), *United States v. Paulino*, 13 F.3d 20 (1st Cir. 1994), and *United States v. Holmquist*, 36 F.3d 164 (1st Cir. 1994).  While these cases provide some insight into the standard for authentication under Rule 901(b)(4), Mr. Davis does not focus on them because the documents there were not authenticated as statements of the defendant, and given the highly fact-specific nature of the inquiry, these cases shed less light on the question at hand.

- In *Thompson*, the return address on the envelope bearing the letter was that of the defendant. 449 F.3d at 274.

- In *Garcia*, the affidavit was in the defendant's own Alien Registration File. 452 F.3d at 39.[7]

In contrast, six of the seven documents the government seeks to authenticate as the statements of Mr. Davis, including GX 82, were found "somewhere in 142 Sanderson Street," which was the building that housed Arthur Sotirion's office. Further, many of the documents were found in file folders containing no relationship to the defendant, the defendant's company, or any work the defendant ever did for the SHA. There appears to be no First Circuit case admitting statements of a defendant under Rule 901(b)(4) where this predicate — recent possession of the document by the defendant — was absent.

Second, in each of the above cases, the contents of the document linked it directly to the defendant, to the exclusion of virtually anyone else.

- In *Newton*, the document contained personal information linking it directly to the defendant, including instructions to split money with the defendant's wife and family, several known aliases of the defendant, bank accounts linked to the defendant, and the defendant's lawyer's name. 891 F.2d at 946.

- In *McMahon*, the defendant passed the note himself, it contained several statements in the first person, and referenced a recent conversation between the defendant and the person to whom he passed the note, who was hard of hearing and therefore may well have needed to have the statements written out. 938 F.2d at 1508.

---

[7] Mr. Davis notes that the two other 901(b)(4) cases, *Paulino* and *Holmquist*, also share this essential trait. In *Paulino*, the document in question was a receipt indicating payment of rent for an apartment proven to be a drug den. 13 F.3d at 22-23. The document was seized from an apartment that the defendant had occupied, was in at the time of the raid, and the defendant possessed the only key to the apartment. *Id.* In *Holmquist*, the document in question was a photocopy of a check written to the defendant for $2,500. 36 F.3d at 167. The document was sent from a customer of the defendant to an investigating Customs Agent, and in the very same package was an invoice sent by the defendant to a customer billing the customer $2,500; the invoice was already in evidence and its authenticity was not in question. *Id.*

- In *Bello-Perez*, the letter contained the defendant's name, outlined the defendant's particular circumstances (implicated in drug dealing), identified the author as Hispanic (as was the defendant), detailed family problems specific to the defendant, and was written to an individual known by the defendant.  977 F.2d at 671.

- In *Thompson*, the letter was written in the first person and had multiple "clear reference[s]" to circumstances and knowledge unique to the defendant.  449 F.3d at 274.

- In *Garcia*, the affidavit, contained in the defendant's own Alien Registration File, was signed by the defendant himself, which signature was identical to that of his signature made in open court and observed by the district court that very day.  452 F.3d at 40.[8]

In contrast, for the documents the government seeks to admit here, the contents of the documents do not link them nearly so closely or exclusively to Mr. Davis.

Before defendant turns to the individual exhibits at issue, three global observations are in order.  First, in attempting to make its circumstantial case, the government consistently refers to what it believes to be the "distinctive, all-capital" style of the handwriting on some of the exhibits.  Putting aside whether a handwriting expert might agree with this statement by counsel, the government ignores the fact that many of the "statements" in the exhibits are numbers, not letters.  It is worth noting, moreover, that Mr. Katsounakis's handwriting — which he identified and which is in evidence — shares this allegedly "unique" style.  *See* GX 226.

Second, the government repeatedly represents that certain information could only have come from the defendant, that defendant had no employees, and the like.  *See* Motion at 12, 19, 25.  This is a most curious assertion, given a) the government's remark

---

[8]    Once again, both *Paulino* and *Holmquist* also share this trait.  In *Paulino*, the receipt in question bore the defendant's name, and indicated payment of rent for an apartment that defendant was proven to be occupying and for which the defendant had the only key.  13 F.3d at 22-23.  In *Holmquist*, the check was written out to the defendant, and was corroborated both by the defendant's own invoice and other testimony binding the sender of the check to the defendant.  36 F.3d at 167.

in its opening about Mrs. Davis signing P.J. Richfield checks (and, inferentially, perhaps handling other bookkeeping responsibilities); b) the government's allegation that Mr. Davis lied to the FBI when he said he had no employees, *see* Government's Response to Defendant's Motion in Limine No. 11 at 2; and c) the government's pre-trial claim in briefing to the Court that it would introduce evidence that P.J. Richfield had "several" employees to which it was paying impermissibly low wages, *see* Government's Response to Defendant Davis's Motions in Limine Nos. 7, 9 and 10, at 20. Wallace Kisiel, moreover, testified that Mr. Davis's son was a P.J. Richfield employee who worked on the ADA/504 project. Trial Transcript at 1081 (Sept. 27, 2006). Other information the government suggests was uniquely in Mr. Davis's possession could also have come from Art Sotirion, Gary Baribeau, Wallace Kisiel himself, or a host of others, as demonstrated below.

Third, the government relies on a multitude of unsupportable inferences and misstatements of the record in attempting to develop its circumstantial case for authentication. These are explained below. But defendant wants to be clear: his points in this regard demonstrate that the "circumstances" the government relies on are not what they appear to be, as described by the government, and that those circumstances do not support a finding by a preponderance of the evidence under Rule 104 that the statements in the exhibits are the defendant's. In other words, the defendant's comments do not go to the "weight" of the evidence, but to the threshold facts regarding admissibility.

### A. *Government Exhibit 82*

Because the government has selectively "cherry-picked" only certain portions of the exhibit to describe to the Court in an effort to make it seem more linked to the

defendant, a complete description of the document is necessary. Exhibit 82 is a folder seized from somewhere in the Sanderson Street building that housed Mr. Sotirion's office and storeroom. The outside of the folder states: "New Bills." Inside the folder is a package of four, separately clipped groups of documents totaling twelve pages. The first group of documents is six pages that have no obvious relation to one another—including handwritten notes dated 12/28/94; a copy of a file folder labeled "Wk Ending June 1-4, 1982"; a copy of a file folder labeled "General"; two pages of typed and handwritten notes dated 12/23/94; and a portion of what appears to be a typed letter dated February 1, 1994, with undated handwritten notes on the back. The second group of documents includes a register tape from an adding machine. The third group of documents consists of what appears to be a January 7, 1994 invoice from an entity called "Early Enterprises" to G&R Construction concerning "demolition and clean up of debris" at Riverview Rehabilitations, along with a copy of an envelope addressed to G&R Construction from Early Enterprises. The fourth group of documents is two pages of undated, handwritten notes.

Although the government has repeatedly described this ramshackle collection of papers as a "blueprint" for the conspiracy, it concedes that it has no evidence that any payment was made, or other action taken, based on this document. Government's Response to Defendant Davis's Motions in Limine Nos. 7, 9 and 10, at 15-16.

Contrary to the government's contention, the government is far from meeting its burden of demonstrating, by a preponderance of the evidence, that Exhibit 82 is or contains a statement of the defendant. The government relies on several unsupported inferences, misleading suggestions about existing evidence, and facts not in evidence in

attempting to meet its burden. To begin, it is far from clear that the testimony of the additional witnesses proffered by the government will provide the link to Exhibit 82 that the government has represented in its motion. According to the government's motion, it contends that both Lee and Needleman will testify that they received checks for work done on Arthur Sotirion's home, and that the checks came from a third party they did not recognize. Motion at 14. Needleman apparently stated that the check came from a company called "P and something." *Id.* The government once again conveniently leaves out important details from the 302 interview memoranda of Lee and Needleman that suggests the checks did not come from the defendant. First, the government does not have copies of the checks they received, and therefore cannot directly link these checks to Mr. Davis. Second, both men stated that the checks they received had a picture of a "bulldozer" or "tractor" on them. *See* 302 Interview Memorandum of William Needleman at 2 (Oct. 3, 2006); 302 Interview Memorandum of Philip Lee at 2 (Oct. 2, 2003). Already placed in evidence by the government are at least three checks, Exhibits 167, 169, and 171, from "G and R" Construction which have the mentioned bulldozer logo, in contrast, no checks from P.J. Richfield contain this logo. It is thus entirely possible that these men were paid by G & R Construction and not P.J. Richfield. Further, this demonstrates that others, including Mr. Baribeau, are equally likely to have knowledge about the contents of the Exhibit.

Second, the government also fails to alert the Court that two of the exhibits it intends to introduce in an effort to circumstantially authenticate GX 82 as a statement of Mr. Davis – Exhibits 321 and 322, which the government asserts are P.J. Richfield ledgers – **do not appear to be in the same handwriting**. This alone demonstrates that

the government cannot meet its threshold burden of demonstrating that the document is necessarily the statement of the defendant.

Further, unlike every First Circuit case affirming a 901(b)(4) authentication, the circumstances of the seizure of the document do not link it to the defendant, to the practical exclusion of all others. The document was seized from somewhere in the Sanderson Street building. Motion at 11. No copy of this document was found in the defendant's files. The evidence does not even demonstrate that the document was seized from Mr. Sotirion's office or his files, but merely from the building that housed his office. Moreover, the folder containing Exhibit 82 bears no link to the defendant, nor do most of the contents of the Exhibit.

Also unlike all the First Circuit cases affirming a 901(b)(4) authentication, the contents and substance of Exhibit 82—even the pages and specific writing cherry-picked by the government—were not linked to the defendant to the practical exclusion of all others. In addition to Mr. Davis, Messrs. Sotirion, Asselin, and Baribeau all would have known about the essential details of the 504/ADA construction job. Further, the evidence has shown that each of these men used secretaries or others to write documents for them, and the writing could be that of a secretary or other employee working on behalf of any of them.

Moreover, the government's contention that the writing on the document concerning "G&R Job Net" is somehow linked to the defendant is absurd. The government contends that because Mr. Baribeau testified that Mr. Sotirion controlled his finances and "steered" a subcontract on Mr. Baribeau's job to Mr. Davis, a "logical and reasonable inference" is that Mr. Sotirion knew about the amount of Mr. Baribeau's

profit, communicated this profit to the Mr. Davis, and that Exhibit 82 represents Mr.

Davis's agreement to share this profit with Messrs. Asselin and Sotirion. Motion at 16.

There is no actual evidentiary support for this inference. Mr. Baribeau testified

extensively in this case, including at length about the ADA-504 job he received. He

never testified that he agreed to pay his profit to the defendant, or that he in fact did pay

his profit to the defendant. Moreover, he never testified that Mr. Sotirion ever discussed

his finances with the defendant.

Further, the government in its Motion states that two pages of Exhibit 82 "detail

expenses for this contract, totalling approximately $560,000." Motion at 12. Again,

there is simply no basis for the government to claim that that $560,000 were the expenses

of P.J. Richfield on this contract. Equally without basis is the government's claim that

Mr. Sotirion "possessed these notes, and wrote on them, after they were created, on or

about December 23, 1994." Motion at 11. This document has a typewritten portion as

well as multiple sets of handwriting, and the government has no witness who has ever

seen or can explain this document. The document is confusing and there is no indication

on its face as to when Mr. Sotirion "possessed" this document, when he wrote on it, or

the order in which the handwritten portions were created.

Finally, the government's attempt to link the typewritten portion of the document

to Mr. Davis is equally unavailing. The government again cherry picks two numbers

from the typewritten portion and attempts to link them to numbers on Government

Exhibit 255, a P.J. Richfield financial statement (which, as the government conveniently

omits, is also not in evidence). Motion at 15-16. But the typewritten portion of the

document contains references to numerous different figures, including "Total Sales

711,411," "Cost 850,907, "Net Loss (138664)," as well as capital figures, net cash lost, and other numbers that are not in any way linked to the defendant or P.J. Richfield and that are not corroborated by any evidence. Once again, the government simply omits any mention of the typed portion as a whole, and has no explanation for what these figures are or how they link the document to the defendant.

In short, given the location of the document's seizure, the lack of any indication from the folder in which the few relevant pages were found that it originated with or was linked to the defendant, and the multiple unsupported inferences referenced by the government in its brief, even considering all the references to facts not in evidence, the government has failed to meet its burden of demonstrating, by a preponderance of the evidence, that Exhibit 82 contains handwritten statements of the defendant.

### B.     *Government Exhibit 79*

The government has also failed to meet its burden of authentication for Exhibit 79. First, as explained above, while the government continues simply to represent to the Court that "P.J. Richfield was solely operated by the defendant," Motion at 19, the evidence does not support this claim. The testimony of the government's own witnesses has shown that Mr. Davis's son was an employee of – or worked for – P.J. Richfield. Further, the government contended in its opening that the defendant's wife provided clerical support for P.J. Richfield, specifically signing P.J. Richfield checks for work done by subcontractors. Finally, while some witnesses have testified that, out on construction sites they dealt primarily or exclusively with Mr. Davis, this does not demonstrate that P.J. Richfield had no other employees to assist in the kind of clerical work that might result in the generation of an invoice.

22

Further, these documents were not even found in P.J. Richfield's files,
nevertheless linked directly to the defendant. And no witness has been able to identify
any of the invoices, testify that they are written in Mr. Davis's handwriting, or that Mr.
Davis ever gave these invoices to them. In fact, only one witness, George Williamson,
has even testified about one of the several sets of bills underlying one of these invoices.
In short, the government's argument necessarily devolves to a claim that because these
invoices are on P.J. Richfield letterhead, it is reasonable to assume that Mr. Davis wrote
them. This is plainly insufficient to meet its threshold preponderance of the evidence
burden of authenticating the documents as the statements of Mr. Davis.

### C.    *Government Exhibit 63*

The government has also failed to meet its burden of authentication for Exhibit
63. While the document does appear to reference some exterior 504/ADA work, for
which P.J. Richfield was the general contractor, it also contains references to painting of
the first floor of a Clyde Street Building, as well as an electrician, which presumably
relate to *interior* 504/ADA work—a project on which Gary Baribeau (and not Mr. Davis)
was the general contractor, and therefore Mr. Baribeau was ultimately responsible for
ensuring the work on those projects was finished. And contrary to the government's
contention, this Court has already stated that the initials on the bottom of Exhibit 63 do
**not** appear to be those of the defendant. Trial Transcript at 1726 (Oct. 4, 2006). Finally,
neither the document itself, nor any copy thereof, was found in P.J. Richfield's files, nor
is it in any other way linked directly to the defendant. Again, the government's argument
seems to be that the document appears to relate at least in part to a project done by P.J.
Richfield, and therefore the Court should simply take the government's word for it that

this is the defendant's handwriting.  This argument falls far short of its authentication burden.

**D.**    ***Government Exhibit 69***

The entire factual predicate underlying the government's theory of authentication for Exhibit 69 is simply incorrect based on the evidence.  The government contends that Exhibit 69 is a reply to a duly authenticated letter sent by James Bright to Mr. Davis on October 12, 1994.  Motion at 21.  But Exhibit 69 makes no mention of either the October 12 letter specifically or its contents generally, and thus can be in no way seen as a "reply to a duly authenticated letter" as the government contends.  *Id.*  Already in evidence as Government Exhibit 68 is a November 3, 1994 letter from Mr. Bright to Mr. Asselin expressly stating that Mr. Davis did not reply to his October 12 letter, and that no punch list had been created for the job.  Further, Exhibit 69 is an undated letter that references a December 6, 1994 phone conversation with Mr. Bright (not the October 12 letter), and indicates that the punch list items have been completed.  Given the factual predicate underlying the government's theory is false, the government has failed to meet its burden of authenticating this document.

**E.**    ***Government Exhibit 61***

Once again, the government's argument is unavailing with respect to its authentication of Exhibit 61.  While the document references a P.J. Richfield project, there is no indication from its content or substance that it was even written by a P.J. Richfield employee, nevertheless the defendant.  Further, there are many people who would have had knowledge about changes to the ADA/504 project that could have written this document, including, but not limited to: any number of SHA employees, the

24

SHA modernization coordinator, any of the three architects (Bright, Hanifan, and Caolo) who worked on the project, any subcontractors working on the project – all of whom, at one time or another, worked on the project and/or attended the construction meetings concerning the project.  *See* Trial Transcript at 1771-92 (Oct. 4, 2006).  Again, the document was seized from the Sanderson Street building, and no copy was found anywhere in P.J. Richfield's or the defendant's own files.  And the government is incorrect that handwriting identified as Arthur Sotirion's in the corner of the document stating "Spec.," with the words "Footing 4" underneath, are clearly a reference to the four foot foundation walls about which several witnesses have testified.  Motion at 23.  The reference is so vague, and the government has no witness to testify about this document, that it is impossible to say what this handwriting references.  Finally, setting aside the authentication issue, it is not even clear that this document is relevant, given the government's contention that the four foot foundation walls were never built, not that the size of such walls was reduced.

### F.    *Government Exhibit 67*

Government Exhibit 67 is a typewritten document that references "advantage[s]" to the SHA and "advantage[s]" to Mr. Davis for work done on an SHA contract. Notably, this is the sole document that the government does not contend is the statement of the defendant.  Rather, the government seems to make two arguments here, either that because the document is annotated by Mr. Sotirion, it is the "adopted" statement of a co-conspirator, or that the circumstances suggest it was typed either by Mr. Sotirion or Mr. Davis, so it should be admitted as a co-conspirator statement irrespective of its authorship.  Motion at 24.  Both arguments are incorrect, legally and factually.  As to the

former, the government cites to no case law or rule of evidence to support the notion that a co-conspirator "adopting" a document that contains statements that are not his own can render that document admissible against a co-conspirator. While under Rule 801(d)(2)(B) an adoptive admission of the *defendant* would be admissible against him, and of course under Rule 801(d)(E) an actual statement of a co-conspirator is admissible, the government's attempt to conflate these two rules in order to authenticate this document has no legal basis. Further, even if the government's theory were legally sound, the fact that a witness has testified that Arthur Sotirion's handwriting exists somewhere on this document is insuffient, without more, to demonstrate that he "manifested an adoption or belief in its truth." Fed. R. Evid. 801(d)(2)(B). No witness has testified about this document or the circumstances of its creation, and there is no factual basis for stating that Mr. Sotirion adopted the typewritten portion.

Furthermore, there is no basis in the record for assuming, as the government asks this Court to do, that the document must have been created by either Mr. Davis or Mr. Sotirion. The document appears to contemplate changes to a P.J. Richfield contract, wherein Mr. Davis would do additional work not required by the contract specifications which would be a net "advantage" to the SHA, and in exchange Mr. Davis would not be required to do other aspects that were initially part of the contract specifications, resulting in a net "advantage" to him. Once again, these kinds of changes to the contract would have been known to many people, the majority of whom are not alleged co-conspirators, including, but not limited to, Wallace Kisiel, James Bright, James Hanifan, and Vito Caolo – all of whom, at one time or another, worked on the project and/or attended the construction meetings concerning this project. Therefore, unlike the 8th Circuit case

cited to by the government in its motion, Exhibit 67 is not the type of document that could only have been written by a co-conspirator. *See United States v. Helmel*, 769 F.2d 1306, 1313 (8th Cir. 1985) (admitting a ledger detailing the financial affairs of the illegal gambling enterprise).

### G.    *Government Exhibit 84*

The government seeks to authenticate as a statement of the defendant one page in a folder containing a hodgepodge of documents that was produced pursuant to a subpoena for P.J. Richfield files. Once again, the government's argument boils down to a claim that because the document was produced by P.J. Richfield, and pertains to P.J. Richfield work, therefore it must have been written by the defendant. In support of its argument, the government this time claims that "it is undisputed that the defendant operated P.J. Richfield by himself," a statement that is unsubstantiated and contrary to the testimony of the government's own witnesses and and the government's arguments. Absent someone to identify the document or to testify that it was written by the defendant, the government simply cannot meet its burden to authenticate Exhibit 84.

### CONCLUSION

For the reasons stated above, the Court should deny the government's Motion *In Limine* to Admit Certain Evidence.

Respectfully submitted,

PETER DAVIS

By his attorneys,

**/s/ James C. Rehnquist**
James C. Rehnquist (BBO # 552602)

27

Kathleen Luz (BBO # 643278)
William J. Trach (BBO #661401)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated:  October 10, 2006

## CERTIFICATE OF SERVICE

I, James C. Rehnquist, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants, on October 10, 2006.

 /s/ James C. Rehnquist
James C. Rehnquist

LIBA/1735877.2