UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                              Criminal No. 04-30033-MAP

RAYMOND ASSELIN, SR., et al.

Defendants.

## DEFENDANT PETER DAVIS'S MEMORANDUM
## IN SUPPORT OF PROPOSED JURY INSTRUCTIONS

Given the complexity of the legal issues to be decided by the jury in this case, defendant
Peter Davis submits this memorandum in support of his proposed jury instructions. This
memorandum is intended to assist the Court in understanding the legal positions the defendant
has taken with respect to some of the more complex instructions. It is not meant to raise every
objection Mr. Davis has or will make with respect to the government's proposed instructions,
which Mr. Davis will describe during the charging conference.

Attached as an appendix to this memorandum is a binder that contains each of the
defendant's proposed instructions, as well as copies of the sources from which those proposed
instructions have been adapted. This includes both the various model instructions relied upon, as
well as case law supporting the more complicated instructions.

**INSTRUCTION NO. 2.5—*Membership in the Conspiracy* (Appendix Tab 19)**

The first and third paragraphs of this proposed instruction are adapted from the Sand
treatise's model instruction for membership in a RICO conspiracy, Instruction 52-32. The Sand
model instruction has been modified, simply adding "conduct or" in front of "participate" in the
first paragraph, so that the instruction more faithfully tracks the language of 18 U.S.C. § 1962(c).

The second paragraph of the instruction is excerpted directly from the First Circuit pattern instruction on conspiracy. The final paragraph is excerpted directly from the Sand model instruction on membership in a conspiracy generally, Instruction 19-6.

There has been no shortage of confusion in the case law as to the precise requirement for membership in a RICO conspiracy. In particular, there is some confusion as to whether the Supreme Court's operation/management test for determining whether outsiders to the RICO enterprise can be held liable for a substantive RICO violation, set forth in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), applies in the context of RICO conspiracy. *Compare Neibel v. Trans World Assurance Co.*, 108 F.3d 1123, 1128-29 (9th Cir. 1997), *with United States v. Warneke*, 310 F.3d 542, 547 -548 (7th Cir. 2002). As such, Mr. Davis's proposed instruction does not use the operation/management language from *Reves* in describing the membership element, or suggest that the government must prove Mr. Davis himself operated or managed the SHA.

The proposed instruction does, however, state that "the government must show that the defendant agreed to conduct or participate in, directly or indirectly, the affairs of the SHA through a pattern of racketeering activity." This language, with the minor noted alteration, is taken directly from the Sand treatise, and is an appropriate description of the membership element in this case, for two reasons. First, taken in its entirety (and in conjunction with the remaining instructions), the instruction is clear in stating that Mr. Davis need not have agreed to commit the underlying criminal acts, specifically stating that he need not have agreed to commit any racketeering acts. Thus, the instruction does not run the risk of convincing the jury that Mr. Davis needed to have committed, or agreed to commit, a substantive RICO violation in order to be found guilty of RICO conspiracy. *See Salinas v. United States*, 522 U.S. 52 (1997). Second,

and more importantly, given the indictment against Mr. Davis and the government's theory of the case, if the government is able to prove that Mr. Davis agreed to engage in a bribery scheme with SHA officials, this might be sufficient to show that he agreed to conduct or participate in the affairs of the SHA. *See Reves*, 507 U.S. at 184 ("An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery."). Conversely, because the acts of bribery are the only racketeering acts relating to Mr. Davis, if the government is not successful in showing that Mr. Davis was engaged in the charged bribery scheme, the evidence will be insufficient to find him guilty of RICO conspiracy.[1]

**INSTRUCTION 2.6—*Pattern of Racketeering Activity* (Appendix Tab 20)**

The first paragraph of this proposed instruction is adapted from the Sand treatise's model instruction on pattern of racketeering activity, Instruction 52-23. The Sand model instruction has been modified to reflect that Mr. Davis is being tried under § 1962(d) for conspiring to violate § 1962(c). A defendant may be convicted of violating § 1962(d) if the government proves that he "adopt[ed] the goal of furthering or facilitating [a] criminal endeavor" that, "if completed, would satisfy all of the elements of [§ 1962(c)]," even if the government fails to prove that the defendant "himself commit[ed] or agree[d] to commit the two or more predicate acts requisite to the underlying offense." *Salinas*, 522 U.S. 52 at 65; *accord United States v. Cianci*, 378 F.3d 71, 90 (1st Cir. 2004). Mr. Davis has used the phrases "the commission of" and "agreed-upon racketeering acts" in his proposed instruction to reflect that settled point of law.

---

[1] In short, this is not an instance like that in *Salinas*, in which a low-level member of the enterprise, though not actually conducting its affairs himself, assisted his superiors in the operating the affairs of the enterprise through a pattern of racketeering activity.

The second and third paragraphs of the proposed instruction also draw heavily from the Sand treatise's model instruction 52-23 but are supplemented with additional analytical concepts concerning "continuity" derived from Supreme Court and First Circuit authority that are appropriately considered by the jury in this case. First, Mr. Davis's proposed instruction highlights that racketeering acts extending over a short period of time and threatening no future criminal conduct do not satisfy the continuity requirement. Second, Mr. Davis's proposed instruction explains that multiple racketeering acts do not form a pattern when they are appropriately characterized as a single criminal episode. Each concept, and its applicability to the evidence Mr. Davis expects will presented to the jury in this trial, will be explained in turn.

Mr. Davis expects that any agreed-upon racketeering activity the government may be able to prove will also be shown to have occurred over too short a period to be continuous under the Supreme Court's decision in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), and therefore the jury should be instructed to properly make that determination. In *H.J. Inc.*, the Court explained the temporal limitations inherent in the concept of continuity:

> A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of predicate acts extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.

492 U.S. at 242. Thus, if the racketeering activity to which Mr. Davis agreed lasted for too short a period and threatened no future criminal conduct, the government will have failed to prove continuity as a matter of law.[2]

---

[2]    As the Supreme Court has explained, "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Here, the open-ended theory of continuity—conduct that by its nature projects into the future with a threat of repetition—is not viable. Mr. Davis expects to prove that he

Here, the evidence may show that the duration of the agreed-upon racketeering acts was so short that the jury could reasonably find the requisite continuity lacking. The thirteen racketeering acts specified in the Indictment covered a period of less than fifteen months, from September 30, 1996, through December 17, 1997. Indictment ¶ 40. The First Circuit has held on more than one occasion that short stints of racketeering activity involving relatively few predicate acts are not sufficiently continuous to violate § 1962(c). *See Libertad v. Welch*, 53 F.3d 428, 445 (1st Cir. 1995) (five acts over a three-month period "did not constitute a closed-ended period of continued criminal conduct"); *see also Giuliano v. Fulton*, 399 F.3d 381, 390 (1st Cir. 2005) (sixteen predicate acts over a six-month period was probably inadequate); *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 17 (1st Cir. 2000) (21-month period in which 17 acts were committed was "more than a few weeks or months" but not so long that it necessarily met the continuity requirement); *Apparel Art Int'l, Inc. v. Jacobson*, 967 F.2d 720, 723 (1st Cir. 1992) (several racketeering acts committed over a few months "all took place over a comparatively short period of time"). Accordingly, this Court should instruct the jury that even if it finds that Mr. Davis agreed to the commission of racketeering acts, it nevertheless may not convict if it finds that the duration of that agreed-upon racketeering activity was too short and did not pose a threat of future criminal activity.

The last paragraph of this proposed instruction helps guide the jury in assessing continuity in the event it determines that the period of agreed-upon racketeering activity was not

---

completely retired from the contracting business in 1998, at least five years before the Indictment in this case was returned. Under the circumstances, there simply was no threat of repetition. *See Systems Mgmt., Inc. v. Loiselle*, 303 F.3d 100, 106 (1st Cir. 2002) ("If Loiselle had concrete plans to bid on contracts on other jobs and to carry them out through [racketeering activity], the 'continuing threat' label would be supported, and the case would fit within what the Supreme Court has viewed as an 'open ended' pattern of racketeering sufficient under RICO."). Hence, the government's proposed instruction no. 38, which instructs only with respect to the open-ended theory of continuity, is flawed.

necessarily too short to form a RICO pattern. The First Circuit has repeatedly held that cases falling into a "middle ground where the duration and extensiveness of the alleged conduct does not easily resolve the issue" of continuity, there can be no pattern where the racketeering acts, whatever their number, constitute a single criminal episode—that is, when "the RICO claim concerns a single, narrow scheme targeting few victims." *Giuliano*, 399 F.3d at 387, 390; *see also Soto-Negron*, 339 F.3d at 38-39; *Systems Mgmt.*, 303 F.3d at 105-06; *Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 731-32 (1st Cir. 1996); *Apparel Art Int'l*, 967 F.2d at 722-23; *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 31 (1st Cir. 1987).[3]

It may be that the only evidence of agreed-upon racketeering activity the jury considers or credits concerns the thirteen payments allegedly made by Mr. Davis during the 1996-1997 time frame; if so, and if the jury believes that those payments were all made in furtherance of a single goal, then this case will fall squarely within First Circuit precedent rejecting closed-ended continuity. In *Efron*, for example, 17 RICO predicate acts were alleged to have been committed over a 21-month period. 223 F.3d at 17. The court observed that First Circuit precedent "firmly rejects RICO liability where 'the alleged racketeering acts …, taken together, … comprise a single effort to facilitate a single financial endeavor.'" *Id.* at 19 (quoting *Schultz*, 94 F.3d at 732 (internal quotation omitted)). And, there, the "multiple related acts … all allegedly were aimed at a single goal." *Id.* at 18. The court thus determined that "the finite nature" of the racketeering activities, together with "their occurrence over a relatively modest period of time," could not

---

[3]    In *United States v. Connolly*, the First Circuit recognized the single-criminal-episode doctrine but held that it did not apply on the facts of that case, where there was evidence of "at least three different 'episodes' … each planned and executed independently of the others over a period of years, and each the result of detailed planning and scheming…." 341 F.3d 16, 30 (1st Cir. 2003). Mr. Davis has acknowledged the *Connolly* court's description of a single criminal episode as something "narrow in scope and purpose" by requesting that language in his proposed jury instruction.

support a jury finding of a RICO pattern under the closed-ended theory of continuity. *Id.* at 19.

Consistent with *Efron* and other First Circuit cases applying the single-criminal-episode theory,

the jury should be instructed that it may find continuity is lacking if the agreed-upon racketeering

activity, although technically amounting to several crimes, all furthered a single goal. *See also*

*Systems Mgmt*, 303 F.3d at 105-06 (no pattern where multiple racketeering acts were all directed

at defendant's effort to maintain one contract); *Apparel Art,* 967 F.2d at 724 (no continuity

where numerous criminal acts were all addressed to a contractor's effort to secure and maintain a

single contract); *Roeder*, 814 F.2d at 31 (no pattern where a single bribe was paid in three

installments, each constituting an individual racketeering act).

## INSTRUCTION 3.6—*Intent to Commit Bribery* (Appendix Tab 27)

"Bribery requires intent 'to influence' an official act or 'to be influenced' in an official

act," *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404 (1999), and Mr. Davis's

proposed instruction 3.6 accurately educates the jury about that required intent, distinguishing

bribes from other things of value offered, promised, or given to public officials—whether they be

illegal gratuities or entirely non-criminal gifts. This proposed instruction is largely based on the

O'Malley treatise's instruction on intent to commit bribery, Instruction § 27.03, although it has

been augmented to address certain issues that are specific to the circumstances of this case.

First, Mr. Davis requests that the jury be instructed as to the substance of paragraph two

because of the government's pervasive—and misleading—use of the term "kickback" during this

trial. The bribery statute Mr. Davis is charged with having conspired to violate, 18 U.S.C. § 201,

refers to "bribery" and "gratuity," not "kickbacks." Here, it is highly likely that the timing of the

payments alleged to have been made by Mr. Davis will raise a genuine issue whether they were

in fact bribes. Given the informal and ambiguous nature of the word "kickback"—and the potential that it could be construed to mean either a gratuity or a bribe (if paid after the fact pursuant to a pre-existing agreement)—it is crucial that the jury not reflexively correlate the word "kickback" with "bribe" as defined in § 201(b) and *Sun-Diamond*.

Second, Mr. Davis's proposed instruction 3.6 is drafted to orient the jury to the appropriate section of § 201—the section applicable to third-party gifts. The government's theory, at least with respect to the 1996-1997 time frame, is that Mr. Davis made payments to third persons—Chris and Joe Asselin—in exchange for official action by Ray Asselin, Jr. and/or Arthur Sotirion. Where supposed bribes are paid to third parties, the government must prove that they were made pursuant to an offer or promise to the public official. 18 U.S.C. § 201(b)(1) ("Whoever … offers or promises any public official … to give anything of value to any other person or entity….").

Third, because there may be a genuine issue whether the payments alleged to have been made by Mr. Davis actually were bribes under § 201(b), the jury needs to be fully educated about the differences between bribes and non-bribe offers, promises, or gifts of thing of value to a public official. "Bribery requires intent 'to influence' an official act or 'to be influenced' in an official act, while illegal gratuity requires only that the gratuity be given or accepted 'for or because of' an official act. In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Sun-Diamond*, 526 U.S. at 404. Mr. Davis's paragraph nine clearly draws that distinction—closely tracking the language of the Supreme Court's decision in *Sun-Diamond*.

Fourth, Mr. Davis's proposed instruction highlights that the government is required to establish a nexus between the thing of value offered, promised, or given and a specific official act. The Court in *Sun-Diamond* explicitly held that "in order to establish a violation of 18 U.S.C. § 201(c)(1)(A), the Government must prove a link between a thing of value conferred upon a public official and a *specific* 'official act' for or because of which it was given." 526 U.S. at 414 (emphasis added).[4] Although "the magnitude of the necessary link … remains in some doubt," *Schaffer*, 183 F.3d at 841; it is unassailable that the *Sun-Diamond* Court required for a bribery conviction that "some *particular* official act be identified and proved," 526 U.S. at 406 (emphasis added).[5]

The definition of "official act" should, as in Mr. Davis's proposed instruction, be limited to the one provided in the statute. Section 201(a)(3) defines the term "official act" to mean "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit. The Court in *Sun-*

---

[4]    Although the precise holding of *Sun-Diamond* pertains to illegal gratuities, the Court plainly assumed that such a nexus was required to prove bribery as well. *See id.* at 405; *see also United States v. Schaffer*, 183 F.3d 833, 854-55 (D.C. Cir. 1999) (Henderson, J., dissenting) ("The Court took for granted that the more stringent *quid pro quo* requirements for bribery required a connection between the thing given and a specific act or omission by the public official."), *vacated in part as moot in light of presidential pardon* 240 F.3d 35 (2001).

[5]    Mr. Davis acknowledges a line of cases from the Fourth Circuit holding that where a payment is intended to influence a course of official action, the government is not required to prove a link between a payment (i.e., an alleged bribe or gratuity) and a specific official act. *See United States v. Quinn*, 359 F.3d 666, 673 (4th Cir. 2004); *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) (following *United States v. Arthur*, 544 F.2d 730, 734 (4th Cir. 1976)). *Jennings* and *Arthur* were both decided before *Sun-Diamond*, and *Quinn* simply followed *Jennings* without considering whether *Sun*-Diamond effected a change in the law. Nevertheless, there is a significant question whether the Fourth Circuit's analysis of this issue survived the Supreme Court's decision. *See Sun-Diamond*, 526 U.S. at 403-04, 414 (calling into question the D.C. Circuit's resolution of respondent's challenge to the sufficiency of the indictment, including the following language from the appeals court's opinion: "That an official has an abundance of relevant matters on his plate should not insulate him or his benefactors from the gratuity statute—as long as the jury is required to find the requisite intent to reward past favorable acts or to make future ones more likely."). No court in the First Circuit has held that such a course-of-dealing approach is permissible in the wake of *Sun-Diamond*.

*Diamond* went to great lengths to explain that "official act" was "carefully defined" in §

201(a)(3), clarifying that not all "official acts" in any sense of that phrase are "official acts"

under the statute.[6]  526 U.S. at 406-07.  To the extent that the government's proposed instruction

contains additional language purporting to define "official act" more broadly, its definition

should be rejected as unnecessary in light of the statutory definition and as inconsistent with *Sun-

Diamond*.

      Finally, paragraph ten of the proposed instruction addresses the timing of gifts in relation

to the official acts they are alleged to have been made to influence.  It is clear that the payer's

intent, rather than the timing of the payment, is key to determining whether a particular payment

is a bribe.  *See Jennings*, 160 F.3d at 1014 ("Because the distinguishing factor between a bribe

and an illegal gratuity is the intent behind the payment, the timing of the payment in relation to

the official act for which it is made is (in theory) irrelevant."); *United States v. Griffin*, 154 F.3d

762, 764 (8th Cir. 1998) (no requirement that, "for bribery, the government must prove that the

bribe-taker be paid before he performs the illegal service."); *United States v. Gatling*, 96 F.3d

1511, 1523 (D.C. Cir. 1996) (quoting *United States v. Campbell*, 684 F.2d 141, 148 (D.C. Cir.

1982)) ("Timing is not determinative of whether a payment constitutes a bribe or a gratuity, since

'[t]he statute proscribes offers and promises of bribes as well as the giving of bribes, and it is

only logical that in certain situations the bribe will not actually be conveyed until the act is

done.'").  But because the intent required for bribery is "the intent '*to influence*' an official act or

'to be influenced' in an official act," *Sun-Diamond*, 526 U.S. at 404 (emphasis added), in a sense

---

[6]    Indeed, one circuit court has held that *Sun-Diamond*'s analysis of "official act" limits the definition to acts involving "at least a rudimentary degree of formality."  *United States v. Valdes*, 437 F.3d 1276, 1279 (D.C. Cir. 2006), *judgment vacated and rehearing* en banc *granted.*

it is simply true as a matter of logic that "[b]ribery is entirely future-oriented … [and] involves the present giving, promise, or demand of something in return for some action in the future…," *Schaffer*, 183 F.3d at 842.[7]  That bribery is inherently future oriented does not mean that a gift (payment) must necessarily precede the official act to constitute a bribe, however.  Rather, where the government is able to prove that there was a promise or offer to pay a bribe that precedes the official act, a gift given after the official act can still be a bribe.  In the absence of such evidence, however, it simply would not be possible for the government to prove that the gift was given with the requisite intent.

**INSTRUCTION NO. 4.0—*Statute of Limitations* (Appendix Tab 28)**

The first, fourth, and fifth sentences of the proposed instruction are merely an explanation to the jury: 1) that it will be required to decide the statute of limitations question; 2) that the statute of limitations for the charged crimes is five years; and 3) that the Indictment was returned on July 9, 2004.  The second and third sentences are a direct quote from *Toussie v. United States*, 397 U.S. 112, 114-15 (1970).  The final sentence is an adaptation of the legal principle set out in *United States v. Juodakis*, 834 F.2d 1099, 1105 (1st Cir. 1987)).

---

[7]    *Accord United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993).  The issue in *Mariano* was whether the appropriate analogous sentencing guideline for the defendants' 18 U.S.C. § 666 convictions was the gratuity guideline or the bribery guideline.  983 F.2d at 1158.  In analyzing that question, the First Circuit distinguished the payment of illegal gratuities from the payment of bribes, explaining that the latter involves "the intent of the payer, by the greasing of palms, to affect the future actions of a public official."  *Id.* at 1159.  Because the defendants there admitted that admitted that they "each sought to receive a *quid pro quo* in the form of future (favorable) treatment, and since the offenses to which they pleaded guilty involved corrupt intent," the First Circuit affirmed the district court's election of the bribery guideline.  *Id.*  Although "the fact that appellants had already received sewer-line and stadium repair contracts at payoff time [was] not outcome determinative," *id.* at 1159-60, the payments there could supportably have been found to have been intended "to influence the future actions of" the pertinent public officials, *id.* at 1160.  This is because the payments were made "to forestall city officials from reassigning the work" and to "retain valuable contracts which [the officials] might otherwise have redirected to a competitor."  *Id.* at 1159.  Nothing in *Mariano* detracts from the principle that bribes are inherently made with the intent to influence future action.

Mr. Davis contends that a brief instruction on the purpose of the statute of limitations is important and helpful to the jury here. The statute of limitations is a somewhat obscure and counterintuitive doctrine, and some explanation of its purpose will help the jury to understand that it is an important and longstanding legal principle, and not a mere technicality. Further, there has been a fair amount of media coverage concerning the statute of limitations, both statewide and locally, for sexual crimes in which the statute of limitations has been portrayed as a technicality allowing sexual predators to escape punishment for their crimes. *see* Michael Paulson and Suzanne Smalley, *Mass. House OKs Stricter Abuse Laws*, Boston Globe, Sept. 9, 2006, at A1 (quoting House Speaker Salvatore F. DiMasi as saying "We've seen people who were molested when they were children, and some people virtually were getting away with it because their statute of limitations had run [out] and we weren't able to prosecute."); Bill Zajac, *Grand Jury Indicts Former Massachusetts Bishop: Statute of Limitations Prevents Prosecution*, Springfield Republican, Sept. 28, 2004 (quoting a victims-group advocate as saying: "Our hearts ache for these brave young men who did what they should: reported to police, cooperated with prosecutors, but were ultimately re-victimized by an archaic and dangerously restrictive legal technicality."). This instruction will explain to the jury that the statute is designed to protect legitimate interests, and not a mechanism to allow criminals to get away with their crimes.

The final sentence explains to the jury that the government must prove beyond a reasonable doubt that the conspiracy Mr. Davis joined, as defined by the scope of his specific agreement, existed within the statute of limitations period. This principle was first outlined by the First Circuit in *United States v. Juodakis*. Adopting the position of the Second Circuit as outlined by Judge Friendly in *United States v. Borelli*, 336 F.2d 376, 385 (2d Cir. 1964), the Court held that to warrant conviction, "the Government must present evidence justifying the jury

in finding beyond a reasonable doubt that the particular agreement into which a defendant entered continued into the period not barred by limitation . . . and the scope of his agreement must be determined individually from what was proved as to him." *Juodakis*, 834 F.2d at 1104. The First Circuit has held that this fundamental principle of conspiracy law also applies in the RICO conspiracy context. *United States v. Boylan*, 898 F.2d 230, 243 (1st Cir. 1990).

**INSTRUCTION NO. 4.0—*Withdrawal* (Appendix Tab 29)**

The first and last paragraphs of this proposed instruction are adapted from the Sand treatise's model instruction for withdrawal from a conspiracy, Instruction 19-10, and from the First Circuit case *United States v. Piva*, 870 F.2d 753 (1st Cir. 1989). The second paragraph is excerpted directly from the Ninth Circuit Pattern Model Criminal Instruction 8.19 on withdrawal from a conspiracy. The third paragraph is excerpted directly from the First Circuit case *United States v. David*, 940 F.2d 722, 739 (1st Cir. 1991).

The first paragraph reflects the substance of the instructions given by the district court, and implicitly approved by the First Circuit, in *United States v. Piva*, 870 F.2d 753 (1st Cir. 1989). In *Piva*, the district court instructed the jury that the burden of *production* was on the defendant to point to some evidence that he withdrew from the conspiracy, and if the defendant met that burden, the burden of *persuasion* shifts to the government to prove beyond a reasonable doubt that the defendant did not withdraw. *Id.* at 756-57. This is also consistent with the approach taken by several other circuits, and outlined in detail by the Seventh Circuit in *United States v. Read*, 658 F.2d 1225 (7th Cir. 1980)).[8]

---

[8]    Notably, the government's proposed instruction on conspiracy does not purport to put the burden on defendant to prove withdrawal. *See* Government's Request for Jury Instructions No. 28, at 35-36.

Mr. Davis has proposed adopting the Ninth Circuit's model instruction on withdrawal from a conspiracy because it is the instruction most consistent with *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-65 (1978), a Supreme Court case that directly ruled on the propriety of jury instructions on the issue of withdrawal. *U.S. Gypsum* involved the criminal prosecution of several companies for conspiracy to violation § 1 of the Sherman Act. *Id.* at 427. The appealing defendant-company's theory at trial was that it withdrew from the conspiracy, and that the jury should be allowed to consider the resumption of competitive activity as an affirmative act demonstrating withdraw. *Id.* at 464. While the district court allowed the company to argue this theory to the jury, its instructions were more narrow:

> In order to find that a defendant abandoned or withdrew from a conspiracy prior to December 27, 1968, you must find, from the evidence, that he or it took some affirmative action to disavow or defeat its purpose. Mere inaction would not be enough to demonstrate abandonment. To withdraw, a defendant either must have affirmatively notified each other member of the conspiracy he will no longer participate in the undertaking so they understand they can no longer expect his participation or acquiescence, or he must make disclosures of the illegal scheme to law enforcement officials.
>
> Thus, once a defendant is shown to have joined a conspiracy, in order for you to find he abandoned the conspiracy, the evidence must show that the defendant took some definite, decisive step, indicating a complete disassociation from the unlawful enterprise."

*Id.* at 463-64. The court found that, in limiting the instruction to "only two circumscribed and arguably impractical methods of demonstrating withdrawal from the conspiracy," the district court committed reversible error. *Id.* at 464-65. As the Court stated, "[n]othing in the case law suggests, much less commands, that such confining blinders be placed on the jury's freedom to consider evidence regarding the continuing participation of alleged conspirators in the charged conspiracy."

14

Mr. Davis acknowledges that several First Circuit cases have stated that withdrawal from a conspiracy "*typically*" "requires either ... a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." *United States v. Piper*, 298 F.3d 47, 53 (1st Cir. 2002) (citing *Juodakis*, 834 F.2d at 1102) (emphasis added). And the government's proposed jury instruction No. 28 expressly incorporates this language. But Mr. Davis contends that this language is insufficient to provide the basis for a proper jury instruction on withdrawal. The First Circuit cases citing this language have either involved a review of the district court's denial of a withdrawal instruction at all, or the review of the district court's denial of Rule 29 motion on the basis that the defendant withdrew as a matter of law. None has stated that this language is an appropriate instruction to the jury in making its determination as the ultimate finder of fact that the defendant withdrew. Using this confining, either/or language as the basis for a withdrawal instruction would be directly contrary to the Supreme Court's decision in *U.S. Gypsum*. For this reason, Mr. Davis argues that the Ninth Circuit's model instruction is the most faithful to the *U.S. Gypsum* Court's reasoning.

Respectfully submitted,

PETER DAVIS

By his attorneys,

  /s/ James C. Rehnquist
James C. Rehnquist (BBO # 552602)
Kathleen Luz (BBO # 643278)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated: October 11, 2006

## <u>CERTIFICATE OF SERVICE</u>

I, James C. Rehnquist, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants, on October 11, 2006.

<u> /s/ James C. Rehnquist           </u>
James C. Rehnquist

LIBA/1733071.2