# INSTRUCTION NO. 2.6

*Pattern of Racketeering Activity - Part II*

Westlaw.

399 F.3d 381                                                                                          Page 1
399 F.3d 381, RICO Bus.Disp.Guide 10,830
**(Cite as: 399 F.3d 381)**

C

Briefs and Other Related Documents

United States Court of Appeals,First Circuit.
Louis J. GIULIANO; GTWO, LLC, A
Massachusetts Limited Liability Company, Plaintiffs,
Appellants,
v.
Stanley FULTON; My Way Holdings, LLC; Anchor
Partners, LLC., Defendants, Appellees.
**No. 04-1168.**

Heard Oct. 8, 2004.
Decided March 7, 2005.
Rehearing Denied May 31, 2005.

**Background:** Real estate developer brought action
alleging that co-venturers conspired to participate and
participated, through repeated acts of mail and wire
fraud, in illegal racketeering scheme in violation of
Racketeer Influenced and Corrupt Organizations Act
(RICO). The United States District Court for the
District of Massachusetts, Robert E. Keeton, J.,
dismissed for failure to state claim. Developer
appealed.

**Holdings:** The Court of Appeals, Howard, Circuit
Judge, held that:

(1) developer failed to allege closed-ended pattern of
racketeering activity, and

(2) developer failed to allege open ended continuity.

Affirmed.

West Headnotes

**[1] Racketeer Influenced and Corrupt
Organizations 319H ⊂⊃3**

319H Racketeer Influenced and Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk3 k. Elements of Violation in
General. Most Cited Cases
To state a claim under the Racketeer Influenced and

Corrupt Organizations Act (RICO), a plaintiff must
allege four elements: (1) conduct, (2) of an
enterprise, (3) through a pattern, (4) of racketeering
activity. 18 U.S.C.A. § 1961 et seq.

**[2] Racketeer Influenced and Corrupt
Organizations 319H ⊂⊃28**

319H Racketeer Influenced and Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk28 k. Continuity or Relatedness;
Ongoing Activity. Most Cited Cases

**Racketeer Influenced and Corrupt Organizations
319H ⊂⊃29**

319H Racketeer Influenced and Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk29 k. Time and Duration. Most
Cited Cases
Party alleging Racketeer Influenced and Corrupt
Organizations Act (RICO) violation may demonstrate
continuity of a pattern of racketeering activity over a
closed period by proving a series of related predicates
extending over a substantial period of time, and
predicate acts extending over a few weeks or months
and threatening no future criminal conduct do not
satisfy continuity requirement. 18 U.S.C.A. § 1961
et seq.

**[3] Racketeer Influenced and Corrupt
Organizations 319H ⊂⊃28**

319H Racketeer Influenced and Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk28 k. Continuity or Relatedness;
Ongoing Activity. Most Cited Cases
A plaintiff under the Racketeer Influenced and
Corrupt Organizations Act (RICO) need not wait for
a long-term pattern to develop under the open-ended
approach for demonstrating continuity, but may state
a claim so long as the alleged racketeering acts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 381
399 F.3d 381, RICO Bus.Disp.Guide 10,830
**(Cite as: 399 F.3d 381)**

themselves include a specific threat of repetition extending indefinitely into the future or are part of an ongoing entity's regular way of doing business. 18 U.S.C.A. § 1961 et seq.

**[4]    Racketeer    Influenced    and    Corrupt Organizations 319H ⬡⬡10**

319H    Racketeer    Influenced    and    Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk4 Racketeering or Criminal Activity
                319Hk10 k. Fraud in General. Most Cited Cases
Generic allegations of common law fraud that do not implicate the mails or wires do not constitute racketeering activity under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1961 et seq.

**[5]    Racketeer    Influenced    and    Corrupt Organizations 319H ⬡⬡70**

319H    Racketeer    Influenced    and    Corrupt Organizations
    319HI Federal Regulation
        319HI(B) Civil Remedies and Proceedings
            319Hk68 Pleading
                319Hk70 k. Racketeering or Criminal Activity; Predicate Acts. Most Cited Cases
A court will not imply or read into the complaint mail or wire fraud as predicate acts under Racketeer Influenced and Corrupt Organizations Act (RICO) where they are not alleged specifically. 18 U.S.C.A. § 1961 et seq.

**[6]    Racketeer    Influenced    and    Corrupt Organizations 319H ⬡⬡10**

319H    Racketeer    Influenced    and    Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk4 Racketeering or Criminal Activity
                319Hk10 k. Fraud in General. Most Cited Cases
While allegation that associate of plaintiff real estate developer submitted switched-page forgery and testified falsely concerning that document at Massachusetts Racing Commission hearing, if true, may have constituted fraud or other common law or statute violations, it did not amount to a Racketeer Influenced and Corrupt Organizations Act (RICO)

predicate act because associate was not alleged to have utilized the mail or the wires. 18 U.S.C.A. § 1961 et seq.

**[7]    Racketeer    Influenced    and    Corrupt Organizations 319H ⬡⬡6**

319H    Racketeer    Influenced    and    Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk4 Racketeering or Criminal Activity
                319Hk6 k. What Are Predicate Acts; Racketeering or Criminal Activity. Most Cited Cases
Under the Racketeer Influenced and Corrupt Organizations Act (RICO), a proposed or anticipated fraudulent act cannot be counted as a predicate act in furtherance of a closed-ended racketeering scheme. 18 U.S.C.A. § 1961 et seq.

**[8]    Racketeer    Influenced    and    Corrupt Organizations 319H ⬡⬡29**

319H    Racketeer    Influenced    and    Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk29 k. Time and Duration. Most Cited Cases
Alleged scheme to fraudulently procure ownership of single piece of real property from one individual victim and his company through commission of 16 predicate acts over six-month period was not adequate to establish closed-ended pattern of racketeering activity under Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1961 et seq.

**[9]    Racketeer    Influenced    and    Corrupt Organizations 319H ⬡⬡30**

319H    Racketeer    Influenced    and    Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk30 k. Number of Persons Involved or Victimized. Most Cited Cases
Merely alleging that a defendant used a governmental body as a tool for facilitating a racketeering scheme that ultimately harmed the plaintiff is not enough to transform a narrow scheme into a broad and far reaching scheme, so as to state a pattern of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

racketeering activity with closed-ended continuity under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1961 et seq.

**[10] Racketeer Influenced and Corrupt Organizations 319H ⌔28**

319H    Racketeer    Influenced    and    Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk28 k. Continuity or Relatedness; Ongoing Activity. Most Cited Cases
Alleged scheme by co-venturers, to fraudulently procure ownership of single piece of real property and accompanying racetrack from developer, did not establish open ended continuity pattern under Racketeer Influenced and Corrupt Organizations Act (RICO), since there was no specific threat of repetition extending indefinitely into future and there was no allegation that racketeering acts were part of co-venturers' regular way of doing business. 18 U.S.C.A. § 1961 et seq.

*382 Robert S. Ovoian, for appellants.
Thomas A. Reed, with whom J. Owen Todd, David H. Rich, and Todd & Weld LLP were on brief, for appellees.

Before TORRUELLA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and HOWARD, Circuit Judge.
HOWARD, Circuit Judge.
Louis Giuliano and GTWO, LLC ("GTWO/MA") brought this civil action alleging that defendants Stanley Fulton, Anchor Partners, LLC ("Anchor"), [FN1] and My Way Holdings, LLC ("My Way") conspired to participate and participated, through repeated acts of mail and wire fraud, in an illegal racketeering scheme in violation of the Racketeer Influenced and Corrupt Organizations*383    Act ("RICO"), 18 U.S.C. § § 1962(b)-(d). The district court dismissed the amended complaint for failure to state a claim. See Fed.R.Civ.P. 12(b)(6). We affirm.

        FN1. Although the amended complaint refers mostly to an entity named Anchor Gaming, Inc., it appears that Anchor Gaming was a subsidiary controlled by Anchor Partners, LLC. Because the distinction is not critical to our disposition,

we refer to both entities as "Anchor."

**I.**

We take as true the facts alleged in the complaint when reviewing a dismissal for failure to state a claim. Soto-Negron v. Taber Partners I, 339 F.3d 35, 36 (1st Cir.2003). At the heart of this lawsuit is a joint venture gone sour. We note that the parties who were principally involved in the venture, and in the subsequent conduct that has been alleged to constitute a RICO violation, are not defendants in this action. Indeed, the defendants here are accused of financing and furthering the racketeering scheme only after it had already been initiated by these other parties, who have been sued by the plaintiffs in state court, and whom we shall, at times, refer to as the "alleged conspirators."

The dispute centers around a 92-acre property in Massachusetts that Giuliano and an associate, Gary Piontkowski, discussed purchasing in 1997 for the purpose of operating a harness racing track. Piontkowski entered into a purchase and sale agreement with the owner of the property and, in 1998, formed Plainville Racing Company, LLC ("PRC") to operate the proposed racetrack. Shortly thereafter, Piontkowski assigned his rights in the property to Giuliano with the understanding that Giuliano, through his company GTWO/MA, would secure financing to complete the purchase of the property and to build the necessary facilities. Before acquisition of the property was complete, Giuliano executed a sublease whereby PRC leased, for the purpose of operating the racetrack, a 52-acre portion of the property from GTWO/MA for below-market rent. An addendum to the sublease granted PRC the right to exercise an option to purchase the subleased premises for fair market value.

Following execution of the sublease, the Massachusetts Racing Commission ("Commission") granted PRC a 1999 harness racing license (racing licenses are awarded annually by the Commission) conditioned on Giuliano completing acquisition of the property by December 1, 1998. Giuliano obtained the necessary financing and a deed to the property was executed in favor of GTWO/MA on November 16, 1998. Shortly after closing, however, and less than two weeks before expiration of the purchase and sale agreement, Giuliano's lender threatened to back out if the loan was not restructured under new terms. Given that both the Commission's deadline and the expiration of the purchase and sale agreement were fast approaching, Giuliano agreed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 381
399 F.3d 381, RICO Bus.Disp.Guide 10,830
(Cite as: 399 F.3d 381)

the new terms.

Under the restructured loan, a nominee of the lender, a limited liability company formed by the lender under Rhode Island law, GTWO, LLC ("GTWO/RI"), took title to the property. Giuliano received an option to purchase the property and a master lease giving him control of the property during the pendency of the option. Giuliano could exercise the option, at any time before January 28, 2000, by paying back his loan advancement in full plus interest. The lender required GTWO/MA and PRC to execute a First Amendment to Lease ("First Amendment") to confirm that the sublease between GTWO/MA and PRC was subordinate to the master lease between GTWO/RI and GTWO/MA. The First Amendment also converted PRC's option to purchase the subleased premises into an option to purchase GTWO/MA's one-year leasehold interest. Giuliano and Piontkowski signed the First Amendment with Russell Paige, an employee of GTWO/MA, serving as an attesting witness.

*384 Shortly after the restructuring, and in response to the negative cash flow created by PRC's below-market rent,[FN2] Giuliano insisted that Piontkowski provide him with an option to purchase all of Piontkowski's shares of PRC stock for $1 million. Piontkowski agreed and a stock purchase agreement was executed in favor of Giuliano. When Giuliano subsequently learned that another Piontkowski-owned company was also a part-owner of PRC, Giuliano had Piontkowski execute a second stock purchase agreement that gave Giuliano the option to purchase all of the shares of that company. Piontkowski then asked Giuliano to sign a Lease Confirmation and Acknowledgment agreement ("Lease Confirmation") that essentially stated, in contravention of the First Amendment, that PRC's option to purchase the subleased premises was binding upon GTWO/RI. Giuliano refused to sign the Lease Confirmation, believing that he did not have authority to sign for GTWO/RI.

> FN2. While Giuliano's rent accrued at a rate of $180,000 per month under the master lease, he only collected $81,000 per month from PRC under the sublease.

Beginning in June of 1999, PRC began breaching its obligations under the terms of the sublease and GTWO/MA provided PRC with several written notices of default. According to Giuliano, this is when Piontkowski hatched a scheme to seize Giuliano's property. On June 25, 1999, Piontkowski sent a letter to Giuliano asserting PRC's purported right to purchase the subleased premises. Attached to the letter was a copy of the Lease Confirmation (that Giuliano had previously refused to sign, but which seemingly bore his signature), that PRC asserted created privity between PRC and the record title owner of the property. Giuliano denied the authenticity of the document, alleging that it was a "switched-page" forgery-the attached signature page actually coming from the First Amendment that Giuliano had previously signed for his lender.

In two separate letters in the fall of 1999, Giuliano notified Piontkowski first, of his intent to exercise his options under the stock purchase agreements to acquire all of Piontkowski's interests in PRC and in the other Piontkowski-owned entity, and second, of the termination of PRC's sublease due to PRC's defaults. Piontkowski, however, refused to sell his ownership interest in PRC and refused to surrender the subleased premises.

In late September 1999, Piontkowski called a meeting of PRC's investors to discuss PRC's application, to be filed in competition with Giuliano, for a year 2000 racing license. After the investors concluded that the switched-page Lease Confirmation was not authentic, Paige, now employed by PRC, manufactured a new version of the Lease Confirmation by cutting and pasting Giuliano's signature onto a blank Lease Confirmation form. Paige forwarded this "cut-and-paste" forgery to Piontkowski, who later circulated it to the PRC investors.

In October 1999, PRC submitted a year 2000 application stating that PRC had long-term control of the subleased premises. At a series of Commission hearings in October and November 1999, Piontkowski and PRC presented the switched-page forgery as evidence of PRC's rights to the property. Piontkowski and Paige testified that Piontkowski had never signed the First Amendment and had never agreed to subordinate PRC's sublease to Giuliano's master lease. Moreover, they testified that Giuliano had signed the Lease Confirmation, which acknowledged that PRC had a 30-year lease with an option to purchase the premises. Piontkowski asserted that it was Giuliano who had perpetrated the *385 fraud by attaching the signature page from the Lease Confirmation onto the First Amendment. When the authenticity of the switched-page Lease Confirmation was questioned, Piontkowski submitted the cut-and-paste Lease Confirmation. Relying on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 381
399 F.3d 381, RICO Bus.Disp.Guide 10,830
(Cite as: 399 F.3d 381)

the forged documents and perjured testimony, the Commission concluded that PRC's sublease had not been subordinated to the master lease and thus PRC had a long-term right to control of the premises. Accordingly, on November 15, 1999, the Commission granted a year 2000 racing license to PRC.

Piontkowski and PRC then filed a complaint in Massachusetts state court seeking a declaration that PRC had validly exercised its option to purchase the subleased premises. On November 1, 1999, PRC used the cut-and-paste forgery and perjured testimony to obtain a Memorandum of *Lis Pendens* from the court that effectively clouded title to the property. Throughout the course of these state proceedings, PRC submitted numerous fraudulent filings to the court. The state court relied on these fraudulent misrepresentations in denying Giuliano's motion to dismiss.

On November 12, 1999, Giuliano filed his own Massachusetts state court action against Piontkowski and PRC seeking specific performance of the stock purchase agreements. In their answer, Piontkowski and PRC again relied on the cut-and-paste forgery. Because the ultimate objective of the racketeering scheme was to unite the alleged conspirators' control of both the racing license and the racetrack property, and since PRC was the entity they were using to achieve that end, the alleged conspirators' misrepresentations in this state action were intended to further the scheme by preventing Giuliano from seizing control of PRC.

In December 1999, anticipating the expiration of Giuliano's option, Alfred Ross, one of PRC's investors, solicited financing from Stanley Fulton and Anchor. Fulton and senior management from Anchor met with Ross and Piontkowski in Arizona later that month to discuss financing the acquisition of the property. Fulton was apprised of the fraudulent basis of PRC's and Piontkowski's claims against Giuliano and was made aware of the means and objectives of the illegal scheme. Despite this knowledge, Fulton and Anchor agreed to provide $5 million toward acquisition of the property. Mindful of Giuliano's outstanding claims under the stock purchase agreements, the alleged conspirators formed a straw holding company to shield the property from the potential reach of Giuliano. All of PRC's investors, including Ross and Piontkowski, combined with Fulton and Anchor to create Ourway Realty, LLC ("Ourway").

The scheme was successful. With the *lis pendens* clouding record title, Giuliano was unable to obtain the financing necessary to exercise his option before it expired on January 28, 2000. Shortly thereafter, PRC released, without consideration, its claim against GTWO/RI that it had a 30-year lease with an option to purchase, thus lifting the cloud on title. The alleged conspirators then acquired the property, Ourway took title, and PRC entered into a series of one-year leases with Ourway. PRC did not, however, pay any rent to Ourway, and the leases explicitly provided for the automatic termination of PRC's leasehold interest should Giuliano gain control of PRC. [FN3]

> FN3. In June of 2000, Giuliano was granted summary judgment by the Massachusetts court as to his right to enforce the stock purchase agreements.

According to Giuliano, the alleged conspirators have persisted in their misrepresentations *386 to the state courts and to the Commission. In the three years following Ourway's acquisition of the property, PRC and Piontkowski continued to deny falsely, in state court and Commission filings, any knowledge concerning the origin of the cut-and-paste forgery. These misrepresentations were allegedly made with the full knowledge and acquiescence of the defendants.

On October 1, 2003, Ourway filed an application for a year 2004 racing license. The application stated Ourway's intention to purchase all of PRC's assets in exchange for a cancellation of debt owed by PRC to Ourway for accrued unpaid rent. Ourway's application stated that Piontkowski would continue as the manager of the racetrack. The proposed transfer of PRC's assets to Ourway is the most recent ploy to defeat Giuliano's efforts to reacquire control of the property.

On October 10, 2003, Giuliano and GTWO/MA (henceforth "Giuliano") moved to file an amended complaint in Massachusetts federal district court alleging that the defendants were conspirators and active participants in a pattern of racketeering activity whereby mail and wire communications were used to defraud the plaintiffs of valuable property in violation of 18 U.S.C. § § 1962(b)-(d). The district court allowed the amended complaint, but nevertheless dismissed the case for failure to state a claim. The court held that the plaintiffs failed to allege a pattern of racketeering activity sufficient to make out a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 381                                                                                         Page 6
399 F.3d 381, RICO Bus.Disp.Guide 10,830
**(Cite as: 399 F.3d 381)**

RICO claim because the alleged predicate acts did not "amount to or pose a threat of continued criminal activity."

In this appeal, Giuliano argues that the district court minimized or ignored three important factors: (1) that the alleged illegal scheme was carried out over a period of more than four years; (2) that the alleged scheme was both extensive and complex; and (3) that the alleged scheme posed a "societal threat" because it perpetrated a fraud on the Massachusetts state courts and on the Commission.   According to Giuliano, having overlooked these factors, the court failed to comprehend the true breadth and depth of the alleged racketeering activity.

## II.

We review *de novo* a district court's dismissal of a complaint for failure to state a claim. *Soto-Negron, 339 F.3d at 38.*   When reviewing a Fed.R.Civ.P. 12(b)(6) dismissal, "[w]e accept as true the well-pleaded factual allegations of the complaint, draw all reasonable inferences therefrom in the plaintiff's favor and determine whether the complaint, so read, sets forth facts sufficient to justify recovery on any cognizable theory." *Martin v. Applied Cellular Tech., Inc., 284 F.3d 1, 6 (1st Cir.2002).*

[1] To state a RICO claim, plaintiffs must allege four elements:  "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 233 (1st Cir.2003)* (quoting *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).*   "Racketeering activity" means any act that violates one of the federal laws specified in the RICO statute, *see* 18 U.S.C. § 1961(1), including the mail and wire fraud statutes, 18 U.S.C. § § 1341 and 1343.   At least two acts of racketeering activity must occur within ten years of each other to constitute a "pattern." *Id.* § 1961(5).   The Supreme Court has construed the pattern element as additionally requiring a showing that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *387H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).*   This is the so-called "continuity plus relationship" standard. *Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 15 (1st Cir.2000).*

[2][3] The Supreme Court has identified two methods for establishing continuity.   Under the "closed-

ended" approach, continuity is established by showing "a series of related predicates extending over a substantial period of time" that "amount to" a threat of continued criminal activity. *H.J., 492 U.S. at 242, 109 S.Ct. 2893.*   Because the RICO statute was only intended to reach long-term criminal conduct, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement." *Id.*   Under the "open-ended" approach, a RICO plaintiff need not wait for a long-term pattern to develop, but may state a claim so long as the alleged "racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] ... are part of an ongoing entity's regular way of doing business." *Id.*

In this case, the district court declined to find either "open-ended" or "closed-ended" continuity.   The court concluded that the plaintiffs failed to establish open-ended continuity because the only scheme alleged in the amended complaint, "to take over certain valuable real estate ... in Massachusetts," presented no danger of continuing racketeering activity "indefinitely into the future."   Relying on *Efron, 223 F.3d at 18,* the court also concluded that the plaintiffs had not shown closed-ended continuity because the alleged racketeering activity concerned a single scheme with a closed group of targeted victims.   Because the parties focus their arguments on the correctness of the court's closed-ended continuity holding, we begin our analysis there.

Giuliano's primary appellate argument is that the amended complaint alleged numerous predicate acts extending over four years and that these allegations of temporal duration and extensive conduct satisfy the requirement for closed-ended continuity.   He points out that a closed-ended pattern sometimes can be established by examining only the number of alleged predicate acts and the duration of the alleged racketeering activity. *See H.J., 492 U.S. at 242, 109 S.Ct. 2893.*   This is because, where the temporal duration of the alleged activity and the alleged number of predicate acts are so extensive that "common sense compels a conclusion of continuity," closed-ended continuity should be found. *Efron, 223 F.3d at 18; see also Fleet Credit Corp. v. Sion, 893 F.2d 441, 446-47 (1st Cir.1990)* (holding that an allegation of 95 fraudulent mailings over a period of four and one-half years is sufficient, without more, to state a pattern of racketeering activity).

Conversely, where only a few predicate acts are alleged, *or* where the period of time is short,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 381                                                                                                 Page 7
399 F.3d 381, RICO Bus.Disp.Guide 10,830
**(Cite as: 399 F.3d 381)**

continuity can never be established. *See Sion,* 893 F.2d at 447. This is because "[t]oo few acts would suggest that the defendants were engaged in only 'sporadic activity,' ... and too short a period of time would suggest that defendants were not engaged in 'long-term criminal conduct.' " *Id.* (quoting *H.J.,* 492 U.S. at 239, 242, 109 S.Ct. 2893).

Some cases, however, fall into a middle ground where the duration and extensiveness of the alleged conduct does not easily resolve the issue. In these cases, we examine other indicia of continuity, *see Efron,* 223 F.3d at 17 (where plaintiff alleged 17 acts of wire and mail fraud over 21 months, the time frame was "not so long[,]" nor were the predicate acts "so many[,]" that "other indicators of continuity-or the lack of them-are without significance"*388 ), including whether the RICO allegation concerns only a single scheme that is not far reaching, *see Kenda Corp.,* 329 F.3d at 233; *Apparel Art Int'l, Inc. v. Jacobson,* 967 F.2d 720, 723-24 (1st Cir.1992) (Breyer, C.J.). In such cases, we decline to find the requisite continuity. *See Sys. Mgmt., Inc. v. Loiselle,* 303 F.3d 100, 105-06 (1st Cir.2002) ("RICO is not aimed at a single narrow criminal episode, even if that single episode involves behavior that amounts to several crimes.").

[4] In light of these principles, our first task is to determine whether the duration of the alleged racketeering conduct is either so long or so short that the continuity determination can be resolved on that basis alone. In performing this task, we evaluate the complaint through the particularity prism of Fed.R.Civ.P. 9(b), *see New England Data Servs., Inc. v. Becher,* 829 F.2d 286, 290 (1st Cir.1987), considering "only those predicate acts specifically alleged" in the complaint, *Efron,* 223 F.3d at 16. Also, we do not credit generic allegations of common law fraud that do not implicate the mails or wires, as these acts do not constitute racketeering activity under RICO. *See Sion,* 893 F.2d at 445; *see also Efron,* 223 F.3d at 20 (noting that "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it").

[5][6] With this in mind, we give the amended complaint the required scrutiny.[FN4] Many of the specific allegations of fraud do not implicate the mail or the wires. For example, it is claimed that Piontkowski submitted the switched-page forgery and testified falsely concerning that document at an October 21, 1999 Commission hearing. While this allegation, if true, may constitute fraud or other common law or statutory violations, it does not amount to a RICO predicate act because Piontkowski is not alleged to have utilized the mail or the wires. We will not imply or read into the amended complaint the mail or wire connection where it is not alleged specifically. *See Sion,* 893 F.2d at 444 (we have "no duty to conjure up unpled allegations in order to bolster the plaintiff's chances of surviving a 12(b)(6) motion to dismiss") (internal quotation marks omitted).

FN4. The defendants also contend that the plaintiffs failed to allege a conspiracy adequately, and thus we should not consider any acts committed by the non-defendant conspirators. They also say that misrepresentations made to the state courts and to the Commission, as well as the attempts to conceal underlying racketeering activity through fraudulent misrepresentations, are not predicate acts under RICO. Because the amended complaint fails to state a viable RICO claim even if these allegations are taken into account, we bypass these arguments.

With respect to the actual named defendants, the most we are told is that "[t]he arrangements for the Arizona meeting [with Piontkowski and Ross], the agreements calling for Fulton [and Anchor] to provide financing in furtherance of the Illegal Scheme, [and] the actual transfer of the funds Fulton provided for the financing were all accomplished through the use of the mail and interstate wire communications." We are also told that "[o]n multiple occasions on and after December of 1999, Fulton consulted and communicated by mail, telephone and interstate wire transmission with the other participants in the Illegal Scheme, to discuss the planning and to make decisions about the method and strategy of carrying out the Illegal Scheme." These vague allegations do not satisfy Fed.R.Civ.P. 9(b). *See North Bridge Assocs., Inc. v. Boldt,* 274 F.3d 38, 43 (1st Cir.2001) (RICO plaintiff must *389 state "the time, place and content of the alleged mail and wire communications perpetrating" the fraud) (internal quotation marks omitted); *Sion,* 893 F.2d at 444-45.

The attempt to establish the ongoing nature of the racketeering activity also falls short. Giuliano alleges that the alleged conspirators maintained their misrepresentations, with the full knowledge and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 381                                                                                   Page 8
399 F.3d 381, RICO Bus.Disp.Guide 10,830
(Cite as: 399 F.3d 381)

acquiescence of the defendants, throughout the pendency of the two state court proceedings and each year, from 1999 to 2003, when the Commission considered racing license applications.    But even assuming these misrepresentations could be actionable under RICO, all of Giuliano's post-1999 allegations fall well short of satisfying Fed.R.Civ.P. 9(b).   For example, the amended complaint alleged that "[c]ontinuously since the start of the state court litigation between the parties in 1999, and after Fulton, Anchor Partners and My Way joined the Illegal Scheme shortly thereafter, Piontkowski [and] PRC    have    made    innumerable    fraudulent misrepresentations to the state court and to the Commission."    No specificity is provided with regard to the time, place or content of these alleged misrepresentations.

[7]   Giuliano additionally alleges that Ourway's October 1, 2003 filing with the Commission, stating its intention to purchase all of PRC's assets, establishes a proposed fraudulent transfer of assets designed to frustrate Giuliano's efforts to regain control of the racetrack.[FN5]   However, a proposed or anticipated fraudulent act cannot be counted as a predicate act in furtherance of a closed-ended racketeering scheme.    Cf. Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir.1990) (affirming the dismissal of a RICO claim as unripe where the plaintiff's alleged injury was "contingent on events that may not occur as anticipated or may not occur at all").

> FN5. Giuliano's appellate brief asserts that the allegedly fraudulent transfer was indeed consummated after the amended complaint was filed.

[8]   Having pruned the amended complaint to its properly pleaded allegations, we are left with an alleged scheme that is far less extensive than portrayed by the plaintiffs.    On June 25, 1999 Piontkowski and PRC allegedly sent correspondence to Giuliano via mail and fax asserting the right under the forged Lease Confirmation to purchase the subleased premises.    Similar correspondence was sent to Giuliano by mail on October 1 and again on October 5, 1999.   Around this time, Paige allegedly faxed the cut-and-paste forgery to Piontkowski, who then faxed it to the other PRC investors.   Paige also allegedly e-mailed PRC's attorney a draft of the false statement that he planned to deliver to the Commission at the November 1999 hearings. Regarding the allegedly fraudulent PRC filings, the

amended complaint provided details on three: (1) a post-hearing submission sent by mail to the Commission and Giuliano on November 9, 1999; (2) PRC's request to the state court for a lis pendens sent by mail in December 1999; and (3) PRC's opposition to Giuliano's motion to remove the lis pendens sent by mail in December 1999.

Finally, the amended complaint alleged that PRC and Piontkowski attempted to conceal the underlying fraud through (1) an affidavit by Piontkowski, denying any knowledge of the forgeries, that was faxed to the state court in a December 1999 opposition to Giuliano's motion to dismiss the lis pendens action, and (2) a written discovery response, sent by mail to Giuliano's counsel sometime in 2001, falsely omitting any reference to the draft statements created for Paige's November 1999 Commission testimony.

*390 Thus, we are left with approximately 16 alleged predicate acts [FN6] conducted almost exclusively between June and December of 1999, the only exception being the allegedly misleading discovery response in 2001.   Our case law suggests that the commission of 16 predicate acts over a six-month period is inadequate to establish a closed-ended pattern of racketeering activity.    See Loiselle, 303 F.3d at 106 (21-month scheme involving mail fraud was not actionable under RICO); Boldt, 274 F.3d at 43 (two acts of mail fraud over four months insufficient to support a RICO claim).

> FN6.   Given the vagueness inherent throughout the amended complaint, even after culling it to its properly plead allegations, it is difficult to come to a precise figure.    For example, it is alleged that Piontkowski faxed the cut-and-paste forgery to the PRC investors.   The amended complaint does not quantify exactly how many PRC investors this document was sent to.     Elsewhere the amended complaint mentions at least four people who were PRC investors at around that time.   For the sake of our analysis, therefore, we will assume that Piontkowski faxed the forgery four times on this occasion.

[9] But even assuming that this case falls into the middle ground, the plaintiffs have failed to allege a pattern of racketeering activity with the required closed-ended continuity.   As discussed above, where a case falls into the middle ground, we have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 381                                                                                                           Page 9
399 F.3d 381, RICO Bus.Disp.Guide 10,830
**(Cite as: 399 F.3d 381)**

consistently declined to find continuity where the RICO claim concerns a single, narrow scheme targeting few victims. *See Efron,* 223 F.3d at 19 ("[C]ombination of single scheme, single injury, and few victims ... makes it virtually impossible for plaintiffs to state a RICO claim.") (internal quotation marks omitted).   At most, the plaintiffs' amended complaint establishes a situation similar to *Efron,* where we held that the plaintiffs' allegation that his business partners engaged in a series of 17 predicate acts over a 21-month period failed to state a pattern of racketeering activity.   We concluded that while the 21-month period fell into the middle ground, the claim failed because all of the alleged acts of deception "were aimed at the single goal of transforming the ownership of the [business]" and harmed only three named victims. *Efron,* 223 F.3d at 18;  *see also Apparel Art,* 967 F.2d at 723.   So too here.   The amended complaint alleges a six-month scheme [FN7] to fraudulently procure ownership of a single piece of property from one individual victim and his company.[FN8]  Their only injury was the loss of the property and the accompanying racetrack.   There is no allegation that anything broader or more far reaching was attempted.   Thus, this case falls squarely within our precedent rejecting closed-ended continuity. *See Efron,* 223 F.3d at 21 ("Taken together, the acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular [business venture] from a limited*391 number of [victims].   This cannot be a RICO violation.").

> FN7. The allegedly fraudulent 2001 discovery response does nothing to extend the scheme, as a "pattern is not formed by sporadic activity." *H.J.,* 492 U.S. at 239, 109 S.Ct. 2893.

> FN8. Contrary to the plaintiffs' assertion, we do not view the Massachusetts state courts or the Commission as "victims" of the alleged racketeering scheme.   Moreover, merely alleging that the defendant used a governmental body as a tool for facilitating a racketeering scheme that ultimately harmed the plaintiff is not enough to transform a narrow scheme into a broad and far reaching scheme. *See Apparel Art,* 967 F.2d at 721-24 (finding no pattern of racketeering activity and placing no import on the plaintiff-subcontractor's allegation that the defendant-contractor's scheme to obtain a government contract included

submission of false statements to the United States Department of Defense); *see also Loiselle,* 303 F.3d at 105-06 (finding the absence of a broad and far reaching racketeering scheme where the defendant had secured and maintained a contract with a state-run college system through several acts of mail fraud).

[10] The district court's ruling that there was no open-ended continuity is similarly unassailable.   The amended complaint did not allege a specific threat of repetition extending indefinitely into the future, nor did it allege that the racketeering acts were a part of the defendants' regular way of doing business.   To the contrary, it acknowledged that all of the racketeering activity was focused on the singular objective of wresting control of the racetrack away from Giuliano.   Once achieved, the illegal scheme, as alleged, would end.   The amended complaint does not suggest that the defendants or the alleged conspirators would "seek to repeat their fraud in other ... similar business settings," or that they would "employ mail and wire fraud indefinitely" in their future racing or gaming operations. *Id.* at 19.

### III.

For the foregoing reasons, the district court concluded correctly that the plaintiffs' amended complaint alleged neither a closed-ended nor an open-ended pattern of racketeering activity.   Therefore, the amended complaint was properly dismissed.

*Affirmed.*

C.A.1 (Mass.),2005.
Giuliano v. Fulton
399 F.3d 381, RICO Bus.Disp.Guide 10,830

Briefs and Other Related Documents (Back to top)

• 04-1168 (Docket) (Feb. 02, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

THIS PAGE INTENTIONALLY LEFT BLANK

**Westlaw.**

341 F.3d 16                                                                                                    Page 1
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
**(Cite as: 341 F.3d 16)**

**H**

**Briefs and Other Related Documents**

United States Court of Appeals,
First Circuit.
UNITED STATES, Appellee,
v.
John J. CONNOLLY, Jr., Defendant, Appellant.
**No. 02-2201.**

Heard May 9, 2003.
Decided Aug. 14, 2003.

Following jury trial, defendant, a former Federal Bureau of Investigation (FBI) agent, was convicted in the United States District Court for the District of Massachusetts, Joseph L. Tauro, J., of racketeering under the Racketeer Influenced and Corrupt Organizations Act (RICO), obstruction of justice, and making false statements. Defendant appealed. The Court of Appeals, Lipez, Circuit Judge, held that: (1) finding of enterprise was supported by sufficient evidence; (2) finding of pattern of racketeering activity was supported by sufficient evidence; (3) defendant was not entitled to fact-finding as to underlying offense that would determine applicable sentencing guideline range; and (4) defendant was not entitled to inquiry into alleged juror misconduct.

Affirmed.

West Headnotes

**[1] Criminal Law** ☞**1139**
110k1139 Most Cited Cases

**[1] Criminal Law** ☞**1144.13(3)**
110k1144.13(3) Most Cited Cases

**[1] Criminal Law** ☞**1144.13(5)**
110k1144.13(5) Most Cited Cases

**[1] Criminal Law** ☞**1159.2(7)**
110k1159.2(7) Most Cited Cases
In evaluating a claim of insufficiency of the evidence, Court of Appeals reviews the record de novo, and Court will affirm the conviction if, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in

its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.

**[2] Criminal Law** ☞**1144.13(3)**
110k1144.13(3) Most Cited Cases

**[2] Criminal Law** ☞**1159.2(7)**
110k1159.2(7) Most Cited Cases
To uphold a conviction challenged for insufficiency of the evidence, the Court of Appeals need not believe that no verdict other than a guilty verdict could sensibly be reached; rather, the operative inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

**[3] Criminal Law** ☞**1159.2(2)**
110k1159.2(2) Most Cited Cases
Court of Appeals will give considerable deference to a jury's assessment of the evidence and will disturb the jury's verdict based on alleged insufficiency of evidence only if it is premised upon evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative; Court will reverse only if the verdict is irrational.

**[4] Racketeer Influenced and Corrupt Organizations** ☞**25**
319Hk25 Most Cited Cases

**[4] Racketeer Influenced and Corrupt Organizations** ☞**35**
319Hk35 Most Cited Cases
An "enterprise," under the Racketeer Influenced and Corrupt Organizations Act (RICO), is an entity comprising a group of persons associated together for a common purpose of engaging in a course of conduct; the "pattern of racketeering activity" is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C.A. § § 1961(4, 5), 1962(c).

**[5] Racketeer Influenced and Corrupt Organizations** ☞**26**
319Hk26 Most Cited Cases

**[5] Racketeer Influenced and Corrupt Organizations** ☞**35**
319Hk35 Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16                                                                                          Page 2
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
(Cite as: 341 F.3d 16)

**[5]** **Racketeer Influenced and Corrupt Organizations** ☜95
319Hk95 Most Cited Cases
An enterprise, under the Racketeer Influenced and Corrupt Organizations Act (RICO), is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit, while a pattern of racketeering activity is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise; while the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. 18 U.S.C.A. § § 1961(4, 5), 1962(c).

**[6]** **Racketeer Influenced and Corrupt Organizations** ☜93
319Hk93 Most Cited Cases
In a prosecution under the Racketeer Influenced and Corrupt Organizations Act (RICO), the existence of an enterprise at all times remains a separate element which must be proved by the Government. 18 U.S.C.A. § 1962(c).

**[7]** **Racketeer Influenced and Corrupt Organizations** ☜36
319Hk36 Most Cited Cases
To constitute an "enterprise" under Racketeer Influenced and Corrupt Organizations Act (RICO), an organization need not be formal or have an ascertainable structure; to the contrary, it need only be a group of persons associated together for a common purpose of engaging in a criminal course of conduct. 18 U.S.C.A. § § 1961(4), 1962(c).

**[8]** **Racketeer Influenced and Corrupt Organizations** ☜95
319Hk95 Most Cited Cases
Ongoing nature of alleged enterprise under Racketeer Influenced and Corrupt Organizations Act (RICO) was supported by sufficient evidence, despite jury's finding that several alleged racketeering acts were unproven beyond a reasonable doubt; government introduced significant evidence of existence of enterprise apart from specified racketeering acts, and specified acts may have been unproven for reasons unrelated to existence of association-in-fact enterprise. 18 U.S.C.A. § § 1961(4), 1962(c).

**[9]** **Racketeer Influenced and Corrupt Organizations** ☜39
319Hk39 Most Cited Cases

Association-in-fact allegedly dedicated to protection of its members and furtherance of members' criminal activities was sufficiently organized to constitute "enterprise" and support conviction of member, who was former Federal Bureau of Investigation (FBI) agent, under Racketeer Influenced and Corrupt Organizations Act (RICO), even if most members of such enterprise were also members of separate criminal organization; group was cohesive over time, membership shared resources and revenues, and group had discernable structure. 18 U.S.C.A. § § 1961(4), 1962(c).

**[10]** **Racketeer Influenced and Corrupt Organizations** ☜26
319Hk26 Most Cited Cases

**[10]** **Racketeer Influenced and Corrupt Organizations** ☜28
319Hk28 Most Cited Cases
It is not the number of predicates that determines whether alleged predicate acts constitute a pattern of racketeering activity under Racketeer Influenced and Corrupt Organizations Act (RICO); rather, it is the relationship that they bear to each other or to some external organizing principle, and the two factors most pertinent to this determination are relatedness and continuity. 18 U.S.C.A. § § 1961(5), 1962(c).

**[11]** **Racketeer Influenced and Corrupt Organizations** ☜29
319Hk29 Most Cited Cases
Because Racketeer Influenced and Corrupt Organizations Act (RICO) was intended by Congress to apply only to enduring criminal conduct, predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy continuity requirement for establishing a pattern of racketeering activity. 18 U.S.C.A. § § 1961(5), 1962(c).

**[12]** **Racketeer Influenced and Corrupt Organizations** ☜28
319Hk28 Most Cited Cases
Alleged predicate acts had sufficient continuity to constitute "pattern of racketeering activity," in violation of Racketeer Influenced and Corrupt Organizations Act (RICO), as at least three different episodes were independently planned and executed over period of years, and acts involved threat of future criminal conduct, in that acts were part of an ongoing criminal enterprise undertaken to facilitate future criminal acts by other members of the enterprise. 18 U.S.C.A. § § 1961(5), 1962(c).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
**(Cite as: 341 F.3d 16)**

Page 3

**[13] Criminal Law** 1042
110k1042 Most Cited Cases
Defendant's challenge to trial court's application of sentencing guidelines would be reviewed for plain error, where defendant raised such objection for first time on appeal.

**[14] Criminal Law** 1042
110k1042 Most Cited Cases
On plain error review of defendant's challenge to application of sentencing guidelines, defendant bore burden of proving (1) an error, (2) that was plain, and (3) that affected substantial rights; if he could make such showing, defendant had to then demonstrate that the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings.

**[15] Sentencing and Punishment** 761
350Hk761 Most Cited Cases
District court was not required to conduct any fact-finding as to what constituted underlying offense for which defendant obstructed justice, in determining sentence of defendant for violation of Racketeer Influenced and Corrupt Organizations Act (RICO), as there was no risk as to over- or under-charging of indictment, and there was no genuine dispute that obstruction was targeted to prosecution that included charges of first-degree murder. 18 U.S.C.A. § 1962(c); U.S.S.G. § § 2E1.1, 2J1.2(c), 2X3.1, 18 U.S.C.A.

**[16] Criminal Law** 1042
110k1042 Most Cited Cases
Even if fact-finding inquiry was warranted as to what constituted underlying offense for which defendant obstructed justice, for purpose of sentencing defendant for violation of Racketeer Influenced and Corrupt Organizations Act (RICO), district court's failure to conduct such inquiry did not constitute plain error. 18 U.S.C.A. § 1962(c); U.S.S.G. § § 2E1.1, 2J1.2(c), 2X3.1, 18 U.S.C.A.

**[17] Criminal Law** 868
110k868 Most Cited Cases
Defendant was not entitled to inquiry into alleged juror misconduct that consisted of taking notes outside of trial and relying on such notes during deliberations, despite court's admonition to jurors that they could not take notes during trial; alleged note-taking was not actually inconsistent with court's instructions, and defendant could not specify any prejudice resulting from potential use of notes during deliberations. Fed.Rules Evid.Rule 606(b), 28

U.S.C.A.

**[18] Criminal Law** 1155
110k1155 Most Cited Cases
Court of Appeals reviews the district court's response to an allegation of juror misconduct only for abuse of discretion.

**[19] Criminal Law** 957(2)
110k957(2) Most Cited Cases
Rule prohibiting admission of juror testimony to impeach a jury verdict is based on significant policy considerations, including finality, maintaining the integrity of the jury system, encouraging frank and honest deliberations, and the protection of jurors from subsequent harassment by a losing party. Fed.Rules Evid.Rule 606(b), 28 U.S.C.A.

**[20] Criminal Law** 868
110k868 Most Cited Cases
A court should only conduct an inquiry into whether extraneous prejudicial information was improperly brought to jury's attention when reasonable grounds for investigation exist, i.e., there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant. Fed.Rules Evid.Rule 606(b), 28 U.S.C.A.

**[21] Criminal Law** 957(2)
110k957(2) Most Cited Cases
Intrinsic influences on a jury's verdict are not competent to impeach a verdict.
*19 Andrew Nathanson, with whom Tracy A. Miner, John J. Tangney, Jr., and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C. were on brief, for appellant.

William J. Nardini, with whom John H. Durham and Michael J. Sullivan, United States Attorney, were on brief, for appellee.

Before LIPEZ, Circuit Judge, PORFILIO, Senior Circuit Judge, [FN*] HOWARD, Circuit Judge.

> FN* Of the United States Court of Appeals for the Tenth Circuit, sitting by designation.

LIPEZ, Circuit Judge.

At the conclusion of a three week trial, a federal jury found former Federal Bureau of Investigation ("FBI") agent John J. Connolly, Jr., guilty of one count of racketeering under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
(Cite as: 341 F.3d 16)

Page 4

1962(c), two counts of obstruction of justice, 18 U.S.C. § 1503, and one count of making false statements, 18 U.S.C. § 1001. The district court subsequently imposed a sentence of 121 months of imprisonment, followed by a two-year period of supervised release. Connolly now appeals his RICO conviction, arguing that he is entitled to a judgment of acquittal on the RICO charge because the government failed to prove two critical elements of its RICO charge--participation in an "enterprise," and a "pattern of racketeering activity." *See id.* § 1961(4), (5) (defining "enterprise" and "pattern of racketeering activity"). [FN1]

> FN1. Connolly does not appeal his convictions for obstruction of justice and making a false statement.

Connolly also appeals his sentence, arguing that the district court erred in its calculation of the applicable offense level pursuant to sections 2E1.1, 2J1.2, and 2X3.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). Finally, Connolly argues that the district court erred when it denied his request to convene a post-verdict evidentiary hearing to inquire into the propriety of alleged note-taking by jurors. He asks that we remand the case to the district court for an inquiry into possible juror misconduct.

Finding no reason to disturb Connolly's conviction or sentence or to remand to the district court, we affirm.

**\*20 I.**

We provide some general background facts here, saving our more detailed discussion of the evidence for our assessment in Part II of Connolly's claims of evidentiary insufficiency. Connolly joined the FBI in 1968; from 1973 until 1990 he served as an agent in the Bureau's Boston office. During his tenure, he was responsible for handling several high-ranking, confidential informants with connections to two criminal syndicates--the Winter Hill Gang, and the New England branch of La Cosa Nostra. According to the government, the Winter Hill Gang is a "clandestine criminal organization engaged in multiple crimes, including murder, bribery, extortion, loan sharking, and illegal gambling in the greater Boston, Massachusetts area." La Casa Nostra--a considerably larger, better known, and more established criminal organization-- similarly engages in illegal activities in and around Boston. Despite the fact that the Winter Hill Gang and La Cosa Nostra were often rivals, members of the two groups frequently cooperated in criminal undertakings.

Two of the informants for whom Connolly was responsible, James Bulger and Stephen Flemmi, were members of the Winter Hill Gang. Bulger and Flemmi reported on the activities of both the Gang and La Cosa Nostra for over a decade. Shortly after Connolly retired from the FBI in 1990, however, Bulger and Flemmi were "closed" as FBI informants--i.e., the FBI no longer desired their services.

After Bulger and Flemmi ceased to serve as informants, their involvement with the Gang's criminal activities nonetheless continued. For example, at some point in the early 1990s, Flemmi, working with the "boss" of La Cosa Nostra's Boston family, Frank Salemme, ran an illegal "numbers" operation in the Boston area. On January 10, 1995, a federal grand jury indicted Bulger, Flemmi, Salemme, and several other persons for multiple counts of illegal gambling, extortion, assault, bribery, obstruction of justice, loansharking, and RICO violations. *See United States v. Salemme,* No. 94-CR-10287-MLW-2 (D.Mass. Jan. 10, 1995) (indictment). Flemmi was quickly arrested and taken into custody. Bulger and Salemme, however, forewarned of the pending indictment, disappeared a few days before its issuance. The authorities apprehended Salemme eight months later. Bulger remains at large.

The instant criminal proceeding began in December 1999, when another federal grand jury indicted Flemmi and Connolly on charges of racketeering, obstruction of justice, and conspiracy. [FN2] A superceding indictment was filed in October 2000 with additional charges of obstruction of justice and making a false statement. According to the superceding indictment, Connolly had led a double-life for over two decades. While serving as an FBI agent, Connolly had been intimately involved in the criminal activities of the Winter Hill Gang and its members, receiving and making bribes from and on behalf of members of the Gang. Even after his retirement from the Bureau, Connolly allegedly continued to exploit his connections within the Bureau to become privy to confidential information that he would then pass along to members of the Winter Hill Gang.

> FN2. The indictment also named Bulger as a defendant on one count. That count was ultimately dismissed on the government's motion after the issuance of the superceding indictment (which did not name Bulger as a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
**(Cite as: 341 F.3d 16)**

Page 5

defendant).

Specifically, the superceding indictment included nine counts, which we summarize as follows:

**\*21** *Counts 1 & 2*--RICO and Conspiracy to Violate RICO, alleging that Connolly had, through a pattern of racketeering activity, participated in the affairs of an association-in-fact enterprise whose members included Bulger, Flemmi, himself, and unidentified others. The purpose of the enterprise was to protect Bulger, Flemmi, and their associates (including Salemme and members of the Winter Hill Gang) from arrest and prosecution, and to facilitate their criminal activities. The two counts detail fourteen different "racketeering acts," including allegations of bribery, extortion, and obstruction of justice.

*Count 3*--Conspiracy to Obstruct Justice, alleging that Connolly and Flemmi, together with others, had conspired to obstruct justice in the prosecution of Bulger, Flemmi, and Salemme in *United States v. Salemme.*

*Count 4*--Obstruction of Justice, alleging that Connolly had informed Salemme of the pending indictment in *United States v. Salemme.*

*Count 5*--Obstruction of Justice, alleging that Flemmi had also provided Salemme with news of the pending indictment.

*Count 6*--Obstruction of Justice, alleging that Connolly had caused an anonymous letter to be sent to Judge Mark Wolf who was presiding over *United States v. Salemme.* The letter purported to come from three unnamed Boston Police Officers and credited certain claims made by the defense.

*Counts 7 & 8*--Obstruction of Justice, alleging that Connolly had persuaded Flemmi to give false testimony in *United States v. Salemme.* Specifically, Connolly persuaded Flemmi to testify that another FBI agent--and not Connolly--had alerted him and Bulger to the pending indictment.

*Count 9*--False Statement, alleging that Connolly had lied to an FBI agent when he told the agent that he had not been in contact with the defense team in *United States v. Salemme.*

Flemmi ultimately pleaded guilty to Counts 3 and 5 (the only two counts in which he was named) and was sentenced to 41 months of imprisonment.

In May 2002, the trial against Connolly began on Counts 1, 4, 6, 7, and 9. [FN3] At the close of the government's case and at the close of all of the evidence, Connolly moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. The court denied the motions. The jury returned guilty verdicts against Connolly on four of the five counts at issue--

Counts 1, 6, 7 and 9--and acquitted on Count 4. Connolly renewed his Rule 29 motion after the verdict, and the court once again denied it.

> FN3. The remaining counts against Connolly were severed prior to trial and ultimately dismissed on the government's motion.

On September 16, 2002, the district court sentenced Connolly to a term of incarceration of 121 months followed by a two-year period of supervised release. The district court denied Connolly's request for release on bail pending appeal, and we denied a similar, subsequent application. We now address Connolly's arguments of error by the trial court.

## II.

Connolly claims that he is entitled to a judgment of acquittal on the RICO count because the government failed to present sufficient evidence to prove beyond a reasonable doubt two essential elements of the RICO charge: (1) Connolly's participation \*22 in an "enterprise," and (2) a "pattern of racketeering activity," as defined by statute and applicable case law. *See* 18 U.S.C. § 1961(4), (5).

[1][2] In evaluating a claim of insufficiency of the evidence, we review the record de novo, and "[w]e will affirm the conviction if, 'after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.' " *United States v. Boulerice,* 325 F.3d 75, 79 (1st Cir.2003) (quoting *United States v. O'Brien,* 14 F.3d 703, 706 (1st Cir.1994)). We "need not believe that no verdict other than a guilty verdict could sensibly be reached." *United States v. Gomez,* 255 F.3d 31, 35 (1st Cir.2001) (quoting *United States v. Echeverri,* 982 F.2d 675, 677 (1st Cir.1993)). Rather, the operative inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (original emphasis).

[3] To that end, a reviewing court must play "a very circumscribed role in gauging the sufficiency of the evidentiary foundation upon which a criminal conviction rests." *United States v. Blasini-Lluberas,* 169 F.3d 57, 62 (1st Cir.1999). We will give considerable deference to a jury's assessment of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16                                                                      Page 6
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
**(Cite as: 341 F.3d 16)**

evidence, and we will disturb the jury's verdict only if it is premised upon "evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." _United States v. Czubinski,_ 106 F.3d 1069, 1073 (1st Cir.1997). That is to say, we will reverse only if the verdict is irrational. _See United States v. Berrios,_ 132 F.3d 834, 843 (1st Cir.1998) ("[W]e must consider the evidence in the light most favorable to the verdict and reverse only if no rational trier of fact could have found him guilty.").

The RICO count alleged a violation of 18 U.S.C. § 1962(c), which provides in pertinent part:

It shall be unlawful for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The meaning of "enterprise" and "pattern of racketeering activity" is explicated in § 1961:

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

The Supreme Court has repeatedly indicated that courts should take a "natural and commonsense approach" in assessing the elements of a RICO violation. _H.J. Inc. v. Northwestern Bell Tel. Co.,_ 492 U.S. 229, 237, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); _see Reves v. Ernst & Young,_ 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993); _United States v. Turkette,_ 452 U.S. 576, 580-81, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); _see also **United States v. Boylan**,_ 898 F.2d 230, 250 (1st Cir.1990) ("**In the absence of any pat formula, the Court has instructed us to use a flexible approach ... 'deriv[ing] from a \*23 common-sense, everyday understanding of RICO's language and Congress' gloss on it.' ")** (quoting _H.J. Inc.,_ 492 U.S. at 241, 109 S.Ct. 2893). Against this backdrop, we now turn to Connolly's specific claims.

### A. "Enterprise"
#### 1. The Charge

Count 1 of the superceding indictment alleged that Connolly, Bulger, Flemmi, and others were members of an "enterprise," that is to say, "a group of

individuals associated in fact," 18 U.S.C. § 1961(4), and that this enterprise,

through its members and associates, acted to protect James Bulger, Stephen Flemmi and their associates, including Francis P. Salemme and those in the Winter Hill Gang, from arrest and prosecution for criminal activities including murder, loan sharking, illegal gambling, extortion, obstruction of justice, and bribery; and it acted to facilitate those criminal activities of Bulger, Flemmi, and their associates.

The indictment further alleged that the enterprise protected and fostered its members' criminal activities by

(1) providing Bulger and Flemmi with confidential law enforcement information regarding Grand Jury investigations, court-authorized electronic surveillance, and other investigative efforts; (2) deflecting and squelching prosecutions and criminal investigations of their crimes; and (3) improperly preserving their status as FBI informants through the filing of misleading official reports and by failing to report information relating to Bulger and Flemmi which was material to the investigation of criminal activity.

The indictment distinguishes this association-in-fact enterprise from the Winter Hill Gang and La Cosa Nostra, though individual affiliations do overlap. The indictment also alleges that members of the enterprise committed fourteen different "racketeering acts," which included several acts of bribery, obstruction of justice, and extortion.

#### 2. The Evidence

Kevin Weeks, who identified himself as Bulger's "right-hand man," was the government's star witness and provided substantial testimony regarding the existence of the enterprise. For example, Weeks testified that a special fund was created from some of the proceeds of Bulger's and Flemmi's criminal activities, and that Connolly received cash payments from that fund in exchange for a regular flow of information about law enforcement activities that might affect the group. Additionally, Weeks testified that Connolly was the enterprise's contact in the FBI, and that Bulger had given Connolly money in return for protecting the enterprise. According to Weeks, Bulger told him that Connolly was "one of ours." John Martorano, a member of the Winter Hill Gang, corroborated Weeks's testimony regarding Connolly's repeated receipt of gratuities in exchange for information. Salemme likewise testified that he and Flemmi had twice set aside $5000 from the proceeds of their numbers racket to pay Connolly for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
**(Cite as: 341 F.3d 16)**

Page 7

information he provided.

In return for these payments, Connolly provided a wealth of sensitive information, often with dire consequences. For example, Martorano testified that Connolly told Bulger that an informant named Richard Castucci had provided the FBI with information regarding the whereabouts of two fugitive Winter Hill members. Bulger told Martorano of the leak, and Martorano in turn murdered Castucci in order to silence him. Martorano also testified that Connolly had told Bulger and others that another informant, Brian Halloran, had implicated Martorano in the murder of a recalcitrant *24 associate, Roger Wheeler. Weeks testified that Bulger, upon learning from Connolly of Halloran's betrayal, ambushed Halloran as he got into a car outside a Boston restaurant, and fatally shot both Halloran and the driver, Michael Donahue.

Martorano also testified that Connolly told Bulger and Flemmi that the FBI agents who had been working with Halloran were going to put pressure on another associate, John Callahan, to come clean about the Wheeler murder. According to Martorano, Connolly told Bulger and Flemmi that they were "all going to go to jail for the rest of our life if something doesn't happen to John Callahan." Worried about the possibility of a breach, Bulger and Flemmi convinced Martorano that Callahan had to be silenced. In an effort to deflect any attention away from the ongoing Boston investigation, Martorano lured Callahan to Florida where, with another associate, he murdered Callahan.

Weeks also testified that he and Bulger had extorted a person named Stephen Rakes into selling them a South Boston liquor store. After Weeks had forcibly acquired ownership of the store, Rakes's wife went to her uncle, Joseph Lundbohm, who was a detective in the Boston Police Department. Lundbohm testified that he, in turn, went to Connolly with the problem, and Connolly stated that nothing could be done unless Rakes agreed to wear a recording device. Lundbohm, out of fear for the safety of his niece and her husband, told Connolly that wearing a wire would be unacceptable. Connolly did not take any action to stop the extortionate takeover, nor did he report the incident to his superiors.

As for Connolly's efforts to derail the *United States v. Salemme* prosecution, Weeks testified that on December 23, 1994, Connolly came to the South Boston liquor store that Weeks and Bulger had extorted from the Rakes, looking for Bulger. Only

Weeks was on the premises, however, and Connolly led him to the inside of the walk-in refrigerator at the back of the store where electronic surveillance would be difficult. There, Connolly told Weeks that he had just learned that federal indictments were pending against Bulger and Flemmi and that agents planned to make arrests over the holidays. Even though Connolly no longer worked at the FBI, he told Weeks that he was certain of this information because it had come from then-FBI Assistant Special Agent in Charge Dennis O'Callaghan. Connolly also indicated that only four people in the FBI knew about the pending indictment. Connolly instructed Weeks to pass along the information to Bulger and Flemmi immediately. Weeks did so. Flemmi, in turn, passed along the information to Salemme. Bulger and Salemme both skipped town and managed to avoid arrest. Salemme was ultimately arrested eight months later. Bulger's whereabouts remain unknown.

Weeks also testified that he and Connolly had worked together to compose a letter that they submitted anonymously to Judge Mark Wolf, the United States District Judge presiding over the *United States v. Salemme* case. The letter, printed on Boston Police Department letterhead, claimed to be from three disgruntled Boston Police Officers, and stated that the wiretaps the government was planning to use in its prosecution had been illegally obtained. Judge Wolf testified that the letter had caused him to order the parties to submit briefs, to hold a number of pretrial hearings, and to hear testimony on the contents of the letter. Weeks testified that Connolly eventually told him the identities of the confidential informants who had worn the concealed recorder, and *25 Weeks passed along this information to Flemmi and Salemme in jail.

Finally, Weeks testified that Connolly feared that Flemmi would divulge Connolly's involvement in the enterprise and name him as the person who had leaked the news of the indictments. Connolly, through Weeks, convinced Flemmi to testify that Connolly's former FBI supervisor, John Morris, had tipped him off about the indictments. However, Morris had been transferred out of Boston in 1991, long before the indictment issued. According to Weeks, Connolly advised Weeks that Flemmi should testify that Morris had learned of the impending indictments through what is known as a "pros memo" (i.e., prosecution memo) that Morris had seen while in Washington. Flemmi ultimately testified to that effect during hearings before Judge Wolf.

**3. The Legal Requirements for an Enterprise**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[4][5][6][7] As the Supreme Court indicated in *Turkette*, the government is required to prove both the existence of an "enterprise" and a "pattern of racketeering activity."

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

*Turkette*, 452 U.S. at 583, 101 S.Ct. 2524 (citation omitted). As this passage makes clear, an enterprise is not merely a related assortment of criminal activities. Rather, there must be some goal--"a purpose of engaging in a course of conduct"--beyond the isolated benefit that can redound from the commission of each criminal act, and there must be an "ongoing organization" with "associates function[ing] as a continuous unit." *Id.* The organization need not be formal or have an "ascertainable structure." *United States v. Patrick,* 248 F.3d 11, 19 (1st Cir.2001). To the contrary, it need only be a "group of persons associated together for a common purpose of engaging in a criminal course of conduct." *United States v. Owens,* 167 F.3d 739, 751 n. 6 (1st Cir.1999) (quoting *United States v. Doherty,* 867 F.2d 47, 68 (1st Cir.1989)) (modification omitted).

**4. Connolly's Arguments**

a. Continuity

[8] Connolly argues that the evidence failed to demonstrate "that the members of the alleged enterprise had functioned as an *ongoing* organization" (original emphasis). In pressing this claim, he focuses on the fourteen racketeering acts alleged in the indictment. [FN4] These fourteen acts were *26 submitted to the jury for a determination of

"proven beyond a reasonable doubt" or "not proven beyond a reasonable doubt." Of the fourteen, the jury found nine of them "not proven beyond a reasonable doubt." Of the racketeering acts found by the jury to be "proven beyond a reasonable doubt," one was an act of bribery in 1982 or 1983, and the other were four acts of obstruction of justice in the mid- to late-1990s in connection with the *United States v. Salemme* prosecution.

> FN4. Racketeering Acts 1 through 10 allegedly took place during Connolly's tenure as an FBI agent. Act 1 alleged that Connolly took a bribe from Bulger and Flemmi. Acts 2 through 5 alleged that Connolly paid bribes to Morris on behalf of Bulger and Flemmi. Act 6 pertained to Connolly's involvement in the extortion of Rakes. Acts 7 through 9 concerned Connolly's sharing of confidential law enforcement information that led to the killings of Castucci, Callahan, and Halloran. Act 10 alleged that Connolly, working with Morris, had informed Bulger and Flemmi of a court-authorized wiretap and an ongoing grand jury investigation into illegal gambling activity. Racketeering Acts 11 through 14 allegedly took place during the period 1994 to 1998, after Connolly had retired from the FBI. All four involved obstruction of justice surrounding the *United States v. Salemme* case and are discussed in more detail in Part II.B below. Several of the Acts were broken down into subparts, each one having the same factual basis. For example, the indictment divided the sixth Racketeering Act into Act 6A and 6B, "either one of which alone constitutes Racketeering Act 6." As described on the verdict sheet, Act 6A accused Connolly of "aiding and abetting the extortion of Julie and Stephen Rakes," while 6B accused him of "aiding and abetting a conspiracy to extort Julie and Stephen Rakes."

Connolly cites these findings to argue that the government had failed to prove "continuity" in the enterprise, i.e., that the enterprise had functioned as an ongoing organization over the period of time alleged, from September 1975 to September 1998. Since the jury found that all but one of the alleged racketeering acts dating from the 1970s and 1980s had not been proven beyond a reasonable doubt, Connolly argues that there was an insufficient basis for the jury to conclude that Connolly was part of an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16                                                                                                              Page 9
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
**(Cite as: 341 F.3d 16)**

ongoing criminal enterprise. *See, e.g., United States v. Pelullo,* 964 F.2d 193, 212 (3d Cir.1992) (noting that RICO enterprises should be "distinguished from individuals who associate for the commission of sporadic harm").

We reject this argument for two reasons. First, the government introduced significant evidence of the existence of the enterprise apart from the specified racketeering acts. For example, Weeks, Martorano, and Salemme testified about several payments made to Connolly over the period in question that do not appear in the alleged racketeering acts. They also testified that these payments were made to guarantee the flow of confidential law enforcement information from Connolly to members of the enterprise. This testimony provided evidence of an ongoing criminal relationship between Connolly and members of the enterprise, and supported the jury's ultimate finding regarding Connolly's participation in an ongoing association-in-fact.

Second, as the government correctly argues, simply because the jury found a specified racketeering act as "unproven beyond a reasonable doubt" does not mean that the jury found the evidence relating to that act unpersuasive, in combination with other evidence in the case, on the existence of an association-in-fact enterprise. Rather, it may only mean that the government did not prove a requisite element of the underlying crime alleged as a racketeering act. For example, the district court instructed the jury that in order to prove Act 1--that Connolly had accepted a bribe--the government had to demonstrate that Connolly had "demanded, sought, or received a thing of value as a quid pro quo, or in return for a promise, implicit or stated, to do or omit to do a *27 particular act in violation of his lawful duty." In returning a finding of "unproven," the jury could have concluded that the evidence underlying Act 1, while failing to demonstrate this requisite quid pro quo, nevertheless demonstrated a corrupt gratuity evidencing the existence of an illegal enterprise.

Likewise, Racketeering Act 7, as described on the verdict sheet, alleged that Connolly had committed obstruction of justice by "alerting Bulger that Richard Castucci was an informant." The district court instructed the jury that in order to prove obstruction of justice, the government had to demonstrate that Connolly had knowingly endeavored to obstruct or impede a pending judicial proceeding. The court also instructed the jury that "[a] judicial proceeding is pending once a grand jury, for example, begins its investigation or when an indictment has been

returned." The jury might have concluded, however, that Connolly leaked information regarding Castucci for the purpose of frustrating an FBI investigation, and not to obstruct the grand jury proceedings.

Hence, the fact that nine of the fourteen enumerated racketeering acts were found "unproven" does not compel a finding of no continuity in the enterprise. The evidence relating to those acts remained available to the jury in its evaluation of the enterprise element of the RICO charge. *Cf. United States v. Vastola,* 899 F.2d 211, 222 (3d Cir.) (holding that findings of not guilty on three of four alleged predicate racketeering acts do not mandate judgment of acquittal on RICO count), *vacated on other grounds,* 497 U.S. 1001, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990). That being so, the inquiry on appeal is whether the jury, in light of the totality of the evidence, was presented with sufficient evidence of "continuity" to support a conviction. *See United States v. Powell,* 469 U.S. 57, 67, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). Given the testimony of Weeks, Martorano, and others recounting a regular course of criminal conduct over two decades, we have no difficulty in concluding that the government satisfied its burden on this point.

b. Organization

[9] Connolly next argues that the government failed to adduce sufficient evidence demonstrating "that the members of the alleged enterprise had functioned as a continuing *unit* " (original emphasis). Rather, as Connolly characterizes it, the evidence demonstrated, at most, "the sporadic occurrence of [criminal racketeering] activity" by a group that had "no name, no regular business or activities, no cohesion over time, no sense of membership or ongoing association, no sharing of resources or revenues, [and] no systemic linkage or coordination of activities." Hence, according to Connolly, there were "no indicia of an organization" and, therefore, no "enterprise."

We disagree with Connolly's appraisal of the evidence, as well as his reading of the term "enterprise." The evidence showed that Connolly, Bulger, Flemmi, Salemme, and others worked together in an association-in-fact enterprise over a period of almost two decades, joining forces to protect themselves from prosecution and to further other criminal activities--some alleged in the indictment, and others not specifically alleged. There was cohesion in the group over time; the membership shared resources and revenues; there was, in fact, a sense of membership.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

As for the meaning of "enterprise," there is no requirement under RICO that an enterprise have an "ascertainable structure." *Patrick,* 248 F.3d at 19. Indeed, as the Supreme Court noted in *Turkette,* "[t]here is no restriction upon the associations embraced by the [statute's] definition," **\*28** *Turkette,* 452 U.S. at 580, 101 S.Ct. 2524, and "Congress has instructed us to construe RICO 'liberally ... to effectuate its remedial purposes.' " *United States v. London,* 66 F.3d 1227, 1243 (1st Cir.1995) (quoting Pub.L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970) (*reprinted in note following* 18 U.S.C. § 1961)). Hence an "enterprise" need only be "a group of persons associated together for a common purpose of engaging in a criminal course of conduct." *Owens,* 167 F.3d at 751 n. 6; *see also Boylan,* 898 F.2d at 242 ("**What counts is whether it can be said, on the totality of the evidence, that all of the alleged coconspirators directed their efforts towards the accomplishment of a common goal ....**") (internal quotation marks omitted).

Construing the term "enterprise" broadly, as we must, we have no difficulty in concluding that the association-in-fact alleged in the indictment was sufficiently "organized" to support a RICO conviction, and that the government had adequately proved the existence of that enterprise to sustain a conviction. Indeed, there was a discernable structure to the enterprise, with members playing designated roles in keeping the enterprise functioning as a viable unit. For example, Martorano could be considered the head of the enterprise's enforcement division, executing individuals who could prove to be a liability. Connolly's role was that of information officer, i.e., an intelligence conduit from law enforcement. Weeks, as Bulger's "right-hand man," managed special funds and functioned as an intermediary between Bulger and others.

Connolly insists, however, that Bulger, Flemmi, and others were actually members of the Winter Hill Gang, and that this somehow forecloses the possibility of membership in another enterprise. We fail to follow this logic. As the indictment makes clear, the alleged enterprise in this case-- while perhaps overlapping in membership and some criminal activities with the Winter Hill Gang and even La Cosa Nostra--was a separate entity, distinguishable from both of these other criminal organizations. Membership in the Winter Hill Gang does not, ipso facto, preclude membership in another criminal enterprise. While the evidence demonstrated that Bulger, Flemmi, and others were

associates of the Winter Hill Gang, it also demonstrated that they were members of a separate enterprise dedicated to their own protection and the advancement of their own criminal activities. Moreover, evidence was presented suggesting that the enterprise was distinct (if not totally separate) from the Winter Hill Gang. For example, the jury heard testimony that part of the money that the enterprise's members extorted or otherwise illegally procured was used to pay bribes necessary to ensure the enterprise's survival. Moreover, Bulger told Weeks that Connolly, who was not a member of the Winter Hill Gang, was nevertheless "one of ours." The jury could therefore have readily inferred the existence of a continuing unit which included Connolly and was distinct from the Winter Hill Gang.

**B. "Pattern of Racketeering Activity"**
**1. The Predicate Acts**

Racketeering Acts 11 and 12 occurred in late 1994 or early 1995 and concerned Connolly's tip-offs to Bulger, Flemmi, and Salemme regarding their indictment. Racketeering Act 13 occurred in March 1997 and concerned the fraudulent, anonymous letter that Connolly sent to Judge Wolf purporting to be from three police officers. Racketeering Act 14 occurred in 1998 and concerns the false testimony that Flemmi **\*29** gave after being coached and directed by Connolly. [FN5]

> FN5. In evaluating Connolly's argument regarding the "pattern of racketeering activity" element, we do not rely on the "unproven" Racketeering Acts (1 through 3 and 5 through 10) described in note 4, *supra.* The Third Circuit, however, has indicated that a reviewing court need not be constrained by the jury's findings regarding the individual racketeering acts in determining whether the evidence, taken as a whole, supports an ultimate finding of guilt through a "pattern of racketeering activity." *See Vastola,* 899 F.2d at 222-23. Since the "proven" racketeering acts (11 through 15) establish the requisite pattern, we need not consider whether other evidence adduced at trial supports such a finding.

**2. The Legal Requirements for a Pattern**

[10] While the RICO statute does not define in absolute terms what constitutes a "pattern of racketeering activity," it does set a minimum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
**(Cite as: 341 F.3d 16)**

requirement: proof of a pattern of racketeering activity "requires [proof of] at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). The Supreme Court, interpreting RICO, has stated that "while two acts are necessary, they may not be sufficient." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). "It is not the *number* of predicates" that determines whether they constitute a pattern of racketeering activity; rather, it is "the *relationship* that they bear to each other or to some external organizing principle." *H.J. Inc.*, 492 U.S. at 238, 109 S.Ct. 2893 (emphasis added). The two factors most pertinent to this determination, according to the Court, are relatedness and continuity. *See id.* at 239, 109 S.Ct. 2893 ("It is this factor of *continuity plus relationship* which combines to produce a pattern.") (original emphasis) (citation omitted).

[11] Continuity, according to the Supreme Court, can refer "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. 2893. We have previously indicated that it is " 'difficult to formulate in the abstract any general test' for the continuity required for a pattern." *Apparel Art Int'l v. Jacobson*, 967 F.2d 720, 722 (1st Cir.1992) (quoting *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. 2893); *see also Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 15 (1st Cir.2000) ("We have more than once remarked upon the difficulty of articulating concrete guidelines for this 'continuity plus relationship' standard for identifying a pattern."). In *H.J. Inc.* the Supreme Court noted that Congress chose not to define "pattern of racketeering activity" with any degree of specificity in the RICO statute. Hence, the Court instructed lower courts to adopt a flexible approach to RICO claims, employing a "commonsense, everyday understanding of RICO's language and Congress' gloss on it." *H.J. Inc.* 492 U.S. at 241, 109 S.Ct. 2893. Lower courts, in turn, have repeatedly looked to one guidepost contained in *H.J. Inc.*: "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time," or by evidence that the acts "include a specific threat of repetition extending indefinitely into the future." *Id.* at 242, 109 S.Ct. 2893. Because RICO was intended by Congress to apply only to enduring criminal conduct, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.; Efron*, 223 F.3d at 15; *Apparel Art*, 967 F.2d at 723.

**\*30 3. Connolly's Argument**

[12] Connolly concedes that the four racketeering acts at issue are sufficiently related for RICO purposes. Each act served to protect members of the enterprise. Connolly insists, however, that the four racketeering acts simply constituted a "single criminal episode," that they did not present the threat of ongoing conduct, and that they therefore were not a pattern of racketeering activity. We disagree.

While we have previously indicated that "[w]e can be reasonably certain" that the pattern requirement "does *not* encompass a single criminal episode, a single 'crime' (in the ordinary, nontechnical sense of that word)," *Apparel Art*, 967 F.2d at 722 (original emphasis), we have also indicated that a "single criminal episode" is something narrow in scope and purpose, for example, a single interstate bank robbery. As we explained in *Apparel Art*, a bank robbery could include several different "crimes" (in the technical sense of the word)--such as gun possession, threatening a teller, stealing a getaway car, and eventually lying about one's participation-- but they nevertheless do not add up to a "pattern of racketeering activity." *See id.* The instant case, however, is altogether different. Here, there were at least three different "episodes"--the disclosing of the indictment, the fabricated letter, and the perjured testimony--each planned and executed independently of the others over a period of years, and each the result of detailed planning and scheming by members of a criminal enterprise seeking to impede the criminal prosecutions of their cohorts. This is precisely the kind of activity that RICO was intended to forestall. *See H.J. Inc.*, 492 U.S. at 247-48, 109 S.Ct. 2893.

As for the threat of future criminal conduct, the racketeering acts at issue were part of an ongoing criminal enterprise undertaken to facilitate future criminal acts by other members of that enterprise. The enterprise sought to insure that its members would never be brought to justice, and indeed, one of them is still at large. As the government describes it, the enterprise engaged in a "do-whatever-is-necessary" long-term pattern of criminal activity that threatened ongoing criminal conduct of the sort that RICO was designed to prevent. [FN6] In short, there was ample evidence supporting the jury's conclusion that the government had satisfied the "pattern of racketeering activity" element of the crime.

FN6. The Second Circuit has noted that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16                                                                                                          Page 12
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
**(Cite as: 341 F.3d 16)**

courts have been quicker to find RICO violations "in cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals." _United States v. Aulicino, 44 F.3d 1102, 1111 (2d Cir.1995)_. We agree with the common-sense conclusion that in such situations, there is a greater threat of future criminal conduct. Of course, as explained in the text, there is no hard and fast rule, and the fact that there may be "inherently unlawful" conduct underlying the RICO charge would not prevent us from concluding that there was nevertheless no pattern of racketeering activity. _See, e.g., Miranda v. Ponce Fed. Bank, 948 F.2d 41, 45-46 (1st Cir.1991)_.

### III.

In sentencing Connolly, the district court relied upon the Pre-Sentence Report ("PSR") prepared by the U.S. Probation Office. The PSR calculated the appropriate sentence after navigating through a series of cross-references as follows (with the cross-referenced subject matter _underlined_ for the reader's convenience):

• Under U.S.S.G. § 2E1.1, the base offense level for a RICO conviction is the greater of either (i) 19, or (ii) the offense applicable to the _underlying *31 racketeering activity_, i.e., obstruction of justice.

• As for the _underlying racketeering activity_, under U.S.S.G. § 2J1.2, the base offense level for obstruction of justice is 12. Subsection (c), however, indicates that if the obstruction of justice interfered with the investigation or prosecution of a criminal offense, the court should look to § 2X3.1 (_accessory after the fact_ ) with respect to the criminal offense obstructed, provided that the corresponding offense level is greater than 12.

• Section 2X3.1 provides that the base offense level for being an _accessory after the fact_ is 6 levels lower than the offense level for the _underlying offense,_ but in no event less than 4, or more than 30.

• The PSR identified first-degree murder as the _underlying offense_ because (1) Connolly's racketeering activities concerned the obstruction of the prosecution of _United States v. Salemme,_ and (2) the most serious of the underlying offenses charged in the _Salemme_ indictment was _first-degree murder._

• Under § 2A1.1, the base offense level for _first-degree murder_ is 43.

Under § 2X3.1, however, the maximum base

offense level for accessory after the fact is 30. The Probation Office therefore recommended a base offense level of 30. The PSR determined that no adjustment was necessary for the multiple counts, or for any other reason, and that Connolly should be placed in Criminal History Category I. The corresponding sentencing range for Category I, when combined with an offense level of 30, is 97 to 121 months.

At sentencing, Connolly challenged the calculation of the offense level, arguing that he was not "subjectively aware" of the more serious charges alleged in the _Salemme_ indictment, and that first-degree murder should therefore not be considered the "underlying offense" under U.S.S.G. § 2X3.1. The district court properly overruled Connolly's objection. _See United States v. McQueen, 86 F.3d 180, 184 (11th Cir.1996)_ ("Neither § 2J1.2(c)(1) nor § 2X3.1 requires such knowledge as a prerequisite to application of the offense level for the 'underlying offense.' "). It then adopted the factual findings and the Guidelines calculation contained in the PSR, and sentenced Connolly to the maximum of the applicable range, i.e., 121 months.

[13][14] On appeal, Connolly abandons his subjective knowledge argument and presses a new argument that the district court made a "basic mistake" in sentencing when it referenced the murder guideline "without conducting any fact-finding' as to what exactly constitutes the "underlying offense." Since Connolly raises this objection for the first time on appeal, we review for plain error only. _United States v. Henderson, 320 F.3d 92, 102 (1st Cir.2003); see United States v. Grant, 971 F.2d 799, 803 (1st Cir.1992)_ (noting that "as a general rule, appellant may not 'switch horses mid-stream' and raise new legal arguments not made the basis for objections in the district court"). Accordingly, Connolly "bears the burden of proving (1) an error, (2) that is plain, and (3) that affects substantial rights." _United States v. Downs-Moses, 329 F.3d 253, 263 (1st Cir.2003)_. Assuming he can meet this high hurdle, Connolly must then demonstrate that the error "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." _United States v. Matos, 328 F.3d 34, 43 (1st Cir.2003)_.

[15] The plain language of the applicable sections of the Guidelines does not support Connolly's argument. The obstruction of justice guideline, § 2J1.2(c), provides that:

*32 If the offense involved obstructing the investigation or _prosecution of a criminal offense,_

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
**(Cite as: 341 F.3d 16)**

apply § 2X3.1 (Accessory After the Fact) in respect *to that criminal offense,* if the resulting offense level is greater than that determined above. (emphasis added). We fail to see how this language obliges an evidentiary inquiry into the substance of "that criminal offense." Moreover, the commentary to section 1B1.5 (governing the interpretation of cross-references) indicates that,

A reference may direct that, if the conduct involved another offense, the offense guideline for such other offense is to be applied.... Where there is more than one such offense, the most serious such offense ... is to be used.

U.S.S.G. § 1B1.5, comment. (n.1). The PSR followed these directives to the letter. The jury found that Connolly had obstructed the prosecution in *United States v. Salemme* at various times from late 1994 to mid-1998, including *after* the grand jury had returned a superceding indictment charging Flemmi, Bulger, Salemme, and others with a number of crimes, including first-degree murder. The Probation Office reasonably looked to the most serious offense contained in the superseding indictment, and, as explained above, calculated the base offense level at 30.

This is not to say that a factual inquiry into the underlying offense would never be appropriate. For example, if a defendant were convicted of obstruction of justice for lying in a grand jury proceeding, a sentencing court would be justified in probing deeper into the nature of the underlying offense. Otherwise, the perjurer, through his false testimony, could cause an indictment for a minor (instead of a serious) crime to issue, and then gain the benefit of his perjury if the court were to rely solely on the indictment in determining the underlying offense. The converse, of course, is also true--an overzealous prosecutor could seek to enhance the perjurer's sentence by spuriously convincing a grand jury to increase the counts in an indictment. Hence, the Fourth Circuit has held that, in such a situation, a factual inquiry into what constitutes the underlying offense would not be inappropriate. *See United States v. Dickerson,* 114 F.3d 464, 467-68 (4th Cir.1997). The Ninth Circuit, citing *Dickerson,* indicated in *United States v. Arias,* 253 F.3d 453 (9th Cir.2001), that a factual inquiry into the underlying offense would be appropriate only if there were a "*genuine* dispute" as to its substance. *Id.* at 461 (emphasis added).

[16] Connolly relies unpersuasively on *Dickerson* and *Arias* in pressing his claim. Unlike Dickerson, Connolly did not perjure himself before a grand jury, and there was therefore no risk of over- or under-

charging of the indictment. And unlike *Arias,* there is no *genuine* dispute in this case as to the underlying offense. When Connolly wrote the fraudulent letter to Judge Wolf, and when he instructed Flemmi on how to lie on the witness stand, the *Salemme* prosecution included charges of first-degree murder. Moreover, Weeks testified during the trial that Connolly's goal was to get the entire case against Flemmi "tossed out," and substantial evidence adduced at trial supports that conclusion. Finally, even assuming that an inquiry into the underlying offense would be appropriate in this case, and assuming it was error for the district court not to undertake that inquiry *sua sponte,* any such error would be far from "plain," i.e., "clear, in the sense that it was obvious." *United States v. Geronimo,* 330 F.3d 67, 74-75 (1st Cir.2003) (internal quotation marks omitted). Indeed, the fact that Connolly, who was ably represented by counsel below, only belatedly turns to this argument, and cites only two cases from **\*33** other jurisdictions, belies any claim that the error was truly "obvious."

Since Connolly has failed to demonstrate that the district court committed any error--plain or otherwise--when it determined that first-degree murder was the "underlying offense" for purposes of U.S.S.G. § 2J1.2(c) and § 2X3.1, we affirm the sentence imposed by the district court.

## IV.

[17] On the first day of trial, when the jury first entered into the courtroom, the district court judge noticed that one of the jurors was carrying a notebook. Without prompting from counsel, the judge informed the jury as follows:

I noticed one of you came in with a notebook. I just want to alert you that I do not permit note taking. I want you to just sit and listen to the evidence and then use your collective memories as you deliberate at the conclusion of the case. Some very, very fine judges, colleagues, friends of mine, they do permit note taking. I don't. I want you to just sit back and pay attention. So that is the way we will proceed.

Connolly did not object to this instruction, nor did he seek clarification or modification of it. The parties do not recall seeing any jurors taking notes in the courtroom over the course of the trial.

Almost a month after the trial had ended, an article appeared in the *Boston Globe* which stated, in pertinent part:

Although the judge had prohibited jurors from taking notes during the trial, some jurors went

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
(Cite as: 341 F.3d 16)

Page 14

home and jotted down testimony they had heard that day, according to [two jurors]. "A couple of jurors took notes at night, which was very helpful [during deliberations]," [one juror] said.

(second modification in original). Arguing that the jury may have relied on "extraneous prejudicial information" during deliberations, Connolly filed a motion for an evidentiary inquiry into whether jurors had, in fact, taken notes during trial and whether they had considered any such notes during their deliberations. In a brief order, the district court denied the request:

> On the first day of trial I told the jurors I did not permit note taking during trial.... I did not, however, forbid the jurors from making notes of their impressions of the evidence when not in court. Indeed, writing material was provided to the jurors in their deliberating room. It was expected that jurors would make notes and use them during their deliberations. There is no occasion for the inquiry requested by Defendant. Defendant's Motion, therefore, is DENIED.

Connolly now assigns error to this decision, [FN7] asking that we remand the case for further inquiry into this purported juror "misconduct."

> FN7. Connolly unsuccessfully renewed this claim in his successive applications for release pending appeal. The district court, denying the request for release, concluded that "no prejudice to the Defendant resulted from the jurors' considering notes they may have taken at night." In our order denying the same, we noted the article's ambiguity with respect to whether the alleged notes actually made their way into the jury room, and, citing _United States v. Bassler,_ 651 F.2d 600, 601-02 (8th Cir.1981), we indicated that "[e]ven assuming that the jurors consulted these notes during deliberations, it is far from clear that prejudice should be presumed in the absence of a cautionary instruction [regarding the proper use of notes during deliberations]."

[18] We review the district court's response to an allegation of juror misconduct only for abuse of discretion. _See *34United States v. Ortiz-Arrigoitia,_ 996 F.2d 436, 442 (1st Cir.1993) (indicating that district court has broad discretion to "determine the nature and extent of its inquiry" into juror improprieties); _Mahoney v. Vondergritt,_ 938 F.2d 1490, 1492 (1st Cir.1991) (noting that district court judges have "broad discretion in determining how to respond to allegations of extraneous influence on

jurors"); _Boylan,_ 898 F.2d at 258 ("[T]he district court has broad discretion to determine the type of investigation which must be mounted.").

[19][20] Federal Rule of Evidence 606(b) codifies the "near-universal and firmly established common-law rule" that prohibits the admission of juror testimony to impeach a jury verdict. _Tanner v. United States,_ 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). There are significant policy considerations underlying such a rule, including finality, maintaining the integrity of the jury system, encouraging frank and honest deliberations, and the protection of jurors from subsequent harassment by a losing party. _See McDonald v. Pless,_ 238 U.S. 264, 267-68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). Rule 606(b) does, however, create an exception to the common-law rule in situations where "extraneous prejudicial information [is] improperly brought to the jury's attention." Fed.R.Evid. 606(b). Despite this exception, we have nevertheless warned that "[c]ourts generally 'should be hesitant[ ] to haul jurors in after they have reached a verdict ... to probe for potential instances of bias, misconduct, or extraneous influences.' " _Neron v. Tierney,_ 841 F.2d 1197, 1205 (1st Cir.1988) (quoting _United States v. Moon,_ 718 F.2d 1210, 1234 (2d Cir.1983)). A court should only conduct such an inquiry when "reasonable grounds for investigation exist," i.e., "there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." _Moon,_ 718 F.2d at 1234 (citation omitted). Connolly cannot meet this high standard.

The _Boston Globe_ article indicated that two jurors made notes at home some evenings regarding that day's in-court testimony. We agree with the district court that this note-taking, assuming it actually happened, was not inconsistent with the court's instructions. The judge told the jurors that he wanted them to focus on the testimony, not in-court note-taking: "I want you to just sit back and pay attention." Such a prescript did not foreclose the possibility of note-taking outside of court. Indeed, as the district judge noted, the jurors were provided with writing materials in the jury room from the outset of trial. Hence, the note-taking described in the _Globe_ article did not constitute juror misconduct.

[21] Moreover, assuming that any notes actually made their way into the jury room during deliberations, [FN8] the notes cannot be considered an "extraneous" or "extrinsic" influence. In _Bassler,_ the district court instructed the jury at the beginning

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

341 F.3d 16
341 F.3d 16, 62 Fed. R. Evid. Serv. 474
**(Cite as: 341 F.3d 16)**

of the trial that note-taking was not permitted. Like the two jurors in Connolly's trial, one of the *Bassler* jurors understood this instruction to mean that "no notes should be taken during the actual trial time but could be taken during recess or other times outside actual trial time." *Id.* at 602. The juror therefore took notes at the end of each day, and these notes eventually found their way into the jury room during deliberations. The *Bassler* court held that the juror's daily notes could not be considered an improper "extrinsic influence" because they were, in fact, *intrinsic.* We agree, and "[i]ntrinsic influences on a *35 jury's verdict are not competent to impeach a verdict." *Id.* Hence Connolly cannot rely on the notes to demonstrate prejudice. *Cf. United States v. Balsam,* 203 F.3d 72, 86 (1st Cir.2000) (indicating that sharing of notes in open court by jurors does "not raise the same specter of prejudice as improper *outside* influences upon the jury") (emphasis added).

> FN8. We have previously noted the *Globe* article's ambiguity on this point. *See supra* note 7.

Even if the notes could, somehow, be considered "extrinsic," Connolly falls far short of providing specifics regarding any prejudice. Instead, he only insists that the district court should have conducted "an inquiry." Tellingly, he does not suggest what form this inquiry should take. Rather, he simply asks that we remand with instructions to the district court to "do what has to be done to ferret out the truth." He does not identify any witnesses he would call at an evidentiary hearing, or what the substance of any testimony could possibly be. Indeed, Connolly has made no proffer of *any* evidence other than the *Boston Globe* article. Instead, there is only speculation, and mere speculation can hardly be considered "clear, strong, substantial and incontrovertible evidence." *Moon,* 718 F.2d at 1234.

We have repeatedly said that courts should respond to allegations of juror impropriety in a manner appropriate to the facts and circumstances at hand. *See Ortiz-Arrigoitia,* 996 F.2d at 443 ("The trial judge is not ... shackled to a rigid and unyielding set [of] rules and procedures that compel any particular form or scope of inquiry."); *Boylan,* 898 F.2d at 258 **("We abjure imposition of a rigid set of rules for the conduct of inquiries into the presence or extent of extrinsic influences.");** *see also Moon,* 718 F.2d at 1234 ("[E]ach situation in this area is *sui generis.").* Since we agree with the district court's conclusion that its instructions to the jury did not preclude note-taking outside the courtroom, and since

Connolly has failed to make any substantial evidentiary showing regarding prejudicial impropriety, the district court properly exercised its discretion in denying Connolly's motion for further inquiry.

### V.

For the foregoing reasons, the judgment of conviction entered on the jury's verdict and the sentence of the district court are *AFFIRMED.*

### SO ORDERED.

341 F.3d 16, 62 Fed. R. Evid. Serv. 474

**Briefs and Other Related Documents (Back to top)**

• 02-2201 (Docket) (Sep. 18, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.