# INSTRUCTION NO. 2.6

*Pattern of Racketeering Activity - Part III*

Westlaw.

223 F.3d 12                                                                  Page 1
223 F.3d 12, RICO Bus.Disp.Guide 9931
**(Cite as: 223 F.3d 12)**

▷

Briefs and Other Related Documents

United States Court of Appeals,First Circuit.
David EFRON, Individually, as a Class a Special
Partner of Es Hotel Isla Verde, a Puerto Rico
Civil Partnership, and for and on behalf of that
Partnership, Plaintiff, Appellant,
v.
EMBASSY SUITES (PUERTO **RICO**), INC.,
Embassy Suites (Isla Verde), Inc., Promus Hotel
Corporation, Mora Development Corporation, First
Big Island Steakhouse, Inc., Cleofe Rubi Gonzalez,
Moraima Cintron De Rubi, Emma M. Cancio-Santos,
E.S. Hotel Isla Verde, S.E., Corporacion De
Desarrollo Hotelero, and Fundacion Segarra
Boerman E Hijos, Inc., Defendants, Appellees.
No. 99-1679.

Heard May 8, 2000.
Decided Aug. 14, 2000.

Limited partner in hotel project brought suit under
Racketeer Influenced and Corrupt Organizations Act
(**RICO**), claiming that several of his partners
intentionally caused project to experience financial
difficulties in scheme to extract additional money
from him and other investors and, ultimately, to
squeeze down value of his substantial interest in the
partnership. The United States District Court for the
District of Puerto Rico, Hector M. Laffitte, Chief
District Judge, 47 F.Supp.2d 200, dismissed **RICO**
claim, and partner appealed. The Court of Appeals,
Coffin, Senior Circuit Judge, held that complaint
failed to adequately allege pattern of racketeering
activity.

Affirmed.

West Headnotes

**[1] Racketeer Influenced and Corrupt
Organizations 319H ☞28**

319H    Racketeer    Influenced    and    Corrupt
Organizations
   319HI Federal Regulation
      319HI(A) In General
         319Hk24 Pattern of Activity
           319Hk28 k. Continuity or Relatedness;
Ongoing Activity. Most Cited Cases

Although showing of two predicate acts is only
requirement imposed by Racketeer Influenced and
Corrupt Organizations Act (**RICO**) for "pattern"
element, plaintiff also must demonstrate that
predicates are related, and that they amount to or
pose threat of continued criminal activity. 18
U.S.C.A. § 1961(1)(B), (5).

**[2] Racketeer    Influenced    and    Corrupt
Organizations 319H ☞70**

319H    Racketeer    Influenced    and    Corrupt
Organizations
   319HI Federal Regulation
      319HI(B) Civil Remedies and Proceedings
         319Hk68 Pleading
           319Hk70 k. Racketeering or Criminal
Activity; Predicate Acts. Most Cited Cases
Plaintiff was not entitled to have requirements for
pleading predicate acts under Racketeer Influenced
and Corrupt Organizations Act (**RICO**) relaxed,
where communications which allegedly defrauded
him were not in exclusive control of defendant. 18
U.S.C.A. § 1961(1)(B), (5).

**[3] Racketeer    Influenced    and    Corrupt
Organizations 319H ☞62**

319H    Racketeer    Influenced    and    Corrupt
Organizations
   319HI Federal Regulation
      319HI(B) Civil Remedies and Proceedings
         319Hk56 Persons Entitled to Sue or
Recover
           319Hk62 k. Causal Relationship; Direct
or Indirect Injury. Most Cited Cases
To state claim under Racketeer Influenced and
Corrupt Organizations Act (**RICO**), plaintiff must
show injury proximately caused by racketeering
activity. 18 U.S.C.A. § 1962.

**[4] Racketeer    Influenced    and    Corrupt
Organizations 319H ☞28**

319H    Racketeer    Influenced    and    Corrupt
Organizations
   319HI Federal Regulation
      319HI(A) In General
         319Hk24 Pattern of Activity
           319Hk28 k. Continuity or Relatedness;
Ongoing Activity. Most Cited Cases

223 F.3d 12                                                                                    Page 2
223 F.3d 12, RICO Bus.Disp.Guide 9931
(Cite as: 223 F.3d 12)

**Racketeer Influenced and Corrupt Organizations**
**319H ⬤➥29**

319H    Racketeer    Influenced    and    Corrupt
Organizations
   319HI Federal Regulation
      319HI(A) In General
         319Hk24 Pattern of Activity
            319Hk29 k. Time and Duration. Most
Cited Cases
Seventeen alleged predicate acts of wire and mail
fraud over 21 months did not pose threat of continued
criminal activity, as required to satisfy "pattern"
element of Racketeer Influenced and Corrupt
Organizations Act (RICO) claim alleging scheme to
diminish value of project, pressing plaintiff and two
others to yield up their interests so that schemers
could own and control whole project; victims' injury
resulted from single set of alleged misdeeds and
occurred at same time, and there was nothing to
suggest that defendants would seek to repeat their
fraud in other partnerships or similar business
settings, or to employ mail and wire fraud
indefinitely in the partnership. 18 U.S.C.A. §
1961(1)(B), (5).

**[5] Conspiracy 91 ⬤➥18**

91 Conspiracy
   91I Civil Liability
      91I(B) Actions
         91k18 k. Pleading. Most Cited Cases
Claim of conspiracy to violate Racketeer Influenced
and Corrupt Organizations Act (RICO) may survive
factfinder's conclusion that there is insufficient
evidence to prove RICO violation, but if pleadings
do not state substantive RICO claim upon which
relief may be granted, then conspiracy claim also
fails. 18 U.S.C.A. § 1962(d).


*13 Guy B. Bailey, Jr. and Alan M. Dershowitz, with
whom Victoria B. Eiger and Karin B. Morrell were
on brief, for appellant.
Salvador Antonetti-Zequeira for appellees.
Maria del Carmen Taboas on brief for First Big
Island Steakhouse, Inc., and Emma M. Cancio-
Santos.
Arturo Diaz-Angueira and Roberto Feliberti on brief
for Embassy Suites (Puerto Rico), Inc., Embassy
Suites (Isla Verde), Inc., and Promus Hotel
Corporation.
Luis Sanchez Betances on brief for Mora

Development, Cleofe Rubi Gonzalez and Moraima
Cintron de Rubi.

Before SELYA, Circuit Judge, COFFIN, Senior
Circuit Judge, and BOUDIN, Circuit Judge.
COFFIN, Senior Circuit Judge.
Plaintiff-appellant David Efron, a member of a
limited partnership formed to build and operate an
Embassy Suites hotel in Puerto Rico, claims that
several of his partners intentionally caused the project
to experience financial difficulties in a scheme to
extract additional money from him and other
investors and, ultimately, to squeeze down the value
of Efron's substantial interest in the partnership.
Efron brought a civil suit under the Racketeer
Influenced and Corrupt Organizations Act (RICO),
18 U.S.C. § 1962(c), (d), and Puerto Rico law.
Concluding that the allegations in the complaint did
not show RICO violations, the court dismissed the
federal claims and declined to exercise supplemental
jurisdiction over the Commonwealth claims. See
Efron v. Embassy Suites (Puerto Rico), Inc., 47
F.Supp.2d 200 (D.P.R.1999). We affirm, agreeing
with the district court that appellant has failed to
adequately allege a "pattern of racketeering activity,"
see 18 U.S.C. § 1962(c), but adding elaboration to its
rationale.


I. Factual Background

We narrate the allegations contained in the complaint
and RICO case statement in the light most favorable
to appellant. See Feinstein v. Resolution Trust
Corp., 942 F.2d 34, 37 (lst Cir.1991). Efron and his
associates formed the ES Hotel Isla Verde, S.E.
Partnership ("the Partnership") in 1995 to develop
and operate an Embassy Suites hotel and casino in
the Carolina section of San Juan, Puerto Rico. Efron
contributed approximately $5 million in property and
cash, receiving in return twenty-two percent of the
equity in the project. Of the six other partners, four
are defendants in this case: Cleofe Rubi Gonzalez
("Rubi"); his wife, Moraima Cintron de Rubi
("Cintron"); Mora Development Corporation
("MDC"), a company owned by Rubi; and Embassy
Suites Isla Verde, Inc. ("ESIV"). Two other partners
are described as co-victims, although they did not
join Efron's suit: Corporacion De Desarrollo
Hotelero ("CDH"), a public corporation that is a
subsidiary of Puerto Rico's Department of Tourism;
and Fundacion Segarra Boerman e Hijos ("FSBH").
Also named as defendants were several corporations
affiliated with the defendant partners, including
Embassy Suites (Puerto Rico), Inc. ("ESPR"), a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

company hired by the Partnership to manage the hotel, and First Big Island Steakhouse, Inc., a Rubi-controlled company **14** that leased space from the Partnership for a restaurant ("Outback"). Emma Cancio Santos, an attorney for ESIV and Rubi, also was named as a defendant.

Efron alleges that the defendants deliberately caused the hotel project to lose money by generating excessive construction costs, engaging in sweetheart leases with the on-site restaurant and gift shop, overpricing rooms, and performing other acts of mismanagement. According to the complaint, ESPR purposefully created artificial cash shortfalls, which under the Partnership agreement could be covered by capital calls to the limited partners. The agreement specified that a partner who did not provide the requested capital could have his interest reduced proportionately. Efron alleges that, to protect his initial investment and avoid losing his equity, he was forced to invest an additional $1 million in response to such capital calls.[FN1]

> **FN1.** The complaint elaborated on the improper practices as follows: the cost overruns allegedly resulted from (1) payments to a Rubi-owned company in excess of the value of goods and services received; (2) subcontractor bills from other Rubi projects that were shifted onto the Partnership, and (3) construction delays from the late addition to the project of the Outback restaurant. Cash shortfalls continued to build after the hotel was completed because the defendants allegedly overpriced rooms and failed to adequately market the hotel's services. In addition, the lease arrangement with Outback allegedly benefited Rubi to the detriment of the Partnership, and the lease to the hotel's gift shop allegedly was below market value.

Efron filed suit in October 1997. The amended complaint identified seventeen instances of alleged mail or wire fraud during a twenty-one-month period as the unlawful acts supporting a **RICO** claim, the first of which was a letter sent to the partners by Rubi on January 11, 1996, stating that the project was experiencing cost overruns of about $7 million. The subsequent letters fall into two general categories: (1) communications that relate to the project's cost overruns and possible solutions, namely, capital contributions from the partners and refinancing, and (2) communications that concern appellant's efforts to

review the Partnership books and obtain information about the restaurant and other lease arrangements.

In addition to the substantive **RICO** claim, *see* 18 U.S.C. § 1962(c), the amended complaint asserted a **RICO** conspiracy cause of action, *see* 18 U.S.C. § 1962(d), as well as claims under Commonwealth law for fraud, breach of contract, breach of fiduciary duty, and violation of the Puerto **Rico RICO** act.

The district court rejected defendants' argument that the amended complaint lacked the particularity required for fraud claims under Fed.R.Civ.P. 9(b), but it concluded that appellant had not adequately alleged a pattern of racketeering activity. It alternatively ruled that Efron lacked standing to bring the **RICO** claims either individually or derivatively on behalf of the Partnership. Having dismissed the federal **RICO** claims, the court declined to exercise supplemental jurisdiction to hear the Commonwealth law claims. On appeal, Efron contends that the court improperly viewed the alleged facts and inferences in the defendants' favor, leading it to conclude wrongly that he had failed to establish the elements of a **RICO** violation and conspiracy. He further maintains that the amended complaint demonstrates his standing, both individually for his unique damages and derivatively for the Partnership.

We turn now to the issue which we deem dispositive-whether the amended complaint described a "pattern" of racketeering activity. We first sketch the general principles governing **RICO** claims and then evaluate appellant's specific contentions in light of those standards.

## II. *Discussion*

[1] To state a **RICO** claim under section 1962(c), a plaintiff must allege each of the four elements required by the statute: " '(1) conduct (2) of an enterprise (3) **\*15** through a pattern (4) of racketeering activity.' " *Feinstein*, 942 F.2d at 41 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).[FN2] This case centers on whether Efron alleged sufficient facts to support a jury finding of a "pattern," there being no dispute that the complaint adequately alleged the other components of a **RICO** violation. By statute, the "pattern" element requires a plaintiff to show at least two predicate acts of "racketeering activity," which is defined to include violations of specified federal laws, such as the mail and wire fraud statutes, *see* 18 U.S.C. § 1961(1)(B), (5).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

223 F.3d 12
223 F.3d 12, RICO Bus.Disp.Guide 9931
(Cite as: 223 F.3d 12)

Page 4

Although showing two predicate acts is the only statutory requirement, case law establishes that this is not sufficient to prove a "pattern"-the plaintiff also must demonstrate that the "predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *see also Feinstein,* 942 F.2d at 44.

> FN2. Section 1962(c) provides, in relevant part:
> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

We have more than once remarked upon the difficulty of articulating concrete guidelines for this "continuity plus relationship" standard for identifying a pattern. *See Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.,* 94 F.3d 721, 731 (1st Cir.1996); *Apparel Art Int'l, Inc. v. Jacobson,* 967 F.2d 720, 722 (1st Cir.1992); *see also H.J. Inc.,* 492 U.S. at 236, 109 S.Ct. 2893 ("[D]eveloping a meaningful concept of 'pattern' within the existing statutory framework has proved to be no easy task.").[FN3] The Supreme Court has noted that the "relationship" portion of the standard is easier to grasp, in part because there exists a relevant statutory definition in another portion of the legislation of which **RICO** was a part. *See H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. 2893. Under Title X of the partially repealed Organized Crime Control Act of 1970, the pattern requirement was defined "solely in terms of the *relationship* of the defendant's criminal acts one to another: '[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* (quoting 18 U.S.C. § 3575(e)). The parties do not dispute the relatedness of the communications at issue here.

> FN3. The "continuity plus relationship" description was quoted by the Supreme Court in *H.J. Inc.* from the legislative history of the **RICO** statute. *See* 492 U.S. at 239, 109 S.Ct. 2893 (quoting 116 Cong. Rec. 18940 (1970)). Justice Scalia in a

concurrence in *H.J. Inc.* termed that formulation "about as helpful ... as 'life is a fountain.' " *Id.* at 252, 109 S.Ct. 2893 (Scalia, J., concurring).

The continuity element, which lacks statutory illumination, has proved more puzzling. Noting that it is "difficult to formulate in the abstract any general test for continuity," the Supreme Court in *H.J. Inc.* nonetheless provided a starting point for analysis. *See* 492 U.S. at 241-43, 109 S.Ct. 2893; *Feinstein,* 942 F.2d at 45. We previously have summarized the court's guidance as follows:

For there to be continuity, the plaintiff must show that the related predicates "amounted to, or posed a threat of, continued criminal activity." ... Under the "amount[ing] to" approach, "[a] party alleging a **RICO** violation may demonstrate continuity ... by proving a series of related predicates extending over a substantial period of time." *H.J.,* 492 U.S. at 242, 109 S.Ct. 2893. Because **RICO** was intended by Congress to apply only to enduring criminal conduct, "[p]redicate acts extending over a few weeks or months ... do not satisfy this requirement." *Id.* Under the "threat" **\*16** approach, however, even where the predicate acts occur in a narrow time frame and suit is brought before the pattern has taken definitive shape, the requirement can still be satisfied by ... a showing that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] ... are part of an ongoing entity's regular way of doing business." *Id.*

*Feinstein,* 942 F.2d at 45 (some citations omitted).

The Supreme Court thus described continuity as "both a closed-and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. 2893. The Justices also explained in *H.J. Inc.* that showing a "pattern" does not necessarily require proof of multiple criminal "schemes." Finding that the "multiple-scheme" prerequisite "brings a rigidity to the available methods of proving a pattern that simply is not present in the idea of 'continuity' itself," *id.* at 240-41, 109 S.Ct. 2893, the Court emphasized instead the temporal focus of the "continuity" requirement. Thus, one scheme that extends over a substantial period of time, or that shows signs of extending indefinitely into the future, can establish a pattern.

In this case, the district court ruled that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

223 F.3d 12
223 F.3d 12, RICO Bus.Disp.Guide 9931
**(Cite as: 223 F.3d 12)**

Page 5

allegations in appellant's complaint failed to establish either type of continuity. After trimming the number of actionable letters and faxes to eight,[FN4] it held that "[t]he acts are simply too few and the time period too short" to establish a closed period of racketeering activity, *see* 47 F.Supp.2d at 206,[FN5] and it concluded that there was no future threat of continuing mail and wire fraud to establish open-ended continuity. Rejecting appellant's contention that the defendants were engaged in a long-term, ongoing criminal enterprise, it characterized the conflict as a "bitter local law dispute between partners." *Id.* at 210 n. 11.

> FN4. The court excluded seven faxes because Efron failed to allege that they had been transmitted interstate and eliminated two mailings as not in furtherance of the alleged scheme.

> FN5. The court pointed out that, of the viable predicate acts, all but two occurred during a 90-day period from June to September 1997.

[2] Before we address the court's conclusion on the merits, we discuss two preliminary issues. Efron claims on appeal that the court erred in disregarding the faxes and refusing to consider all of the specified fraudulent mailings. He claims that, under *New England Data Servs., Inc. v. Becher,* 829 F.2d 286 (1st Cir.1987), he is entitled to an opportunity to particularize the alleged predicate acts to remedy their deficiencies regarding when and where the mail or wires were used before his complaint is dismissed. He extends this argument as well to his general allegation that, in addition to the seventeen specifically pleaded communications, there were "literally hundreds of acts" and a "myriad of mail and wire frauds." But in this case, the underlying rationale for relaxation of pleading requirements-that the needed information is likely to be in the exclusive control of the defendant, *see id.* at 290-is absent. The gist of Efron's complaint is that he and his non-conspiring partners were defrauded by communications that were sent to them, and such communications would not be in defendants' sole control. Moreover, any need to flesh out allegations in the complaint should have been raised first through a renewed request to conduct discovery and a motion in the district court seeking leave to amend the complaint to cure the infirmities identified by that court. *See Feinstein,* 942 F.2d at 43-44. Nonetheless, while we consider only those predicate acts specifically alleged in evaluating the adequacy of

appellant's "pattern" allegations, *see Fleet Credit Corp. v. Sion,* 893 F.2d 441, 445 (1st Cir.1990), we are reluctant in *17 the context of an interstate business to exclude the faxes on the highly technical ground of appellant's failure to plead their interstate quality. We need not do so because including them will not change the outcome of our review.

[3] A second preliminary issue merits comment. It is whether the pleadings sufficiently indicate that appellant's injuries were caused by the predicate acts of wire and mail fraud. That such a causal nexus must exist is well established. *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 266-68 & n. 12, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (to state a **RICO** claim, plaintiff must show injury proximately caused by racketeering activity); *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 172 (2d Cir.1999) (plaintiffs must show that the defendants' misstatements were "the reason the transaction[s] turned out to be ... losing one[s]" (citation omitted)); *Bonilla v. Volvo Car Corp.,* 150 F.3d 62, 66-67 (1st Cir.1998) (**RICO** requires plaintiffs to show that they were "injured in [their] business or property by reason of" the racketeering activity); *Miranda v. Ponce Fed. Bank,* 948 F.2d 41, 44, 47 (1st Cir.1991) (to avert dismissal under Rule 12(b)(6), civil **RICO** complaint must state facts showing "a causal nexus between [racketeering activity] and the harm alleged"; the "injury itself" must be "the result of a predicate act"); *cf. Beck v. Prupis,* 529 U.S. 494, ----, 120 S.Ct. 1608, 1617, 146 L.Ed.2d 561 (2000) (holding that the injury underlying a **RICO** conspiracy claim must be caused not by any overt act but by conduct that constitutes racketeering activity or is otherwise unlawful under the **RICO** statute).

On the facts, the lack of causation seems to be a significant possibility. Efron entered the partnership before any of the alleged predicate acts occurred, and thus without reliance on any misrepresentations. He asserts that he was coerced into paying $1 million beyond his original contribution to preserve his equity, but he does not allege that he was deceived by the written requests for additional capital. Instead, he describes his "injury-in-fact" as the prospect of a squeezed-down equity position in the partnership, which would have been a by-product of his refusal to contribute all of the requested funds but not necessarily a loss occasioned by misrepresentations or false assurances. In his **RICO** case statement, Efron suggests that he was the only one of the three victim partners who was *not* deceived, asserting that the defendants "conducted their misdeeds under unsuspecting eyes, *except for Efron.*" (Emphasis

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

223 F.3d 12
223 F.3d 12, RICO Bus.Disp.Guide 9931
**(Cite as: 223 F.3d 12)**

added.)

Despite this seeming weakness in appellant's **RICO** claim, we are disinclined to rest a judgment on a decision of the causation issue. It was alluded to in appellees' briefs only in a list of pleading requirements, and it was the subject of brief treatment by the parties at oral argument. It is conceivable that an extremely generous reading of the complaint might allow the inference that Efron contributed $1 million beyond his original investment in response to the defendants' written requests because he initially was deceived into believing there was a legitimate need for the funds. In any event, our disposition makes it unnecessary to explore further the question of whether the mailings caused a loss to appellant.

We therefore move to the merits and the issue of continuity, accepting for purposes of our discussion that all seventeen alleged acts of wire and mail fraud are viable predicate acts under the **RICO** statute. Although the twenty-one month time frame for these communications meets the Supreme Court's requirement for closed continuity of more than "a few weeks or months," _H.J. Inc., 492 U.S. at 242, 109 S.Ct. 2893,_ it is not so long a period nor are there so many predicate acts that other indicators of continuity-or the lack of them-are without significance. Cf. _Fleet Credit Corp., 893 F.2d at 447_ (finding that ninety-five fraudulent mailings over four and one-half years "is the type of 'long-term criminal conduct' defined by the [Supreme*18 Court] as constituting 'continued criminal activity' "); _United States v. Pelullo, 964 F.2d 193, 209 (3d Cir.1992)_ ("[M]ost courts that have found continuity in a closed period did so in cases involving periods of several years.") [FN6]; _Hindes v. Castle, 937 F.2d 868, 875 (3d Cir.1991)_ (collecting cases ranging from a period of four and one-half to seventeen years).

FN6. Although the court in _Pelullo_ concluded that 19 months was a sufficient period for a finding of continuity, _see 964 F.2d at 209,_ it expressed some doubt that the facts established either open or closed continuity. _See id._ at 209 n. 15, 210. It nonetheless remanded the case for retrial on the **RICO** count, as well as on multiple wire fraud counts whose reversal was based on evidentiary error.

The Supreme Court in _H.J. Inc._ noted Congress's "natural and commonsense approach to **RICO's** pattern element," _see 492 U.S. at 237, 109 S.Ct._

2893, suggesting that its discussion of temporal factors did not mean that other considerations were to be entirely ignored. Indeed, in rejecting the notion that a pattern of racketeering activity requires proof of multiple schemes, the Court noted that "proof that a **RICO** defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity." _Id._ at 240, 109 S.Ct. 2893. Likewise, where the racketeering activity exceeds in duration the "few weeks or months" that the Supreme Court in _H.J. Inc._ deemed inadequate, but is neither so extensive in reach nor so far beyond the minimum time period that common sense compels a conclusion of continuity, the fact that a defendant has been involved in only one scheme with a singular objective and a closed group of targeted victims also strikes us as "highly relevant." Cf. _Vicom, Inc. v. Harbridge Merchant Servs., 20 F.3d 771, 780 (7th Cir.1994)_ (various factors considered in assessing continuity, including the number of victims, the presence of separate schemes, and the occurrence of distinct injuries); _Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1543 (10th Cir.1993)_ (considering, in addition to duration, "extensiveness" of the **RICO** scheme, including number of victims, variety of racketeering acts, whether the injuries caused were distinct, and the complexity and size of the scheme); _Pelullo, 964 F.2d at 208_ ("We have eschewed the notion that continuity is _solely_ a temporal concept, though duration remains the most significant factor.") [FN7]; _U.S. Textiles, Inc. v. Anheuser-Busch Cos., 911 F.2d 1261, 1269 (7th Cir.1990)_ (" '[I]t is not irrelevant, in analyzing the continuity requirement, that there is only one scheme.' ") (quoting _Sutherland v. O'Malley, 882 F.2d 1196, 1204 (7th Cir.1989)_).

FN7. The Third Circuit, _en banc,_ later discussed the continuity requirement at length in a series of opinions. _See Tabas v. Tabas, 47 F.3d 1280 (3d Cir.1995)_ (en banc). The majority adhered to the view that multiple factors may be relevant in evaluating continuity.

[4] Having considered carefully the various factors here, we have concluded that the allegations do not demonstrate the kind of broad or ongoing criminal behavior at which the **RICO** statute was aimed. In essence, appellant alleges a scheme to diminish the value of the project in the short run, pressing plaintiff and two others to yield up their interests so that the schemers could own and control the whole project. Although multiple related acts of deception were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

223 F.3d 12
223 F.3d 12, RICO Bus.Disp.Guide 9931
(Cite as: 223 F.3d 12)

claimed to underlay the faxes and mailings, all allegedly were aimed at the single goal of transforming the ownership of the Partnership during its early stages. *See* Amended Complaint, ¶ 19 (defendants' goal was "to dilute the interests of the Special Partners and to siphon away Partnership assets" to gain "outright control of the Partnership"). The three named victims were not separately targeted through repetitions of criminal conduct, which could have reflected persistent or broad-based crime; their injury instead resulted from a single set of alleged misdeeds and occurred at the same time.

**\*19** This narrow attack on three partners' participation in a particular business venture is qualitatively different from the single scheme underlying *H.J. Inc.* The plaintiffs there had alleged that telephone company officials and others had engaged in multiple acts of bribery over at least a six-year period to obtain approval for unfairly and unreasonably high rates. 492 U.S. at 250, 109 S.Ct. 2893. Thousands of telephone company customers presumably were injured by the ongoing scheme.

Although a **RICO** pattern need not have countless victims, the finite nature of the racketeering activities alleged here, together with their occurrence over a relatively modest period of time, cannot, in our view, support a jury finding of a **RICO** pattern under the "closed" continuity approach. Our own precedent firmly rejects **RICO** liability where "the alleged racketeering acts ..., 'taken together, ... comprise a single effort' to facilitate a single financial endeavor," *Schultz,* 94 F.3d at 732; *see also Apparel Art,* 967 F.2d at 723 ("[A] single criminal episode, or event, is not a 'pattern' ... [because] its parts, taken together, do not 'amount to or pose a threat of continued criminal activity.'") (quoting *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. 2893). [FN8] And, while the cases in this volatile field understandably cannot all be reconciled, we find ourselves in good company. *See, e.g., Edmondson & Gallagher v. Alban Towers Tenants Ass'n,* 48 F.3d 1260, 1265 (D.C.Cir.1995) (combination of "single scheme, single injury, and few victims ... makes it virtually impossible for plaintiffs to state a **RICO** claim"); [FN9] *Stone,* 998 F.2d at 1545 ("Where the scheme has a limited purpose, most courts have found no continuity."); *Sil-Flo, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1516 (10th Cir.1990) (affirming dismissal of **RICO** claim where a "closed-ended series of predicate acts ... constituted a single scheme to accomplish 'one discrete goal,' directed at one individual with no potential to extend to other persons or entities" (citation omitted)); *Menasco, Inc. v. Wasserman,* 886

F.2d 681, 684 (4th Cir.1989) ("Defendants' actions were narrowly directed towards a single fraudulent goal.").

> FN8. In *Apparel Art,* then Chief Judge Breyer noted that the court deliberately used "a vague term like 'episode' " to distinguish the concept of an isolated occurrence from the technical concept of a scheme, as used by the Supreme Court in *H.J. Inc. See* 967 F.2d at 722.

> FN9. In *Alban Towers,* the court noted that "[t]he number of alleged predicate acts (fifteen), and the most generous estimate of the length of time the acts continued (three years ... ), are not enough to overwhelm the three narrowing factors." 48 F.3d at 1265.

Nor is it reasonable to infer from the allegations here that there is a risk of a broader scheme, or that the fraudulent acts directed at appellant would continue indefinitely into the future, either of which might support a conclusion of "open-ended" continuity. There is nothing to suggest that the defendants would seek to repeat their fraud in other partnerships or similar business settings, or to employ mail and wire fraud indefinitely in the Embassy Suites partnership, thereby showing that racketeering activity might be a "regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate **RICO** 'enterprise,' " *H.J. Inc.,* 492 U.S. at 243, 109 S.Ct. 2893; *cf. Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 31 (1st Cir.1987) ("no suggestion that defendants used similar means to obtain other subcontracts, or that they bribed anyone else").

Viewing the Partnership as either the **RICO** enterprise or defendants' "ongoing legitimate business," the scenario painted by Efron's pleadings does not threaten the "long-term criminal conduct" with which Congress was concerned, *see H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893. Almost by definition, the alleged fraud had a limited life expectancy. The scheme's objective, as reasonably understood from Efron's not **\*20** fully consistent allegations,[FN10] was to squeeze appellant and two co-partners out of the partnership early in its existence so that the remaining partners could reap greater profits through the self-interested operation of this hotel and their other businesses. *See Vicom, Inc.,* 20 F.3d at 782 ("[S]chemes which have a clear and terminable goal have a natural ending point ... [and]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

therefore cannot support a finding of any specific threat of continuity that would constitute open-ended continuity.").

> FN10. In paragraph 19 of the amended complaint and on page 6 of the **RICO** case statement, for example, Efron describes the defendants' goal to be "gaining outright control of the Partnership." In paragraph 22 of the amended complaint, he alleges that MDC and Rubi made "continual capital calls *either* to defraud the Special Partners of more money *or*, alternatively, to try to 'squeeze down' their interests in the Partnership." (Emphasis added.) Paragraph 41, section a, described the first alleged predicate act as a letter sent by Rubi to the special partners concerning cost overruns. Efron alleges: "This was the implementation, carrying out, and continuation of the previously designed scheme to defraud Efron out of additional monies or alternatively to dilute his interest and to deprive him of the full realization of his investment, or all of these." In section r of that paragraph, at the conclusion of the full list of predicate acts, he asserts: "All of the noted predicate acts were meant to defraud, misrepresent, mislead, and to deprive the Special Partners, including Efron, of their ownership interest in the Partnership."
> Thus, although the amended complaint and **RICO** case statement refer to a general goal to defraud Efron and the other victim partners of "more money," the amended complaint read as a whole does not depict this as a long-term objective but simply as a necessary step toward defendants' specific goal of "tak[ing] unrestricted control of the enterprise." *See* **RICO** case statement at 7. His brief and oral argument were framed similarly. *See, e.g.,* Brief at 27 ("By their nature, the [defendants'] goals will not be reached, at least until such time as plaintiff loses his entire interest in the partnership.")

It is true that the scheme as alleged already had spanned twenty-one months, and that its exact endpoint could not be ascertained from the pleadings because it depended upon Efron's and the other victim partners' refusal to respond to capital calls large enough to result in squeezing down their interests in the Partnership. This is far different,

however, from the open-ended continuity illustrated by the single scheme described in *H.J. Inc.,* an endeavor that apparently would have gone on without end had it not been detected. *See* 492 U.S. at 250, 109 S.Ct. 2893. Had Efron argued that the defendants planned to operate the hotel indefinitely at a paper loss as a means of perpetually defrauding him, rather than asserting the specific objective of squeezing him out of the Partnership, he would have a stronger argument for an open-ended **RICO** pattern. His pleadings and argument, however, depict an undertaking with a soon-to-be reached endpoint. Indeed, Efron's refusal to contribute any more funds and his decision to file suit to protect his interest suggest that the objective was virtually accomplished.

We note that courts, including our own, have suggested that **RICO** claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a **RICO** pattern from allegations that, upon closer scrutiny, do not support it. *See, e.g., Schultz*, 94 F.3d at 732; *Roeder*, 814 F.2d at 31. The Seventh Circuit has been explicit in cautioning against finding continuity too easily in the context of a single dishonest undertaking involving mail or wire fraud:
Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are "related" by purpose and spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and augmented criminal sanctions [under **RICO**] dependent solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires pursuit for an extended period of *21 time. Given its "natural and common sense approach to **RICO**'s pattern element," we think it unlikely that Congress intended **RICO** to apply in the absence of a more significant societal threat.

*United States Textiles, Inc.,* 911 F.2d at 1268 (quoting *Marshall-Silver Constr. Co. v. Mendel,* 894 F.2d 593, 597 (3d Cir.1990) [FN11]); *cf. Tabas v. Tabas,* 47 F.3d 1280, 1290 (3d Cir.1995) (*en banc* ) ("The inclusion within the scope of civil **RICO** of [mail and wire fraud], more prevalent in the commercial world than in the world of racketeers, has caused concern that **RICO** sweeps too broad a swathe."); *Menasco,* 886 F.2d at 683 ("Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences.... The pattern requirement ...

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

223 F.3d 12
223 F.3d 12, RICO Bus.Disp.Guide 9931
(Cite as: 223 F.3d 12)

Page 9

ensure[s] that **RICO's** extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value...."").

> FN11. In *Tabas,* 47 F.3d at 1293 n. 17, the Third Circuit noted that, to the extent *Marshall-Silver* could be read to *require* the existence of a "societal threat" to establish **RICO** continuity, it is overruled. We deem this narrowing of *Marshall-Silver* unimportant for present purposes.

In sum, while the complaint pleads a series of related racketeering acts and permits an inference that defendants defrauded appellant and two of his partners, we agree with the district court's determination that no reasonable jury could find that these allegations establish a **RICO** "pattern." Taken together, the acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners. This cannot be a **RICO** violation.

### III. *Other issues*

[5] Our conclusion that appellant has failed to adequately plead a substantive violation of **RICO** makes it unnecessary for us to consider his other claims of error. Questions concerning his standing obviously are moot. In addition, his conspiracy claim is without merit. A conspiracy claim under section 1962(d) may survive a *factfinder's* conclusion that there is insufficient evidence to prove a **RICO** violation, *Howard v. America Online, Inc.,* 208 F.3d 741, 751 (9th Cir.2000), *cert. denied,* 121 S.Ct. 77 (2000), but if the pleadings do not state a substantive **RICO** claim upon which relief may be granted, then the conspiracy claim also fails, *id.; see also Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense....").

*The judgment of the district court is therefore affirmed.*

C.A.1 (Puerto Rico),2000.
Efron v. Embassy Suites (Puerto Rico), Inc.
223 F.3d 12, RICO Bus.Disp.Guide 9931

Briefs and Other Related Documents (Back to top)

• 99-1679 (Docket) (Jun. 03, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

THIS PAGE INTENTIONALLY LEFT BLANK



94 F.3d 721
94 F.3d 721, RICO Bus.Disp.Guide 9108
**(Cite as: 94 F.3d 721)**

Page 1

▷

United States Court of Appeals,First Circuit.
Peter M. SCHULTZ and Pamela A. Schultz,
Plaintiffs, Appellants,
v.
RHODE ISLAND HOSPITAL TRUST NATIONAL
BANK, N.A., et al., Defendants, Appellees.
BOWDOIN CONSTRUCTION CORP., Plaintiff,
Appellant,
v.
RHODE ISLAND HOSPITAL TRUST NATIONAL
BANK, N.A., et al., Defendants, Appellees.
ALLENBY ENTERPRISES, INC., et al., Plaintiffs,
Appellants,
v.
RHODE ISLAND HOSPITAL TRUST NATIONAL
BANK, N.A., et al., Defendants, Appellees.
**Nos. 95-1997, 95-2113 and 95-2172.**

Heard June 7, 1996.
Decided Aug. 22, 1996.

Contractor and investors in failed real estate project
brought separate actions against bank which served
as escrow agent on project for alleged fraud,
negligent misrepresentation, breach of contract, and
violations of Racketeer Influenced and Corrupt
Organizations Act (RICO). The United States
District Court for the District of Massachusetts,
Joseph L. Tauro, Robert E. Keeton, and Patti B.
Saris, JJ., 1994 WL 326376, 869 F.Supp. 1004,
granted motion to dismiss and motions for summary
judgment, and plaintiffs appealed. Actions were
consolidated for appeal. The Court of Appeals,
Lynch, Circuit Judge, held that: (1) defendant
satisfied its obligations under escrow agreement; (2)
defendant could not be held liable for breach of
covenant of good faith and fair dealing; (3) defendant
could not be held liable for fraud or aiding and
abetting fraud by developer; and (4) plaintiffs failed
to establish requisite predicate acts or "pattern"
requirements for RICO claim.

Affirmed.

West Headnotes

**[1] Deposits and Escrows 122A €━13**

122A Deposits and Escrows

122AII Conditional Deposits or Escrows
122Ak13 k. Depositaries. Most Cited Cases
Escrow agent for real estate investment project
satisfied its obligation under escrow agreement by
not releasing escrowed investor funds until it verified
that minimum subscription level of $6 million had
been reached; escrow agent had no obligation to
investigate for fraud or other duties not spelled out in
agreement.

**[2] Deposits and Escrows 122A €━13**

122A Deposits and Escrows
122AII Conditional Deposits or Escrows
122Ak13 k. Depositaries. Most Cited Cases
Escrow agent for investors in real estate investment
project could not be held liable for breach of
covenant of good faith and fair dealing based on
escrow agent's release of escrowed funds upon
showing that minimum subscription level (MSL) of
$6 million had been reached; plaintiffs pointed to no
record evidence that would permit finding that
release of escrow funds was done other than under
good-faith belief that MSL requirement had been
satisfied, and that all of conditions for releasing the
funds had been met.

**[3] Deposits and Escrows 122A €━13**

122A Deposits and Escrows
122AII Conditional Deposits or Escrows
122Ak13 k. Depositaries. Most Cited Cases
Escrow agent for investors in real estate investment
project could not be held liable to investors for fraud
or aiding and abetting fraud of developer regarding
release of escrowed funds to developer upon showing
that minimum subscription level (MSL) of $6 million
had been reached pursuant to escrow agreement;
there was no serious argument that escrow agent
made affirmative material misrepresentations, agent
had only arm's length business relationship with
developer, and assuming agent had duty to disclose
known fraud, there was no evidence that agent had
knowledge of any fraud.

**[4] Fraud 184 €━30**

184 Fraud
184I Deception Constituting Fraud, and Liability
Therefor
184k30 k. Persons Liable. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 F.3d 721                                                    Page 2
94 F.3d 721, RICO Bus.Disp.Guide 9108
**(Cite as: 94 F.3d 721)**

To establish common-law cause of action for aiding and abetting fraud, plaintiffs must at least demonstrate some measure of "active participation" and knowing provision of substantial assistance by defendant to principal's alleged fraud.

**[5] Racketeer Influenced and Corrupt Organizations 319H ⟳79**

319H    Racketeer    Influenced    and    Corrupt Organizations
   319HI Federal Regulation
      319HI(B) Civil Remedies and Proceedings
         319Hk76 Evidence
            319Hk79 k. Weight and Sufficiency. Most Cited Cases
Even assuming that aiding and abetting securities fraud could be Racketeer Influenced and Corrupt Organizations Act (RICO) predicate act, plaintiff investors failed to establish that defendant escrow agent engaged in RICO predicate acts of aiding and abetting securities fraud of developer, mail fraud, or wire fraud; record contained no evidence that defendant "consciously shared" in specific intent to defraud plaintiffs, and there was no basis in record for finding that mailings or wires by defendant constituted communications in furtherance of scheme intended to deceive plaintiffs. 18 U.S.C.A. § 1961(1); Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[6] Racketeer Influenced and Corrupt Organizations 319H ⟳28**

319H    Racketeer    Influenced    and    Corrupt Organizations
   319HI Federal Regulation
      319HI(A) In General
         319Hk24 Pattern of Activity
            319Hk28 k. Continuity or Relatedness; Ongoing Activity. Most Cited Cases
While two predicate acts are necessary to form Racketeer Influenced and Corrupt Organizations Act (RICO) "pattern," they may not be sufficient unless they are both related and amount to or pose threat of continued criminal activity; RICO pattern consists of continuity plus relationship. 18 U.S.C.A. § § 1961(5), 1962(b-c).

**[7] Racketeer Influenced and Corrupt Organizations 319H ⟳31**

319H    Racketeer    Influenced    and    Corrupt Organizations

   319HI Federal Regulation
      319HI(A) In General
         319Hk24 Pattern of Activity
            319Hk31 k. Multiple Mailings or Communications; Mail or Wire Fraud. Most Cited Cases
Alleged racketeering acts attributed to escrow agent in real estate investment project, that of sending mailings and wires in course of its involvement in offering, taken together comprised only single effort to facilitate single financial endeavor of purchase and renovation of resort, and therefore could not satisfy "pattern" requirement under Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § § 1961(5), 1962(b-c).

*722 Edwin A. McCabe, with whom McCabe Brown Sutherland, Joseph P. Davis III, and Lane, Altman & Owens were on brief, Boston, for plaintiffs-appellants.
Joseph L. Kociubes, with whom Peter Alley, Denise Jefferson Casper, and Bingham, Dana & Gould were on brief, Boston, for Rhode Island Hospital Trust National Bank.
Allen N. David, Elizabeth Z. Holmes, and Peabody & Arnold, on brief, Boston, for Federal Deposit Insurance Corp. as receiver of Coolidge Bank and Trust Co.
Robert D. Cultice, Louis J. Scerra, Jr., and Goldstein & Manello, P.C., on brief, Boston, for Chrysler First Business Credit Corp.

Before TORRUELLA, Chief Judge, and CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.
LYNCH, Circuit Judge.
These three actions, consolidated for appeal, arise out of a failed real estate venture involving the purchase and redevelopment of the Sea Crest Hotel in Falmouth, Massachusetts ("the Sea Crest"). In a federally registered public offering, investors purchased condominium unit deeds and "pooled income" interests in the Sea Crest project. One of the offering's features, as disclosed in the prospectus, was that the offering would be terminated and all investor deposits refunded if the aggregate amount of investments sold did not reach a minimum subscription level ("MSL") by a set deadline. Plaintiffs asserted that Rhode Island Hospital Trust National Bank ("RIHT"), the lender that financed *723 the developer's purchase of the Hotel and served as the escrow agent responsible for holding investor deposits, was liable to them for purportedly failing to determine that the MSL requirement had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 F.3d 721
94 F.3d 721, RICO Bus.Disp.Guide 9108
(Cite as: 94 F.3d 721)

Page 3

not in fact been satisfied by the requisite date. The district courts concluded, as a matter of law, that the plaintiffs' claims against RIHT for fraud, negligent misrepresentation, breach of contract, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § § 1961 *et seq.,* were all deficient. We agree that plaintiffs have established no legal basis for holding RIHT liable for their losses. Accordingly, we affirm.

## I.

### *Factual Background*

In the mid-1980's, Eugene Marchand developed a plan to purchase and renovate the Sea Crest Resort and Conference Center, a large beach resort on Cape Cod. Marchand sought to revitalize the hotel as a convention-oriented facility. The plan involved converting the Sea Crest into a condominium, and then selling the individual condominium units to investors, together with interests in the pool of income to be generated from the resort. The condominium units and these "pooled income" interests were to be sold as registered securities in a public offering. The issuer of the securities would be Marchand's development company, Laurel-Sea Crest Realty Sales Corp. ("Laurel"), of which Marchand was the sole shareholder. Laurel's purchase of the Sea Crest, for $19.4 million, would be financed through sales to investors and a bank loan from RIHT. With projected expenses of $40.5 million and total expected gross proceeds from the offering projected at $45 million, Laurel stood to make a net profit of $4.5 million.

On September 12, 1986, Laurel filed a registration statement and prospectus with the SEC, describing the proposed offering of 266 "condominium hotel interests." The prospectus stated that the offering would be conditioned upon a minimum level of investor participation:
Unless 60 Hotel Interests are subscribed for by qualified investors ("Minimum Subscription Level") within 60 days of the effective date of the Registration Statement of which this Prospectus is a part, but in no event later than December 31, 1986, this offering will be withdrawn and all funds will be returned promptly to subscribers.

The prospectus also stated that every investor would be required to "pay a down payment of 10% of the purchase price of the Hotel Interest (the 'Escrow Deposit')," which would be "deposited ... in a segregated, federally insured, interest bearing account ... at the Rhode Island Hospital Trust National Bank ... on behalf of Investor." The prospectus named RIHT as escrow agent for the offering.

As Laurel waited for the registration statement to be declared effective by the SEC, it secured the financing it needed to purchase the Sea Crest. On November 14, 1986, RIHT issued a commitment letter to Laurel approving a fourteen million dollar first mortgage construction loan to be used by Laurel in acquiring and renovating the Sea Crest facility. RIHT's commitment, like the offering, was conditioned upon the "presale" of a minimum number of Sea Crest interests prior to December 29, 1986, the expiration date of RIHT's commitment letter.[FN1]

> FN1. RIHT's presale requirement was, in fact, more stringent than the MSL requirement. The commitment letter specified that "[p]rior to closing, a minimum of 80 units must be under written agreement of purchase-sale with a 10% non-refundable deposits [sic]," and that those 80 units must account for "no less than $13.6 million" in gross proceeds.

As of the date that RIHT issued its commitment letter to Laurel, however, the SEC had yet to approve Laurel's registration statement. In fact, the registration statement was not declared effective by the SEC until December 12, 1986, leaving just two and a half weeks for Laurel to achieve the MSL set in the prospectus and the minimum number of presales required by RIHT. It was clear that Laurel needed more time. Laurel sought to restructure the offering and obtain a new commitment agreement from RIHT, with a new timetable for meeting the minimum presale requirement. RIHT agreed to renegotiate.

**\*724** As Laurel and RIHT neared agreement on a new loan commitment, Laurel filed, on March 2, 1987, a post-effective amendment to its original registration statement. The amendment established a new deadline for Laurel to meet the MSL requirement. It also restructured the requirement to condition the offering on a minimum dollar amount of aggregate sales, rather than a minimum number of unit sales. The amended prospectus explained:
Unless Hotel Interests of $6,000,000 in aggregate purchase price are subscribed for by qualified investors ("Minimum Subscription Level") within

94 F.3d 721                                                                                    Page 4
94 F.3d 721, RICO Bus.Disp.Guide 9108
**(Cite as: 94 F.3d 721)**

120 days of the effective date [FN2] of the Registration Statement of which this Prospectus is a part, this offering will be withdrawn and all funds will be returned promptly to subscribers.

> FN2. The 120th day after December 12, 1986, the effective date of the registration statement fell on April 11, 1987, a Saturday.

The amended prospectus left unchanged the original prospectus's representation that each investor would be required to tender a down payment equal to ten percent of the selling price of the unit to be purchased, which would be deposited in an escrow account held by RIHT.

RIHT issued a new commitment letter to Laurel on March 30, 1987. This time, RIHT agreed to give Laurel an 18.3 million dollar loan, conditioned upon the presale of only 40 units with a minimum aggregate selling price of $6 million, each presale requiring a ten percent nonrefundable investor deposit. Laurel was required to satisfy the new 40-unit presale condition by no later than April 10, 1987, the expiration date of the new commitment letter.

Apart from RIHT's lending relationship with Laurel, the bank's only role in the Sea Crest offering was to act as escrow agent. RIHT did not sign the registration statement. Nor did it participate in promoting the offering or in selling or soliciting subscriptions. RIHT's duties as escrow agent were to be governed by a written escrow agreement between Laurel and RIHT, addressed to the investor. A copy of the agreement, annexed as an exhibit to Laurel's registration statement, was to be provided to each subscribing investor. As will be discussed, there is some dispute as to the particular form of agreement by whose terms RIHT agreed to be bound. It is clear, however, that RIHT assumed at most a duty to hold investors' deposits in escrow until "[Laurel] shall verify to the Bank that ... $6,000,000 in aggregate purchase price for Hotel Interests have been subscribed for and received as required under the Registration Statement...."

As the offering proceeded, Laurel, through its selling agent (Broad Reach Capital), collected purchase and sale agreements for individual Sea Crest condominium units ("unit sale agreements"). Notwithstanding the prospectus's representations that investors would be required to tender a ten percent non-refundable "escrow deposit" upon subscribing to

the offering, Laurel and Broad Reach Capital accepted *promissory notes* for ten percent of the purchase price-in lieu of cash deposits-from almost half of the investors who signed unit sale agreements prior to the MSL deadline. Such cash deposits as were tendered by the investors were placed in an escrow account at RIHT. But as the deadline for meeting the MSL approached, only a total of some $309,000 had been deposited into the RIHT escrow account.

RIHT and Laurel conducted their loan closing on April 9, 1987, just prior to the expiration date of the March commitment letter. At the closing, RIHT was provided with copies of the unit sale agreements that had been executed. An officer of the bank counted the sale agreements to verify that there had been at least 40 units sold (as required in RIHT's loan commitment letter) and tallied the aggregate amount of sales to verify that the six million dollar MSL requirement had been met (as set forth in the agreement and the prospectus). No one at RIHT undertook to verify whether there was a ten percent deposit in escrow for each unit subscription. Having satisfied itself that at least 40 subscriptions and $6 million in aggregate sales had been achieved, RIHT proceeded to close its loan with Laurel and thereafter released the escrowed investor deposits to Laurel. Laurel purchased the Sea *725 Crest and separately closed on its sales of individual condominium units to investors.

In May 1987, Laurel hired Bowdoin Construction Corp. ("Bowdoin") to serve as the general contractor for the renovation of the Sea Crest. Pursuant to a letter of intent from Laurel, Bowdoin began construction work and arranged the necessary subcontracts. Based on a decision by Marchand, Bowdoin continued its construction work through the 1987 summer season, causing a fall-off in revenues to the resort and putting a wrinkle into Laurel's ongoing sales efforts.

By late September 1987, Laurel was under severe financial strain. It had stopped making payments to Bowdoin, even though Bowdoin continued construction. On October 1, RIHT downgraded the credit status of its loan to Laurel. The stock market crash later that month only worsened matters, and in November 1987, Laurel defaulted on the RIHT loan. Laurel and RIHT discussed restructuring or refinancing the loan. Bowdoin inquired about the status of Laurel's funding. After allegedly being assured that it would be paid through new financing from RIHT, Bowdoin continued with construction.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 F.3d 721                                                                                                                  Page 5
94 F.3d 721, RICO Bus.Disp.Guide 9108
(Cite as: 94 F.3d 721)

In the meantime, restructuring negotiations between Laurel and RIHT had ended unsuccessfully.

By January 1988, when Bowdoin finally ceased construction, it had incurred unreimbursed expenses of over $1 million.   A month later, Laurel filed a Form 8-K with the SEC disclosing that the Sea Crest offering would be indefinitely suspended, with only 58 of the total 266 condominium units having been sold.   Soon afterward, a number of lawsuits were filed.   In April 1988, RIHT sued Laurel to collect on its loan.   In July 1988, Bowdoin filed an action for breach of contract and enforcement of a mechanic's lien in state court, but then voluntarily dismissed the action based, allegedly, on Laurel's representation that doing so was Bowdoin's best chance of recovering any of its unpaid debts.[FN3]   Ultimately, Bowdoin collected only a fraction of the amount owed to it by Laurel.   Laurel, RIHT, and others were named in suits filed by investors, as well as in a newly instigated action by Bowdoin.

> FN3. After Bowdoin dropped the state court lawsuit and discharged the lien, RIHT sold its interest in the Sea Crest loan, at a $5.7 million loss, to Coolidge Bank (who had to that point owned a participation interest in the loan).

## II.

*Procedural Background*

*A. District Court Proceedings*

Three separate cases have been consolidated for purposes of this appeal.   Two of the cases, *Schultz v. RIHT* and *Allenby Enters., Inc. v. RIHT*, are brought by investors in the Sea Crest offering.[FN4]   The third case, *Bowdoin Constr. Corp. v. RIHT*, is brought by Bowdoin.   The *Schultz* and *Allenby* plaintiffs asserted claims against Laurel, RIHT and several others for alleged violations of the federal securities laws and civil RICO, and for common law fraud, negligent misrepresentation, breach of contract, and breach of the covenant of good faith and fair dealing.   The *Bowdoin* complaint asserted claims against Laurel, RIHT, and others for violations of civil RICO, breach of contract, and breach of the covenant of good faith and fair dealing.

> FN4. The plaintiffs in the *Schultz* action purchased a total of five condominium units in April 1987 (prior to the MSL deadline), at an aggregate purchase price of approximately $1 million.   There are 38 plaintiffs in the *Allenby* action. Collectively, they purchased 33 condominium units at an aggregate purchase price of some $5 million.   Approximately $1.5 million of the *Allenby* plaintiffs' purchases were made *after* the MSL deadline (April 10, 1987) had passed.

In October 1993, before the *Schultz* action was scheduled to go to trial, the plaintiffs in all three actions reached a settlement agreement with Laurel, Marchand, and certain other affiliated parties, and dismissed all claims against them, with prejudice.   In exchange, the plaintiffs received a promise from the settling defendants to waive the attorney-client privilege and to provide interviews and trial testimony as requested by the plaintiffs.   No money changed hands.

The *Schultz* action proceeded to trial against RIHT and the other remaining defendant (a bank that had provided financing to some of the investors) in January 1994, before Chief Judge Tauro.   The plaintiffs presented twelve days of testimony, including the testimony of Eugene Marchand.   At the *726 end of the plaintiffs' case, the defendants moved for judgment as a matter of law.   In its memorandum of decision, the district court concluded that *Central Bank v. First Interstate Bank*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), required the dismissal of the plaintiffs' claims for aiding and abetting securities fraud under Section 10(b) of the Securities Exchange Act of 1934.   The court also concluded that the plaintiffs had failed to present adequate evidence on any of their common law claims or their RICO claim, and granted the motion for judgment as a matter of law.

Thereafter, Judges Keeton and Saris granted summary judgment motions filed by RIHT in the *Allenby* and *Bowdoin* actions, respectively.   In deciding the *Allenby* motion, Judge Keeton, discerning no material difference between the issues in *Allenby* and *Schultz*, followed Judge Tauro's decision, based both on an independent assessment of the case and as a matter of *stare decisis*.   In *Bowdoin*, in which the plaintiff asserted RICO violations predicated upon allegations of aiding and abetting securities fraud, Judge Saris entered summary judgment in favor of RIHT, on the dual

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 F.3d 721
94 F.3d 721, RICO Bus.Disp.Guide 9108
(Cite as: 94 F.3d 721)

Page 6

grounds that such a claim could not be viable after *Central Bank,* and that plaintiffs had, in any event, failed to adduce sufficient evidence of a "pattern" of racketeering activity.

### B. Posture on Appeal

The parties informed us at oral argument that the only remaining defendant in all three of these cases, at least for purposes of this appeal, is RIHT. [FN5] We limit our review, therefore, to those claims seeking to hold RIHT responsible for the plaintiffs' alleged injuries.

> FN5. Plaintiffs' counsel stated at oral argument that, although one other party nominally remains in the case, plaintiffs would be content to have this court's decision turn solely upon a determination of the merits of the claims against RIHT.

In each of the three cases, we review *de novo* the district court's entry of judgment as a matter of law. Because the appeals largely raise the same dispositive issues (albeit on somewhat different records), we distinguish them only as necessary. We look to whether, viewing the record in each case in the light most favorable to the plaintiffs, any reasonable jury could find in the plaintiffs' favor. *See* Fed.R.Civ.P. 50(a) (*Schultz* ); Fed.R.Civ.P. 56(c) (*Allenby; Bowdoin* ). Having assessed the merits of each of the plaintiffs' theories of liability under this standard of review, we now affirm. [FN6]

> FN6. RIHT broadly argues, as a basis for affirmance independent of the underlying merits of these actions, that the plaintiffs' claims in all three cases are barred as a result of their settlement with, and prejudicial dismissal of their claims against, the Laurel defendants. RIHT further contends that the judgment entered by the district court in *Schultz,* if affirmed, constitutes res judicata in relation to the plaintiffs' claims in the *Allenby* and *Bowdoin* actions, and that the latter two actions are barred on a theory of non-party claim preclusion. *See* Gonzalez v. Banco Central Corp., 27 F.3d 751, 755 (1st Cir.1994); *see also* Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 43 F.3d 1054, 1069-70 (6th Cir.), *cert. denied,* 516 U.S. 912, 116

S.Ct. 296, 133 L.Ed.2d 203 (1995). We decline the invitation to venture into this complex and unsettled area of the law, and rest our affirmance on the merits of the three cases before us.

### III.

### Breach of Contract

RIHT's only relationship with the investor plaintiffs arose out of the bank's role as escrow agent in the Sea Crest offering. The *Schultz* and *Allenby* plaintiffs assert that RIHT failed in that capacity, acting in breach of the terms of the written escrow arrangement, in accordance with which RIHT agreed to hold the deposits to be tendered by investors. More specifically, the plaintiffs contend that RIHT violated the terms of the escrow agreement when, on April 9, 1987, it released all escrowed funds to Laurel, even though, allegedly, the offering's MSL requirement had not been satisfied.[FN7]

> FN7. The district court in the *Schultz* action reasoned that only those investors whose funds were actually deposited into the escrow account had standing to challenge RIHT's compliance with the escrow agreement. The record shows that the two plaintiffs in the *Schultz* action did not pay a ten percent cash down payment, instead signing a promissory note to Laurel for that amount. Most of the plaintiffs in the *Allenby* case, on the other hand, did pay a ten percent deposit, but a number of the units-representing about $975,000 in aggregate sales-were sold without a cash deposit having been tendered. Furthermore, some of the *Allenby* plaintiffs purchased their units *after* the MSL deadline had passed. While we find the district court's point to be forceful, we need not rely on it, given our disposition of the merits of the issue.

There is a threshold dispute as to the particular escrow agreement that governs. Plaintiffs contend that RIHT was in breach of the terms of an agreement referred to by the parties as the "long-form" escrow. RIHT replies that it was bound only by the terms of the so-called "short-form" escrow, but argues, in the alternative, that even if it was bound by the long-form escrow, the record establishes that no breach

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 F.3d 721
94 F.3d 721, RICO Bus.Disp.Guide 9108
(Cite as: 94 F.3d 721)

occurred.

**\*727** The short-form escrow agreement was attached as an exhibit to the registration statement that Laurel filed with the SEC on September 1986, and had been signed by RIHT in November 1986. The short-form provided, in pertinent part:

TO PROSPECTIVE PURCHASERS OF HOTEL INTERESTS IN SEA CREST CONDOMINIUM

Rhode Island Hospital Trust National Bank (the "Bank") ... having been requested to act as escrow agent ("Escrow Agent") for deposits to be made by prospective purchasers ("Buyer") of Hotel Interests in the above-referenced Condominium from Laurel-Sea Crest Realty Sales Corp. ("Seller") ... does hereby accept such request and agrees to hold deposits made payable to the Sea Crest Condominium Escrow Account, and received by it, upon the following terms and conditions to which Buyer and Seller agree to be bound by executing the Unit Sale Agreement ("Agreement") for Buyer's Hotel Interest, to which a copy of this escrow letter will be annexed.

1. The Bank agrees to maintain such deposit (the "Deposit") at its bank for the benefit of Buyer and Seller....

2. In the event the [Unit Sale] Agreement is consummated, as evidenced by Buyer's acceptance of a deed to the Hotel Unit, or by written statement to that effect executed by or on behalf of Buyer and Seller, Escrow Agent shall pay over the Deposit to Seller, and shall pay such interest as may have accrued thereon, to Buyer....

The long-form escrow agreement was filed with the SEC and signed by RIHT at some later time, the precise date being in dispute. The first paragraph of the long-form agreement was the same as that in the short-form, but the body was substantially different. The long-form agreement provided, in relevant part:1. The Bank agrees to maintain such deposit (the "Deposit") at its bank for the benefit of Buyer and Seller.... The Deposit shall be held by the Bank until the Seller shall verify to the Bank that (a) $6,000,000 in aggregate purchase price for Hotel Interests have been subscribed for and received as required under the Registration Statement (the "Minimum Subscription Level") and thereafter disbursed ... or (b) such Minimum Subscription Level has not been achieved within 120 days of the effective date of the Registration Statement with the Securities and Exchange Commission. In the event the Minimum Subscription Level is not achieved within such 120 day period, all deposits and interest accrued thereon shall be promptly returned to Buyer.

2. In the event the Minimum Subscription Level is achieved and the [Unit Sale] Agreement is consummated, as evidenced by Buyer's acceptance of a deed to the Hotel Unit, or by written statement to that effect executed by or on behalf of Buyer and Seller, Escrow Agent shall pay over the Deposit to Seller, and shall pay such interest as may have accrued thereon, to Buyer....

Both the long- and short-form escrow agreements ended with the following clauses:8. Escrow Agent assumes no obligations or responsibility hereunder other than to make delivery of the Deposit, and any earnings thereon, as herein provided....

It is understood and agreed that a copy of this instrument will be annexed as an exhibit to the [Unit Sale] Agreement. Buyer shall be entitled to rely upon this escrow agreement, with the same force and effect as if the Bank had contracted directly with Buyer....

The crucial difference between the two agreements lies in the description of the **\*728** conditions that were to trigger RIHT's duty to release any escrowed funds to Laurel. The long-form agreement linked RIHT's duty to release funds from escrow upon the meeting of the MSL requirement; the short-form agreement did not.

There is no dispute that RIHT at some point signed *both* the short- and long-form agreements. The question is when. The plaintiffs argue that RIHT became bound by the long-form agreement before the April 1987 MSL deadline, and that RIHT therefore had a duty of "verif[ication]" with respect to the satisfaction of the MSL requirement before releasing the funds in escrow. RIHT, on the other hand, concedes that it signed the long-form agreement at *some* point, but not before June 1987. Thus, RIHT asserts that, as of April 1987, it was bound only by the short-form agreement, which makes no mention of the MSL requirement.[FN8] Even accepting the plaintiffs' rendition of the record, however, we conclude that no rational trier of fact could find that RIHT committed a breach.

> FN8. On the one hand, RIHT has provided an unrebutted attestation that the only escrow agreement on record with the SEC as of April 1987 was the short-form agreement. On the other hand, there is some evidence (albeit circumstantial) to suggest that RIHT had agreed to be bound by the long-form

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 F.3d 721
94 F.3d 721, RICO Bus.Disp.Guide 9108
(Cite as: 94 F.3d 721)

agreement prior to April 1987. For example, a copy of the long-form agreement (lacking RIHT's signature) was attached to a letter from Marchand's attorney to RIHT dated March 16, 1987, in which the attorney proposed to RIHT a particular procedure for dealing with interest accruing to the Sea Crest escrow account.

We look first to the express terms of the long-form escrow agreement. [FN9] Under that agreement, RIHT was required to "hold deposits made payable to the Sea Crest Condominium Escrow Account, and received by it" until "[Laurel] shall verify to the Bank that (a) $6,000,000 in aggregate purchase price for Hotel Interests have been subscribed for and received as required under the Registration Statement (the 'Minimum Subscription Level')...." This language unambiguously limits RIHT's obligations as escrow agent to holding deposits "received by it" until Laurel "verifi[ed]" that $6 million in subscriptions had been received.

> FN9. The parties appear to agree that Massachusetts law governs.

[1] The record before us permits no genuine dispute that RIHT satisfied its limited duties under the agreement. The evidence is clear that RIHT did not release any funds that had been deposited into the Sea Crest escrow account until it had been provided by Laurel (prior to the MSL deadline) with copies of executed unit sale agreements with an aggregate face value in excess of $6 million. Plaintiffs concede that there is uncontradicted testimony to this effect.

Plaintiffs' argument is that RIHT was required to do more. They contend that RIHT should have refused to release funds in escrow on April 9, 1987 on the grounds that: (i) many of the unit sales counted toward the MSL were not backed by ten percent cash deposits; (ii) Laurel had pledged seven Sea Crest units as collateral for a "bridge" loan that it had obtained from Wedgestone Realty Investors Trust, the proceeds of which were applied to Laurel's purchase of the Sea Crest; and (iii) the $6 million in unit sales that were applied to the MSL computation had not actually been received by Laurel before the MSL deadline.

The response is that the escrow agreement cannot fairly be read to say that any one of these circumstances created a bar to the disbursement of the escrowed funds. Under the terms of its escrow

agreement, RIHT's role in the Sea Crest offering was a limited one, narrowly defined in a written agreement. The escrow agreement did not impose on RIHT a generalized duty to police the offering. To the contrary, the agreement disclaimed any duty to the parties in escrow "other than to make delivery of the [escrowed funds], and any earnings thereon."

Thus, although the fact that Laurel sold a number of Sea Crest units without taking a ten percent deposit from the purchaser was arguably at odds with the prospectus, there is no language in the escrow agreement conditioning the release of any escrowed funds upon RIHT's having received deposits totalling a full ten percent of the six million dollar minimum sales amount. Similarly, there was nothing about Laurel's "bridge" loan from Wedgestone that obligated RIHT, under the *729 escrow agreement, to determine that the MSL had not been met, or that funds in escrow were otherwise required to be returned to investors.

Finally, the plaintiffs' argument that $6 million in actual funds had not been "received" prior to RIHT's closing of escrow goes nowhere. To the extent that plaintiffs argue that RIHT itself was required to be in receipt of the $6 million, the argument is inconsistent with the language of the escrow agreement. To the extent that the agreement can be read to require that the $6 million have been "received" at all, the agreement plainly envisions that it would be *Laurel* who would receive the funds, and who would thereafter verify the same to RIHT.

In any event, RIHT's alleged failure to verify the satisfaction of the purported "receipt" requirement does not help the plaintiffs' case. The purported "receipt" requirement is necessarily separate and distinct from the MSL requirement, and satisfaction of the latter did not depend on satisfaction of the former. [FN10] The only circumstance specified in the escrow agreement as requiring RIHT to return escrow deposits to investors was the failure to attain the MSL; Laurel's alleged non-receipt of $6 million in sales proceeds did *not* require investor funds to be refunded or the offering to be withdrawn. At most, the logic of plaintiffs' theory is that RIHT released escrowed funds too *early*, and *not* that RIHT wrongfully failed to call for termination of the offering.[FN11]

> FN10. The prospectus itself states that "[c]losings [on the individual unit sale agreements] will commence once the

94 F.3d 721
94 F.3d 721, RICO Bus.Disp.Guide 9108
(Cite as: 94 F.3d 721)

Minimum Subscription Level has been satisfied." This language clearly contemplates that the MSL would be satisfied *before* the actual consummation of the unit sale agreements. And because the proceeds from the unit sale agreements that were counted toward the MSL could not have been "received" by Laurel until *after* the closings on those units, it follows that the satisfaction of the MSL could not have depended upon any such "receipt."

FN11. This is not a case involving the fabrication of "sham" transactions designed to create the mere illusion that sales had been generated. The apparent absence of some deposits notwithstanding, there has been no suggestion that any of the unit sale agreements that were counted toward the MSL in this case were anything other than bona fide, binding contracts of purchase and sale.

The question remains whether RIHT, in its capacity as escrow agent, owed any duties to plaintiffs other than those spelled out in the agreement. The Supreme Judicial Court of Massachusetts has recently indicated that there is an absence of discussion in Massachusetts law of whether an escrow agent's duties may extend beyond satisfying the literal terms of the escrow agreement. *See In re Discipline of Two Attorneys,* 421 Mass. 619, 626, 660 N.E.2d 1093 (1996) ("Massachusetts cases have not discussed whether an escrow holder has any duty beyond fulfilling the terms of the escrow."). FN12 But we find no support for plaintiffs' broad arguments that RIHT, which is not alleged to have been in a conflict of interest, was required, in effect, to actively root out fraud of which it had no knowledge and to police Laurel's conduct in the Sea Crest offering. FN13 *See Two Attorneys,* 421 Mass. at 626-27, 660 N.E.2d 1093 (citing *Maganas v. Northrup,* 135 Ariz. 573, 663 P.2d 565 (1983) (duty to disclose *known* fraud); *Collins v. Heitman,* 225 Ark. 666, 284 S.W.2d 628 (1955) (duty not to engage in self-dealing); *Kitchen Krafters, Inc. v. Eastside Bank of Mont.,* 242 Mont. 155, 789 P.2d 567 (1990) (duty to disclose material facts relevant to escrow), *overruled on other grounds by Busta v. Columbus Hosp. Corp.,* 916 P.2d 122 (Mont.1996); *American State Bank v. Adkins,* 458 N.W.2d 807 (S.D.1990) (duty to avoid self-dealing and conflicts of interest)).

FN12. *But cf. Schmid v. National Bank of*

*Greece,* 622 F.Supp. 704, 710 (D.Mass.1985) ("The escrow agreement or instructions constitute the full measure of the obligation assumed by the escrow holder and owing to the parties."), *aff'd,* 802 F.2d 439 (1st Cir.1986) (tbl.).

FN13. Despite plaintiffs' contrary suggestion, SEC Rule 10b-9 does not warrant the importation into the escrow agreement of a generalized duty to ensure that the offering as a whole complied with the securities laws. Rule 10b-9 makes it a violation of Section 10(b) of the Securities Exchange Act of 1934 for any person to make a representation, in connection with an offering, that securities are being offered on any "basis whereby all or part of the consideration paid for any such security will be refunded to the purchaser if all or some of the securities are not sold," unless the offering is structured in a specified way. 17 C.F.R. § 240.10b-9. Here, however, there is no support for a finding that the Sea Crest offering did not comply with Rule 10b-9 or, even more basically, that RIHT ever made any "representation" covered by the Rule.

IV.

*Other Common Law Claims*

*A. Breach of Covenant of Good Faith and Fair Dealing*

[2] The plaintiffs have not pointed to any record evidence that would permit a finding that RIHT's release of the escrow funds to Laurel was done other than under a good faith belief that the MSL requirement had *730 been satisfied, and that all of the conditions for releasing the funds had been met. The record supports no conclusion that RIHT acted with the sort of dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing. *See Anthony's Pier Four, Inc. v. HBC Assoc.,* 411 Mass. 451, 471-72, 583 N.E.2d 806 (1991); *American Employers' Ins. Co. v. Horton,* 35 Mass.App.Ct. 921, 923, 622 N.E.2d 283 (1993). The district court did not err in summarily disposing of the plaintiffs' claims for the breach of the covenant of good faith and fair dealing.

94 F.3d 721                                                                                                           Page 10
94 F.3d 721, RICO Bus.Disp.Guide 9108
(Cite as: 94 F.3d 721)

*B. Fraud and Negligent Misrepresentation*

[3] Plaintiffs do not seriously argue that RIHT made any affirmative material misrepresentations to them concerning the Sea Crest offering. RIHT did not sign the registration statement, and there is no evidence that RIHT had any involvement in the preparation of the registration statement or other offering materials for the Sea Crest project. Nor did RIHT participate in Laurel's marketing or sales efforts. The only communication between plaintiffs and RIHT appears to have been through the escrow agreement, which was addressed to investors and was to have been annexed to each unit sale agreement.

Absent allegations of affirmative misrepresentations or misstatements by RIHT, the question becomes whether RIHT was guilty of any actionable omissions. Absent a duty to speak, RIHT's silence could not have been fraudulent. *See Royal Business Group, Inc. v. Realist, Inc.,* 933 F.2d 1056, 1064 (1st Cir.1991). RIHT's role in the offering was to hold funds deposited with it until Laurel verified that certain conditions had been met. Even assuming that RIHT, as escrow agent, had a duty to disclose *known* fraud on the part of Laurel, *see, e.g., Maganas,* 663 P.2d at 565 (*cited in Two Attorneys,* 421 Mass. at 626-27, 660 N.E.2d 1093), plaintiffs point to no evidence that would show that RIHT was aware of fraudulent conduct by Laurel or any other party involved in the offering.

It is true that RIHT might have had reason to realize that a number of investors had provided promissory notes in lieu of ten percent cash deposits upon execution of their unit sale agreements. But there is no reason why RIHT should have suspected that this was the result of *fraud.* Indeed, the plaintiffs do not allege that the promissory notes were fraudulently made or procured; rather, they were facially valid, enforceable instruments. Furthermore, Laurel's acceptance of bona fide promissory notes, instead of deposits, was not so obviously inconsistent with the prospectus that RIHT should have concluded that a fraud was being perpetrated. Finally, plaintiffs fail to argue that any nondisclosure by RIHT on this issue would have affected their decision to invest; nor do they explain how any such nondisclosure could have been the cause of their losses. *See, e.g., Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1471-72 (1st Cir.1996) (elements of fraud include proof of reliance and causation).

*C. Aiding and Abetting Fraud*

[4] The plaintiffs' common law claim of aiding and abetting fraud fares no better. To establish a common law cause of action for aiding and abetting, plaintiffs must at least demonstrate some measure of "active participation" and the knowing provision of substantial assistance by RIHT to the principal's (here, Laurel's) alleged fraud. *See Spinner v. Nutt,* 417 Mass. 549, 556, 631 N.E.2d 542 (1994). Plaintiffs point to nothing in the record that would satisfy these basic elements. Indeed, the evidence is to the contrary. In his testimony in the *Schultz* trial, Marchand himself expressly disavowed the existence of any sort of association between Laurel and RIHT other than an arm's length business relationship.

V.

*RICO Violations*

In order to prevail on a RICO claim, a plaintiff must prove, *inter alia,* that the defendant*731 engaged in a "pattern of racketeering activity." *See* 18 U.S.C. § 1962. Here, RIHT argues that the district court correctly granted judgment in its favor on plaintiffs' RICO claims, because plaintiffs have failed to establish that RIHT's conduct falls within any of the categories of "racketeering activity" described in the statute, *see* 18 U.S.C. § 1961(1), and because plaintiffs have failed to adduce evidence of the requisite "pattern" of predicate acts necessary to trigger RICO liability, *see* 18 U.S.C. § 1962(b)-(c).

*A. Establishment of a Predicate Act*

Plaintiffs argue that, on the record, a rational trier of fact could find that RIHT engaged in three racketeering predicates: (i) aiding and abetting securities fraud; (ii) mail fraud; and (iii) wire fraud. The district court found that "aiding and abetting securities fraud" cannot be a RICO predicate, in light of the Supreme Court's decision in *Central Bank,* 511 U.S. at 164, 114 S.Ct. at 1455 (1994) (no private right of action for aiding and abetting under Section 10(b) of the Exchange Act), and that the record supports no finding of mail or wire fraud by RIHT.

[5] We reserve to another day the issue of whether *Central Bank* necessarily implies that aiding and abetting securities fraud cannot be a "racketeering activity" within the meaning of § 1961(1). Even assuming that aiding and abetting securities fraud *can*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 F.3d 721                                                                                                    Page 11
94 F.3d 721, RICO Bus.Disp.Guide 9108
**(Cite as: 94 F.3d 721)**

be a RICO predicate act, we find the record support for such a claim to be lacking, as we do with respect to the plaintiffs' allegations that RIHT engaged in mail or wire fraud.

As for the aiding and abetting allegation, we agree with the district court that the record contains not a scintilla of evidence that would support the requisite finding that RIHT "consciously shared" in the principal wrongdoer's (Laurel's) specific intent to defraud the plaintiffs. *See United States v. Loder, 23 F.3d 586, 590-91 (1st Cir.1994)* (describing the elements of criminal aiding and abetting). The lack of evidence of fraudulent intent on the part of RIHT similarly dooms plaintiffs' allegations that the bank committed mail or wire fraud. There is no basis in the record from which a rational trier of fact could conclude that the mailings or wires by RIHT (described in the plaintiffs' brief in only a fleeting fashion) constituted communications "in furtherance" of a scheme *"intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct. " McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir.)* (emphases added), *cert. denied, 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990).*

We conclude that the record contains insufficient evidence to raise a triable issue as to whether RIHT committed any of the RICO predicate acts alleged by the plaintiffs.

### B. The "Pattern" Requirement

[6] The plaintiffs' RICO claims fail for an additional, independent reason. For the plaintiffs to prevail, they must establish not only that RIHT engaged in some "racketeering activity," but that the bank's conduct constituted a "pattern" of such activity. *See 18 U.S.C. § 1962(b)-(c).* The RICO statute by its terms specifies that a "pattern" entails at least two predicate racketeering acts. *See 18 U.S.C. § 1961(5).* However, while two predicate acts are necessary to form a RICO "pattern," they may not be sufficient unless they are both "related" and "amount to or pose a threat of continued criminal activity." *See H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239-40, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989); Fleet Credit Corp. v. Sion, 893 F.2d 441, 444 (1st Cir.1990).* "In other words, a RICO pattern consists of 'continuity plus relationship.' " *Sousa v. BP Oil, Inc., 1995 WL 842003, \*13 (D.Mass.1995)* (quoting *H.J., 492 U.S. at 239, 109 S.Ct. at 2900-01).*

This court has remarked upon the elusiveness of any helpful, talismanic definition of a RICO "pattern." *See Apparel Art Int'l Inc. v. Jacobson, 967 F.2d 720, 722 (1st Cir.1992).* But, as then-Chief Judge Breyer explained, courts have consistently held that a "single episode" of criminal behavior, even if it involves the commission of multiple related acts, does not constitute a "pattern." *See id.* at 723. Instead, courts have tended to find RICO "patterns" only where the defendant's *\*732* conduct consists of "multiple criminal episodes" extending over long periods of time. *Id.* at 724; *see also H.J., 492 U.S. at 242, 109 S.Ct. at 2902* ("Congress was concerned in RICO with long-term criminal conduct.").

[7] Here, the alleged instances of wrongful conduct by RIHT all constituted part of a *single* "episode." Like the multiple predicate acts that were described in *Apparel Art* as "compris[ing] a single effort" to achieve one goal (obtaining and keeping a Defense Department contract), *see 967 F.2d at 723,* the alleged racketeering acts attributed to RIHT in this case, "taken together, ... comprise a single effort" to facilitate a single financial endeavor: the purchase and renovation of the Sea Crest resort. *Id.*

If the mailings and wires RIHT transmitted in the course of its involvement in the Sea Crest offering could amount to a RICO "pattern," then virtually every claim asserted under the federal securities laws could spawn a companion RICO cause of action, because "[i]n today's integrated interstate economy, it is the rare transaction that does not somehow rely on extensive use of the mails or the telephone." *Roeder v. Alpha Indus., Inc., 814 F.2d 22, 31 (1st Cir.1987)* (internal quotation omitted). We conclude that the instances of RIHT's conduct identified by plaintiffs as constituting RICO predicate acts did not form a "pattern" of racketeering activity and are more "appropriately characterized as separate parts of a single [allegedly] criminal episode." *Apparel Art, 967 F.2d at 723.*

### VI.

### Conclusion

The three separate judgments entered by the district court in these consolidated cases are *affirmed.*

C.A.1 (Mass.),1996.
Schultz v. Rhode Island Hosp. Trust Nat. Bank, N.A.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 F.3d 721
94 F.3d 721, RICO Bus.Disp.Guide 9108
**(Cite as: 94 F.3d 721)**

Page 12

94 F.3d 721, RICO Bus.Disp.Guide 9108

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

THIS PAGE INTENTIONALLY LEFT BLANK

Westlaw.

967 F.2d 720                                                      Page 1
967 F.2d 720, RICO Bus.Disp.Guide 8036
**(Cite as: 967 F.2d 720)**

▷

United States Court of Appeals,First Circuit.
APPAREL ART INTERNATIONAL, INC., Plaintiff,
Appellant,
v.
Leon JACOBSON, et al., Defendants, Appellees.
**No. 91-2070.**

Heard March 2, 1992.
Decided June 26, 1992.

Subcontractor brought **RICO** claim against
contractor after federal contract was cancelled
because of conduct of contractor. Suit was
dismissed by the United States District Court for the
District of Puerto Rico, Jose Antonio Fuste, J., and
subcontractor appealed. The Court of Appeals,
Breyer, Chief Judge, held that subcontractor had
failed to allege requisite "pattern of racketeering
activity."

Affirmed.

West Headnotes

[1]   Racketeer   Influenced   and   Corrupt
Organizations 319H ☜26

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk26 k. Number of Predicate Acts.
Most Cited Cases

**Racketeer Influenced and Corrupt Organizations
319H ☜28**

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk28 k. Continuity or Relatedness;
Ongoing Activity. Most Cited Cases
Complaint failed to allege "pattern of racketeering
activity" within scope of **RICO** statute; complaint
alleged several instances of criminal behavior
including bribe, several false statements, cover-up,

and possibly unlawful access to confidential
information taking place over a comparatively short
period of time and comprising single effort to obtain
and keep a single Defense Department contract, plus
a single fraudulent conveyance several years later in
effort to avoid later court judgment; latter alleged
incident was too unrelated to be part of a racketeering
pattern. 18 U.S.C.A. § § 1961-1968, 1961(5), 1962.

[2]   Racketeer   Influenced   and   Corrupt
Organizations 319H ☜27

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk27 k. Number of Schemes, Goals,
Episodes, or Transactions. Most Cited Cases

**Racketeer Influenced and Corrupt Organizations
319H ☜28**

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk28 k. Continuity or Relatedness;
Ongoing Activity. Most Cited Cases
Definition of "pattern of racketeering activity" for
purposes of **RICO** does not encompass a **single
criminal episode,** though it may technically involve
several crimes, nor does it consist of several different
but totally separate instances of criminal conduct
taking place over time. 18 U.S.C.A. § § 1961-1968,
1961(5), 1962.

*720 Freddie Perez-Gonzalez with whom Woods,
Rosenbaum, Luckeroth & Perez-Gonzalez, Hato Rey,
P.R., was on brief, for plaintiff, appellant.
Marc Lamer with whom Kostos and Lamer, P.C.
Philadelphia, Pa., was on brief, for defendants,
appellees.

Before BREYER, Chief Judge, FEINBERG,[FN*]
Senior Circuit Judge, and CYR, Circuit Judge.

        FN* Of the Second Circuit, sitting by
        designation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

967 F.2d 720                                                                                                Page 2
967 F.2d 720, RICO Bus.Disp.Guide 8036
(Cite as: 967 F.2d 720)

BREYER, Chief Judge.
The appellant, a subcontractor, brought this lawsuit under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § § 1961-1968, against a contractor. The subcontractor claimed that the contractor, by defrauding the federal government in various ways, injured the subcontractor as well as the government. The district court dismissed the suit on the ground that the subcontractor had already litigated its RICO claim in an earlier arbitration proceeding; hence principles of res judicata barred the present action. We affirm the district court's dismissal, but for a different reason. See Rodriguez-Antuna v. Chase Manhattan Bank Corp., 871 F.2d 1, 3 (1st Cir.1989) (court of appeals may affirm judgment on any ground supported by record, whether or not considered by district court) (citing cases). In our view, the subcontractor's RICO complaint fails to allege the "pattern of racketeering activity" that the RICO statute requires. See 18 U.S.C. § 1961(5); *721 H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 236-43, 109 S.Ct. 2893, 2898-2902, 106 L.Ed.2d 195 (1989) (explicating "pattern" requirement).


I

Background

A

The Complaint's RICO Allegations


The Racketeer Influenced and Corrupt Organizations Act permits "any person injured in his business or property," 18 U.S.C. § 1964(c), by "a pattern of racketeering activity," 18 U.S.C. § 1962, (including at least two acts of certain specified crimes, 18 U.S.C. § 1961(5)) to obtain treble damages from the racketeers. 18 U.S.C. § 1964(c). The subcontractor's complaint says that the contractor engaged in a "pattern of racketeering activity," primarily with the objective of obtaining a particular Defense Department contract to make camouflaged chemical protection suits.

The complaint specifically alleges the following unlawful activity:
1. Bribes. In late 1984 or early 1985, the contractor, Amertex International, provided a Defense Department contracting officer with lodging on three vacation trips in Puerto Rico, a free boat trip and airplane trip, and $25,000 in cash. In return, in February 1985, the officer awarded Amertex a $96 million chemical protection suit contract.
2. False Statements. During approximately the same time period, Amertex, in order to qualify for the contract, falsely told the Defense Department that it was a small business, that is, that it had fewer than 500 employees. Later, it tried to cover up by making it appear that various additional employees worked for an independent "temporary personnel" agency.
3. Obtaining Confidential Government Information. At about the same time, the president of Amertex, Leon Jacobson, obtained confidential information that the Defense Department intended to amend the terms of the chemical protection suit contract, making it more profitable than it appeared to be.
4. Failure to Disclose. After Amertex obtained the contract, it awarded a subcontract to the plaintiff, Apparel Art International. When doing so, Amertex did not tell Apparel about the bribes and lies that would (and did) lead to cancellation of the main contract by the Defense Department.
5. Fraudulent Conveyance. Amertex's bribes came to light, the Defense Department cancelled the contract, Apparel brought an arbitration proceeding (as provided in the subcontract), and Apparel recovered a damage award of $338,000. In the meantime, Amertex fraudulently conveyed its assets to its owners, and to others, in order to prevent Apparel from reaching those assets to satisfy the award.

As a result of this "pattern of racketeering activity," says Apparel's complaint, Amertex, and certain of its owners and officers, harmed Apparel, in the amount of approximately $4,817,750 (or, $14,453,250, when trebled).


B

Key Procedural Events


The key procedural events in this litigation include the following:
1. November 1986. Apparel brought its arbitration proceeding, in which, as we have said, it obtained an award for $338,000.
2. September 1989. Apparel sued in federal district court to confirm the arbitrator's award. See 9 U.S.C. § 9.
3. April 1990. The federal court confirmed the

967 F.2d 720                                                    Page 3
967 F.2d 720, RICO Bus.Disp.Guide 8036
**(Cite as: 967 F.2d 720)**

award.

4.  *June 1990.*    Apparel filed the present **RICO** complaint (in the same federal district court, but assigned to a different judge).

5.  *August 1990.*    The **RICO** defendants filed a motion to dismiss the **RICO** complaint on the grounds that it did not allege a "pattern of racketeering activity" and failed to satisfy certain other statutory requirements.

6.  *August 1991.*    The court dismissed the **RICO** complaint for a reason that the parties had not argued, namely that, given*722 the previous arbitration proceeding, principles of res judicata barred the present **RICO** claim.


The plaintiff, Apparel, now appeals the dismissal, arguing that the arbitrators did not permit it to assert its **RICO** claim in the arbitration; hence, it should be able to assert the claim in a second, federal court action. *See, e.g., Kremer v. Chemical Constr. Corp., 456 U.S. 461, 480-81 & n. 22, 102 S.Ct. 1883, 1897 & n. 22, 72 L.Ed.2d 262 (1982) (res judicata and collateral estoppel not applicable against party that did not have opportunity to litigate claim); Mitchell v. Humana Hospital-Shoals, 942 F.2d 1581, 1582-83 & n. 1 (11th Cir.1991) (same).*


II

*Dismissal of the **RICO** Complaint-Lack of a "Pattern"*


[1] Apparel's claim that the district court improperly applied res judicata raises a very substantial issue. However, we need not decide it because we can affirm the district court's decision on the different ground that the defendants asserted, and the parties fully briefed, in the court below.    *See Rodriguez-Antuna, 871 F.2d at 3.*    The **RICO** statute requires a plaintiff to show 1) two or more "acts of racketeering activity," that is, acts that violate certain specified federal statutes, *see* 18 U.S.C. § 1961(1), such as the mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343, the Travel Act, 18 U.S.C. § 1952, or the Hobbs Act, 18 U.S.C. § 1951; and 2) that these acts, taken together, demonstrate a *"pattern of racketeering activity."*    18 U.S.C. § 1961(5) (emphasis added).    Apparel's complaint alleges specific "acts of racketeering activity," which, taken together, do *not* demonstrate that necessary "pattern."

We believe it possible to make clear why this is so

without trying to find, or to explain, some alternative *verbal* formulation for the word "pattern," a task that courts have found difficult to carry out.    *See, e.g., H.J. Inc., 492 U.S. at 241, 109 S.Ct. at 2901* ("difficult to formulate in the abstract any general test" for the continuity required for a pattern); *id.* at 252, 109 S.Ct. at 2907 (Scalia, J., concurring in the judgment) (Court's formulation of " 'continuity plus relationship'.... seems to me about as helpful ... as 'life is a fountain' ").    After all, there are many words best defined by, say, pointing to examples (consider the color "red") or simply by using them in different relevant contexts.    And, it sometimes helps more to say what lies beyond a word's conceptual scope than to provide an alternative verbal formulation of what lies within. *Cf. Menasco, Inc. v. Wasserman, 886 F.2d 681, 684 (4th Cir.1989)* ("the test is commonsensical, not formulaic").

[2] We can begin with the Supreme Court's statement that, to prove a "pattern of racketeering activity," one must show separate predicate acts that 1) are "related," and 2) "amount to or pose a threat of continued criminal activity." *H.J. Inc., 492 U.S. at 239, 109 S.Ct. at 2900.*    We can be reasonably certain that this definition does *not* encompass a single criminal event, a **single criminal episode**, a single "crime" (in the ordinary, nontechnical sense of that word).    (We deliberately employ a vague term like "episode," for we do not want to use a word such as "scheme," which might have a technical meaning. *Cf. id.* at 234-37 & n. 2, 109 S.Ct. at 2898 & n. 2.)    For example, a single (interstate) bank robbery, *see* 18 U.S.C. § 1951, consists of several different parts (say, using a gun, threatening a teller, stealing a getaway car, perhaps abducting the teller as well, and eventually lying about participation).    Some of those separate parts may themselves constitute separate criminal acts or "crimes" (in the technical sense that each, separately, violates a specific statute).    Yet, those several separate criminal parts, taken together, do not generally make out a "pattern."    To hold otherwise would mean that many individual bank robberies, frauds, drug sales, embezzlements, and other crimes as well would automatically fall within the scope of the **RICO** statute, a result contrary to **RICO's** basic purpose. *See H.J. Inc., 492 U.S. at 239, 109 S.Ct. at 2900* ("A pattern is not formed by 'sporadic activity.' ") (quoting S.Rep. No. 617, 91st *723 Cong., 1st Sess. 158 (1969)).    One might express the fact that a **single criminal episode**, or event, is not a "pattern" by stating that its parts, taken together, do not "amount to or pose a threat of continued criminal activity." *H.J. Inc., 492 U.S. at 239, 109 S.Ct. at 2900.*    Or, one might risk

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

967 F.2d 720
967 F.2d 720, RICO Bus.Disp.Guide 8036
(Cite as: 967 F.2d 720)

circularity and simply state that those parts do not bear to each other the *relevant* ("pattern of racketeering") relationship. *See id.* (racketeering predicates must be "related"). But, however courts express the point, they have consistently held that a single episode does not constitute a "pattern," even if that single episode involves behavior that amounts to several crimes (for example, several unlawful mailings). *See, e.g., Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 31 (1st Cir.1987) (single bribe paid in three installments, each constituting a mail fraud violation, did not make out "pattern"); *J.D. Marshall Int'l, Inc. v. Redstart, Inc.,* 935 F.2d 815, 820-21 (7th Cir.1991); *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1417-19 (3d Cir.), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991).

Moving now to the opposite extreme, we can also be reasonably certain that, to show a "pattern," one must do more than simply show several different but totally "separate" instances of criminal conduct taking place over time. One 1982 securities fraud and one 1987 drug importation, for example, presumably constitute two separate instances of "racketeering activity." *See* 18 U.S.C. § 1961(1) (including these among acts constituting "racketeering activity"). But, if the two separate securities fraud and drug episodes take place several years apart and involve different victims, methods, purposes, and (almost all) participants, they may well lack the requisite "racketeering" relationship to each other. Thus, they would not constitute a "pattern of racketeering activity." *See H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901; *Menasco,* 886 F.2d at 684.

We can imagine some cases in which it is difficult to say whether several instances of criminal conduct are but parts of a single criminal instance or episode, or constitute several episodes making up a "pattern" (say, several minor frauds designed to raise money in order to finance an effort to rob Fort Knox). *Cf., e.g., id.* And, we can imagine other cases in which it is difficult to decide whether several, quite separate, instances of criminal conduct bear the requisite "racketeering relationship" one to the other (say, multiple instances of fraud over a long time). *See, e.g., Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 45 (1st Cir.1991); *Vild v. Visconsi,* 956 F.2d 560, 566-67 (6th Cir.1992). But neither difficulty arises here. The present case, with one exception, involves several instances of criminal behavior-a bribe, several false statements, a cover-up, and (possibly unlawful) access to confidential information. But, these events all took place over a comparatively short period of time. *See H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at

2902 ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct."); *J.D. Marshall,* 935 F.2d at 820 (thirteen months a "relatively short period of time"). And, taken together, they comprise a single effort to obtain (and to keep) one $96 million Defense Department contract. Thus, they seem like the single, complex interstate bank robbery, *see* pages 722-23, *supra,* and are appropriately characterized as separate parts of a **single criminal episode.** They do not seem like a string of interstate robberies or frauds, separate criminal episodes so related as to threaten further, "continued," racketeering activities. *See H.J. Inc.,* 492 U.S. at 242-43, 109 S.Ct. at 2902.

We note that the courts have not found "patterns" despite circumstances more elaborate, complex, and longer lasting, than those alleged here. *See, e.g., Feinstein,* 942 F.2d at 44-47 (acts of mail and wire fraud related to two real estate transactions, two years and hundreds of miles apart and each involving some different defendants, not part of common scheme); *Vild,* 956 F.2d at 565-70 (allegations against real estate promoters of extortion and mail and wire fraud directed towards *724 plaintiff and of mail and wire fraud towards third parties not sufficient); *J.D. Marshall,* 935 F.2d at 820-21 (allegations of mail and wire fraud over thirteen months in connection with sale of company's assets). Where the courts have found "patterns," the underlying activity is far more easily characterized as involving multiple criminal episodes, extending over more time, than that before us. *See, e.g., H.J. Inc.,* 492 U.S. at 250, 109 S.Ct. at 2906 (mail and wire fraud scheme over six year period to bribe public utility commissioners to approve unfair and unreasonable rates); *Fleet Credit Corp. v. Sion,* 893 F.2d 441, 447 (1st Cir.1990) (scheme of mail and wire fraud using two jewelry manufacturing companies to defraud plaintiff of $7.5 million in loans over seven years); *Combs v. Bakker,* 886 F.2d 673, 677-78 (4th Cir.1989) ("multiple predicate acts of fraudulent misrepresentations by use of interstate wire and mail facilities, obviously 'related' by design, and 'continuous' enough to have claimed upwards of 55,000 individual victims in necessarily independent transactions").

The one alleged fact that amounts to a conceivable exception to what we have just said consists of the fraudulent conveyance. That conveyance was not part of the conduct aimed at securing the contract, and, according to the complaint, it took place several years later. If we assume that this activity falls

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

967 F.2d 720                                                                                                    Page 5
967 F.2d 720, RICO Bus.Disp.Guide 8036
**(Cite as: 967 F.2d 720)**

within the scope of a **RICO** predicate criminal statute, *see* 18 U.S.C. § 1961(1), we nonetheless find the conduct too un related-*too* separate, *too* distinct, *too* obviously related to a simple effort to avoid a later court judgment-to permit a finding that, taken together with the earlier acts, it is part of a racketeering "pattern." The relation here seems like that between the 1982 securities fraud and the 1987 drug importation. *See* page 723, *supra.* "A pattern is not formed by 'sporadic activity.' " *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900 (quoting S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)). *See Feinstein,* 942 F.2d at 45.

In sum, we conclude that the complaint does not allege the two or more separate acts that bear a relationship, each to the others, either "amount[ing] to," or "pos[ing] a threat of," the kind of "continued" criminal activity at which the **RICO** statute was aimed. *See H.J. Inc.,* 492 U.S. at 239, 242, 109 S.Ct. at 2902.

We add that we have decided this case with the benefit of the legal memoranda that the parties filed on this issue in the district court-memoranda contained in the record before us. In light of the thorough arguments in those memoranda, we have found no need to remand the case, or to ask for further briefing on the issue. *Cf. Triad Assoc., Inc. v. Chicago Housing Authority,* 892 F.2d 583, 594 (7th Cir.1989) (affirming dismissal of **RICO** complaint due to failure to show pattern of racketeering activity, even though issue not reached by district court), *cert. denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990).

The judgment of the district court is

*Affirmed.*

C.A.1 (Puerto Rico),1992.
Apparel Art Intern., Inc. v. Jacobson
967 F.2d 720, RICO Bus.Disp.Guide 8036

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.