# INSTRUCTION NO. 4.0

*Statute of Limitations*

## INSTRUCTION NO. 4.0
### *Statute of Limitations*

One issue you will need to decide in this case is whether the prosecution of Mr. Davis began within the statute of limitations period. "The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past."[1] In this case, the statute of limitations for the two crimes charged against Mr. Davis is five years. I instruct you that the indictment in this case was returned on July 9, 2004. As such, the government is required to prove, beyond a reasonable doubt, that any conspiracy that Mr. Davis joined – as defined by the scope of the specific agreement Mr. Davis may have had with individuals the government has proven beyond a reasonable doubt were his co-conspirators – was in existence on July 9, 1999, five years prior to the date he was indicted.[2]

---

[1]    *Toussie v. United States*, 397 U.S. 112, 114-15 (1970).

[2]    Adapted from *United States v. Juodakis*, 834 F.2d 1099, 1105 (1st Cir. 1987)).

THIS PAGE INTENTIONALLY LEFT BLANK



90 S.Ct. 858                                                                                    Page 1
397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156
**(Cite as: 397 U.S. 112, 90 S.Ct. 858)**

▷
Briefs and Other Related Documents

Supreme Court of the United States
Robert I. TOUSSIE, Petitioner,
v.
UNITED STATES.
**No. 441.**

Argued Jan. 14, 1970.
Decided March 2, 1970.

Defendant was convicted in the United States District Court for the Eastern District of New York, 280 F.Supp. 473, for failing to register for the draft. The Court of Appeals, 410 F.2d 1156, affirmed, and certiorari was granted. The Supreme Court, Mr. Justice Black, held that neither statute requiring male citizens between ages of 18 and 26 to register for draft nor regulation referring to registration as continuing duty imposed on defendant a continuing duty to register which would effectively extend five-year statute of limitations for prosecution for failure to register; thus statute of limitations began to run five days after defendant's 18th birthday.

Reversed.

Mr. Chief Justice Burger, Mr. Justice White and Mr. Justice Harlan dissented.

West Headnotes

**[1] Federal Courts 170B** 458

170B Federal Courts
    170BVII Supreme Court
        170BVII(B) Review of Decisions of Courts of Appeals
            170Bk455 Decisions Reviewable and Grounds for Issuance
                170Bk458 k. Criminal Cases. Most Cited Cases
                    (Formerly 106k383(1))
Certiorari was granted to review conviction for failing to register for draft.

**[2] Criminal Law 110** 145.5

110 Criminal Law
    110X Limitation of Prosecutions
        110k145.5 k. Nature and Scope of Limitations. Most Cited Cases
            (Formerly 110k1451/2)
Purpose of statute of limitations is to limit exposure to criminal prosecution to certain fixed period of time following occurrence of those acts the legislature has decided to punish by criminal sanctions 18 U.S.C.A. § 3282.

**[3] Criminal Law 110** 145.5

110 Criminal Law
    110X Limitation of Prosecutions
        110k145.5 k. Nature and Scope of Limitations. Most Cited Cases
            (Formerly 110k1451/2)
Statute of limitations is designed to protect individuals from having to defend themselves against charges when basic facts may have become obscured by passage of time and to minimize danger of official punishment because of acts in the far distant past. 18 U.S.C.A. § 3282.

**[4] Criminal Law 110** 150

110 Criminal Law
    110X Limitation of Prosecutions
        110k148 Commencement of Period of Limitation
            110k150 k. Continuing Offenses. Most Cited Cases
Doctrine of continuing offenses should be applied to effectively extend statute of limitations only in limited circumstances and only when explicit language of substantive criminal statute compels such conclusion or nature of crime involved is such that Congress must have intended that it be treated as a continuing one. 18 U.S.C.A. § 3282.

**[5] Constitutional Law 92** 77

92 Constitutional Law
    92III Distribution of Governmental Powers and Functions
        92III(C) Executive Powers and Functions
            92k77 k. Encroachment on Legislature. Most Cited Cases
Questions of limitations are fundamentally matters of legislative not administrative decision.

**[6] Statutes 361** 241(1)

90 S.Ct. 858
397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156
**(Cite as: 397 U.S. 112, 90 S.Ct. 858)**

Page 2

361 Statutes
   361VI Construction and Operation
      361VI(B) Particular Classes of Statutes
         361k241 Penal Statutes
            361k241(1) k. In General. Most Cited Cases
When choice has to be made between two readings of what Congress has made a crime, it is appropriate, before court chooses the harsher alternative, to require that Congress should have spoken in language that is clear and definite; the court should not derive criminal outlawry from some ambiguous implication.

[7] Criminal Law 110 &#8594;150

110 Criminal Law
   110X Limitation of Prosecutions
      110k148 Commencement of Period of Limitation
         110k150 k. Continuing Offenses. Most Cited Cases
Neither statute requiring male citizens between ages of 18 and 26 to register for draft nor regulation referring to registration as continuing duty imposed on defendant a continuing duty to register which would effectively extend five-year statute of limitations for prosecution for failure to register; hence statute of limitations began to run five days after defendant's 18th birthday. Universal Military Training and Service Act, § § 3, 12(a) as amended 50 U.S.C.A. App. § § 453, 462(a); 18 U.S.C.A. § 3282; Proclamation No. 2799, 62 Stat. 1531 supplemented by Proclamation No. 2942, 65 Stat. c. 35.

**859 *112 Murray I. Gurfein, New York City, for petitioner.
Francis X. Beytagh, Washington, D.C., for respondent.
Mr. Justice BLACK delivered the opinion of the Court.
[1] Petitioner Robert Toussie was convicted, after a jury trial, of failing to register for the draft. His conviction was affirmed by the Court of Appeals, *113410 F.2d 1156 (C.A.2d Cir.), and we granted certiorari, 396 U.S. 875, 90 S.Ct. 155, 24 L.Ed.2d 133 (1969). For the reasons hereafter set forth we conclude that this prosecution was barred by the statute of limitations and therefore reverse the conviction.

Section 3 of the Universal Military Training and Service Act, 65 Stat. 76, provides that:

'Except as otherwise provided in this title, it shall be the duty of every male citizen * * * who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder.'FN1

     FN1. 50 U.S.C.App. s 453. This Act was amended by the Military Selective Service Act of 1967, 81 Stat. 100, but those amendments did not change this provision. Failure to perform this duty is punishable by fine, imprisonment, or both. 50 U.S.C.App. s 462(a) (1964 ed., Supp. IV).

The applicable presidential proclamation provides that '(p)ersons who were born on or after September 19, 1930, shall be registered on the day they attain the eighteenth anniversary of the day of their birth, or within five days thereafter.'FN2 Since Toussie, an American citizen, was born on June 23, 1941, he was required to register sometime between June 23 and June 28, 1959. He did not do so during that period or at any time thereafter. On May 3, 1967, he was indicted for failing to register and that indictment led to the conviction under review.

     FN2. Proclamation No. 2799, July 20, 1948, 62 Stat. 1531. The Proclamation was first issued under the authority of the Selective Service Act of 1948, 62 Stat. 604, but it was continued after the passage of the Universal Military Training and Service Act by Proclamation No. 2942, August 30, 1951, 65 Stat. c35.

*114 Before trial Toussie moved to dismiss the indictment, arguing that prosecution was barred by the statute of limitations which provides that '(e)xcept as otherwise**860 expressly provided by law, no person shall be prosecuted, trid, or punished for any offense, not capital, unless the indictment is found * * * within five years next after such offense shall have been committed.' 18 U.S.C. s 3282. Since there is no express provision to the contrary in the Draft Act, Toussie argued that his crime was complete in 1959, and it could not be the subject of a prosecution based on an indictment returned in 1967-eight years thereafter. The Government agreed that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 S.Ct. 858
397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156
**(Cite as: 397 U.S. 112, 90 S.Ct. 858)**

the crime was complete in 1959, but argued that it continued to be committed each day that Toussie did not register. The District Court held that the Act imposes a continuing duty to register which lasts until age 26 and that prosecution for failing to perform that duty before the man becomes 26 is timely if the indictment is returned before the defendant becomes 31 years old-in this case any time prior to June 23, 1972. 280 F.Supp. 473, 474 (D.C.E.D.N.Y.1967). The Court of Appeals agreed. 410 F.2d, at 1157-1158. If the offense is a continuing one the prosecution was timely, but, if not, the District Court erred in not dismissing the indictment.

[2][3][4] In deciding when the statute of limitations begins to run in a given case several considerations guide our decision. The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment *115 because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity. For these reasons and others, we have stated before 'the principle that criminal limitations statutes are 'to be liberally interpreted in favor of repose,' United States v. Scharton, 285 U.S. 518, 522, 52 S.Ct. 416, 417, 76 L.Ed. 917 (1932).' United States v. Habig, 390 U.S. 222, 227, 88 S.Ct. 926, 929, 19 L.Ed.2d 1055 (1968). We have also said that '(s)tatutes of limitations normally begin to run when the crime is complete.' Pendergast v. United States, 317 U.S. 412, 418, 63 S.Ct. 268, 271, 87 L.Ed. 368 (1943); see United States v. Irvine, 98 U.S. 450, 452, 25 L.Ed. 193 (1879). And Congress has declared a policy that the statute of limitations should not be extended '(e)xcept as otherwise expressly provided by law.' 18 U.S.C. s 3282. These principles indicate that the doctrine of continuing offenses should be applied in only limited circumstances since, as the Court of Appeals correctly observed in this case, '(t)he tension between the purpose of a statute of limitations and the continuing offense doctrine is apparent; the latter, for all practical purposes, extends the statute beyond its stated term.' 410 F.2d at 1158. These considerations do not mean that a particular offense should never be construed as a continuing one. They do, however, require that such a result should not be reached unless the explicit language of

the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one.

The statute in this case provides that all young men, with certain exceptions, between the ages of 18 and 26 shall register 'at such time or times and place or places' as the President may prescribe. The Government refers to a regulation promulgated under the Act which provides*116 that '(t)he duty of every person subject to registration * * * shall continue at all times, and if for any reason any such person is not registered on the day or one of the days fixed for his registration,**861 he shall immediately present himself for and submit to registration * * *.' 32 CFR s 1611.7(c). It is urged that this regulation only makes explicit what Congress implicitly said in the Act itself, that is that registration is a duty that continues until age 26 and failure to register before then is a criminal offense that can be punished as late as five years after the 26th birthday.

The statute admittedly might be construed as the Government urges, but in light of the history of the draft laws and the principle that continuing offenses are not to be too readily found, we do not feel this particular Act incorporates such a doctrine. The draft law of 1917 provided in s 5 that certain persons were subject to registration and that 'upon proclamation by the President * * * stating the time and place of such registration it shall be the duty of all (such) persons * * * to present themselves for and submit to registration.' 40 Stat. 80. Pursuant to that authority the President proclaimed June 5, 1917, as the first registration day,[FN3] and on that day approximately 10,000,000 young men were registered.[FN4] There were no more general draft registrations until August 24, 1918, when the President required all those men who had become subject to registration since June 5, 1917, to come in and register.[FN5] Later that year Congress amended the statute, expanded the age group subject to registration,[FN6] and provided that 'upon *117 proclamation by the President, * * * stating the time or times and place or places of * * * registration, it shall be the duty of all persons of the designated ages * * * to present themselves for and submit to registration * * *.' 40 Stat. 955-956. Although this provision seemingly would have authorized registrations on different days, the President again issued a proclamation designating a single day, September 12, 1918, as registration day for all those so subject.[FN7] That registration was the last under the World War I draft. It is thus clear that throughout the administration of the first draft law,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 S.Ct. 858                                                                                                    Page 4
397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156
**(Cite as: 397 U.S. 112, 90 S.Ct. 858)**

registration was thought of as a single, instantaneous act to be performed at a given time, and failure to register at that time was a completed criminal offense.

> FN3. Proclamation of May 18, 1917, 40 Stat. 1664.

> FN4. U.S. Selective Service System, Registration and Selective Service 11 (1946).

> FN5. Proclamation of August 13, 1918, 40 Stat. 1834.

> FN6. The first registration was of all men between the ages of 21 and 30.40 Stat. 80. In 1918 Congress expanded the group to all those between the ages of 18 and 45. 40 Stat. 955.

> FN7. Proclamation of August 31, 1918, 40 Stat. 1840.

As events developed prior to what became World War II, Congress again decided to draft young men for service in the Armed Forces. In the Selective Training and Service Act of 1940 it was provided that men subject to registration were to register 'at such time or times and place or places, and in such manner and in such age group or groups, as shall be determined by rules and regulations prescribed hereunder.' 54 Stat. 885. While this language would again have authorized registration on different days for different men, the first proclamation under the new Act set a uniform date, October 16, 1940, for the registration of all men.[FN8] It was not until two years later that the President first issued a proclamation setting forth different dates for the registration of different groups of men, and in that same proclamation the President established the basic registration procedure of the present system, **862 that all young men shall register on their 18th birthday.[FN9]

> FN8. Proclamation No. 2425, September 16, 1940, 54 Stat. 2739.

> FN9. Proclamation No. 2572, November 17, 1942, 56 Stat. 1982.

*118 After the 1940 Act expired on March 31, 1947, Congress again decided to register men for the draft

and declared that men between the ages of 18 and 26 would be subject to registration. Selective Service Act of 1948, 62 Stat. 604. Since the authority to register under the 1940 Act had expired, it was necessary to provide for the initial registration of the entire group of men between 18 and 26. In language identical to that found in the statute involved in this case,[FN10] Congress again left the administrative details to the President and authorized registration 'at such time or times and place or places' as he might designate. We do not think the imposition of the duty to register on men between 18 and 26 and the provision for registration at different times was intended to indicate that the statute of limitations did not begin to run when the crime was first complete. Since at the time of the initial registration under the 1948 Act there were men of various ages who had to be registered, the Act was phrased generally in terms of a duty imposed on the entire group. Under this authority the President in fact required registration of all men between 18 and 26 during the month of September 1948. Persons of different ages were required to register on different days, and all those born after September 19, 1930, were required to register 'on the day they attain the eighteenth anniversary of the day of their birth, or within five days thereafter.'[FN11] The registration provisions of that Act have remained in force since 1948, and there has thus been a continual registration of 18-year-olds shortly after their birthday. With the exception of a few men who are not subject to registration when they are 18 but may become *119 so later on,[FN12] the effect of these provisions has been to eliminate the necessity for registrations of men older than 18. Viewed in the light of history we do not think the Act intended to treat continued failure to register as a renewal of the original crime or the repeated commission of new offenses, but rather perpetuated the conception of the first registration that a man must register at a particular time and his failure to do so at that time is a single offense. That time will not be the same day for all as it was in 1917, and from the Selective Service System's viewpoint the process of registration is a 'continuing' one. But from the registrant's viewpoint the obligation arises at a specific time. In Toussie's case it arose when he turned 18. He was allowed a five-day period in which to fulfill the duty, but when he did not do so he then and there committed the crime of failing to register.

> FN10. See supra, at 859.

> FN11. See supra, at 859, and Proclamation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 S.Ct. 858                                                                                          Page 5
397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156
(Cite as: 397 U.S. 112, 90 S.Ct. 858)

No. 2799, July 20, 1948, 62 Stat. 1531.

FN12. For example, students at certain military colleges are exempted from registration. 50 U.S.C.App. s 456(a)(1) (1964 ed., Supp. IV). If a student in such an institution withdraws, he would presumably be required to register since the Act specifically states that '(n)o exemption from registration * * * shall continue after the cause therefor ceases to exist.' 50 U.S.C.App. s 456(k). Thus such a student may not be required to register until some time after his 18th birthday.

The Government points out that the 'continuing duty' regulation has been in existence since before the passage of the 1948 Act,[FN13] and that most lower federal courts have held that failing to register is a continuing offense for purposes of applying the statute of limitations.[FN14] It **863 is suggested that since Congress has legislated *120 several times in this field, its failure to indicate that the crime should not be treated as a continuing offense supports the Government's argument that it is. Petitioner on the other hand suggests that Congress has on occasion explicitly stated that a certain offense will be deemed a continuing one,[FN15] and its failure to do so in this statute indicates that it did not intend to adopt that theory. Since there is no specific evidence that Congress actually was aware of this limitations question when it acted-whatever weight such evidence might deserve-and since we are reluctant to imply a continuing offense except in limited circumstances, we conclude that any argument based on congressional silence is stronger in favor of not construing this Act as incorporating a continuing-offense theory.

FN13. The regulation was first promulgated under the 1940 Act on June 4, 1941. Selective Service System Regulations Vol. 2, s IX, 205(d), 6 Fed.Reg. 2747.

FN14. See Fogel v. United States, 162 F.2d 54 (C.A.5th Cir.), cert. denied, 332 U.S. 791, 68 S.Ct. 99, 92 L.Ed. 373 (1947); Gara v. United States, 178 F.2d 38, 40 (C.A.6th Cir. 1949), aff'd by an equally divided Court, 340 U.S. 857, 71 S.Ct. 87, 95 L.Ed. 628 (1950); McGregor v. United States, 206 F.2d 583 (C.A.4th Cir. 1953); cf. United States v. Guertler, 147 F.2d 796 (C.A.2d Cir. 1945). But cf. United States v. Salberg,

287 F. 208 (D.C.N.D.Ohio 1923).

FN15. Congress has provided that concealment of a bankrupt's assets shall 'be deemed to be a continuing offense * * * and the period of limitations shall not begin to run until * * * final discharge or denial of discharge.' 18 U.S.C. s 3284.

[5] Unlike other instances in which this Court has held that a particular statute describes a continuing offense, there is no language in this Act that clearly contemplates a prolonged course of conduct.[FN16] While it is true that *121 the regulation does in explicit terms refer to registration as a continuing duty, we cannot give it the effect of making this criminal offense a continuing one. Since such offenses are not to be implied except in limited circumstances, and since questions of limitations are fundamentally matters of legislative not administrative decision, we think this regulation should not be relied upon effectively to stretch a five-year statute of limitations into a 13-year one, unless the statute itself, apart from the regulation, justifies that conclusion.[FN17]

FN16. Cf. United States v. Cores, 356 U.S. 405, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958), in which the Court held, for venue purposes, that the statute prohibiting alien crewmen from remaining in the United States after their permits expired contemplated that the offense would continue as long as the crewman remained in this country and the statute of limitations did not start to run when he first overstayed his permit. In that case we stated that '(s) ection 252(c) punishes '(a)ny alien crewman who willfully remains in the United States in excess of the number of days allowed.' The conduct proscribed is the affirmative act of willfully remaining, and the crucial word 'remains' permits no connotation other than continuing presence.' Id., at 408, 78 S.Ct., at 878. See also Armour Packing Co. v. United States, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908), in which we held that, for venue purposes, violations of the Elkins Act, 32 Stat. 847, were continuing offenses. In that case the statute specifically provided that '(e)very violation * * * shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

committed or through which the transportation may have been conducted * * *.' Id., at 73, 28 S.Ct., at 432. Both of these cases dealt with venue and did not involve the statute of limitations question presented in this case.

FN17. It is significant that the courts that have concluded that failure to register is a continuing offense have done so by relying explicitly on the regulation. See Fogel v. United States, supra, 162 F.2d at 55; McGregor v. United States, supra, 206 F.2d, at 584; Gara v. United States, supra, 178 F.2d, at 39; and the opinions below in this case, 280 F.Supp., at 474, 410 F.2d, at 1157. It is equally significant that the only court that concluded that the offense was not a continuing one did so at a time when there was no 'continuing-duty' regulation issued to implement the registration provisions. United States v. Salberg, supra, interpreting the 1917 Draft Act, held that failure to register was not a continuing offense. The first continuing-duty regulation was promulgated in 1941. See n. 13, supra. These decisions support our conclusion that the statute itself, apart from any reliance on the administrative regulation, does not require that it be construed to incorporate a continuing-offense theory. We do not hold, as the dissent seems to imply, post, at 867, that the continuing duty regulation is unauthorized by the Act. All we hold is that neither the regulation nor the Act itself requires that failure to register be treated as the type of offense that effectively extends the statute of limitations.

**864 *122 There is also nothing inherent in the act of registration itself which makes failure to do so a continuing crime. Failing to register is not like a conspiracy which the Court has held continues as long as the conspirators engage in overt acts in furtherance of their plot. See United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910), Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). It is in the nature of a conspiracy that each day's acts bring a renewed threat of the substantive evil Congress sought to prevent. The fact that the first draft registrations clearly were viewed as instantaneous events and not a continuing process indicates that there is nothing inherent in the nature of failing to register that makes it a continuing offense.

[6][7] We do not mean that the argument in support of implying a continuing offense in this case is insubstantial, but it is at best highly equivocal. Basically we are faced with the task of construing a somewhat ambiguous statute in one of two ways. One way would limit institution of prosecution to a period of five years following the initial violation, while the other could effectively extend the final date for prosecution until as late as 13 years after the crime is first complete. As we have said before: 'when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication.' United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-222, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952).

Not insignificantly those remarks were also made in the context of considering the continuing-offense doctrine. In light of all these considerations we conclude that the *123 draft law does not intend to permit criminal prosecution for failing to register as late as 13 years after the initial failure. Consequently the statute of limitations begins to run at the initial failure to register as required by law. Since the facts in this case clearly show that Toussie failed in his legal obligation when he did not register prior to June 28, 1959, the statute began to run at that time and prosecution based on an indictment returned almost eight years later was barred.

It should be emphasized that this conclusion does not mean that the gravity of this offense is in any way diminished. Failure to register is subject to heavy criminal penalities. The only question is whether those penalties must result from a prosecution begun within five years or whether they can be delayed for a longer period. We are not convinced that limiting prosecution to a period of five years following the initial failure to register will significantly impair either the essential function of raising an army or the prosecution of those who fail to register. We do feel that the threat of criminal punishment and the five-year statute of limitations is a sufficient incentive to encourage compliance with the registration requirements. If Congress had felt otherwise it could easily have provided **865 for a longer period of limitations. It has not yet done so.

There is no doubt that the jury found that Toussie willfully failed to register and thereby subject himself

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to the same possibility of military service that faces other young men who fully comply with their legal obligations.   There is some cause to feel that dismissal of the indictment in such a case is an injustice in a society based on full and equal application of the laws.   But while Congress has said that failure to register is a crime, it has also made prosecution subject to the statute of limitations. 'Every statute of limitations, of course, may permit a rogue to escape,' *124Pendergast v. United States, 317 U.S. 412, 418, 63 S.Ct. 268, 271, 87 L.Ed. 368 (1943), but when a court concludes that the statute does bar a given prosecution, it must give effect to the clear expression of congressional will that in such a case 'no person shall be prosecuted, tried, or punished.'   The judgment of conviction in this case must therefore be reversed.

Reversed.

Mr.   Justice WHITE, with whom THE CHIEF JUSTICE and Mr. Justice HARLAN join, dissenting. The general statute of limitations provides in pertinent part that '(e)xcept as otherwise expressly provided by law, no person shall be prosecuted * * * unless the indictment is found * * * within five years next after such offense shall have been committed.' 18 U.S.C. s 3282.   The majority holds that this statute bars petitioner's prosecution, shortly before his 26th birthday, for failing ever to have registered for the draft.   That conclusion, I submit, is supported by neither the language, the purpose, nor the history of the applicable Selective Service Acts.

It is at once clear that nothing is gained by stressing that the general statute of limitations applies '(e)xcept as otherwise expressly provided by law.'   The question in this case is not whether the five-year statute applies, but when it begins to run.   That question in turn depends on what the 'offense' is for which petitioner is being tried, and when it was that he committed that offense.   In the typical case, an offense if complete as soon as every element in the crime occurs, and the statute of limitations begins to run from that date.   But in the case of a 'continuing offense,' the crime is not exhausted for purposes of the statute of limitations as long as the proscribed course of conduct continues.   United States v. Cores, 356 U.S. 405, 409, 78 S.Ct. 875, 878, 2 L.Ed.2d 873 (1958); United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 125, 54 L.Ed. 1168 (1910); see *125Model Penal Code s 1.07, Comment (Tent.Draft No. 5, 1956).   The question into which category a given offense falls has long been held to be entirely a matter of statutory interpretation.   See, e.g., United

States v. Cores, supra; Pendergast v. United States, 317 U.S. 412, 419-421, 63 S.Ct. 268, 271, 272, 87 L.Ed. 368 (1943); Bramblett v. United States, 97 U.S.App.D.C. 330, 332, 231 F.2d 489, 492, cert. denied, 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 874 (1956).

In this case, the offense derives from 50 U.S.C.App. ss 453 and 462(a) (1964 ed. and Supp. IV). The latter section makes it a crime to evade registration or to 'neglect or refuse to perform any duty' required by the Selective Service laws.   The former section-453-spells out the 'duty' that petitioner is charged with failing to perform here:
'(I)t shall be the duty of every male citizen of the United States, and every other male person now or hereafter in the United States, who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and **866 place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder.'

By any natural reading of this language, at least where the President has established 'times' and 'places' for continually accepting registrations, the 'offense' created is the offense of being at one and the same time, unregistered after having been required to register, and being between the ages of 18 and 26.   Indeed, coupled with s 462's provision for punishment of anyone who 'evades' registration, this crime is very similar to the crime committed by an alien who unlawfully 'remains' in the country.   See United States v. Cores, supra; majority *126 opinion, ante, at 863 n. 16.   Under this view of the Act, the only question that the statute of limitations raises is whether, at any time within five years preceding the indictment,     those     two     characteristics-being unregistered and between the specified age limits-accurately described the accused.

The majority concludes, however, that the only duty prescribed by s 453 is a duty to register on those specific days-and those days only-declared by the President for initial registrations.   In this case, by presidential proclamation, persons not yet 18 in 1948 were to 'be registered on the day they attain the eighteenth anniversary of the day of their birth, or within five days thereafter.'   According to the majority, once the fifth day has passed, the unregistered 18-year-old, although he has indeed committed an offense, is no longer under any further obligation to register.   That conclusion is wholly at

odds with the purposes of the Selective Service Act as a whole and this section in particular, as well as with the regulations, longstanding administrative interpretation, and the presidential proclamation itself.

Since 1941, Selective Service regulations, issued under authority explicitly granted the President, 50 U.S.C.App. s 460 (1964 ed. and Supp. IV); 32 CFR pt. 1611 (invoking authority under s 460), have provided that:

'The duty of every person subject to registration to present himself for and submit to registration shall continue at all times, and if for any reason any such person is not registered on the day or one of the days fixed for his registration, he shall immediately present himself for and submit to registration before the local board in the area where he happens to be.' 32 CFR s 1611.7(c).

If there was any doubt as to whether the duty imposed by s 453 extends beyond the fifth day after petitioner's *127 birthday, this regulation surely sets that issue at rest.[FN1] Indeed, the Court apparently concedes**867 as much since it decides to fall back on the theory that the regulation is not authorized by the Act.[FN2]

FN1. Despite the majority's assertion to the contrary, the quoted regulation is neither the first nor the only regulation reflecting the expectation that registration was to occur, even though it was 'late' registration. Even under the 1917 Act, the regulations 'prescribed by the President under the authority vested in him by the terms of the Selective Service Law,' U.S. War Dept., Selective Service Regulations, p. i (2d ed. 1918), provided for registration 'other than on Registration Day * * * irrespective of the date on which (the applicant) was required to register.' Id., s 54; see U.S. War Dept., Selective Service Regulations s 54 (1917) ('Local Boards will accomplish the registration of persons subject to registration who, for any reason, have not been registered on or since (Registration Day)') (emphasis added). Similarly, under the 1940 Act, procedures were described for registering '(a)ll persons who present themselves for registration, including persons who should have registered on a previous registration day * * *.' 32 CFR s 613.11(b) (Cum.Supp. 1944) (emphasis

added). And the current regulations provide that '(t)he Director of Selective Service shall also arrange for and supervise the registration of persons who present themselves for registration at times other than on the day or days fixed for any registration.' 32 CFR s 1612.1.

It is incongruous, to say the least, to admit that local boards have a duty and responsibility to register late applicants, see also 32 CFR s 1611.6, but that such applicants have no corresponding duty to cooperate with the board. Presumably under the majority's view, an unregistered male, discovered by the local board after the time for his initial registration had passed, could not be punished if he 'refuses to cooperate or is inclined to evade, refuses to answer, or answers falsely * * *.' See 32 CFR s 1613.16 (provision for dealing with 'recalcitrants').

FN2. The majority seems concerned to distinguish the 'limitations question,' ante, at 863, from the question of whether the duty in this case is continuing, ante, at 863 n. 17. But the Court cannot have it both ways. If the duty continues, as the regulation prescribes, the limitations question has been settled: the definition of the 'offense' was not yet exhausted when this indictment was brought. United States v. Cores, 356 U.S. 405, 409, 78 S.Ct. 875, 878, 2 L.Ed.2d 873 (1958); United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 125, 54 L.Ed. 1168 (1910). If, on the other hand, the statute has run, then the 'continuing-duty' regulation must be invalid. While I can sympathize with the Court's discomfort over the position it is thus forced to assume, I view that unease as simply an additional indication that the regulations involved in this case are fully within the scope of the powers given the President under the Act.

*128 That position, however, is simply untenable. In addition to the general authorization to the President in s 460(b) 'to prescribe the necessary rules and regulations to carry out the provisions of this title,' s 453 itself expressly requires registration 'at such time or times and place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder.' The majority's reference to the 1917 Act, if it proves anything, proves just the opposite of the Court's conclusion. Under that Act, the President prescribed one day when registration was to take place, utilizing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

local election precincts and a registration system that were not well adapted to take registrations on any other day.[FN3] By 1942, the system had been *129 streamlined to the point where local boards were open every day for the purpose of accepting new registrations. The current regulations are nothing more or less than a setting of 'times' and 'places' (your nearest local board during **868 the usual business hours)[FN4] for late as well as timely registrations. Within five years prior to the bringing of this indictment, petitioner-in the words of the statute-had a 'time' and a 'place' to register, 'determined by proclamation of the President and by rules and regulations prescribed' by the President.

> FN3. The first registration is described in U.S. Selective Service System, Registration and Selective Service 10-11 (1946): 'The basic idea was to follow the general organization and the administrative units of the election machinery. The Governors in the States, the County Clerks, or other designated persons in the county and in registration precincts were selected or appointed registrars. The ordinary place of registration was the ordinary place for voting. Thus the normal processes of Government were utilized for this extraordinary activity.'

Although it appears that late registration by local boards after Registration Day was authorized by the President, see n. 1, supra, until World War II and the 1940 Act, the local boards' 'primary functions (were) not registration but classification and induction.' Id., at 23. Once Registration Day had passed, and the emergency machinery had been dismantled, special procedures were required for accomplishing late registration, see U.S. War Dept., Selective Service Regulations s 54(b) (2d ed. 1918), and 'local boards had difficulty with the proper entry or handling of registrations which, too often for insufficient reason, were received late.' U.S. Selective Service System, supra, at 91. Significantly, during subsequent registration days under the 1917 Act, when the boards once again had the help of special machinery, tens of thousands of tardy registrations were effected. Id., at 15. By 1941, the boards were equipped to handle late registrations as a matter of course, resulting in the issuance of the 'continuing-duty' regulation. See id., at 42, 91-92.

> FN4. See, for example, in addition to the 'continuing-duty' regulation, the following regulation designating the 'Place and time of

registration':
'Any person required to be registered may present himself for and submit to registration at any designated place of registration or at the office of any local board during the hours for registration specified in the Presidential proclamation or during the usual business hours.' 32 CFR s 1613.1(a) (emphasis added).

Despite the majority's implication to the contrary, ante, at 863, there is specific evidence that Congress actually was aware of this question when it acted, and that Congress did not expect that the duty to register would cease merely because the times set for initial registration had passed. During the hearings on the 1940 Act, Senator Reynolds asked then-Major Hershey whether a person could avoid his duty to register altogether by, for example, joining the National Guard-which would give him an exemption-and then getting out as soon as registration day had passed. Major Hershey replied that such persons would have to register as soon as they lost their exempt status, and he persisted in that answer *130 despite the Senator's puzzlement (like the majority's) over the fact that the registration period would seem to have expired. The Senator finally accepted Major Hershey's explanation after assuring himself that 'your registration boards are at all times in session * * * (a)nd they would be given the opportunity to register.'[FN5] Even the relevant presidential proclamation, wholly apart from the 'continuing-duty' regulation, accords with this view that the duty to register is not defined solely in terms of the setting of the sun on the day originally fixed for registration. The proclamation declares that a person unable to register on the day fixed for his registration 'because of circumstances beyond his control * * * shall do so as soon as possible after the cause for such inability ceases to exist.'[FN6] Apparently, the majority concedes that in what it calls these few 'exceptions,' the Act does impose a valid duty to register on a day other than the initial date. That being the case, it is inconceivable to me that Congress can be said to have authorized the President to require late registration of those with a good excuse for their tardiness, but not to have similarly authorized him to require late registration of those with a bad excuse or no excuse at all.

> FN5. Hearings on S. 4164 before the Senate Committee on Military Affairs, 76th Cong., 3d Sess., 385 (1940). See also the exchange between Senator Reynolds-by then Chairman of the Committee-and General

Hershey during hearings a year later on an amendment to the 1940 Act, pointing out that the Act 'gives a broad discretion to call these men as the Army sees fit * * * (a)nd to register them as they see fit.' Hearings on S. 2126 before the Senate Committee on Military Affairs, 77th Cong., 1st Sess., 34 (1941).

FN6. Proclamation No. 2799, July 20, 1948, 62 Stat. 1531, 13 Fed.Reg. 4173. Similar language is contained in the Supplementing Proclamation, No. 2942, August 30, 1951, 65 Stat. c36.

The 'continuing-duty' view of s 453 receives support from an appraisal of the section's purpose in the context *131 of the statute considered as a whole. Immediately following the registration requirement, s 454 declares that 'every male citizen * * * who is between the ages of 18 years and 6 months and 26 years, at the time fixed for his registration, or who attains the age of 18 years and 6 months after having been required to register pursuant to (s 453) shall be liable for training and service in the Armed Forces * * *.' Since even under the majority's view, petitioner was at one **869 time a person 'required to register,' this section, by its literal terms, made him still liable for induction at the time this indictment was brought. But if he still had a duty to serve, then it is completely illogical to conclude that he did not also still have a duty to register. The whole purpose of the registration section is to provide a manpower pool from which inductees can be selected; registration is but the necessary first step in the congressional scheme for processing, classifying, and selecting individuals for training.[FN7] See United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). And the instant regulation, declaring that the duty to register 'shall continue at all times,' is but one of numerous provisions and regulations in the Selective Service Act that reflect the concept that continuing duties are essential if this orderly induction process is to take *132 place.[FN8] Even apart from the settled rule that the 'interpretation expressly placed on a statute by those charged with its administration must be given weight by courts faced with the task of construing the statute,' e.g., Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965), it seems clear to me that the regulation merely spells out an intent already inherent in the statutory scheme.[FN9] Yet *133 the majority holds that when dawn breaks on **870 the unregistered male, six days after his 18th birthday, his crime is complete and ended; though the

Act specifically declares that he is still liable for induction, he has no obligation to take the step that makes that induction possible. I for one cannot ascribe such inconsistent intent to Congress.

FN7. This view of the registration provisions, relating them to the induction provisions as a reservoir to a pipeline, was repeatedly emphasized in the hearings on the 1940 Act and amendments thereto. See, e.g., Hearings on H.R. 10132 before the House Committee on Military Affairs, 76th Cong., 3d Sess., 10-11, 15, 116 (1940); Hearings on S. 2126 before the Senate Committee on Military Affairs, 77th Cong., 1st Sess., 83 (1941) ('if you do not coordinate registration and induction, you are going to run into embarrassment'); U.S. Selective Service System, supra, n. 3, at 1-2 ('(t)he object * * * of registration is * * * to know where available manpower is and to be able to reach it * * *').

FN8. See 32 CFR ss 1617.1, 1623.5 (registration and classification certificates must be kept in one's personal possession 'at all times'); 32 CFR s 1641.7 (duty to keep local board informed of current status); 32 CFR s 1641.3 (duty 'to keep (the registrant's) local board advised at all times of the address where mail will reach him'). The latter regulation was long ago interpreted as imposing a continuing duty to advise the local board of a change of address in a decision that rejected a claim similar to petitioner's that the then three-year statute of limitations barred prosecution, because the address was changed more than three years before the indictment was brought. United States v. Guertler, 147 F.2d 796 (C.A.2d Cir. 1945). Presumably under the majority's theory that 'continuing duties' can only be created by express provision in the statute, this decision is overruled, and the continuing duty imposed by this regulation is brushed aside-all in the face of a statute that Congress knew 'wouldn't be worth a dime to us in 2 years' if registration information and lists were not 'kept up to date.' Hearings on S. 2126 before the Senate Committee on Military Affairs, 77th Cong., 1st Sess., 37, 38 (1941).

FN9. In the Military Selective Service Act

of 1967, enacted June 30, 1967, 81 Stat. 100, Congress added to s 454(a) a provision that registrants who failed or refused to report for induction were 'to remain liable for induction and when available shall be immediately inducted.' 50 U.S.C.App. s 454 (1964 ed., Supp. IV). Petitioner relies on this provision as an indication that Congress did not intend to impose continuing duties except where, as here, it used express language to that effect. The legislative history shows just the opposite to be the case. Congress assumed that, even without express language, liability for induction would continue until age 26; the amendment was prompted solely in order to 'insure that a registrant who prolongs litigation of his draft classification beyond age 26' (when he would 'no longer (be) liable for military service') 'would nonetheless remain liable for induction, regardless of age * * *.' H.R.Rep.No.267, 90th Cong., 1st Sess., 30 (1967). There is not the slightest suggestion that Congress suspected, that the registration and liability provisions of ss 453 and 454-interrelated provisions which must fairly be read in pari materia-ever created anything other than continuing duties until the specified 26-year age limit was reached.

The Court does not even have the excuse that its construction is required in order to avoid a serious constitutional problem. Petitioner has argued that if his duty to register continues, he cannot be punished for failing to comply since late registration would necessarily be incriminating. See Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). But the Court of Appeals below drew dead aim on the defect in this argument, and the Court's opinion wisely refrains from relying on the suggested Fifth Amendment problem. For if this is a continuing offense, petitioner-as the Government concedes-is subject to only one prosecution based on his single uninterrupted course of conduct. See Model Penal Code, s 1.08, Comment 33-34 (Tent. Draft No. 5, 1956). Petitioner was subject to that prosecution six days after his 18th birthday; his continued failure to register did not subject him to any additional penalty beyond what he had already risked. Thus, though it may be conceded that late registration would have been incriminating, the statute here, unlike the statutes in Marchetti, Grosso, and Leary does not

compel incrimination. Petitioner had nothing to gain in the form of avoiding an additional*134 penalty by registering and revealing that his registration was late. The only possible 'incentive' in this case stems from the fact that by registering, petitioner would have caused the statute of limitations to commence running, thus giving the Government only five years in which to prosecute instead of leaving prosecution open until age 31.[FN10] To suggest that this possibility of starting the statute running is sufficiently 'attractive' to amount to 'compulsion' for purposes of the Fifth Amendment is purest fancy.

> FN10. Petitioner has suggested that if the duty to register is continuing, there is no logical stopping place for bounding the duty, so that 'a person seventy years old can be prosecuted for having failed to register fifty-two years before at the age of eighteen.' Brief for Petitioner 17. But the paraded horrible overlooks the fact that the same provisions that create the duty, also indicate that the duty ends at age 26-the age beyond which no one was ever required to register under this Act and this proclamation, and beyond which no one would normally have been liable for induction. See nn. 6, 8, supra; S.Rep.No.1268, 80th Cong., 2d Sess., 6 (1948) ( '(r)egistration is not required of persons who have reached the age of 26').

The 'continuing offense' is hardly a stranger to American jurisprudence. The concept has been extended to embrace such crimes as embezzlement,[FN11] conspiracy,[FN12] bigamy,[FN13] nuisance,[FN14] failure to provide support,[FN15] repeated*135 failure **871 to file reports,[FN16] failure to register under the Alien Registration Act,[FN17] failure to notify the local board of a change in address,[FN18] and, until today, failure to register for the draft.[FN19] Since the continuing-offense concept too freely applied can lead to tension with the purposes of a statute of limitations, we should undoubtedly approach the task of statutory interpretation with 'a presumption against a finding that an offense is a continuing one * * *.' Model Penal Code s 1.07, Comment (Tent. Draft No. 5, 1956). But the presumption is by its nature rebuttable; if it is ever to give way, it must surely do so in a case such as this where every other guide to statutory interpretation points to a contrary legislative intent. To hold otherwise-to erect as the majority does an absolute bar to finding a continuing offense in the absence of express statutory language-is to shirk our judicial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

responsibility of interpreting Acts of Congress as they come to us, without insisting that Congress make our task easier by using some particular form of words to express its intent.[FN20] Our own cases distinguish*136 the 'instantaneous' from the 'continuing' offense on the theory that in the former case, the illegal aim is attained as soon as every element of the crime has occurred, whereas in the latter case, the unlawful course of conduct is 'set on foot by a single impulse and operated by an unintermittent force,' until the ultimate illegal objective is finally attained. United States v. Midstate Co., 306 U.S. 161, 166, 59 S.Ct. 412, 414, 83 L.Ed. 563 (1939); see also United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 224, 73 S.Ct. 227, 230, 231, 97 L.Ed. 260 (1952). The latter definition fits this case precisely. By his own testimony, petitioner admits that he set out to evade registration and liability for the draft. That aim could only be accomplished by remaining unregistered until he was past 26-the age of prime liability. If he had succeeded in reaching 26 and escaping liability, the Government should have its five years to detect and punish his illegal course of conduct. As it is, the Court holds that petitioner not only succeeded in his aim, but was immune from prosecution for his unlawful conduct at the age of 23. While all around him, young men were being inducted, 26-year-olds first, petitioner at 18 years and 6 days is forever free of any duty-and at 23 is forever free from prosecution for his initial failure-to place himself, like them, into the pool from which inductees are selected. I cannot agree. I would affirm.

FN11. See State v. Thang, 188 Minn. 224, 246 N.W. 891 (1933).

FN12. See Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253, 60 S.Ct. 811, 858, 84 L.Ed. 1129 (1940); United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910).

FN13. See Cox v. State, 117 Ala. 103, 23 So. 806, 41 L.R.A. 760 (1898); compare People v. Brady, 257 App.Div. 1000, 13 N.Y.S.2d 789 (1939), with Commonwealth v. Ross, 248 Mass. 15, 142 N.E. 791 (1924).

FN14. E.g., State v. Dry Fork R. Co., 50 W.Va. 235, 40 S.E. 447 (1901).

FN15. Richardson v. State, 30 Del. (7 Boyce) 534, 109 A. 124 (Ct.Gen.Sess.1920); Towns v. State, 24 Ga.App. 265, 100 S.E. 575 (1919).

FN16. See Hanf v. United States, 235 F.2d 710 (C.A.8th Cir.), cert. denied 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 81 (1956).

FN17. United States v. Franklin, 188 F.2d 182 (C.A.7th Cir. 1951).

FN18. United States v. Guertler, 147 F.2d 796 (C.A.2d Cir. 1945); see n. 8, supra.

FN19. See Fogel v. United States, 162 F.2d 54 (C.A.5th Cir.), cert. denied, 332 U.S. 791, 68 S.Ct. 99, 92 L.Ed. 373 (1947); Gara v. United States, 178 F.2d 38, 40 (C.A.6th Cir. 1949), aff'd by an equally divided Court, 340 U.S. 857, 71 S.Ct. 87, 95 L.Ed. 628 (1950); McGregor v. United States, 206 F.2d 583 (C.A.4th Cir. 1953). But cf. United States v. Salberg, 287 F. 208 (D.C.N.D.Ohio 1923) (holding the duty under the 1917 Act not to be continuing).

FN20. Similarly, the requirement that criminal statutes be strictly construed in determining the substantive offense in order to prevent problems of fair warning, cf. United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (holding that defendant's acts constituted a continuing course of conduct, subject only to one prosecution), does not lead to the majority's per se rule in deciding what type of offense is involved for purposes of the statute of limitations. Given the explicit provisions of s 453, the 'continuing-duty' regulation, and the consistent administrative interpretation of the Act, there can be no suggestion that petitioner did not have fair warning that he was required to register, or that petitioner was unfairly led into thinking that repose would be his when he reached 23.

U.S.N.Y. 1970.
Toussie v. U.S.
397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156

Briefs and Other Related Documents (Back to top)

• 1970 WL 155745 (Appellate Brief) Brief for the United States (Jan. 07, 1970) Original Image of this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 S.Ct. 858                                                                    Page 13
397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156
**(Cite as: 397 U.S. 112, 90 S.Ct. 858)**

Document (PDF)
• 1969 WL 119991 (Appellate Brief) Brief for Behalf
of Petitioner (Dec. 04, 1969)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

THIS PAGE INTENTIONALLY LEFT BLANK

Westlaw.

834 F.2d 1099                                                                                      Page 1
834 F.2d 1099
**(Cite as: 834 F.2d 1099)**

▷

United States Court of Appeals,First Circuit.
UNITED STATES, Appellee,
v.
Aloyisius JUODAKIS, Defendant, Appellant.
**No. 86-1624.**

Submitted Oct. 9, 1987.
Decided Dec. 10, 1987.

Defendant was convicted in the United States District
Court for the District of Massachusetts, W. Arthur
Garrity, Jr., J., of conspiracy to manufacture
methaqualone, and defendant appealed. The Court
of Appeals held that Government failed to establish
overt act in furtherance of conspiracy to manufacture
drugs within statute of limitations.

Reversed.

West Headnotes

**[1] Conspiracy 91 ☜40.4**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k39 Persons Liable
                91k40.4 k. Withdrawal. Most Cited
Cases
In order to withdraw, conspirator must act
affirmatively either to defeat or disavow purpose of
conspiracy, and typically, this means that there must
be evidence either of full confession to authorities or
communication by accused to his coconspirators that
he has abandoned enterprise and its goals.

**[2] Conspiracy 91 ☜27**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k23 Nature and Elements of Criminal
Conspiracy in General
                91k27 k. Overt Act. Most Cited Cases

**Criminal Law 110 ☜150**

110 Criminal Law
    110X Limitation of Prosecutions

110k148 Commencement of Period of
Limitation
    110k150 k. Continuing Offenses. Most
Cited Cases
Alleged coconspirator's removal of materials from
laboratory facility was not overt act in furtherance of
agreement for defendant to serve as consultant on
mechanical or chemical matters involved in
manufacture of methaqualone at new laboratory, so
that Government failed to establish overt act within
statute of limitations even if defendant's proof that he
had withdrawn from conspiracy more than five years
before indictment did not establish withdrawal from
conspiracy; in light of cessation of manufacturing
operations, cessation of defendant's active
participation and intervening DEA raid, fact that
defendant had once reassociated with alleged
coconspirator after alleged coconspirator had
changed location was not sufficient to show
defendant had agreed to do it again.

**\*1099** Aloyisius Juodakis, on brief, pro se.
Sydney Hanlon, Sp. Asst. U.S. Atty., and Frank L.
McNamara, Jr., Acting U.S. Atty., Boston, Mass., on
brief for appellee.

Before COFFIN, BREYER and SELYA, Circuit
Judges.

PER CURIAM.
Appellant was convicted of conspiracy to
manufacture methaqualone. There was abundant
evidence and, indeed, defendant admitted that he had
at various times helped produce methaqualone. His
major arguments on appeal, however, are that there
was insufficient evidence of any overt act in
furtherance of the charged conspiracy occurring
within the five year limitations period prior to the
indictment and that he withdrew from the conspiracy
prior to the five year limitations period. He also
challenges the jury instructions.

Defendant was indicted on November 25, 1985. We
review the evidence with particular attention to
events after November 25, 1980 to determine
whether prosecution was barred by the statute of
limitations, 18 U.S.C. § 3282, or whether, instead, as
the government contends, overt acts in furtherance of
the conspiracy were performed after November 20,
1980 and defendant's association with it continued

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 F.2d 1099
834 F.2d 1099
(Cite as: 834 F.2d 1099)

into the limitations period.

**\*1100** There was evidence of the following. According to the testimony (given under immunity) of Gerard Stackhouse, he and one Francis Foley discussed manufacturing drugs sometime in 1976. Thereafter, Stackhouse researched how to produce methaqualone, and in 1977 a facility was rented in Worcester, Massachusetts. Foley financed the operation and helped to renovate the place while Stackhouse, along with one Leonard Lewis, tried to produce methaqualone. Also present doing carpentry work was Tilman Lukas who, although originally unaware of any wrongdoing, guessed something illegal was afoot and was let in on the secret. After nine months to a year of effort, Stackhouse and Lewis succeeded in producing methaqualone powder. The next step was to turn the powder into tablets. Toward that end, in the spring of 1978, Foley and Stackhouse went to California where they met with Gene Wise and defendant. Defendant, according to his own testimony, had constructed a pill machine for his employer, Wise, and this machine was supplied to Foley and Stackhouse so that they could produce Quaaludes, the pill form of methaqualone. Stackhouse had trouble with the machine, so in May 1978 defendant went to Massachusetts. Defendant said he got the machine running and helped in other aspects of the Worcester methaqualone operation for about four months. Defendant became uncomfortable, however, because he felt operations were not sufficiently concealed and Foley was ordering chemicals too openly. Consequently, he said, he returned to California in September 1978. During the following twelve months, defendant came to Massachusetts on several errands for Wise, sometimes carrying money to Foley and pills back to Wise.

Meanwhile, the Worcester group had two mishaps. First, in late 1978, they lost their lease. Second, at around the same time, Stackhouse and others (but not Foley) were stopped on their return trip from New York after purchasing there the direct chemical precursors to methaqualone. The agents took the chemicals, but allowed Stackhouse to go. Stackhouse had no further association with Foley's enterprise after that.

After Stackhouse's departure, Foley moved the business to South Boston. In June 1979, a building at 377 West First Street, South Boston was acquired and renovations were begun.

Defendant next appeared on the scene in the summer of 1979. Defendant said he returned to Massachusetts at that time and rented an apartment in Hingham (starting September 1, 1979) in order to participate in a venture Foley and Wise were contemplating. The precise nature of the Foley-Wise venture was never decided upon, defendant said, but among the matters discussed was manufacturing the precursors to maethaqualone, an operation defendant thought would be perfectly legal. Defendant's job, he said, was to set up the South Boston space so that it could be used for any number of chemicals, a general purpose facility so to speak. Defendant connected a condenser, checked seals on reactor vessels, and tested equipment, but, he said, never manufactured anything. In December 1979, at a time when defendant was running tests on equipment and wondering what would happen next, Wise was lost at sea. The demise of Wise, whom defendant regarded as his protector, coupled with friction with Foley and defendant's feeling that he was in over his head with larger equipment than he had ever used before, convinced defendant to leave Massachusetts, he said. On January 15, 1980, he turned in the keys to his Hingham apartment and informed the rental manager he was leaving. The lease was formally terminated April 30, 1980, but the rental manager testified defendant was not in the apartment after January 15, 1980. Defendant said he never told Foley about being in over his head for he was afraid Foley would take it badly. Instead, he simply packed and left. After returning to California, defendant put his knowledge to use and made methaqualone himself. There is no contention that defendant's production of methaqualone in California was part of the conspiracy charged in the indictment.

**\*1101** In contrast to defendant's testimony that he left Boston in *January* 1980, never again to provide any aid to Foley's business, was the testimony of William Garstang. In early 1979, Garstang moved into the house defendant rented in California. Defendant, who shared the residence with Garstang, would be absent from California approximately two weeks out of every six, according to the latter. In the spring of 1980, defendant told Garstang that he was involved in a drug manufacturing operation in Boston or a suburb, that the operation was having difficulties (including management problems), and that he was making curative efforts to try to get the operation to run smoothly and get paid. Defendant's periodic absences from California did not cease until summer 1980, Garstang said, when defendant and Garstang began manufacturing their own methaqualone in California.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 F.2d 1099
834 F.2d 1099
**(Cite as: 834 F.2d 1099)**

The gas records for the South Boston facility from September 1979 to June 12, 1980 were introduced into evidence. They show a peak usage in January 1980 ($309.70). Thereafter, the bills dropped ($171.95 February; $68.65 March; $57.97 April; $22.25 May), and service was terminated after June 12, 1980 for nonpayment.

There is no direct evidence of what, if anything, transpired at the South Boston site after January 1980 (when defendant says he left) through summer 1980 (when the gas was turned off and defendant's periodic trips east ceased) through November 25, 1980, the date five years prior to defendant's indictment. Robert Hanley, the building's previous owner who had a business next door, said he never saw a sign of life after the renovations.

We now come to events occurring within the limitations period. In late May 1981, Federal Drug Enforcement Administration (DEA) agents searched the South Boston premises. They found a dismantled laboratory. Some, but not all, of the chemicals needed to make methaqualone were present. Samples of residue found in various places along with dust and other sweepings from the floor were taken and analyzed. They were found to contain methaqualone and other chemicals from which methaqualone is produced. While the DEA chemist could not say when the lab had last been operative, he felt it indeed had been used to produce methaqualone in view of the methaqualone residue found on the floor and in drawers.

After the May 1981 search, the agent padlocked the door and put seals on the door and building indicating a search warrant had been executed. Thereafter, surveillance was conducted on three occasions. On July 28, 1981 and July 30, 1981, Foley was observed removing a glass condenser and other equipment from the premises.

Tilman Lukas (the carpenter at the Worcester operation to whom Stackhouse had eventually acknowledged that methaqualone was being produced) testified that in the summer of 1981, Foley called and asked if Lukas would store equipment for him. Not long thereafter, Foley made two or three trips to Lukas's business in Amherst, Massachusetts with glassware, mantels, chemical drums, drying ovens, rheostats, pipe fittings, and electrical and building equipment which Lukas stored for him.

With this evidentiary background, we turn to the indictment, the district court's rulings, and the arguments.

The indictment, returned November 25, 1985, charged that "[f]rom on or about June 7, 1979 [the date Daniel Shea, an alleged co-conspirator acquitted at trial, acquired the South Boston facility] until on or about July 30, 1981 [the date Foley was observed removing equipment] at Boston and Amherst and elsewhere," Foley, Shea, and defendant conspired to manufacture methaqualone. The acts upon which the government relies for its position that the conspiracy continued to exist within the limitations period-November 25, 1980 to November 25, 1985-are Foley's removal of equipment from the South Boston facility and transportation of it to Tilman Lukas's business in Amherst in the summer of 1981.

In denying defendant's motion for a judgment of acquittal, the district court had no hesitancy concluding withdrawal from the conspiracy had not been established*1102 as a matter of law, for withdrawal requires more affirmative action then just dropping out. The difficult question, the court stated, was whether the removal of the materials from the South Boston facility in July 1981 was an act in furtherance of the charged conspiracy. The court concluded that it was, stating as follows:
"The Worcester evidence I think is probative of the fact that this was like a floating crap game, in the sense that it was a floating laboratory. It was a pretty big float, because this was a big operation, but still, it is like any moonshine operation, floating crap game, any illegal operation that requires premises and special equipment. It moves around, and this was moved once, and I think the transfer to Amherst at the end of July by Mr. Foley of key ingredients or equipment is not only consistent with manufacture but very probative of a plan to continue it.
"So there is the slim reed on which this case passes the motion [for acquittal]."

Defendant repeats these same two arguments-insufficient evidence of any overt act in furtherance of the conspiracy within the limitations period and withdrawal from the conspiracy-on appeal. Logically, perhaps, we should first determine whether the charged conspiracy existed within the limitations period, for if it did not, then we would not need to address withdrawal. However, because the stringent requirements the law imposes for withdrawal-mere cessation of activity is not enough-somewhat color our view as to whether the charged conspiracy continued into the limitations period, we turn first to withdrawal.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 F.2d 1099
834 F.2d 1099
(Cite as: 834 F.2d 1099)

Page 4

### 1. *Withdrawal*

Defendant, in arguing withdrawal, points out that there is no evidence he did anything in furtherance of the charged conspiracy after the summer of 1980, the date Garstang said defendant returned permanently to California. The government argues that neither defendant's moving back to California nor the absence of evidence that defendant actually helped Foley in some way after the summer of 1980 required a finding of withdrawal. In the prosecution's view, the evidence supports the conclusion that defendant's role was not only to set up the Boston laboratory, a task which may have been completed in January 1980 when defendant terminated his Hingham lease, but also to serve as a consultant as needed.

[1] The law with respect to withdrawal has been frequently stated. "[M]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal." *See, e.g., United States v. Dunn,* 758 F.2d 30, 37 (1st Cir.1985) (quoting *United States v. Phillips,* 664 F.2d 971, 1018 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982)); *United States v. Mardian,* 546 F.2d 973, 978 (D.C.Cir.1976). In order to withdraw, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy. *Dunn,* 758 F.2d at 38; *Hyde v. United States,* 225 U.S. 347, 369, 371-72, 32 S.Ct. 793, 803-04, 56 L.Ed. 1114 (1912) (withdrawal requires affirmative action; a disclosure to authorities may not suffice if the disclosure is incomplete and defendant continues to acquiesce in the conspiracy). Typically, there must be evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals. *United States v. Steele,* 685 F.2d 793, 803-04 (3d Cir.), *cert. denied sub nom. Mothon v. United States,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982).

[2] Defendant does not rely on confession, and hence the question is whether the evidence supports only the view that defendant permanently severed his ties and communicated that fact to Foley (or another co-conspirator) prior to November 25, 1980.

Admittedly, defendant said he did *not* tell Foley he felt unqualified for the job or that he was leaving. Rather, defendant said, he simply returned to California. One inference may be that by leaving so abruptly, defendant graphically communicated (in a nonverbal manner) that he was quitting the enterprise. That, however, the government*1103 argues, is not the only permissible conclusion the jury could draw. Defendant had once before returned to California after his active (four month) daily participation in the Worcester operation had ceased, yet he had remained available and had even made a few deliveries of money and pills for Foley and Wise. Similarly, the jury could conclude that defendant's surrender of the keys to his Hingham apartment did not denote withdrawal. Rather, defendant's primary task of setting up the lab had been completed and defendant was no longer needed on a daily basis. When needed, however, defendant would periodically come to Boston up to the summer of 1980. That defendant may not have been called upon for his particular expertise-defendant has degrees in electrical engineering-after the summer of 1980 does not necessarily establish either that defendant had quit the enterprise or that Foley had retired him, the government would asseverate. Arguably, Foley's energies may have been concentrated on more basic problems-Wise, a source of financing, had died and the gas had been disconnected for nonpayment-which would need to be surmounted before defendant's specialized talents could be put to use. Foley had once before overcome setbacks when he relocated from Worcester to Boston. He might have hoped to do so again and then to call on defendant to put the lab back into operation.

We think, under the stringent standards for withdrawal, that the district court was probably correct that defendant could not be said as a matter of law to have withdrawn from the conspiracy and that the issue was one for the jury. Nevertheless, the case is troubling. For all that appears, there had been a substantial hiatus (approximately a year, at a minimum) in operations and in defendant's direct participation when Foley removed the equipment in July 1981. (Gas had been turned off in June 1980, defendant's trips east had ceased at about that time, the lab's neighbor had observed no activity, and the lab had been discovered by the DEA in May 1981.) Absent either active involvement or active withdrawal, for how long is defendant to be held responsible as a conspirator for whatever methaqualone operation Foley might contemplate or eventually undertake?

There are parallels between the present case and *United States v. Borelli,* 336 F.2d 376 (2d Cir.1964), *cert. denied sub nom., Cinquegrano v. United States,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 F.2d 1099
834 F.2d 1099
**(Cite as: 834 F.2d 1099)**

There, defendants were indicted for a drug importation conspiracy alleged to have taken place from 1950 to 1959. There was evidence that a core group of conspirators repeatedly imported and distributed heroin. The only evidence, however, as to a particular conspirator, Tantillo, was that he accepted two deliveries of heroin in 1951 (beyond the limitations period) and that in 1960 (within the limitations period), at a chance meeting with another conspirator, Tantillo said he was sorry he had been compelled to stop buying from the other. In claiming withdrawal, Tantillo relied on the absence of activity on his part after (as well as long before) August 15, 1957, the date five years prior to the return of the indictment. The court, however, in an opinion written by Judge Friendly, pointed to the "rigorous requirements for making out the defense of withdrawal" the Supreme Court had laid down in _Hyde v. United States_, 225 U.S. at 369, 32 S.Ct. at 803, and concluded that although Tantillo had done nothing actively in furtherance of the conspiracy after 1951, he had not as a matter of law withdrawn; his 1960 conversation raised a jury issue whether he had sufficiently manifested an intention to withdraw. _Borelli_, 336 F.2d at 385, 388-89.

The court briefly considered whether _Hyde_ 's affirmative action requirement was too severe when a defendant "simply engaged in the supply, transportation, or purchase of contraband before the period of limitations and the only effects realistically continuing into the period were the profits the central core had realized and its hope of further assistance." It concluded, however, it did not need to reach that question. Instead, Judge Friendly focused on whether Tantillo's agreement with the core group continued into the period not barred by the *1104 statute of limitations. Judge Friendly explained as follows. The gist of a conspiracy offense is the agreement. Consequently, it was "essential to determine what kind of agreement or understanding existed as to _each_ defendant." _Borelli_, 336 F.2d at 384 (emphasis added). The agreement would not necessarily be the same with respect to each defendant in a multifaceted drug conspiracy; the agreement among the core members might embrace more extensive operations than the agreement between core participants and lower echelon personnel or helpmates whose involvement was more peripheral. To warrant conviction, "the Government must present evidence justifying the jury in finding beyond a reasonable doubt that the particular agreement into which a defendant entered continued into the period not barred by limitation ... and the scope of his agreement must be determined

individually from what was proved as to him." _Borelli_, 336 F.2d at 385. Following this approach, the court concluded Tantillo's agreement had been less extensive in time and scope than that of the core importers.

We find this approach-focusing upon the particular agreement the defendant entered-instructive here. Utilizing Judge Friendly's framework, we turn to the question whether the government proved beyond a reasonable doubt that an overt act in furtherance of the particular agreement defendant made occurred within the limitations period.

### 2. _Existence of the Conspiracy within the Limitations Period_

Here, as in _Borelli_, the accused was admittedly involved actively with the core mover (Foley) at one time, but thereafter ceased active participation. According to the government's theory of the case, defendant's agreement with Foley was to set up the South Boston lab and then to serve as a consultant on mechanical or chemical matters as needed. But is there any basis for concluding beyond a reasonable doubt that defendant agreed, whether implicitly or explicitly, to serve Foley wherever Foley might choose to relocate? That is, did defendant, by once agreeing to be associated with Foley's Boston methaqualone operations thereby, absent meeting the stringent requirements for withdrawal, become responsible as a conspirator in whatever future methaqualone operations Foley might undertake? We think not. To be sure, defendant had once followed Foley from Worcester to South Boston. As a result of that relocation, however, there had been a considerable interruption in production (since a new facility had had to be found and renovated), there were changes in personnel and in defendant's role, and the government has not contended that the South Boston and Worcester operations were all part of one continuing conspiracy. We see much less support for viewing Foley's removal of equipment from the South Boston lab and storing of it in Amherst in the hope of resuming operations at some, as of then, unknown time and place as part of or a logical consequence of the particular agreement defendant entered into when he threw in with Foley in South Boston.

Continuity is particularly attenuated in this case in view of a number of relevant factors. Wise, defendant's preceptor, was dead. There had been a substantial hiatus in operations. While it can be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 F.2d 1099
834 F.2d 1099
**(Cite as: 834 F.2d 1099)**

concluded from the DEA chemist's testimony that the South Boston lab was used at some time to produce methaqualone, there is no basis to conclude production occurred close to Foley's July 1981 removal of equipment.  The DEA had found the lab dismantled, gas had been terminated in June 1980, defendant's trips east had ceased at about that time, Foley's group by then had no known person other than defendant with the knowledge to produce methaqualone, and the lab's neighbor saw no activity.  In May 1981, the DEA sealed and posted the lab, thus alerting the lab's former workers of the government's suspicion of wrongdoing.   Hence, Foley's removal of lab equipment was not closely similar to a simple dismantling of a still followed by quick resumption in a new location by a group with a repeated history of such evasions.   Foley's conduct can, we think, far more logically be regarded as a unilateral grasp to salvage what he could of a moribund operation.

**\*1105** It may be that Foley did hope to resurrect the operation.  It may be that, had Foley found a suitable new facility, defendant would have joined him.   But the burden of proving beyond a reasonable doubt the existence of the particular conspiracy-as determined by defendant's agreement-within the limitations period was upon the government.   In light of the cessation of both operations generally and defendant's active participation particularly by the summer of 1980, and having in mind the intervening DEA raid, we conclude that the fact that defendant had once reassociated with Foley after Foley had changed locations was not sufficient to show that defendant had agreed to do it again.   Consequently, the government failed to prove that Foley's removal of equipment in July 1981 was an overt act in furtherance of the particular agreement defendant entered.   On this record the statute of limitations barred the prosecution.

The judgment of conviction is *reversed.*

C.A.1 (Mass.),1987.
U.S. v. Juodakis
834 F.2d 1099

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.