# INSTRUCTION NO. 4.1

*Withdrawal - Part I*

# INSTRUCTION NO. 4.1
## *Withdrawal*

Mr. Davis has raised the defense that he withdrew from the conspiracy prior to the statute of limitations period. Thus, if you find that the agreement Mr. Davis joined was in fact in existence as of July 9, 1999, you must find him not guilty unless the government has proven beyond a reasonable doubt that he remained a member of that conspiracy after July 9, 1999 and did not withdraw from it.[1]

Once a person becomes a member of a conspiracy, that person remains a member until that person withdraws from it. One may withdraw by doing acts which are inconsistent with the purpose of the conspiracy and by making reasonable efforts to tell the co-conspirators about those acts. You may consider any definite, positive step that shows that the conspirator is no longer a member of the conspiracy to be evidence of withdrawal.[2]

Mere cessation of activity in furtherance of the conspiracy, in and of itself, does not constitute withdrawal.[3]

In this regard, you are reminded that the burden remains on the government to prove, beyond a reasonable doubt, that Mr. Davis did not withdraw from the conspiracy.

---

[1]   1 L. Sand, *et al.*, Modern Federal Jury Instructions, Instruction No. 19-10 (2002); *see also United States v. Piva*, 870 F.2d 753 (1st Cir. 1989); *United States v. Read*, 658 F.2d 1225 (7th Cir. 1980)).

[2]   Ninth Circuit Model Criminal Jury Instructions, Instruction 8.19 (2003); *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-65 (1978) ("Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment.").

[3]   *United States v. David*, 940 F.2d 722, 739 (1st Cir. 1991).

THIS PAGE INTENTIONALLY LEFT BLANK

**Form Instruction 19-10 Withdrawal From the Conspiracy**[1]

**The defendant has raised the defense that he was not a member of the conspiracy because he withdrew from the conspiracy.**

**Once a person joins a conspiracy, that person remains a member until he withdraws from it. Any withdrawal must be complete and it must be done in good faith.**

**A person can withdraw from a conspiracy by taking some affirmative steps to terminate or abandon his participation in, and efforts to promote, the conspiracy. In other words, the defendant must have demonstrated some type of positive action which disavowed or defeated the purpose of the conspiracy.**

**(*If applicable:* By way of example, a defendant may withdraw from a conspiracy by: giving a timely warning to the proper law enforcement officials; or wholly depriving his prior efforts of effectiveness in the commission of the crime; or making appropriate efforts to prevent the commission of a crime; or by doing acts which are inconsistent with the object(s) of the conspiracy and making reasonable efforts to communicate those acts to his co-conspirators.)**

**(*In the First, Fourth, Seventh and Ninth Circuits add:* In this regard, you are reminded that the burden remains on the government to prove, beyond a reasonable doubt, that the defendant was a member of the conspiracy and did not withdraw from it.)**

**(*In the Second, Third, Fifth, Sixth, Eighth, Tenth and Eleventh Circuits add:* The defendant has the burden of proving that he withdrew from the conspiracy by a preponderance of the evidence. To prove something by a preponderance of the evidence means to prove that it is more likely true than not true. It is determined by considering all of the evidence and deciding which evidence is more convincing. In determining whether the defendant has proven that he withdrew from the conspiracy, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence regardless of who may have produced them. If the evidence appears to be equally balanced, or if you cannot say upon which side it weighs heavier, you must resolve this question against the defendant. However, it is important to remember that the fact that the defendant has raised this defense does not relieve the government of its burden of proving that there was an agreement, that defendant knowingly and voluntarily joined it, and that an overt act was committed. Those are things that the government still must prove beyond a reasonable doubt in order for you to convict defendant of the crime of conspiracy.)**

**Authority**

**United States Supreme Court:** *United States v. United States Gypsum Co., 438 U.S. 422, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978)* ; *Hyde v. United States, 225 U.S.*

*347, 32 S. Ct. 93, 56 L. Ed. 1114 (1912)* .

**First Circuit:** *United States v. Munoz, 36 F.3d 1229 (1st Cir. 1994),* cert. denied, 513 U.S. 1179 (1995) ; *United States v. Pica, 870 F.2d 753 (1st Cir. 1989)* .

**Second Circuit:** United States v. Flaharty, 295 F.3d 182 (2d Cir. 2002), *cert. denied, -- U.S. --, 123 S. Ct. 1502 (2003); United States v. Jones, 27 F.3d 50 (2d Cir.), cert. denied,* 513 U.S. 955 (1994) .

**Seventh Circuit:** *United States v. Sax, 39 F.3d 1380 (7th Cir. 1994)* .

**Ninth Circuit:** *United States v. Smith, 623 F.2d 627 (9th Cir. 1980)* .

**Eleventh Circuit:** *United States v. Young, 39 F.3d 1561 (11th Cir. 1994)* ; *United States v. Diaz, 662 F.2d 713 (11th Cir. 1981)* .

A member of a conspiracy continues to be responsible for acts committed by his co-conspirators until there has been an affirmative showing of withdrawal.[2] This principle applies with equal force to a member of the conspiracy who has been arrested.[3]

The courts have long recognized the fact that there are turnovers of personnel in conspiracies.[4] Nevertheless, participation in the conspiracy is presumed to continue until the last overt act of the co-conspirators, *unless* the defendant can produce affirmative evidence of withdrawal.[5] It has been held proper to instruct the jury that participation continues until the defendant "withdraws," as that term has been construed.[6]

In that connection, the Ninth Circuit instruction, provides, in pertinent portion, as follows:
Once a person becomes a member of a conspiracy, that person remains a member until the person withdraws from it.[7]

Withdrawal is, of course, a defense to the element of membership.[8] Therefore the burden of coming forward with evidence of withdrawal rests squarely upon the shoulders of the defendant.[9] However, as discussed below, there is a split in authority as to whether withdrawal is an affirmative defense placing the burden of persuasion on the defendant or whether the burden of persuasion is on the government to disprove the defense beyond a reasonable doubt.[10]

There is abundant authority for the proposition that where the evidence adduced at trial discloses no factual basis for a withdrawal defense, it need not be submitted to the jury.[11] For example, the Eleventh Circuit has held that no withdrawal instruction was required when the defendant did not communicate his disavowal of the conspiracy to his co-conspirators to disclose the illegal scheme to the authorities.[12]

The Eleventh Circuit has also stated that, even where the evidence warrants a withdrawal instruction, the failure to give one is not error where the instruction proposed by the defendant inaccurately stated the law regarding the withdrawal defense.[13]

By the same token, failure to object to a "withdrawal charge" may result in the appellate court affirming because there was no "plain error."[14]

*United States v. Chester*[15] is merely a variation of the famous "time-bomb" analogy formulated by Judge Friendly in *United States v. Borelli:*[16]
When conspirators have set a dynamite machine with a timed fuse in position to blow up a building and go away and leave it to do its destructive work in due course of time, they are continuing in their purpose and are in the actual execution of that purpose every moment of time until the machine explodes.[17]

In this regard, evidence of incarceration has been deemed sufficient to require submission of the issue of withdrawal to the jury.[18] However, while arrest or incarceration *may* constitute withdrawal, it does not do so as a matter of law.[19]

As Judge Friendly observed in *United States v. Borelli,*[20] a defendant, to avail himself of the withdrawal defense, must "mak[e] a clean breast to the authorities ... or communicat[e] the abandonment in a manner reasonably calculated to reach co-conspirators."[21] In addition to being complete, the withdrawal must be done in good faith.[22]

There is ample authority to support the view that "withdrawal from a conspiracy requires a disavowal of the conspiracy or an affirmative action that would have defeated the purpose of the conspiracy," or "definite, decisive and positive steps to show that the conspirator's disassociation from the conspiracy is sufficient."[23] It is also well established that a mere cessation of conspiratorial activity on the part of the defendant is not sufficient to constitute withdrawal.[24]

Instruction 19-10 offers the court four examples of when the withdrawal defense may be found to exist. These examples may be submitted together or in the alternative if only some are applicable.[25] The four examples are all adapted from the Seventh Circuit instruction,[26] although their roots may be traced back to *United States v. United States Gypsum Co.*[27]

In the *Gypsum* case, the Supreme Court concluded that in order for a defendant to have "withdrawn" from the conspiracy, he must have taken "affirmative" actions "inconsistent with the object of the conspiracy" *and* "communicated" these measures in a "manner reasonably calculated" to reach his co-conspirators.[28] In this regard, the Ninth Circuit instruction deals with this aspect of the instruction in a relatively straightforward manner:
One may withdraw by doing acts which are inconsistent with the purpose of the conspiracy and by making reasonable efforts to tell the co-conspirators about those acts.[29]

The conjunctive test articulated in *Gypsum* is embodied in Instruction 19-10 as the fourth example.

In *Gypsum,* the Supreme Court also held that it is reversible error for a trial court to couch a withdrawal instruction in language which unnecessarily limited the jury's consideration to only two possible methods of withdrawal (to wit, communications to other conspirators; disclosures to authorities). The lower court had charged as follows:

In order to find that a defendant abandoned or withdrew from a conspiracy prior to December 27, 1968, you must find, from the evidence, that he or it took some affirmative action to disavow or defeat its purpose. Mere inaction would not be enough to demonstrate abandonment. To withdraw, a defendant either must have affirmatively notified each other member of the conspiracy he will no longer participate in the undertaking so they understand they can no longer expect his participation or acquiescence, or he must make disclosures of the illegal scheme to law enforcement officials.

Thus, once a defendant is shown to have joined a conspiracy, in order for you to find he abandoned the conspiracy, the evidence must show that the defendant took some definite, decisive step, indicating a complete disassociation from the unlawful enterprise.[11]

The defendant in *Gypsum* had requested a more expansive instruction permitting the jury to consider other specific actions which were allegedly inconsistent with the objectives of the conspiracy. For example, in *Gypsum*--where the defendants were charged with violations of section 1 of the Sherman Act --the defendant wished to utilize proof of resumption of competitive behavior as an affirmative action to demonstrate withdrawal from the price-fixing scheme.[12] The Supreme Court agreed: The charge, fairly read, limited the jury's consideration to only two circumscribed and arguably impractical methods of demonstrating withdrawal from the conspiracy. Nothing that we have been able to find in the case law suggests, much less commands, that such confining blinders be placed on the jury's freedom to consider evidence regarding the continuing participation of alleged conspirators in the charged conspiracy.[13]

In obvious deference to *Gypsum*, the Ninth Circuit instruction includes the following language:
You may consider any definite, positive step that shows that the conspirator is no longer a member of the conspiracy to be evidence of withdrawal.[14]

While the foregoing instruction is no doubt flexible, it is also somewhat vague.

The Sixth Circuit pattern instructions include examples of actions which would qualify as withdrawal, as well as broad language which encompasses "any other affirmative acts that are inconsistent with the purpose of the conspiracy, and that are communicated in a way that is reasonably likely to reach the other members."[15] However, the recommended instruction is preferred because it offers a more comprehensive expression of the types of effective withdrawals while maintaining the required flexible language of *Gypsum.* Instruction 19-10 thus adopts an approach parallel to that noted in the Comment to the Seventh Circuit instruction,[16] which suggests that the instruction be tailored by the trial court to the specific actions of the defendant that are inconsistent with the object of the conspiracy. The recommended instruction presents, as one illustration of such conduct, the giving of seasonable notification by the defendant to the authorities. Instruction 19-10 does not place the burden upon the defendant to prove withdrawal, but only to come forward with sufficient evidence of withdrawal.

As noted previously, the courts agree that the initial burden of coming forward with

evidence of withdrawal rests on the defendant.[37] However, there is a substantial split in authority concerning the burden of persuasion. Seven circuits--the Second,[38] Third,[39] Fifth,[40] Sixth,[41] Eighth,[42] Tenth,[43] and Eleventh[44]--continue to adhere to the traditional view that withdrawal is an affirmative defense for which the defendant bears the burden of proof by a preponderance of the evidence. In contrast, the First,[45] Fourth,[46] Seventh[47] and Ninth Circuits[48] and the Federal Judicial Center[49] take the position that the burden of persuasion remains with the government to disprove withdrawal beyond a reasonable doubt. The District of Columbia Circuit has not expressed an opinion on this issue. Accordingly, Instruction 19-10 provides alternative language for use in these respective jurisdictions. The language instructing the jury on the defendant's burden is derived from the Eighth Circuit Pattern Instruction.[50] The other pattern instructions following the majority view[51] are problematic because they fail to explain the different burden of proof on the defendant, leaving the possibility that the jury might require the defendant to prove withdrawal beyond a reasonable doubt. The final two sentences, reminding the jury that the government must still prove all of the elements of conspiracy beyond a reasonable doubt, are derived from the Sixth Circuit instruction.[52]

It should be noted, however, that withdrawal may not be deemed a defense to a charge of conspiracy (rather than merely a basis for limiting introduction of evidence) if the withdrawal occurred within the statute of limitations.[53] Likewise, withdrawal must occur before the object of the conspiracy has been achieved, or the venture has failed, for it to be effective.[54]

On the other hand, withdrawal may be a defense to a substantive offense committed pursuant to the conspiracy's common plan and prosecuted under the *Pinkerton* theory, if the offense was committed after the defendant's withdrawal from the conspiracy.[55]

Sixth Circuit Pattern Criminal Jury Instruction 3.11B.

THIS PAGE INTENTIONALLY LEFT BLANK

Westlaw.

870 F.2d 753                                                                  Page 1
870 F.2d 753, 27 Fed. R. Evid. Serv. 1101
(Cite as: 870 F.2d 753)

▷

United States Court of Appeals, First Circuit.
UNITED STATES of America, Appellee,
v.
Joseph PIVA, Defendant, Appellant.
No. 87-1871.

Heard June 6, 1988.
Decided March 21, 1989.

Defendant was convicted in the United States District
Court for the District of Massachusetts, Rya W.
Zobel, J., of conspiracy to distribute more than 1,000
pounds of marijuana, and he appealed. The Court of
Appeals, Acosta, District Judge, sitting by
designation, held that: (1) any error in instruction on
defense of withdrawal from conspiracy was harmless;
(2) prior consistent statements of informant could be
admitted; and (3) error in permitting state trooper to
vouch for informant's credibility was harmless.

Affirmed.

West Headnotes

**[1] Criminal Law 110 ☜1172.1(4)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1172 Instructions
                110k1172.1 In General
                    110k1172.1(2) Particular Instructions
                        110k1172.1(4) k. Defenses. Most
Cited Cases
Any error in district court's charge concerning
withdrawal from conspiracy was harmless in view of
conclusion on appeal that defendant had not
withdrawn from conspiracy.

**[2] Conspiracy 91 ☜40.4**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k39 Persons Liable
                91k40.4 k. Withdrawal. Most Cited
Cases
There are two ways of withdrawing from conspiracy,
both requiring affirmative action by conspirator: to

confess to authorities or to communicate to
coconspirators that conspirator has abandoned
conspiracy and its goals.

**[3] Conspiracy 91 ☜40.4**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k39 Persons Liable
                91k40.4 k. Withdrawal. Most Cited
Cases
Defendant's return of purchase money for fishing
boat, to be used to retrieve drugs from ship, was not
type of affirmative action indicating change of heart
needed to sustain defense of withdrawal from
conspiracy to distribute marijuana, where return of
money occurred only after defendant procured dock
to off-load marijuana onto land and showed dock
facility to another conspirator, defendant returned
money because he was unable to make purchase, and
defendant deducted his prearranged share of money
before returning it.

**[4] Witnesses 410 ☜414(2)**

410 Witnesses
    410IV Credibility and Impeachment
        410IV(F) Corroboration
            410k414 Competency of Corroborative
Evidence
                410k414(2) k. Former Statements
Corresponding with Testimony. Most Cited Cases
Fact that defendant did not cross-examine witness
about prior consistent statements did not render
improper admission of those statements to rebut
charge of recent fabrication or improper influence or
motive absent any indication that defendant was
precluded from recalling witness or from exploring
content of statements and circumstances under which
they were made; omission, if any, could only be
attributed to defendant. Fed.Rules Evid.Rule
801(d)(1)(B), 28 U.S.C.A.

**[5] Witnesses 410 ☜414(2)**

410 Witnesses
    410IV Credibility and Impeachment
        410IV(F) Corroboration
            410k414 Competency of Corroborative
Evidence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

870 F.2d 753
870 F.2d 753, 27 Fed. R. Evid. Serv. 1101
**(Cite as: 870 F.2d 753)**

410k414(2)   k.   Former   Statements Corresponding with Testimony. Most Cited Cases
District court's finding that prior consistent statements of witness were being used to rebut express or implied charge against witness of recent fabrication or improper influence or motive was not clearly erroneous, where part of defense to drug distribution conspiracy charge was that the Department of Labor and others were trying to implicate defendant in crime because of union activities, defense counsel suggested in argument and in cross-examination that witness had not mentioned defendant's name until after he was visited by Department of Labor investigator, and defense counsel characterized witness as "one-man crime wave" who was trying to stay out of jail by turning government informant.     Fed.Rules  Evid.Rule 801(d)(1)(B), 28 U.S.C.A.

**[6] Criminal Law 110 ☜1043(3)**

110 Criminal Law
  110XXIV Review
    110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
      110XXIV(E)1 In General
        110k1043 Scope and Effect of Objection
          110k1043(3)   k.   Adding   to   or Changing Grounds of Objection. Most Cited Cases
Defendant did not preserve for appeal claim that prior consistent statement of witness was inadmissible because it was made after witness had acquired motive to fabricate, where defendant contended before district court only that evidence was hearsay and that it was being improperly used to rehabilitate testimony of witness; claim could not be raised for first   time   on   appeal.     Fed.Rules   Evid.Rule 801(d)(1)(B), 28 U.S.C.A.

**[7] Witnesses 410 ☜414(2)**

410 Witnesses
  410IV Credibility and Impeachment
    410IV(F) Corroboration
      410k414 Competency of Corroborative Evidence
        410k414(2)   k.   Former   Statements Corresponding with Testimony. Most Cited Cases
State trooper's testimony regarding prior consistent statements of Government informant did not have to be excluded on ground that its probative value was substantially   outweighed   by   danger   of   unfair prejudice, though jury would be less apt to question trooper's credibility, where testimony of trooper was

admitted after testimony of informant and defense fully explored before jury possible motives of witness to fabricate testimony and his status as paid informant.   Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**[8] Witnesses 410 ☜318**

410 Witnesses
  410IV Credibility and Impeachment
    410IV(A) In General
      410k318 k. Corroboration of Unimpeached and Uncontradicted Witness. Most Cited Cases
State trooper testifying as government witness should not have been permitted to vouch for credibility of informant;   fact that impermissible vouching was elicited from government witness, rather than usual case of overzealous prosecutor whose argument goes beyond   pale   of   propriety,   could   not   make Government's actions any less reprehensible.

**[9] Criminal Law 110 ☜1170.5(6)**

110 Criminal Law
  110XXIV Review
    110XXIV(Q) Harmless and Reversible Error
      110k1170.5 Witnesses
        110k1170.5(6) k. Error Cured by Rulings and Instructions of Court. Most Cited Cases
        (Formerly 110k11701/2(6))
Error in permitting trooper to vouch for informant's credibility, in prosecution for conspiracy to distribute marijuana, was harmless, in view of district court's timely instruction to jury that trooper's opinion of informant's credibility was of no concern to them and that they had to make their own evaluation of informant's testimony.

*754 Elizabeth A. Lunt with whom Norman S. Zalkind, by appointment of the Court, and Zalkind, Sheketoff, Homan, Rodriguez & Lunt, Boston, Mass., were on brief, for defendant, appellant.
R.J. Cinquegrana, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN and SELYA, Circuit Judges, and ACOSTA,[FN*] District Judge.

    FN* Of the District of Puerto Rico, sitting by designation.

ACOSTA, District Judge.
Joseph Piva ("appellant") appeals from his conviction

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

870 F.2d 753
870 F.2d 753, 27 Fed. R. Evid. Serv. 1101
**(Cite as: 870 F.2d 753)**

Page 3

of conspiracy to distribute more than one thousand pounds of marijuana. He argues that the trial court erred (1) in instructing the jury on the defense of withdrawal from the conspiracy and (2) in allowing a state police officer to repeat statements made to him by one of appellant's co-conspirators, Anthony Pacheco ("Pacheco"), who subsequently became a government informant. Because we find no reversible error, we affirm.

### THE FACTS

Between late December 1982 and early January 1983, a group led by Peter, Paul and Maurice "Buzzy" Dionne was making arrangements to import a large quantity of marijuana into this country. The basic plan was to use a fishing boat to rendezvous on the high seas with a drug-laden mother ship, the JUAN XXIII.

The scheme did not succeed because the vessel was spotted by a United States Coast Guard patrol aircraft whereupon it dumped its cargo overboard. The following day, January 6, 1983, personnel from the Coast Guard Cutter CHILULA boarded and seized the JUAN XXIII and arrested its crew.

Some of the intended drug importers sailed to meet the JUAN XXIII in the fishing boat WANDERER. This vessel, which was also spotted by a Coast Guard patrol aircraft on January 5, 1983, returned to port after dumping overboard equipment and supplies it was taking to the JUAN XXIII.

The WANDERER conspirators were not identified until 1985 when the disgruntled co-conspirator, Pacheco, became a government informant in order to avenge himself for a slight unrelated to this case. Pacheco, a motorcycle gang member with a long criminal history who had acted as security chief for the failed drug operation, contacted Massachusetts State Police Trooper Joseph Costa ("Trooper Costa") in March of 1985 and "told all."

Pacheco's testimony revealed that appellant's part in this conspiracy consisted of (1) procuring a dock to off-load the marijuana*755 onto land; (2) showing the dock facility to the person (Pacheco) who was to be in charge of "security" during the off-loading operation; and (3) attempting to procure and to captain the intended fishing vessel, which he did not do because the price of the vessel he tried to purchase was too high.

Appellant was tried separately from the other conspirators and eventually all were convicted.

The record reflects the following immunized testimony by Pacheco during appellant's separate trial:

1. In December 1982, Pacheco attended a meeting at Buzzy Dionne's house where Buzzy told Peter Dionne, in appellant's presence, that he had paid appellant ten thousand dollars for a dock.

2. During another meeting four or five days later, Peter Dionne gave Pacheco a bag containing one hundred thousand dollars in cash, and asked Pacheco to hold it for him.

3. One or two days later, Pacheco returned the money to Peter Dionne who gave it to appellant.

4. During another meeting at Buzzy Dionne's house, Peter Dionne told Pacheco that appellant would receive between twenty and fifty thousand dollars and would keep the off-load boat in return for his services.

5. Appellant also took Pacheco to a dock which he said was a good off-load area. He showed Pacheco the guard shack from which he could act as a look out, and added that once a truck was backed up to the dock, no one could see what was happening inside.

6. During another meeting, Peter Dionne asked Pacheco to "beat up" appellant because he had only returned $75,000 of the $100,000 he had been given after being unable to buy a boat.[FN1] (Pacheco did not carry out the assault and he did not see appellant again in the context of the conspiracy.) During this meeting, Peter Dionne stated that he and a cousin would obtain another off-load boat. Appellant was not involved in this part of the operation.

> FN1. Pacheco testified that appellant had not been able to obtain the boat because the owner wanted $150,000 for it.

7. Pacheco became a government informant to get back at some of his co-conspirators, but did not include appellant among the targets of his revenge.

On cross-examination, Pacheco's testimony was impeached (1) when he was confronted with a statement to the federal Grand Jury that he had given the $100,000 to appellant in a meeting at a cafe; (2)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

870 F.2d 753
870 F.2d 753, 27 Fed. R. Evid. Serv. 1101
**(Cite as: 870 F.2d 753)**

when it was pointed out that Pacheco had not mentioned appellant in a 34-page statement given to law enforcement officers in June 1986; (3) with questions implying that agents of the Department of Labor might have suggested the names of certain docks to him; and (4) when it was brought out that he had been paid close to $20,000 by law enforcement agencies to ensure his cooperation and that he would receive additional funds in order to relocate his residence.

Trooper Costa was allowed to testify as to the following statements made to him by Pacheco.

1. During a conversation on April 16, 1985:

a) Pacheco told Trooper Costa that he wanted to become an informant because he wanted revenge on four of the co-conspirators. Trooper Costa knew the persons mentioned. Appellant was not among them.

2. During a February 1986 conversation Pacheco told Trooper Costa:

a) That he (Pacheco) attended meetings at Peter Dionne's house, with appellant present, during which the operation was discussed.

b) That Peter Dionne asked him (Pacheco) to hold $100,000.00 in cash which was to be used to buy a boat.

**\*756** c) That he returned the money to Peter Dionne, who gave it to appellant who was to use it to buy the boat.

d) That he (Pacheco) was present when appellant returned some of the money after being unable to purchase a boat.

e) That appellant had twice taken him (Pacheco) to a fishing dock where appellant was working as a watchman. There, they observed the comings and goings of police and other passersby. Appellant also told Pacheco that should anyone be working late at the dock where he (appellant) was working, he would get the keys to two other docks which could be used to off-load the boat.

f) That the venture fell apart because the Coast Guard seized the mother ship.

Testimony of eight other witnesses and other evidence that appellant had worked at the target dock on or about the time of the conspiracy was also heard.

There were also copies of checks totalling $75,000 issued to a lawyer acting on behalf of appellant on January 5, 1983 and cashed by appellant on January 6, 1983.

The jury returned a verdict of guilty.

## THE CONSPIRACY INSTRUCTIONS

Appellant attacks the trial judge's instructions on conspiracy, which we must scrutinize in light of the entire charge to the jury. *See, e.g., United States v. Glantz,* 847 F.2d 1, 8-12 (1st Cir.1988).

The trial judge instructed the jury as follows on the subject of conspiracy:
\* \* \* a person cannot withdraw from a conspiracy after the person knows that it has either failed or succeeded. Any withdrawal has to take place before the person either knows of failure or knows of success of the venture.

Trial Transcript, volume 4 at page 89 (hereinafter "T. [volume # ]:[page ##### ]"). Later, in response to a written question from the jury about withdrawal, the judge recalled the jurors to the courtroom and gave them the following instructions:I told you the defendant has asserted, has claimed not only, he not only denies that he ever became a member of the conspiracy, but he also says that he withdrew from any relationship that the Government says was a conspiracy. And he says that he withdrew before he knew that the conspiracy had succeeded or failed, before he knew whether the object was attained or whether they were simply never going to get there.
With respect to the legal principles of withdrawal, once a person becomes a member of a conspiracy, that person is a member of that conspiracy unless he withdraws, and by withdrawing I mean, unless he takes some affirmative step to get out of it and he let[s] the other members of the conspiracy know that he's doing that, and he let[s] them know in such a way that they know he's doing that.
Do you understand so far?
Simply disagreeing with the conspiracy or becoming disinterested in the conspiracy or in any member of the conspiracy is not enough. In order to withdraw, a member of the conspiracy has to take active steps to remove himself from the conspiracy and to let the others know that he's doing that, the other [ ] members of the conspiracy.
Now, I told you that the Government has to prove beyond a reasonable doubt that there was a conspiracy and that the defendant willfully became a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

870 F.2d 753                                                                                           Page 5
870 F.2d 753, 27 Fed. R. Evid. Serv. 1101
**(Cite as: 870 F.2d 753)**

member of the conspiracy.

On the question of withdrawal, you only get to that if the defendant can point to some evidence, he doesn't have to offer any witnesses, he can rely on the evidence that the Government offered, but he has to point to some evidence that is before you that shows that he did take some active step to get out of the conspiracy.

Once he has done that, the Government has the burden again of proving beyond a reasonable doubt that he did not withdraw.

Do you understand that, do you understand the sequence? Yes?

So, I suggested to you that you should first consider whether there was a conspiracy; second, if you find there was *757 one, whether the defendant willfully became a member.    And if you found that he willfully became a member, then look at the evidence and see whether the defendant has, in your minds, whether you agree with the defendant that there was some evidence that showed that he withdrew, and then the Government has to prove to you beyond a reasonable doubt that he did not withdraw.   Okay?

It's a complicated sequence, do you understand it?

Do you wish me to go through it again?   Do you want me to explain it again?   All right.   Let me-yes?

JUROR NO. 6:  Is there a time period by which he has to withdraw?

THE COURT:  Yes.   Thank you for reminding me.

*If there is to be withdrawal, it has to be before it is known whether the venture succeeded or failed, indeed, before the venture fails or succeeds.   Once the object of the conspiracy has been achieved, or once the venture has just gone down the tube, you can no longer withdraw.*

T. 4:101-103 (emphasis added).

The first part of this charge presents a *subjective* time limitation for withdrawal, whereas the last paragraph (which we have underlined) presents an *objective* time limit.   An *objective* test is the more appropriate one since it would fit the rationale for the asserted defense of withdrawal, which is to create an incentive for persons either to report and prevent the commission of a crime or to refrain from *actually* participating in it.   Public policy and common sense require this to occur prior to the consummation of the crime or its failure.

[1] At the end of his last instruction to the jury, in response to a question, the judge emphasized a conspirator's knowledge of the viability of the conspiracy vis-á-vis the defense of withdrawal. However, the question of whether or not appellant

actually knew of the failure of the drug exchange in the high seas is wholly irrelevant because the record shows, beyond a reasonable doubt, that appellant failed to prove that he withdrew from this conspiracy *at any time.   See Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986)* ("Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.")    Therefore, even assuming *arguendo* that the trial judge erred in giving the challenged instruction, such error was harmless because appellant had not withdrawn from the conspiracy.    *See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).*

[2] There are two ways of withdrawing from a conspiracy, both requiring *affirmative* action by the conspirator: (1) to confess to the authorities or (2) to communicate to the co-conspirators that the conspirator has abandoned the conspiracy and its goals.

The law with respect to withdrawal has been frequently stated.   '[M]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal.'    In order to withdraw, a conspirator must act affirmatively either to defeat or [to] disavow the purposes of the conspiracy.    Typically, there must be evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals.

*United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir.1987) (per curiam ).*

[3] Before deciding the question of withdrawal, we must establish the scope of the conspiracy *as to this particular conspirator.*

The gist of a conspiracy offense is the agreement. Consequently, it [is] 'essential to determine what kind of agreement or understanding existed as to *each* defendant.'    The agreement would not necessarily be the same with respect to each defendant in a multifaceted drug conspiracy;   the agreement among the core members might embrace more extensive operations than the agreement between core participants and lower echelon personnel or helpmates whose involvement *758 was more peripheral.    To warrant conviction, 'the Government must present evidence justifying the jury in finding beyond a reasonable doubt that the particular agreement into which a defendant entered continued into the period not barred by limitation ... and the scope of his agreement must be determined

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

individually from what was proved as to him.' * * *

_Juodakis, 834 F.2d at 1104_ (citing _United States v. Borelli, 336 F.2d 376, 384 (2d Cir.1964), cert. denied sub nom., Cinquero v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965))_ (emphasis in the original).

Appellant's role in this conspiracy consisted of (1) procuring a dock to off-load the marijuana onto land; (2) showing the dock facility to Pacheco; and (3) procuring and operating the intended fishing vessel.

Defendant's "withdrawal" occurred, if at all, when he returned the purchase money for the boat to the Dionnes. But the return of the money came only after appellant had completed his first two duties within the conspiracy for which he was paid, i.e., getting the dock and showing it to Pacheco. Furthermore, the return of the money was not motivated by a desire to withdraw from the conspiracy. He had no change of heart. The money was returned simply because he was unable to make the purchase due to the higher sale price. Moreover, he did not even return all the money. Appellant had deducted his pre-arranged share, i.e., $25,000, before returning it to the Dionnes. This is far from the type of affirmative action needed to indicate a change of heart to sustain the defense of withdrawal. Therefore, appellant did not effectively withdraw from this conspiracy.

## THE PRIOR CONSISTENT STATEMENTS

Overruling the defense's hearsay objection, the trial judge allowed Trooper Costa to repeat statements made to him by Pacheco when the latter became an informant, finding that the evidence was admissible as "prior consistent statements" under _Fed.R.Evid. 801(d)(1)(B)_, which, in relevant part, reads as follows:

A statement is not hearsay if-
**(1) Prior statement by witness.**
The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, * * *.

[4] Appellant argues that the evidence fails the first

requirement of this Rule and was thus inadmissible because the declarant (Pacheco) was not cross-examined about these statements. While it is true that the declarant must be _available_ for cross-examination regarding this type of statement, _United States v. Vest, 842 F.2d 1319, 1329 (1st Cir.1988)_, there is no indication in the record that the defense was precluded from recalling Pacheco for re-cross or from exploring the content of the statements and the circumstances under which they were made. Therefore, we find that the declarant was available for cross-examination and thus the alleged omission, if any, can only be attributed to appellant.

[5] As to the second requirement of _Rule 801(d)(1)(B)_ the trial court's determination that the statements are being used to "rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive" will only be overturned if it is clearly erroneous, because it is a factual finding. _See Fed.R.Evid. 104(a)_ and _Vest, 842 F.2d at 1329._ The trial court's finding on this point was not clearly erroneous.

Part of appellant's defense was that the United States Department of Labor, among others, was somehow trying to implicate him in the crime because of his union activities.[FN2] At trial, defense counsel suggested *759 in argument and in cross-examination that Pacheco had not mentioned appellant's name until after he was visited by a Department of Labor investigator. Additionally, defense counsel characterized Pacheco as a "one-man crime wave" who was trying to stay out of jail by turning government informant. This approach by defense counsel forced the government to attempt to rehabilitate its witness's credibility. The judge properly concluded that such rehabilitation of Pacheco's credibility was appropriate. _See United States v. Patterson, 644 F.2d 890, 900-901 (1st Cir.1981)_ ("Defendants undertook to impeach [the declarant] by suggesting that he was testifying out of self-interest and that his own conduct showed lack of regard for the law. The jury could have thought it was being suggested that [the declarant's] testimony was recently fabricated or improperly influenced.")

FN2. Appellant is a Port Agent for the Seafarer's Union, which was negotiating a new contract around the time of appellant's arrest.

[6] Finally, appellant submits that there is yet a _third_ requirement for admissibility pursuant to _Rule_

870 F.2d 753                                                                    Page 7
870 F.2d 753, 27 Fed. R. Evid. Serv. 1101
**(Cite as: 870 F.2d 753)**

801(d)(1)(B). Specifically, he argues that the admission of the February 1986 [FN3] statements into evidence was erroneous because Pacheco made these assertions *after* he had reasons to fabricate testimony, to wit, avoiding jail, making money, and getting revenge on his cohorts.[FN4] Our review of the record convinces us that this fine-tuned evidentiary argument was not preserved for appeal because appellant failed to make "a timely objection * * * stating the specific ground of [that] objection." Fed.R.Evid. 103(a)(1).

FN3. Until this point, we have not differentiated between the 1985 and the 1986 statements; however, the discussion that follows is directed exclusively to the 1986 declarations.

FN4. There is a conflict among the Courts of Appeals regarding the effect of a motive to fabricate on admissibility of statements pursuant to Rule 801(d)(1)(B). *See generally* Judith A. Archer, Note, *Prior Consistent Statements: Temporal Admissibility Standard Under Federal Rule of Evidence 801(d)(1)(B),* 55 Fordh.L.Rev. 759 (1987). The majority view is that statements made after the declarant had acquired a motive to lie are not substantively admissible as prior consistent statements. *See, e.g., United States v. Bowman,* 798 F.2d 333 (8th Cir.1986), *cert. denied, 479 U.S. 1043, 107 S.Ct. 906, 93 L.Ed.2d 856 (1987); United States v. Henderson, 717 F.2d 135 (4th Cir.1983), cert. denied, 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984); United States v. Rohrer, 708 F.2d 429 (9th Cir.1983); United States v. Quinto, 582 F.2d 224 (2d Cir.1978).* The minority view is that the motive to lie affects the weight to be given to the evidence by the trier of fact, not its admissibility. *See, e.g., United States v. Parry, 649 F.2d 292 (5th Cir. Unit B 1981); United States v. Hamilton, 689 F.2d 1262, 1273-74 (6th Cir.1982), cert. denied, 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983)* (though not expressly rejecting the temporal admissibility requirement, it expresses "uneasiness" with the *Quinto* opinion).
Because we find that appellant failed to preserve the issue for appeal, we express no opinion on this matter.

Appellant objected to Trooper Costa's testimony on the ground that it was hearsay.[FN5] After a brief recess, the judge admitted the evidence specifically overruling the hearsay objection by citing Rule 801(d)(1)(B). At this point defense counsel had a duty to "call [his specific objection] to the attention of the trial judge, so as to alert [her] to the proper course of action * * *." Notes of the Advisory Committee on Proposed Rule 103(a). But counsel failed to tell the trial judge why an apparently on-point exception to the hearsay rule arguably did not apply. Although he contended that the evidence was hearsay and that it was being improperly used to rehabilitate Pacheco's testimony,[FN6] counsel did not argue at trial that the evidence was inadmissible because it was made after the declarant had acquired a motive to fabricate. This lack of specificity, after the judge believed she had resolved the objection, precludes appellant from raising this issue for the first time before us. *See United States v. Figueroa, 818 F.2d 1020, 1025 (1st Cir.1987)* ("[A]n issue not raised *760 below cannot be raised for the first time on appeal.") (citing *United States v. Argentine, 814 F.2d 783, 791 (1st Cir.1987)* (quoting*Nogueira v. United States, 683 F.2d 576, 580 (1st Cir.1982)*)).

FN5. He also objected to it on the ground that its probative value was substantially outweighed by the possibility of unfair prejudice to him, an argument that he also makes on appeal and which we discuss below. Additionally, he objected to the evidence on relevance grounds, but that argument is not now before us.

FN6. Appellant's counsel stated: "[The testimony] is hearsay, it is clearly hearsay. It's a way of somehow making this maggot[,] Mr. [ ] Pacheco, this legal crime wave into somehow [sic, someone?] believable, because it comes through the lips of Mr. Costa." T. 3:55.

[7] Appellant further argues that the February 1986 statement [FN7] should have been excluded pursuant to Fed.R.Evid. 403.[FN8] Appellant cites *United States v. Mazza, 792 F.2d 1210 (1st Cir.), cert. denied, 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987),* in support of this contention. While we agree with appellant that "the government effectively managed to have the jury hear a second-hand account of [the informant's] entire story through [a] witness[ ] whose credibility the jury was less apt to question," 792 F.2d at 1215, we do not find it to be reversible error.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

870 F.2d 753                                                                                          Page 8
870 F.2d 753, 27 Fed. R. Evid. Serv. 1101
**(Cite as: 870 F.2d 753)**

Here, the testimony of Trooper Costa was admitted after Pacheco's testimony, whereas in *Mazza* the agents' testimony came at the opening of the trial. Thus we are not faced here with the *Mazza* danger that the agent would testify as to items that would never come into evidence, nor would Pacheco's testimony be bolstered by the law enforcement officer *before* the jury could evaluate it independently. Furthermore, the government was justified in seeking admission of this testimony because of the defense's attacks on the informant's credibility. The defense fully explored before the jury Pacheco's possible motives to fabricate testimony as well as his status as a paid informant, and the jury reached its own conclusions. Accordingly, we find that the trial court carefully considered the possibility of unfair prejudice in the admission of this testimony and acted within its considerable discretion in rejecting the Rule 403 challenge.

FN7. Though conceding that no objection was made, appellant challenges the admission of Pacheco's own testimony regarding this statement. Appellant's Brief at 30 n. 6. We find that admission of this testimony did not constitute plain error. *See* Fed.R.Evid. 103.

FN8. In relevant part, Fed.R.Evid. 403 reads as follows:
Although relevant, evidence may be excluded if its probative value is *substantially* outweighed by the danger of *unfair* prejudice, * * *.
(Emphasis added.)

TROOPER COSTA'S STATEMENTS

[8][9] In addition to repeating the statements discussed in the preceding section of this opinion, Trooper Costa testified that during the April 1985 conversation he asked for more specific information in order to evaluate Pacheco's credibility. The Trooper then stated, over objection, "I told him I had to find the trust in him[ ] because we had never dealt together before, and the only way we could do that was that he had to tell me the truth whenever I asked him." T. 4:63.

This testimony merits separate discussion because it deals with a professional government witness vouching for the credibility of an informant. "We have stated, more often than we care to remember,

that it is wrong for a prosecuting attorney to inject his personal beliefs into [a trial]." *United States v. Mejia-Lozano,* 829 F.2d 268, 273 (1st Cir.1987). We particularly disapprove of attempts by the government to characterize their witnesses as trustworthy. *See, e.g., United States v. Martin,* 815 F.2d 818, 821 (1st Cir.1987). The fact that the impermissible vouching is elicited from a government witness makes little difference. *See United States v. Price,* 722 F.2d 88 (5th Cir.1983) (I.R.S. agent's testimony, elicited by the prosecution, that he believed statements by other government witnesses constituted reversible error). Although we conclude that admission of this testimony did not constitute reversible error, the United States Attorney's office would be well advised not to use its professional witnesses to vouch for the credibility of their informants.

In this case, any unfair prejudice was eliminated-or reduced to harmless error-by the trial judge's timely instruction to the jury that Trooper Costa's opinion of Pacheco's credibility was of no concern to them and that they had to make their own evaluation of the informant's testimony. [FN9] *Cf.* \*761 *Price,* 722 F.2d at 88 (failure to give specific curative instruction on vouching was error). Nevertheless, we warn that the better practice is to exclude this type of vouching from the evidence.

FN9. The Court stated:
Members of the jury, you have to make a determination whether you believe Mr. Pacheco. Whether Mr. Costa believes him or not is not relevant to that, you have to make that determination, based on your own observations of Mr. Pacheco and only that, and your judgment as to whether he was telling the truth.
T. 3:63.

CONCLUSION

Having found no reversible error in appellant's trial, the judgment of conviction is AFFIRMED.

C.A.1 (Mass.),1989.
U.S. v. Piva
870 F.2d 753, 27 Fed. R. Evid. Serv. 1101

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

THIS PAGE INTENTIONALLY LEFT BLANK

**Westlaw.**

658 F.2d 1225                                                                    Page 1
658 F.2d 1225,  Fed. Sec. L. Rep. P 98,284
**(Cite as: 658 F.2d 1225)**

▷

United States Court of Appeals,Seventh Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ralph READ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ronald SPIEGEL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Howard SWIGER, Defendant-Appellant.
**Nos. 80-1017 to 80-1019.**

Argued Oct. 20, 1980.
Decided Sept. 9, 1981.[FN*]

FN* Pursuant to Circuit Rule 16, this
opinion was circulated to all the active
judges of the court. No judge requested a
hearing en banc.

Defendants were convicted before the United States
District Court for the Northern District of Illinois,
John Powers Crowley, J., of conspiracy, mail fraud
and securities fraud, and they appealed. The Court of
Appeals, Bauer, Circuit Judge, held that: (1) evidence
supported verdict that only the single conspiracy
charged existed; (2) burden of going forward with
evidence of withdrawal from a conspiracy and with
evidence of withdrawal prior to statute of limitations
is on a defendant but once he advances sufficient
evidence burden of persuasion is on the prosecution
to disprove the withdrawal defense beyond a
reasonable doubt; (3) failure to instruct that
Government had burden to disprove withdrawal
beyond a reasonable doubt was reversible error; (4)
withdrawal defense was not applicable to substantive
offenses of securities and mail fraud; and (5) it was
not error to deny mistrial motion based on juror's
letter stating that many jurors disregarded
instructions and had predetermined guilt.

Affirmed in part and reversed and remanded in part.

West Headnotes

**[1] Conspiracy 91 ☞24(2)**

91 Conspiracy

91II Criminal Responsibility
91II(A) Offenses
91k23 Nature and Elements of Criminal
Conspiracy in General
91k24 Combination or Agreement
91k24(2) k. Single or Multiple
Conspiracies. Most Cited Cases
(Formerly 91k23)
If there is one overall agreement among the various
parties to perform different functions to carry out
objectives of a conspiracy the agreement constitutes a
"single conspiracy," but if the evidence shows more
than one agreement directed at different goals a
single conspiracy has not been shown. 18 U.S.C.A. §
371.

**[2] Conspiracy 91 ☞43(12)**

91 Conspiracy
91II Criminal Responsibility
91II(B) Prosecution
91k43 Indictment or Information
91k43(12) k. Issues, Proof, and
Variance. Most Cited Cases
If a single conspiracy is alleged but several
conspiracies are proven, a variance between the
indictment and proof is shown and if the variance
prejudices substantial rights such as by surprise,
transference of guilt by substantial evidence of
crimes unrelated to the defendant or double jeopardy,
defendant must be acquitted but if the evidence
shows that one of the conspiracies proven is a
conspiracy alleged in the indictment, the conviction
can stand. 18 U.S.C.A. § 371.

**[3] Conspiracy 91 ☞40**

91 Conspiracy
91II Criminal Responsibility
91II(A) Offenses
91k39 Persons Liable
91k40 k. In General. Most Cited Cases
To convict corporate officers of conspiring to
artificially inflate year-end inventory so as to increase
purported profits each officer was not required to
have agreed to or to have participated in every step of
the conspiracy, which included manufacturing and
inventory destruction schemes, "cover-up" plans,
packaging of bogus inventory, and although one
officer entered conspiracy late he was responsible for
prior acts of all the conspirators once he knowingly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

658 F.2d 1225
658 F.2d 1225,  Fed. Sec. L. Rep. P 98,284
(Cite as: 658 F.2d 1225)

contributed his efforts in furtherance thereof, and even if two others did not participate in later events of the conspiracy they were still responsible for their actions in furtherance of the initial goal. Securities Exchange Act of 1934, § § 10(b), 13, 32, 15 U.S.C.A. § § 78j(b), 78m, 78ff; 18 U.S.C.A. § § 371, 1014, 1341.

**[4] Conspiracy 91 ⬉40.3**

91 Conspiracy
   91II Criminal Responsibility
      91II(A) Offenses
         91k39 Persons Liable
           91k40.3 k. Persons Joining After Formation of Conspiracy. Most Cited Cases
Each conspirator is liable for overt acts of every other conspirator done in furtherance of the conspiracy, whether the acts occurred before or after he joined the conspiracy. 18 U.S.C.A. § 371.

**[5] Conspiracy 91 ⬉47(3.1)**

91 Conspiracy
   91II Criminal Responsibility
      91II(B) Prosecution
         91k44 Evidence
           91k47 Weight and Sufficiency
              91k47(3) Particular Conspiracies
                 91k47(3.1) k. In General. Most Cited Cases
      (Formerly 91k47(3))
Evidence in prosecution of then corporate officers for conspiring to artificially inflate year-end inventory and increase corporation's reported profits established that the single conspiracy charged in the indictment existed and that there existed a common scheme, plan or purpose among defendants to manipulate corporate finances. Securities Exchange Act of 1934, § § 10(b), 13, 32, 15 U.S.C.A. § § 78j(b), 78m, 78ff; 18 U.S.C.A. § § 371, 1014, 1341.

**[6] Constitutional Law 92 ⬉266(7)**

92 Constitutional Law
   92XII Due Process of Law
      92k256 Criminal Prosecutions
         92k266 Rules of Evidence in General
           92k266(7) k. Presumptions, Burden of Proof, and Weight of Evidence. Most Cited Cases
Due process requires that the prosecution prove beyond a reasonable doubt every fact necessary to constitute the crime charged. U.S.C.A.Const. Amends. 5, 14.

**[7] Criminal Law 110 ⬉330**

110 Criminal Law
   110XVII Evidence
      110XVII(C) Burden of Proof
         110k326 Burden of Proof
           110k330 k. Matters of Defense and Rebuttal in General. Most Cited Cases
Where a particular defense negates an essential element of the offense as defined, the government may not place the burden of persuasion of such element on the defendant. U.S.C.A.Const. Amends. 5, 14.

**[8] Criminal Law 110 ⬉150**

110 Criminal Law
   110X Limitation of Prosecutions
      110k148 Commencement of Period of Limitation
         110k150 k. Continuing Offenses. Most Cited Cases
Five-year statute of limitations for conspiracy prosecutions runs from the date of the last overt act. 18 U.S.C.A. § § 371, 3282.

**[9] Criminal Law 110 ⬉150**

110 Criminal Law
   110X Limitation of Prosecutions
      110k148 Commencement of Period of Limitation
         110k150 k. Continuing Offenses. Most Cited Cases
In practice, to convict a defendant the prosecution must prove that the conspiracy existed and that each defendant was a member of the conspiracy at some point in the five years preceding the date of the indictment. 18 U.S.C.A. § § 371, 3282.

**[10] Conspiracy 91 ⬉40.4**

91 Conspiracy
   91II Criminal Responsibility
      91II(A) Offenses
         91k39 Persons Liable
           91k40.4 k. Withdrawal. Most Cited Cases
"Withdrawal" marks a conspirator's disapproval or abandonment of the conspiratorial agreement and after defendant withdraws he is no longer a member of the conspiracy and later acts of the conspirators do not bind him but defendant is still liable for his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

previous agreement and for prior acts of his coconspirators in pursuit of the conspiracy. 18 U.S.C.A. § 371.

**[11] Criminal Law 110 ⬡150**

110 Criminal Law
    110X Limitation of Prosecutions
        110k148 Commencement of Period of Limitation
            110k150 k. Continuing Offenses. Most Cited Cases
A defendant's withdrawal from a conspiracy starts the running of the statute of limitations as to him and if indictment is filed more than five years after withdrawal the statute of limitations bars prosecution for actual participation and defendant cannot be held liable for acts or declarations committed in the five years preceding the indictment by other conspirators. 18 U.S.C.A. § § 371, 3282.

**[12] Conspiracy 91 ⬡40.4**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k39 Persons Liable
                91k40.4 k. Withdrawal. Most Cited Cases
Dropping out of a conspiracy during the five-year limitations period does not absolve a defendant as he is still liable for the agreement and acts committed before he withdraws and since the continuing conspiracy is alleged as one crime defendant is also liable in effect for the crimes of coconspirators even after his withdrawal. 18 U.S.C.A. § § 371, 3282.

**[13] Criminal Law 110 ⬡622.6(4)**

110 Criminal Law
    110XX Trial
        110XX(A) Preliminary Proceedings
            110k622 Joint or Separate Trials of Codefendants
                110k622.6 In General
                    110k622.6(4) k. Conspiracy. Most Cited Cases
            (Formerly 110k622.2(4), 110k622(1))
Although a defendant may withdraw from a conspiracy during the five-year limitations period, severance is not ordinarily justified because the circumstances usually provide sufficient basis for joinder. 18 U.S.C.A. § § 371, 3282.

**[14] Conspiracy 91 ⬡44.2**

91 Conspiracy
    91II Criminal Responsibility
        91II(B) Prosecution
            91k44 Evidence
                91k44.2 k. Presumptions and Burden of Proof. Most Cited Cases
            (Formerly 91k441/2, 91k4.128)
As withdrawal negates the essential element of membership in the conspiracy it must be disproved beyond a reasonable doubt by the government; burden of going forward with evidence of withdrawal and with evidence that he withdrew prior to statute of limitations is on defendant but once he advances sufficient evidence the burden of persuasion is on the prosecutor to disprove the defense of withdrawal beyond a reasonable doubt and jury should be specifically instructed in such regard, overruling cases imposing burden of proving withdrawal on defendant. 18 U.S.C.A. § § 371, 3282.

**[15] Criminal Law 110 ⬡1173.2(5)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1173 Failure or Refusal to Give Instructions
                110k1173.2 Instructions on Particular Points
                    110k1173.2(5) k. Evidence in General. Most Cited Cases
Failure to specifically instruct on government's burden of disproving defenses is not reversible error per se, notwithstanding a general instruction on government's burden of proof;  rather, all the instructions and the facts and circumstances are to be reviewed.

**[16] Criminal Law 110 ⬡1173.2(5)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1173 Failure or Refusal to Give Instructions
                110k1173.2 Instructions on Particular Points
                    110k1173.2(5) k. Evidence in General. Most Cited Cases
Failure to specifically instruct that Government had burden of disproving beyond a reasonable doubt the defendant's withdrawal from the conspiracy more

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

658 F.2d 1225
658 F.2d 1225,  Fed. Sec. L. Rep. P 98,284
**(Cite as: 658 F.2d 1225)**

than five years before indictment was filed required reversal of conspiracy conviction where statute ran on April 24, 1974, five years before return date of indictment, indictment charged no overt act of defendant after that date, evidence conflicted on withdrawal and jury might have believed that defendant's evidence of withdrawal had to convince them, not merely create a reasonable doubt and other instructions may have led jury to infer that defendant bore burden of proof.  18 U.S.C.A. § § 371, 3282.

**[17] Criminal Law 110 👌858(4)**

110 Criminal Law
    110XX Trial
        110XX(J) Issues Relating to Jury Trial
            110k858 Taking Papers or Articles to Jury Room
                110k858(4) k. Copies of Instructions. Most Cited Cases
Sending copy of instructions to the jury room is recommended.

**[18] Courts 106 👌100(1)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(H) Effect of Reversal or Overruling
            106k100 In General
                106k100(1) k. In General;  Retroactive or Prospective Operation. Most Cited Cases
Holding that withdrawal from conspiracy must be disproved by the government beyond a reasonable doubt and that once jury is instructed on withdrawal defense it should also be instructed that government bears the burden of disproving withdrawal beyond a reasonable doubt is prospective only.  18 U.S.C.A. § § 371, 3282.

**[19] Conspiracy 91 👌43(12)**

91 Conspiracy
    91II Criminal Responsibility
        91II(B) Prosecution
            91k43 Indictment or Information
                91k43(12) k. Issues, Proof, and Variance. Most Cited Cases
Acts not alleged in an indictment may be proved to show a defendant's participation in the conspiracy within the statute of limitations.  18 U.S.C.A. § § 371, 3282.

**[20] Conspiracy 91 👌44.2**

91 Conspiracy
    91II Criminal Responsibility
        91II(B) Prosecution
            91k44 Evidence
                91k44.2 k. Presumptions and Burden of Proof. Most Cited Cases
                    (Formerly 91k441/2)
A defendant claiming withdrawal from a conspiracy must put forth some evidence of good faith, although burden of persuasion remains on the government.  18 U.S.C.A. § § 371, 3282.

**[21] Criminal Law 110 👌422(1)**

110 Criminal Law
    110XVII Evidence
        110XVII(O) Acts and Declarations of Conspirators and Codefendants
            110k422 Grounds of Admissibility in General
                110k422(1) k. In General. Most Cited Cases
Evidentiary rule that statements and acts of coconspirators are relevant and admissible against other conspirators applies in mail and securities fraud cases in which an overall scheme to defraud is charged.  Securities Exchange Act of 1934, § § 10(b), 13, 32, 15 U.S.C.A. § § 78j(b), 78m, 78ff;  18 U.S.C.A. § § 371, 1014, 1341.

**[22] Postal Service 306 👌35(20)**

306 Postal Service
    306III Offenses Against Postal Laws
        306k35 Use of Mails to Defraud
            306k35(20) k. Persons Liable. Most Cited Cases
A party's "withdrawal" from a mail fraud or securities fraud scheme is no defense because membership in the scheme is not an element of the offense;  hence, although defendant may have withdrawn from the conspiracy he was liable for mail fraud as a principal or as aider and abettor and not as conspirator and as an aider and abettor he need not have agreed to the scheme but need only have associated himself with criminal venture and participated in it and, hence, he was not entitled to instruction on withdrawal, i. e., that withdrawal was effective if he withdrew before date of mailings or securities transactions.  Securities Exchange Act of 1934, § §  10(b), 13, 32, 15 U.S.C.A. § § 78j(b), 78m, 78ff;  18 U.S.C.A. § § 371, 1014, 1341.

**[23] Criminal Law 110 👌149**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

658 F.2d 1225
658 F.2d 1225,  Fed. Sec. L. Rep. P 98,284
**(Cite as: 658 F.2d 1225)**

Page 5

110 Criminal Law
   110X Limitation of Prosecutions
      110k148 Commencement of Period of Limitation
         110k149 k. Commission of Offense in General. Most Cited Cases
As regards mail and securities fraud prosecutions, the statute of limitations began to run from the date of the mailings or stock sales and prosecution was timely where mailings and sales occurred within five years of the indictment, notwithstanding that defendant's actions as regards the subject scheme occurred before the statutory period. Securities Exchange Act of 1934, § § 10(b), 13, 32, 15 U.S.C.A. § § 78j(b), 78m, 78ff; 18 U.S.C.A. § § 371, 1014, 1341, 3282.

**[24] Indictment and Information 210 ☜⟶7**

210 Indictment and Information
   210II Finding and Filing of Indictment or Presentment
      210k7 k. Term of Court or Time of Finding. Most Cited Cases
Although defendant, in conspiracy, mail fraud and securities fraud prosecution, complained of preindictment delay, he failed to prove actual prejudice and trial court recognized that the fraud was vigorously pursued once uncovered and that delay was not caused merely to gain tactical advantage over the accused. Securities Exchange Act of 1934, § § 10(b), 13, 32, 15 U.S.C.A. § § 78j(b), 78m, 78ff; 18 U.S.C.A. § § 371, 1014, 1341.

**[25] Securities Regulation 349B ☜⟶60.15**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.11 Transactions Subject to Regulation
               349Bk60.15 k. Connection with Purchase or Sale. Most Cited Cases
      (Formerly 349Bk64)
Since every purchase or sale of a stock listed on an exchange is effected through the exchange, defendants' fraud, which was in connection with the exchange and included submission of false statements in mailings and disclosure statements, was also in connection with the purchase or sale of stock. Securities Exchange Act of 1934, § § 10(b), 13, 32, 15 U.S.C.A. § § 78j(b), 78m, 78ff.

**[26] Securities Regulation 349B ☜⟶193**

349B Securities Regulation
   349BI Federal Regulation
      349BI(G) Offenses and Prosecutions
         349Bk193 k. Fraudulent Transactions. Most Cited Cases
Intent that defendants' actions would influence a securities transaction was not an element of offense of securities fraud. Securities Exchange Act of 1934, § § 10(b), 13, 32, 15 U.S.C.A. § § 78j(b), 78m, 78ff.

**[27] Witnesses 410 ☜⟶270(2)**

410 Witnesses
   410III Examination
      410III(B) Cross-Examination
         410k270 Cross-Examination as to Irrelevant, Collateral, or Immaterial Matters
            410k270(2) k. Particular Matters as Subjects of Cross-Examination. Most Cited Cases
Trial court did not improperly restrict defendants' cross-examination of witness by excluding evidence allegedly showing that witness had committed improprieties at parent corporation before he claimed to know about the problems at subsidiary, which problems were basis of conspiracy and mail fraud and securities fraud prosecutions, where trial court ruled that proffered evidence was irrelevant to the issues in the case of witness' credibility and witness was carefully cross-examined and jury given ample opportunity to test his memory, truthfulness, perception, and bias.

**[28] Witnesses 410 ☜⟶330(1)**

410 Witnesses
   410IV Credibility and Impeachment
      410IV(A) In General
         410k330 Cross-Examination to Discredit Witness or Disparage Testimony in General
            410k330(1) k. In General. Most Cited Cases
Cross-examination of defendant was proper where aimed at testing his credibility and such examination was within the scope of the direct examination.

**[29] Criminal Law 110 ☜⟶855(1)**

110 Criminal Law
   110XX Trial
      110XX(J) Issues Relating to Jury Trial
         110k855 Misconduct of or Affecting Jurors

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

658 F.2d 1225
658 F.2d 1225, Fed. Sec. L. Rep. P 98,284
**(Cite as: 658 F.2d 1225)**

110k855(1) k. Misconduct of Jurors in General. Most Cited Cases
It was not error to deny mistrial although before jury began its third day of deliberations a juror delivered a letter stating that most of the jurors had made up their minds by second week of seven-week trial, that many completely disregarded the judge's instructions that the jurors not look in newspaper financial sections and made a point of examining subject corporation's stock and that many jurors refused to deliberate or discuss the case claiming that defendants were "guilty" and that several jurors thought the whole trial was hilarious and laughed at counsel, where trial court read additional cautionary instructions and interviewed the writer, who stated that after the additional instruction the "people that were so irate * * * come around."

**\*1228** Lawrence M. Gavin, Edward L. Foote, Lawrence J. Suffredin, Chicago, Ill., for defendant-appellant.
Keith Syfert, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS and BAUER, Circuit Judges, and TEMPLAR, Senior District Judge. [FN\*\*]

> FN\*\* The Honorable George Templar, Senior Judge of the United States District Court for the District of Kansas, is sitting by designation.

BAUER, Circuit Judge.
Defendants-appellants Ralph Read, Ronald E. Spiegel, and Howard Swiger appeal their convictions for conspiracy, mail fraud, and securities fraud. We affirm the judgments of conviction entered for Ralph Read and Howard Swiger in Nos. 80-1017 and 80-1019. We reverse Ronald Spiegel's conviction for conspiracy in No. 80-1018 and remand for a new trial. We affirm Spiegel's conviction on the substantive counts.

I

The indictment charged a scheme to artificially inflate the year-end inventory of Cenco Medical Health Supply Corporation ("CMH") and thus increase its reported profits. The defendants-appellants were officers of CMH and Cenco, CMH's parent corporation. Ralph Read was president of Cenco and a member of its board of directors; Ronald

Spiegel was a vice-president of Cenco, and president of CMH; Howard Swiger was also a vice-president of Cenco and comptroller of CMH. Other defendants Russell Rabjohns, Bernard Magdovitz, **\*1229** and Jack Carlson pled guilty to two counts and testified for the government. Another defendant, Robert Smith, was acquitted.

We need only briefly outline the evidence at trial showing defendants' massive manipulation of CMH's finances from 1970 to 1975. The greatest amount of the fraud was accomplished by overstating CMH's inventory. During annual inventory, each CMH branch recorded the amount of every item in stock on computer cards. When the cards were returned to the central Chicago office for processing, some of the defendants, at Spiegel's direction, increased the numbers on the cards. Thousands of cards were altered in this fashion; defendants made additional changes in the computer listings of the inventory that CMH submitted to its auditors. In 1970, defendants increased the reported inventory of CMH by 3.5 million dollars. In each succeeding year, defendants increased the inventory by several millions more and carried the previous years' inflation forward. The overstatement of inventory decreased CMH's cost of sales, which in turn produced greater reported profits, dollar-for-dollar. This practice continued until 1975. Estimates of the total fraud ranged from 20 to 25 million dollars.

Other methods included inflating profits by accruing sales in one year and deferring expenses for those sales until the next fiscal year. The defendants also increased reported sales by listing the sales from August 1972 on computer printouts for March 1973 sales. They also created fake documents showing hundreds of thousands of dollars of non-existent inventory to be in transit between warehouses so that it could not be physically counted.

In 1974, Curtiss-Wright Corporation, a large conglomerate, purchased five percent of Cenco's shares. Curtiss-Wright's accountants, while examining Cenco's finances for a possible loan, found discrepancies in Cenco's inventory records. Alarmed, the defendants sought to create the appearance of $10 million of non-existent inventory should Curtiss-Wright's auditors physically check the inventory. In order to do so, they ordered the repacking of obsolete inventory in boxes of expensive products. Finally, in 1975, the defendants implemented an inventory destruction program to cover up the fraud. The defendants persuaded Cenco's board of directors to approve the destruction

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

658 F.2d 1225
658 F.2d 1225,  Fed. Sec. L. Rep. P 98,284
(Cite as: 658 F.2d 1225)

of $16 million of obsolete inventory as part of a supposed tax savings program. Almost all of the "destroyed" inventory existed only on paper.

The ultimate result of the fraud was to overstate the profitability of Cenco, thereby defrauding its board, its stockholders, and the SEC. The prosecution also showed that Read's compensation was linked to the company's profits.

The indictment charged the defendants with conspiracy, mail fraud, and securities fraud.[FN1] On September 6, 1979, the case proceeded to trial against Read, Spiegel, Swiger, and Smith. On October 29, 1979, following almost eight weeks of testimony, the jury returned guilty verdicts on all counts as to Read, Spiegel, and Swiger. Smith was acquitted. Read, Spiegel, and Swiger appeal their convictions.

> FN1. Count 1 charged all defendants with conspiracy to commit several federal offenses in violation of 18 U.S.C. s 371; securities fraud, 15 U.S.C. ss 78j(b), 78m, and 78ff, 17 C.F.R. s 240.106-5; mail fraud, 18 U.S.C. s 1341; and bank fraud, 18 U.S.C. s 1014. Counts 2 through 18 charged mail fraud and alleged the mailing of 17 different items between June 1, 1974 and August 23, 1974, in violation of 18 U.S.C. s 1341. Counts 19 through 29 charged securities fraud, and alleged eleven purchases of Cenco stock between May 3, 1974 and December 30, 1974, in violation of 15 U.S.C. s 78j(b). Count 30 charged that defendants filed a false amended form 10k with the SEC in August 1974, in violation of 15 U.S.C. s 78ff.
> Counts 6 and 24 were dismissed at trial on the government's motion.

## II

All appellants charge that the evidence at trial proved multiple conspiracies, not the single conspiracy charged in the indictment. They claim they were prejudiced by this variance between the indictment and proof. *1230 We find that the evidence showed a single conspiracy.

[1][2] The problem of single or multiple conspiracies relates to the scope of the conspiracy in which the defendant is involved. "If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy." United States v. Varelli, 407 F.2d 735, 742 (7th Cir. 1969).

On the other hand, if the evidence shows more than one agreement, directed at different goals, a single conspiracy has not been shown. If a single conspiracy is alleged but several conspiracies are proven, a variance between the indictment and proof is shown. If the variance prejudices the substantial rights of a defendant for example by surprise, transference of guilt by substantial evidence of crimes unrelated to the defendant, or double jeopardy the defendant must be acquitted. Kotteakos v. United States, 328 U.S. 750, 774, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). If the evidence, however, shows that one of the conspiracies proven is the conspiracy alleged in the indictment, the defendant's conviction can stand. United States v. Papia, 560 F.2d 827, 838-39 (7th Cir. 1977). The jury here was cautioned, as we recommended in Papia, id. at 838, that it could not convict a defendant of conspiracy if it found that the proof did not show the single conspiracy charged in the indictment.

Each appellant claims that he was not involved in one or more parts of the conspiracy to manipulate Cenco's finances. The manufacturing and inventory destruction schemes were planned and executed after Spiegel and Swiger left Cenco, and, they claim, after they left the conspiracy. Since they did not agree to or condone the operations, Spiegel asserts these "cover-up" plans were a separate conspiracy among the remaining defendants. Read, in contrast, claims he cannot be held liable for the inventory inflation scheme because he learned of it only in 1974, after it was almost over. The evidence also showed that several defendants received kickbacks from Rose Packaging Company, the firm which packaged the bogus inventory. None of the appellants received kickbacks, and they claim the kickback scheme constituted a separate conspiracy. We disagree.

[3][4] Appellants do not dispute their agreement to the common goal charged in the indictment to "manipulate and falsely report and cause to be manipulated and falsely reported financial information, including profit figures, of Cenco and its subsidiaries." Indictment P 14. Appellants' objections concern only their participation in the various activities of the conspiracy. Each defendant, however, need not agree to or participate in every step of the conspiracy. Each conspirator is liable for overt acts of every other conspirator done in

658 F.2d 1225
658 F.2d 1225,  Fed. Sec. L. Rep. P 98,284
(Cite as: 658 F.2d 1225)

furtherance of the conspiracy, whether the acts occurred before or after he joined the conspiracy. United States v. Hickey, 360 F.2d 127, 140 (7th Cir.), cert. denied, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966). He need not be a member of the conspiracy at its inception or throughout the conspiracy. Id. at 138. Read entered the conspiracy late, but he was responsible for the prior actions of all the conspirators once he knowingly contributed his efforts in furtherance of it. Id. at 140. Even if Spiegel and Swiger did not participate in the later events of the conspiracy, they were still responsible for its actions in furtherance of the initial goal. [FN2]

> FN2. Spiegel claims he withdrew from the conspiracy, a matter to be discussed in Part III infra.

We must view the evidence relating to the kickbacks in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The evidence showed that the packaging scheme cost CMH less than expected. The jury could have easily inferred that the kickbacks were arranged so as to avoid suspicion should money be returned to CMH from Rose Packaging. There was also testimony that the kickbacks were for attorneys*1231 fees should the fraud be discovered. See tr. 790-91. Further, the jury was instructed that it could find that a defendant was a member of the conspiracy only with evidence of his own acts and declarations. None of the appellants took kickbacks. Evidence of this collateral activity was harmless in light of the overwhelming evidence that the appellants joined in a single conspiracy. United States v. Bastone, 526 F.2d 971, 980 (7th Cir. 1975), cert. denied, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976).

[5] The evidence at trial amply supported the jury's verdict that the one conspiracy charged in the indictment existed. The government showed a common scheme, plan, or purpose among the defendants to manipulate Cenco's finances. United States v. Dalzotto, 603 F.2d 642, 644 (7th Cir.), cert. denied, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979). Since we hold that the evidence amply supported the jury's finding of one conspiracy, there was no variance between the indictment and proof. It follows that none of the appellants were entitled to separate trials on the grounds of prejudicial variance. The trial court correctly denied each appellant's motion for severance.

III

Ronald Spiegel's main defense at trial was that he withdrew from the conspiracy more than five years before the indictment was filed. He argued that his prosecution therefore was barred by the statute of limitations. 18 U.S.C. s 3282. Spiegel argues on appeal that the trial court gave erroneous instructions on the issue of withdrawal.

The trial court instructed the jury:

Now, we talked about withdrawal. How does a person withdraw from a conspiracy? A person can withdraw from a conspiracy, and in such a case he is not liable for the acts of his former co-conspirators after his withdrawal. A defendant may withdraw by notifying co-conspirators that he will no longer participate in the undertaking. A defendant may also withdraw from a conspiracy by engaging in acts inconsistent with the objects of the conspiracy. These acts or statements need not be known or communicated to all other co-conspirators as long as they are communicated in a manner reasonably calculated to reach some of them. To withdraw from a conspiracy there is no requirement that a conspirator try to convince the other co-conspirators to abandon their undertaking or that he go to public authorities or others to expose the conspiracy or to prevent the carrying out of an act involved in the conspiracy. But a withdrawal defense requires that a defendant completely abandon the conspiracy and that he do so in good faith. If you find that a defendant completely withdrew from the conspiracy before the 24th of April, 1974, you should acquit him. If you find that he was a member on April 24, 1974, and that an overt act was committed while he was still a member, his later withdrawal, if any, standing alone, is not a defense.

Why do we pick the date "April 24th, 1974"? We do that because the indictment in this case, as you will see, bears a stamp, the Clerk's stamp that it was filed on April 24th, 1979. There is a five year statute of limitations for criminal conspiracy and the charge and the five year statute of limitations runs from the date of the last overt act in the indictment to the date of the filing of the indictment. Accordingly, if you find that an overt act was committed within five years before April 24, 1979 another way of saying that is that if you find that an overt act was committed between April 24th, 1974 and August of 1975, the conspiracy count in its entirety may be considered by you, going all the way back to 1970 or earlier.

Tr. 5621-23.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Spiegel objected to the above instructions. He claimed before the trial court, and here, that the instructions put the burden of proving withdrawal on Spiegel and failed to put the burden of disproving withdrawal beyond a reasonable doubt on the government. He also attacks the propriety of instructing the jury that the withdrawal *1232 must be in good faith. He further asserts that the instruction erroneously allowed the jury to find that he participated in the conspiracy after the limitations date by proof of overt acts not alleged in the indictment.

Spiegel also claims he withdrew before commission of the securities and mail fraud crimes. He complains that the jury was not instructed that his withdrawal was effective if it occurred before the dates of the sales or mailings charged in the indictment.

We agree that the instructions concerning withdrawal were erroneous and require a remand for a new trial on the conspiracy charge. We disagree, however, that withdrawal is a defense to the substantive crimes, and affirm Spiegel's conviction on those counts.

A

[6] Due process requires that the prosecution prove beyond a reasonable doubt every fact necessary to constitute the crime charged. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); Mullaney v. Wilbur, 421 U.S. 684, 685, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); Patterson v. New York, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). The prosecution's burden often includes disproving defenses because they bring into question facts necessary for conviction. This rule has been well-settled with regard to some defenses. See, e. g., Davis v. United States, 160 U.S. 469, 488, 16 S.Ct. 353, 358, 40 L.Ed. 499 (1895) (insanity).[FN3]

> FN3. See also, e. g., United States v. Landry, 257 F.2d 425, 429-30 (7th Cir. 1958) (entrapment); United States v. Wolffs, 594 F. 77, 80 (5th Cir. 1979) (entrapment); United States v. Booz, 451 F.2d 719, 723 (3d Cir. 1971) (alibi); United States v. Corrigan, 548 F.2d 879, 882 (10th Cir. 1977) (self-defense); United States v. Sennett, 505 F.2d 774, 778 (7th Cir. 1974) (insanity).

[7] Patterson requires us to inquire whether the

particular defense negates an essential element of the offense as defined by the legislature. 432 U.S. at 210, 97 S.Ct. at 2327. As held in Holloway v. McElroy, 632 F.2d 605, 625 (5th Cir. 1980), the government "may not place the burden of persuasion on (an) issue upon the defendant if the truth of the 'defense' would necessarily negate an essential element of the crime charged."

18 U.S.C. s 371 provides:
If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The statute, as long construed, requires the prosecution to prove (1) that the alleged conspiracy existed; (2) that an overt act was committed in furtherance of the conspiracy; and (3) that the defendant knowingly and intentionally became a member of the conspiracy.

[8][9] Prosecution for conspiracy is also subject to a five-year statute of limitations, 18 U.S.C. s 3282, which runs from the date of the last overt act. Fiswick v. United States, 329 U.S. 211, 216, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946). In practice, to convict a defendant the prosecution must prove that the conspiracy existed and that each defendant was a member of the conspiracy at some point in the five years preceding the date of the indictment. Grunewald v. United States, 353 U.S. 391, 396, 77 S.Ct. 963, 969, 1 L.Ed.2d 931 (1957); United States v. Borelli, 336 F.2d 376, 389 (2d Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

[10][11][12][13] Withdrawal marks a conspirator's disavowal or abandonment of the conspiratorial agreement. Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912). By definition, after a defendant withdraws, he is no longer a member of the conspiracy and the later acts of the conspirators do not bind him. The defendant is still liable, however, for his previous agreement and for the previous acts of his co-conspirators in pursuit of the conspiracy. *1233United States v. Hickey, 360 F.2d at 140. Withdrawal is not, therefore, a complete defense to the crime of conspiracy. Withdrawal becomes a complete defense only when coupled with the defense of the statute of limitations. A defendant's withdrawal from the conspiracy starts the running of

the statute of limitations as to him. If the indictment is filed more than five years after a defendant withdraws, the statute of limitations bars prosecution for his actual participation in the conspiracy. He cannot be held liable for acts or declarations committed in the five years preceding the indictment by other conspirators because his withdrawal ended his membership in the conspiracy. United States v. Borelli, 336 F.2d at 388. It is thus only the interaction of the two defenses of withdrawal and the statute of limitations which shields the defendant from liability.[FN4]

> FN4. Dropping out during the limitations period does not absolve a defendant. He is still liable for the agreement and acts committed before he withdraws. Since a continuing conspiracy is alleged as one crime, he is also liable in effect for the crimes of his co-conspirators even after his withdrawal. Severance is not ordinarily justified because the circumstances usually provide sufficient basis for joinder under the rules of criminal procedure.

Withdrawal, then, directly negates the element of membership in the conspiracy during the period of the statute of limitations. Under Patterson, Mullaney, and Winship, the government should disprove the defense of withdrawal beyond a reasonable doubt.

The government, however, insists that Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912), a long-established Supreme Court case, placed the burden of proving withdrawal on the defendant. Indeed, Hyde has often been cited for that proposition in the courts of appeals. Almost every case we researched holds that the burden is on the defendant to "prove" or "establish" withdrawal.[FN5] Within this Circuit, we recently held that it "is well-settled (that) this burden of establishing withdrawal lies on the defendant." United States v. Dorn, 561 F.2d 1252, 1256 (7th Cir. 1977).

> FN5. See, e. g., United States v. Bradsby, 628 F.2d 901, 905 (5th Cir. 1980); United States v. Jimenez, 622 F.2d 753, 757 (5th Cir. 1980); United States v. Krasn, 614 F.2d 1229, 1236 (9th Cir. 1980) (court rejected defendant's claim that he does not bear burden); United States v. Boyd, 610 F.2d 521, 528 (8th Cir. 1978), cert. denied, 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777

(1980); United States v. James, 609 F.2d 36, 41 (2d Cir. 1979), cert. denied, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980); United States v. Gillen, 599 F.2d 541, 548 (3d Cir.), cert. denied, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979); United States v. Parnell, 581 F.2d 1374, 1384 (10th Cir. 1978), cert. denied, 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979); United States v. Pearson, 508 F.2d 595, 597 (5th Cir.), cert. denied, 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66 (1975); United States v. Heckman, 479 F.2d 726, 729 (3d Cir. 1973). Seventh Circuit cases are collected in n.6 infra. One Second Circuit case, United States v. Panebianco, 543 F.2d 447, 453 (2d Cir. 1976), cert. denied, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977), referred in passing to defendant's "burden of production," but without explanation.

We have, however, reexamined Hyde. Our research convinces us that the cases, including our own, have misinterpreted Hyde. According to our interpretation, Hyde placed only the burden of going forward on the defendant. To understand what Hyde did hold, however, it is important to understand the law of conspiracy as it existed pre-Hyde.

Turn-of-the-century law held that the crime of conspiracy was complete with the agreement. United States v. Owen, 32 F. 534 (D.Or.1887). Under old law, the statute of limitations ran from the first overt act. United States v. Britton, 108 U.S. 199, 204, 2 S.Ct. 531, 534, 27 L.Ed. 698 (1883). To prove that a conspiracy was still "live," the government had to prove each defendant's membership in the conspiracy with evidence from within the statute of limitations. Ware v. United States, 154 F. 577, 580 (8th Cir.), cert. denied, 207 U.S. 588, 28 S.Ct. 255, 52 L.Ed. 353 (1907). Put another way, the government had to prove that each defendant had not withdrawn prior to the running of the statute of limitations.

In Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912), the Supreme *1234 Court reacted to the problems of proving membership in a conspiracy that did not end with one agreement, but rather was a continuous series of agreements, such as gambling or liquor and drug smuggling. See United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910). The old rule envisioned a static conspiracy, with the relation of the conspirators fixed at one moment in time. The Hyde Court rejected that image. It held that if a conspiracy may continue, "it

658 F.2d 1225
658 F.2d 1225,  Fed. Sec. L. Rep. P 98,284
(Cite as: 658 F.2d 1225)

would seem necessarily to follow (that) the relation of the conspirators to it must continue, being to (the conspiracy) during its life as it was to it the moment it was brought into life." 225 U.S. at 369, 32 S.Ct. at 803. Since liability for conspiracy is predicated on the responsibility of the participants for each other's acts, "(i)f each conspirator was the agent of the others" at one time, "he remains an agent during all (other) time(s)." Id. Thus, the Court held, the government need only prove a defendant's membership in the conspiracy at one point in time.

The Court next responded to debate that its new theory of group responsibility would make conspirators perpetually liable. The Court stated that its new theory would not "take from a conspirator the power to withdraw from the execution of the offense or to avert a continuing criminality." Id. The Court stated the defense of the statute of limitations was viable in a continuing conspiracy, but that its "application" was "different." Id. Withdrawal from a conspiracy, the Court held, "requires affirmative action, but certainly that is no hardship. Having joined in an unlawful scheme ... to be continuous until full fruition be secured, until he does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law." Id. (emphasis added). The Court justified its new requirement of affirmative proof of withdrawal by saying:

As the offense has not been terminated or accomplished he is still offending. And we think, consciously offending, offending as certainly ... as at the first moment of his confederation, and consciously through every moment of its existence .... As he has started evil forces he must withdraw his support from them or incur the guilt of their continuance.

Id. at 369-70, 32 S.Ct. 803.

Hyde made one definite change in the law the prosecution no longer had to show each defendant's participation in the conspiracy during the statute of limitations. Instead, the prosecution could prove a defendant's membership at any time during the life of the conspiracy. It was then up to the defendant to show that he did "some act to disavow or defeat the purpose" of the conspiracy to mark his withdrawal. If his withdrawal predated the statute of limitations, he could then "claim the delay of the law."

Hyde said nothing explicit about the amount of evidence the defendant must offer to show "some act to disavow or defeat the purpose" of the conspiracy. As one commentator noted, the Hyde language

"might have been interpreted as merely shifting the production burden on the issue of withdrawal to the defendant, and leaving the persuasion burden with the state." Developments in the Law-Criminal Conspiracy, 72 Harv.L.Rev. 920, 958 (1959). Two early cases interpreted Hyde in this manner. Mansfield v. United States, 76 F.2d 224, 229 (8th Cir.), cert. denied, 296 U.S. 601, 56 S.Ct. 117, 80 L.Ed. 425 (1935), flatly held that the burden of persuasion was on the government. The court, citing Hyde, held that the jury need only

find some evidence that would create a doubt in their minds as to whether or not the appellants remained in the scheme or conspiracy to defraud before they would be justified in acquitting them of the conspiracy on the basis of (withdrawal). It does not relieve the government of the burden of establishing their guilt beyond a reasonable doubt.

Id. at 230. Another case, Buhler v. United States, 33 F.2d 382, 385 (9th Cir. 1929), held that implicit in the guilty verdict was a finding "beyond reasonable doubt that appellant continued to participate in the alleged**1235 conspiracy" within the statutory period. Accord, United States v. Ames, 39 F.Supp. 885, 886 (S.D.N.Y.1941) ("the conscious participation of the defendant ... within three years before the filing of the indictment (is) indispensable to the maintenance of the prosecution").

Other cases, however, reached strikingly different conclusions. Coates v. United States, 59 F.2d 173, 174 (9th Cir. 1932), drew from Hyde's requirement of an affirmative showing a presumption that a "conspiracy once established is presumed to continue until the contrary is established." (Emphasis added). Accord, Marino v. United States, 91 F.2d 691, 695 (9th Cir. 1937), cert. denied, 302 U.S. 764, 58 S.Ct. 410, 82 L.Ed. 593 (1938). That Hyde set up a presumption that membership in the conspiracy continued with the conspiracy was probably a reasonable interpretation of the decision. As a slightly later case held, "abandonment will not be presumed" by lack of evidence of a defendant's participation within the statute of limitations period. Local 167, Int'l Bro. of Teamsters v. United States, 291 U.S. 293, 298, 54 S.Ct. 396, 398, 78 L.Ed. 804 (1934). The "some act to disavow" standard suggests that Hyde set up a rebuttable presumption. Mansfield and Buhler correctly interpreted the presumption to require the defendant to produce some evidence of withdrawal; the prosecution was then required to prove the contrary beyond a reasonable doubt. Cf. United States v. Davis, 160 U.S. at 487-88, 16 S.Ct. at 358 (requiring this order of proof in insanity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

658 F.2d 1225
658 F.2d 1225,  Fed. Sec. L. Rep. P 98,284
(Cite as: 658 F.2d 1225)

defense cases). Coates and Marino, however, loosely used the term "established" to describe the defendant's burden, although in both cases the defendant produced no evidence of withdrawal at all. Slightly later decisions built on this shakey foundation. For example, United States v. Rollnick, 91 F.2d 911, 918 (2d Cir. 1937), cited Coates for the "presumption" point and then repeated the Hyde affirmative act requirement. Again, the defendant had put on no evidence of withdrawal. Then, six years later, United States v. Cohen, 145 F.2d 82, 90 (2d Cir. 1944), cert. denied, 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945), cited Rollnick and the same language in Hyde but held that the defendant has "the burden of satisfying (the jury) that he had withdrawn."

At the same time, courts grappled with the issue of what acts constituted withdrawal. Mansfield and Buhler both recognized that evidence showing the defendant's severing of relations with the companies involved in the conspiracies created a jury issue of withdrawal. United States v. Dubrin, 93 F.2d 499, 504 (2d Cir. 1937), cert. denied, 303 U.S. 646, 58 S.Ct. 644, 82 L.Ed. 1107 (1938), ruled on similar evidence that the defendant had not shown any evidence of withdrawal. Although the defendant left the brokerage firm involved in the conspiracy more than three years prior to indictment (the then applicable statute of limitations), his departure was not sufficient to raise the withdrawal issue because it was not an affirmative act. Eldredge v. United States, 62 F.2d 449, 451 (10th Cir. 1932), went even further. It held that the defendant must show not only affirmative acts of disassociation with the conspiracy but also that these acts effectively nullified all the consequences of his previous participation. This was a requirement definitely not set forth in Hyde. Eldredge's requirement of an effective withdrawal, however, was repeated by later cases in dicta, lending support to the idea that the defendant must create more than a doubt about his withdrawal from the conspiracy. See Note, 29 N.Y.U.L.Rev. 1470, 1473 (1954) (criticizing Eldredge as shifting the burden of proof to the defendant).

A subtle, but important, change was occurring. Within decades, the Hyde rule that a defendant show some "affirmative action" to trigger the withdrawal defense was transformed into a rule that the defendant must meet "rigorous requirements" to show his withdrawal. United States v. Borelli, 336 F.2d at 388. The Mansfield case was ignored; Buhler was distinguished on its facts. Present law now states the burden of establishing withdrawal lies on the

defendant. See cases cited at n.5.

**\*1236** The withdrawal rule is based on a misinterpretation of Hyde's requirement that the defendant do "some act to disavow or defeat the purpose" of the conspiracy to withdraw. We have traced back the citation of authority in our own cases; they lead back to only the same language in Hyde.[FN6]

FN6. United States v. D'Andrea, 585 F.2d 1351, 1355 n.3 (7th Cir. 1978), cert. denied, 440 U.S. 983, 99 S.Ct. 1795, 60 L.Ed.2d 244 (1979), and United States v. Dorn, 561 F.2d 1252, 1256 (7th Cir. 1977), rely on United States v. Borelli, 336 F.2d 376, 388 (2d Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). Borelli cited United States v. Cohen, 145 F.2d 82, 90 (2d Cir. 1944), cert. denied, 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945). Cohen relied in part on United States v. Perlstein, 126 F.2d 789, 798 (3d Cir.), cert. denied, 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752 (1942), which states only the presumption that the conspiracy continued. Perlstein cites Marino v. United States, 91 F.2d 691, 695 (9th Cir. 1937), cert. denied, 302 U.S. 764, 58 S.Ct. 410, 82 L.Ed. 593 (1938), and Coates v. United States, 59 F.2d 173, 174 (9th Cir. 1932), which, as discussed earlier, rely on Hyde. United States v. Bastone, 526 F.2d 971, 988 (7th Cir. 1975), cert. denied, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976), in affirming an "if you find" instruction on withdrawal, cited United States v. Cirillo, 468 F.2d 1233, 1239 (2d Cir. 1972), cert. denied, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973); United States v. Chester, 407 F.2d 53, 55 (3d Cir.), cert. denied, 394 U.S. 1020, 89 S.Ct. 1642, 23 L.Ed.2d 45 (1969); and Hyde. Cirillo cites United States v. Cianchetti, 315 F.2d 584, 589 (2d Cir. 1963), and United States v. Stromberg, 268 F.2d 256, 263 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959), which rely on Cohen, Marino, and Hyde. None of these cases discuss the burden of proof. Chester cites Hyde and Deacon v. United States, 124 F.2d 352, 358 (1st Cir. 1941). Deacon endorsed an "if you find" instruction without reference to the burden of proof, citing

658 F.2d 1225                                                                                    Page 13
658 F.2d 1225, Fed. Sec. L. Rep. P 98,284
**(Cite as: 658 F.2d 1225)**

Hyde; Stephens v. United States, 41 F.2d 440, 448 (9th Cir.), cert. denied, 282 U.S. 880, 51 S.Ct. 83, 75 L.Ed. 777 (1930); and Mansfield v. United States, 76 F.2d 224, 229-30 (8th Cir.), cert. denied, 296 U.S. 601, 56 S.Ct. 117, 80 L.Ed. 425 (1935). Stephens cited Hyde in holding that the defendant failed to "disavow or otherwise do what was requisite to set in motion the statute of limitations." 41 F.2d at 449. Mansfield, as we discussed at pages 1234-1235, supra, correctly stated the law. Bastone, then, is the clearest example of the law being turned on its head over forty years.

United States v. Nowak, 448 F.2d 134, 139 (7th Cir. 1971), cert. denied, 404 U.S. 1039, 92 S.Ct. 714, 30 L.Ed.2d 731 (1972), cited Hyde, United States v. Beck, 118 F.2d 178, 184-85 (7th Cir.), cert. denied, 313 U.S. 587, 61 S.Ct. 1121, 85 L.Ed. 1542 (1941), and Blue v. United States, 138 F.2d 351, 360 (6th Cir. 1943), cert. denied, 322 U.S. 736-37, 64 S.Ct. 1046, 88 L.Ed. 1570 (1944). Beck and Blue relied only on Hyde for the withdrawal issue.

[14] As withdrawal negates the essential element of membership, it must be disproved beyond a reasonable doubt by the government. We therefore overrule those cases imposing the burden of proving withdrawal on the defendant.[FN7] We hold today that the burden of going forward with evidence of withdrawal and with evidence that he withdrew prior to the statute of limitations remains on the defendant. However, once he advances sufficient evidence, the burden of persuasion is on the prosecution to disprove the defense of withdrawal beyond a reasonable doubt. As in the cases of other defenses, once the jury has been instructed on the withdrawal defense, the jury should be instructed that the government bears the burden of disproving withdrawal beyond a reasonable doubt. [FN8]

FN7. United States v. Dorn, 561 F.2d 1252, 1256 (7th Cir. 1977), and parts of United States v. D'Andrea, 585 F.2d 1351, 1355 n.3 (7th Cir. 1978), cert. denied, 440 U.S. 983, 99 S.Ct. 1795, 60 L.Ed.2d 244 (1979); United States v. Bastone, 526 F.2d 971, 988 (7th Cir. 1975), cert. denied, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976).

FN8. The type of evidence necessary to create a jury question on withdrawal is not at all affected by our ruling. See United States v. United States Gypsum Co., 438 U.S. 422, 463-65, 98 S.Ct. 2864, 2886-87, 57 L.Ed.2d 854 (1978), and Instruction 5.12 of the Federal Criminal Jury Instructions of the Seventh Circuit. See also United States v. Lowell, 649 F.2d 950 (3d Cir. 1981). To avoid all liability, the defendant must come forward with evidence that he withdrew prior to the statute of limitations. The import of our decision is that the showing is only one of production, not persuasion.

**B**

The government argues that the failure to specifically instruct the jury of its burden to disprove withdrawal beyond a reasonable doubt was harmless error because the government's burden was adequately *1237 explained in other instructions. The trial court in fact justified his refusal of Spiegel's instruction on this basis.[FN9]

FN9. Spiegel tendered an instruction stating: "Once evidence is introduced which tends to show that a defendant withdrew from a conspiracy or scheme, then the government must prove beyond a reasonable doubt that such defendant did not in fact withdraw." The trial court refused the instruction, stating, "I have already told them what the burden of proof is. The government has the burden of proof on every issue of this case." Tr. 5524. See also tr. 5526.

[15][16] In some circuits, failure to specifically instruct on the government's burden of disproving defenses is reversible error per se, notwithstanding a general instruction on the government's burden of proof. See e. g., United States v. Wolffs, 594 F.2d 77, 83 (5th Cir. 1979); Notaro v. United States, 363 F.2d 169, 176 (9th Cir. 1966); United States v. Booz, 451 F.2d 719, 723-24 (3d Cir. 1971). The newly-recommended instructions of the Seventh Circuit suggest that the jury be explicitly instructed of the burden as one of the elements of the offense in the "issues" instruction,[FN10] or in some cases, with the instruction on the defense itself. See, e. g., Instruction 4.04, "Entrapment," Committee on Federal Criminal Jury Instructions of the Seventh Circuit, Federal Criminal Jury Instructions of the Seventh Circuit (approved in principle by the Judicial Council of the Seventh Circuit, 1980) (West). Nevertheless, this Circuit does not impose a per se rule; we review all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

658 F.2d 1225
658 F.2d 1225,  Fed. Sec. L. Rep. P 98,284
**(Cite as: 658 F.2d 1225)**

the instructions and the facts and circumstances of the case. United States v. Johnson, 605 F.2d 1025, 1028 (7th Cir. 1979) (en banc ), cert. denied, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). Our review of the evidence and the instructions convinces us that the failure to instruct here was reversible error.

> FN10. Instruction 6.01 provides:
> To sustain the charge of
> First:
> Second:
> Third:
> Fourth: (Negating any issues raised by an affirmative defense, e. g., insanity, self-defense.)
> If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.
> If, on the other hand, you find from your consideration of all of the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.
> Instruction 6.01, "Issues in the Case and Burden of Proof." Committee on Federal Criminal Jury Instructions of the Seventh Circuit, Federal Criminal Jury Instructions of the Seventh Circuit (approved in principle by the Judicial Council of the Seventh Circuit, 1980) (West).

The statute of limitations ran on April 24, 1974, five years before the return date of the indictment. 18 U.S.C. s 3282. The indictment charges no overt act of Spiegel after that date; the indictment alleges several "parts" of the conspiracy in April 1974, but without specific dates.[FN11]

> FN11. The indictment alleged, in part, in Count I:
> 38. It was a further part of the conspiracy that in 1974 ... Ronald Spiegel ... (was) aware and took part in inflation of CMH inventory for the Fiscal Year ending April 30, 1974.
> 41. It was a further part of the conspiracy that in approximately April of 1974 the defendants (including) Ronald Spiegel held a number of conversations to prevent the exposure of the inventory inflation scheme that had occurred and was occurring at CMH.
> 43. It was a further part of the conspiracy that in approximately May of 1974, the defendant Ronald Spiegel entered into a severance agreement with Cenco and permitted the use at CMH of falsified documents which had previously been prepared in anticipation of inventory inflation for the Fiscal Year ending April 30, 1974. The falsified information was included in Cenco's consolidated financial figures for the Fiscal year ending April 30, 1974.
> 44. It was a further part of the conspiracy that defendant Howard Swiger returned most of the false CMH inventory inflation documents which the defendant Ronald Spiegel had ordered to be destroyed prior to his reaching a severance agreement with Cenco.
> Spiegel is not mentioned in the next thirty-three paragraphs of Count I. All of the defendants are covered by the last two paragraphs of Count I.
> The statute of limitations was not at issue for the mail and securities fraud counts, as the statute runs from the date of the mailing or securities sale. See Part D infra.

**\*1238** The evidence conflicted on Spiegel's withdrawal from the conspiracy, thus making the burdens of proof more dispositive. Russell Rabjohns testified that Spiegel told him to destroy the cards used to inflate inventory and that Spiegel said there would be no inventory inflation in 1974. Tr. 1149, 1161. At trial Rabjohns placed the conversation seven to ten days before May 11, 1974; at an earlier deposition Rabjohns said this conversation took place before April 10, 1974. Tr. 628. Spiegel's counsel impeached Rabjohns at trial by showing him that the conversation in May took place at a restaurant different from the one Rabjohns remembered and that there was an earlier lunch with Spiegel in April. Tr. 1159. Counsel also elicited testimony that the government told Rabjohns that the date of the conversation was very important. Tr. 967. All this certainly created a jury issue on the statute of limitations.

Spiegel claimed that he instituted a computer program which would improve, not worsen, inventory control. Tr. 1116. He also put on evidence that he refused to meet Read's projections for CMH by inflating inventory. Tr. 1116-17. Bernard Magdovitz testified that he told Spiegel in early May

658 F.2d 1225
658 F.2d 1225,  Fed. Sec. L. Rep. P 98,284
**(Cite as: 658 F.2d 1225)**

not to destroy the cards, but Spiegel said it was none of his business. Tr. 3997. He also testified that Spiegel was terminated because he was not going to go along with more inflation. Tr. 4263.

The prosecuting attorneys put on evidence controverting Spiegel's claims. They attempted to show that Spiegel did not withdraw, but that he was fired in May 1974 because of his role in the scheme. Tr. 3733. They showed that Spiegel's severance agreement with Cenco was the largest in its history. Tr. 3881-83. The government claimed that the agreement was reached so that Spiegel would not destroy the phony inventory cards. Tr. 1419. The testimony at trial, however, revealed that Magdovitz was surprised when he found out, after Spiegel's resignation, that the cards had not been destroyed. Tr. 4009, 4273. The jury could have believed no blackmail was involved.

The government further showed that Spiegel met with some of the defendants after he left Cenco. Tr. 1404. At one of the meetings, Spiegel discussed the inventory destruction plan. Tr. 4107-08. Finally, in June 1975, Spiegel appeared before the Cenco board of directors and denied any knowledge of the falsification of the financial figures within Cenco. Tr. 2255.[FN12]

> FN12. Spiegel claims this act was not alleged in the indictment and therefore should not have been introduced to disprove withdrawal, an argument we reject infra.

The conflicting evidence demonstrates that the erroneous instruction may have prejudiced Spiegel. The jury might have believed that Spiegel's evidence of withdrawal had to convince them, not merely create a reasonable doubt. Bihn v. United States, 328 U.S. 633, 638, 66 S.Ct. 1172, 1174, 90 L.Ed. 1484 (1946).

The other jury instructions may have also led the jury to infer that Spiegel bore the burden of proof as to withdrawal. Although the trial court indicated that he did not wish to give instructions on the burden of proof several times, he did repeat the burden of proof as to other defendants' defenses. For example, after summarizing the indictment, the trial court stated:
The defendants have pleaded not guilty to the charges in the indictment, and this plea puts in issue each of the essential elements of the offenses I'll describe to you in the instructions, and imposes upon the government the burden of establishing each of these

elements of proof beyond a reasonable doubt.

Tr. 5612. After briefly summarizing each defendant's theory of defense, the court said that the jury must find "beyond a reasonable doubt" that each element of the offense challenged by the particular defendant existed.[FN13] After describing Spiegel's **1239** defense of withdrawal, he said nothing about the burden of persuasion. Compare tr. 5615 and 5617.

> FN13. For example, the court instructed, after listing Ralph Read's contentions:
> In order to convict him of any charge, you must find beyond a reasonable doubt, contrary to his defense, that he did knowingly join an illegal conspiracy, and at that time did knowingly approve the use of false financial information in the annual reports and SEC filings, and further that Defendant Read willfully participated in the fraud.
> Tr. 5615. The judge gave no such instruction after describing Spiegel's defenses.

[17] Although the trial court referred to the government's burden of proof many times in the charge, it was never mentioned in connection with withdrawal. Moreover, the withdrawal instruction itself said that the jury must find ("If you find") that Spiegel withdrew. It did not state that the jury should acquit if they had a reasonable doubt as to his membership in the conspiracy on April 24, 1974. Tr. 5622. The "if you find" language has been found to be misleading in cases involving other defenses. See, e. g., Notaro v. United States, 363 F.2d at 173. Finally, since the jury received a copy of the instructions (a practice we endorse) they could compare and see that they were not told that the government bore the burden to disprove withdrawal.

[18] In sum, the circumstances here demonstrate that the erroneous instruction on withdrawal was prejudicial to Spiegel. A new trial on the conspiracy count is required. Since this opinion represents a change in the law of the Circuit on the subject of withdrawal instructions, its application is prospective only.

## C

[19] We reject Spiegel's other objections to the withdrawal instructions. Acts not alleged in the indictment may be proved to show his participation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

within the statute of limitations. United States v. Harris, 542 F.2d 1283, 1300 (7th Cir. 1976), cert. denied, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); Worthington v. United States, 1 F.2d 154, 155 (7th Cir.), cert. denied, 266 U.S. 626, 45 S.Ct. 125, 69 L.Ed. 475 (1924). The jury was properly instructed that Spiegel had to withdraw before any act committed within the statute of limitations period. United States v. Nowak, 448 F.2d 134, 140 (7th Cir. 1971), cert. denied, 404 U.S. 1039, 92 S.Ct. 714, 30 L.Ed.2d 731 (1972).

[20] Good faith may also be required to withdraw. The defendant must put forth some evidence of good faith, although the burden of persuasion is always on the government. United States v. Dorn, 561 F.2d at 1256; United States v. Nowak, 448 F.2d at 139.


D

Spiegel also attacks the court's instruction on withdrawal from the securities and mail fraud charges. The judge instructed the jury on the mail fraud counts that "one can withdraw from a scheme to defraud the same way one withdraws from a conspiracy, and you know what has to be shown before you can establish that withdrawal." Tr. 5625. Spiegel complains that the jury should have been instructed that his withdrawal was effective if he withdrew before the date of the mailings or securities transactions. We reject Spiegel's contention for the more fundamental reason that Spiegel was not entitled to an instruction on withdrawal for the substantive offenses.

[21] A scheme to defraud and conspiracy embrace analogous, but not identical, concepts. The primary analogy between the two crimes is evidentiary. The evidentiary rule that statements and acts of co-conspirators are relevant and admissible against other conspirators applies in mail and securities fraud cases in which an overall scheme to defraud is charged. United States v. Serlin, 538 F.2d 737, 743 (7th Cir. 1976).[FN14]

FN14. In Serlin, we relied on an Eighth Circuit case, United States v. Cohen, 516 F.2d 1358 (8th Cir. 1975). Cohen held that withdrawal was an available defense to mail fraud. Id. at 1364. Withdrawal, however, was not an issue in Serlin, and we did not cite Cohen for that proposition there. We further decline to follow Cohen for the

reasons stated in the body of the opinion.

[22] *1240 The elements of the offenses are, however, different. The predicate for liability for conspiracy is an agreement, and a defendant is punished for his membership in that agreement. Mail and securities fraud, on the other hand, punish the act of using the mails or the securities exchanges to further a scheme to defraud. No agreement is necessary. A party's "withdrawal" from a scheme is therefore no defense to the crime because membership in the scheme is not an element of the offense. Spiegel is liable for mail fraud as a principal or as an aider and abettor, not a conspirator. As an aider and abettor, Spiegel need not agree to the scheme. He need only associate himself with the criminal venture and participate in it. United States v. Beck, 615 F.2d 441, 448-49 (7th Cir. 1980).

The evidence here overwhelmingly showed Spiegel's association and participation in the mail and securities frauds. He directed the inventory inflation scheme which largely contributed to the false statements contained in the mailings and disclosure statements. The mailings and sales were an inevitable consequence of his actions. Spiegel "could properly be found to be jointly responsible ... for setting the scheme in motion ... and thus causing the mailings by third parties." United States v. Brighton Building and Maintenance Co., 598 F.2d 1101, 1104 (7th Cir.), cert. denied, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979).

[23] Nor is the statute of limitations implicated here. The statute of limitations begins to run from the date of the mailings or stock sales. Like a person who sets a bomb with a timed fuse, Spiegel is responsible from the moment the bomb explodes, even though all his actions occurred before the statutory period. United States v. Ashdown, 509 F.2d 793, 797-98 (5th Cir.), cert. denied, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975). All the mailings and sales occurred within five years of the indictment, as required by 18 U.S.C. s 3282. Accordingly, the prosecution was timely. Of course, as in any prosecution, proof of conduct prior to the statute of limitations is admissible to show the scheme and intent.

Since we hold that withdrawal is not an available defense to the substantive counts, Spiegel was not entitled to an instruction regarding withdrawal. Although the court erred, Spiegel could not have been prejudiced by the giving of an instruction favorable to him. His conviction on the securities and mail fraud counts was therefore proper.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IV

### A

Appellants' other contentions of trial error require slight attention. No prejudicial variance arose from the government's proof that the inventory inflation resulted in a reduction of Cenco's loss in 1974 rather than a profit, as alleged in one paragraph of the indictment. Testimony at trial demonstrated that Cenco's loss for 1974 would have been far greater but for the inventory inflation. Tr. 4508. The difference between a true "profit" and a reduction of loss, under the circumstances, was immaterial.

### B

[24] Read also complains of pre-indictment delay. He has failed, however, to prove actual prejudice from the delay. The trial court also recognized that the fraud at Cenco was vigorously pursued once uncovered and that the delay was not caused merely "to gain tactical advantage over the accused." United States v. Marion, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971).

### C

[25] We reject Spiegel's challenge to the trial court's instruction on the securities fraud counts. The language employed in the instructions properly informed the jury that the fraud had to be in connection with a securities transaction. The court instructed the jury that the third element of the offense was that "while he was a participant in the scheme he used or caused to be used the facilities of the National Securities *1241 Exchange in connection with the purchase or sale of stock." Tr. 5629-30. The judge also instructed the jury that an act done with the knowledge that the national securities exchange would be used in the ordinary course of business is one which knowingly causes the exchange to be used. Since every purchase or sale of a stock listed on an exchange is effected through the exchange, the defendants' fraud, which was in connection with the exchange, was also in connection with the purchase or sale of stock.

[26] The court also properly refused to instruct the jury that the defendants must have intended that their

actions would influence a securities transaction. No such intent is required. United States v. Charnay, 537 F.2d 341, 352 (9th Cir.), cert. denied, 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976).

### D

[27] Spiegel also complains that the court restricted his cross-examination of Bernard Magdovitz by excluding evidence allegedly showing that Magdovitz had committed improprieties at Cenco before he claimed to know about the problems at CMH. We agree that the district court correctly exercised its discretion in refusing the evidence. The judge ruled that the proffered evidence was irrelevant to the issues in the case of Magdovitz' credibility. Magdovitz was carefully cross-examined, and the jury was given ample opportunity to test his memory truthfulness, perception, and bias. United States v. Fitzgerald, 579 F.2d 1014, 1021 (7th Cir.), cert. denied, 439 U.S. 1002, 99 S.Ct. 610, 58 L.Ed.2d 677 (1978).

### E

Read contends that he was subjected to an overly broad cross-examination. He particularly objected to a line of questioning in which the government asked him whether he believed, in light of all the testimony Read heard in the trial, that there was no inventory fraud at Cenco.

[28] Our review of the record convinces us of the propriety of the cross-examination. Read flatly denied any knowledge of any impropriety at Cenco and denied implicating conversations by other witnesses. The government's cross-examination was aimed at testing the credibility of Read's testimony, and Judge Crowley properly ruled the cross-examination was proper on that basis. Tr. 5101. The cross-examination was within the scope of the direct examination. Cf. Brown v. United States, 356 U.S. 148, 154-55, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958).

### F

[29] Spiegel and Read also contend that juror misconduct requires reversal. Before the jury began its third day of deliberations, a juror delivered a letter to the district court. According to the letter, most of the jurors made up their minds by the second week of

trial (the trial lasted at least seven weeks); many
completely disregarded the judge's instructions that
the jurors not look in the newspaper financial
sections and made a point of examining Cenco stock;
many of these jurors refused to deliberate or discuss
the case, claiming "all these guys are guilty," and
instead worked on crossword puzzles, and several of
the jurors thought the whole trial was hilarious and
laughed at the attorneys.

Judge Crowley denied defendants' motion for mistrial
based on the alleged misconduct. Instead, Judge
Crowley read the jury an additional cautionary
instruction after receipt of the letter. He also
interviewed the juror who wrote the letter after the
verdict was delivered. She said that "the change was
incredible (after the judge gave the additional
instruction) ... the people that were so irate actually,
you know, started to come around and everything."
Tr. Oct. 29, 1979 at 3.

Judge Crowley properly exercised his discretion in
responding to the allegations. He was in "the best
position to sense the atmosphere of the courtroom as
no appellate court can on a printed record."
*1242United States v. Barnes, 604 F.2d 121, 144 (2d
Cir.   1979), cert. denied, 446 U.S. 907, 100 S.Ct.
1833, 64 L.Ed.2d 260 (1980). It was not error to deny
the motion for a mistrial.


### G

Since a new trial is necessary for Spiegel, we need
not address Spiegel's contentions regarding Rabjohns'
alleged change in testimony.

We affirm the judgment of convictions of Read and
Swiger entered in numbers 80-1017 and 80-1019. We
reverse Spiegel's conviction on Count I in 80-1018
and remand for a new trial; we affirm his conviction
on the remaining counts.

No. 80-1017 Affirmed;

No.  80-1018  Affirmed  In  Part,  Reversed  And
Remanded In Part;

No. 80-1019 Affirmed.

C.A.Ill., 1981.
U.S. v. Read
658 F.2d 1225,  Fed. Sec. L. Rep. P 98,284

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

THIS PAGE INTENTIONALLY LEFT BLANK



Model Crim. Jury Instr. 9th Cir. **8.19** (2003)
(INSTRUCTIONS)

<br>

**Federal Jury Practice & Instructions**
**Pattern & Model Jury Instructions -- Criminal**
**Ninth Circuit Manual of Model Jury Instructions -- Criminal**
Committee on Model Jury Instructions Ninth Circuit

### Chapter 8. Offenses Under Title 18

**8.19** Withdrawal From Conspiracy

Once a person becomes a member of a conspiracy, that person remains a member until that person withdraws from it. One may withdraw by doing acts which are inconsistent with the purpose of the conspiracy and by making reasonable efforts to tell the co-conspirators about those acts. You may consider any definite, positive step that shows that the conspirator is no longer a member of the conspiracy to be evidence of withdrawal.

The government has the burden of proving beyond a reasonable doubt that the defendant did not withdraw from the conspiracy before the overt act--on which you all agreed--was committed by some member of the conspiracy.

#### Comment

It is proper to instruct that continued participation in a conspiracy is presumed unless there is evidence of withdrawal. _United States v. Krasn,_ 614 F.2d 1229, 1236 (9th Cir.1980). _See also United States v. Basey,_ 613 F.2d 198, 202 (9th Cir.1979), _cert. denied,_ 446 U.S. 919 (1980).

If requested, an instruction on the government's burden of disproving withdrawal should be given. _United States v. Read,_ 658 F.2d 1225, 1236-37 (7th Cir.1981) (holding that, under the circumstances of the case, the failure to instruct the jury on the government's burden of disproving withdrawal constituted reversible error).

In the absence of a statute of limitations defense, do not use this instruction if the conspiracy charged in the indictment requires no proof of an overt act charged, since the crime is complete upon entering into the conspiracy. _United States v. Grimmett,_ 150 F.3d 958, 961 (8th Cir.1998). If the statute of limitations is a defense, this instruction should be modified to require the government to disprove withdrawal before the limiting date. _Id._

Approved 2000

(2003)

FEDCRIM-JI9 **8.19**
END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.