# INSTRUCTION NO. 4.1

*Withdrawal - Part III*

Westlaw.

940 F.2d 722
940 F.2d 722
**(Cite as: 940 F.2d 722)**

▷

United States Court of Appeals,First Circuit.
UNITED STATES of America, Appellee,
v.
Shmuel DAVID, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Jaime Toro ARISTIZIBAL, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Amparo Toro ARISTIZIBAL, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Yehuda YARDEN, Defendant, Appellant.
**Nos. 89-1807 to 89-1809, 89-2110.**

Heard April 4, 1991.
Decided July 29, 1991.
Rehearing and Rehearing En Banc Denied Aug. 28,
1991.
Motion for Rehearing Denied Sept. 27, 1991.

Defendants were convicted on multiple counts of drug offenses, two counts of conspiracy, and continuing criminal enterprise following jury trial by the United States District Court for the District of Massachusetts, John J. McNaught, J. Defendants appealed. The Court of Appeals, Selya, Circuit Judge, held that: (1) beeper clone was properly authorized; (2) authorization for telephone intercept was proper; (3) evidence was sufficient to support continuing criminal enterprise conviction; (4) evidence supported jury finding of two conspiracies; (5) evidence of violence was admissible as to nonparticipant coconspirator; and (6) double jeopardy prohibited separate sentences for conspiracy and continuing criminal enterprise.

Affirmed in part and vacated in part.

West Headnotes

**[1] Telecommunications 372** 🔗1472

372 Telecommunications
  372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
    372X(B) Authorization by Courts or Public
Officers
      372k1471 Conduct and Duration of
Surveillance
        372k1472 k. In General. Most Cited
Cases
        (Formerly 372k519.1, 372k519)
Digital display beeper was properly authorized to monitor telephone numbers from whom drug defendant received telephone calls, even though investigation had been in progress for only three weeks, where undercover agents had been unable to determine identity of defendant's customers, suppliers, or location used to process and store drugs by using public records and telephone toll records, and where confidential sources had used beeper to arrange drug purchases from defendant. 28 U.S.C.A. §§ 2510-2521, 2518(1)(c).

**[2] Telecommunications 372** 🔗1472

372 Telecommunications
  372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
    372X(B) Authorization by Courts or Public
Officers
      372k1471 Conduct and Duration of
Surveillance
        372k1472 k. In General. Most Cited
Cases
        (Formerly 372k519.1, 372k519)
Wiretap of drug defendant's telephone was properly authorized where undercover agents had been unable to discover participants in drug ring by questioning informants, using beeper clone which had previously been authorized, pen register, attempting to introduce undercover agent, and conducting physical surveillance and where this information was likely to be obtained through wiretap. 28 U.S.C.A. §§ 2510-2521, 2518(1)(c).

**[3] Telecommunications 372** 🔗1473

372 Telecommunications
  372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
    372X(B) Authorization by Courts or Public
Officers
      372k1471 Conduct and Duration of
Surveillance
        372k1473 k. Scope; Minimization. Most
Cited Cases
        (Formerly 372k520)
Undercover agents minimize interception of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

communications under court-approved electronic surveillance by desisting when agents realize that conversation is unrelated to investigation. 18 U.S.C.A. § 2518(5).

**[4] Telecommunications 372 📧1473**

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
     372X(B) Authorization by Courts or Public Officers
       372k1471 Conduct and Duration of Surveillance
        372k1473 k. Scope; Minimization. Most Cited Cases
        (Formerly 372k520)
Minimization of court-approved electronic surveillance of conversation in foreign language or code where translator is not available must be accomplished as soon as practicable after interception. 18 U.S.C.A. § 2518(5).

**[5] Telecommunications 372 📧1473**

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
     372X(B) Authorization by Courts or Public Officers
       372k1471 Conduct and Duration of Surveillance
        372k1473 k. Scope; Minimization. Most Cited Cases
        (Formerly 372k520)
After-the-fact minimization of intercepted telephone conversations which drug defendant conducted in Hebrew was appropriate where Israeli police officers were borrowed to interpret Hebrew as it pertained to drug dealings approximately two weeks after original wiretap authorization, conversations were taped in full, and interpreters were told to stop listening to tape once they determined that conversation was beyond scope of investigation. 18 U.S.C.A. § 2518(5).

**[6] Telecommunications 372 📧1473**

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
     372X(B) Authorization by Courts or Public Officers
       372k1471 Conduct and Duration of

Surveillance
        372k1473 k. Scope; Minimization. Most Cited Cases
        (Formerly 372k520)
After-the-fact minimization of conversations intercepted pursuant to court-approved electronic surveillance must be performed reasonably; key is that process utilized must protect suspect's privacy interests to approximately same extent as would contemporaneous minimization. 18 U.S.C.A. § 2518(5).

**[7] Criminal Law 110 📧1144.13(3)**

110 Criminal Law
   110XXIV Review
     110XXIV(M) Presumptions
       110k1144 Facts or Proceedings Not Shown by Record
        110k1144.13 Sufficiency of Evidence
         110k1144.13(2) Construction of Evidence
          110k1144.13(3) k. Construction in Favor of Government, State, or Prosecution. Most Cited Cases

**Criminal Law 110 📧1144.13(5)**

110 Criminal Law
   110XXIV Review
     110XXIV(M) Presumptions
       110k1144 Facts or Proceedings Not Shown by Record
        110k1144.13 Sufficiency of Evidence
         110k1144.13(5) k. Inferences or Deductions from Evidence. Most Cited Cases
Appellate court, faced with sufficiency challenge, must take evidence in light most hospitable to prosecution, drawing all plausible inferences in its favor and resolving all credibility determinations in line with jury's verdict.

**[8] Criminal Law 110 📧1159.2(7)**

110 Criminal Law
   110XXIV Review
     110XXIV(P) Verdicts
       110k1159 Conclusiveness of Verdict
        110k1159.2 Weight of Evidence in General
         110k1159.2(7) k. Reasonable Doubt. Most Cited Cases
On sufficiency challenge, verdict must be affirmed so long as any rational trier of fact could have found

essential elements of crime beyond reasonable doubt.

**[9] Controlled Substances 96H 🔑40**

96H Controlled Substances
    96HII Offenses
        96Hk40 k. Continuing Criminal Enterprise; Drug Organizations. <u>Most Cited Cases</u>
        (Formerly 138k73.1, 138k73 Drugs and Narcotics)
To constitute "continuing criminal enterprise," no formal structure or elaborate organizational chart need be in existence; to convict, jurors need not agree on particular identities of henchmen, but must only agree that there were at least five. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c)(2)(A), <u>21 U.S.C.A. § 848(c)(2)(A).</u>

**[10] Criminal Law 110 🔑1159.5**

110 Criminal Law
    110XXIV Review
        110XXIV(P) Verdicts
            110k1159 Conclusiveness of Verdict
            110k1159.5 k. Particular Issues or Elements. <u>Most Cited Cases</u>
Verdict which found continuing criminal enterprise will be upheld on review as long as reasonable juror could have concluded beyond reasonable doubt that defendant organized, supervised, or managed five different people in furtherance of narcotics-related activities; there is no requirement that five individuals be shown to have acted in concert or contemporaneously, or that degree of supervision exercised over each person was comparable. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c)(2)(A), <u>21 U.S.C.A. § 848(c)(2)(A).</u>

**[11] Controlled Substances 96H 🔑87**

96H Controlled Substances
    96HIII Prosecutions
        96Hk70 Weight and Sufficiency of Evidence
            96Hk87 k. Continuing Criminal Enterprise; Drug Organizations. <u>Most Cited Cases</u>
        (Formerly 138k123.4, 138k123(4) Drugs and Narcotics)
Evidence supported finding that drug defendant undertook continuing criminal enterprise with position of authority over five other persons where defendant ran drug trafficking operation in Boston which included aide in Florida to acquire and ship

cocaine, assistant in Boston, couriers to transport cocaine, middleman who purchased drugs on behalf of defendant and where at least three assistants interrogated and threatened drug courier after courier tried to steal shipment of cocaine. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c)(2)(A), <u>21 U.S.C.A. § 848(c)(2)(A).</u>

**[12] Conspiracy 91 🔑48.1(1)**

91 Conspiracy
    91II Criminal Responsibility
        91II(B) Prosecution
            91k48 Trial
            91k48.1 Questions for Jury
            91k48.1(1) k. In General. <u>Most Cited Cases</u>
Question of whether given body of evidence is indicative of single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily matter of fact.

**[13] Criminal Law 110 🔑1159.5**

110 Criminal Law
    110XXIV Review
        110XXIV(P) Verdicts
            110k1159 Conclusiveness of Verdict
            110k1159.5 k. Particular Issues or Elements. <u>Most Cited Cases</u>
Jury's determination as to whether one or more conspiracies existed is subject to review only for evidentiary sufficiency.

**[14] Criminal Law 110 🔑1144.13(3)**

110 Criminal Law
    110XXIV Review
        110XXIV(M) Presumptions
            110k1144 Facts or Proceedings Not Shown by Record
            110k1144.13 Sufficiency of Evidence
            110k1144.13(2) Construction of Evidence
            110k1144.13(3) k. Construction in Favor of Government, State, or Prosecution. <u>Most Cited Cases</u>

**Criminal Law 110 🔑1144.13(5)**

110 Criminal Law
    110XXIV Review
        110XXIV(M) Presumptions
            110k1144 Facts or Proceedings Not Shown by Record

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

940 F.2d 722
940 F.2d 722
**(Cite as: 940 F.2d 722)**

110k1144.13 Sufficiency of Evidence
        110k1144.13(5)  k.  Inferences  or
Deductions from Evidence. Most Cited Cases
Review of jury verdict by Court of Appeals is
conducted in light most favorable to Government,
drawing all legitimate inferences in favor of verdict.

**[15] Conspiracy 91 ⬤⤳24(2)**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k23 Nature and Elements of Criminal
Conspiracy in General
                91k24 Combination or Agreement
                    91k24(2)  k.  Single  or  Multiple
Conspiracies. Most Cited Cases
To determine whether more than one conspiracy was
proven, relationship of charged conspiracies must be
considered  in  terms  of:    times  when  relevant
activities transpired;   locations at which activities
occurred;        identities    of    persons    involved;
coconspirators' ends;   means used to achieve those
ends;  and similarities or differences in evidence used
to prove conspiracies.

**[16] Conspiracy 91 ⬤⤳47(12)**

91 Conspiracy
    91II Criminal Responsibility
        91II(B) Prosecution
            91k44 Evidence
                91k47 Weight and Sufficiency
                    91k47(3) Particular Conspiracies
                        91k47(12)    k.    Narcotics    and
Dangerous Drugs. Most Cited Cases
Evidence supported finding of two conspiracies in
drug ring operation, rather than change of direction
for  single  preexisting  conspiracy,  where  new
conspiracy involved larger amount of drugs, primary
source  of  supply  was  shifted  from  Florida  to
Colombia,  previous supplier and middlemen were
eliminated from conspiracy, and new market areas
were targeted and penetrated.   Comprehensive Drug
Abuse Prevention and Control Act of 1970, § 406,
21 U.S.C.A. § 846.

**[17] Conspiracy 91 ⬤⤳24(1)**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k23 Nature and Elements of Criminal
Conspiracy in General

                91k24 Combination or Agreement
                    91k24(1) k. In General. Most Cited
Cases

**Conspiracy 91 ⬤⤳24.5**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k23 Nature and Elements of Criminal
Conspiracy in General
                91k24.5 k. Knowledge and Intent. Most
Cited Cases
To prove conspiracy charge, Government must show
that conspiracy existed, defendant knew of it, and
that he voluntarily participated in it.

**[18] Conspiracy 91 ⬤⤳24.5**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k23 Nature and Elements of Criminal
Conspiracy in General
                91k24.5 k. Knowledge and Intent. Most
Cited Cases
Defendant charged with conspiracy must be shown to
have intended to agree with coconspirators and to
commit substantive offense.

**[19] Conspiracy 91 ⬤⤳47(1)**

91 Conspiracy
    91II Criminal Responsibility
        91II(B) Prosecution
            91k44 Evidence
                91k47 Weight and Sufficiency
                    91k47(1) k. In General. Most Cited
Cases

**Conspiracy 91 ⬤⤳47(2)**

91 Conspiracy
    91II Criminal Responsibility
        91II(B) Prosecution
            91k44 Evidence
                91k47 Weight and Sufficiency
                    91k47(2) k. Circumstantial Evidence.
Most Cited Cases
Proof of defendant's conspiratorial involvement may
consist of indirect evidence, including inferences
drawn from acts performed in furtherance of
conspiracy.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

940 F.2d 722
940 F.2d 722
**(Cite as: 940 F.2d 722)**

**[20] Conspiracy 91 ⚯47(12)**

91 Conspiracy
   91II Criminal Responsibility
      91II(B) Prosecution
         91k44 Evidence
            91k47 Weight and Sufficiency
               91k47(3) Particular Conspiracies
                  91k47(12) k. Narcotics and
Dangerous Drugs. Most Cited Cases
Evidence supported finding that drug defendant
agreed to help a ringleader transport cocaine, even
though most of anticipated cocaine never
materialized and no sale occurred, where defendant
recruited courier to transport drugs and introduced
courier to ringleader.

**[21] Conspiracy 91 ⚯24.10**

91 Conspiracy
   91II Criminal Responsibility
      91II(A) Offenses
         91k23 Nature and Elements of Criminal
Conspiracy in General
            91k24.10 k. Success; Attaining
Objective. Most Cited Cases
Criminal conspiracy can exist despite eventual failure
of its objective.

**[22] Conspiracy 91 ⚯41**

91 Conspiracy
   91II Criminal Responsibility
      91II(A) Offenses
         91k39 Persons Liable
            91k41 k. Acts of Cococonspirators. Most
Cited Cases
When person opts to join ongoing conspiracy, he is
accountable for earlier acts of coconspirators in
furtherance of conspiracy.

**[23] Conspiracy 91 ⚯47(12)**

91 Conspiracy
   91II Criminal Responsibility
      91II(B) Prosecution
         91k44 Evidence
            91k47 Weight and Sufficiency
               91k47(3) Particular Conspiracies
                  91k47(12) k. Narcotics and
Dangerous Drugs. Most Cited Cases
Drug defendant's participation in new conspiracy was
supported by evidence that defendant played integral
role in beginning of new arrangement for obtaining

drugs and defendant earmarked drugs for one of his
own customers.

**[24] Telecommunications 372 ⚯1018(4)**

372 Telecommunications
   372III Telephones
      372III(I) Offenses and Prosecutions
         372k1015 Prosecutions
            372k1018 Evidence
               372k1018(4) k. Weight and
Sufficiency. Most Cited Cases
     (Formerly 372k363)
Drug defendant's conviction for unlawful use of
telephone was supported by evidence, even though
defendant never physically possessed drugs, where
drug conspiracy was shown to have existed and
defendant made interstate calls to advance
conspiracy's ends. Comprehensive Drug Abuse
Prevention and Control Act of 1970, § 403(b), 21
U.S.C.A. § 843(b).

**[25] Criminal Law 110 ⚯691**

110 Criminal Law
   110XX Trial
      110XX(D) Procedures for Excluding Evidence
         110k690 Right to Object
            110k691 k. In General. Most Cited Cases
Defendants in drug prosecution lacked standing to
object to admission of evidence of violence by
coconspirators, under rule limiting admissibility of
evidence of other crimes, since alleged other crimes,
wrongs, or acts were not those of objecting
defendants. Fed.Rules Evid.Rule 404(b), 28
U.S.C.A.

**[26] Criminal Law 110 ⚯422(1)**

110 Criminal Law
   110XVII Evidence
      110XVII(O) Acts and Declarations of
Conspirators and Codefendants
         110k422 Grounds of Admissibility in
General
            110k422(1) k. In General. Most Cited
Cases
Evidence that coconspirators interrogated and beat
courier suspected of stealing cocaine and that
ringleader made statement to his drug supplier, that
another drug supplier had been killed, was not so
shocking as to make it probable that limiting
instructions did not preclude prejudice to defenses of
coconspirators who did not participate in violence;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

940 F.2d 722
940 F.2d 722
**(Cite as: 940 F.2d 722)**

thus, admission of evidence of violent incident was not error.

**[27] Criminal Law 110 ⚖︎422(1)**

110 Criminal Law
　110XVII Evidence
　　110XVII(O) Acts and Declarations of Conspirators and Codefendants
　　　110k422 Grounds of Admissibility in General
　　　　110k422(1) k. In General. Most Cited Cases
Evidence of beating of drug courier suspected of stealing shipment of cocaine and threats to supplier that another drug supplier had been killed, which were made during drug conspiracy and in which ringleader participated, was admissible as to ringleader where challenged evidence was independently admissible as proof that ringleader ran continuing criminal enterprise and trial court did not abuse its discretion in finding that probative value of evidence outweighed its prejudicial impact. Fed.Rules Evid.Rule 403, 28 U.S.C.A.; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408, 21 U.S.C.A. § 848.

**[28] Conspiracy 91 ⚖︎45**

91 Conspiracy
　91II Criminal Responsibility
　　91II(B) Prosecution
　　　91k44 Evidence
　　　　91k45 k. Admissibility in General. Most Cited Cases
Evidence of undercover drug agent's negotiations for purchase of illegal drugs from defendant was admissible on conspiracy charge where meeting was arranged by codefendant who was known to be involved in drug ring; evidence was probative of defendant's intent to continue dealing with drug ring, opportunity or continuing involvement in conspiracy, and working relationship among defendant and coconspirators. Fed.Rules Evid.Rules 403, 404(b), 28 U.S.C.A.

**[29] Criminal Law 110 ⚖︎835**

110 Criminal Law
　110XX Trial
　　110XX(H) Instructions: Requests
　　　110k835 k. Refusal of Requests. Most Cited Cases
Trial court may refuse to give proposed instruction

which is incorrect, misleading, or incomplete in some material respect.

**[30] Criminal Law 110 ⚖︎835**

110 Criminal Law
　110XX Trial
　　110XX(H) Instructions: Requests
　　　110k835 k. Refusal of Requests. Most Cited Cases
Refusal to give conspiracy defendant's requested jury instruction was not abuse of discretion where requested instruction was confusing and ambiguous.

**[31] Double Jeopardy 135H ⚖︎151(2)**

135H Double Jeopardy
　135HV Offenses, Elements, and Issues Foreclosed
　　135HV(A) In General
　　　135Hk139 Particular Offenses, Identity of
　　　　135Hk151 Conspiracy; Racketeering
　　　　　135Hk151(2) k. Multiple Conspiracies or Prosecutions. Most Cited Cases
Double jeopardy prohibited separate convictions and sentences on two drug conspiracy convictions used to establish continuing criminal enterprise; cumulative punishment would result from both predicate offenses and conspiracy. Comprehensive Drug Abuse Prevention and Control Act of 1970, § § 401, 406, 408, 21 U.S.C.A. § § 841, 846, 848; U.S.C.A. Const.Amend. 5.

**[32] Double Jeopardy 135H ⚖︎151(5)**

135H Double Jeopardy
　135HV Offenses, Elements, and Issues Foreclosed
　　135HV(A) In General
　　　135Hk139 Particular Offenses, Identity of
　　　　135Hk151 Conspiracy; Racketeering
　　　　　135Hk151(3) Conspiracy and Substantive or Predicate Offense
　　　　　135Hk151(5) k. Drug or Narcotics Cases. Most Cited Cases
Double jeopardy does not prohibit separate convictions and sentences under both continuing criminal enterprise and count charging underlying substantive predicate offense, even though counts are intertwined. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408, 21 U.S.C.A. § 848; U.S.C.A. Const.Amend. 5.

**[33] Double Jeopardy 135H ⚖︎151(5)**

135H Double Jeopardy

940 F.2d 722
940 F.2d 722
**(Cite as: 940 F.2d 722)**

135HV Offenses, Elements, and Issues Foreclosed
   135HV(A) In General
     135Hk139 Particular Offenses, Identity of
      135Hk151 Conspiracy; Racketeering
       135Hk151(3) Conspiracy and Substantive or Predicate Offense
       135Hk151(5) k. Drug or Narcotics Cases. Most Cited Cases
Double jeopardy did not prohibit separate convictions and sentences of coconspirator on continuing criminal enterprise and counts charging underlying substantive act. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408, 21 U.S.C.A. § 848; U.S.C.A. Const.Amend. 5.

**[34] Sentencing and Punishment 350H** ⟐⟿664(6)

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
     350HIV(A) In General
      350Hk655 Constitutional, Statutory, and Regulatory Provisions
       350Hk664 Retroactive Operation
        350Hk664(6) k. Continuing Offenses.
Most Cited Cases
   (Formerly 110k1236)
Sentencing Guidelines apply to defendant whose offense begins before guidelines' effective date and continues after effective date.

**[35] Criminal Law 110** ⟐⟿1158(1)

110 Criminal Law
   110XXIV Review
     110XXIV(O) Questions of Fact and Findings
      110k1158 In General
       110k1158(1) k. In General. Most Cited Cases

**Sentencing and Punishment 350H** ⟐⟿973

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
     350HIV(H) Proceedings
      350HIV(H)2 Evidence
       350Hk973 k. Degree of Proof. Most Cited Cases
   (Formerly 110k1313(1))
Determination of fact-bound matters pertinent to sentencing need only be supported by preponderance of evidence and can be set aside only for clear error.

**[36] Sentencing and Punishment 350H** ⟐⟿664(6)

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
     350HIV(A) In General
      350Hk655 Constitutional, Statutory, and Regulatory Provisions
       350Hk664 Retroactive Operation
        350Hk664(6) k. Continuing Offenses.
Most Cited Cases
   (Formerly 110k1236)
Sentencing Guidelines applied to drug supplier who was convicted of conspiracy, even if drug supplier ended his involvement in conspiracy before guidelines became effective, where conspiracy continued beyond effective date of guidelines.

**[37] Conspiracy 91** ⟐⟿40.4

91 Conspiracy
   91II Criminal Responsibility
     91II(A) Offenses
      91k39 Persons Liable
       91k40.4 k. Withdrawal. Most Cited Cases
Cessation of activity, in and of itself, is not enough to constitute withdrawal from conspiracy.

**[38] Sentencing and Punishment 350H** ⟐⟿664(6)

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
     350HIV(A) In General
      350Hk655 Constitutional, Statutory, and Regulatory Provisions
       350Hk664 Retroactive Operation
        350Hk664(6) k. Continuing Offenses.
Most Cited Cases
   (Formerly 91k51)
Where defendant is convicted of participation in conspiracy which extends past effective date of Sentencing Guidelines, guidelines take into account entirety of defendant's behavior in furtherance of conspiracy.

**[39] Constitutional Law 92** ⟐⟿203

92 Constitutional Law
   92VIII Retrospective and Ex Post Facto Laws
     92k198 Retroactive Operation of Ex Post Facto Laws
      92k203 k. Nature or Extent of Punishment. Most Cited Cases

**Sentencing and Punishment 350H** ⟐⟿664(6)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

940 F.2d 722
940 F.2d 722
**(Cite as: 940 F.2d 722)**

Page 8

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
      350HIV(A) In General
         350Hk655 Constitutional, Statutory, and Regulatory Provisions
            350Hk664 Retroactive Operation
               350Hk664(6) k. Continuing Offenses. Most Cited Cases
         (Formerly 110k1236)
Calculating conspirator's guideline sentencing range based on total amount of cocaine involved in conspiracy did not violate ex post facto clause, even though quantity included drugs which were handled before effective date of sentencing guidelines, where conspiracy continued beyond effective date of guidelines. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408, 21 U.S.C.A. § 848; U.S.C.A. Const. Art. 1, § § 9, cl. 3, 10, cl. 1.

**[40] Sentencing and Punishment 350H ⬅⟿775**

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
      350HIV(D) Multiple Offenses or Counts
         350Hk775 k. Continuing Offenses. Most Cited Cases
         (Formerly 110k1244)
Conspiracy defendant's convictions for continuing criminal enterprise and each of underlying substantive offenses were properly grouped for purposes of determining relevant conduct for Sentencing Guidelines. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408, 21 U.S.C.A. § 848; U.S.S.G. § § 3D1.1(a), 3D1.2, 18 U.S.C.A.App.

**[41] Sentencing and Punishment 350H ⬅⟿673**

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
      350HIV(B) Offense Levels
         350HIV(B)1 In General
            350Hk671 Activity in Concert with Others
               350Hk673 k. Scope of Activity Undertaken. Most Cited Cases
         (Formerly 138k133 Drugs and Narcotics)
For attribution to occur, there is no requirement that defendant involved in drug conspiracy actually have known that particular shipment was effectuated as long as shipment was foreseeable fruit of conspiracy and within its scope. U.S.S.G. § 2D1.4, comment. (n.1).

**[42] Sentencing and Punishment 350H ⬅⟿675**

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
      350HIV(B) Offense Levels
         350HIV(B)1 In General
            350Hk671 Activity in Concert with Others
               350Hk675 k. Reasonably Foreseeable Acts and Omissions. Most Cited Cases
         (Formerly 138k133 Drugs and Narcotics)
Particular shipment of cocaine was properly attributed to coconspirator, even if he was not aware of shipment, where shipment was reasonably foreseeable part of conspiracy, defendant introduced courier to ringleader, and was aware that ringleader was waiting for shipment from Colombia. U.S.S.G. § 2D1.4, comment. (n.1).

**\*726** Wendy Sibbison, Greenfield, Mass., with whom Barry P. Wilson and Zalkind, Sheketoff, Wilson, Homan, Rodriguez & Lunt, were on brief, Boston, Mass., for defendant, appellant Shmuel David.
Dana A. Curhan, New Bedford, Mass., for defendant, appellant Jaime Toro Aristizibal.
Raymond E. Gillespie, Cambridge, Mass., for defendant, appellant Amparo Toro Aristizibal.
Stephen R. Kaplan, Northampton, Mass., for defendant, appellant Yehuda Yarden.
Frank J. Marine, Atty., U.S. Dept. of Justice, Washington, D.C., with whom Wayne A. Budd, U.S. Atty., and Jonathan Chiel and Stephen P. Heymann, Asst. U.S. Attys., were on brief, Boston, Mass., for U.S.

Before CAMPBELL, SELYA and CYR, Circuit Judges.

SELYA, Circuit Judge.
These appeals arise out of the ashes of the long, hard-fought criminal trial of six defendants, Eliahu Abramson, Efraim Natanel, Shmuel David, Yehuda Yarden, Jaime Toro Aristizibal, and Amparo Toro Aristizibal. Abramson was acquitted. Natanel, whose appeal has already been decided, *United States v. Natanel,* 938 F.2d 302 (1st Cir.1991), was convicted on only one count. The remaining four defendants were convicted on multiple counts. After sifting through the copious record in light of their myriad claims of error, we affirm most of what transpired, but vacate two of David's convictions.

I. BACKGROUND

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

940 F.2d 722
940 F.2d 722
(Cite as: 940 F.2d 722)

This case involves a spider web of drug dealing, with David at the web's center. The web was spun over a period of close to two years, engulfing an array of persons and places. A useful way to introduce the various characters and to gain some perspective on this arachnoid adventure is to summarize the superseding indictment.

The indictment named fourteen defendants in twenty-seven counts. Count 1 alleged that David, Yarden, the Toros, Joseph Zalmanovich, and Mordechai Mizrahi engaged in a conspiracy to distribute cocaine, 21 U.S.C. § 846, from not later than August 1986 until about March 1988.[FN1] Count 2 alleged that twelve defendants, save only the Toros, conspired to possess and distribute cocaine in March and April 1988. The count 1 conspiracy allegedly took place in Massachusetts, Florida, and Belgium; the count 2 conspiracy allegedly took place in the same three venues, plus Ohio and Colombia. Most of the remaining counts represented either substantive charges of possession with intent to distribute, 21 U.S.C. § 841(a)(1), or charges of facilitating drug transactions by using the telephone, in violation of 21 U.S.C. § 843(b). These counts are summarized in the appendix. The linchpin of the indictment was count 17, wherein David was *727 charged with engaging in a continuing criminal enterprise (CCE), 21 U.S.C. § 848, from on or before August 1986 through April 28, 1988.

> FN1. The Toros are husband and wife. Zalmanovich, familiarly known as "Yossi," was apparently a fugitive at the time of trial. Mizrahi, familiarly known as "Nuni," became a government witness and testified against the appellants.

Trial began on March 27, 1989. Verdicts were returned against the appellants on May 31, 1989. David was convicted on twenty-two counts. Jaime Toro was convicted on the count 1 conspiracy and on twelve substantive counts of possession with intent to distribute. His wife, Amparo, was convicted on the count 1 conspiracy. Yarden was convicted of participating in both conspiracies and on a telephone count. After sentencing, these appeals ensued.[FN2]

> FN2. David was sentenced to thirty-year terms of imprisonment on the CCE and on all but one of the possession counts; twenty years on the two conspiracy counts; and shorter jail terms on the remaining charges.

The sentences all ran concurrently. Jaime Toro received concurrent sentences of seventeen and a half years on the conspiracy count and on all but one possession count (for which he got a lesser sentence, concurrent with the others). Amparo Toro was sentenced to fifteen years and eight months in prison on her lone conviction. Yarden received one hundred twenty-one months in prison on each conspiracy count and a four-year sentence on count 21, all concurrent. Fines, supervised release terms, and special assessments were also imposed.

We eschew an exegetic opening statement, preferring instead to discuss the facts, insofar as necessary to place the issues into workable perspective, in the course of the commentary that follows. We mix and match the asseverations advanced by the several appellants in an effort to sustain a natural progression.

## II. SUPPRESSION ISSUES

David argues that the district court erred in denying his motions to suppress evidence obtained from a court-authorized digital display beeper (a so-called beeper clone) and certain court-approved telephone intercepts.[FN3] We deal with these issues *seriatim.*

> FN3. On appeal, Yarden adopts David's suppression arguments. We take no view of Yarden's standing to raise these points since our resolution of the merits makes the matter of standing academic.

### A. *The Beeper Clone.*

David was the proprietor of a beeper corresponding to telephone number (617) 466-0366. On December 4, 1987, the government received authorization from the United States District Court for the District of Massachusetts to intercept communications targeted for this beeper. The authorization was thereafter renewed on several occasions. Judge Woodlock, who allowed the intercept, found probable cause to believe both that David was using the beeper to further criminal activity and that communications sent to the beeper, if made known, would reveal telephone numbers instrumental in arranging narcotics transactions. The interceptions were to be effected via a beeper clone which, rather than intercepting actual conversations, would intercept

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

940 F.2d 722
940 F.2d 722
(Cite as: 940 F.2d 722)

and display telephone numbers transmitted to the authentic beeper. Federal agents utilized the beeper clone to obtain information leading to evidence against David and others. After indictment, David moved to suppress the investigatory fruits derived from the beeper clone. The trial judge held a hearing, reserved decision, and later denied the motion without stated reasons.

The interception of electronic communications as an investigative technique is governed by Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § § 2510-2521 (Title III). The statutory scheme provides a mechanism through which the government may seek judicial authorization to surveil electronic communications. Section 2518 of Title III sets out what must be included in an authorization application. One requirement is "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). We have explained that "[t]he basis for the statutory monition is the salutary notion that the sovereign should make a reasonable, good faith effort to run the gamut of normal investigative *728 procedures before resorting to means so intrusive as electronic interception of telephone calls." United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir.1987). David tells us that, in this instance, the Drug Enforcement Administration (DEA) had not run the gamut of reasonable alternative investigative techniques before applying for permission to employ the beeper clone. We are not convinced.

In these purlieus, appellate review is limited to the question of whether "the issuing court could reasonably have concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed." United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir.1989); see also United States v. Scibelli, 549 F.2d 222, 226 (1st Cir.) (appellate court need only "decide if the facts set forth in the application were minimally adequate to support the determination that was made"), cert. denied, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977). This inquiry is not rigid or rule-oriented; to the precise contrary, "Title III demands a practical, commonsense approach to exploration of investigatory avenues and relative intrusiveness." United States v. Uribe, 890 F.2d 554, 556 (1st Cir.1989). Because drug trafficking is inherently difficult to detect and presents formidable problems in pinning down the participants and defining their roles, investigative personnel must be accorded some

latitude in choosing their approaches. In short, Title III "was not meant to force the government to run outlandish risks or to exhaust every conceivable alternative before applying for intercept authorizations. Hoffman, 832 F.2d at 1306.

[1] In this case, we think the proof supports a finding that conventional approaches were sufficiently milked and, if pressed further, would likely have proven empty. The cynosure of the government's application was an affidavit in which a DEA agent, Doherty, limned the investigative techniques used up to that moment and told why he thought the investigation, absent injection of a beeper clone, had dried up. Doherty described the government's painstaking use of public documents and telephone toll records to obtain information about David and other suspects. He then recounted knowledge gleaned through three confidential informants. The first (CI-1) informed the agent that he often called David's beeper as a prelude to purchasing cocaine. He also stated, based on personal observations of Yossi inspecting and paying for cocaine in Florida, that David was purchasing seven to ten kilograms of cocaine monthly for distribution in Boston. The second informant told the agent that he had bought cocaine from one Jacky Amouyal in front of a restaurant which Amouyal said David owned in part, and that Amouyal referred to a man who was in the restaurant at the time as "Shmuel" (David's first name). The third informant said that he bought cocaine from David on several occasions, contacting him through his beeper. In addition, some two weeks before the affidavit was signed, the agent reported that CI-1 called David's beeper in the agent's presence. David returned the call a few minutes later. A conversation in Hebrew ensued. CI-1 informed Doherty that, in the course of the conversation, David stated his desire to buy more cocaine in Florida; expressed an interest in purchasing marijuana, too; and mentioned that he still had 18 "pieces" (kilograms) of cocaine yet to unload.

Doherty then explained why the investigation could not proceed effectively without resort to a beeper clone. He pointed out that the informers had been unable to identify current customers of David's drug operation, furnish a complete list of David's suppliers, or pinpoint the locations used to store, process, and distribute the cocaine. An undercover agent, he said, would not be able to root out more than a single member of the ring and would be of no help in identifying customers. Reviewing David's telephone toll records (which had been subpoenaed)

would not do the trick, as those records would only chronicle long-distance calls and, in any event, would be stale. Doherty considered, and rejected as inefficacious, the use of a pen register, inasmuch as no particular telephone could yet be singled out, to the exclusion of other telephones, as being used by David. Finally,*729 the agent stated his belief that not enough information had been gathered to support the issuance of a search warrant.

In these circumstances, it is plain that the district court could appropriately have found the beeper clone to be warranted. The government showed that it had invested considerable time and energy in conventional investigative methods. Its reasons for doubting the ultimate efficacy of such techniques seem plausible. An application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley. It is enough that reasonable efforts to succeed without such assistance have been tried and failed, and that electronic surveillance seems a suitable next step in a plausible progression.

To be sure, David argues that the investigation had only been in progress for three weeks and that this interval was too short a time for the government to have adequately explored less intrusive avenues. Yet, although the length of time an investigation has run is an important factor to consider in weighing the reasonableness of a Title III request, we refuse to place talismanic significance on time alone. High-stakes drug trafficking is by its nature volatile, fast-paced, elusive, and in constant motion. The reaction time of those who seek to expose narcotics rings must be gauged in that light. We cannot subscribe, therefore, to a bright-line rule that says an investigation must be ongoing for more than three weeks before an intercept can be authorized. Rather, the nisi prius court, as it did here, must review the totality of the application to determine if the government made a reasonable, good faith effort to investigate without the intercept, taking into account all of the pertinent circumstances (including, but by no means limited to, the investigation's temporal dimensions). Reading the instant application in its entirety, we cannot say that Judge Woodlock erred in finding the investigation sufficiently mature to warrant authorization of a beeper clone.[FN4]

FN4. At any rate, David's conclusion depends on his premise that the investigation was only three weeks old when the

application was made. That premise, however, is set less in concrete than in quicksand. It is based on the fact that the earliest specific example of an investigative act detailed in the application was a November 16 telephone call between David and CI-1. This incident, David muses, marks the beginning of the investigation. But, we doubt that this could be so. At the very least, the DEA needed time to cultivate its relationship with CI-1 and set up the telephone call.

*B. The Telephone Intercept.*

[2] On February 17, 1988, while the beeper clone was still in use, the government applied for, and received, permission to tap David's telephone. In obtaining the order, the government relied, *inter alia,* on information obtained through the beeper clone. Once again, David challenges the authorization on the ground that necessity was not shown. We need not dally. During the roughly two months that had elapsed from the beeper authorization to the wiretap application, the DEA endeavored to discover the identities of David's principal cohorts in numerous ways. Four informants were questioned, the beeper clone was put in service, a pen register was tried, an unsuccessful attempt to introduce an undercover agent transpired, and physical surveillance was essayed. None of these techniques revealed the type of information that the DEA needed to crack the drug ring-information which was likely to be obtained through the wiretap. Hence, it was not error for the issuing court to find that a wiretap was appropriate.

David has a second string to his bow. Title III provides that court-approved electronic surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). David hawks the notion that the government did not properly minimize the wiretapping in respect to the overheard Hebrew-language conversations.

[3][4] Normally, minimization is done extemporaneously and contemporaneously; when agents who overhear a conversation realize (or have sufficient reason to realize) that it is unrelated to the investigation, *730 they must desist. Where intercepted conversations are in a foreign language or code and, despite the exercise of reasonable diligence, a translator is not available for on-the-spot minimization, a different rule obtains. In such circumstances, "minimization may be accomplished

as soon as practicable after ... interception." *Id.* David's appeal requires that we probe the interstices of these rules.

[5] The facts are straightforward. The DEA secured the original wiretap authorization on February 17, 1988. According to Doherty's affidavit, the agents were then in the process of locating interpreters capable of understanding modern Hebrew as it pertained to drug dealings. Through law enforcement agencies in Israel, the government was able to borrow Israeli police officers for this purpose. The Israeli officers arrived in Boston on March 1. Following some briefing, they were deployed as monitors on March 5. Before then, the DEA taped Hebrew conversations in full and minimized them after the fact. We are confident that this schedule comported with the statutory directive. The government need not show, as a prerequisite to after-the-fact minimization, that contemporaneous minimization was an utter impossibility. Here, the evidence indicated that, despite reasonable, good-faith efforts, Hebrew interpreters were not available at all times. Thus, after-the-fact minimization, which is expressly authorized by Title III, became appropriate. No more was exigible.

[6] Unquestionably, after-the-fact minimization, even where appropriate, must be performed reasonably. *See Scott v. United States,* 436 U.S. 128, 139-42, 98 S.Ct. 1717, 1724-26, 56 L.Ed.2d 168 (1978); *Uribe,* 890 F.2d at 557. But, that guidepost was not skirted. The key to after-the-fact minimization is that the process utilized must protect the suspect's privacy interests to approximately the same extent as would contemporaneous minimization, properly conducted. *Accord United States v. Gambino,* 734 F.Supp. 1084, 1106 (S.D.N.Y.1990). This criterion was fulfilled. The DEA's protocol was designed to replicate what would happen in a contemporaneous minimization: the interpreters were told to stop listening to a tape once they determined that the conversation was beyond the scope of the investigation. By translating only the portions of the tapes that seemed relevant, the government's actions comported with the expectations of Congress, *see, e.g.,* S.Rep. No. 541, 99th Cong., 2d Sess. 1, 30, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3555, 3584, and were acceptable under Title III.

### III. SUFFICIENCY OF THE EVIDENCE

David mounts a challenge to evidentiary sufficiency with respect to his conviction on the continuing criminal enterprise count. In particular, he exhorts that there was not enough proof that his drug crimes were "undertaken ... in concert with five or more other persons with respect to whom [David] occupies a position of organizer, a supervisory position, or any other position of management." 21 U.S.C. § 848(c)(2)(A). We read the record differently.

[7][8] The applicable standard of review is a familiar one. An appellate court, faced with a sufficiency challenge, must take the evidence in the light most hospitable to the prosecution, drawing all plausible inferences in its favor and resolving all credibility determinations in line with the jury's verdict. *See United States v. Ingraham,* 832 F.2d 229, 230 (1st Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Cintolo,* 818 F.2d 980, 983 (1st Cir.), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987). The verdict must be affirmed so long as any rational trier of the facts could have found the essential elements of the crime beyond a reasonable doubt. *See, e.g., United States v. Gomez-Pabon,* 911 F.2d 847, 852 (1st Cir.1990), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991).

[9][10] Applying this standard in the current context necessitates that we keep several principles in mind. In determining whether David organized, supervised or managed a criminal enterprise and its associates,*731 we are to give the operative terms their ordinary meanings. *See United States v. Apodaca,* 843 F.2d 421, 425-26 (10th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 325, 102 L.Ed.2d 342 (1988). To constitute a CCE, no formal structure or elaborate organizational chart need be in existence. *See United States v. Gonzales,* 866 F.2d 781, 784 (5th Cir.), *cert. denied,* 490 U.S. 1093, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989). To convict, the jurors need not agree on the particular identities of the henchmen, but must only agree that there were at least five. *See United States v. Tarvers,* 833 F.2d 1068, 1075 (1st Cir.1987). There is, moreover, no requirement that the five individuals be shown to have acted in concert or contemporaneously, *see United States v. Aiello,* 864 F.2d 257, 264 (2d Cir.1988); *United States v. Lueth,* 807 F.2d 719, 731 (8th Cir.1986), or that the degree of supervision exercised over each person was comparable, *see United States v. Jones,* 801 F.2d 304, 308 (8th Cir.1986). As long as a reasonable juror could have concluded beyond a reasonable doubt, in line with these tenets, that the defendant organized, supervised, or managed five different people in furtherance of his narcotics-related activities, the verdict must stand.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In this case, our review is tightly cabined. While David advances various arguments, factual and legal, as to why particular people could not be considered to be under his organizational spell, he neither challenges the jury instructions that were given with respect to this element of the offense nor contends that other (necessary) instructions were omitted. Therefore, so long as the record supports a finding that *any* five people were under David's control, our task is complete and the status of other individuals becomes immaterial.[FN5]

> FN5. To illustrate, suppose there were ten people (A–J) who potentially could be considered to be part of David's organization; that there was sufficient evidence to show that A–E so qualified; but that, for various reasons, legal or factual, the jury could not have counted F–J toward the required total. With no preserved objection to the charge, a CCE conviction would have to be upheld, because the jury *could* have counted A, B, C, D, and E to reach the magic number. By contrast, if the defendant had requested a jury instruction that F–J could not be counted, and the court had erroneously refused the instruction, then the defendant might be successful in challenging the verdict on appeal.

[11] We recount the facts in greater detail than we otherwise might only because knowledge of them is useful to an understanding of issues subsequently discussed. The evidence showed that David assembled, and thereafter ran, a drug trafficking operation in the Boston area from 1986 through 1988. For most of that time, he was distributing from seven to ten kilograms of cocaine per month. His aides included Yossi (who was based in Florida, had a hand in acquiring the cocaine, and arranged to ship it north) and Nuni (who was David's right hand man in Boston). David concedes that his relationship with both Yossi and Nuni constituted supervision for the purposes of section 848. He likewise concedes that he oversaw at least one other person, as a courier, from time to time.[FN6] Accordingly, our inquiry reduces to determining whether the evidence was sufficient to show that two other persons were subject to David's hegemony. We find that it was.

> FN6. The record reveals that, over time, David used at least three couriers-a nameless

"guy with the El Camino," Eli Filin, and Richard Parrish. David contends that his supervision of three couriers in succession amounted to the supervision of one person, since the three filled a single role in the enterprise. While his position is not without some theoretical support, *see, e.g.,* *United States v. Bond,* 847 F.2d 1233, 1237 (7th Cir.1988), the question is complicated by David's failure to request a jury instruction on this point. We elect not to pursue the matter, preferring to assume, without deciding, that the three couriers were, as David would have it, the functional equivalent of one subordinate.

In the first place, Reuven Furer acted as a middleman between David and his Florida suppliers (the Toros). Furer arranged a dozen or more shipments, kept the cocaine at his place of business in Florida until it could be delivered, paid the Toros with funds furnished by David, and attended meetings on David's behalf. Although David argues vigorously that Furer's status was more akin to that of an independent contractor, we think any ambiguity *732 was for the jury to resolve. The CCE statute can be satisfied by evidence that the defendant organized five or more people in the criminal endeavor without any proof that the defendant exercised knee-jerk control over those whom he organized, or that they were his puppets. *See* *Apodaca,* 843 F.2d at 426.

Adding Furer to the roster still leaves one slot to be filled. Summarizing a vignette from the record illustrates that the jury could lawfully have chosen from a surfeit of eligible candidates to fill this vacancy. In June 1987, David's courier, Filin, tried to steal a shipment of cocaine. He and an accomplice faked a robbery as part of delivery. David became suspicious. He and Yossi (the shipment's intended recipient) flew to Florida, met with Furer, and arranged for another load to be delivered by Filin. When Filin arrived at Furer's place of business, David was waiting with a gun (which Furer had supplied). David took Filin to Yossi's Florida apartment. There, three thugs (Dede, Moshe One, and Moshe Two) threatened Yossi with a baseball bat while David questioned him about his possible involvement in the heist. David concluded that Yossi was not responsible.

Soon thereafter, Filin was given another batch of cocaine and told to bring it to Boston. When Filin arrived at the designated address, David and Nuni escorted him to another apartment where Moshe One

and Moshe Two were waiting. Filin was tied to a chair, beaten, and threatened with his life unless he told the truth about the purloined narcotics. A gun (furnished by Nuni) was held to Filin's head. When Filin did not confess, he was taken to a hotel room where Dede was waiting. Dede suggested that both Filin and Yossi be required to take lie detector tests. Filin was released. A short time later, Furer asked him to make another delivery to Boston. Upon his arrival, a lie detector test was administered. Filin failed the test, confessed to the robbery, and agreed to return the cocaine.

It is clear from this tawdry tale that, at the very least, the jury was entitled to find that Dede, Moshe One, and Moshe Two, in addition to Yossi, Nuni, Furer, and a courier, were within David's sphere of influence and subject to his supervision in the course of his drug trafficking activities. Wholly apart from evidence implicating other persons, this proof was enough to scuttle the assignment of error.

## IV. ONE CONSPIRACY, TWO CONSPIRACY

[12][13] Appellant Yarden argues that he was improperly convicted and sentenced for two conspiracies that were in actuality a unitary conspiracy, thereby causing him to be put twice in jeopardy for a single offense. The question of whether a given body of evidence is indicative of a single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily a matter of fact. *See United States v. Boylan*, 898 F.2d 230, 243 (1st Cir.), *cert. denied*, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). In a jury trial, given proper instructions (or in lieu thereof, unchallenged instructions), the jury's determination as to whether one or more conspiracies existed is subject to review only for evidentiary sufficiency. *Id.; accord United States v. Khoury*, 901 F.2d 948, 956 (11th Cir.1990).

In this instance, the court's jury instructions were adequate, providing a satisfactory framework within which the jury could find that Yarden was a part of (1) no conspiracy, (2) either or both of the charged conspiracies, or (3) a single conspiracy encompassing both charged conspiracies. The jury having determined that there were two distinct conspiracies as charged and that Yarden was a member of each of them, his assignment of error boils down to whether there was sufficient evidence to sustain these findings.

### A. *Number of Conspiracies.*

[14] We first summarize the evidence from which we believe the jury could reasonably have concluded that there were two different conspiracies as set out in counts 1 and 2. Our review is to be conducted in the light most favorable to the government, drawing all legitimate inferences*733 in favor of the verdict. *See United States v. Angiulo*, 897 F.2d 1169, 1197 (1st Cir.), *cert. denied*, --- U.S. ----, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).

The government charged that one conspiracy began in 1986 and ended in March 1988, whereas the second conspiracy began in March 1988 and ended the following month. The evidence showed that, during late 1986 and early 1987, David's ring was buying cocaine in Florida from the Toros (usually receiving about ten kilograms at a crack) and selling it in the Boston area. This was the norm until the summer of 1987 (when Filin stole a shipment). Thereafter, David, having soured on his Florida connections, began exploring the New York market for cocaine. It was approximately at this time that Furer, who had been convicted of an unrelated crime, agreed to become a government informant. He made various telephone calls trying to persuade David to resume purchasing cocaine from the Toros.

In February 1988, Furer was successful; David wanted to start buying larger quantities of cocaine and felt that the New York prices were exorbitant. A meeting was held at Furer's office. David, Nuni, Furer, and the Toros attended. David announced a desire to acquire a minimum of one hundred kilograms of cocaine per month. The Toros agreed to inform their sources. Later that day, Furer told David that Jaime Toro was working on setting up a meeting, and asked David if he wanted ten or fifteen kilograms to tide him over until a larger-scale transaction could be arranged. A few days passed. Then, on February 23, 1988, Amparo Toro told David that the Toros' superiors were not interested in meeting with him. David then asked whether he could get the ten to fifteen kilograms previously mentioned.

Meanwhile, Yarden, who was living in Belgium, had approached David about getting involved in some drug deals. Yarden recruited Parrish to act as a courier to transport the cocaine from Florida to Boston. Parrish and David spoke and agreed on Parrish's fee. Parrish was told to stand by until the ten/fifteen kilogram consignment was ready. On February 26, Jaime Toro brought a single kilogram to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Furer's office. David was inaccessible, however, and no transaction occurred. (As matters turned out, David and Yossi had retrieved their money from Furer's office and gone back to Boston that same day.)

On February 29, David told Yarden that the Florida supply source had not panned out. He indicated frustration with the high price of doing business through Furer and the Toros. Yarden then proposed that a new arrangement be fashioned: either he would start supplying David with cocaine or David would begin to supply him with cocaine in Europe. The discussion ended without a definitive agreement. Several days later, David told Parrish that he was fed up with his Florida associates and was looking elsewhere for cocaine. On March 8, Yossi told David that he had lined up a meeting in Colombia to discuss direct purchases of cocaine. His spirits buoyed, David flew to Colombia shortly thereafter.

On March 24, David informed Yarden that he had negotiated a supply of cocaine at not much more than half the Toros' price. David started gathering cash. By March 28, he thought he had accumulated what he needed to conclude the Colombian transaction. In the meantime, Yarden inquired whether David would furnish one of his Boston customers with three kilograms of cocaine. David agreed and a price was set.

On April 24, David called Nuni from Florida and told him that forty kilograms was en route. He asked Nuni to bring more money to him in Florida. The shipment arrived, but was thirty kilograms lighter than expected. Parrish drove the contraband to Boston where David met him. On April 28, a courier from Ohio-a new market for David-arrived in Boston to pick up five kilograms for $30,000. Later that day, Nuni and David were arrested.

When all is said and done, a conspiracy is merely an agreement, express or implied, under the terms of which the participants, including the defendant, collogue to accomplish an unlawful objective, taking at least *734 one overt step in furtherance of that objective. *See, e.g., United States v. Latham,* 874 F.2d 852, 863 (1st Cir.1989). In analyzing the evidence in a multiple conspiracy case, then, we can start by asking a basic question: Is the proof sufficient to permit a jury to find, beyond a reasonable doubt, the separate agreements charged in the indictment? *See United States v. Glenn,* 828 F.2d 855, 858 (1st Cir.1987). The answer to this question may rest wholly on circumstantial evidence.

Indeed, "the government can prove the existence of both express and tacit agreements by pointing to the actions as well as the words of the defendants." *Id.*

[15] There is no mechanical test through which a reviewing court can plumb the scope and contours of a given conspiracy or determine how many conspiracies may be said to exist. Rather, we must make a case-specific assay, concentrating on the totality of the evidence and the permissible inferences therefrom. *See United States v. Drougas,* 748 F.2d 8, 17 (1st Cir.1984). Nevertheless, where, as here, it is clear that at least one conspiracy could be found, a possible method of organizing the evidence to determine whether more than one conspiracy was proven is to examine the relationship of the charged (multiple) conspiracies to one another in terms of factors such as the times when the relevant activities transpired; the locations at which the activities occurred; the identities of the persons involved; the coconspirators' ends; the means used to achieve those ends; and the similarities (or differences) in the evidence used to prove the two conspiracies. *Cf., e.g., Gomez-Pabon,* 911 F.2d at 860 (outlining test to be used in assessing whether two charged conspiracies constitute a single offense for double jeopardy purposes).

[16] On the present facts, it is readily apparent that reasonable jurors could have reached divergent conclusions in terms of the number of conspiracies which were afoot. It can plausibly be argued, as Yarden exhorts, that the events of March and April 1988 represented no more than a change in direction of the ongoing conspiracy. By the same token, however, it can be argued with at least equal cogency that the original conspiracy had ended and a new one had emerged. David's dissatisfaction was evident during and after his February trip to Florida. His relationship with the Toros had deteriorated markedly. He was frustrated by the ongoing conspiracy's inability to structure and support the larger operation that he envisioned. The cast of characters changed in that time frame; only four of the six count 1 coconspirators (including David and Yarden) were named in count 2, and there was evidence that up to eight persons who had not been accused of membership in the earlier conspiracy had participated in the later one. Given these circumstances, the jury could logically have believed that, after discussions with Yarden and Parrish, David decided to dismantle the preexisting apparatus, strike off in a different direction, and start a new operation.

To be sure, there was some overlap amongst

participants. Moreover, the object of the two conspiracies was the same-although the second was designed to be on a grander scale. Yet, such factors are suggestive rather than dispositive; there is no rule of law that requires the architecture, the goals, or the staffing of successive conspiracies to be wholly different, one from the other. Moreover, there were important differences in the two operations-to name a few, the setting of a more ambitious sales quota; the shift to Colombia as the primary source of supply; the elimination of the Toros and Furer from the team; and the targeting and penetration of new market areas.

We need not paint the lily. In the final analysis, we think that the facts, viewed favorably to the government, supported a rational conclusion that the arrangement to import cocaine directly from Colombia marked the inception of a conspiracy distinct from the original conspiracy, not a mere adjustment in the framework of the latter. *Compare, e.g., United States v. Hart,* 933 F.2d 80, 86 (1st Cir.1991) (affirming finding of separate drug trafficking conspiracies despite proximity in time, partial*735 overlap in locale, similarity in nature of unlawful conduct, and identity of objectives) *with, e.g., Gomez-Pabon,* 911 F.2d at 861 (where second venture is merely an adaptation of conspiratorial plan of thwarted first venture, two conspiracies cannot be made out). A criminal jury, after all, "is free to choose among varying interpretations of the evidence, as long as the interpretation they choose is reasonable." *United States v. Guerrero-Guerrero,* 776 F.2d 1071, 1075 (1st Cir.1985), *cert. denied,* 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986).

**B. *Yarden's Involvement.***

[17][18][19] We turn now to the related question of whether there was sufficient evidence to tie Yarden to both conspiracies. To prove such a charge, the government must show that a conspiracy existed, that the defendant knew of it, and that he voluntarily participated in it. *See Gomez-Pabon,* 911 F.2d at 852; *United States v. Aponte-Suarez,* 905 F.2d 483, 489 (1st Cir.), *cert. denied,* 498 U.S. 990, 111 S.Ct. 531, 112 L.Ed.2d 541 (1990), 498 U.S. 1092, 111 S.Ct. 975, 112 L.Ed.2d 1061 (1991). The defendant must have intended to agree with his coconspirators and to commit the substantive offense. *See United States v. Rivera-Santiago,* 872 F.2d 1073, 1079 (1st Cir.), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576, 493 U.S. 832, 110 S.Ct. 105, 107 L.Ed.2d 68 (1989). The proof of a defendant's

conspiratorial involvement may consist of indirect evidence, including inferences drawn from acts performed in furtherance of the conspiracy. *Gomez-Pabon,* 911 F.2d at 853; *Glenn,* 828 F.2d at 858.

[20][21] On the count 1 conspiracy, we think the jury could have found that Yarden agreed to help David transport the cocaine that the Toros were supposed to produce in late February. To implement this agreement, Yarden recruited Parrish and introduced him to David. That most of the cocaine never materialized, and that the rest never changed hands, is of no moment. The law is well settled that a criminal conspiracy can exist despite the eventual failure of its objective. *See United States v. Gilley,* 836 F.2d 1206, 1213 (9th Cir.1988); *United States v. Marolla,* 766 F.2d 457, 461 (11th Cir.1985); *United States v. Guerro,* 693 F.2d 10, 13 (1st Cir.1982); *United States v. Waldron,* 590 F.2d 33, 34 (1st Cir.), *cert. denied,* 441 U.S. 934, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979); *see also United States v. Nuccio,* 373 F.2d 168, 174 n. 4 (2d Cir.) ("no proof of actual dealings in narcotics is required to establish conspiracy to violate the narcotics laws"), *cert. denied,* 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967).

[22] Moreover, the evidence that Yarden enlisted in the count 1 conspiracy by no later than February 1988 was solid. On this record, nothing further was required. When, as here, a miscreant opts to join an ongoing conspiracy, the law holds him accountable for the earlier acts of his coconspirators in furtherance of the conspiracy. *See, e.g., Cintolo,* 818 F.2d at 997 ("one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of coconspirators, made after the formation and in furtherance of the conspiracy"); *United States v. Baines,* 812 F.2d 41, 42 (1st Cir.1987) ( "[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight-or conduct-regardless of whether he is aware of just what it is composed."); *see also United States v. Smith,* 726 F.2d 852, 866 (1st Cir.1984) (en banc).

[23] The matter of the count 2 conspiracy need not occupy us for long. Yarden played an integral role in the genesis of the new arrangement. In addition, he earmarked some of the Colombian cocaine for one of his own customers. It borders on the frivolous to raise questions of evidentiary sufficiency anent his participation in the count 2 conspiracy.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## V. THE COUNT 21 CONVICTION

[24] We will not tarry over Yarden's challenge to his conviction on count 21. At trial, some of the evidence against Yarden consisted of his role in Hebrew-language telephone conversations intercepted by the *736 government. Yarden's conviction for the unlawful use of a telephone was based on these conversations. On appeal, he argues that the conviction cannot stand because he never physically possessed any cocaine. The argument is a non-sequitur.

Yarden was indicted and convicted on count 21 for unlawful use of a telephone in facilitation of a conspiracy to possess cocaine, in violation of 21 U.S.C. § 843(b). Thus, actual possession was not required. In a section 843(b) "telephone" case involving a narcotics conspiracy, the prosecution only has to show that the conspiracy existed and that the accused made interstate calls to advance its ends. See United States v. Thomas, 586 F.2d 123, 130-31 (9th Cir.1978); see also United States v. Cordero, 668 F.2d 32, 43 (1st Cir.1981) (telephone calls facilitating development of a drug conspiracy violate § 843(b)). Such findings could easily be made on the instant record. Yarden's conviction on count 21 is unimpugnable.

## VI. EVIDENTIARY ISSUES

The appellants contend that they were deprived of fair trials because of various evidentiary rulings. Their contentions are rickety. We address only the more substantial of them.

### A. Evidence of Violence.

All the appellants challenge the admission of evidence concerning threats and violence perpetrated by David, Dede, Moshe One, and Moshe Two in the aftermath of Filin's theft of the cocaine shipment. They also protest the admission into evidence of a recorded conversation in which David informed Furer, arguably in an attempt to intimidate him, that Musa, a New York drug dealer, had been murdered. Because the evidence actually involved David, and not the other appellants, our analysis must proceed in two stages. We turn first to the arguments advanced by the Toros and Yarden, all of whom tell us that the district court erred in overruling their objections and in allowing the evidence.

[25] 1. Admissibility as to Non-Participants. In essence, the Toros and Yarden claim that, as to them, the evidence in question was unduly prejudicial and admitted in contravention of Fed.R.Evid. 404(b) and 403.[FN7] Their reliance on Rule 404(b) is mislaid. The evidence concerned the acts of a codefendant-not conduct attributable to any of them. Objections based on Rule 404(b) may be raised only by the person whose "other crimes, wrongs, or acts" are attempted to be revealed. See, e.g., United States v. Gonzalez-Sanchez, 825 F.2d 572, 583 (1st Cir.) ("Rule 404(b) does not exclude evidence of prior crimes of persons other than the defendant."), cert. denied, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). Because the evidence in question was evidence of David's behavior, the Toros and Yarden lack standing to invoke the rule.[FN8]

FN7. The rules provide:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Fed.R.Evid. 404(b).
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
Fed.R.Evid. 403.

FN8. In passing, we acknowledge that, theoretically, acts could, under certain circumstances, be considered the acts of a non-actor through attribution, inasmuch as certain acts of a conspirator may be attributed to his coconspirators. See, e.g., United States v. Crocker, 788 F.2d 802, 806 (1st Cir.1986); United States v. Cranston, 686 F.2d 56, 62 (1st Cir.1982). In this case, however, neither Yarden nor the Toros argue that any such direct attribution was in prospect. At any rate, the jury was specifically instructed that the challenged evidence bore only on the question of David's guilt or innocence.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[26] Refined to bare essence, then, the trio's argument comes down to a claim that the evidence likely spilled over and prejudiced their defenses. We do not think this claim has any merit. The trial judge carefully instructed the jury to consider the evidence only as against David. This was the proper course to ensure against prejudicial spillover. *See, e.g., United States v. Dworken,* 855 F.2d 12, 29 (1st Cir.1988); *United States v. Luna,* 585 F.2d 1, 5 (1st Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978). Of course, there may be cases where the evidence against a coconspirator is so inflammatory that the risk of prejudice, despite limiting *737 instructions, is unacceptably great. We need not speculate, however, for this is not such an extreme case. The Filin incident, albeit fearsome, was not overblown. As to the other episode, David never said that he killed Musa or arranged for his execution. In fine, neither body of evidence was so shocking, relative to the other evidence adduced at trial, as to make it probable that the limiting instructions would fall on deaf ears or that the jury's perception of the other defendants would be unfairly tainted by their association with David. And we take the jury's acquittal of two defendants, Natanel and Abramson, on the conspiracy charges, as an *ex post* validation of the trial judge's faith in the effectiveness of his limiting instructions. *Accord, e.g., Natanel,* 938 F.2d at 308 (listing other cases).

[27] 2. *Admissibility as to David.* Although David is postured somewhat differently with respect to this evidence, he has not argued the idiosyncrasies of his own position. Rather, he has adopted verbatim the other appellants' arguments. *See* Fed.R.App.P. 28(i). Adoption by reference, however, cannot occur in a vacuum; to be meaningful, the arguments adopted must be readily transferrable from the proponent's case to the adopter's case. *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990); *see also United States v. Dworken,* 855 F.2d 12, 32 n. 22 (1st Cir.1988). Since David was himself the actor, his situation regarding the extrinsic act evidence is materially different than that of the co-appellants. For that reason, his incorporation by reference of the others' arguments does not adequately develop or preserve the issue with respect to his own appeal. *See, e.g., Zannino,* 895 F.2d at 17 (it is a "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

In any event, we do not doubt that the evidence was properly admitted against David. For one thing,

Rule 404(b) does not apply at all. The challenged evidence was independently admissible as proof that David ran a CCE. Rule 404(b) only applies to "[e]vidence of *other* crimes, wrongs, or acts." Fed.R.Evid. 404(b) (emphasis supplied). Evidence which is part and parcel of the crime being tried is simply not "other crimes" evidence within the ambit of Rule 404(b). *See, e.g., United States v. Tejada,* 886 F.2d 483, 486-87 (1st Cir.1989); *United States v. DeLuna,* 763 F.2d 897, 913 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985); *United States v. Dunn,* 758 F.2d 30, 38 (1st Cir.1985).

Nor does Rule 403 create an insurmountable obstacle. The district judge found that the evidence's probative value outweighed its prejudicial impact, a finding which we review for abuse of discretion. *See United States v. Hadfield,* 918 F.2d 987, 994-95 (1st Cir.1990), *cert. denied,* 500 U.S. 936, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991). Our review is deferential: "Only rarely-and in extraordinarily compelling circumstances-will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1340 (1st Cir.1988). This is not the rare or extraordinary case. The lower court acted well within the realm of its discretion in admitting the challenged evidence.

### B. *Evidence Anent "The Mexican."*

In November 1987, while the count 1 conspiracy was still in progress, Furer (who had by then agreed to cooperate with the government) attempted to arrange a transaction between David and an undercover DEA agent known by the sobriquet "the Mexican." David, exercising great caution, refused to swallow the baited hook. He suggested that Furer have Jaime Toro do a deal with the Mexican to "see if everything go[es] well." Furer then introduced Toro to the agent, who said that he wanted to buy ten kilograms of cocaine. Toro showed him one kilogram of the drug and gave him a small sample. For various reasons, no purchase eventuated.

[28] The judge decided to admit evidence of the negotiations over objection, but instructed the jury to consider the testimony only with respect to Toro. On appeal, Toro claims that the ruling contravened Rules 404(b) and 403. We reject the claim out of hand. The meeting was set up by Furer. Because Furer was known to Toro as David's henchman, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

organization was involved.   Hence, evidence of those negotiations possessed the "special relevance" which Rule 404(b) demands.   *See Ingraham, 832 F.2d at 231; see also *738United States v. Rodriguez-Estrada,* 877 F.2d 153, 155 (1st Cir.1989) (Rule 404(b) evidence must possess some " 'special' probative value").   That is to say, the evidence was probative of several controverted issues, including Toro's intent to continue dealing with David's organization, the opportunity on his part for continuing involvement with the count 1 conspiracy, and the working relationship among David, Furer, and Toro.   *See, e.g., Hadfield,* 918 F.2d at 994; *United States v. Crocker,* 788 F.2d 802, 804 (1st Cir.1986); *cf. United States v. Fields,* 871 F.2d 188, 197-98 (1st Cir.) (discussing use of evidence of subsequent acts), *cert. denied,* 493 U.S. 955, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989).   As for Rule 403, the district court's finding that the evidence's probative value overbalanced its potential for unfair prejudice was plainly supportable.   *See, e.g., Rodriguez-Estrada,* 877 F.2d at 156 ("By design, all evidence is meant to be prejudicial;   it is only *unfair* prejudice which must be avoided.").

[29][30]   Jaime Toro's added assertion-that the judge erred in refusing one of his suggested instructions on the proper uses of the evidence-is equally lame.   The requested charge was confusing and ambiguous, if not flatly incorrect.   It is beyond peradventure that a trial court may refuse to give a proposed instruction which is incorrect, misleading, or incomplete in some material respect.   *See, e.g., United States v. Silverman,* 745 F.2d 1386, 1396 (11th Cir.1984); *United States v. Iaciofano,* 734 F.2d 87, 90 (1st Cir.), *cert. denied,* 469 U.S. 850, 105 S.Ct. 168, 83 L.Ed.2d 103 (1984); *United States v. Haldeman,* 559 F.2d 31, 103 n. 196 (D.C.Cir.1976) (listing cases), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).   Toro's proffered instruction, which declared that the evidence in question could not "be considered ... in determining whether the accused did the act charged in the indictment.... [or] for any other purpose whatever, unless the jury first find [sic] that other evidence in the case, standing alone, establishes beyond a reasonable doubt that the accused did the act charged in the indictment," was of this genre.

We do not think the instruction clearly states, or even closely approximates, the method of Rule 404(b).   To be sure, the uses of Rule 404(b) evidence are circumscribed, but the evidence is not stripped of all vitality.   The rule specifically permits extrinsic act evidence to be introduced to prove matters central to the offense charged, e.g., motive, opportunity, intent,

and so forth.   In this case, as we have already mentioned, the evidence regarding the Mexican was specially probative in a number of ways.   The proposed instruction was totally one-sided, ignoring altogether the proper usages of the evidence.   Under the circumstances, the lower court acted within its discretion in refusing to give an instruction which, if not flatly erroneous, at least ran a substantial risk of misleading the jury.

Amparo Toro's argument about this testimony scarcely justifies comment.   The district judge carefully instructed the jury not to consider the challenged evidence against her.   She has not shown any likelihood of prejudicial spillover.   Her assignment of error must, therefore, fail.

## VII. DOUBLE JEOPARDY

David challenges his convictions on the conspiracy and substantive possession counts, citing the Double Jeopardy Clause.[FN9]   He theorizes that a person who is convicted and sentenced on a CCE charge under 21 U.S.C. § 848 cannot constitutionally be convicted and sentenced for predicate offenses, such as conspiracy, 21 U.S.C. § 846, or possession with intent to distribute, 21 U.S.C. § 841, perpetrated in the course of, and included within, the CCE.

> FN9.   The Double Jeopardy Clause mandates that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

[31]   We recently addressed these same double jeopardy concerns in *United States v. Rivera-Martinez,* 931 F.2d 148 (1st Cir.1991).   We ruled that, when a section 846 conspiracy count is used to establish the "continuing series of violations" and "in concert" aspects of a CCE, cumulative punishment on both the conspiracy and the CCE would be unconstitutional.   *See id.* at 152-53.   It is undisputed in this case that the conspiracy counts, counts 1 and 2, were used in exactly this fashion to construct the CCE.   Hence, under our holding in *Rivera-Martinez,* the convictions and sentences on the conspiracy counts must "be erased from the docket." *Id.* at 153.

[32][33]   A different result obtains in respect to David's convictions on counts 3 through 16.   In *Rivera-Martinez,* we held *739 that, unlike in situations where CCE and conspiracy counts are intertwined, Congress intended there to be separate

940 F.2d 722
940 F.2d 722
(Cite as: 940 F.2d 722)

punishments for both a CCE offense and any substantive predicate offenses. *Id.* at 153-54 (citing *Garrett v. United States, 471 U.S. 773, 795, 105 S.Ct. 2407, 2419, 85 L.Ed.2d 764 (1985)).* Thus, the Double Jeopardy Clause does not prohibit conviction and sentence on both a CCE and a count charging an underlying substantive act. *See id.; accord United States v. Jones, 918 F.2d 909, 911 (11th Cir.1990)* (per curiam); *United States v. Jefferson, 782 F.2d 697, 701 (7th Cir.1986).*

We see no need to revisit this issue or to indulge in a rote repetition of the rationale supporting our conclusions.[FN10] It suffices to say that, for the reasons explained at some length in our earlier precedent, *Rivera-Martinez, 931 F.2d at 151-54,* the Double Jeopardy Clause requires only that David's convictions and sentences on counts 1 and 2 be vacated; his convictions and sentences on counts 3 through 16 are impervious to assault on double jeopardy grounds.

> FN10. In an effort to avoid the unwelcome force of precedent, David argues that, even though Congress initially intended that separate punishments be imposed, the federal sentencing guidelines, as they have evolved, presuppose a different result. This argument is plucked out of thin air, without any logical foundation or citation to persuasive authority. Nothing in the Sentencing Reform Act, or in the guidelines themselves, undercuts the rationale of *Garrett* and its progeny.

## VIII. SENTENCING ISSUES

We must next digest a banquet of sentencing issues served up by the appellants.[FN11] The main course comprises the guidelines' applicability to the initial conspiracy. The trimmings consist of incremental arguments concocted by David and Yarden, respectively. Before beginning to work our way through the menu, however, we set the appetizer to one side, categorically rejecting a salmagundi of constitutional attacks on the sentencing guidelines. These issues have been convincingly dealt with before, *see, e.g., Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); United States v. Bradley, 917 F.2d 601, 605 n. 3 (1st Cir.1990); United States v. La Guardia, 902 F.2d 1010, 1014-17 (1st Cir.1990); United States v. Seluk, 873 F.2d 15, 16-17 (1st Cir.1989)* (per curiam), and no useful purpose would be served by pushing them

around yet another plate.

> FN11. In imposing sentence on the defendants, the district court applied the version of the sentencing guidelines which became effective January 15, 1988. The parties do not dispute that this was the proper course. We agree. *See generally United States v. Aymelek, 926 F.2d 64, 66 n. 1 (1st Cir.1991).* Hence, unless otherwise indicated, all citations herein to the guidelines are to that version.

### A. *Applicability of the Guidelines.*

[34] The Toros challenge the lower court's decision to use the sentencing guidelines with regard to the convictions stemming from the count 1 conspiracy. It is well established that the guidelines apply to a defendant whose offense begins before the guidelines' effective date and continues after the effective date. *See, e.g., United States v. Fazio, 914 F.2d 950, 959 & n. 14 (7th Cir.1990)* (collecting cases). The appellants' asseveration depends, therefore, upon whether the conspiracy could be found to extend past November 1, 1987.

[35][36] The district court concluded that the conspiracy was of sufficient duration. We remain mindful that the determination of factbound matters pertinent to sentencing need only be supported by a preponderance of the evidence and can be set aside only for clear error. *See United States v. Ruiz, 905 F.2d 499, 507-08 (1st Cir.1990); United States v. Mocciola, 891 F.2d 13, 16-17 (1st Cir.1989); United States v. Diaz-Villafane, 874 F.2d 43, 48 (1st Cir.), cert. denied, 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989).* Under this criterion, we have no hesitancy in concluding that the finding was amply bulwarked. Indeed, the record was replete with evidence that the count 1 conspiracy did not end until February 1988, at the earliest.

[37] The Toros try to pull a rabbit out of this somewhat bedraggled hat. They say that, even if the conspiracy lasted into 1988, their involvement in it ended no later than the summer of 1987. But, there is no evidence that the Toros withdrew from the conspiracy at an earlier date. It is black letter law that cessation of activity, in and of itself, is not enough to constitute withdrawal from a conspiracy: *740 In order to withdraw, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy.... Typically, there must be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals.

*United States v. Juodakis,* 834 F.2d 1099, 1102 (1st Cir.1987) (per curiam) (citations omitted). Given this rigorous standard, the record before us simply does not permit a finding that the Toros withdrew from the venture. And the sockdolager, of course, is the evidence that the Toros attempted to resume more active participation in the count 1 conspiracy by reestablishing their supply relationship with David in February 1988, well subsequent to the guidelines' inception date.

[38] Equally unpersuasive is the appellants' contention that, for the purpose of factoring guideline calculations, only activity occurring subsequent to November 1, 1987, should have been considered. Where, as here, a defendant is convicted of participation in a conspiracy which extends past the effective date of the guidelines, the guidelines take into account the entirety of the defendant's behavior in furtherance of the conspiracy. *See, e.g., United States v. Arboleda,* 929 F.2d 858, 870-71 (1st Cir.1991); *United States v. McKenzie,* 922 F.2d 1323, 1328 & n. 2 (7th Cir.1991) (collecting cases).


B. *David's Remaining Points Anent Sentencing.*

David challenges the district court's construction of his guideline sentencing range (GSR).[FN12] In approaching this aspect of the case, we confess to finding the record less than pellucidly clear as to the exact manner in which the district court arrived at the GSR. Nevertheless, the gaps in the record do not relate to factual findings, such as would suggest a need to remand. *Cf., e.g., United States v. McDowell,* 918 F.2d 1004, 1011-12 (1st Cir.1990). We can reconstruct the computation satisfactorily (excluding, of course, the conspiracy convictions, *see supra* Part VII).

           FN12. David does not assign error to the sentences imposed on the "telephone" counts, 21 U.S.C. § 843, so we ignore those counts for purposes of this discussion.

Understanding the calculation of the GSR in this case requires an understanding of the term "relevant conduct" as it relates to modern-day sentencing in the federal courts. We explicated the latter concept, vis-a-vis drug offenses, in *United States v. Sklar,* 920 F.2d 107 (1st Cir.1990):

Under the sentencing guidelines as they relate to most narcotics cases, the base offense level-a critical datum in arriving at the GSR-is predicated in large part on the amount of drugs involved. The drug quantity is derived from all acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction," whether or not charged in the indictment. U.S.S.G. § 1B1.3(a)(2). This means that "in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or ... common scheme or plan as the count of conviction." *Id.,* commentary (backg'd)....

*Id.* at 110; *see also United States v. Blanco,* 888 F.2d 907, 909-11 (1st Cir.1989) (describing mechanical operation of "relevant conduct" model).

[39] Here, the district court found that the relevant drug quantity was two hundred fifty kilograms. David does not dispute this assessment as a matter of fact. He does argue, however, that the drugs which he handled before November 1, 1987 should have been excluded because of *ex post facto* problems. The argument is puerile. The CCE ran well past the guidelines' trigger date, and the substantive counts underlying the CCE are thus brought squarely into the computation. *See, e.g., United States v. Allen,* 886 F.2d 143, 145-46 (8th Cir.1989) (amounts of cocaine purveyed prior to guidelines' effective date were appropriately aggregated in setting base offense level when distribution was pursuant to a continuing course of conduct that extended past the effective date); *see also Arboleda,* 929 F.2d at 870-71; *United States v. Cusack,* 901 F.2d 29, 32 (4th Cir.1990) (per curiam). Doing so does not violate the Ex Post Facto Clause, which, in contexts such as this, prohibits **741** any law "mak[ing] more burdensome the punishment for a crime, *after* its commission." *United States v. Giry,* 818 F.2d 120, 135 (1st Cir.) (citations omitted), *cert. denied,* 484 U.S. 855, 108 S.Ct. 162, 98 L.Ed.2d 116 (1987); *see also Allen,* 886 F.2d at 146. In David's case, the guidelines came into effect not after the criminal activity, but during it. Thus, the total amount of narcotics plied in the CCE's course could constitutionally be aggregated for sentencing purposes. *See Cusack,* 901 F.2d at 32 (RICO case); *cf. Giry,* 818 F.2d at 135 (amendment increasing penalty taking effect during commission of conspiracy does not violate Ex Post Facto Clause).

[40] The next step toward setting the GSR required

superimposing the guidelines' grouping provisions upon the relevant conduct provisions. The guidelines provide in pertinent part that:
When a defendant has been convicted of more than one count, the court shall:
(a) Group the counts resulting in conviction into distinct Groups of Closely-Related Counts ("Groups") by applying the rules specified in [U.S.S.G.] § 3D1.2.
(b) Determine the offense level applicable to each Group by applying the rules specified in [U.S.S.G.] § 3D1.3.

U.S.S.G. § 3D1.1(a). Where, as in this instance, differing counts involve "substantially the same harm," and the offense levels are determined "primarily on the basis of ... the quantity of a substance involved," grouping is appropriate. U.S.S.G. § 3D1.2(d). Inasmuch as section 3D1.2(d) specifically recites that offenses which are covered by U.S.S.G. §§ 2D1.1, 2D1.2 and 2D1.5 are to be grouped, it is crystal clear in David's case that count 17 (the CCE charge, covered by § 2D1.5) was duly grouped with counts 3 through 16 (the substantive offenses, each of which was covered by § 2D1.1).

After counts have been appropriately grouped pursuant to section 3D1.2(d), "the offense level applicable to [the] Group is the offense level corresponding to the aggregated quantity [of drugs]." U.S.S.G. § 3D1.3(b). Moreover, "[w]hen the [grouped] counts involve varying offenses" of the same general type, to which different guidelines apply, the sentencing judge must "apply the offense guideline that produces the highest offense level." Id. Thus, to determine the base offense level for the Group comprising counts 3 through 17, the district court was obliged to survey the offense levels applicable to each count and then assign the highest of those levels to the Group.

On the facts of this case, the substantive possession offenses all had the same base offense level, thirty-six, a level determined primarily by the aggregate quantity of drugs involved in David's course of conduct. See U.S.S.G. § 2D1.1 (Drug Quantity Table) (establishing base offense level at 36 where relevant conduct implicates "50 KG cocaine" or more). This was higher than the base offense level assigned to count 17, see U.S.S.G. § 2D1.5, and thus became the trial court's starting point. To the benchmark, the court added two levels for possession of a firearm during the commission of at least one of the offenses. See U.S.S.G. § 2D1.1(b). In addition, the court added four levels pursuant to U.S.S.G. §

3B1.1 (authorizing upward adjustment for a defendant who plays an "aggravating role" as an organizer or leader of a criminal activity involving five or more participants).[FN13] A two-level downward adjustment was made for acceptance of responsibility. U.S.S.G. § 3E1.1(a). The adjusted offense level, then, was forty. The district court used this level to fix the GSR. It sentenced David within the confines of the range. See U.S.S.G. Ch. 5, Pt. A (Sentencing Table).

> FN13. David's contention that the record did not sustain an upward role-in-the-offense adjustment is effectively demolished by our earlier discussion of the evidence against him. See supra Part III. To say more would be an exercise in superfluity.

David complains that, by operation of the grouping principles, the CCE offense takes on the higher offense level attendant to surrounding substantive offenses. Were the CCE offense level calculated separately in his case, the base level would be only thirty-two, and no upward adjustment for role in the offense would be feasible, see U.S.S.G. § 2D1.5, comment., n. 1. It follows that the offense level for the CCE, standing alone, would have been lower than for the grouped counts. On this basis, David somehow concludes that the court was powerless to apply a more onerous base offense level to the CCE through grouping.

*742 The asseveration, although couched in the most perfervid rhetoric, strikes no responsive chords. For one thing, it runs counter to the express language of the guidelines, which mandate such grouping. For another thing, there is nothing particularly surprising, or unfair, about the result. The CCE base offense level, thirty-two, is clearly intended to be a minimum. It ensures that when a defendant is convicted only on a CCE charge, or on a combination of a CCE and substantive charges involving relatively small amounts of drugs, a substantial sentence will nonetheless ensue. When, as here, a defendant is convicted not only of operating a CCE, but also on substantive counts involving vast amounts of drugs, the constraint set by U.S.S.G. § 2D1.5 is slack, and the base offense level takes on the coloration of the provisions applicable to the substantive counts. Thus, the level of forty, being properly calculated on at least one substantive count, was appropriately assigned to the CCE as well.

David also contests the upward adjustment for

940 F.2d 722
940 F.2d 722
**(Cite as: 940 F.2d 722)**

Page 23

possession of a firearm. The district court ordered the increase based on evidence that a gun was held to Filin's head in an attempt to get Filin to talk about the stolen drug shipment. *See supra* p. 732. The judge found specifically that the firearm was of assistance in commission of the drug offenses and that David was responsible for its use. David's challenge to these findings is reviewable only for clear error.

The evidence obviously supports the finding that David was responsible for the gun's use, whether or not he actually held the gun himself. It was perfectly reasonable for the sentencing judge to conclude that, in brandishing a firearm (or causing one to be brandished) while trying to retrieve a stolen consignment of cocaine, David was furthering the substantive offense related to that shipment. *See, e.g., McDowell,* 918 F.2d at 1011 (§ 2D1.1(b) adjustment should be made if gun is present "unless it is clearly improbable that the weapon and the offense were connected"); *Ruiz,* 905 F.2d at 507 (summarizing cases from other circuits). The upward adjustment was appropriate.

### C. Yarden's Remaining Points Anent Sentencing.

Yarden asserts that the district court improperly fixed his base offense level by attributing to him the ten kilogram shipment of cocaine which Parrish brought to Boston in April 1988. *See supra* p. 733. Yarden claims that he was unaware of the shipment and that its attribution to him for purposes of sentencing on the count 2 conspiracy was error. But, the district court's answer to this fact-dominated question is reviewable only for clear error, *see Bradley,* 917 F.2d at 605; *Diaz-Villafane,* 874 F.2d at 48, and we discern none here.

[41][42] For attribution to occur, there is no requirement that a defendant involved in a drug conspiracy must actually have known that a particular shipment was effectuated. As long as the shipment was a foreseeable fruit of the conspiracy and within

its scope, the amount of drugs may be attributed to a coconspirator. *See* U.S.S.G. § 2D1.4, comment., n. 1 ("If the defendant is convicted of conspiracy, the sentence should be imposed only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to the defendant or was reasonably foreseeable."). Whether or not Yarden actually knew that the ten kilograms were in transit, there is no doubt that, given the scope and contours of the planned conspiracy, the shipment was reasonably foreseeable.

Moreover, Yarden introduced Parrish to David as a possible courier and was clearly aware that David was awaiting cocaine from Colombia. The evidence in this case was adequate to support the court's explicit finding that, at a minimum, Yarden played some role in effectuating the shipment. This, we think, was enough, by itself, to bring the ten kilogram transaction into the sentencing calculation. *Cf., e.g., United States v. Franco,* 909 F.2d 1042, 1046 (7th Cir.1990) (where defendant knew or could reasonably have foreseen sale by coconspirator, quantity sold properly used in computing defendant's sentence).

### IX. CONCLUSION

We need go no further. To the extent that the appellants have preserved other issues for appeal, none warrant discussion. After close and careful perscrutation of the record in light of the applicable law, we are fully persuaded that the several appellants, caught in a web of their own manufacture, *743 were fairly tried and, with one exception, justly convicted and sentenced.

*The appellant David's convictions and sentences on counts 1 and 2 of the indictment are vacated. David's other convictions and sentences are affirmed. The convictions and sentences of appellants Jaime Toro Aristizibal, Amparo Toro Aristizibal and Yehuda Yarden are all affirmed.*

### APPENDIX
Summary of Specific-Transaction
Counts in Superseding Indictment

_____

<u>Count No.</u>          <u>Approx. Offense Date</u>          <u>Defendants Involved</u>

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

940 F.2d 722                                                         Page 24
940 F.2d 722
**(Cite as: 940 F.2d 722)**

| 3  | August 1986       | David, Yossi, J. Toro                          |
|----|-------------------|------------------------------------------------|
| 4  | November 13, 1986 | David, Yossi, J. Toro                          |
| 5  | December 19, 1986 | David, Yossi, J. Toro                          |
| 6  | January 23, 1987  | David, Yossi, J. Toro                          |
| 7  | March 2, 1987     | David, Yossi, J. Toro                          |
| 8  | March/April 1987  | David, Yossi, J. Toro                          |
| 9  | April 24, 1987    | David, Yossi, J. Toro                          |
| 10 | May 1, 1987       | David, Yossi, J. Toro                          |
| 11 | June 12, 1987     | David, Yossi, J. Toro                          |
| 12 | June/July 1987    | David, Yossi, J. Toro, Nuni                    |
| 13 | July 1, 1987      | David, Yossi, J. Toro, Nuni                    |
| 14 | July 15, 1987     | David, Yossi, J. Toro, Nuni                    |
| 15 | April 26, 1988    | David, Yossi, Nuni                             |
| 16 | April 28, 1988    | David, Nuni, Abramson, Anthony Ramirez, Wilfredo Martinez |
| 18 | May 1987          | Natanel                                        |
| 19 | March 10, 1988    | David, Danny Yarden                            |
| 20 | March 25, 1988    | David, Yossi, Shlomo Levy                      |
| 21 | March 24, 1988    | David, Yehuda Yarden                           |
| 22 | March 26, 1988    | Yossi, Natanel                                 |
| 23 | March 27, 1988    | David, Natanel                                 |
| 24 | April 27, 1988    | David, Ramirez                                 |
| 25 | April 24, 1988    | Nuni, Abramson                                 |
| 26 | April 28, 1988    | Nuni, Abramson                                 |
| 27 | April 26, 1988    | David, Yossi                                   |

NOTE: Counts 3-16 and count 18 charged possession with intent to distribute, see 21 U.S.C. § 841(a)(1); count 19 was dropped prior to verdict; counts 20-27 charged communications offenses, see 21 U.S.C. § 843(b) .

On Motion for Rehearing.

Sept. 27, 1991.

Appellant has filed a petition for rehearing focused exclusively upon the district court's upward adjustment of the guideline sentencing range to reflect the use of a firearm in connection with the commission of the offenses of conviction, particularly the continuing criminal enterprise (CCE) charge. Appellant's petition challenges our affirmance of this aspect of his sentence on several grounds. To some extent, these arguments rehash points made to, and rejected by, the panel, see, e.g., Op. at 741, 742-43, and do not call for any further comment. The appellant also argues, however, that the upward adjustment was erroneous because the Sentencing Guidelines in effect at the time he was sentenced contained a lacuna making the gun possession enhancement inapplicable to a CCE charge under 21 U.S.C. § 848. On a proper record, this artfully spun asseveration *744 might have some merit (or, at least, call for some detailed analysis). The appellant, however, failed to make the argument at the time of sentencing or to object to the presentence report on this basis. As we have stated on numerous occasions in analogous circumstances, issues not seasonably presented in the district court will not be addressed on appeal. See, e.g., United States v. Pilgrim Marketing Corp., 944 F.2d 14, 21 (1st Cir.1991) (refusing to consider defendant's conceptual challenge to abuse-of-trust enhancement under sentencing guidelines because point was not raised below); United States v. Fox, 889 F.2d 357, 359 (1st Cir.1989) (similar).

The petition for panel rehearing is denied.

C.A.1 (Mass.),1991.
U.S. v. David
940 F.2d 722

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.