# EXHIBIT A

09/01/06  12:48 FAX 4137850394       US ATTY'S OFFICE                    ⌀006/018



FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  07/30/2006

JOSEPH ASSELIN, Date of Birth: ▌, 1963, Social Security Number: ▌-1677, appeared at the United States Attorney's Office, Springfield, MA, with his attorney, Bernie Grossman, for the purpose of giving a proffer. Present for the government were Assistant United States Attorney (AUSA) William Welch, AUSA Steve Breslow, AUSA Kevin O'Regan, Special Agent (SA) Samuel Ortiz, Office of Inspector General, Department of Housing and Urban Development, and SA Susan Kossler, Federal Bureau of Investigation.

At the beginning of the proffer, AUSA Welch advised ASSELIN of the standard guidelines of the proffer, that is, that it was against the law for ASSELIN to lie during the proffer and further, ASSELIN should not downplay his responsibility nor exaggerate the conduct of others. ASSELIN stated he understood the guidelines of the proffer, and thereafter provided the following information:

**BACKGROUND**

ASSELIN was born and grew up in Springfield, MA. He attended Cathedral High School. He graduated from Western New England College in 1985. His first job after graduating was with Suffield Bank. ASSELIN was hired as a loan inspector for construction lending. ASSELIN stayed with Suffield for about five years. He received several promotions but stayed with commercial and/or construction lending.

In July 1990, ASSELIN was fired by Suffield Bank for poor performance. Following a foreclosure, Suffield Bank had taken over a residential real estate development in Northampton, MA called Indian Hills. The bank had decided to finish the development, selling off each house as it was completed. ASSELIN had a budget and construction deadlines to meet. He missed some of his deadlines and there were also some cost overruns. Some of this occurred as a result of PETER DAVIS not meeting his (DAVIS') deadlines.

In January 1991, ASSELIN worked for ED MURPHY for about three to four weeks. ASSELIN was then offered a job by PALMER GOODELL INSURANCE AGENCY as an accountant. The salary at PALMER

Investigation on  07/28/2006   at  Springfield, MA

File # 194B-BS-90535-302                     Date dictated

by  SA Susan E. Kossler                      209sek01.302

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)

194B-BS-90535-302

Continuation of FD-302 of __Joseph Asselin__ , On 07/28/2006 , Page 2

GOODELL was substantially more that what MURPHY could offer ASSELIN. MURPHY told ASSELIN to take the job. ASSELIN was eventually promoted to Chief Financial Officer. In 2000, PALMER GOODELL was sold to a division of Banknorth. ASSELIN stuck around for two more years before leaving in March 2002.

Effective July 2002, ASSELIN purchased CHAFFEE HELLIWELL INSURANCE COMPANY. The actual closing for the sale was in September 2002.

**BUSINESS WITH PETER DAVIS / FORMATION OF PJ RICHFIELD**

In 1986/1987, when ASSELIN was involved in construction lending, he began to interact with PETER DAVIS (DAVIS). ASSELIN had previously known DAVIS because DAVIS was part of a group called the "breakfast club." The original members of the group were DAVIS, ASSELIN'S father, RAY ASSELIN, SR. (RAY SR.), ASSELIN'S uncle, BILL ASSELIN, JOHN PAPPAS, BILL PAPPAS, PETER PAPPAS (BILL'S son), and PETER ALEXOPOULOS. The group met every Saturday morning over breakfast. It was a social group but they also were partners in business projects and shared mutual investments.

ASSELIN'S first joint venture with DAVIS was in South Hadley. BILL PAPPAS owned a sub-division off of Lathrop Street. ASSELIN and DAVIS decided to buy two lots. BILL ASSELIN and JOHN PAPPAS took two lots. PETER PAPPAS took one lot. ALEXOPOULOS may have bought two lots.

ASSELIN and DAVIS got a loan through Bank of Boston. ASSELIN did all the paperwork for the loan. The loan was in the name of PJ RICHFIELD, a company formed by ASSELIN and DAVIS. PJ stands for PETER and JOSEPH, and RICHFIELD is a combination of "rich fields", referring to the land purchased in South Hadley. ASSELIN thought he had a 50% interest in PJ RICHFIELD. He had a stock certificate that indicated he owned 50% of the shares.

This was ASSELIN'S first real estate investment. He was not sure if it was the first real estate investment for DAVIS. ASSELIN relied on the advise of his father. RAY SR encouraged his son to make the investment because ASSELIN had expressed an interest, but RAY SR did not want to get involved.

DAVIS handled the checkbook for this project. No Springfield Housing Authority (SHA) workers were used on these

FD-302a (Rev. 10-6-95)

194B-BS-90535-302

Continuation of FD-302 of __Joseph Asselin__, On __07/28/2006__, Page __3__

two houses. RAY DESCOUTEAU and JIM HOULE worked on the houses but they had their own company and worked on their own time. When DAVIS and ASSELIN sold the houses, they "made a bundle."

DAVIS and ASSELIN used the profit from the houses in South Hadley to buy a sub-division in Granby called Country View Lanes. They had to construct a road for this project. BILL PAPPAS put up a $100,000 certificate of deposit (CD) to finance the road. Because ASSELIN was busy at Suffield Bank, DAVIS was more of the "hands on" guy in Granby. They sold off a couple of lots and developed the rest and overall made a profit.

DAVIS and ASSELIN used the profit from Granby to purchase 10 or 11 lots in Wilbraham. They always rolled their profits into the next project. In 1987/1988, ASSELIN recalled having to declare something on his taxes but that was the only year.

By the time they purchased the land in Wilbraham, ASSELIN was still a financial partner but was completely hands off regarding the construction and other day to day responsibilities, which were handled by DAVIS. DAVIS kept the books for PJ RICHFIELD and wrote the checks to the vendors.

The housing market collapsed in 1989/1990 and ASSELIN and DAVIS "lost our shirts." The bank took over the property. When the bank took over, the remaining properties, described by ASSELIN as being on "the left hand side", were sold at auction. DAVIS told ASSELIN that they broke even after the auction. ASSELIN was unaware the bank had placed an attachment on his former residence. ASSELIN was shown bank documents regarding the land in Wilbraham. After viewing the documents, ASSELIN still did not recall the attachment. ASSELIN was not sure if it was his signature on one of the documents regarding the attachment. ASSELIN re-stated that DAVIS handled the day to day finances. The profits from South Hadley and Granby were lost in Wilbraham. DAVIS and RAY SR told ASSELIN all of the debt was settled and they "broke even." ASSELIN returned his stock certificates to DAVIS and thought PJ RICHFIELD was "done." ASSELIN was not aware of any paperwork associated with the issuance or return of the stock certificate.

The three primary years that ASSELIN worked with DAVIS were 1986, 1987, and 1988.

FD-302a (Rev. 10-6-95)

1948-BS-90535-302

Continuation of FD-302 of _____Joseph Asselin_____, On __07/28/2006__, Page __4__

    DAVIS drew a salary from PJ Richfield, ASSELIN did not.

    About the same time the Wilbraham project failed, the CD for the road construction in Granby matured. According to ASSELIN, the bank made a "mistake" and returned the CD to DAVIS and ASSELIN. There was some discussion as to what to do with the money. RAY SR was present during these discussions. RAY SR recommended returning the money to BILL PAPPAS and worry about the money owed to the bank later. The money was repaid to PAPPAS.

    The failure of the Wilbraham project, and what to do about it, was discussed at Saturday breakfast club meetings.

    Around the same time as the Wilbraham failure, DAVIS started doing other projects. DAVIS started moving away from residential development and started doing commercial work for RAY SR. ASSELIN did not know how DAVIS started doing the work for RAY SR., he just knew that DAVIS was. ASSELIN was aware that RAY SR was "guiding" DAVIS with respect to an application for a project at the Holyoke Housing Authority. ASSELIN was not aware of any other jobs. ASSELIN did not know if RAY SR guided DAVIS regarding any Springfield jobs.

    Around 1990, ASSELIN stopped attending the Saturday morning breakfasts. ASSELIN was married and had started a family. He was also now employed with PALMER GOODELL.

    Just slightly before this time, 1989/1990, was when ASSELIN started having "issues" with DAVIS regarding the construction schedule at Indian Hills in Northampton. DAVIS was one of several sub-contractors. DAVIS had the sub-contract to do either finish work or drywall. ASSELIN thought it was probably drywall. The idea for DAVIS to be a sub-contractor at Indian Hills was developed during a conversation between ASSELIN, DAVIS, and RAY SR. RAY SR suggested ASSELIN could make sure DAVIS would get the contract from the bank and in return, ASSELIN would receive a "fee back" or "commission" from DAVIS. ASSELIN recalled his father saying, "You can get him a commission, can't you Pete?"

    The bank did not know that DAVIS was paying ASSELIN a commission nor did it know that ASSELIN was a business partner with DAVIS in PJ RICHFIELD.

09/01/06  12:47 FAX 4137850394        US ATTY'S OFFICE                    ☒010/016

FD-302a (Rev. 10-6-95)

194B-BS-90535-302

Continuation of FD-302 of ___Joseph Asselin_____, On _07/28/2006_, Page __5__

    ASSELIN would tell DAVIS the quote DAVIS had to beat to get the sub-contract. DAVIS would offer a quote just under the figure ASSELIN had given him. ASSELIN did not want DAVIS to bid too low because it would have affected ASSELIN'S commission. AUSA Breslow asked ASSELIN how DAVIS felt about this arrangement. ASSELIN responded, "He loved it!"

    There were four or five houses that had to be finished and sub-contracts were awarded for each house. DAVIS got the drywall sub-contract for all the houses. ASSELIN did not remember if DAVIS used his name or PJ RICHFIELD for the contracts. ASSELIN did not think DAVIS had another company.

    ASSELIN'S commission was based on the amount of the contract. DAVIS figured out the amount and told ASSELIN what percentage he would receive. ASSELIN was not sure what percentage of the total amount he was paid. ASSELIN was paid entirely in cash, none of which he reported to the Internal Revenue Service. ASSELIN initially estimated the cumulative amount he received from DAVIS as $10,000 to no more than $20,000. ASSELIN then recalled he had borrowed $20,000 from RAY SR, possibly to buy the residential lots. RAY SR took out a home equity loan to get the money. ASSELIN used the commission payments from DAVIS to pay his father back.

    ASSELIN did not know if DAVIS was doing SHA work at the same time. ASSELIN was shown a DECAM form for PETER DAVIS. ASSELIN did not recognize the form, however he did recognize several of the projects listed on the form, such as the residential developments in South Hadley, Granby, and Wilbraham.

**ASSELIN'S HOME IN AMHERST**

    In the fall of 1997, ASSELIN had begun building his house in Amherst. During August or September, RAY SR. approached ASSELIN. RAY SR. said DAVIS owed RAY SR. some money. At the time, ASSELIN did not realize just how much money DAVIS owed his father. ASSELIN believed that DAVIS owed RAY SR. money because RAY SR had generated business for DAVIS, but ASSELIN did not know specifically what business his father had generated. He found out much later it was because of the "same scenario", like ASSELIN and DAVIS had in Northampton. In this case, DAVIS owed RAY SR. for SHA contracts RAY SR. had awarded to DAVIS. When the house was being built, DAVIS wanted to make all of the payments

FD-302a (Rev. 10-6-95)

194B-BS-90535-302

Continuation of FD-302 of ____Joseph Asselin_____ , On 07/28/2006 , Page 6

in 1997. This was because it coincided with DAVIS closing the books on his last SHA project.

DAVIS wanted to pay some of ASSELIN'S construction costs as a way to settle his debt with RAY SR. RAY SR. explained DAVIS could pay RAY SR "dollar for dollar" and RAY SR. would get 100% of the value owed to him. DAVIS could pay for concrete work, lumber work, and brick work. RAY SR. said if DAVIS paid RAY SR. in cash, DAVIS would have to pay taxes on the cash and this amount would be deducted from the amount owed RAY SR. RAY SR. said if DAVIS paid for ASSELIN'S construction costs, DAVIS could "write it off as materials and labor", in other words, deduct the costs from his taxes. RAY SR. said this was his gift to ASSELIN.

RAY SR. asked ASSELIN for a list of the vendors who were working on ASSELIN'S house. The lumber vendor was SPRINGFIELD LUMBER. The "brick man" was JACK MATOUSE and the concrete vendor was ROY & DUTIL. When RAY SR. heard the lumber and brick vendors, he responded, "Good, Peter has used those guys too." RAY SR. was not sure about ROY & DUTIL. There was a fourth vendor paid by DAVIS, TOUSSAINT BROTHERS, who did the framing. ASSELIN was not sure if the TOUSSAINTS had previously worked for DAVIS.

While construction was proceeding, RAY SR. would ask ASSELIN for the bills, "How much you owe your concrete guy? You got a bill? I'll give it to Peter. Peter needs to pay his bills." ASSELIN actually paid MATOUSE before he finished his work because DAVIS wanted to get the bill paid. ASSELIN never went over 30 days on his lumber bills because of DAVIS. ASSELIN received the checks for the framers ahead of time and held them until the framers were done.

At some point, RAY SR. asked ASSELIN for copies of the lumber bills to give to DAVIS. ASSELIN did not receive any checks directly from DAVIS. The checks were always delivered through his father. MATOUS may have received one check directly from DAVIS.

Once the bills were paid in 1997, ASSELIN did not hear about/from DAVIS until a chance meeting in 2000/2001. DAVIS may have been in town for a wedding, and ASSELIN happened to run into him one day. DAVIS told ASSELIN, "I hear you have a nice (or a beautiful) house." ASSELIN responded it was nice and

09/01/06 12:48 FAX 4137850394          US ATTY'S OFFICE                    ⌀012/016

FD-302a (Rev. 10-6-95)

194B-BS-90535-302

Continuation of FD-302 of __Joseph Asselin__, On 07/28/2006, Page 7

thanked DAVIS. DAVIS said he was glad everything had worked out. DAVIS said, "It worked for both of us." ASSELIN took this statement to mean, "I got a nice house, my father got repaid, and Peter got to deduct the payments on his taxes."

After the wedding, ASSELIN asked RAY SR. about DAVIS and if he was worried about being investigated. RAY SR. said DAVIS was "sitting okay" because the IRS only goes back so far to audit taxes and the time for auditing 1997 and the bills paid for ASSELIN'S house had passed. ASSELIN responded he was glad DAVIS was not worried.

Regarding the other vendors used to build his house, as construction progressed, ASSELIN realized that all of the vendors obtained by his father were also vendors for SHA. ASSELIN had considered using someone for the electrical work, but his father wanted to use a SHA vendor. RAY SR. told ASSELIN, "we're gonna run it all through Manny", regarding the heating work. ASSELIN was aware these vendors had also been awarded contracts at other housing authorities. ASSELIN by this time knew that these vendors owed his father money for "fees" or commission for work his father had generated for them and were basically working on his house for free.

DAVIS was the only vendor who asked for documents or wanted to get billed for payment. The one exception was for a shed that was built in the backyard. GARY BARIBEAU, owner of G & R CONSTRUCTION (G&R), asked for a bill for the shed.

## RAY ASSELIN SR.'S RELATIONSHIP WITH VENDORS

ASSELIN stated, "I knew my Dad had leverage over all the vendors." ASSELIN used an example of an incident with EASTERN ELECTRONICS. ASSELIN had been trying to get EASTERN ELECTRONICS to the new house to install an alarm and central vac system. Initially, ASSELIN was told they would be there in two weeks. ASSELIN called and complained to his father. After his father spoke with the vendor, they came the next day.

ASSELIN felt that his father deserved the commissions he received from the vendors. GARY BARIBEAU, owner of G & R CONSTRUCTION, and NICK KATSOUNAKIS, owner of MANNY'S, were just tradesmen before they started doing business with RAY SR. They never had the wherewithal to put contracts together without help

FD-302a (Rev. 10-6-95)

194B-BS-90535-302

Continuation of FD-302 of ___Joseph Asselin_____, On _07/28/2006_, Page __8__

from RAY SR. DAVIS, although he was smarter, still received help from RAY SR with the paperwork required for the contracts.

As a general rule, RAY SR. was strict with the contractors. RAY SR. would not pay until the work was completed. The contractors always wanted payment immediately upon completion, including DAVIS.

RAY SR. told ASSELIN that DAVIS did not complete some of his work. For one of the parking lots DAVIS built, DAVIS did not tie off the last sewer hole into the sewer system. RAY SR. let DAVIS get away with this because the work had already been inspected and approved when DAVIS told RAY SR about it.

At the same garage, the roof was not done to specifications. RAY SR. observed this as it was happening and made DAVIS redo the work.

ASSELIN was aware that another SHA contract awarded to DAVIS involved porches.

ASSELIN was shown handwritten notes regarding PJ RICHFIELD, taxes, and money owed to Bank of Boston. ASSELIN did not recognize these notes.

ASSELIN recalled he had other discussions with his father regarding cash payments versus having a vendor pay for costs and getting a "dollar for dollar value."

ASSELIN did not know of any disagreements between his father and DAVIS that caused DAVIS to move to Newburyport. ASSELIN thought DAVIS was moving back home.

**DISCUSSIONS ABOUT THE CRIMINAL INVESTIGATION:**

ASSELIN never discussed the public corruption investigation or pending trial with DAVIS. A few months after everyone was indicted and arrested, RAY SR. told ASSELIN that DAVIS was going to say the payments made on ASSELIN'S house were profits from their prior real estate dealings (meaning South Hadley, Granby, and Wilbraham). ASSELIN responded he thought PJ RICHFIELD was broke after the failure in Wilbraham. RAY SR. said DAVIS would think of something. ASSELIN responded, "Dad, whatever it takes to get us off." ASSELIN got the impression that DAVIS suggested this story to RAY SR. to see if ASSELIN

FD-302a (Rev. 10-6-95)

194B-BS-90535-302

Continuation of FD-302 of  Joseph Asselin                             , On 07/28/2006 , Page  9

would agree with it. ASSELIN'S response of "whatever it takes...." was not an acceptance of the proposal as much as a reflection that ASSELIN did not think the excuse would really work and he just wanted to end the conversation.

Before the indictments, RAY SR. told ASSELIN that DAVIS had been subpoenaed and DAVIS sent the subpoena to his son. After the son appeared in grand jury, RAY SR. told ASSELIN that the son could not answer any questions about what had happened in the 1980s.

Sometime after the indictments, RAY SR explained the money owed to RAY SR by the people who had done work on ASSELIN'S house, was fees or kickbacks for getting DAVIS and the other vendors jobs. RAY SR explained the money laundering charge came from accepting cash from the vendors. RAY SR and ART SOTIRION "developed" these vendors. ASSELIN commented, "My father for the longest time thought it was still okay to do this." The conversation regarding how DAVIS was going to fix things came after this conversation.

ASSELIN had no knowledge of the "R Factor" or the "A Factor."

Early on in the investigation, there were many conversations with RAY SR and other family members wherein it was discussed that ASSELIN would simply say the payments were a gift from his father.

None of the conversations about the investigation that are noted in this section took place in the presence of an attorney.

## ASSELIN'S RELATIONSHIP WITH PALMER GOODELL VENDORS

BILL PORFILLO, the owner of EASTERN ELECTRONICS, built the cost of ASSELIN'S alarm and central vac into a remodeling project for PALMER GOODELL. CARNEVALE, the President of PALMER GOODELL, did not know about the bill. ASSELIN did not think CARNEVALE would care about the extra cost as long as the final cost was still under budget. ASSELIN wanted to do something for his sister but his father took care of it.

MVM CLEANING was a cleaning service for PALMER GOODELL. Whenever a special cleaning project came up for bid, ASSELIN

09/01/06  12:49 FAX 4137850394        US ATTY'S OFFICE                    ☒015/018

FD-302a (Rev. 10-6-95)

194B-BS-90535-302

Continuation of FD-302 of __Joseph Asselin_____, On 07/28/2006, Page 10

would usually give the job to MVM but ASSELIN expected something
in return. For example, one of the special projects was power
washing. ASSELIN told MVM he would give them the job but he
wanted his own power washer as part of the deal. MVM agreed to
give ASSELIN their power washer when they were finished with the
project. MVM also cleaned ASSELIN'S house for free. ASSELIN
received a computer in exchange for awarding MVM a carpet
cleaning contract. MVM broke ASSELIN'S shower door while
cleaning it and ASSELIN made them replace the door with a $1,000
door. MVM gave ASSELIN a 27" television after they bought a new
one. When PALMER GOODELL had to purchase approximately 80 new
chairs, MVM said they had a dealer that could give them a good
price and offered to cut ASSELIN in on the deal. ASSELIN
received a cash kickback of less than $1,000 for the chair deal.
MVM also took ASSELIN out to dinner a couple of times. ASSELIN
equated the goods and services he received from MVM with getting
baseball tickets from Traveler's Insurance Company. ASSELIN
stated, "I wasn't hurting anybody and I was coming in within
budget."

The vending company ASSELIN hired for PALMER GOODELL
was recommended to ASSELIN by his brother, JIMMY ASSELIN. The
company was owned by "PIC" DELONG. ASSELIN kicked out AROMATIC,
which was the old company. ASSELIN received a percentage of the
month's proceeds at the end of the month. The payments were in
cash. PIC'S brother was the one who always delivered the
payment. It was usually $150 to $200. The payments were not
regular. Sometimes they skipped a month or two, "you couldn't
count on it."

ASSELIN also received a "commission" from PYNCHON
PRESS. The owner, CLAUDE LABRIE, was a friend of the family.
PYNCHON PRESS had been a vendor of PALMER GOODELL for a while.
They basically did a good job, although ASSELIN never got along
with their marketing person. When PALMER GOODELL spun off part
of the company, LABRIE wanted to make sure he continued to get
their business. ASSELIN told LABRIE he would make sure LABRIE
continued to get the contracts but ASSELIN "expected to be taken
care of" in return. ASSELIN received $2,4000 per year as a
commission. At the end of the year, LABRIE sent ASSELIN a 1099
in his son's name to cover the payment. ARTHUR SOTIRION was
responsible for setting the price fo the commission. ASSELIN
told SOTIRION about the deal he had brokered with LABRIE.
SOTIRION asked ASSELIN how much he was getting and ASSELIN did
not know yet. SOTIRION advised ASSELIN if ASSELIN was going to

FD-302a (Rev. 10-6-95)

1948-BS-90535-302

Continuation of FD-302 of __Joseph Asselin__ , On _07/28/2006_ , Page _11_

    ask for a deal, he needed to set a good price. SOTIRION negotiated the $2,400 per year commission for ASSELIN.

    RON GORDENSTEIN is the owner of BROADWAY OFFICE SYSTEMS. GORDENSTEIN gave ASSELIN a desk, which is in his office now. ASSELIN paid GORDENSTEIN a portion of what the desk was worth. GORDENSTEIN stored ASSELIN'S furniture in his warehouse on Tapley Street for six months and helped ASSELIN move into his new house at no cost to ASSELIN. This was not done in relation to any specific contract.

    PALMER GOODELL got the SHA contract for payroll deductions. PALMER GOODELL tried to get the commercial truck insurance contract but were not successful. The contract with SHA was all above board. There were no commissions, kickbacks, nothing of the kind.