UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                              Criminal No. 04-30033-MAP

RAYMOND ASSELIN, SR., et al.

Defendants.

**DEFENDANT PETER DAVIS'S RULE 29
MOTION FOR JUDGMENT OF ACQUITTAL**

Pursuant to Fed. R. Crim. P. 29, Defendant Peter Davis hereby moves for entry of a judgment of acquittal on all counts.

**INTRODUCTION**

Federal Rule of Criminal Procedure 29 provides that the Court must enter a judgment of acquittal where the "evidence is insufficient to sustain a conviction." Fed. R. Crim. Proc. 29(a). Here, Mr. Davis is entitled to judgment of acquittal on all counts for five independent reasons. First, the government has failed to prove as it must, beyond a reasonable doubt, that Mr. Davis was engaged in an unlawful agreement to commit bribery and violate RICO within the statute-of-limitations period—that is, after July 9, 1999. Here, the undisputed evidence demonstrates that as of June 1998, more than a year prior to the limitations period, Mr. Davis had retired from contracting work, moved from the Springfield area, and had no relationship whatsoever with the Springfield Housing Authority; accordingly, the government has failed to demonstrate that Mr. Davis's conspiratorial agreement existed within the statute-of-limitations period. Second, even if the government were able to prove that actions in furtherance of his agreement occurred after July 1999, Mr. Davis is nonetheless entitled to a judgment of acquittal because the government

has not proven that Mr. Davis did not withdraw from any alleged conspiracy prior to the

limitations period.  Third, no rational trier of fact could conclude that an offer or promise was

made by Mr. Davis with the intent to induce any official act.  Indeed, the <u>only</u> evidence on this

point comes from Joseph Asselin, who testified that Mr. Davis wrote checks to vendors for work

done on his home for past SHA contracts Mr. Asselin, Sr. awarded Mr. Davis.  This evidence

alone is simply insufficient for a rational jury to conclude that Mr. Davis made an offer or

promise to Mr. Asselin, Sr. or Arthur Sotirion, with the intent to influence any official act.

Without such evidence, Mr. Davis is entitled to a judgment of acquittal.  Fourth, Mr. Davis is

entitled to a judgment of acquittal because the government has failed to introduce any evidence

of a nexus between Mr. Davis's payments for the benefit of the Asselin children to any specific

"official act" by Mr. Asselin, Sr. or Arthur Sotirion, as that term is defined in the statute,

§ 201(a)(3).  Finally, as to the RICO conspiracy charge, the government has not proven beyond a

reasonable doubt that Mr. Davis agreed to the commission of a "pattern" of racketeering activity

or that he agreed to participate in the operation or control of the SHA.

## <u>SUMMARY OF EVIDENCE</u>

### A.    *Evidence Relevant to Mr. Davis's Statute-of-Limitations and Withdrawal Arguments*

The record is undisputed that Mr. Davis permanently severed his relationship with the

Springfield Housing Authority by May 1998 at the latest.  He last bid (unsuccessfully) for a

contract on June 4, 1998, and received his final payment from the SHA, for work done on a

previous contract on May 11, 1998.  Deborah Barton, currently the CFO of the SHA, testified

that she reviewed the SHA meeting minutes and vendor payments, that no contracts were

awarded to P.J. Richfield after October 21, 1997, and no payments were made to P.J. Richfield

after May 11, 1998. Trial Tr. 1053-54 (Sept. 27, 2006).[1] The record is equally clear that Mr.

Davis, in this same time frame, retired and moved from the Springfield area to eastern

Massachusetts. Mr. Davis's retirement, move, and cessation of any involvement with SHA were

all known by his alleged co-conspirators. Joseph Asselin testified that his father, Raymond

Asselin, Sr., told him that in the fall of 1997 Mr. Davis had planned to retire from SHA work and

move away from the Springfield area to eastern Massachusetts. Trial Tr. 2891-92 (Oct. 13,

2006). Mr. Asselin also testified that Mr. Davis's retirement and move from Springfield were

openly discussed among Raymond Asselin, Sr. and the rest of the Asselin family (all or almost

all of whom are alleged fellow co-conspirators) during family dinners. *Id.* at 2892. Lisa Asselin

also testified that she knew that sometime in 1997 or 1998 Mr. Davis had retired and moved

from the Springfield area to Newburyport, MA. *Id.* at 1361-62 (Oct. 3, 2006).

The record evidence demonstrates that, while Mr. Davis had <u>no</u> business dealings with

the SHA after 1998, he did have a few isolated social contacts with the Asselin family. Lisa

Asselin testified that, after retiring and moving to Newburyport, Mr. Davis attended a campaign

fundraiser for Christopher Asselin's 1999 political campaign, and that she observed Mr. Davis

give Christopher Asselin an envelope. *Id.* at 1626-27, 1630. Government Exhibit 139 indicates

that sometime prior to May 1999, Mr. Davis contributed $100 to Christopher Asselin's

campaign. FBI Special Agent Morehead testified that on April 10, 2003, he interviewed Mr.

Davis about his involvement with the SHA, and Mr. Davis told him that he had seen Raymond

Asselin, Sr. at a wedding sometime about a year before the interview. *Id.* at 2478-79 (Oct. 10,

---

[1]    This testimony was confirmed by Defense Exhibit ZZ (listing all SHA contracts over $20,000), and
Government Exhibit 2 (vendor payments to P.J. Richfield), which indicate that Mr. Davis did not receive, and
was not paid for, any SHA contracts after May 1998. Moreover, the SHA meeting minutes, Defense Exhibits
Q-U, contain no mention of P.J. Richfield after June 8, 1998.

2006).  Joseph Asselin testified that he saw Mr. Davis at the funeral of Billy Pappas, another

"breakfast club member," in 2000 or 2001, Trial Tr. at 2870-71 (Oct. 13, 2006), and that Mr.

Davis would periodically socialize with his father after his retirement and move.  *Id.*  Apart from

the above—one wedding, one fundraiser, and one funeral – there is no other evidence of any

other social contacts between the Davises and any of the Asselins after 1998.

      The only other evidence in the case regarding <u>any</u> post-1998 conduct by Mr. Davis is

Special Agent Morehead's testimony about his interview of Mr. Davis on April 10, 2003.  The

government contended initially that Mr. Davis made false statements in this interview—

including that Mr. Davis was the sole employee of P.J. Richfield and that one Walter Kelly was a

partner of Mr. Davis's—but seems to have changed its position as to at least some of these

statements.  Agent Morehead testified in evidence admitted only as probative of consciousness of

guilt that, when interviewed by the FBI in April 2003, Mr. Davis made the following statements

to the FBI: (1) Mr. Davis's primary relationship with Raymond Asselin was through SHA, but

that he also socialized with Mr. Asselin, Sr.; (2) Mr. Davis's only business relationship with any

member of the Asselin family outside of the SHA was through Joseph Asselin convincing him to

bid on work generated by the bank at which Mr. Asselin worked; and (3) Mr. Davis's partner in

P.J. Richfield in the late 1980s was Walter Kelly.  *Id.* at 2467-73.

      The government may point to post-May 1998 conduct by the cooperating contractors in

an attempt to develop an argument that this conduct is somehow attributable to Mr. Davis for

purposes of analyzing Mr. Davis's withdrawal and statute-of-limitations defenses.  As explained

below, the law requires that the focus be on <u>Mr. Davis's</u> alleged conspiratorial agreement, not

any other agreement.  Notably, Mr. Baribeau, Mr. Katsounakis, and Mr. Ware all testified that

they were not involved in any conspiracy with Mr. Davis.  *See, e.g.* Trial Tr. at 543 (Sept. 21,

2006) (Katsounakis never had any agreement with Mr. Davis to commit bribery); 1433 (Sept. 29, 2006) (Mr. Baribeau never conspired with Mr. Davis to commit bribery); 2244 (Oct. 10, 2006) (Mr. Ware's unlawful activity was not done only to benefit himself and not to help any of the other contractors, who were in fact his competitors).

### B.     Evidence Relevant to Mr. Davis's Bribery and RICO Conspiracy Arguments

It is undisputed that P.J. Richfield checks were used to pay for work done at the homes of Joseph Asselin and Christopher Asselin. The hearsay statements of Raymond Asselin, Sr., offered through Joseph Asselin's testimony, provide the only direct evidence in the case of the purpose of those P.J. Richfield payments, at least as to the payments made for work done on Joseph Asselin's house.

Joseph Asselin testified that he had conversations in the late 80s and early 90s in which his father, Mr. Asselin, Sr., told him generally, without reference to particular contractors, that "he would help these folks [contractors] get work for the Housing Authority and he would charge them a fee, a percentage fee for the work that he got them." Trial Tr. at 2676 (Oct. 11, 2006). His father told him that he would receive "fees and commissions" that were "essentially kickbacks." *Id*. at 2676-77. Joseph Asselin further testified that he knows which contractors paid kickbacks "because [he] received benefits from those contractors." *Id*. at 2677.[2]

Asselin also testified that his father told him he received "fees, commissions, or kickbacks" from Mr. Davis. *Id*. at 2678. He testified that Mr. Davis (among others) had an "accruing debt of kickbacks" owed to his father. *Id*. at 2679-81. Asselin testified that his father

---

[2]     Joseph Asselin's testimony concerning his father's receipt of "kickbacks" confuses rather than clarifies the issues in this case. The use of the term "kickback," in the colloquial sense used by Mr. Asselin, could just as easily be construed to be a "thank you" (and thus a gratuity) as an arranged-in-advance bribe. Nothing in Joseph Asselin's testimony illuminates which type of payments were made by Mr. Davis.

told him that Mr. Davis was going to pay for some of the construction work on Asselin's home because Mr. Davis owed Mr. Asselin, Sr. money because "Ray had gotten him some Housing contracts and this was a commission that [his] father was owed." *Id*. at 2748.[3]

In short, the evidence is that Peter Davis paid for work on Joseph Asselin's house to discharge a debt he owed to Raymond Asselin, Sr. for getting him SHA contracts. The payments were <u>not</u> for any of the other myriad benefits the government contends Mr. Davis received—use of SHA labor, supplies, equipment; lax enforcement of inspections and punch list requirements; assistance with paperwork—but rather for being awarded contracts. By contrast, Joseph Asselin testified that his father told him that he was generally strict with the contractors; that he resisted their efforts to get paid before work was completed; and that he made Peter Davis redo work that had been done improperly. Trial Tr. at 2904-05 (Oct. 13, 2006).

## <u>ARGUMENT</u>

Federal Rule of Criminal Procedure 29 provides that the Court must enter a judgment of acquittal where the "evidence is insufficient to sustain a conviction" Fed. R. Crim. Proc. 29(a). In reviewing the sufficiency of the evidence, the Court must determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Grace*, 367 F.3d 29, 34 (1st Cir. 2004) (quoting *United States v. Casas*, 356 F.3d 104, 126 (1st Cir. 2004)). The court must review all the evidence, direct and circumstantial, and reject "those evidentiary interpretations . . . that are unreasonable, insupportable, or overly speculative." *United States v. Hernandez*, 218 F.3d 58, 64 (1st Cir. 2000) (quoting *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995) (omission in original)). If the evidence "gives equal

---

[3]     There is no evidence that Mr. Asselin, Sr. and Mr. Sotirion shared these "kickbacks," and indeed there is no evidence that any agreement Mr. Davis joined involved Mr. Sotirion.

or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime

charged," the motion should be granted. *United States v. Morillo*, 158 F.3d 18, 22 (1st Cir.

1998) (quoting *United States v. Flores-Rivera*, 56 F.3d 319, 323 (1st Cir. 1995)).

Here, as described more fully below, no rational trier of fact could find that the

government has met its burden of proof as to the two crimes charged in the Indictment—that is, a

conspiracy to commit a violation of 18 U.S.C. § 201 and conspiracy to commit a violation of 18

U.S.C. § 1962. Accordingly, Mr. Davis is entitled to judgment of acquittal on all counts.

I.    **MR. DAVIS IS ENTITLED TO A JUDGMENT OF ACQUITTAL BECAUSE NO
      RATIONAL JURY COULD FIND, BEYOND A REASONABLE DOUBT, THAT
      MR. DAVIS'S CONSPIRATORIAL AGREEMENT EXISTED WITHIN THE
      STATUTE-OF-LIMITATIONS PERIOD.**

As the First Circuit has made clear, the burden is on the government to prove beyond a

reasonable doubt that Mr. Davis's unlawful agreement existed within the statute-of-limitations

period. *United States v. Juodakis*, 834 F.2d 1099, 1104 (1st Cir. 1987). *Juodakis* makes clear

that the familiar "train" metaphor sometimes used to describe conspiracies in other contexts, *see*

*United States v. Baines*, 812 F.2d 41, 42 (1st Cir. 1987), have no place when considering

withdrawal and statutes of limitations, which require a laser-like focus on the precise nature of

the defendant's conspiratorial agreement.

The analysis in *Juodakis* is illustrative. The indictment in *Juodakis*, returned on

November 25, 1985 (making November 25, 1980, the relevant statute-of-limitations date),

charged a conspiracy to manufacture drugs. After involvement with his co-conspirators in the

creation of a drug laboratory in Worcester from May-September 1978, the defendant moved back

to his home in California. *Id.* at 1100. He returned to Massachusetts in the summer of 1979 to

help set up a new laboratory in South Boston. *Id.* When one of his co-conspirators disappeared,

the defendant became concerned as a result of friction with the third co-conspirator and a feeling

that he was in over his head. *Id.* As a result, and without saying anything to the third co-

conspirator, defendant moved back to California in January 1980. Defendant made periodic trips

back to Boston throughout the summer of 1980. *Id.* at 1101. However the evidence showed that

any activity related to the South Boston laboratory by the defendant terminated by July 1980.

The only evidence of any activity after November 25, 1980, relating to the South Boston

laboratory was of the remaining co-conspirator removing equipment from the laboratory and

storing it with a friend in Amherst. *Id.* The defendant moved for acquittal, arguing both that he

withdrew from the conspiracy prior to the limitations period and that there was no act in

furtherance of the conspiracy during the limitations period, which the district court denied. *Id.*

      The First Circuit affirmed the district court's denial of the motion as to withdrawal. It

noted defendant's periodic trips back to Boston throughout the summer of 1980 and his failure—

unlike the evidence here, see below—to communicate to any of his confederates that he was

disengaging from the conspiracy. Accordingly, the Court found that the district court was

"probably correct" that it could not be said that defendant withdrew from the conspiracy as a

matter of law, and that the question was properly for the jury. *Id.* at 1102-03. The Court found

this result "troubling," however, as defendant's participation in the conspiracy had ceased more

than a year before his co-conspirators removal of the equipment from the laboratory, the only

post-limitations period action in furtherance of the charged conspiracy. *Id.* at 1103. The Court

then asked rhetorically: "Absent either active involvement or active withdrawal, for how long is

defendant to be held responsible as a conspirator for whatever [illegal drug activity his co-

conspirator] might contemplate or eventually undertake?" *Id.*

8

The First Circuit then turned to whether the co-conspirator's post-limitations period removal of equipment from the South Boston laboratory was in furtherance of the defendant's conspiratorial agreement. The court began this analysis by noting that because the "gist of conspiracy is the agreement . . . it is essential to determine what kind of agreement or understanding existed as to each defendant." *Id.* at 1104 (quotation omitted). As the court held:

> The agreement would not necessarily be the same with respect to each defendant in a multifaceted drug conspiracy; the agreement among the core members might embrace more extensive operations than the agreement between core participants and lower echelon personnel or helpmates whose involvement was more peripheral. To warrant conviction, "the Government must present evidence justifying the jury in finding beyond a reasonable doubt that the particular agreement into which a defendant entered continued into the period not barred by limitation . . . and the scope of his agreement must be determined individually from what was proved as to him."

*Id.* (citing *United States v. Borelli*, 336 F.2d 376 (2d Cir 1964) (emphasis added). The Court concluded that the government failed to prove beyond a reasonable doubt that the scope of defendant's conspiracy included an agreement to continue to work for his co-conspirator during any future drug operations his co-conspirator might undertake. *Id.* As such, because "the burden of proving beyond a reasonable doubt the existence of the particular conspiracy—as determined by defendant's agreement—within the limitations period was upon the government," the Court held that the co-conspirator's subsequent removal of materials from the South Boston laboratory and other unlawful activity was not in furtherance of the agreement the defendant joined. *Id.* at 1105. Given this, the Court held that the government failed to meet its burden of proving that the defendant's agreement existed within the statute-of-limitations period, and reversed the defendant's conviction. *Id.*

*Juodakis* compels a similar result here. *Juodakis* demonstrates that the government must prove, beyond a reasonable doubt, that Mr. Davis was engaged in an unlawful agreement to commit bribery and RICO within the statute-of-limitations period—that is, after July 9, 1999. Defendant submits that there is not a shred of evidence of any such agreement. The undisputed evidence, rather, demonstrates that as of May 1998, more than a year prior to the limitations period, Mr. Davis had retired from contracting work, moved from the Springfield area, and had no relationship whatsoever with the Springfield Housing Authority. *See supra* pp. 1-2. While, as was the case in *Juodakis*, the government has demonstrated that the person or persons with whom Mr. Davis may have had an unlawful agreement (*e.g.*, Raymond Asselin, Sr.) continued to engage in unlawful activity into the limitations period, such actions can only be attributable to Mr. Davis if the government proves beyond a reasonable doubt that they were in furtherance of Mr. Davis's agreement. *See Juodakis*, 834 F.2d at 1104. But they were not. Any actions by Mr. Asselin, Sr. or any other alleged co-conspirator after July 9, 1999, are directly analogous to the actions of the third co-conspirator in *Juodakis*, who engaged in post-limitations-period removal of materials from the laboratory, after defendant had ceased any involvement in the conspiracy. Here, as in *Juodakis*, those actions were not in furtherance of the agreement that the defendant made.[4]

Indeed the only evidence in the record that Mr. Davis even had any contact with

---

[4]    Moreover, the evidence as proven against Mr. Davis is almost identical to the facts of *United States v. Borelli*, 336 F.2d 376 (2d Cir 1964) (Friendly, J.), which provided the legal underpinning for *Juodakis* and whose facts are described in detail in *Juodakis*. *Borelli* involved a ten-year continuous conspiracy to import and distribute heroin that began well before, but continued well into, the limitations period. At trial, the only evidence of any conspiratorial activity against one defendant occurred well before the limitations period began. Looking at the defendant's conspiratorial agreement, the court found it was less extensive in time and scope than that of the core members who continued the conspiracy, and that the government had not proven the agreement continued to exist into the limitations period. *See Juodakis*, 834 F.2d at 1104.

individuals with whom he may have had an unlawful agreement is the testimony of Joseph

Asselin that, after Mr. Davis retired from contracting and moved from Springfield to

Newburyport, MA, he had some intermittent social interactions with Mr. Asselin, Sr., and the

testimony by Agent Morehead that at a wedding sometime in 2002, Mr. Asselin, Sr. spoke with

Mr. Davis. *Supra* at 4. This is not surprising, given that the evidence demonstrates that Mr.

Davis and Mr. Asselin, Sr. had been very close friends for decades prior to entering in any

unlawful agreement they may have had. Trial Tr. at 2868-69 (Oct. 13, 2006). Defendant

submits that no rational jury could find that these isolated social interactions are sufficient to

demonstrate that Mr. Davis continued to have an unlawful agreement with Mr. Asselin, Sr. or

anyone else to commit bribery or violate RICO.

  The only other evidence of even the subject matter of the conspiracy in connection with

Mr. Davis during the limitations period is the testimony of Agent Morehead that, when

questioned by the FBI about his involvement with the SHA and the Asselin family, Mr. Davis

was not entirely truthful about his prior relationship with the Asselins. *Supra* at 4. That

testimony, it must be noted, was admissible only as probative of consciousness of guilt. But,

regardless, as this Court's dismissal of the substantive RICO count makes clear, any allegedly

false statements by Mr. Davis made to law enforcement agents are insufficient to qualify as

predicate RICO acts. Furthermore, as is clear from both Supreme Court and First Circuit case

law, any false statements Mr. Davis may have made to law enforcement agents can only be

found by this Court to be in furtherance of any conspiracy Mr. Davis may have been involved in

if this Court finds that the government has demonstrated that the RICO and bribery conspiracies

included an "express agreement" to conceal. *See Grunewald v. United States*, 353 U.S. 391, 402

11

(1957); *United States v. Twitty*, 72 F.3d 228, 233 (1st Cir. 1995). As the First Circuit held in

*Twitty*:

> *Grunewald,* however, laid down special requirements of proof resting upon a distinct policy concern, namely, that "every conspiracy is by its very nature secret"; that "every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces"; and that if these facts were enough for a conspiracy to conceal, then the statute of limitations and other safeguards would be virtually "wipe[d] out." For this reason, it held that even egregious and organized acts of concealment were not sufficient, unless agreed to as part of the original conspiratorial plan.

*Id.* (emphasis added) (citations omitted).

In light of the Supreme Court's "distinct policy concern" with respect to the statute of

limitations, the First Circuit held that "we read *Grunewald* to impose a special burden to show

that an express agreement to conceal was, or at least became, part of the central conspiratorial

agreement and that the later acts relied upon were in furtherance of this agreement." *Id.* at 234.

Given the First Circuit's requirement that the government meet a "special requirement" of

proving "an express agreement to conceal," the utter lack of evidence of any such "express

agreement" makes clear that any false statements Mr. Davis may have made to law enforcement

agents five years after he had ceased any involvement with the conspiracy were not in

furtherance of the charged conspiracies.

Particularly given the government's proposed jury instructions, defendant expects that the

government will cite to cases stating that "[w]here a conspiracy contemplates a continuity of

purpose and a continued performance of acts, it is presumed to exist until there has been an

affirmative showing that it has terminated." *See United States v. Piper*, 298 F.3d 47 (1st Cir

2000) (citing *United States v. Elwell*, 984 F.2d 1289, 1293 (1st Cir. 1993). From this, defendant

expects the government to argue that that it only need prove that defendant "joined the

conspiracy" and that "the conspiracy" continued into the limitations period, and that doing so entitles the government to a presumption that defendant was "a member of the conspiracy" within the limitations period absent a finding that he withdrew.  But what *Juodakis* demonstrates is that this argument assumes the existence of a fact that is the government's burden to prove beyond a reasonable doubt—namely, that "the conspiracy" the government may have demonstrated existed during the limitations period was necessarily part of <u>Mr. Davis's agreement</u>.  As the First Circuit stated in *Juodakis*:  "To warrant conviction, the Government must present evidence justifying the jury in finding beyond a reasonable doubt that <u>the particular agreement into which a defendant entered</u> continued into the period not barred by limitation . . . and the scope of his agreement must be determined individually from what was proved as to him."  *Id.* (emphasis added) (citation omitted).[5]  Defendant submits that whatever the scope of the agreement the government may have proved he had prior to retiring and moving from Springfield in 1998, when the Court looks "individually [at] what was proved as to him" there is no evidence that could justify a jury in finding beyond a reasonable doubt that the particular agreement into which a defendant entered continued into the period not barred by limitation."

---

[5]    That *Juodakis* controls here is supported by *United States v. Piper*, 298 F.3d 47 (1st Cir. 2002), relied upon by the government in its proposed jury instructions.  *Piper* involved a conspiracy to distribute drugs, for which the defendant, Piper, was the supplier, a co-conspirator, Stilkey, was the seller, and an undercover government agent, Shafir, was the buyer.  *Id.* at 51.  During the third drug deal between Piper and Stilkey, Stilkey became upset by the quality of drugs Piper was supplying, and Piper then left from Maine to Florida.  *Id.* at 52.  The district court admitted as a co-conspirator statement a taped conversation between Stilkey and undercover agent Shafir that Piper had burned a lot of bridges as a result of his supplying of low quality drugs, had left for Florida and would be "dealt with" upon his return, and that Stilkey was trying to interest Shafir in purchasing drugs from a new supplier, a man named Mounts.  *Id.*  The First Circuit held that the district court "clearly erred" in admitting this conversation against the defendant, because the conversation was not in furtherance of <u>the defendant's agreement.</u>  *Id.* at 55.  The First Circuit found that because this conversation "in no way advanced the goal of effecting cocaine sales" through Piper's conspiratorial agreement, the district court erred in admitting these statements.  *Id.*  As in *Piper*, the government cannot demonstrate that any statements and/or actions by other alleged co-conspirators that occurred after Mr. Davis left Springfield and retired from contracting were in furtherance of any unlawful agreement Mr. Davis may have had.

*Id.* As such, defendant respectfully requests that the Court grant his Rule 29 motion for acquittal.

## II.     MR. DAVIS IS ENTITLED TO A JUDGMENT OF ACQUITTAL BECAUSE THE EVIDENCE DEMONSTRATES UNEQUIVOCALLY THAT HE WITHDREW FROM ANY CONSPIRACY PRIOR TO THE LIMITATIONS PERIOD.

Even if the Court finds that the agreement into which Mr. Davis entered continued into the period not barred by the statute of limitations, Mr. Davis is entitled to a judgment of acquittal for an alternative reason—namely, Mr. Davis withdrew from the conspiracy prior to the limitations period.

The First Circuit has approved a two-step approach to the burden of proof for withdrawal. *United States v. Piva*, 870 F.2d 753 (1st Cir. 1989). First, the burden of production is on the defendant to point to some evidence that he withdrew from the conspiracy. *Id.* at 756-57. If the defendant meets that burden, the burden of persuasion shifts to the government to prove beyond a reasonable doubt that the defendant did not withdraw. *Id.*; *see also United States v. Read*, 658 F.2d 1225 (7th Cir. 1980)); 1 L. Sand, *et al.*, Modern Federal Jury Instructions, Instruction No. 19-10 (2002). This is similar to the burden-shifting mechanism for other defenses, such as entrapment and self-defense. *United States v. Annese*, 631 F.2d 1041, 1047 (1st Cir. 1980) (employing the same burden-shifting approach to the defense of entrapment); First Circuit Pattern Jury Instructions (Criminal), Instruction 5.04 (1998) (employing the same burden-shifting approach for claim of self-defense).

To withdraw from the conspiracy, a defendant must take some affirmative act. *United States v. Juodakis*, 834 F.2d 1099, 1102 (1st Cir. 1987). Mere cessation of activity in furtherance of the conspiracy is not enough. *Id.* While the finder of fact should not be unduly restricted in determining whether the evidence demonstrates withdrawal, "[a]ffirmative acts inconsistent with

the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-65 (1978).  The First Circuit has noted that withdrawal from the conspiracy "*typically* . . . requires either . . . a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals."  *United States v. Piper*, 298 F.3d 47, 53 (1st Cir. 2002) (citing *Juodakis*, 834 F.2d at 1102).  While the Supreme Court made clear in *U.S. Gypsum* that these "typical" two scenarios are not the only means of demonstrating withdrawal, as is clear from below, Mr. Davis clearly withdrew from the conspiracy under any standard.[6]

To begin, the evidence shows that Mr. Davis took affirmative acts inconsistent with the conspiracy.  The evidence is undisputed that Mr. Davis ceased bidding on contracts by June 1998, and never received another payment on any contract after May 11, 1998.  These actions effectively disabled him from further participation in the conspiracy.  Deborah Barton testified that she reviewed the SHA meeting minutes and vendor payments, that no contracts were awarded to P.J. Richfield after October 21, 1997, and that no payments were made to P.J. Richfield after May 11, 1998.  Trial Tr. 1053-54 (Sept. 27, 2006).  This testimony was confirmed by Defense Exhibit ZZ, and Government Exhibit 2, which summarize the SHA bid award and vendor payments, and the SHA meeting minutes, Defense Exhibits Q-U, which contain no mention of P.J. Richfield after June 8, 1998.  Furthermore, Joseph Asselin testified that his father, Raymond Asselin, Sr., told him that in the fall of 1997 Mr. Davis had planned to retire from SHA work and move away from the Springfield area to eastern Massachusetts.  Trial Tr. at.

---

[6]    At least one district court in this district has granted a Rule 29 motion for judgment of acquittal based on the *Juodakis* and *U.S. Gypsum* test.  *United States v. Nippon Paper*, 62 F. Supp. 2d 173, 190-92 (D. Mass. 1999).

2891-92 (Oct. 13, 2006). Mr. Asselin also testified that Mr. Davis's retirement and move were openly discussed by the Asselin family. *Id.* at 2892. Lisa Asselin also testified that she knew that sometime in 1997 or 1998 Mr. Davis had retired and moved from the Springfield area to Newburyport, MA. *Id.* at 1361-62 (Oct. 3, 2006). None of this evidence can be disputed by the government.

Given the above facts, Mr. Davis has clearly satisfied his burden of production by pointing to evidence sufficient to demonstrate a prima-facie case for withdrawal. Accordingly, the government has the burden of proving beyond a reasonable doubt that Mr. Davis did not withdraw from the conspiracy and remained a member of the conspiracy into the limitations period. Here, the government cannot point to <u>any</u> evidence that Mr. Davis was a member of the charged RICO or bribery conspiracies during the limitations period, nevertheless sufficient evidence to convince a rational jury beyond a reasonable doubt.

According to the Indictment and the government's theory of the case, in order to be a member of either of the charged conspiracies, one must i) be a contractor; and ii) do work for the SHA. As is clear from above, the undisputed facts of the case are that, as of June 1998, Mr. Davis had retired from contracting work, ceased any relationship with the SHA, moved from the Springfield area to Newburyport, MA, and communicated these facts to his co-conspirators. Thus, Mr. Davis took "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-65 (1978). Indeed, because being a contractor and bidding on SHA jobs are conditions precedent to involvement in either charged conspiracy (at least from the standpoint of someone in Mr. Davis's position), it is hard to imagine any action more

16

inconsistent with the object of the conspiracy than retiring from contracting and moving away from the Springfield area.

Many of the cases holding that a defendant withdrew from the conspiracy contain precisely this fact pattern. Many courts have found, that is, that where involvement in the conspiracy necessarily entails association with or employment by a particular organization, retiring from, or severing all ties with, that organization is sufficient to constitute withdrawal. In *United States v. Nerlinger*, 862 F.2d 967 (2d Cir. 1988), the Second Circuit reviewed the district court's denial of the defendant's claim that he withdrew from the alleged conspiracy for purposes of determining whether certain allegedly post-involvement co-conspirator hearsay statements were properly admitted against the defendant. *Id.* at 974. *Nerlinger* involved a conspiracy between the head trader and several salesmen at a NY trading firm, whereby the salesmen opened accounts at the firm in the names of friends or family members, and then the trader would steer favorable trades to those accounts, ensuring profits that the salesmen would then share with the trader. *Id.* at 969-70. This activity happened between July 1982 and December 1983. Nerlinger, a salesman involved in the conspiracy, had resigned from the firm and closed his account in March 1982. *Id.* at 970. The court held that resigning from the firm and closing the account was sufficient to satisfy the standard for withdrawal "because it disabled him from further participation and made that disability known to [his co-conspirator]." *Id.* at 974. As to the communication requirement, the court wrote that nothing in the case law on withdrawal "requires the hiring of a calligrapher to print formal notices of withdrawal to be served upon coconspirators." *Id.* Further, while the government argued that Nerlinger's inquiry to the trader as to whether he could continue to maintain the account after resigning signaled that he did not

disavow the conspiracy, the court held that his closing the account in the face of the invitation to leave it open amounted to an explicit withdrawal. *Id.* at 975.

The Third Circuit applied a similar analysis in reversing the district court's denial of a motion for judgment of acquittal based on withdrawal in *United States v. Steele*, 685 F.2d 793 (3d Cir. 1982). *Steele* involved a conspiracy in which members of General Electric bribed a Puerto Rican public official in order to obtain a lucrative power plant construction contract. *Id.* at 797-98. The indictment was returned on September 4, 1980. Defendant Naples, who had had retired from GE on August 29, 1975, slightly more than five years prior to the return of the indictment, argued on appeal that his resignation amounted to withdrawal from the conspiracy and that his prosecution was barred by the statute of limitations. *Id.* at 803. The court agreed, holding that by presenting evidence that he resigned from the company and severed his employment relationship with GE in August 1975, the burden shifted to the government either to impeach or rebut his evidence or show some act in furtherance of the conspiracy during the limitations period. *Id.* at 804. The government's failure to do so entitled Naples to a Rule 29 judgment of acquittal. *Id.*

*Steele* relied on principles of law set out in *United States v. Lowell*, 685 F.2d 793 (3d Cir. 1981). There the Third Circuit held that withdrawal as matter of law is shown in the following circumstance:

> [W]here fraud constitutes the "standard operating procedure" of a business enterprise, "affirmative action" sufficient to show withdrawal as a matter of law from the conspiracy embodied in the business association may be demonstrated by the retirement of a coconspirator from the business [defined as "the termination of the employment relationship"], severance of all ties to the business, and consequent deprivation to the remaining conspirator group of the services that constituted the retiree's contribution to the fraud.

18

*Id.* at 955 (footnote omitted).

A similar analysis of a similar withdrawal issue was undertaken by Judge Keeton in *United States v. Shaw*, 106 F. Supp. 2d 103 (D. Mass. 2000). In *Shaw,* the court cited *Lowell* and *Nerlinger* for the proposition "that a defendant can withdraw from a business conspiracy (a conspiracy carried out through the regular activities of an otherwise legitimate business enterprise) by severing his ties to the business." *Id.* at 123. *Shaw* arose in the context of a motion to dismiss by a defendant who alleged that his prosecution was barred by the statute of limitations because he retired from the business through which the conspiracy was carried out prior to the limitations period. *Id.* at 122-23. The court denied the motion, as the question whether his retirement was sufficient to constitute withdrawal was dependent on the facts of the case, and therefore inappropriate to decide at the motion-to-dismiss stage. *Id.* at 123.

Mr. Davis's situation is remarkably similar to the cases cited above. Mr. Davis's involvement in the charged conspiracies required both being a contractor and bidding on SHA jobs. More than a year before the statute-of-limitations period began, Mr. Davis took affirmative actions inconsistent with the conspiracy by retiring from P.J. Richfield, ceasing to be a contractor, ceasing any involvement with the SHA, and moving away from the Springfield area. The government can point to no evidence of actions in furtherance of the conspiracy by Mr. Davis after this withdrawal, and indeed can point to no evidence of any involvement in the charged conspiratorial activity whatsoever after June 1998. Given this lack of evidence, Mr. Davis is entitled to a Rule 29 motion for acquittal.

## III.   MR. DAVIS IS ENTITLED TO A JUDGMENT OF ACQUITTAL BECAUSE THE GOVERNMENT HAS FAILED TO PROVE THAT THE CONDUCT TO WHICH HE AGREED AMOUNTED TO BRIBERY.

### A.    The Indictment and the Law of Bribery

1.    *The Indictment*

To obtain a conviction on either Count 2 or Count 3 of the Indictment, the government

must prove that the conduct to which Mr. Davis agreed amounted to bribery.  In Count 3, the

government charges Mr. Davis under 18 U.S.C. §§ 201 and 371 with conspiracy to commit

federal bribery and receive illegal gratuities.  Paragraphs 40 and 61, taken together, set forth the

thirteen specific acts of bribery Mr. Davis is alleged to have committed in furtherance of the

§ 371 conspiracy—all of which involve payments by Mr. Davis's company, P.J. Richfield, for

the benefit of either Christopher and Merylina Asselin or Joseph and Melinda Asselin, during the

period of September 30, 1996, through December 17, 1997.  None of the acts specified against

Mr. Davis involve payments made to Raymond Asselin, Sr. or Arthur Sotirion personally.

Likewise, Count 2, which charges Mr. Davis with RICO conspiracy, alleges, as relevant to Mr.

Davis, an agreement to violate § 201.  Without proof that Mr. Davis agreed to conduct that

amounts to bribery, therefore, both Count 2 and Count 3 fail as a matter of law.

2.    *The Bribery Statute*

The crime of federal bribery, as to the bribe giver, is set forth in 18 U.S.C. § 201(b)(1).

That section provides that the following individual is guilty of bribery:

> (b)  Whoever—
>     (1)  directly or indirectly, corruptly gives, offers or
> promises anything of value to any public official or any person
> who has been selected to be a public official, or offers or promises
> any public official or any person who has been selected to be a
> public official to give anything of value to any other person or
> entity, with intent—
>         (A)  to influence any official act; or
>         (B)  to influence such public official to commit or
>     aid in committing, or collude in, or allow, any fraud, or
>     make opportunity for the commission of any fraud, on the
>     United States; or

20

> (C)  to induce such public official or such person
> who has been selected to be a public official to do or omit
> to do any act in violation of the lawful duty of such official
> or person.

18 U.S.C. § 201(b)(1).  As pertinent to this case, the statute defines the term "public official" to

mean "… an officer or employee or person acting for or on behalf of the United States, or any

department, agency or branch of Government thereof … in any official function, under or by

authority of any such department, agency, or branch of Government."  18 U.S.C. § 201(a)(1).

And it defines the term "official act" to mean "any decision or action on any question, matter,

cause, suit, proceeding or controversy, which may at any time be pending, or which may by law

be brought before any public official, in such official's official capacity, or in such official's

place of trust or profit."  18 U.S.C. § 201(a)(3).

As explained above, all of the acts of bribery specified against Mr. Davis involve

payments made for the benefit of certain Asselin children.  On its face, § 201(b)(1) requires that

when so-called bribes are paid to third parties, they must be made pursuant to an offer or promise

to a public official.  Thus, the statute reads:

> directly or indirectly, corruptly *gives, offers or promises* anything
> of value to any public official …, or *offers or promises* any public
> official … to give anything of value to any other person or entity.

The absence of the verb "gives" from the clause concerning third-party gifts demonstrates that to

prove a violation of the statute when a third-party gift is involved, the government must prove an

offer or promise to the public official, not simply a gift or the payment to a third party.[7]

---

[7]     This distinction is captured in the gratuity statute as well.  Section 201(c) does not on its face contain a
provision prohibiting gratuities to third parties analogous to the provision contained in § 201(b)(1).

3.    *United States v. Sun-Diamond Fruit Growers of California*

A thorough understanding of the Supreme Court's decision in *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999) is critical to this Court's analysis of the bribery issues in this case.[8]  *Sun-Diamond* involved the prosecution of an agricultural trade association for allegedly giving illegal gratuities to former Secretary of Agriculture Michael Espy.  526 U.S. 398, 400-01.  The illegal-gratuity statute, 18 U.S.C. § 201(c)(1)(A), "prohibits giving 'anything of value' to a present, past, or future public official 'for or because of any official act performed or to be performed by such public official.'"  *Id.* at 401.  The question before the Court was whether conviction under the statute "requires any showing beyond the fact that a gratuity was given because of the recipient's official position."  *Id.*

---

[8]    Prior to *Sun-Diamond*, the First Circuit had held that Mass. Gen. L. 268A, which is analogously worded to 18 U.S.C. § 201, did not require "proof that the offender gave the item of 'substantial value' because of a specifically identified official act," specifically noting that whether such proof was required under the federal statute was an open issue.  *United States v. Sawyer*, 85 F.3d 713, 737-38 (1st Cir. 1996) ("*Sawyer I*"); *see also United States v. Woodward*, 149 F.3d 46, 60 (1st Cir. 1998).  In a later case, the court recognized that such a link was "now required under § 201."  *United States v. Sawyer*, 239 F.3d 31, 40 n.8 (1st Cir. 2001) ("*Sawyer II*").

In addition to those cited other places in this motion, the First Circuit has discussed bribery in the following cases:  *United States v. Caro-Munez*, 406 F.3d 22, 27 (1st Cir. 2005) (holding that the government is not required to prove a nexus between the bribery charged and municipality's receipt of federal funds under 18 U.S.C. § 666); *United States v. Cianci*, 378 F.3d 71, 96-97 (1st Cir. 2004) (rejecting defendants' argument that there was insufficient evidence of a connection between their conduct and federal funds under 18 U.S.C. § 666); *United States v. Freeman*, 208 F.3d 332, 340-41 (1st Cir. 2000) (concluding there was sufficient evidence to support a conviction for bribery conspiracy, even though acceptance arguably lent more support to a charge of extortion); *United States v. Vaknin*, 112 F.3d 579 (1st Cir. 1997) (discussing the Victim & Witness Protection Act in relation to bank bribery); *United States v. Tejada-Beltran*, 50 F.3d 105, 109 (1st Cir. 1995) (discussing relevant conduct for sentencing in bribery cases); *United States v. Arruda*, 715 F.2d 671, 682 (1st Cir. 1983) (discussing Mass. Gen. L. 268A; observing that bribery includes corrupt intent to accept money in return for the performance of a legitimate official act); *United States v. Previtte*, 648 F.2d 73, 77 (1st Cir. 1981) (discussing the application of Wharton's Rule in the gratuities/bribery context); *United States v. Hathaway*, 534 F.3d 386, 395 (1st Cir. 1976) (explaining that bribery and extortion are not mutually exclusive concepts); *Howard v. United States*, 345 F.2d 126, 128 (1st Cir. 1965) (explaining that under 41 U.S.C. §§ 51, 54, as with bribery, the crime as to the recipient is complete upon acceptance, regardless of whether or not improper action is thereafter taken); *Gorin v. United States*, 313 F.2d 641, 650-51 (1st Cir. 1963) (concluding that the bribe payer, the two men who knowingly supplied him the money for the bribe, and an individual to whom they made payments were involved in a bribery conspiracy).

The indictment alluded to two matters in which the trade association had an interest in favorable treatment from the Secretary when it bestowed the supposed gratuities but did not "allege a specific connection between either of them—or between any other action of the Secretary—and the gratuities conferred." *Id.* at 401-02. The trial court denied the trade association's motion to dismiss the gratuity charge because of this omission, stating that "'it [was] not necessary for the indictment to allege a direct nexus between the value conferred to Secretary Espy by Sun-Diamond and an official act performed or to be performed by Secretary Espy. It is sufficient for the indictment to allege that Sun-Diamond provided things of value to Secretary Espy *because of his position*.'" *Id.* at 402-03 (quoting 941 F. Supp. 1262, 1265 (D.D.C. 1996)) (emphasis added). The trial court thus instructed the jury that "'[i]t is sufficient if Sun-Diamond provided Espy with unauthorized compensation *simply because he held public office*,' and that '[t]he government *need not prove* that the alleged gratuity was linked to a specific or identifiable official act or *any act all*.'" *Id.* at 403 (citation omitted) (emphasis added).

The D.C. Circuit reversed and remanded for a new trial because the jury charge ignored the "for or because of any official act" language of the statute and instead "'invited the jury to convict on materially less evidence than the statute demands—*evidence of gifts driven simply by Espy's official position*.'" *Id.* (quoting 138 F.3d 961, 968 (D.C. Cir. 1998)) (emphasis added). At the same time, the court of appeals affirmed the district court's refusal to dismiss the gratuity charge itself, stating that the Government need not show a gratuity was given "for or because of" *any particular act or acts*." *Id.* at 403 (emphasis added). The D.C. Circuit wrote: "'That an official has an abundance of relevant matters on his plate should not insulate him or his benefactors from the gratuity statute—as long as the jury is required to find the requisite intent to

reward past favorable acts or to make future ones more likely.'" *Id.* at 403-04 (quoting 138 F.3d at 969).

As previously noted, the specific question before the Court was whether the gratuity statute criminalizes payments made to a public official simply by virtue of his or her being a public official. *See id.* at 400. To answer that question, the Court began by construing the bribery and gratuity sections of § 201 and contrasting their requirements. *See id.* at 404. Whereas the gratuity section requires a showing that something of value was given, offered, or promised "for or because of any official act performed or to be performed by such public official," § 201(c)(1), the bribery section requires a showing that something of value was corruptly given, offered, or promised with the intent "to influence any official act," § 201(b)(1). The Court explained:

> The distinguishing feature of each crime is its intent element. Bribery requires intent "to influence" an official act or "to be influenced" in an official act, while illegal gratuity requires only that the gratuity be given or accepted "for or because of" an official act. In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.

*Id.* at 404. Thus, the intent required to prove bribery is the intent *to influence* an official act, *i.e.*, to induce a *quid pro quo*, while the intent required to prove a gratuity is the intent *to reward* (or say "thank you" for) an official act. *See id.*

The government defended the district court's jury instruction by asserting that the gratuity statute "reaches any effort to buy *favor or generalized goodwill* from an official," but the Court rejected the charge. *Id.* at 405-06 (emphasis added). Instead, the Court determined that

24

"[t]he insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some particular official act be identified and proved." *Id.* at 406. Merely showing that the payment was made "for or because of such official's ability to favor the donor in executing the functions of his office" did not suffice. *Id.* The Court thus affirmed the judgment of the court of appeals, remanding the case to the district court for a new trial on the gratuity charge. The Supreme Court did not grant certiorari on the sufficiency of the indictment—and the D.C. Circuit's conclusion that the government need not show that a gratuity was given "for or because of" any particular act or acts—but did note that its opinion "casts doubt on the lower courts' resolution of" that question. *Id.* at 414.

At least two key principles flow from the requirement that proof of a *quid pro quo* is necessary to prove bribery, as explained in *Sun-Diamond*: (1) not all offers, promises, or gifts of things of value to public officials are bribes and (2) the evidence, including the timing of the payment, must demonstrate that the giver intended to influence an official act in order for the offer, promise, or gift to be a bribe.

First, as *Sun-Diamond* made clear, not every offer, promise, or gift of a thing of value to a public official is a bribe. In particular, an "effort to buy favor or generalized goodwill from an official who either has been, is, or may at some unknown, unspecified later time, be in a position to act favorably to the giver's interest" is not a bribe. *See Sun-Diamond*, 526 U.S. at 405. And a gift, offer, or promise that constitutes "merely a reward for" some official act is an illegal gratuity, but it is not a bribe. *Id.* at 405. As the First Circuit has put it, a gratuity involves a "situation in which the offender gives the gift without attaching any strings, intending it instead as a reward for actions the public official has already taken or is already committed to take." *United States v. Mariano*, 983 F.3d 1150, 1159 (1st Cir. 1993). Without knowing the intent

25

behind the offer, promise, or gift, it is impossible to know whether the offer, promise, or gift, was a bribe.  *See Sun-Diamond*, 526 U.S. at 405; *see also Mariano*, 983 F.3d at 1158.

Second, the timing of the gift, offer, or promise to a public official is analytically important in determining whether it was a bribe—although ultimately it is the state of mind of the giver that controls.  In *Sun-Diamond*, the Court explained:

> [F]or bribery, there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.

526 U.S. at 404-05.  The D.C. Circuit explained the distinction this way:  "Bribery is entirely future-oriented, while gratuities can be either forward or backward looking.  In other words, whereas bribery involves the present giving, promise, or demand of something in return for some action in the future," an unlawful gratuity can be made either in connection with either a past or future official act.  *United States v. Schaffer*, 183 F.3d 833, 841 (D.C. Cir. 1999), *vacated as moot in light of presidential pardon* 240 F.3d 35 (2001); *accord United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993) (distinguishing the payment of illegal gratuities from the payment of bribes, explaining that the latter involves "the intent of the payer, by the greasing of palms, to affect the future actions of a public official").[9]  The timing of the payment is not

---

[9]     The issue in *Mariano* was whether the appropriate analogous sentencing guideline for the defendants' 18 U.S.C. § 666 convictions was the gratuity guideline or the bribery guideline.  983 F.2d at 1158.  Because the defendants there admitted that admitted that they "each sought to receive a *quid pro quo* in the form of future (favorable) treatment, and since the offenses to which they pleaded guilty involved corrupt intent," the First Circuit affirmed the district court's election of the bribery guideline.  *Id.*  Although "the fact that appellants had already received sewer-line and stadium repair contracts at payoff time [was] not outcome determinative," *id.* at 1159-60, the payments there could supportably have been found to have been intended "to influence the future actions of" the pertinent public officials, *id.* at 1160.  This is because the payments were made "to forestall city officials from reassigning the work" and to "retain valuable contracts which [the officials] might otherwise have redirected to a competitor."  *Id.* at 1159.  Nothing in *Mariano* detracts from the principle that bribes are inherently made with the intent to influence future action.

dispositive, however, because a bribe can be paid after an official act has been taken, so long as the payment was made pursuant to a pre-official-act offer or promise. *United States v. Campbell*, 684 F.2d 141, 148 (D.C. Cir. 1982) ("The statute proscribes offers and promises of bribes as well as the giving of bribes, and it is only logical that in certain situations the bribe will not actually be conveyed until the act is done.").[10]  It is the intent of the giver that ultimately is determinative. "Without knowing the payor's intent, one cannot know whether the payment was a bribe or an illegal gratuity.  Thus, without proof of corrupt intent on the payor's part, a bribery conviction is impossible." *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998).[11]

> **B.    There is no evidence from which a rational trier of fact could find beyond a reasonable doubt that an offer or promise was made by Mr. Davis with the intent to influence any official act.**

Here, the government simply has failed to meet its burden of proof with respect to identifying <u>any</u> offer or promise by Mr. Davis to Raymond Asselin, Sr. or Arthur Sotirion to give anything of value with the intent to influence an official act.  The mere payments by Mr. Davis for the benefit of the Asselin children are insufficient, without more, to demonstrate a pre-existing offer or promise made by Mr. Davis with the intent of influencing a public official in an official act.

The government's theory boils down to the following:  Mr. Davis wrote checks to vendors for work done on Joseph Asselin's home in relation to past SHA contracts Mr. Asselin,

---

[10]    *See also United States v. Griffin*, 154 F.3d 762, 764 (8th Cir. 1998) (no requirement that, "for bribery, the government must prove that the bribe-taker be paid before he performs the illegal service."); *United States v. Gatling*, 96 F.3d 1511, 1523 (D.C. Cir. 1996) ("Timing is not determinative of whether a payment constitutes a bribe or a gratuity.").

[11]    *See also Malatkofski v. United States*, 179 F.2d 905, 909 (1st Cir. 1950) ("[T]he indictments charge that the money was paid … 'with the corrupt intent of influencing his action and decision in the awarding of such contracts.'  That must have been meant by the pleader to refer to matters which had not already been decided and disposed of by the Supply Officer before the bribe was given.").

Sr. awarded Mr. Davis. This scenario, however, is implausible based on the evidence presented at trial. Indeed, there is simply no evidence in the record that Mr. Asselin, Sr. (or Mr. Sotirion) had the ability to, or ever did in fact, control the bid-award process. None of the three so called "corrupt contractors" who testified ever suggested that they made payments to Mr. Asselin, Sr. or Mr. Sotirion in exchange for Mr. Sotirion or Mr. Asselin, Sr. awarding them contracts. *See, e.g.,* Trial Tr. at 1432-33 (Sept. 29, 2006) (Baribeau testified that he did not pay bribes to Sotirion, or for the benefit of Asselin, Sr.'s children, in order to get SHA contracts he bid on); Trial Tr. at 2150 (Oct. 6, 2006) (Ware testified that he did not know whether or not Sotirion coordinated who would get the low bid). In fact, the undisputed evidence demonstrates that (1) Mr. Davis was awarded only those bids on which he was the lowest responsive bidder in a sealed, competitive bidding process in which numerous contractors (in addition to the so-called "corrupt contractors)" took part, *see, e.g.*, Exhibits 13, 14, 16, 18, 21, 22, 27, 31, 32, and 39; and (2) the SHA attorneys reviewed the bid packages, determined the bid packages were in order, and recommended awarding the bid to the lowest responsive bidder. *See, e.g.,* Defendant Exhibit X. Stated simply, there is no evidence from which a reasonable jury could infer that Mr. Asselin, Sr. had the ability to, or did in fact, steer general-contracting awards to Mr. Davis—or, more importantly for determining his state of mind, that Mr. Davis believed he could.

But even if a reasonable jury could infer that Mr. Asselin, Sr. did, in fact award Mr. Davis contracts, nothing in Joseph Asselin's testimony permits the inference of an offer or promise by Mr. Davis to Mr. Asselin, Sr. (or even Mr. Sotirion), made with the intent to influence any official act. The purpose of Mr. Davis's payments, according to Joseph Asselin, was related to unspecified past contracts that Mr. Asselin, Sr. "had gotten" for Mr. Davis. At most, Joseph Asselin's testimony evidences a post-hoc agreement to pay down a "debt"—a

"debt" that on the only evidence in this case could have existed only in the mind of Raymond

Asselin, Sr. until repayment was demanded of Mr. Davis as he prepared to retire from SHA

work. There is absolutely no evidence from which a rational juror could conclude beyond a

reasonable doubt that Arthur Sotirion or Raymond Asselin, Sr.—or anyone else for that matter—

communicated to Mr. Davis that he was accruing that debt contemporaneously with such accrual,

nor is there any evidence Mr. Davis offered or promised to give anything of value at a time when

he believed he was in a position to influence an official act. Under the circumstances, a rational

trier of fact could conclude that those payments were thank-you payments or rewards to Mr.

Asselin, Sr. for SHA contracts Mr. Davis received, *i.e.*, gratuities. But such payments, absent

any evidence of an offer or promise to make the payment with the intent to influence an official

act, are not bribes. *See Sun-Diamond*, 526 U.S. at 405; *Mariano*, 983 F.3d at 1158. A kickback

in the colloquial sense could just as easily refer to a gratuity as it could a bribe. Joseph Asselin's

testimony that he and his father discussed the obligation of the contractors as being "essentially

kickbacks" shed more heat than light on the issue.

Furthermore, no offer or promise from Mr. Davis to Raymond Asselin, Sr. or Arthur

Sotirion can be inferred from the cooperating contractors' experiences. Mr. Davis's situation

was entirely different from that of Nicholas Katsounakis, Gary Baribeau, and Frank Ware. In the

first place, Mr. Davis dealt with Mr. Asselin, Sr., whereas the cooperating contractors all dealt

with Arthur Sotirion. Second, the cooperating contractors testified that they made payments to

Mr. Sotirion and Mr. Asselin, Sr. in order to continue receiving SHA work. Trial Tr. at 1434-35

(Sept. 29, 2006) (Baribeau paid money because he wanted more work from the SHA); Trial Tr.

at 462-63) (Katsounakis testimony regarding why he continued to pay bribes). By contrast, the

evidence in the record demonstrates that Mr. Davis's payments all came in 1996-97—at the end

of his tenure as a public contractor for SHA and at which point he had decided to retire—when their purpose could not have been to obtain future work from SHA. *Compare Malatkofski*, 179 F.2d at 911 (concluding that the payment was made "not merely in fulfillment of a prior arrangement between the parties and in payment of past favors, but also had the purpose to induce [the public official] to continue his official favors in the future").

Finally, even the cooperating contractors' testimony revealed significant differences in their individual arrangements with Arthur Sotirion. While Mr. Katsounakis discussed the amount of the bribe with Mr. Sotirion *before* submitting a bid, Trial Tr. at 359 (Sept. 20, 2006), Mr. Baribeau had discussions as to the amount of his payments to Mr. Sotirion *after* the project had ended, Trial Tr. at 1424 (Sept. 29, 2006). In addition, while Mr. Katsounakis and Mr. Ware paid Mr. Sotirion large amounts of cash, *see, e.g.,* Trial Tr. at 363 (Sept. 20, 2006)and 2126 (Oct. 6, 2006), Mr. Baribeau never paid cash, although he was asked to do so once by Mr. Sotirion and refused. Trial Tr. at 1276-78 (Sept. 28, 2006). In the absence of any uniform system concerning the amount of the bribe, method of payment, and when the "offer or promise" of payment was made, it would be far too speculative for a rational trier of fact to draw any inference equating Mr. Davis's situation to that of any of the cooperating contractors' arrangements.[12]

---

[12]  Furthermore, the facts here provide none of the direct or circumstantial evidentiary support for the inference of a pre-existing offer or promise that has been found in other cases. In *Gatling*, where the public official's intent was at issue, the offer of payment came shortly on the heels of the official act in question, but the jury was entitled to infer from the public official's recent prior acceptance of a payment from the same donor that the official acted in the expectation that another payment would be offered. *See* 96 F.3d at 1523. In *Griffin*, the public official was not paid until after he had steered business to the payor, but the official admitted that he had agreed to accept money in exchange for being influenced in his official action and, the court found, "was not merely paid after the fact for something he had already done, and would have done anyway." *See* 154 F.3d at 763-64. And in *Jennings*, it was held to be reasonable for the jury to infer an arranged-in-advance *quid pro quo* where the evidence showed a meeting between the giver and the recipient that reeked of influence peddling, followed by a series of payments tightly linked to favorable official acts over a short period of time. *See* 160 F.3d at 1017-18.

**C.    There is no evidence from which a rational trier of fact could find beyond a reasonable doubt that there is any nexus between the payments Mr. Davis made for the benefit of the Asselin children and any particular official act.**

Likewise, the government's evidence fails to establish any nexus between Mr. Davis's payments and any specific official act by Raymond Asselin, Sr. or Arthur Sotirion. As explained above, the *Sun-Diamond* Court unanimously held that in order to establish a violation of 18 U.S.C. § 201, the government "must prove a link between a thing of value conferred upon a public official and a *specific* 'official act.'" 526 U.S. at 414. Although the precise holding of *Sun-Diamond* pertains to illegal gratuities, the Court plainly assumed that such a nexus was required to prove bribery as well. *See id.* at 405; *see also Schaffer*, 183 F.3d at 854-55 (Henderson, J., dissenting) ("The Court took for granted that the more stringent *quid pro quo* requirements for bribery required a connection between the thing given and a specific act or omission by the public official."), *vacated in part as moot in light of presidential pardon* 240 F.3d 35 (2001).

Here, the government has made no effort whatsoever to establish any link between Mr. Davis's payments for the benefit of the Asselin children and any "official act" by Arthur Sotirion or Raymond Asselin, Sr., as that term is defined in the statute, § 201(a)(3). Joseph Asselin testified that Mr. Davis's payments were made to pay down a debt he had accrued for work generated for him at SHA by Raymond Asselin, Sr. But the government has presented no evidence as to which work Mr. Asselin, Sr. "got" for Mr. Davis—that is, which contracts constitute the "official acts" Mr. Davis intended by his payments to influence. And this identification of the official act is crucial. Even if an "offer or promise" by Mr. Davis could be inferred here (and, as noted above, it cannot), the government has failed to demonstrate (or even identify) what specific official act Mr. Davis sought to influence. It is undisputed that Mr. Davis

31

was the lowest responsive bidder on every contract he was awarded by the SHA. And the government has failed to demonstrate that Mr. Davis made an offer or promise to pay something of value in exchange for the other so-called "benefits" received by Mr. Davis—such as assistance with Mr. Sotirion with the paperwork associated with the bidding process and assistance with the punch-list tasks on the ADA/504 project. Indeed, it is far from clear that these additional "benefits" constitute "official acts" by either Mr. Sotirion and/or Mr. Asselin, Sr. within the meaning of the statute. In any event, the government's failure to provide evidence of a nexus between any alleged offer or promise by Mr. Davis to the specific official action he sought to induce is fatal to the government's case. Accordingly, Mr. Davis is entitled to judgment of acquittal as to all counts. *Cf. Schaffer*, 183 F.3d at 843-45 (upholding the district court's judgment of acquittal on an illegal-gratuity charge where the government's evidence linking the defendant's provision of a thing of value to a specific official act was "far too meager" and the "inferential leap across the chasm separating th[e] premise from the requisite conclusion … [could not] be considered reasonable").

     The government may argue that it is not required to correlate a particular payment to a particular official act and that it can prove bribery simply by demonstrating that Mr. Davis made a course of payments for the benefit of the Asselin children in exchange for a pattern of official acts favorable to Mr. Davis. Mr. Davis acknowledges a line of cases from the Fourth Circuit holding, notwithstanding the language of section 201, that where a payment is intended to influence a course of official action, the government is not required to prove a link between a payment (i.e., an alleged bribe or gratuity) and a specific official act. *See United States v. Quinn*, 359 F.3d 666, 673 (4th Cir. 2004); *Jennings*, 160 F.3d at 1014 (following *United States v. Arthur*, 544 F.2d 730, 734 (4th Cir. 1976)). *Jennings* and *Arthur* were both decided before *Sun-*

*Diamond*, and *Quinn* simply followed *Jennings* without considering whether *Sun-Diamond*

effected a change in the law.[13]  Thus, there is a significant question whether the Fourth Circuit's

analysis of this issue survived the Supreme Court's decision.  *See Sun-Diamond*, 526 U.S. at

403-04, 414.  Indeed, no court in the First Circuit has held that such a loosey-goosey course-of-

dealing approach is permissible in the wake of *Sun-Diamond*.[14]

---

[13]    The Fourth Circuit in *Quinn* relied on its own, pre-*Sun-Diamond* precedent in concluding that the government was not required to detail the precise links between payments and the official acts intended to be induced.  The court wrote:

> Nor must the government prove 'that the defendant intended for his payments to be tied to specific official acts (or omissions).…  Rather, it is sufficient to show that the payor intended for each payment to induce the official to adopt a specific course of action.'  In other words, the *quid pro quo* requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor.

*Id.* at 673 (quoting *Jennings*, 160 F.3d at 1014).  A close reading of *Sun-Diamond*, however, raises questions about the enduring validity of the Fourth Circuit's reasoning.  Notably, the Court in *Sun-Diamond* explicitly called into doubt the lower courts' conclusion that the government was not required to show that an illegal payment was made for or because of any particular official act or acts.  *See* 526 U.S. at 403, 414.  The specific section of the D.C. Circuit's opinion the Court called into doubt discussed the D.C. Circuit's earlier decision in *United States v. Campbell*, 684 F.2d 141 (D.C. Cir. 1982), in terms that echo the faulty reasoning of the Fourth Circuit in *Quinn* and *Jennings*:

> Campbell argued, much as Sun-Diamond does here, that the jury should have been required "to find that the gratuity was conferred with 'specific knowledge' of a 'definite official action for which compensation was intended.'"  We rejected that argument, holding that it was sufficient for the jury to find that the trucking company had provided free services to Campbell because it believed the judge had been, or would later be, "generally lenient" in dealing with the company's voluminous traffic citations.  The government, we held, was not required to show that any particular free service provided to Campbell was earmarked for any particular ticket or tickets; leniency in a multitude of specific acts was enough.  That an official has an abundance of relevant matters on his plate should not insulate him or his benefactors from the gratuity statute—as long as the jury is required to find the requisite intent to reward past favorable acts or to make future ones more likely.

*United States v. Sun-Diamond Growers of Cal.*, 138 F. 3d 961, 969 (D.C. Cir. 1998) (internal citations omitted) (emphasis added).

[14]    In the context of honest-services fraud, the First Circuit previously had held that "a person with continuing and long-term interests before an official might engage in a pattern of repeated, intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services." *Sawyer I*, 85 F.3d at 730; *see also Woodward*, 149 F.3d at 55, 57-58.  In a later case, the First Circuit clarified that *Sun-Diamond*'s holding concerning § 201 did not affect this analysis of honest-services fraud. *Sawyer II*,

**IV.    MR. DAVIS IS ENTITLED TO A JUDGMENT OF ACQUITTAL BECAUSE THE GOVERNMENT HAS FAILED TO PROVE THAT HE AGREED TO CONDUCT OR PARTICIPATE IN THE CONDUCT OF THE AFFAIRS OF THE SHA THROUGH A PATTERN OF RACKETEERING ACTIVITY**

Mr. Davis is also entitled to a judgment of acquittal on the RICO conspiracy charge for two reasons (1) because there is no evidence from which a rational trier of fact could conclude beyond a reasonable doubt that Mr. Davis agreed to the commission of a pattern of racketeering activity; and (2) because there is no evidence from which a rational trier could infer that Mr. Davis conduct or participate in the conduct of the affairs of the SHA.

First, where the inference that Mr. Davis made *any* offer or promise to Mr. Asselin, Sr. or Arthur Sotirion is insupportable, see above, the further inferences that Mr. Davis made enough offers or promises to form a pattern are insupportable.  The RICO statute defines the "pattern" element as at least two predicate acts of racketeering activity occurring within ten years of each other.  18 U.S.C. § 1961(5).  But the First Circuit has consistently held that proof of two predicate acts is insufficient to establish a pattern.  *See, e.g., Libertad v. Welch*, 53 F.3d 428, 444 (1st Cir. 1995) ("The definition section does not so much define a pattern of racketeering activity as state a *minimum necessary condition* for the existence of such a pattern." (emphasis added)); *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 444 (1st Cir. 1990) ("The use of the word 'requires'— as opposed to 'means'—in section 1961(5) indicates that alleging two acts of mail fraud (or two or more other statutorily defined predicate acts) is *necessary but not sufficient* to establish a pattern of racketeering activity." (emphasis added)).  Rather, as the Supreme Court has explained, to form a pattern, the government must show "that the racketeering acts … amount to or pose a threat of *continued* criminal activity."  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S.

239 F.3d at 40 n.8, 41; *see also United States v. Potter*, ___ F.3d ___, 2006 WL 2578382, *6 (1st Cir. Sept. 8,

229, 239 (1989) (emphasis added). Here, even if the jury could infer a single offer or promise by Mr. Davis to give anything of value to Raymond Asselin, Sr. or Arthur Sotirion intended to influence any official act, contrary to Mr. Davis's arguments *supra*, still no rational trier of fact could infer beyond a reasonable doubt that there were a sufficient number of agreed-upon offers or promises to form a "pattern" within the meaning of the RICO statute.

Nor could the jury find on the evidence that Mr. Davis agreed to conduct or participate in the conduct of the affairs of the SHA.[15]  The only evidence of any connection between Mr. Davis's payments and SHA contracts comes from Joseph Asselin's testimony that Mr. Davis paid for work on his home because Mr. Davis owed Mr. Asselin, Sr. money for "Housing contracts" Mr. Asselin, Sr. had "gotten" for Mr. Davis. But there is no evidence from which a rational jury could infer that Mr. Davis's payments conducted the SHA's affairs. Certainly, in some instances the affairs of an enterprise might be conducted by bribery. *See Reves v. Ernst & Young*, 507 U.S. 170, 184-85 (1993). But for that to be the case, courts require some evidence that the *quid pro quo* caused the bribed official to act differently than he otherwise would have done. *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 206-07 (D. Mass. 2004) (Saris, J.); *Liberty Mut. Ins. Co. v. Diamante*, 138 F. Supp. 2d 47, 58 (D. Mass. 2000) (Collings, M.J., accepted by Lindsay, J.). Here, there is no such evidence that any payments by Mr. Davis were intended to cause, or had the effect of causing, Mr. Asselin, Sr. to do anything he would not otherwise have done with respect to the SHA contracts Mr. Davis received. Instead, the evidence clearly demonstrates the opposite: Mr. Davis was the lowest

---

2006).

[15]  The government has conceded that it is required to prove beyond a reasonable doubt that Mr. Davis conducted or participated in the conduct of the affairs of the SHA through a pattern of racketeering activity. *See* Government's Proposed Jury Instructions, Instruction No. 37.

responsive bidder for every contract he received and would have been awarded those contracts irrespective of any payments.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Peter Davis respectfully requests that the Court grant his motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29.

Respectfully submitted,

PETER DAVIS

By his attorneys,

 /s/ James C. Rehnquist
James C. Rehnquist (BBO # 552602)
Kathleen Luz (BBO # 643278)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated:  October 16, 2006

## CERTIFICATE OF SERVICE

I, James C. Rehnquist, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants, on October 16, 2006.

 /s/ James C. Rehnquist
James C. Rehnquist

LIBA/1737951.1