UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAYMOND ASSELIN, SR., et al.<br><br>    Defendants. | Criminal No. 04-30033-MAP |

**DEFENDANT PETER DAVIS'S MEMORANDUM REGARDING
CO-CONSPIRATORS' STATEMENTS (*PETROZZIELLO*)**

Defendant Peter Davis submits this memorandum to address the admissibility of certain co-conspirators' statements under the legal principles set forth by the First Circuit in *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977) and *United States v. Ciampaglia*, 628 F.2d 632 (1st Cir 1980). As explained below, the trial was dominated by the hearsay statements of Arthur Sotirion and Raymond Asselin, Sr., among others, that were provisionally admitted into evidence pursuant to *Petrozziello* and *Ciampaglia*. Defendant submits that the government has failed to prove, as it must, that many of these statements were made "during the course and in furtherance of" a conspiracy that includes the defendant, as required by Rule 801(d)(2)(E). The categories of statements defendant seeks to exclude are explained below.

**I.    OVERVIEW**

    **A.    Co-Conspirator Statement Evidence**

The government's evidence included the introduction of dozens of co-conspirator statements of Raymond Asselin, Sr., and Arthur Sotirion. These statements were made from as early as the late 1980s (Joseph Asselin's testimony about conversations he had with his father) until as late as the fall of 2002, after the FBI investigation had begun (Gary Baribeau's testimony

about post-investigation conversations with Art Sotirion).  Co-conspirator statements were introduced both through testimony and also as written statements, including numerous statements identified as being in Arthur Sotirion's handwriting.  Over defendant's objection, the government admitted these statements into evidence provisionally, pursuant to the procedures set forth in *Petrozziello* and *Ciampaglia*.

In describing their illicit relationships with the SHA and Arthur Sotirion, each of the three cooperating contractors — Nicholas Katsounakis, Gary Baribeau, Frank Ware — relied heavily, if not virtually exclusively, on hearsay statements of Arthur Sotirion.  Other hearsay statements of Arthur Sotirion were offered through the testimony of SHA workers, including Wallace Kiesel, David Thompson, Peter Kratimenos, and George Williamson, each of whom testified about certain directions or instructions they received from Mr. Sotirion.  Hearsay statements of various Asselin family members were introduced through the recorded conversations of Lisa Asselin made in 2002 and 2003, and through Lisa Asselin's and Joseph Asselin's testimony about renovation projects that "were discussed" at the Asselin's family dinners.  Finally, Joseph Asselin testified about conversations with his father regarding his father's arrangements with contractors.

Defendant concedes that many of these statements were admissible under Rule 801(d)(2)(E), the exception for co-conspirator hearsay.  But defendant submits that several categories of statements, admitted provisionally, were not in furtherance of any conspiratorial agreement made by the defendant.  These statements fall into six categories:

1.  Statements Made After June 1998 (*i.e.*, after Mr. Davis ceased doing business with SHA);

2.  Statements Made in Asselin Family Dinners About Renovations to the Homes of Asselin Children That Are Unrelated to Mr. Davis or P.J. Richfield;

2

3. Conversations With Asselin Family Members Recorded by Lisa Asselin in 2002 and 2003;

4. Joseph Asselin's Testimony About Conversations With His Father in the 1980s (i.e., before P.J. Richfield received SHA work);

5. Statements of Arthur Sotirion Offered Through The Testimony of Katsounakis, Baribeau, and Ware Regarding Contracts/Projects unrelated to P.J. Richfield; and

6. Statements Regarding Campaign Contributions for Christopher Asselin's Election Campaign and/or Work Done For The Campaign.

As explained below, category-by-category, these statements were not made during and in furtherance of any conspiracy the defendant joined, and the Court should order them stricken from the record; instruct the jury (in a form to be determined) to disregard them in its deliberations; and make *Petrozziello* "findings" consistent herewith.

**B.   Legal Principles Relevant to this Court's Determination Whether Statements Challenged Here Were Made During and In Furtherance of a Conspiracy**

In order for this Court to finally admit statements that have been provisionally admitted under *Petrozziello*, it must find that the statements were made during and in furtherance of a conspiracy in which defendant was (or became) a member. The existence of the conspiracy must be proven by a preponderance of the credible evidence. *Petrozziello*, 548 F.2d at 23. In making *Petrozziello* rulings, the Court does not look at evidence in the light most favorable to the government, but instead makes its own credibility determinations. *Earle v. Benoit*, 850 F.2d 886, 892 (1st Cir. 1988).

Mr. Davis contends that the government has failed in its burden to demonstrate that any conspiratorial agreement he may have had continued to exist after he retired from contracting, moved from the Springfield area, and ceased any contact with the SHA. *United States v. Juodakis*, 834 F.2d 1099, 1104 (1st Cir. 1987); *see also* Defendant Peter Davis's Rule 29 Motion for Judgment of Acquittal at 7-14 (hereinafter "Rule 29 Motion"). In order for hearsay

3

statements made after this time to be admissible against Mr. Davis, the government must demonstrate by a preponderance of the evidence that they were made during and in furtherance of <u>the defendant's agreement</u>. *Id.* There is no evidence in this case that the defendant had any unlawful agreement after retiring from contracting and leaving the Springfield area, nevertheless sufficient evidence to demonstrate both the existence of any such agreement and that the statements admitted, each of which had nothing to do with Mr. Davis or his company P.J. Richfield, were in furtherance of the defendant's agreement.[1] Given the government's inability to make such a showing, the Court should find that these statements are not properly admissible against the defendant.

Furthermore, any post-June 1998 hearsay statements are inadmissible because, even if the government can meet its burden of demonstrating that some such statements were in furtherance of an agreement the defendant had once been a part of, the government cannot meet its burden of proving by a preponderance of the evidence that Mr. Davis did not withdraw from any such conspiracy. Statements made by co-conspirators that are in furtherance of the defendant's conspiracy made after the defendant withdrew from that conspiracy are not properly admissible against the defendant. *See United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988) (holding that the district court abused its discretion in admitting co-conspirator hearsay statements made after defendant withdrew from conspiracy); *see also* Rule 29 Motion at 14-19. Furthermore, because once the defendant meets his burden of production to point to some evidence of withdrawal (a burden easily met here) the burden shifts to the government to disprove withdrawal, *United States v. Piva*, 870 F.2d 753, 756-57 (1st Cir. 1989), in order to demonstrate that these statements are admissible against the defendant under Fed. R. Evid. 801(d)(2)(E), the

---

[1] The First Circuit has held that the requirement of focusing on the on the defendant's particular agreement applies equally in the RICO conspiracy context. *United States v. Boylan*, 898 F.2d 230, 243 (1st Cir. 1990).

4

government must demonstrate by a preponderance of the evidence that the defendant did not withdraw from the conspiracy when he retired from contracting, moved from Springfield to Newburyport, and ceased doing business with the SHA. Because the evidence shows unequivocally that defendant severed all ties with the SHA, an act fundamentally inconsistent with the object of the conspiracy, and communicated this fact to his co-conspirators, the government cannot meet its burden of demonstrating that Mr. Davis did not withdraw. Rule 29 Motion at 14-19. As such, any co-conspirator statements made after June 1998 are inadmissible against the defendant.

Defendant argues, further, that the vast majority of hearsay statements admitted through the testimony of the cooperating contractors were not in furtherance of any conspiratorial agreement the defendant may have had. Defendant submits that the government has not demonstrated by a preponderance of the evidence the existence of one overarching conspiracy between Messrs. Asselin and Sotirion (the "hub") and all the alleged co-conspirator contractors (the "spokes"). Rather, the evidence demonstrates at most — with a few limited contract-specific exceptions, explained below — that each contractor had separate and distinct agreements with Messrs. Asselin and Sotirion. *See United States v. Kotteakos*, 328 U.S. 750 (1946) (finding a "hub-and-spoke" enterprise to comprise multiple conspiracies). The First Circuit has looked at several factors in determining whether the government has met its burden of proving one overarching conspiracy among several "spokes," rather than separate agreements between the "spokes" and the "hub," including: "(1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants." *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999). These factors assist the Court in determining whether the government has met its burden of demonstrating the existence of the "rim of the wheel to enclose the spokes."

5

*United States v. Dworken*, 855 F.2d 12, 24 (1st Cir. 1988) (citing *Kotteakos*, 328 U.S at 754-55). Analyzing these factors in light of the evidence at trial demonstrates that the government cannot meet its burden of proving one overall conspiracy.

The government's theory of the case is that the defendant and other contractors paid bribes to either Raymond Asselin, Sr. or Arthur Sotirion in exchange for either "getting" SHA contracts or for getting other favorable treatment. Given that the government's own theory of the case is that the "purpose" of the alleged bribes was to receive SHA contracts, a result that necessarily precludes other contractors from getting those contracts, to their detriment, there is simply no argument that the various contractors shared a "common purpose." In fact, because the evidence unequivocally demonstrates that the contractors were competitors, their goals in engaging in the alleged conspiratorial activity were diametrically opposed to the goals of the other contractors. The testimony of the contractors bears this out, all of whom testified that they were not involved in any conspiracy with Mr. Davis. *See, e.g.* Trial Tr. at 543 (Sept. 21, 2006) (Katsounakis never had any agreement with Mr. Davis to commit bribery); 1433 (Sept. 29, 2006) (Mr. Baribeau never conspired with Mr. Davis to commit bribery); 2244 (Oct. 10, 2006) (Mr. Ware's unlawful activity was not done only to benefit himself and not to help any of the other contractors, who were in fact his competitors). Given this lack of common purpose, the government has not demonstrated the existence of an overarching conspiracy among the contractors.

Relatedly, the government has failed to demonstrate that the actions of the various contractors encompassed the requisite degree of interdependence to establish one conspiracy. Courts often look to whether the separate conspiratorial activities are "mutually supportive," or whether the separate participants have an "interest in" the activities of the others. *See United*

6

*States v. Laguna-Estela*, 394 F.3d 54, 57-58 (1st Cir. 2005) (citing *United States v. Smith*, 82 F.3d 1261, 1269 (3d Cir. 1996). Once again, the fact that a successful bribe of one contractor is to the direct detriment of any attempted conspiratorial activity of all other contractors demonstrates, far from being "mutually supportive" or sharing "interest in" the activities of other contractors, the contractors' interests were actually opposed to one another. Furthermore, the First Circuit has noted that analyzing interdependence "requires determining whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme. Each individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999) (quotation omitted). Here, not only were the activities of the various alleged co-conspirators not "necessary or advantageous" to the success of the others, each testified that it was their belief that their activity was not interdependent with Mr. Davis.

While, as the "hub," Messrs. Asselin and Sotirion were common participants in each separate conspiracy, as *Kotteakos* demonstrates the existence of a single hub at the center of many similar but distinct unlawful schemes is insufficient to demonstrate one conspiracy. 328 U.S. 750. Given the lack of an common purpose or interdependence here, defendant submits that the government has failed to demonstrate by a preponderance of the evidence that the various contractors were engaged in one overarching conspiracy.

Finally, defendant submits that the government has failed in its burden of demonstrating that the post-investigation statements of concealment by the Asselin family contained in the recordings introduced through Lisa Asselin were in furtherance of any conspiracy Mr. Davis was involved in. As both the Supreme Court and First Circuit have held, statements made after the

7

core conspiratorial activity has ended for the purpose of concealing or covering up the crime can only be deemed in furtherance of the conspiracy if the government can demonstrate an "express agreement" to conceal. *Grunewald v. United States*, 353 U.S. 391, 402 (1957); *United States v. Twitty*, 72 F.3d 228, 233 (1st Cir. 1995). As the First Circuit held in *Twitty*:

> *Grunewald,* however, laid down special requirements of proof resting upon a distinct policy concern, namely, that "every conspiracy is by its very nature secret"; that "every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces"; and that if these facts were enough for a conspiracy to conceal, <u>then the statute of limitations and other safeguards would be virtually "wipe[d] out</u>." For this reason, it held that even egregious and organized acts of concealment were not sufficient, unless agreed to as part of the original conspiratorial plan.

*Id.* (emphasis added) (citations omitted).

In light of the Supreme Court's "distinct policy concern" with respect to the statute of limitations, the First Circuit held that "we read *Grunewald* to impose a special burden to show that an express agreement to conceal was, or at least became, part of the central conspiratorial agreement and that the later acts relied upon were in furtherance of this agreement." *Id.* at 234. Given the First Circuit's requirement that the government meet a "special requirement" of proving "an express agreement to conceal," the utter lack of evidence of any such "express agreement" here demonstrates that the government has failed to meet its burden of demonstrating that the hearsay statements contained in the recordings were in furtherance of any alleged conspiracy Mr. Davis may have engaged in.

8

## II. HEARSAY STATEMENTS THAT WERE PROVISIONALLY ADMITTED BUT WERE NOT MADE DURING AND IN FURTHERANCE OF ANY CONSPIRACY MR. DAVIS JOINED

### 1. Post-1998 Statements

The three so-called "corrupt contractor" witnesses — namely, Nicholas Katsounakis, Gary Baribeau, and Frank Ware — testified extensively concerning statements made by Art Sotirion after June 1998 which, as argued above, are <u>not</u> in furtherance of any conspiracy which Mr. Davis may have agreed to join. *See Juodakis*, 834 F.2d at 1104. Indeed, all of the government's credible evidence regarding so-called "bid rigging" comes from this time frame. Specifically, these witnesses testified to the following post-June 1998 co-conspirator hearsay statements:

1. First, all three contractors testified concerning various bills or invoices Mr. Sotirion instructed them to pay after June 1998. Indeed, Mr. Katsounakis testified at length concerning Government Exhibit 232, a typed and handwritten ledger presented to him by Mr. Sotirion of "kickbacks" owed to Mr. Sotirion and/or Mr. Asselin, Sr., which reflects payments made (and debts accrued) <u>after</u> June 1998.

2. Second, Mr. Katsounakis testified to various statements made by Mr. Sotirion post-1998 concerning an alleged "bid-rigging" scheme. Specifically, Mr. Katsounakis testified that, on the Riverview Kitchens project in 1999, Mr. Sotirion instructed Mr. Katsounakis to make up two bids, one for $100,000 and one for $200,000. Trial Tr. at 393 (Sept. 20, 2006). Similarly, Mr. Katsounakis testified that, in 2001, Mr. Sotirion instructed him to submit an artificially high bid on behalf of Eastern Mechanical, another company owned by Mr. Katsounakis. Trial Tr. at 486-87. And, on a kitchen and bath job in 2002, Mr. Katsounakis testified that Mr. Sotirion instructed him to submit an artificially high bid because Mr. Sotirion wanted Corcoran Plumbing to win the contract. Trial Tr. at 487-88 (Sept. 21, 2006).

3. Third, Mr. Ware testified that, between G&R Construction, Manny's Plumbing, P.J. Richfield, and the Ware Group (or any other entity owned by Frank Ware), Arthur Sotirion would instruct the company that won the bid as a general contractor to use the other companies as subcontractors. Trial Tr. at 2150 (Oct. 6, 2006). However, Mr. Ware testified that he did not become a general contractor until after Mr. Davis retired and stopped bidding on projects through the SHA, Trial Tr. at 2204 (Oct. 6, 2006);

        therefore, any such instruction by Mr. Sotirion necessarily came post-1998.

4.    Finally, Mr. Katsounakis testified concerning a joint venture that Manny's Plumbing & Heating (Mr. Katsounakis's company) and G&R Construction (Mr. Baribeau's company) completed at the Holyoke Housing Authority in September 1999 on which Mr. Sotirion instructed Mr. Katsounakis to pay kickbacks. Trial Tr. at 387, 398 (Sept. 20, 2006); Government Exhibit 232.

The testimony of these witnesses on these points relies almost exclusively on hearsay statements by Mr. Sotirion made after 1998. As explained above, these statements could not have been made in furtherance of any conspiracy Mr. Davis agreed to join and, therefore, should be excluded.

    **2.    Renovation Discussions in Asselin Family Dinners**

Lisa Asselin and Joseph Asselin both testified at some length about conversations among Asselin family members, often at family dinners, about renovations at the homes of the Asselin children. This testimony included discussion regarding the fact that renovations were paid for not by the children themselves, but either by contractors or, in the case of work done by SHA employees, by the SHA itself. *See, e.g.*, Trial Tr. at 1546 (Oct. 3, 2006). This testimony included explicit and implicit statements from family members about the renovations and the sources of payment therefor. *See, e.g.,* Trial Tr. at 2643-45 (Oct. 11, 2006)

With the arguable exception of statements made regarding work done on the homes by Peter Davis and/or P.J. Richfield,[2] none of these statements were made in furtherance of any conspiracy Mr. Davis joined. There is no evidence that Mr. Davis was aware of any work that

---

[2]    Joseph Asselin testified, relying on hearsay statements from his father and also his sister-in-law, that Mr. Davis did grading work and fixed a porch at the Ludlow home of his sister-in-law, Maria Serrazina. Trial Tr. at 2649, 2657 (Oct. 11, 2006). Defendant contends that even these statements, which merely refer to the work that was performed, do not "further the objectives" of any conspiracy.

SHA employees performed for free on the homes of the Asselin children,[3] nor is there any evidence that he knew that any other contractor provided free work or paid for work on the homes of the Asselin children.

### 3. Lisa Asselin's Recorded Conversations

Seven recordings of conversations Lisa Asselin made with members of her family in 2002 and 2003 were introduced into evidence. GXs 140, 142, 144, 146, 147A, 148, 149A. These conversations involve discussion about what persons affiliated with the Asselins' receipt of gratuities might say to law enforcement, and other speculation about the ongoing investigation. Neither Mr. Davis nor P.J. Richfield are even mentioned in these conversations.

The numerous hearsay statements in these conversations, many of which appear to be offered for their truth, are not in furtherance of any conspiracy Mr. Davis joined. There is no evidence that he had any conversation of this nature with any of the Asselins — or anyone else, for that matter — about the nature of the investigation, who was talking to law enforcement, and the like. Nor is there any evidence that he was even aware of the bulk of the conduct — the benefits bestowed upon the Asselin children by and through SHA contractors and employees — that were the focal point of the discussions.

### 4. Statements of Arthur Sotirion to Katsounakis, Baribeau, and Ware Regarding Contracts/Projects Unrelated to P.J. Richfield

The three cooperating contractors also testified extensively concerning hearsay statements made by Mr. Sotirion concerning these three contractors' individual arrangements with Mr. Sotirion concerning the payment of things of value to Mr. Sotirion and Mr. Asselin, Sr. This testimony included discussions with Mr. Sotirion concerning specific payments or

---

[3] Lisa Asselin testified that Peter Davis observed Frank Higginbotham, an SHA employee, working on her deck on a Saturday morning, but there is no evidence that Mr. Davis knew who he was or that he was not being paid by the Asselins for his services.

11

arrangements, and conversations concerning specific contracts these individuals bid on and/or were awarded.

Virtually all of these statements — with the exception of a few, discussed below — were not made in furtherance of any conspiracy Mr. Davis agreed to join. There is very little evidence concerning interactions between these corrupt contractors and Mr. Davis, and the evidence presented certainly does not support a finding that Mr. Davis entered the vast conspiracy as alleged in the Indictment. Mr. Katsounakis, for example, did not utter the names Peter Davis or P.J. Richfield during his direct examination. In fact, the other alleged contractor co-conspirators — Mr. Baribeau, Mr. Katsounakis, and Mr. Ware — openly discussed the conspiracy with one another, but did not discuss this activity with Mr. Davis. Trial Tr. at 1280 (Sept. 28, 2006) (Baribeau first learned of the term "A-factor" from Mr. Katsounakis); Trial Tr. at 360-61 (Sept. 20, 2006) (Katsounakis heard both Mr. Baribeau and Mr. Ware use terms R-factor and A-factor); Trial Tr. at 2124-24 (Oct. 6, 2006) (Ware spoke about the cost of doing business at SHA being more than the job is worth with both Baribeau and Katsounakis, but did not discuss it with Mr. Davis). And, notably, Mr. Baribeau, Mr. Katsounakis, and Mr. Ware all testified that they were not involved in any conspiracy with Mr. Davis. *See, e.g.* Trial Tr. at 543 (Sept. 21, 2006) (Katsounakis never had any agreement with Mr. Davis to commit bribery); 1433 (Sept. 29, 2006) (Mr. Baribeau never conspired with Mr. Davis to commit bribery); 2244 (Oct. 10, 2006) (Mr. Ware's unlawful activity was not done only to benefit himself and not to help any of the other contractors, who were in fact his competitors).

Even the isolated instances of interactions between these contractors and Mr. Davis are simply insufficient to establish, by a preponderance of the evidence, that a single conspiracy existed between Mr. Davis and these three corrupt contractors. These interactions can be

summed up in a few sentences.  First, Mr. Baribeau testified that Mr. Sotirion instructed him to hire Mr. Davis as a subcontractor on both the Williams Street Garage project (in 1990) and on the ADA/504 interior rehab project in 1993.  *See* Trial Tr. at 1287, 1291 (Sept. 28, 2006).  Putting aside for the moment whether there is any linkage of these actions to an offer or promise to induce official action, *see* 18 U.S.C. § 201, there is simply no other evidence of any interaction between Baribeau and Davis between 1990 and 1993 or between 1993 and 1998.  At most, this Court could find two isolated, single-purpose Baribeau-Sotirion-Davis conspiracies regarding these projects.

Second, Mr. Ware testified that he acted as a subcontractor for Mr. Davis on the Christopher Court project, and testified concerning Government Exhibit 90, a handwritten note purportedly written by Arthur Sotirion to Peter Davis, referencing the "R-factor."  There is no other evidence indicating any agreement or understanding between Peter Davis and Frank Ware regarding their work on Chris Court.  Ware also testified that Chris Court was the only project he worked on with or for P.J. Richfield.  Trial Tr. at 2239 (Oct. 10, 2006).  This, again, even if it could be connected to an offer or promise, was at most a one-off, limited purpose conspiracy.

Third, the government may attempt to argue that there was evidence of conspiratorial activity on the bidding on the OSHA Compliance contract, which P.J. Richfield was awarded in October 1997.  Government Exhibit 317, according to the government's evidence, was a bid on this contract that was written by Sotirion but signed by Baribeau.  The government may contend this was evidence of "bid rigging."  The government's argument is completely undercut, however, by the evidence that there were two other bidders on this contract, and no evidence whatsoever of any communication or interaction between or among Sotirion, Ware, or Baribeau.  *See* GX 39.

In short, while some of these isolated interactions may possibly be sufficient to permit an inference that individual, limited, finite conspiracies existed between Mr. Davis and Mr. Baribeau or Mr. Ware (and Mr. Davis would submit that it is not), this evidence is certainly insufficient to establish the vast conspiracy alleged the Indictment, the supposed predicate for the admission of virtually all of the statements made by Mr. Sotirion to Messrs. Baribeau, Ware, and Katsounakis concerning their individual projects. Accordingly, with the exception of statements related to the limited topics referenced above, any co-conspirator hearsay statements concerning contracts and/or projects unrelated to P.J. Richfield should be stricken.

### 5. Statements of Ray Asselin, Sr., to Joseph Asselin in "The Late 1980s and Into the 1990s"

Joseph Asselin testified about conversations he had with his father "in the late 1980s and into the 1990s" in which his father told him, generally, that he [Asselin, Sr.] "would help these folks [contractors] get work for the Housing Authority and he would charge them a fee, a percentage fee, for the work that he got them." Trial Tr. at 2676 (Oct. 11, 2006). Joseph Asselin also testified that, in these conversations, his father described these "fees and commissions" he would charge the contractors as "essentially kickbacks." *Id.* at 2676-77.

The earliest date that this Court could find that Mr. Davis joined any conspiracy is on or about October 12, 1990, when he bid on his first SHA contract. DX I. Based on Joseph Asselin's loose testimony, this Court cannot find, even by a preponderance of the evidence, that the statements made by his father were made during and in furtherance of any conspiracy Mr. Davis joined.

### 6. Statements Regarding Campaign Contributions to Chris Asselin's Campaign or Work Done For Chris Asselin's Campaign

Numerous witnesses testified that Art Sotirion asked them to make contributions to Christopher Asselin's election campaign and/or instructed them to provide services for the

14

campaign in one form or another. *See* Trial Tr. at 2008-09 (Oct. 6, 2006). There is not a shred of evidence that Peter Davis was ever a member of any conspiracy that had, as a focus, the direction of SHA resources for Christopher Asselin's election campaign. All such statements should not have been admitted.

## CONCLUSION

For the foregoing reasons, defendant requests that the co-conspirators' statements identified above be ordered stricken from the record; that the Court order the jury to disregard the statements in its deliberations; and that the Court make *Petrozziello* "findings" consistent herewith.

Respectfully submitted,

PETER DAVIS

By his attorneys,

 /s/ **James C. Rehnquist**
James C. Rehnquist (BBO # 552602)
Kathleen Luz (BBO # 643278)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated: October 17, 2006

**CERTIFICATE OF SERVICE**

      I, James C. Rehnquist, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants, on October 17, 2006.

                              **/s/ James C. Rehnquist**
                              James C. Rehnquist

LIBA/1738256.2