UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR-04-30033-MAP |
| | ) | |
| PETER DAVIS, | ) | |
| Defendant. | ) | |

### Government's Opposition to Defendant's Rule 29 Motion

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, Steven H. Breslow, Assistant United States Attorney, and Kevin O'Regan, Assistant United States Attorney, hereby files this memorandum in opposition to the defendant's Rule 29 motion.

The trial evidence, when viewed as a whole in the light most favorable to the government, is sufficient for a rational jury to reach guilty verdicts on both counts of the indictment. As a result, the motion should be denied.

I.  Rule 29

Under Fed. R. Crim. P. 29, a criminal conviction must be upheld unless the evidence, and all reasonable inferences therefrom, could not have persuaded a rational trier of fact of the defendant's guilt beyond a reasonable doubt. United States v. Lopez-Lopez, 282 F.3d 1, 19 (1st Cir. 2002); United States v. Hernandez, 218 F.3d 58, 64 (1st Cir. 2000); Fed. R. Crim. P. 29(a). As a result, the defendant must overcome "daunting hurdles" to justify granting a motion for judgement of acquittal.

United States v. Cruzado-Laureano, 404 F.3d 470, 483 (1st Cir. 2005).

The First Circuit has elaborated on the standard for judicial review of evidentiary sufficiency in a criminal case as follows:

> If the evidence presented, taken in the light most flattering to the prosecution, together with all reasonable inferences favorable to it, permits a rational jury to find each essential element of the crime charged beyond a reasonable doubt, then the evidence is legally sufficient.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979) [additional citations omitted].  In evaluating sufficiency, both direct and circumstantial evidence are accorded weight.  See, e.g., United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994).  So long as the evidence, taken as a whole, warrants a judgment of conviction, "it need not rule out other hypotheses more congenial to a finding of innocence."  United States v. Gifford, 17 F.3d 462, 457 (1st Cir. 1994).

> When . . . a criminal defendant mounts a sufficiency challenge, all the evidence, direct and circumstantial, is to be viewed from the government's coign of vantage.  Thus, the trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and, moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt. See United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1995); United States v. Rothrock, 806 F.2d 318, 320 (1st Cir. 1986).

United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995).

The trial court also must look at the whole of the evidence. "[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it.  The sum of an evidentiary presentation may well be greater than its constituent parts."  Bourjaily v. United States, 483 U.S. 171, 179-80 (1987);

2

see <u>United States v. Cruzado-Laureano</u>, 404 F.3d at 483 (citing
<u>Bourjaily</u> in considering defendant's motion for judgment of
acquittal).

II.   The Trial Evidence is Sufficient for the Jury
      <u>to Convict the Defendant of Both Charged Crimes</u>

The defendant's presentation of the evidence throughout his
Rule 29 memorandum is selective and filtered through the prism of
his counsel's advocacy.  It is not, as is required, viewed as a
whole and in the light most favorable to the government.  When
viewed properly for Rule 29 purposes, the evidence permits a
rational jury to find each essential element of the crimes charged
beyond a reasonable doubt.

The trial established that the defendant knowingly
participated in both of the charged conspiracies: a racketeering
conspiracy to participate in the corrupt affairs of the
Springfield Housing Authority (the "SHA") as charged in Count Two
and a conspiracy to commit federal bribery as charged in Count
Three.

The evidence established that SHA's Executive Director,
Raymond Asselin, Sr., and his Assistant Executive Director for
Operations, Arthur Sotirion, operated SHA corruptly by, among
other things, rigging bids and soliciting bribes and kickbacks
from a range of contractors, including the defendant (operating
P.J. Richfield); Nicholas Katsounakis (operating Manny's Plumbing
& Heating); Gary Baribeau (operating G & R Associates, Inc.);
Frank Ware (operating the Ware Group, Ware Enterprises, and

Northern Star Development Corp.); and John Spano (operating Valley
Flooring).

According to the testimony of Baribeau, Katsounakis and Ware,
these payments were generally known as the R-factor and the A-
factor, and took the form of cash, checks to third parties, and
the provision of free services.  Each of these witnesses testified
that if they did not make the required payments they would not
receive additional contracts from SHA.

In 1996-97, the defendant paid the R-Factor in approximately
$65,000 of expenses for work performed at the homes of Joseph and
Christopher Asselin.  These payments occurred as the defendant was
performing a million dollar SHA contract at the Christopher Court
apartments - a project that Sotirion knew he did not substantially
complete.  Moreover, after these payments, in 1998 Sotirion and
Asselin awarded the defendant another SHA contract based upon a
rigged competition in which Sotirion submitted a false and
inflated bid on behalf of G & R Associates.

A.   P.J. Richfield

Asselin, Sr. and Sotirion awarded the defendant a number of
contracts from 1990 to 1993, even though Asselin, Sr.'s son Joseph
was jointly liable for approximately $85,000 in debt until May
1993.  T. 2814-15, 2822-23.  This clear conflict of interest was
never disclosed to anyone at SHA.

Joseph Asselin testified that he entered into business with
the defendant in the mid to late 1980s, creating P.J. Richfield in
both of their names: "P" for Peter Davis, and "J" for Joseph

4

Asselin.  Tr. 2610-14.  Joseph Asselin was a 50% partner in P.J. Richfield.  T. 2617.  Ultimately, P.J. Richfield defaulted on a loan from the Bank of Boston, which sued P.J. Richfield, the defendant, and Joseph Asselin.  T. 2625.  In May 1993, P.J. Richfield settled the lawsuit by paying approximately $40,000.  T. 2627-33.  Joseph Asselin explained that his father and the defendant had agreed that the $40,000 was going to come from SHA contracts that P.J. Richfield obtained.  T. 2634.

Sotirion also engineered the defendant's entry into SHA work. In approximately 1990, Sotirion directed Gary Baribeau to bid on an SHA contract at the Williams Street garage.  Sotirion further instructed Baribeau that "Peter Davis is going to build the garage" so that the defendant could become certified to do public work.  T. 1287-88, 1421.  When the state certification agency sent Baribeau a letter concerning the defendant's work, he gave it to Sotirion, whom he believed filled it out and sent it back.  T. 1288-89.

Thereafter, the defendant's company received a wide range of preferential treatment from Asselin and Sotirion, including the payment of approximately $3.1 million in SHA contracts from 1990 to 1998 and preferential supervision of those contracts.  For example, Sotirion drafted most of the defendant's own bills for his 1993 project at Christopher Court.  T 863-68.

B.    The Defendant's Performance On The ADA-504 Project

Asselin, Sr. and Sotirion divided the 1993 ADA-504 handicap modernization project into two separate contracts: one contract

for exterior site work at 14 developments, and another contract
for interior work at one development.  P.J. Richfield was given
the exterior contract, and G & R Associates was given the interior
contract.

The day before the bids were due for the exterior contract in
June 1993, Sotirion met alone with the defendant to review the
specification.  T. 1085-86.  After the defendant was given the
contract, Sotirion told the project architect, James Bright, and
the SHA modernization coordinator, Wallace Kisiel, that he and
Asselin, Sr. would take care of the defendant's bills.  As a
result, Bright and Kisiel never confirmed the work claimed to be
complete on these bills, which falsely reported the state of the
defendant's work.  T. 1703, 1093-1101, 1807.  Notably, the
defendant's certificate of completion falsely stated that the work
was completed by July 1994, when substantial aspects of the job
remained incomplete until January 1995.  Government Exhibits 66,
71.  Indeed, the required four-foot foundation walls on many of
the defendant's handicap ramps were simply never installed at all,
resulting in great additional cost to SHA when they inevitably
cracked.

In October 1993, Sotirion gave Baribeau G & R's bid documents
for the ADA-504 interior modifications project, which Baribeau
signed and submitted.  Tr. 1340; Government Exhibit 76.  After
Baribeau was given the job, Sotirion informed Baribeau, "Pete
Davis is going to run the job for you."  Sotirion further
directed, "We're going to give him $1,000 a week" as a supervision

6

fee, even though Baribeau was the "overseer" of the contract. T. 1291-92. Overall, Sotirion monitored the payment of over $150,000 from G & R to the defendant's company on the ADA-504 interior project in 1993-94. T. 1281-85 Government Exhibits 77-78.

During a surprise spot check on the defendant's work, project architect Bright encountered the defendant walking by SHA workers using SHA equipment to perform some of the defendant's work. When he questioned the defendant, the defendant told Bright that he had a "prior arrangement." T. 1699-1700. This prior arrangement was documented by a punch list that Sotirion annotated, dividing some of the ADA-504 work between the defendant's company and SHA's own workers. Government Exhibit 62. SHA workers George Williamson and Peter Kratimenos testified that they performed some of the work on this punch list, and used SHA equipment and materials on the defendant's project.

C.   The Testimony of the Other Corrupt Contractors

1.   Gary Baribeau

Gary Baribeau testified that in approximately 1987, after his brother Roland suffered a stroke in the middle of an SHA contract, Sotirion began to assist Baribeau with the SHA paperwork. T. 1265. Thereafter, Sotirion prepared Baribeau's bids, which Baribeau would then sign. T. 1268. Baribeau never prepared his own bids. T. 1269. Although Baribeau was given some of these bids, Sotirion told Baribeau in advance that he would lose others. T. 1270-71. Baribeau began to pay small kickbacks in approximately 1992 and "then it just started escalating." T.

7

1273-74.  Baribeau's payments continued until approximately 2002, when the FBI's investigation of SHA commenced.  T. 1275. Baribeau's payments usually took the form of checks to third parties: "It just seemed like when they needed something, they passed a bill on to me and said pay it."  T. 1370.  Baribeau paid these bills "[b]ecause Art said take care of it."  T. 1370. Baribeau explained that if he didn't pay the bills, "I knew I wouldn't continue to work for them."  T. 1404; see also T. 1434 (Baribeau paid the money because he wanted to get more work from SHA).

Once, Baribeau "did start trying to slow down" on the payments and "when I did, I didn't hear from Art much any more" for a while.  T. 1370.  Sometimes Sotirion directed Baribeau to disguise the nature of the payments.  For example, on approximately May 16, 2001, Sotirion directed Baribeau to write a check to Blue Dolphin pools for $8,100 for a pool at Christopher Asselin's house, instructing him to fill out the memo line with a reference to SHA site work.   T. 1397-99.

Baribeau discussed the A-factor with Katsounakis, telling him that "to me it's always at the end of the job."  T. 1280-81. Sotirion kept a record of G & R's financial accounts, including its expenses, so at the end of a contract he knew what Baribeau's profit was.  T. 1281.

## 2.   Nicholas Katsounakis

Nicholas Katsounakis testified that he paid approximately $500,000 in bribes and kickbacks to Asselin and Sotirion,

beginning with the first bid that he submitted in 1993.  T. 348-49.  Katsounakis had to pay kickbacks on most of the contracts that he was given.  T. 354.  Sotirion assisted him in preparing his bids, handwriting his forms and providing him with estimates for job costs.  T. 356-57.  Sotirion also assisted Katsounakis in preparing his monthly bills.  T. 374.  Sotirion used the terms R-factor and A-factor to describe the kickbacks, as did Ware and Baribeau.  T. 359.  Katsounakis provided the kickbacks in the form of cash, checks to vendors, other contractors, and other third-parties, or free services on the houses of Sotirion, Asselin, and all of Asselin's children.  T. 361-68.  In approximately 1999, Katsounakis fell behind in his kickback payments, and Sotirion insisted that he pay the money "or else."  T. 370-71.  In approximately 2000, Sotirion even provided Katsounakis with a ledger detailing his kickback debt, which amounted to approximately $717,000.  T. 383-84; Government Exhibit 232. Katsounakis understood that Sotirion could cause him to lose his public works certification, hold back his SHA payments, or insist that he perform all the work on a punch list before payment.  T. 372-74.  Katsounakis also described his participation in several rigged bids, including artificially high bids that he had to submit so another corrupt contractor could win the job.  T. 393-97, 483-89.  Similarly, Katsounakis testified that he received a contract in which a competing contractor's bid was drafted by Sotirion.  T. 491-93.

9

3.   <u>Frank Ware</u>

Frank Ware testified that the R-factor was a share of his profit that was kicked back to Asselin and Sotirion in exchange for obtaining SHA contracts.  Sotirion told Ware that "the R-factor was the cost of doing business here at the Springfield Housing Authority."  T. 2123.  Ware understood that if he didn't pay the R-factor, Asselin and Sotirion would be hold up his payments and "would begin to not move forward with issuing you any new work."  T. 2124.  When Ware fell behind in his R-factor payments, Sotirion told him "I need to do a better job.  I need to pick up the payments."  Tr. 2125.  Ware estimated he paid approximately $400,000 to $500,000 in kickbacks to Asselin and Sotirion, and that when he left the SHA he still owed them approximately $100,000.  T. 2131-32.  Ware paid the R-factor on all of the contracts he had at SHA.  T. 2147.

Sotirion assisted Ware in preparing his bids.  T. 2148.  Similarly, Ware testified that based upon his own observations of Sotirion in his office, Sotirion assisted Manny's Plumbing & Heating, G &R Associates, and P.J. Richfield, "developing their numbers for the projects."  T. 2148-49.  If one of these four contractors won the general contract, the other contractors would receive sub-contracts.  T. 2150.  Ware had to pay the R-factor with respect to his sub-contracts, which Sotirion arranged for him to receive.  T. 2154.  In particular, Ware received sub-contracts from Manny's and P.J. Richfield.  T. 2155.

In 1996, Ware received a sub-contract from P.J. Richfield for the Christopher Court apartments, which he performed in 1997-98. T. 2173-74.  When Ware dealt with P.J. Richfield, he dealt only with Sotirion and the defendant.  T. 2174.  When Ware and the defendant  developed a dispute concerning the sub-contract, Ware resolved the dispute through Sotirion.  T. 2178-79.  To resolve the dispute, Ware provided a typed document to Sotirion, T. 2180; Government Exhibit 90, on which Sotirion then wrote the following in pertinent part:

9/8/97

To:  Peter

From Frank Ware

cc:  AGS

     RBA

       Faxed to Peter 9/8/97

<u>Very reasonable</u>

     Where's Balance

       R-FACTOR

This communication, addressed directly to the defendant from Sotirion, demonstrated directly that the defendant knew about the R-Factor, which Baribeau, Katsounakis and Ware all testified constituted their kickback of profits to Sotirion and/or Asselin.[1]

Notably, on September 22, 1997 (fourteen days after Sotirion wrote this note), the defendant wrote a $7,400 check to Gordon

---

[1]  Exhibit 90 was obtained from P.J. Richfield in response to a subpoena provided to the defendant on April 10, 2003.

Toussaint for framing labor on Joe Asselin's house.  Government Exhibit 122.

If Ware encountered problems on the project, his R-factor payment would not be affected.  T. 2192.  Nonetheless, Ware did receive the assistance of SHA maintenance employees, equipment, and materials on his contracts, in order to "help maintain the R-factor and keep the cost down on the project."  T. 2192-93. Ware's work at SHA ranged from the mid-1990s to 2003.  T. 2120, 2152.

D.    The Defendant's 1996-97 Kickbacks

Between September 30, 1996 to December 19, 1997, the defendant's company wrote fourteen checks totaling approximately $65,000 for work at the houses of Joseph and Christopher Asselin. Government Exhibit 278.  In particular, the defendant paid for the wood, windows, framing labor, and masonry work at Joseph Asselin's house, and for painting, cabinets, window installation, and floor work at Christopher Asselin's house.

Similarly, at Sotirion's direction, Baribeau wrote checks to Springfield Lumber ($18,100), Gordon Toussaint ($5,500) and Roy & Dutil ($4,030) for lumber, framing, and concrete work at Joseph Asselin's house. T. 1347-50; Government Exhibit 173, 175, 176-77. Baribeau also provided free work at Joseph Asselin's house.  Tr. 1341-42.  Baribeau did not submit a bill "because I knew I wasn't going to get paid for it . . . because I never got paid in the past."  T. 1342.

Raymond Asselin kept a careful record of the payments made by the defendant and Baribeau for Joseph Asselin's house.  He recorded these payments on an index card (one side reflecting P.J. Richfield's payments, and the flip side reflecting G & R's payments).  Government Exhibit 137.  Similarly, Raymond Asselin kept a detailed record of the payments made by the defendant for Christopher Asselin's house.  Government Exhibit 104-A.[2]

Joseph Asselin testified that in the late 1980s and 1990s, his father explained to him that he would help certain contractors get work at the SHA "and he would charge them a fee, a percentage fee for the work that he got them."  T. 2676.  His father and Sotirion each received these fees, which his father described as "kickbacks."  T. 2677.  Asselin testified that he knew which contractors had paid kickbacks "because I would receive benefits from the contractors."  T. 2677.  These contractors included the defendant, G & R, Manny's, and others.  T. 2678.  Asselin knew that the defendant, G & R, and Manny's each had an accruing debt of kickbacks. T. 2681.

In particular, Joseph Asselin explained how the defendant assisted with the construction of his Amherst home in 1997.  In the fall of 1997, Asselin, Sr. told him that "the timing was right and that Pete owed him money." T. 2748.  The defendant owed this money because "[m]y father had gotten him some Housing contracts and this was a commission that my father was owed."  T. 2748.

---

[2]  Government Exhibits 137 and 104-A were seized from the homes of Raymond Asselin, Sr. and Christopher Asselin, respectively.

Asselin, Sr. told him that the defendant wanted to pay for some of his construction costs through P.J. Richfield.  T. 2749.  Joseph Asselin and his father discussed the vendors for the construction, and Asselin, Sr. said that "it was good to use the same vendors [as P.J. Richfield] therefore it wouldn't look out of place when they looked in Peter's books . . . ."  T. 2759.  Asselin, Sr. asked him to provide invoices for some of the work "so Peter could have it for his files."  T. 2758.

Like P.J. Richfield, Manny's provided the plumbing for free because, as Asselin Sr. explained, "Manny also owed him some money."  T. 2756.  G & R also paid for various items as part of its kickbacks owed to Asselin, Sr.  T. 2757-58.

In the spring of 1998, as the Amherst house was nearing completion, Asselin, Sr. and the defendant visited Joseph Asselin at the construction site.  Joseph Asselin thanked the defendant for paying the lumber, framing, and masonry bills, and the defendant replied, "It worked out for both of us."  T. 2761.

The defendant's payments were made during the course of the defendant's work at the Christopher Court projects, a million dollar SHA contract that the defendant left substantially uncompleted.  The renovation project required the following work on bathrooms in 92 separate apartments: (1) rake and regrout all tile; (2) replace shower valves and diverters; and (3) install access doors.

According to Dave Thomson, the SHA employee responsible for maintaining these apartments, the defendant's work was "not being

done in full."  T. 2341.  Thomson complained to Sotirion, who told
him not to worry about it.  T. 2344.  After the defendant's work
had ended, Thomson inspected each of the 92 apartments.  According
to him, not one of the apartments had raked and regrouted tile,
replaced (or even rebuilt) shower valves, or access doors
installed.  Indeed, the defendant's own notes indicate that the
access doors and other elements of the project were to be
eliminated.  Government Exhibit 292.  As a result, Thomson and his
staff had to complete this work, but when Thomson complained to
Sotirion, he was told simply to "deal with it."  T. 2365-66.

    E.   <u>The Rigged 1997 OSHA Compliance Bid</u>

Even though Sotirion knew that the defendant had not left the
Christopher Court project substantially complete, Sotirion and
Asselin awarded the defendant another contract in 1997 for OSHA
compliance at various complexes; the defendant's payments on this
new contract continued through 1998.

Notably, a competing bidder for this contract was G & R
Associates, whose bid was handwritten by Sotirion himself.  T.
656, 1997-98.  Sotirion priced the job for G &R bid at $177,891,
or approximately $70,000 higher than the defendant's winning bid
of $108,500.  Government Exhibits 317-319.  Thus, the defendant
won this contract in part due to the submission of a rigged bid.
Moreover, project architect Bright testified that had he known in
1995 that the defendant had falsely certified that his ADA-504
work was complete in 1994, he would never have recommended his low
bid on this latest contract.  T. 1743-44.

F.    The Defendant's Post-1998 Conduct

At some unspecified time in about 1998, the defendant stopped doing business with SHA and moved his personal residence to the eastern part of Massachusetts.  However, there is no evidence in the record that the defendant communicated to Asselin, Sr., and Sotirion that he disavowed their concealed and corrupt relationship.

To the contrary, the defendant continued to associate with Asselin, Sr., and in 1999 made at least one campaign contribution to Chris Asselin's political campaign even though Chris Asselin was not his state representative.  Lisa Asselin testified that the defendant attended one of Christopher Asselin's campaign fundraisers, where she observed the defendant give Christopher Asselin an envelope.  T. 1627.  In addition, according to Christopher Asselin's campaign finance reports filed with the Massachusetts Office of Campaign and Political Finance, the defendant made a $100 contribution on May 4, 1999.  Government Exhibit 139.

At a later time, the defendant discussed the ongoing federal investigation of SHA with Asselin, Sr.  T. 2465-72.  Then, on April 10, 2003, he continued to conceal his agreement to pay bribes to Asselin, Sr., and Sotirion by lying to the FBI about his relationship with SHA and the Asselin family.  In particular, the defendant lied about: (1) the founding of P.J. Richfield (he said that only he started the company); (2) his relationship with Joseph Asselin (he said that his only professional relationship

16

concerned construction work performed by P.J. Richfield for
Asselin's bank); (3) his relationship with Raymond Asselin, Sr.
(he described the relationship as mostly professional); and (4)
the extent of his SHA contracts (he said that they ranged from
fifty to several hundred thousand dollars).

III.  The Statute of Limitations and Withdrawal

    The limitations statute provides, in pertinent part:

    Except as otherwise expressly provided by law, no person
    shall be prosecuted ... for any offense ... unless the
    indictment is found ... within five years next after such
    offense shall have been committed.

18 U.S.C. § 3282.  The five-year period begins to run when the
crime, as alleged, is complete.  See United States v. Torres
Lopez, 851 F.2d 520 (1st Cir. 1988).

    The date from which to measure time in this case is the date
that the original indictment was returned: July 9, 2004.  See
United States v. O'Bryant, 998 F.2d 21 (1st Cir. 1993).
Subtracting five years yields a statute of limitations date of
July 9, 1999.

    The evidence at trial, when viewed as a whole and in the
light most favorable to the government, established that the
bribery and RICO conspiracies continued until well into 2003.  The
defendant's primary defense, therefore, is that he withdrew from
the conspiracies prior to July 9, 1999.

    The defendant has failed, however, to make the threshold
showing required to trigger a withdrawal jury instruction.

Moreover, the trial evidence has demonstrated that the defendant did not, in fact, withdraw from the conspiracy.

In United States v. Piper, 298 F.3d. 47, 53 (1st Cir. 2002), the First Circuit reaffirmed the "strict standard" that a conspirator must meet to demonstrate withdrawal from a conspiracy.

> We have made manifest that in order to withdraw from a conspiracy, "a conspirator must act affirmatively either to defeat or disavow the purposes of a conspiracy." *United States v. Juodakis*, 834 F.2d 1099, 1102 (1st Cir. 1987)(per curiam). Typically, that requires "either . . . a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." *Id.* . . . "Mere cessation of activity in furtherance of the conspiracy does not constitute withdrawal" from a conspiracy. *Id.*

298 F.3d at 53; see also United States v. Potter, 2006 W.L. 2578382 *8, --F.3d.-- (1st Cir. Sept. 8, 2006) (stating "Withdrawal is a demanding defense requiring affirmative evidence of an effort to defeat or disavow or confess.")

In Juodakis, the First Circuit held that the government had failed to prove an overt act within the limitations period because it found that a co-conspirator's dismantling of a drug lab over a year after manufacturing had stopped and after the DEA had raided the lab premises, was not "overt act in furtherance of the particular agreement defendant entered." 834 F.2d at 1105.

Unlike in Juodakis, the particular agreement the defendant entered into in this case – that SHA would be run by Asselin, Sr., and Sotirion through a series of concealed bribes and kickbacks – continued among the co-conspirators well into 2002. There was no

18

cessation of the illegal bribery activity by the SHA conspirators
before the limitations period.

At best, the trial evidence in this case demonstrates "mere
cessation" of the actual exchange of bribes and kickbacks by the
defendant himself in exchange for Asselin, Sr.'s, and Sotirion's
official actions in about 1998.  This alone, is insufficient to
constitute withdrawal.

In addition, when he lied to the FBI, the defendant himself
acted in furtherance of his original agreement with his co-
conspirators to continue to conceal the nature of the bribery
scheme.

In <u>United States v. Twitty</u>, 72 F.3d 228, 233 (1st Cir. 1995),
the First Circuit explained:

> [A]cts of concealment can extend the life of a
> conspiracy if the proof shows "an express
> original agreement among the conspirators to
> continue to act in concert in order to cover
> up" their crime.

<u>Id.</u> at 233, quoting <u>Grunewald v. United States</u>, 353 U.S. 391, 404
(1957); citing <u>United States v. Bigos</u>, 459 F.2d 639, 643 (1st Cir.
1972)(explicit agreement to cover up hijacking plan).

Here, the co-conspirators' agreement to act in concert in
order to cover up their crime can be inferred by their use of
false bid documents, false payment documents, third party
invoices, secret payments of cash and material non-disclosures to
SHA's Board of Commissioners.  The defendant's lies to the FBI
were part of the ongoing agreement to conceal the corrupt bribery
scheme between contractors and executives at SHA.

19

IV.    <u>The Trial Evidence is Sufficient to Prove Bribery</u>

 In <u>United States v. Sun-Diamond Growers of California</u>, 526

U.S. 398, 404-05 (1999), the Supreme Court observed:

> Bribery requires intent "to influence" an
> official act or "to be influenced" in an
> official act . . .. [F]or bribery there must
> be a *quid pro quo* – a specific intent to give
> or receive something of value *in exchange* for
> an official act.

<u>Id.</u>

 The trial evidence, when taken as a whole and viewed in the

light most favorable to the government, established that the

defendant paid Asselin, Sr., and Sotirion in order to influence

them in their official acts as the Executive Director and

Assistant Executive Director of SHA.  In particular, Asselin, Sr.,

and Sotirion were paid and influenced by the defendant to act in

their official capacities on the defendant's behalf with respect

to the preparing of the defendant's bids, the evaluation of the

defendant's bids, the awarding of contracts to the defendant, the

monitoring of the defendant's performance of his SHA contracts

(including arrangements for him to use SHA employees and

equipment) and the approval of defendant's payment by SHA with

respect to his contracts.

 In view of the well established *quid pro quo* between the

defendant's payments and official acts on his behalf, the Supreme

Court's decision in <u>Sun-Diamond</u> is satisfied in this regard and

the defendant's motion should be denied on this ground.

V.  The Government Has Proved That The Defendant Agreed To
    Participate In The Conduct Of The Affairs Of The SHA Through
    A Pattern Of Racketeering Activity

The defense wrongly claims that there is no evidence from
which a rational jury could conclude beyond a reasonable doubt
that the defendant agreed to the commission of a pattern of
racketeering activity, or that he agreed to participate in the
conduct of the affairs of SHA.

To the contrary, the government has established that the
defendant and his co-conspirators committed an extensive pattern
of racketeering activity and agreed to participate in the corrupt
affairs of the SHA.  At the very least, the evidence demonstrated
that between September 30, 1996 to December 19, 1997, the
defendant himself wrote fourteen checks totaling approximately
$65,000 for work at the houses of Joseph and Christopher Asselin.
Government Exhibit 278.  In particular, the defendant paid for the
wood, windows, framing labor, and masonry work at Joseph Asselin's
house, and for painting, cabinets, window installation, and floor
work at Christopher Asselin's house.  Notably, Raymond Asselin
himself kept detailed records of the defendant's payments for his
sons.

The testimony of the other corrupt contractors (including
Gary Baribeau, who also paid for significant work at the homes of
Joseph Christopher Asselin) as well as of Joseph Asselin himself
established the core purpose of these payments: they were kickback
payments to Raymond Asselin for SHA contracts that he obtained for
the defendant.  Indeed, the defendant's fourteen checks were paid

during a period in which his company was receiving hundreds of thousands of dollars in SHA money for the Christopher Court project, which the defendant was substantially failing to complete.  One of these checks - a $7,400 check to Gordon Toussaint - was written on September 22, 1997 - just fourteen days after Sotirion faxed the defendant his request for the R-Factor. Government Exhibits 122, 90.

Moreover, on October 16, 1997 - in the middle of the defendant's payments for Joseph Asselin's home - Sotirion recommended that the defendant win yet another SHA project, for an OSHA compliance contract, based upon a rigged competition featuring a bogus bid from G & R Associates handwritten by Sotirion.  Government Exhibit 317.  Just two days earlier, the defendant had written a $12,400 check to Gordon Toussaint to frame Joseph Asselin's house.

In light of all of the evidence, including the testimony of the other corrupt contractors, Joseph Asselin, and the evidence concerning the defendant's failures at the ADA-504 and Christopher Court projects, a rational jury could conclude at the least that the defendant's fourteen checks were written to ensure that he would continue to receive SHA payments, which he in fact continued to receive up to May 11, 1998.

VI.  <u>Conclusion</u>

For the foregoing reasons, the Government respectfully asks that the Court deny the defendant's Rule 29 motion.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


/s/ Steven H. Breslow
Steven H. Breslow
Assistant U.S. Attorney


/s/ Kevin O'Regan
Kevin O'Regan
Assistant U.S. Attorney

Dated:    October 17, 2006



CERTIFICATE OF SERVICE

October 17, 2006

I certify that I have served a copy of the foregoing by ECF on:

James C. Rehnquist, Esq.
Goodwin Proctor & Hoar
Exchange Place
Boston, MA 02109


/s/ Steven H. Breslow
Steven H. Breslow
Assistant U.S. Attorney

24