UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | CRIM. NO. 04-30033-MAP |
| ) | |
| vs. ) | |
| ) | |
| **PETER DAVIS,** ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT PETER DAVIS'S APPLICATION FOR COSTS AND ATTORNEYS' FEES PURSUANT TO THE HYDE AMENDMENT**

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney, hereby files the instant Opposition To Defendant Peter Davis's Application For Costs And Attorneys' Fees Pursuant To The Hyde Amendment (Docket No. 347) (the "Application").

As set forth below, the government's prosecution of the defendant, while ultimately unsuccessful, did not even approach the misconduct required by the Hyde Amendment. First, the government presented overwhelming evidence that the defendant participated in racketeering and bribery conspiracies, and that these conspiracies continued into the period not barred by the statute of limitations. Moreover, the government reasonably expected the Court (and a jury) to find that the defendant's participation in those conspiracies was not time-barred and that the defendant had not withdrawn from the conspiracies. In sum, the government reasonably expected to

1

prevail on legal and evidentiary positions that would have secured a conviction for crimes that occurred within the statute of limitations. Although the government did not prevail on its positions, the government's failure to persuade the Court on these issues hardly amounts to prosecutorial misconduct warranting fees, particularly where the government could have secured the defendant's conviction on a timely false statements charge that it elected not to bring. Because the Application is meritless, it should be denied.

1. Background

   a. The Indictment

On July 9, 2004, a federal grand jury in the District of Massachusetts returned a 100-count indictment charging the defendant and 12 others with a series of crimes arising from the corrupt operation of the Springfield Housing Authority (the "SHA"). On January 1, 2005, the grand jury returned a 122-count superseding indictment (the "Indictment").

Specifically, the Indictment charged the defendant with the following counts: racketeering, in violation of 18 U.S.C. § 1962(c) (Count 1); racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count 2); conspiracy to commit federal bribery and receive illegal gratuities, in violation of 18 U.S.C. §§ 201 and 371 (Count 3); and obstruction of justice, in violation of 18 U.S.C. § 1503 (Count 107).

The Indictment alleged that the defendant, a contractor doing business as P.J. Richfield, paid bribes to SHA's Executive Director, Raymond Asselin, Sr., and Assistant Executive Director, Arthur Sotirion, in exchange for their fraudulently generating bid proposals, colluding in the preparation of bid proposals, awarding contracts, steering sub-contracts and otherwise providing preferential treatment. Indictment, ¶ 40. In particular, the Indictment alleged that between September 30, 1996 and December 19, 1997, the defendant wrote 14 checks totaling approximately $65,000 for work at the houses of Joseph and Christopher Asselin, two sons of SHA's Executive Director. Id.

The Indictment further alleged that on or about April 10, 2003, the defendant falsely told Special Agents of the Federal Bureau of Investigation ("FBI") that he had not paid for any home improvements for any members of the Asselin family. Although this conduct was only charged as a predicate racketeering act and an independent obstruction of justice, Indictment ¶¶ 54 and 134, it could have also been charged as a false statement in violation of 18 U.S.C. § 1001.

b.  The Court's Dismissal of Counts 1 and 107

On September 7, 2006, this Court granted the defendant's pre-trial motion to dismiss Counts 1 and 107, ruling that the defendant's lies to the FBI agents were insufficient to support an obstruction prosecution under Section 1503 in light of United

States v. Aguilar, 515 U.S. 593 (1995). See Docket No. 243. The Court also rejected the Seventh Circuit's "arm of the grand jury" approach that had been advanced by the government as inconsistent with United States v. Scungio, 255 F.3d 11 (1st Cir. 2001). Because the Section 1503 charge in Count 107 constituted the only timely racketeering act specified in Count 1 (racketeering), the Court dismissed both the racketeering and obstruction counts.

   c.   The Evidence At Trial

        i.   Evidence Of The Defendant's Involvement In The Charged Racketeering and Bribery Conspiracies

             (1)   Background

The evidence overwhelmingly established that the defendant participated in bribery and racketeering conspiracies that were led by Asselin, Sr. and Sotirion. In the face of this great mass of evidence, the defendant's question ("where do I go to get my good name back?"), Application at 7, rings hollow, particularly where this Court observed that "Mr. Davis' misconduct was considerably greater than anything than [another convicted co-conspirator] is alleged to have done."[1]

---

[1] As this Court noted during the sentencing hearing of co-defendant John Spano on December 7, 2006, "I've heard from time to time people referring to the fact that Mr. Davis was acquitted. Maybe in a technical manner, allowing a motion for judgment as a matter of law counts as an acquittal. It wasn't an acquittal though in the sense that Mr. Davis' case went to the jury and the jury found him not guilty. I found that whatever he did was done outside the statute of limitations, and therefore was not a proper charge and I dismissed the charge against Mr. Davis. But if the government had proved the conduct and there

4

Asselin, Sr. and Sotirion operated SHA corruptly by, *inter alia*, rigging bids and soliciting bribes and kickbacks from a range of contractors, including the defendant (operating P.J. Richfield); Nicholas Katsounakis (operating Manny's Plumbing & Heating); Gary Baribeau (operating G & R Associates, Inc.); and Frank Ware (operating the Ware Group, Ware Enterprises, and Northern Star Development Corp.).

Baribeau, Katsounakis, and Ware testified that these bribes were generally known as the R-factor and the A-factor, and took the form of cash, checks to third parties, and the provision of free services. Each of these witnesses testified that if he did not make the required payments, he would not receive contracts from SHA.

The trial demonstrated that the relationship between the defendant and the SHA leaders was corrupt from the start. For example, Asselin, Sr. and Sotirion awarded the defendant's company a number of contracts from 1990 to 1993, even though the defendant had formed P.J. Richfield with Asselin Sr.'s son Joseph and was jointly liable with him for approximately $85,000 in debt until May 1993. T. 2814-15, 2822-23. This clear conflict of interest was never disclosed to anyone at SHA.

---

hadn't been a problem with the statute of limitations, I think that Mr. Davis' misconduct was considerably greater than anything than Mr. Spano is alleged to have done." Docket No. 375, Transcript ("T.") at 17 (emphasis added).

Sotirion also corruptly engineered the defendant's entry into SHA work. In approximately 1990, Sotirion directed Baribeau to bid on an SHA contract at the Williams Street garage. Sotirion further instructed Baribeau that "Peter Davis is going to build the garage" so that the defendant could become certified to do public work. T. 1287-88, 1421. When the state certification agency sent Baribeau a letter concerning the defendant's work, he gave it to Sotirion, whom Baribeau believed filled it out and sent it back. T. 1288-89.

Thereafter, the defendant received from Asselin, Sr. and Sotirion approximately $3.1 million in SHA contracts from 1990 to 1998, as well as preferential supervision of those contracts. For example, Sotirion drafted most of the defendant's own bills for his 1993 project at Christopher Court. T. 863-68.

(2) The Corrupt ADA-504 Contract

Asselin, Sr. and Sotirion awarded the defendant a lucrative contract for the exterior work on the 1993 ADA-504 handicap modernization project. The day before the bids were due for the exterior contract in June 1993, Sotirion met alone with the defendant to review the specifications. T. 1085-86. After the defendant was given the contract, Sotirion told the project architect, James Bright, and the SHA modernization coordinator, Wallace Kisiel, that he and Asselin, Sr. would take care of the defendant's bills. As a result, Bright and Kisiel never confirmed the work claimed to be complete on these bills, which falsely

6

reported the state of the defendant's work. T. 1703, 1093-1101, 1807. Notably, the defendant, Asselin, Sr., and Sotirion falsely certified that the defendant's work was completed by July 1994, when substantial aspects of the job remained incomplete until at least January 1995. Government Exhibits 66, 71.

In October 1993, Sotirion gave Baribeau a completed bid for the interior work on the ADA-504 project, which Baribeau signed and submitted. Tr. 1340; Government Exhibit 76. After Baribeau was given the job, Sotirion informed Baribeau, "Pete Davis is going to run the job for you." Sotirion further directed, "We're going to give him $1,000 a week" as a supervision fee, even though Baribeau was the "overseer" of the contract. T. 1291-92. Overall, Sotirion monitored the payment of more than $150,000 from Baribeau's company to the defendant's company on the ADA-504 interior project in 1993-94. T. 1281-85; Government Exhibits 77-78.

During a surprise spot-check on the defendant's work, project architect Bright encountered the defendant walking by SHA workers using SHA equipment to perform some of the defendant's work. When he questioned the defendant, the defendant told Bright that he had a "prior arrangement." T. 1699-1700. This prior arrangement was documented by a punch list that Sotirion annotated, dividing some of the ADA-504 work between the defendant's company and SHA's own workers. Government Exhibit 62. SHA workers George Williamson and Peter Kratimenos testified that they performed some of the work on

this punch list on SHA time, and used SHA equipment and materials on the defendant's project.

### (3) The Defendant's 1996-97 Bribes

In 1996-97, the defendant paid for approximately $65,000 of expenses for work performed at the homes of Joseph and Christopher Asselin. These payments occurred as the defendant was performing a million dollar SHA contract at the Christopher Court apartments - a project that Sotirion knew the defendant did not substantially complete. Moreover, after these payments, in 1998 Sotirion and Asselin awarded the defendant another SHA contract based upon a rigged competition in which Sotirion submitted a false and inflated bid on behalf of G & R Associates.

Corrupt contractor Frank Ware testified that in 1996, he received a sub-contract from P.J. Richfield for the Christopher Court apartments, which he performed in 1997-98. T. 2173-74. When Ware and the defendant developed a dispute concerning the sub-contract, Ware resolved the dispute through Sotirion. T. 2178-79. To resolve the dispute, Ware provided a typed document to Sotirion, on which Sotirion then wrote the following in pertinent part:

```
9/8/97
To:  Peter
From Frank Ware
cc:  AGS
     RBA
        Faxed to Peter 9/8/97
Very reasonable
     Where's Balance
        R-FACTOR
```

8

T. 2180; Government Exhibit 90.

This communication, addressed directly to the defendant in Sotirion's own handwriting, demonstrated directly that the defendant knew about the R-Factor, which Baribeau, Katsounakis and Ware testified constituted their kickback of profits to Sotirion and/or Asselin.[2]  Notably, on September 22, 1997 (just 14 days after Sotirion wrote the defendant's note requesting the "R-factor"), the defendant wrote a $7,400 check to Gordon Toussaint for framing labor on Joe Asselin's house.  Government Exhibit 122.

Between September 30, 1996 and December 19, 1997, the defendant's company wrote 14 checks totaling approximately $65,000 for work at the houses of Joseph and Christopher Asselin. Government Exhibit 278.  In particular, the defendant paid for the wood, windows, framing labor, and masonry work at Joseph Asselin's house, and for painting, cabinets, window installation, and floor work at Christopher Asselin's house.

Asselin, Sr. kept a careful record of the payments made by the defendant for both Joseph and Christopher Asselin's houses. Government Exhibit 137; Government Exhibit 104-A.[3]

Joseph Asselin testified that in the late 1980s and 1990s, his

---

[2] Exhibit 90 was obtained from P.J. Richfield in response to a subpoena provided to the defendant on April 10, 2003.

[3] Government Exhibits 137 and 104-A were seized from the homes of Raymond Asselin, Sr. and Christopher Asselin, respectively.

father explained to him that he would help certain contractors get work at the SHA "and he would charge them a fee, a percentage fee for the work that he got them." T. 2676. His father and Sotirion each received these fees, which his father described as "kickbacks." T. 2677. Joseph Asselin testified that he knew which contractors had paid kickbacks "because I would receive benefits from the contractors." T. 2677. These contractors included the defendant, G & R, Manny's, and others. T. 2678. Joseph Asselin knew that the defendant, G & R, and Manny's each had an accruing debt of kickbacks. T. 2681.

In particular, Joseph Asselin explained how the defendant assisted with the construction of his Amherst home in 1997. In the fall of 1997, Asselin, Sr. told him that "the timing was right and that Pete owed him money." T. 2748. The defendant owed this money because "[m]y father had gotten him some Housing contracts and this was a commission that my father was owed." T. 2748. Asselin, Sr. told him that the defendant wanted to pay for some of his construction costs through P.J. Richfield. T. 2749. Joseph Asselin and his father discussed the vendors for the construction, and Asselin, Sr. said that "it was good to use the same vendors [as P.J. Richfield] therefore it wouldn't look out of place when they looked in Peter's books . . . ." T. 2759. Asselin, Sr. asked his son to provide invoices for some of the work "so Peter could have it for his files." T. 2758.

In the spring of 1998, as the Amherst house was nearing completion, Asselin, Sr. and the defendant visited Joseph Asselin at the construction site. Joseph Asselin thanked the defendant for paying the lumber, framing, and masonry bills, and the defendant replied, "It worked out for both of us." T. 2761.

### (4) The Corrupt 1997 Contracts

The defendant's payments were made during the course of the defendant's work at the Christopher Court projects, a million dollar SHA contract that the defendant left substantially uncompleted. The renovation project required the following work on bathrooms in 92 separate apartments: (1) rake and regrout all tile; (2) replace shower valves and diverters; and (3) install access doors.

According to Dave Thomson, the SHA employee responsible for maintaining these apartments, the defendant's work was "not being done in full." T. 2341. Thomson complained to Sotirion, who told him not to worry about it. T. 2344. After the defendant's work had ended, Thomson inspected each of the 92 apartments, and found that none of the apartments had raked and regrouted tile, replaced (or even rebuilt) shower valves, or access doors installed. T. 2365-66. Indeed, the defendant's own notes indicate that the access doors and other elements of the project were to be eliminated. Government Exhibit 292. As a result, Thomson and his staff had to complete the defendant's work. When Thomson

complained to Sotirion, he was told simply to "deal with it." T. 2365-66.

Even though Sotirion knew that the defendant had not left the Christopher Court project substantially complete, Sotirion and Asselin awarded the defendant another contract in 1997 for OSHA compliance at various complexes; the defendant's payments on this new contract continued through 1998.

Notably, a competing bidder for this later contract was Baribeau, whose bid was handwritten by Sotirion himself. T. 656, 1997-98. Sotirion priced the job for Baribeau at $177,891, or approximately $70,000 higher than the defendant's winning bid of $108,500. Government Exhibits 317-319. Thus, the defendant won this contract in part due to Sotirion's submission of a rigged low bid for Baribeau.

    ii. Evidence That The Defendant Failed To Withdraw From The Racketeering and Bribery Conspiracies

In approximately June 1998, the defendant stopped doing business with SHA and then moved his personal residence to the eastern part of Massachusetts. Even after that point, the defendant continued to associate with Asselin, Sr., and in 1999 made at least one campaign contribution to Christopher Asselin's political campaign even though Asselin was not his state representative.

Lisa Asselin testified that the defendant attended one of Christopher Asselin's campaign fundraisers, where she observed the

defendant give Christopher Asselin an envelope. T. 1627. In addition, according to Christopher Asselin's campaign finance reports filed with the Massachusetts Office of Campaign and Political Finance, the defendant made a $100 contribution on May 4, 1999. Government Exhibit 139.

The government also sought to introduce evidence from Lisa Sanford, the secretary to Asselin, Sr., that on or about the day that the FBI searched his SHA offices, he repeatedly attempted to locate the defendant on the telephone and sounded upset. T. 1980-84. Sanford would have also testified that she did not recall Asselin, Sr. attempting to reach anyone else at that time. The government contended that the jury could reasonably infer from this evidence that "Ray Asselin was trying to reach Peter Davis because he knew that Peter Davis had to be informed of the FBI investigation and in particular the search. . . . he was trying to reach Peter Davis, his coconspirator, to communicate to him the advance of the investigation and in particular that his own office, which contained relevant records, was being searched." T. 1981-82. The government also argued that evidence was necessary to rebut an expected withdrawal defense, since it demonstrated an attempted contact between the co-conspirators on the very day of the 2002 search. T. 1984. The Court excluded the evidence, stating that the testimony had "real potential for unfair prejudice."

On April 10, 2003, Special Agents of the FBI interviewed the

13

defendant concerning his relationship with the Asselin family and his business at SHA. The defendant admitted that he had already discussed the SHA investigation with Asselin, Sr., who told the defendant that he was being investigated. T. 2472. The defendant also repeatedly lied to the agents about several aspects of his relationship with SHA and the Asselin family. In particular, the defendant lied about: (1) the founding of P.J. Richfield (he said that only he started the company); (2) his relationship with Joseph Asselin (he said that his only professional relationship concerned construction work performed by P.J. Richfield for Asselin's bank); (3) his relationship with Asselin, Sr. (he described the relationship as mostly professional); and (4) the extent of his SHA contracts (he said that they merely ranged from fifty thousand to several hundred thousand dollars).

In addition to the foregoing, the government offered, but the Court excluded, the following core evidence of the defendant's continued involvement in the conspiracies: that the defendant falsely denied paying for any of the Asselin family's home improvements. The government submitted two separate briefs on this issue, first contending that the statements evinced the defendant's consciousness of guilt (Docket No. 259) and then contending that the statements were direct evidence of the defendant's specific involvement in the racketeering conspiracy charged in Count One. (Docket No. 328). The Court rejected both attempts.

d.  The Court's Judgment of Acquittal

On October 17, 2006, this Court allowed the defendant's motion pursuant to Fed. R. Crim. P. 29(a). On October 18, 2006, this Court filed its Memorandum and Order Regarding Defendant's Motion For Judgment Of Acquittal (Docket No. 331) (the "Acquittal Judgment"). The Court found that the government presented the jury with no evidence that the defendant's conspiratorial agreement continued into the period not barred by the statute of limitations, and that the defendant had demonstrated withdrawal through the termination of his SHA business in 1998. Acquittal Judgment, at 3-5.

2.  Argument

a.  Introduction

The defense concedes, as it must, that the government's prosecution was not "vexatious" or "in bad faith." Thus, all that remains for the defense is to argue that the government's case was "frivolous" based upon the Court's Acquittal Judgment.

However, "[a]n acquittal, without more, will not lead to a successful Hyde Amendment claim, as it was Congress's intent to 'limit Hyde Amendment awards to cases of affirmative prosecutorial misconduct rather than simply any prosecution which failed.'" United States v. Schneider, 395 F.3d 78, 88 (2d Cir.), cert. denied, 544 U.S. 1062 (2005) (quoting United States v. Knott, 256 F.3d 20, 29 (1st Cir. 2001)). In Knott, the First Circuit held

that "[t]he district court erred as a matter of law in applying a legal standard that would award fees under the Hyde Amendment <u>in any case where the prosecution is ultimately deemed to have been without sufficient foundation</u>." 256 F.3d at 34 (emphasis added).

Similarly, "as several courts have stated, a defendant must prove more than that his conviction was reversed on appeal; otherwise, almost every reversal would result in an award of attorney's fees." <u>United States v. Lindberg</u>, 220 F.3d 1120, 1125 (9th Cir. 2000) (citing cases). <u>Lindberg</u> involved a reversal based on insufficiency of evidence, which is akin to this Court's judgment of acquittal. As the Ninth Circuit explicitly stated, the mere fact of such a reversal "is not enough to show that the government's position was vexatious, frivolous, or in bad faith." <u>Id.</u> at 1126.

First, the Court's judgment of acquittal rested upon several prior decisions unfavorable to the government, all of which the government could have reasonably expected to win: (a) the dismissal of Counts 1 and 107; (b) the exclusion of testimony that in 2002, Asselin, Sr. repeatedly attempted to reach the defendant on or about the day the FBI searched his SHA offices; and (c) the exclusion of the defendant's 2003 lie to the FBI concerning his bribe payments. Because the government adopted reasonable (albeit unsuccessful) positions on these issues and on the ultimate issue of whether the defendant had engaged in conspiratorial conduct

16

within the statute of limitations, the prosecution was not frivolous.

Second, although the government charged the defendant's 2003 false statements to the FBI as a racketeering act and an obstruction of justice, this conduct could also have been charged as a violation of 18 U.S.C. § 1001. Since the defendant was indicted only fifteen months after his lies to the FBI, the Section 1001 charge would have not been barred by the statute of limitations.[4] Where the same conduct is cognizable as another federal crime that was just not charged, the fact that the government's charging theory was ultimately rejected by the Court does not warrant the application of the Hyde Amendment.

As the First Circuit noted, "the Hyde Amendment was 'targeted at prosecutorial misconduct, not prosecutorial mistake.'" Knott, 256 F.3d at 30, n. 5 (quoting United States v. Gilbert, 198 F.3d 1293, 1304 (11th Cir. 1999)). Because this case did not constitute prosecutorial abuse or misconduct, the Application should be dismissed.

    b.   Principles of Law

The Hyde Amendment provides, in pertinent part, that a court "may award" to a prevailing defendant in a criminal case:

> a reasonable attorney's fee and other

---

[4] In fact, the defendant can still be prosecuted for this offense. The five-year limitations period on the Section 1001 count ends on April 10, 2008. 18 U.S.C. § 3282.

17

> litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under Section 2412 of Title 28, United States Code.

18 U.S.C. § 3006A.

As the First Circuit has emphasized, Congress enacted the Hyde Amendment "in response to perceived cases of prosecutorial abuse." Knott, 256 F.3d at 28 (citing Gilbert, 198 F.3d at 1299-1302 (reviewing legislative history)). "The purpose of the Amendment was to allow defendants to recover attorneys fees and costs in cases of prosecutorial misconduct." Id.

The First Circuit recognized that Congress had a dual concern in enacting the Hyde Amendment: "to protect against prosecutorial misconduct while at the same time providing a sufficiently stringent standard to avoid undermining appropriate prosecutorial zeal." Id. at 29. In other words, Congress opted to "limit Hyde Amendment awards to cases of affirmative prosecutorial misconduct rather than simply any prosecution which failed." Id. (emphasis added). This accords with the longstanding role of a federal prosecutor:

> In prosecuting crime, government attorneys are entitled to be zealous advocates of the law on behalf of their client, the people of the United States. While a prosecutor is not at liberty to strike foul blows, he may strike hard ones, and "[h]e may prosecute with

18

>earnestness and vigor - indeed, he should do so." 198 F.3d at 1303 (quoting <u>Berger v. United States</u>, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L. Ed. 1314 (1935).

<u>Id.</u>

In particular, although the Hyde Amendment was patterned after the Equal Access to Justice Act (the "EAJA"), 28 U.S.C. § 2412, which provides for an award of attorney's fees against the government in civil cases, it differs from the EAJA in two fundamental ways. First, the Hyde Amendment limits recovery to cases where the government's position was "vexations, frivolous, or in bad faith," where the EAJA authorizes awards in any case where the government's position was "not substantially justified." <u>Knott</u>, 256 F.3d at 28. Indeed, Congress not only considered and rejected the EAJA's more lenient standard, but another standard that would have awarded fees where the United States position was "without foundation." <u>Id.</u> Second, Congress placed the burden on the defendant to meet the elevated Hyde Amendment standard. <u>Id.</u>

The Hyde Amendment does not define the words "vexatious, frivolous, or in bad faith." <u>Id.</u> The term "frivolous" cannot mean "without foundation," because that formulation was specifically rejected by the Congress as too lenient a standard. <u>Gilbert</u>, 198 F.3d at 1301-02 (stating that "[t]he effect was to require a criminal defendant seeking fees to show more than that the prosecution had been without foundation."). In short, to meet the requisite proof under <u>any</u> of the Hyde Amendment terms, a defendant

19

must show that the "position underlying the prosecution amounts to prosecutorial misconduct." Id. at 1299.

When a statute fails to define terms, "courts typically read such terms to convey their ordinary meaning." Knott, 256 F.3d at 28. In its ordinary meaning, the term "frivolous" connotes a position worse than simply lacking foundation. See Schneider, 395 F.3d 78, 86 n.3 (collecting dictionary definitions). The Sixth Edition of *Black's*, which was the current edition at the time of the passage of the Hyde Amendment, defines a "frivolous" pleading as one "clearly insufficient on its face" and a "frivolous" claim as one for which a proponent "can present no rational argument based upon the evidence or law in support of that claim." Id. (citing *Black's Law Dictionary* 668 (6th ed. 1990)). Similarly, Webster's defines "frivolous" as "having no basis in law or fact." Id. (citing Webster's Third New International Dictionary 913 (3rd ed. 1993)).

The Eleventh Circuit, in a case cited extensively by the First Circuit in Knott, required a prevailing defendant to establish that the government's position "was foreclosed by legal precedent or so obviously wrong as to be frivolous." Gilbert, 198 F.3d at 1304. The Eighth Circuit limits "frivolous" to cases constituting prosecutorial misconduct: "'a prosecution . . . so utterly without foundation in law or fact as to be frivolous' amounts to prosecutorial misconduct." United States v. Bowman, 380 F.3d 387,