391 (8th Cir. 2004), cert. denied, 543 U.S. 1056 (2005) (quoting United States v. Beeks, 266 F.3d 880, 883-84) (8th Cir. 2001)).

Other Circuits have defined frivolous as "groundless . . . with little prospect of success; often brought to embarrass or annoy the defendant," United States v. Bunn (In re 1997 Grand Jury), 215 F.3d 430, 436 (4th Cir. 2000) (quotation omitted), and "one lacking a reasonable legal basis or where the government lacks a reasonable expectation of [obtaining] sufficient material evidence by the time of trial," United States v. Isaiah, 434 F.3d 513, 520 (6th Cir. 2006).

Because the First Circuit has not yet reviewed a claim of "frivolous" prosecution, it has not defined the term.  However, in the context of discussing a claimed "vexatious" prosecution, the First Circuit stated in *dicta* that "if the government pursues a prosecution without any foundation or basis for belief that it might prevail, such a prosecution would more appropriately be deemed 'frivolous' than 'vexatious.'" Knott, 256 F.3d at 29-30.[5]

As set forth below, this Court need not settle on a precise formula because the defendant's Application fails under any articulation of the standard.

_____

[5]    The government notes that the First Circuit's *dicta* appears to conflict with the panel's acknowledgment that Congress deliberately rejected the "without foundation" standard.  Knott, 256 F.3d 20 (noting that Congress "considered and rejected as too easily met . . . a standard . . . which would have awarded fees, *inter alia*, where the United States' position was 'without foundation.'").

c.    The Government's Prosecution Of The Defendant
      Was Reasonable, Even If Unsuccessful

      i.    The Government Was Entitled to Rely Upon The
            Seventh Circuit's "Arm Of The Grand Jury" Theory In
            Charging The Defendant With Obstruction Of Justice
            And Racketeering

_____ "The government should be allowed to base a prosecution on a novel argument, so long as it is a reasonable one, without fear that it might be setting itself up for liability under the Hyde Amendment.  Just because the government lacks 'precedent' does not automatically mean that its position is frivolous."  <u>United States v. Heavrin</u>, 330 F.3d 723, 729 (6th Cir. 2003).

Here, the government reasonably opted to charge the defendant's 2003 false statements as a racketeering act and as obstruction of justice, relying upon the "arm of the grand jury" theory adopted by the Seventh Circuit.  Under this theory, proof that a federal law enforcement agency acted as "the arm of the grand jury" satisfies the essential element of "a pending judicial proceeding" under 18 U.S.C. § 1503.  <u>United States v. Macari</u>, 453 F.3d 926, 937 (7th Cir.), <u>cert. denied</u>, 127 S.Ct. (2006).  <u>See Aguilar</u>, 515 U.S. at 600 (proof that the agents acted as an arm of the grand jury, **or** indeed that the grand jury had even summoned the testimony of these particular agents satisfies the knowledge and notice element of § 1503)(emphasis added).

In <u>Aguilar</u>, the defendant was indicted under Section 1503 for obstructing a judicial proceeding after giving false information to

federal investigators who were potentially going to be called to testify before a grand jury. Id. The Supreme Court held that lying to an investigating agent "who might or might not testify before a grand jury" did not constitute obstruction of a judicial proceeding. As the Ninth Circuit recognized, the Supreme Court "noted, however, that had the investigators been subpoenaed or summoned by the grand jury, or had there been proof that they were acting as an arm of the grand jury, there would have been enough to support a conviction for obstructing a judicial proceeding." United States v. Hopper, 177 F.3d 824, 830 (9th Cir. 1999) (emphasis added).

The FBI acts as an arm of the grand jury when its agents were "'integrally involved' in the grand jury investigation." Macari, 453 F.3d at 937; see United States v. Fassnacht, 332 F.3d 440, 448-49 (7th Cir. 2003); United States v. Furkin, 119 F.3d 1276, 1282-83 (7th Cir. 1997). In addition, the Government must show that the FBI undertook its investigation "'with the intention of presenting evidence before [the] grand jury.'" Macari, 453 F.3d at 937 (quoting United States v. Maloney, 71 F.3d 645, 657 (7th Cir. 1995)).

In this case, as outlined in its response to the defendant's motion to dismiss Counts 1 and 107, the evidence would have established overwhelmingly that the FBI had been acting as the arm of the grand jury at the time of their interview with the

23

defendant.  As early as July, 2002, the FBI had served grand jury subpoenas for documents and other items upon the Springfield Housing Authority.  In August, 2002, the FBI served grand jury subpoenas for testimony upon Lisa Asselin, Ann Asselin, Janet Asselin, Maria Serrazina, Merylina Asselin, and Melinda Asselin. On September 27, 2002, the FBI executed search warrants at the Springfield Housing Authority and the various residences of Asselin family members. Soon thereafter, witnesses began to appear before the grand jury and testify pursuant to grand jury subpoenas served by the FBI.

On March 19, 2003, the grand jury issued a subpoena to the custodian of records for P.J. Richfield, Inc.  By that date, the grand jury had issued approximately 145 grand jury subpoenas as part of its investigation, many of which the FBI personally delivered to its intended recipients.  On April 10, 2003, the FBI personally served the grand jury subpoena for P.J. Richfield, Inc. upon the defendant.  Indeed, during his interview, the defendant repeatedly told the FBI agents that he was aware of the investigation, specifically telling the agents that he had discussed the investigation with Asselin, Sr.

This evidence more than suffices to establish that the FBI acted as the arm of the grand jury at the time of the defendant's interview. See, e.g., Macari, 453 F.3d at 937 (service of grand jury subpoenas and witness interviews sufficient to establish that

24

federal investigators acted as arm of grand jury); <u>Maloney</u>, 71 F.3d at 657 (service of 300 grand jury subpoenas evidence that IRS acted as arm of grand jury). In fact, the federal law enforcement agencies were working so closely with the grand jury that they were "one and the same." <u>See</u> <u>Furkin</u>, 119 F.3d at 1283 (finding that "the IRS investigation and the grand jury investigation were one and the same.").

In dismissing Counts 1 and 107, the Court noted the government's position was inconsistent with the First Circuit's decision in <u>Scungio</u>, 255 F.3d 11. However, <u>Scungio</u> by no means foreclosed the government's position because that case did not address at all the "arm of the grand jury" theory previously adopted by the Seventh Circuit.[6] Indeed, the First Circuit has <u>never</u> reviewed an argument based upon the "arm of the grand jury" theory.

Thus, the government's position, grounded in the persuasive authority of the Seventh Circuit, was a novel one in the First Circuit. Moreover, this court previously approved the government's

---

[6]   <u>Scungio</u> is also distinguishable for the following reasons. First, it did not deal with a motion to dismiss a Section 1503 count, but rather addressed the proper application of the obstruction of justice guideline. Second, it dealt only with the knowledge element of Section 1503, rather than the nexus element, which was the subject of the defendant's motion to dismiss. (Docket Nos. 191-92).

"arm of the grand jury" in another criminal case.[7]  Such a position
was therefore reasonable, if ultimately unsuccessful; it certainly
was not "frivolous" under the Hyde Amendment.  See Heavrin, 330
F.3d at 729.

>            ii.  The Government Established Evidence Sufficient To
>                 Convict The Defendant Of A Section 1001 Violation

Although the government ultimately failed to persuade the
Court that the defendant's false statements were sufficiently
charged as a racketeering act and obstruction of justice, the
government could certainly have sustained a charge that he violated
18 U.S.C. § 1001 (false statements to federal officials).  As the
First Circuit noted, "the Hyde Amendment was 'targeted at

---

[7]    Indeed, this Court previously had approved the "arm of
the grand jury" theory in United States v. Jamie Dwyer, et al.,
CR-N-03-30018-MAP.  In Dwyer, the defendant was convicted of
obstruction of justice under Section 1503 for having made false
statements during an interview with an FBI agent in the midst of
a grand jury investigation. Dwyer filed post-trial motions in
which she attacked her obstruction of justice conviction, arguing
that the obstruction of justice conviction was legally deficient
under Aguilar because the government had not proven that she had
been told that her statements would be communicated back to the
grand jury.  Docket No. 271, p. 4.  In its response, the
government argued that proof that Dwyer knew that the FBI agent
was acting as an arm of the grand jury was legally sufficient
under Aguilar, and that reversal was not warranted.  Docket No.
291, p. 7.  On June 8, 2005, the district court denied Dwyer's
post-trial motions, thus affirming the obstruction of justice
conviction. Docket No. 304.
    On June 20, 2005, defendant Dwyer moved for reconsideration,
once again arguing that the obstruction of justice count was
legally deficient absent evidence that "[s]he knew that [her]
false statements would be communicated to the grand jury."
Docket No. 308, p. 5.  On June 30, 2005, this court once again
rejected this argument and re-affirmed its previous decision.

prosecutorial misconduct, not prosecutorial mistake.'" <u>Knott</u>, 256
F.3d at 30 n.5 (quoting <u>Gilbert</u>, 198 F.3d at 1304).  Where the same
conduct is cognizable as another federal crime that was just not
charged, the fact that the government's charging theory was
ultimately rejected by the Court does not warrant the application
of the Hyde Amendment.

The Fifth Circuit faced a similar issue in <u>United States v.</u>
<u>Truesdale</u>, 211 F.3d 898 (5th Cir. 2000).  There, the defendants
were convicted, *inter alia*, of conducting an illegal gambling
operation in violation of 18 U.S.C. § 1955, but the Fifth Circuit
reversed their convictions on all counts.  <u>Id.</u> at 900.  Section
1955 prohibits the operation of an illegal gambling business, which
is defined in part as one that "is in violation of the laws of the
State or political subdivision in which it is conducted."  <u>Id.</u>
(citing 18 U.S.C. § 1955(b)(1)(I)).  The government's indictment
did not cite a specific Texas penal code provision, but alleged
only bookmaking, even though custodianship of gambling money was
another Texas state crime.  <u>Id.</u> at 900-01.

In reversing the defendants' convictions, the Fifth Circuit
held that the defendants' bookmaking activities occurred outside
the United States and not in Texas, and that the defendants "went
to great lengths to ensure that their business was conducted
legally."  <u>Id.</u> at 901 (quotation omitted).  The Court held that
the evidence did "not furnish an adequate basis from which a

27

reasonable juror could conclude beyond a reasonable doubt that the appellants were engaged in bookmaking." Id. (quotation omitted). The Court noted, however, that there may have been some evidence that the defendants became custodians of gambling money in violation of Texas state law, but that the government did not indict them, try them, or seek to instruct the jury on that theory.

The defendants subsequently brought a Hyde Amendment claim, arguing that because the government knew or should have known that they were not engaged in bookmaking in Texas, their prosecution was vexatious and frivolous. Id. at 909. The Fifth Circuit disagreed, concluding instead that the government's position reflected "more of confusion and sloppiness than vexatiousness or frivolousness." Id. The court stated that its conclusion was "supported by the government's argument that there was some evidence that Appellants had broken state gambling laws by becoming custodians of gambling proceeds, but the government neglected to proceed on this theory, arguing instead only that Appellants broke state law by engaging in bookmaking." Id.

As in Truesdale, the government here brought a charge that was ultimately found to be unsupported by the evidence, and declined to charge another available statute. Indeed, the instant case is far more favorable than Truesdale, which involved only "some evidence" supporting the uncharged theory. Id. Here, by contrast, there was overwhelming evidence – and simply no dispute – that the defendant

28

lied to the FBI in 2003 by denying that he paid for Asselin family home improvements.  The government's failure to secure a conviction by charging Section 1503 instead of Section 1001 may have been prosecutorial mistake, but it hardly constitutes prosecutorial misconduct.

### iii. The Government Was Entitled To Rely Upon Evidence Subsequently Suppressed In Making Its Prosecutorial Decision To Charge The Defendant

The defendant mistakenly rests its argument upon this Court's judgment of acquittal by relying upon the Court's conclusion that the government presented "no evidence" to convince the jury that his agreement continued into the limitations period.  Application, at 4.  Since the Court's judgment of acquittal was necessarily limited to the evidence that was actually presented to the jury, the defense Hyde Amendment claim ignores substantial evidence that the government proffered (albeit unsuccessfully) to establish the defendant's continuing criminal involvement.  Therefore, the Application should be denied.

As the First Circuit has emphasized:

> For Hyde Amendment purposes, however, the court must assess the basis for pursuing charges from the perspective of the government *at the time*. . . .  The government was entitled, *ab initio*, to rely on the evidence subsequently suppressed in making its prosecutorial decision, provided it could articulate, in good faith, a reasonable position . . . .

Knott, 256 F.3d at 35.

29

Here, the defendant "require[s] undue prescience on the part of the government," id., to anticipate that the Court would exclude the following substantial evidence: (a) Lisa Sanford's testimony that on or about the day the FBI searched Asselin, Sr.'s SHA offices in 2002, he was urgently attempting to reach the defendant; and (b) Special Agent Morehead's testimony concerning the defendant's 2003 denial of paying for Asselin family home improvements. The government reasonably expected to prevail on both of these matters.

First, Lisa Sanford's testimony would have supported the government's view that the defendant and Asselin, Sr. remained co-conspirators long after the defendant ceased his SHA business and moved away. Because Sanford recalled Asselin, Sr. repeatedly attempting to contact the defendant (and no one else) on or about the day of the SHA search of his offices, the government reasonably expected the jury to be able to infer that Asselin, Sr. was attempting to inform the defendant that his offices had been searched.

Asselin, Sr.'s efforts that day to contact the defendant, of all people, were particularly probative of the continuing conspiratorial relationship in light of the very foundation of the defendant's claimed withdrawal: since the defendant had ceased all involvement with SHA four years earlier, a jury could reasonably infer that Asselin, Sr. was intent on ensuring that Davis knew

about the search so that he could conceal their conspiracy.  The government could hardly predict that this testimony would be excluded, since the Court's Rule 403 basis (unfair prejudice) involves a complex balancing of factors and the exercise of discretion.

Second, the defendant's outright denial of paying for home construction work for the Asselin family was powerful substantive evidence of the defendant's involvement in the conspiracies, particularly since these payments were charged as the bribes that he paid to participate in the conspiracies.  Indeed, among its objectives, the racketeering enterprise had an objective to "conceal the participation in and enrichment of its members and persons associated with the Enterprise."  Indictment, ¶ 26.

As the First Circuit reasoned in <u>Knott</u>:

> The government was entitled to rely on its evidence so long as it had a good-faith basis for contending that the evidence was admissible. . . .  An interpretation of the Hyde Amendment which effectively requires the government precisely to anticipate later evidentiary rulings, where reasonable grounds for disagreement exist, is untenable in light of the language and purposes of the Hyde Amendment.

<u>Id.</u> at 35-36.

The government reasonably expected the Court to find ample evidence of the defendant's original agreement to conceal the bribery and racketeering conspiracies.  In <u>United States v. Twitty</u>, 72 F.3d 228, 233 (1st Cir. 1995), the First Circuit explained:

31

> [A]cts of concealment can extend the life of a
> conspiracy if the proof shows "an express
> original agreement among the conspirators to
> continue to act in concert in order to cover
> up" their crime.

Id. at 233 (quoting Grunewald v. United States, 353 U.S. 391, 404

(1957)).

Here, the government reasonably expected that the Court would

find such an express agreement, particularly in light of the co-

conspirators' substantial and ongoing efforts to cloak their

crimes, including the use of false bid documents, false payment

documents, third-party invoices, secret payments of cash, material

non-disclosures to SHA's Board of Commissioners, and the removal of

Wallace Kisiel as SHA's modernization coordinator after he declined

a contractor's bribe.

Moreover, Joseph Asselin testified about the defendant's

original agreement to conceal his kickbacks, which took the form of

payments for the construction of his Amherst home.  In the fall of

1997, Joseph Asselin and his father discussed the vendors for his

home construction, and Asselin, Sr. said that "it was good to use

the same vendors [as the defendant's company] therefore it wouldn't

look out of place when they looked in Peter's books."  T. 2759

(emphasis added).  Asselin, Sr. asked him to provide invoices for

some of the work "so Peter could have it for his files."  T. 2758

(emphasis added).

In this context, the government reasonably expected the Court

32

to find that the defendant's 2003 lies to the FBI were part of an ongoing agreement to conceal the corrupt bribery scheme between contractors and executives at SHA.  "Weighing the strength of the evidence and determining whether or not to prosecute are precisely the sorts of choices the government is entitled to make, based on information it has acquired through due diligence."  <u>Knott</u>, 256 F.3d at 36.

Although this Court ultimately disagreed with the government's view that the evidence established an express agreement to conceal, the government's position was not unreasonable.  "[W]here reasonable grounds for disagreement exist," a Hyde Amendment award is not warranted."  <u>Knott</u>, 256 F.3d at 36.

### iv.  The Government Reasonably Expected To Defeat The Defendant's Withdrawal Defense

The government reasonably expected to defeat the defense that defendant withdrew from the conspiracy before July 9, 1999.[8]

---

[8]    The limitations statute provides, in pertinent part:

Except as otherwise expressly provided by law, no person shall be prosecuted ... for any offense ... unless the indictment is found ... within five years next after such offense shall have been committed.

18 U.S.C. § 3282.  The five-year period begins to run when the crime, as alleged, is complete.  See <u>United States v. Torres Lopez</u>, 851 F.2d 520 (1st Cir. 1988). The date from which to measure time in this case is the date that the original indictment was returned: July 9, 2004.  <u>See</u> <u>United States v. O'Bryant</u>, 998 F.2d 21 (1st Cir. 1993).  Subtracting five years yields a statute of limitations date of July 9, 1999.

First, the evidence at trial amply established - and the defendant did not dispute - that the bribery and RICO conspiracies extended well past 1999 into the early 2000s.  The defendant's sole contention, rather, was that he withdrew from these conspiracies prior to July 9, 1999.

The government reasonably expected to defeat this claim, particularly in light of the exacting standard the defendant had to meet.  In United States v. Piper, the First Circuit reaffirmed the "strict standard" that a conspirator must meet to demonstrate withdrawal from a conspiracy:

> We have made manifest that in order to withdraw from a conspiracy, "a conspirator must act affirmatively either to defeat or disavow the purposes of a conspiracy." United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987)(per curiam).  Typically, that requires "either . . . a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." Id. . . . "Mere cessation of activity in furtherance of the conspiracy does not constitute withdrawal" from a conspiracy. Id.

298 F.3d. 47, 53 (1st Cir. 2002); see also United States v. Potter, 463 F.3d. 9, 20 (1st Cir. 2006) (stating "Withdrawal is a demanding defense requiring affirmative evidence of an effort to defeat or disavow or confess.").

Here, the Court ruled that the defendant's 1998 relocation and retirement from the contracting business "constituted a powerful showing of an affirmative withdrawal from the conspiracy" because

34

it evinced that he had communicated his abandonment of the enterprise and its goals. However, the government reasonably expected that the Court would accept its argument that the defendant's retirement constituted a "[m]ere cessation of activity" that was insufficient for withdrawal. <u>Juodakis</u>, 834 F.2d at 1102.

Similarly, it was entirely reasonable for the government to believe that the defendant's retirement did not constitute an affirmative withdrawal because his retirement did nothing to communicate an abandonment of the enterprise and its goals. If anything, his retirement simply communicated to his confederates that he had made his money and now wanted to retire and live off the wealth generated from his crimes. His retirement certainly said nothing about whether or not he continued to agree with the enterprise and its goals and whether or not "there was an acquiescence which embraced the later acts." <u>Hyde v. United States</u>, 225 U.S. 347, 372 (1912). The fact that the enterprise continued unabated for the next five years certainly confirms that his retirement did nothing to defeat the enterprise and its goals.

Moreover, by relying upon his 2003 lies to the FBI, the government reasonably expected to prove that the defendant did nothing to "defeat or disavow or confess" his involvement in the conspiracy. <u>Potter</u>, 463 F.3d at 20. The Court stated in its Acquittal Judgment that these statements were "at best, highly ambiguous," but the government reasonably expected that the Court

35

would recognize the defendant's lies were clear evidence of his continued agreement to conceal his involvement in the conspiracy. For example, the defendant falsely denied making any payments for Asselin family home improvements, when he had funded approximately $65,000 for the homes of Joseph and Christopher Asselin as part of his kickbacks owed to their father. Further, although Joseph Asselin (a beneficiary of the 1997 bribe payments) was the defendant's founding business partner in P.J. Richfield, the defendant twice lied, by telling the agents that he was the sole founder and by describing his only professional relationship with Asselin as concerning construction work performed by P.J. Richfield for Asselin's bank.

By obscuring his relationship with Joseph Asselin and denying any home payments for the Asselin family, the defendant's concealment of the enterprise's past bribery activity facilitated the enterprise's present and future bribery activity. It was entirely reasonable for the government to contend that the defendant's lies were evidence of his continued acquiescence to the enterprise and its goals through April, 2003, and that in the end, the issue of his intent was for the jury to determine. Hyde, 225 U.S. at 372. Moreover, it was entirely reasonable for the government to believe that his lies also were affirmative evidence of his guilt.

While the government failed to persuade the Court that the

defendant never withdrew from his conspiracies, this failure hardly amounts to prosecutorial misconduct requiring a Hyde Amendment award.

   d.   Special Circumstances Make An Award Unjust

   The Hyde Amendment provides that a court "may" award attorney's fees and other costs to a prevailing defendant "where the court finds that the position of the United States was . . . frivolous . . . unless the court finds that special circumstances make such an award unjust."  18 U.S.C. § 3006A.  Here, even if the Court were to find that the government's decision to prosecute the defendant on the instant charges was "frivolous," special circumstances nonetheless warrant the declination of any award.

   Specifically, the Court's decision to allow the defendant's motion for judgement of acquittal before the jury's verdict, rather than after, constitutes such special circumstances.  By allowing the motion immediately, the Court effectively prevented any consideration of the sufficiency of evidence by both the jury, which had sat dutifully for approximately five weeks of trial, and the First Circuit, which would have reviewed the Court's acquittal if the jury had convicted.

   A jury's guilty verdict (even if negated by this Court and even if this Court's decision had been affirmed by the First Circuit) would have posed a substantial hurdle to the defendant's ability to bear the burden of proof on the Application.  Since any

37

consideration of the evidence by the jury or the First Circuit was foreclosed by the early allowance of the acquittal motion, special circumstances exist to preclude any award for fees and costs.

3.   Conclusion

Here, the government reasonably expected the Court to retain the racketeering and obstruction counts, permit the testimony of Special Agent Morehead and Lisa Sanford, and allow the jury to decide the defendant's guilt.  Thus, the government's prosecution was not a foul blow, but a reasonable one that simply failed to hit the mark.  See Berger v. United States, 295 U.S. at 88 (describing role of prosecutor).  Based upon the foregoing, the government respectfully submits that the Application should be denied.

Filed this 5th day of January, 2007.

                              Respectfully submitted,
                              MICHAEL J. SULLIVAN
                              United States Attorney


                              _____/s/ Steven H. Breslow_____
                              STEVEN H. BRESLOW
                              Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

Hampden, ss.                     Springfield, Massachusetts
                                 January 5, 2007

        I, Steven H. Breslow, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing motion by ECF
to:

James C. Rehnquist, Esq.
Goodwin Proctor & Hoar
Exchange Place
Boston, MA 02109
Counsel for Peter Davis


                              _____/s/ Steven H. Breslow_____
                              STEVEN H. BRESLOW
                              Assistant United States Attorney