UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 04-30033-MAP |
| RAYMOND ASSELIN, SR., et al. | Leave to File Granted on January 18, 2007 |
| Defendants. | |

**PETER DAVIS'S REPLY MEMORANDUM IN FURTHER SUPPORT OF HIS
APPLICATION FOR FEES AND COSTS PURSUANT TO THE HYDE AMENDMENT**

Peter Davis submits this reply memorandum in further support of his application for fees

and costs pursuant to the Hyde Amendment, Pub. L. No. 105-110, 111 Stat. 2440, 2519 (1997),

*reprinted in* 18 U.S.C. § 3006A (statutory note).

**INTRODUCTION**

After having two of four counts dismissed by this Court pretrial, and being acquitted of

the remaining two counts by this Court's grant of his Rule 29 motion after the close of evidence,

Mr. Davis moved under the Hyde Amendment for an award of costs and attorneys fees.  *See*

Peter Davis's Application for Costs and Attorney's Fees Pursuant to the Hyde Amendment

(hereinafter "Application").  The gist of Mr. Davis's argument is that the government's

prosecution of him was so clearly contrary to binding First Circuit and Supreme Court case law

as to be frivolous.  The decision to charge him with obstruction of justice (and thereby

substantive RICO), based solely on his alleged false statements to an FBI agent five years after

ending any involvement with the Springfield Housing Authority (SHA), should have been

foreclosed by the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593 (1995),

and subsequent First Circuit law, as this Court determined in dismissing these charges pre-trial.

The decision to charge Mr. Davis with RICO and bribery conspiracy should have been

foreclosed because any conspiratorial activity by Mr. Davis occurred far outside the statute of limitations period, as this Court found in granting Mr. Davis's Rule 29 motion.

Despite the length of the Government's Opposition, and its extended recitation of evidence largely irrelevant to Mr. Davis's motion, Gov. Opp. at 4-14, its substantive response to Mr. Davis's Application is narrow.  In essence, the government contends its prosecution was not "frivolous" because it mistakenly but not unreasonably relied on certain evidence and legal theories in making its prosecution decision in July 2004.  First, the government claims that it relied on the Seventh Circuit's "arm of the grand jury" theory, under which its prosecution of Mr. Davis for obstruction of justice (and thus substantive RICO) was sustainable.  Gov. Opp. at 22-25.  Second, in charging Mr. Davis with RICO and bribery conspiracies, the government claims it relied upon a) expected testimony from Lisa Sanford (Ray Asselin Sr.'s secretary) and FBI Agent Moorehead, ultimately "suppressed" by the Court, that would have demonstrated Mr. Davis's "continuing criminal involvement" in the conspiracies, Gov. Opp. at 30-31; b) evidence of Mr. Davis's concealment efforts that it believed would extend the conspiracy into the limitations period under *United States v. Twitty*, 72 F.3d 228 (1st Cir. 1995), Gov. Opp. at 31-33; and c) the "exacting standard" for the conspiracy defense of withdrawal, Gov. Opp. at 33-37.

All of these arguments fail.  As explained more fully below, the government's purported reliance on the Seventh Circuit's "arm of the grand jury" theory was unreasonable for many reasons.  Among other things, this theory (at least as articulated by the government) is directly contrary to binding First Circuit precedent, and in any event does not account for the government's lack of any evidence that Mr. Davis knew of the existence of a grand jury proceeding, an essential element of a prosecution under 18 U.S.C. § 1503.

The government's conspiracy arguments are equally meritless.  The excluded testimony from Ms. Sanford and Mr. Moorehead would not have come close to demonstrating that Mr. Davis's involvement in any conspiracy continued into the limitations period; any belief the government had, moreover, that it could prove an "express agreement" to conceal under *Twitty* was unreasonable.  Finally, the government's reliance on the withdrawal standard was unreasonable in view of a) the government's own witnesses' ready acknowledgement that Mr. Davis communicated to the Asselins that he was leaving Springfield and the SHA, b) substantial legal precedent from other circuits finding withdrawal on analogous facts, and c) the government's failure to offer any facts to discharge its burden of proof on the issue.

In sum, the government has failed to identify a sufficient legal or factual basis for its prosecution of Mr. Davis.  Given these circumstances, if Mr. Davis's prosecution does not meet the "frivolous" standard of the Hyde Amendment, it is difficult to imagine how that standard could ever be met.

## ARGUMENT

### I.    THE ONLY PLAUSIBLE INTERPRETATION OF "FRIVOLOUS" WITHIN THE MEANING OF THE HYDE AMENDMENT IS "WITHOUT ANY FOUNDATION OR BASIS FOR BELIEF THAT IT MIGHT PREVAIL."

The government does not take a firm position on the legal standard for a "frivolous" prosecution within the meaning of the Hyde Amendment.  Gov. Opp. at 21.  It does acknowledge, however, that the First Circuit has, at least in *dicta*, stated that "if the government pursues a prosecution without any foundation or basis for belief that it might prevail, such a prosecution would more appropriately be deemed 'frivolous' than 'vexatious.'"  *United States v. Knott*, 256 F.3d 20, 29 (1st Cir. 2001).  And it further acknowledges, by citing these cases in its

3

brief, that other circuits that have interpreted "frivolous" within the meaning of the Hyde

Amendment have all adopted similar interpretations.[1]  Gov. Opp. at 20-21.

The government nonetheless contends that "to meet the requisite proof under <u>any</u> of the

Hyde Amendment terms, a defendant must show that the 'position underlying the prosecution

amounts to prosecutorial misconduct.'"  Gov. Opp. at 19-20.  To the extent that the government

claims that some affirmative finding of prosecutorial misconduct is required for the Court to

deem its prosecution frivolous, such a claim is incorrect, for two reasons.  First, to require a

finding of some sort of affirmative prosecutorial misconduct before allowing recovery based on a

<u>frivolous</u> prosecution would render that term superfluous within the statute, which independently

allows for recovery for prosecutions that are "vexatious" or "in bad faith."  *See Knott*, 256 F.3d

at 30 (rejecting interpretation of Hyde Amendment that would render a term superfluous).  It was

precisely this concern that led the *Knott* Court to distinguish between a "vexatious" prosecution,

which it held required "some finding of malice or improper motive," and a "frivolous"

prosecution, which it defined as one undertaken "without any foundation or basis for belief that it

might prevail."  *Id.* at 29-30.  The *Knott* Court made this distinction perfectly clear:

> To make best sense of the statutory language and in light of the
> purposes embodied in the Hyde Amendment, we conclude that
> something more than simply an inadequate evidentiary foundation
> is required to demonstrate that the prosecution was "vexatious"

---

[1]    *See, e.g.*, *In re 1997 Grand Jury*, 215 F.3d 430, 436 (4th Cir. 2000) ("A frivolous action is groundless, . . . with little prospect of success; often brought to harass or annoy the defendant." (quotation omitted)); *United States v. Isaiah*, 434 F.3d 513, 520 (6th Cir.  2006) ("This court has defined a frivolous position as one lacking a reasonable legal basis or where the government lacks a reasonable expectation of [obtaining] sufficient material evidence by the time of trial." (quotation omitted)); *United States v. Bowman*, 380 F.3d 387, 390 (8th Cir. 2004) ("We have stated a position is frivolous for the purposes of the Hyde Amendment when the position is utterly without foundation in law or fact."); *United States v. Gilbert*, 198 F.3d 1293, 1299, 1304 (11th Cir. 1999) ("A frivolous action is one that is groundless . . . with little prospect of success; often brought to embarrass or annoy the defendant. . . . A defendant seeking Hyde Amendment fees and costs on the basis of a legal position the government took in prosecuting him must establish that the position was foreclosed by binding precedent or so obviously wrong as to be frivolous.").

within the meaning of the Hyde Amendment-that is, some finding of malice or improper motivation is required.  After all, there is an alternate ground in the statute to award fees where an action is frivolous.

*Id.* at 30.

Second, as the case law makes clear, to the extent that recovery under the Hyde Amendment is limited to prosecutions amounting to "prosecutorial misconduct," a "frivolous" prosecution <u>is the equivalent of prosecutorial misconduct</u> within the meaning of the Amendment. *See, e.g.*, *Bowman*, 380 F.3d at 390 ("[A] prosecution . . . so utterly without foundation in law or fact as to be frivolous amounts to prosecutorial misconduct." (quoting *United States v. Beeks*, 266 F.3d 880, 883-84 (8th Cir. 2001))); *Gilbert*, 198 F.3d at 1299 ("A defendant must show that the government's position underlying the prosecution amounts to prosecutorial misconduct-a prosecution brought vexatiously, in bad faith, <u>or so utterly without foundation in law or fact as to be frivolous.</u>" (emphasis added)).  In short, Mr. Davis is entitled to recovery under the Hyde Amendment upon demonstrating that the prosecution was undertaken "without any foundation or basis for belief that it might prevail."  *Knott*, 256 F.3d at 29.

## II.     THE GOVERNMENT'S CLAIMED RELIANCE ON THE SEVENTH CIRCUIT'S "ARM OF THE GRAND JURY" LINE OF CASES WAS WITHOUT MERIT DOES NOT ESTABLISH A SUFFICIENT BASIS FOR THE OBSTRUCTION AND RICO CHARGES.

### A.     The Government Had No Basis in Fact or Law to Believe it Could Demonstrate that Mr. Davis's Alleged False Statements to an FBI Agent <u>Amounted to a Violation of 18 U.S.C. § 1503.</u>

The government's decision to charge Mr. Davis with obstruction of justice and substantive RICO was directly contrary to the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593 (1995), and subsequent First Circuit cases, and therefore was without basis in fact or law.  As explained below, the government's purported reliance on the Seventh

Circuit's "arm of the grand jury" theory does not alter this conclusion. But, in addition to its legal deficiency, the government's obstruction and RICO charge also had a fundamental factual flaw: the government had no evidence that Mr. Davis was aware of the existence of a pending grand jury investigation <u>at all</u>, putting aside the legal significance of whether FBI Agent Moorehead was acting as an "arm" of the grand jury. This is a separate and independent reason why the obstruction and substantive RICO charges were frivolous.

As the Supreme Court held in *Aguilar*, simply making false statements to a law enforcement agent is insufficient as a matter of law to amount to a § 1503 violation. *Id.* at 599-600. Because an element of a § 1503 violation is "intent to influence a judicial proceeding," any government attempt to secure a § 1503 conviction based on false statements made to law enforcement agents necessarily requires proving that the defendant, in making those statements, intended to obstruct some actual judicial proceeding, rather than simply a government investigation. *Id.*; *see also United States v. Scungio*, 255 F.3d 11, 18 (1st Cir. 2001) (failure to demonstrate that the defendant knew of the existence of the grand jury proceeding or, more importantly, that his false statements made to the FBI agent would be provided to the grand jury in connection with that proceeding, renders a § 1503 violation insufficient as a matter of law).[2]

The government charged Mr. Davis with obstruction despite having <u>no</u> evidence that he even knew of the existence of the grand jury proceeding, much less whether his statements made to the FBI agent would be provided to the grand jury in connection with that proceeding. The

---

[2] The government in a footnote claims that *Scungio* is inapposite because "it dealt only with the knowledge element of Section 1503, rather than the nexus element, which was the subject of defendant's motion to dismiss." Gov. Opp. at 25 n.6. But as *Aguilar* makes clear, the "nexus" requirement is <u>one and the same</u> as the "knowledge" or "intent" requirement. 515 U.S. at 599 ("The action taken by the accused must be with an intent to influence judicial or grand jury proceedings. . . . Some courts have phrased this showing as a 'nexus' requirement. . . . [I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct.")

only evidence the government offered on the subject was the testimony of Agent Moorehead

from the FBI, who testified, consistent with his FD-302, that Mr. Davis stated in his 2003

interview that "he had heard from some of his friends in Springfield about the investigation," and

that Mr. Asselin, Sr. told Mr. Davis "that he [Asselin, Sr.] was being investigated."  Tr. at 2465

(Oct. 10, 2006).  Mr. Davis was not asked if he knew of a <u>grand jury</u> investigation.  Although

Agent Moorehead served Mr. Davis with a grand jury subpoena, he did not do so until the end of

the interview, <u>after</u> Mr. Davis made his allegedly false statements.  *Id.* at 2479.

In short, the government did not present, and could not have presented, any evidence that

Mr. Davis was aware of any <u>grand jury</u> investigation at the time his allegedly false statements

were made.  The FBI's execution of searches at the SHA offices in the fall of 2002 had been

publicized in the Springfield area, and Mr. Davis's admitted knowledge of "the investigation"

did not necessarily or even probably mean he was aware that a non-public grand jury

investigation was underway in March 2003.[3]  Such lack of evidence renders this case factually

indistinguishable from *Scungio*, and demonstrates that the government was without basis in fact

or law to believe that it could satisfy *Aguilar*'s "intent" element of a § 1503 violation.  *See*

*United States v. Frankhauser*, 80 F.3d 641, 650-51 (1st Cir. 1996) (reversing obstruction

conviction where there was no evidence defendant, who <u>was</u> aware of an FBI investigation, was

aware of a grand jury investigation).

---

[3]    The government in both its opposition brief and in its opposition to Mr. Davis's motion to dismiss wrote that
FBI agents served Mr. Davis with a grand jury subpoena for P.J. Richfield on April 10, 2003, misleadingly
omitting the fact that the subpoena was not served until <u>after</u> Mr. Davis made the allegedly false statement.
*See* Gov. Opp. at 24. Government's Response to Defendant Davis's Motion to Dismiss (Docket No. 218) at 4.

**B.    The Government's Reliance on the Seventh Circuit's "Arm of the Grand Jury" Theory was Unwarranted.**

The government claims that it reasonably believed it would be able to prove Mr. Davis's intent to obstruct a judicial proceeding by demonstrating that the FBI was acting in concert with the grand jury investigation, and therefore was in essence an "arm of the grand jury." Gov. Opp. at 22. The government purports to rely on a line of Seventh Circuit cases that it contends hold that intent to obstruct a judicial proceeding can be proven when an individual makes false statements to an FBI agent, if the government can demonstrate the FBI generally has been acting as an "arm of the grand jury," irrespective of the defendant's knowledge of the existence of the grand jury proceeding or that his false statements would be provided to the grand jury. Gov. Opp. at 22-25. In dismissing the obstruction and RICO charges, this Court properly held that the government's position was "inconsistent with First Circuit case law," Memorandum and Order Regarding Defendant's Motion to Dismiss Counts 1 and 107 (Docket No. 191) at 2, and the government has not explained here how it gets around that inconsistency.

The government also mischaracterizes the holdings of the Seventh Circuit cases. In the most recent such case relied upon by the government, *United States v. Macari*, 453 U.S. 926 (7th Cir. 2006), the "arm of the grand jury" analysis focused on whether the government satisfied the first element of a § 1503 claim, the existence of a "pending judicial proceeding," not whether the government satisfied *Aguilar*'s "intent" requirement. *Id.* at 936. In the portion of the opinion addressing *Aguilar*'s intent requirement, the "arm of the grand jury" analysis is nowhere to be found. *Id.* at 939. Rather, the court easily distinguished *Aguilar* on the facts and found the intent requirement adequately met, as the defendant's obstructive conduct consisted of counseling a witness to lie to the grand jury. *Id.* at 940. The earlier Seventh Circuit cases on which the

8

government relies are similar. In fact, these case expressly disavow the government's reading of them. For instance, in *United States v. Fassnacht*, 332 F.3d 440 (7th Cir. 2003), the Court made clear, consistent with *Scungio*, that "[m]ere knowledge of a judicial proceeding is not enough to support a conviction under § 1503." *Id.* at 448. The Seventh Circuit went on to say:

> Under *Aguilar*, therefore, there is a significant difference between an accused who provides a false statement to an investigator with the knowledge that the evidence will be provided to the grand jury (or an accused who provides false evidence directly to the grand jury), and an accused who simply makes false statements to an investigative agent. If an accused makes a false statement to an investigating agent without the knowledge that the agent will forward that information to the grand jury, it is "far more speculative" whether the false statement will have the "natural and probable effect" of obstructing justice. Such speculation is insufficient to support a conviction under § 1503.

*Id.* (citations omitted).

In affirming the defendant's conviction, the Seventh Circuit made clear that it was not simply the fact that the defendants provided false information to law enforcement agents and that those agents were acting as an "arm of the grand" jury that supported the conviction, but rather the key was the defendants' <u>knowledge</u> of these facts, and that the false information would be provided to the grand jury:

> [T]here was sufficient evidence presented in this case for the jury to have rationally concluded that [defendants] were aware of the grand jury investigation into their tax returns and that they understood that the IRS agents were "integrally involved" in that grand jury investigation or, at the least, that the IRS agents would provide to the grand jury the information they garnered from the defendants.

*Id.* at 449.[4]  In sum, the Seventh Circuit's so-called "arm of the grand jury" cases do not present

some "novel" theory of liability under § 1503, Gov. Br. at 25, but are completely consistent with

*Aguilar* and *Scungio*.  Under the Seventh Circuit's cases, when a § 1503 prosecution is based on

false statements to a law enforcement agent, the interrelationship of the law enforcement

investigation and the grand jury investigation is a necessary precondition to liability, but it is by

no means sufficient to demonstrate liability, as the government attempts to argue.  Rather, the

defendant's knowledge of the existence of the grand jury proceeding, the interrelationship of that

proceeding with the law enforcement investigation, and that the false statements would

ultimately reach the grand jury are also prerequisites to liability.

The government also argues that this Court "approved the 'arm of the grand jury' theory

in *United States v. Jamie Dwyer, et al.*, CR-N-03-300018-MAP," Gov. Opp. at 26 n.4, a point it

echoes in its opposition to Mr. Davis's motion for discovery, Docket No. 387 at 9-10.  Even a

cursory review of the briefing in *Dwyer*, however, demonstrates that the government overstates

its point.  For starters, the evidence of Dwyer's obstruction did not merely consist of false

statements to a law enforcement agent but, as the government stressed at length in its briefing,

also included withholding and falsifying documents subpoenaed by the grand jury.  *See*

Government's Response to Defendant's Motion for Judgment of Acquittal, Docket No. 291, at

---

[4]    *Fassnacht* involved an interpretation of an earlier Seventh Circuit case on which the government also relies,
*United States v. Furkin*, 119 F.3d 1276 (7th Cir. 1997), which also repudiates the government's position.  In
sustaining Furkin's conviction, the Court stressed that at the time he engaged in his obstructive conduct, Furkin
knew of the existence of the grand jury investigation, knew that the IRS was "integrally involved in the grand
jury investigation," and knew that the grand jury was seeking the very evidence that he falsified and that was
the basis of his obstruction conviction.  Id. The government also cites to *United States v. Maloney*, 71 F.3d 655
(7th Cir. 1995), which is inapposite but also repudiates the government's position.  *Maloney* did not involve
false statements to law enforcement, but counseling a witness to obstruct the investigation. *Id.* at 651-52.
Maloney challenged his conviction on the limited ground that there was insufficient evidence to demonstrate
his knowledge of a grand jury proceeding when his obstructive conduct occurred. Id. at 656.  The Court easily
denied his claim, as "[t]here was substantial, unrebutted, evidence introduced to establish the existence of a
pending judicial proceeding and Maloney's knowledge of it."  *Id.* at 656.

20-23 (attached as Exhibit A).  Furthermore, to the extent Dwyer's obstruction of justice

conviction was supported by Dwyer's false statements to law enforcement agents (and there is no

indication that the jury, or this Court in affirming, relied on that evidence), the government

repeatedly stressed in its briefing the evidence that Dwyer <u>knew of the grand jury investigation at

the time she made her false statements, and knew that the investigating officers to which she

made false statements were acting as the arm of the grand jury</u>.  *See id.* at 20, n.4, 26, 27

("Therefore, there can be no question that defendant Dwyer knew about not only the existence of

the grand jury investigation, but also that the federal investigators were serving as the arm of the

grand jury.").  In short, the government did <u>not</u> advance in *Dwyer* the erroneous theory it is

espousing here, that a § 1503 conviction can stand without any evidence that the defendant even

knew of the existence of the grand jury or that the federal investigation was intertwined with the

grand jury investigation.

Because the conviction was adequately supported by evidence beyond merely the false

statements to law enforcement, this Court certainly did <u>not</u> "approve[]" any "arm of the grand

jury" theory in *Dwyer*, much less the erroneous interpretation advanced here.  *See* Defendant's

Post-Conviction Motions, Docket No. 304, at 1 (during which this Court makes no mention of

the "arm of the grand jury" theory, and simply denies the motion stating "none of the arguments

offered for dismissal, judgment of acquittal, or new trial is supportable, in fact or law") (attached

as Exhibit B).  The liberties taken by the government with this very Court's ruling in another

case speak volumes about the merits of Mr. Davis's Application.

**III.     THE GOVERNMENT'S CONSPIRACY CHARGES WERE BASELESS.**

    **A.     The Government's Purported Reliance on "Suppressed"
       Testimony Is Unavailing.**

The government claims it relied upon anticipated testimony from Lisa Sanford and FBI Agent Moorehead, "suppressed" by the Court, that would have demonstrated Mr. Davis's "continuing criminal involvement" in the RICO and bribery conspiracies.  Gov. Opp. at 29. Specifically, the government claims that it relied upon (1) the proffered testimony of Lisa Sanford, Raymond Asselin, Sr.'s secretary, concerning an alleged attempt by Mr. Asselin, Sr. to contact Mr. Davis by telephone in the fall of 2002; and (2) Mr. Davis's statement to an FBI agent in 2003 denying making payments for any improvements on the homes of the Asselin children. Gov. Opp. at 29-30.  The argument fails, however, as the excluded evidence would <u>not</u> have demonstrated Mr. Davis's continuing criminal involvement in the conspiracies.

First, Lisa Sanford's excluded testimony does not indicate <u>any</u> action on the part of Mr. Davis, much less his involvement in the conspiracy, within the limitations period.  As proffered by the government, Ms. Sanford would have testified that she recalled Mr. Asselin, Sr. "asking for Peter Davis on the phone" on or about the day of the FBI search at SHA offices, and that Mr. Asselin, Sr. "sounded upset."  Tr. at 1981 (Oct. 5, 2006).  This evidence, even if allowed, would not have demonstrated any continued criminal involvement by Mr. Davis within the limitations period.  In fact, when the government argued over defendant's objection at trial that such evidence was relevant to rebut Mr. Davis's expected statute-of-limitations or withdrawal defense, the Court flatly rejected the argument:

> The defense won't have to argue to the jury because <u>if that's the
> only evidence that you've got of Mr. Davis's involvement in any
> conspiracy after a particular date, I'm going to direct the verdict
> because that telephone conversation is meaningless</u>.

Tr. at 1984-85 (Oct. 5, 2006) (emphasis added). The government's argument about the significance of Ms. Sanford's testimony is no more persuasive now than it was then.

Second, Agent Moorehead's excluded testimony amounts at most to evidence of concealment by Mr. Davis. The Supreme Court and the First Circuit have made it clear that post-conspiracy statements made in an effort to conceal one's prior unlawful activity cannot be considered "in furtherance of the conspiracy" for the purposes of extending the statute of limitations unless the government proves beyond a reasonable doubt "an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." *Grunewald v. United States*, 353 U.S. 391, 404 (1957); *United States v. Twitty*, 72 F.3d 228, 223 (1st Cir. 1995). As demonstrated below, there is no basis in fact or law for the government to conclude that such an "express original agreement" existed. Therefore, the government's reliance on this "suppressed" testimony provided no basis for its decision to charge Mr. Davis with the time-barred conspiracies.

It is also worth noting that the government only offered Agent Moorehead's testimony on this issue as evidence of consciousness of guilt. Memorandum and Order Regarding Defendant's Motion for Judgment of Acquittal (Docket No. 331) at 2-3 (hereinafter "Order").. This position would seem to be inconsistent with a reliance on this evidence to prove that the conspiracy continued in to the limitations period.

**B.      There Was No Basis in Fact or Law for the Government to Believe It Could Prove that Mr. Davis Entered into an "Express Original Agreement" to Cover Up the Conspiracy After its Commission.**

The government also claims that it reasonably believed that it could prove an "express original agreement to conceal" the conspiracy after its commission based on (1) the efforts

13

undertaken to conceal the fraudulent activity for the purposes of committing the conspiracy; and (2) the testimony of Joseph Asselin, relaying comments made to him by Mr. Asselin, Sr. that suggests that Mr. Asselin, Sr. and Mr. Davis wanted to conceal the payments Mr. Davis made for improvements to Joseph Asselin's home.  Gov. Opp. at 31-32.  These arguments lack merit.

First, the government's argument — relying solely on "the conspirators' substantial and ongoing efforts to cloak their crimes," Gov. Opp. at 32 — cannot be squared with the holdings of *Grunewald* and *Twitty*.  *Grunewald* and *Twitty* make two things clear: (1) actions taken to conceal the conspiracy after the fact are not in furtherance of the conspiracy absent an express original agreement to conceal, and (2) the fact that actions were taken to conceal the conspiracy during its commission are insufficient as a matter of law to demonstrate the existence of such an "express original agreement" to conceal after the fact.  Indeed, the government's argument for why its belief that an "express original agreement" existed was "reasonable" is the <u>exact same</u> <u>position</u> that the government took, and the Supreme Court roundly rejected, in *Grunewald* itself.  There, the government argued that the jury could have found an express original agreement based on: "(1) a criminal conspiracy which is carried out in secrecy; (2) a continuation of the secrecy after the accomplishment of the crime; and (3) desperate attempts to cover up after the crime begins to come to light."  353 U.S. at 403.  Rejecting the government's attempt to distinguish the facts from earlier cases, the Court wrote:

> In *Krulewitch* it was urged that a continuing agreement to conceal should be implied out of the mere fact of conspiracy, and that acts of concealment should be taken as overt acts in furtherance of that implied agreement to conceal.  Today the Government merely rearranges the argument.  It states that the very same acts of concealment should be used as circumstantial evidence from which it can be inferred that there was from the beginning an 'actual' agreement to conceal.  As we see it, the two arguments amount to the same thing: a conspiracy to conceal is being implied from

> elements which will be present in virtually every conspiracy case, that is, secrecy plus overt acts of concealment.  There is not a shred of direct evidence in this record to show anything like an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission.

*Id.* at 404 (footnote omitted).  The government here is asking this Court to accept as "reasonable," and therefore not frivolous, its purported reliance on the same facts—i.e., that the conspiracy was concealed during its commission, and that acts were taken to conceal the conspiracy after the fact—which were deemed legally insufficient by the Supreme Court.

Second, the government is being disingenuous when it claims that its decision to prosecute Mr. Davis for the charged conspiracies was based in part on its reliance on Joseph Asselin's expected testimony.  Mr. Asselin testified that he did not begin cooperating with the government until July 28, 2006, nearly two years <u>after</u> the government decided to indict Mr. Davis.  Tr. at 2883 (Oct. 13, 2006).   Prior to that date, Mr. Asselin was a co-defendant of Mr. Davis who had never been interviewed by the government or testified before the grand jury; therefore the government could not possibly have relied on his expected testimony in deciding to prosecute Mr. Davis.  Plainly, the government cannot justify its decision to prosecute Mr. Davis based on information acquired two years <u>after</u> the indictment.

### C.     The Government's Purported Reliance on the "Exacting" Standard for <u>Withdrawal Does Not Render Its Prosecution Non-Frivolous</u>.

The government's purported reliance on the "exacting" withdrawal standard does not help its cause.  Gov. Opp. at 33-35.  Before even considering the merits of Mr. Davis's expected withdrawal defense, of course, the government should have concluded that it could not prove the existence of Mr. Davis's conspiratorial agreement within the statute of limitations.  In other

words, to have held a basis to believe its prosecution could succeed the government had to be able to defeat <u>both</u> a statute-of-limitations and a withdrawal defense.

Even so, the government's reliance on the "exacting standard for withdrawal" rings hollow. First, the government's own witnesses freely admitted that the entire Asselin family, all co-conspirators, knew that Mr. Davis was retiring from contracting and moving from the Springfield area, thus demonstrating clearly that Mr. Davis both took actions inconsistent with the object of the conspiracy and communicated that fact to his co-conspirators. *See* Tr. 2891-92 (Oct. 13, 206) (testimony of Joseph Asselin); *id.* at 1361-62 (Oct. 3, 2006) (testimony of Lisa Asselin). Second, while there is no First Circuit case covering the exact factual scenario here, where a defendant severs his relationship with a legal entity that is the *sine qua non* of the conspiracy, every circuit addressing the issue in the analogous context of an individual leaving or retiring from a company or organization has logically concluded that such an action constitutes withdrawal as a matter of law. *See, e.g.*, *United States v. Nerlinger*, 862 F.2d 967 (2d Cir. 1988); *United States v. Steele*, 685 F.2d 793 (3d. Cir. 1982). And third, as the government conceded in this case, upon Mr. Davis making a prima facie showing of withdrawal, the government bore the burden of proving beyond a reasonable doubt that Mr. Davis did not withdraw. As this Court has noted, the government presented no evidence, not merely insufficient evidence, to meet that burden. Order at 6.

## IV.    THAT THE GOVERNMENT MAY HAVE HAD SUFFICIENT EVIDENCE TO PROSECUTE MR. DAVIS UNDER 18 U.S.C. § 1001 IS IRRELEVANT TO WHETHER ITS ACTUAL PROSECUTION OF MR. DAVIS WAS FRIVOLOUS.

The government also argues that, because it could have charged Mr. Davis with an 18 U.S.C. § 1001 (false statements) violation, its decision to charge him with other, more serious crimes instead should be viewed as a mere "mistake," rather than a frivolous prosecutorial

decision. Gov. Opp. at 26-29. This is an odd argument. The decision to charge Mr. Davis with obstruction of justice and substantive racketeering, crimes carrying a Guidelines range of 37-46 months in jail, as opposed to the far less serious crime of making false statements to law enforcement agents, a crime punishable by at most 0-6 months in jail, was no "prosecutorial mistake." It was a deliberate decision to charge Mr. Davis with a far more serious crime, and it was an integral decision because it gave cover to the obvious statute-of-limitations problems in this case by permitting the government to charge substantive racketeering, since Mr. Davis's alleged obstruction of justice constituted the only alleged predicate racketeering act occurring within the limitations period. Moreover, as is clear from above, the decision was made without any basis in fact or law. The government is asking this Court to take the position that once the government can demonstrate that a defendant is chargeable with some crime, it may charge that defendant with any crime, no matter the baselessness of those enhanced charges, and be free from Hyde Amendment liability altogether. The government wants this Court to read a new element into the Hyde Amendment standard that requires the applicant to demonstrate lack of guilt of any crime as a prerequisite to recovery. The Hyde Amendment contains no such requirement, and this Court should reject the government's erroneous theory.

The government's argument also rests on a misreading of *United States v. Truesdale*, 211 F.3d 898 (5th Cir. 2000), the case on which it relies for support. *Truesdale* involved a prosecution for violation of 18 U.S.C. § 1955, which prohibits the operation of an illegal gambling business, defined in part as one that is "in violation of the laws of the State or political subdivision in which it is conducted." *Id.* at 900. The defendants' convictions were overturned because there was insufficient evidence that the defendants' bookmaking activities (which would have been in violation of Texas state gambling laws), were "conducted" within the state of

17

Texas. *Id.* at 900-01. However, the prosecution did present evidence that the defendants conducted <u>other</u> activities within the state of Texas that would have been in violation of Texas state gambling laws, and therefore that the defendants <u>actually violated § 1955, the crime with which they were charged.</u> *Id.* at 909. However, because the prosecution did not pursue this theory at trial, the defendants' convictions were overturned.

Thus, contrary to the government's contention, its position here is neither "similar" to nor "far more favorable than" that of the government's in *Truesdale*. Rather, *Truesdale* involved a case in which there was in fact adequate evidence to convict the defendants of the very crimes with which they were charged, just not on the theory the prosecutors actually pursued at trial. Here, in contrast, there was no evidence to demonstrate that Mr. Davis's allegedly false statements to an FBI agent constituted obstruction of justice or racketeering, and no alternate theory would have made this possible. Rather, at most the evidence may have demonstrated that Mr. Davis committed a <u>far less serious</u> crime, rendering *Truesdale* inapposite.

## V.    THE GOVERNMENT'S "SPECIAL CIRCUMSTANCES" ARGUMENT LACKS MERIT.

As a last ditch effort, the government argues that this Court's decision to grant Mr. Davis's Rule 29 Motion without allowing the case to go to the jury constitutes "special circumstances" counseling against the award of Hyde Amendment fees. Gov. Opp. at 37. Unencumbered by case law, this claim is also counterintuitive: this Court elected to grant Mr. Davis's Rule 29 Motion without allowing the case to go to the jury because of the complete lack of any evidence upon which a rational jury could find Mr. Davis committed the charged crimes within the limitations period. *See* Order at 2-4. Indeed, this was not a decision this Court made lightly; the Court stressed that it had only granted such a motion prior to sending the case to the

jury one other time in 13 years, but elected to do so here because the government's failure to prove its case was "glaring," and evidence of crimes occurring within the limitations period "nonexistent." *Id.* If anything, this Court's decision to grant the defendant's Motion before sending the case to the jury should be seen as evidence supporting the strength of Mr. Davis's Hyde Amendment Application.

The Hyde Amendment case law also undermines the government's claim. In *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999), the court held that the district court's decision to allow the case to go to the jury counseled against granting the Hyde Amendment application, because it represented the decision of a federal judge that the government had presented sufficient evidence to convict, even if the court of appeals subsequently disagreed with that decision. *Id.* at 1299 ("Once a district court judge accepts the government's legal position it will be extremely difficult to persuade us that the issue was not debatable among reasonable lawyers and jurists, i.e., that it was frivolous."). Given the *Gilbert* Court's reasoning, accepting the government's claim that granting the Rule 29 Motion *before* sending the case to the jury should exempt it from liability would mean that the government never would be subject to Hyde Amendment liability. The government's claim, unsupported by law or logic, should be rejected by this Court.[5]

---

[5] Moreover, the government ignores the fact that even if this Court elected not to grant Mr. Davis's Rule 29 Motion, there is little chance that the case would have actually gotten to the jury. The Court likely would have been forced to grant a mistrial, based on multiple decisions made by the government itself. The first was the decision by the government to show in its opening three exhibits that it claimed were in Mr. Davis's handwriting, when it had no basis for making such a claim, which resulted in such exhibits never coming into evidence. Second was the government's decision to rely extensively on co-conspirator hearsay, much of which occurred long after the government had any evidence that Mr. Davis was involved in the conspiracy, all of which would have been improperly admitted against him under *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977). The irreparable taint to the jury from the government's erroneous decisions would have prevented any chance of getting to the jury and securing a favorable verdict.

VI.   **THE GOVERNMENT'S RECITATION OF FACTS ALLEGEDLY DEMONSTRATING MR. DAVIS'S INVOLVEMENT IN THE CONSPIRACY MANY YEARS PRIOR TO THE LIMITATIONS PERIOD IS BOTH IRRELEVANT AND MISLEADING.**

Finally, the government spends several pages of its response reciting facts that, it contends, would have been sufficient to demonstrate that Mr. Davis committed the charged RICO and bribery conspiracies, albeit well outside the statute of limitations period.  Gov. Opp. at 4-14.  The government implies this Court should find that the government's position was not frivolous because, although clearly barred by the statute of limitations, it presented sufficient evidence that Mr. Davis committed the charged crimes.  The government's trivialization of the statute of limitations does not become it.  As the Supreme Court has stated:

> The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions.  Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past.

*Toussie v. United States*, 397 U.S. 112, 114-15 (1970).   By ignoring this principle, the government subjected Mr. Davis to exactly that which the statute was designed to protect him from, forcing him to defend himself against charges based on activities that occurred 10-15 years prior to his trial, and to face the danger of official punishment for acts in the far-distant past.

The government also ignores the substantial problems with its ability to prove the actual crimes charged, RICO conspiracy and bribery conspiracy, as explained in Mr. Davis's Rule 29 Motion.  Docket No. 331 at 19-33.   In particular, there was no evidence that Mr. Davis ever engaged in the *quid pro quo*, or the giving of something of value in exchange for a <u>specific</u> government act, required to secure a bribery conviction.  *United States v. Sun-Diamond Growers*

*of California*, 526 U.S. 398, 404 (1999). At most, the evidence cited by the government demonstrated that Mr. Davis gave things of value in exchange for being in the general goodwill of the SHA officials, rather than in exchange for specific official acts, which the Supreme Court held in *Sun-Diamond* was simply not bribery. *Id.* at 405-06.

Indeed, the actions of the government demonstrate that it did not itself believe that it had a strong case. Included among those actions are:

- The government's reliance in its opening on several documents, including one described as the "blueprint of the conspiracy," for which it had no witness to authenticate;

- That the government spent the vast majority of its four-plus week case presenting evidence of construction minutiae from a time period several years prior to any evidence it had of payments made by Mr. Davis;

- That the government repeatedly amended its witness list and exhibit list during trial in a desperate attempt to fill holes in its case; and

- That the government relied extensively on co-conspirator hearsay at great risk of a mistrial.

While the frivolousness of the government's position is based on the fatal statute of limitations issue, the government's attempt to use its opposition to rewrite the history of the trial should be rebuffed by the Court.

## **CONCLUSION**

For the foregoing reasons, and those set forth in his opening memorandum, Mr. Davis respectfully requests the Court grant his Application for Costs and Attorneys' Fees Pursuant to the Hyde Amendment.

Respectfully submitted,

PETER DAVIS

By his attorneys,

  /s/ James C. Rehnquist
James C. Rehnquist (BBO # 552602)
Kathleen Luz (BBO # 643278)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated:  January 26, 2007

## CERTIFICATE OF SERVICE

I, James C. Rehnquist, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants, on January 26, 2007.

  /s/ James C. Rehnquist
James C. Rehnquist

LIBA/1758807.1