# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )    CR-N-03-30018-MAP
                             )
            Plaintiff,       )
                             )
      vs.                    )
                             )
JAMIE DWYER,                 )
                             )
            Defendant.       )

GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

The United States of America, by and through Michael J.
Sullivan, United States Attorney for the District of
Massachusetts, and William M. Welch II, Assistant United States
Attorney, hereby files this response to defendant Dwyer's Motion
for Judgment of Acquittal.

I.    **Taken In A Light Most Favorable To The Government, The
      Evidence At Trial Established All Of The Required Essential
      Elements To Prove A Conspiracy To Commit Wire Fraud Or
      Program Fraud.**

      **A. Background**

      A review of the sufficiency of the evidence under Rule 29
requires a court to ask "'whether, after viewing the evidence in
the light most favorable to the prosecution, any rational trier
of fact could have found the essential elements of the crime
beyond a reasonable doubt.'" United States v. Cornier-Ortiz, 361
F.3d 29, 32-33 (1st Cir. 2004)(quoting Jackson v. Virginia, 443

1

U.S. 307, 319 (1979). A court should "draw all reasonable evidentiary inferences in harmony with the verdict and resolve all issues of credibility in the light most favorable to the government." United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004).

A court "need not be convinced that the government succeeded in `eliminating every possible theory consistent with the defendant's innocence.'" United States v. Boulerice, 325 F.3d 75, 82 (1st Cir. 2003)(quoting United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002)). Instead, the court "simply consider[s] `all the evidence, direct and circumstantial, and resolve[s] all evidentiary conflicts in favor of the verdict.'" Id. (quoting United States v. Hernandez, 146 F.3d 30, 32 (1st Cir. 1998)).

"`[T]he law is well established that where an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the means, and accordingly the jury instruction may properly be framed in the disjunctive.'" United States v. Garcia-Torres, 341 F.3d 61, 66 (1st Cir. 2003)(quoting United States v. Simpson, 228 F.3d 1294, 1300 (11th Cir. 2000)). See also Griffin v. United States, 502 U.S. 46, 56-57 (1991)(holding that when a jury returns a guilty verdict on an indictment charging multiple objects of a conspiracy in the conjunctive, the verdict stands if the evidence is sufficient on any one of the conspiratorial objects); United

States v. Miller, 471 U.S. 130, 134-38 (1985)(indicating that, if

an indictment gave clear notice of charges, there is no

reversible error when jury convicts on proof of only one of

several means of committing crime alleged in the indictment);

United States v. Coriaty, 300 F.3d 244, 250 (2nd Cir. 2002)

(affirming conviction for conspiracy charging different statutory

violations in the conjunctive where jury instructed in the

disjunctive and evidence sufficient on one of the statutory

objective); United States v. Neuhausser, 241 F.3d 460, 471 n.7

(6th Cir. 2001)(same); United States v. Applewhite, 195 F.3d 679,

689 (3rd Cir. 1999)(same); United States v. Linn, 31 F.3d 987,

990-991 (10th Cir. 1994).  Therefore, the conspiracy conviction

for defendant Dwyer stands if, taking the evidence in a light

most favorable to the Government, the jury reasonably could have

found that defendant Dwyer conspiracy to commit wire fraud or

program fraud.

**B.    Sufficient Evidence Existed To Find Defendant Dwyer
        Guilty Of A Conspiracy To Commit Wire Fraud.**

        1.    Wire Transmission Element of Wire Fraud

        Ample evidence existed that defendant Dwyer

participated in a conspiracy to commit wire fraud.  Defendant

Dwyer first argues as a matter of law that it was not sufficient

for the Government to prove the use of an intrastate wire

communication connected to an interstate telephone system. See

Motion for Judgment of Acquittal (hereinafter "Motion"), p. 14-

3

15.   Instead, defendant Dwyer argues, the Government had to prove the use of an actual interstate wire communication in furtherance of the scheme to defraud.

The Government fully briefed this issue at the time of the Rule 29(a) arguments.  As the court recalls, the Supreme Court reviewed over a hundred years of Commerce Clause jurisprudence in United States v. Lopez, 514 U.S. 549 (1995) and United States v. Morrison, 529 U.S. 598 (2000) and "`identified three broad categories of activity that Congress may regulate under its commerce power.'" Morrison, 529 U.S. at 608-609 (quoting Lopez, 514 U.S. at 558 (1995)).  "`First, Congress may regulate the use of the channels of interstate commerce.'" Morrison, 529 U.S. at 609 (quoting Lopez, 514 U.S. at 558 (citations omitted)).  "`Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.'" Morrison, 529 U.S. at 609 (quoting Lopez, 514 U.S. at 558 (citations omitted)).  "`Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, ... i.e., those activities that substantially affect interstate commerce." Morrison, 529 U.S. at 609 (quoting Lopez, 514 U.S. at 558 (citations omitted)). See also Pierce County, Wash. v. Guillen, 537 U.S. 129, 146-147 (2003).

In summary, the Government's argument at the Rule 29(a)
hearing was that, based upon the Supreme Court's holdings in
Lopez and Morrison, the telephone system was both a channel of
and an instrument of interstate commerce.  Therefore, under Lopez
and Morrison, an intrastate wire communication connected to an
interstate telephone system satisfied the interstate commerce
nexus of the wire fraud statute.  Rather than repeating in detail
its previous legal argument, the Government incorporates by
reference its memorandum of law regarding the use of an
intrastate wire communication connected to an interstate
telephone system to satisfy the interstate commerce nexus of the
wire fraud statute.

Defendant Dwyer's additional legal arguments against the
sufficiency of an intrastate wire communication to prove the
interstate commerce nexus of the wire fraud statute are
unavailing.  Defendant Dywer first argues that "[a] survey of
First Circuit cases finds that interstate wire communications
have been required in every instance." Motion, p. 15.  The
problem with this argument is that all of the cases cited by
defendant Dwyer either pre-date the Supreme Court's decisions in
Lopez and Morrison or rely upon wire fraud cases that pre-date
Lopez and Morrison.  None of the cases discuss Lopez and Morrison
in any meaningful way, if at all.  Therefore, simply surveying
pre-Lopez and Morrison wire fraud jurisprudence does not address

the merits of the Government's argument.

Defendant Dwyer next argues that a strict construction of the language of the wire fraud statute is "plain in requiring an interstate wire communication." Motion, p. 14.  Actually, a strict construction of the wire fraud statute makes plain that an interstate wire communication is not required.

By the time of the wire fraud statute's enactment in 1952, the "in commerce" statutory language had become "a term of art" of Supreme Court Commerce Clause jurisprudence. United States v. Ballinger, 395 F.3d 1218, 1232 (11th Cir. 2005)(quoting United States v. Am. Building Maintenance Indus., 422 U.S. 271, 280 (1975)).  The "in commerce" statutory language meant the first two Lopez categories -- regulation of the channels and the instrumentalities of commerce." Ballinger, 395 F.3d at 1232-33. By the time of the wire fraud statute's enactment, congressional power to regulate the channels and instrumentalities of commerce under the Commerce Clause unquestionably included "the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature." Id. at 1226 (citing Brooks v. United States, 267 U.S. 432, 436 (1925)("Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty, or the spread of any evil or harm to the people of

other states from the state of origin."); <u>Heart of Atlanta Motel,</u>
<u>Inc. v. United States</u>, 379 U.S. 241, 256 (1964)("`[T]he authority
of Congress to keep the channels of interstate commerce free from
immoral and injurious uses has been frequently sustained, and is
no longer open to question.'" (quoting <u>Caminetti v. United</u>
<u>States</u>, 242 U.S. 470, 491 (1917))).

    The legislative history of the wire fraud statute "suggests
that Congress wished to prohibit as much wire fraud as it could
constitutionally make unlawful, limited only by a desire to avoid
`Federal intrusion upon the police power of the States.' <u>See</u>
H.R.Rep.No. 388, 82d Cong., 1st Sess. 3, U.S.Code Cong. &
Admin.News, pp. --- (1951)." <u>United States v. Giovengo</u>, 637 F.2d
941, 943 (3rd Cir. 1980).  The legislative history also revealed
that the wire fraud statute "meant to replicate the mail fraud
statute, which antedated it by some 80 years. *See* S. Rep. No. 44,
82nd Cong., 1st Sess. 19 (1951)(18 U.S.C. § 1343 was designed as
`a parallel [to the] provision now in the law for fraud by
mail')." <u>United States v. Garlick</u>, 240 F.3d 789, 792 (9th Cir.
2001).

    The terms of the mail fraud and wire fraud statutes "protect
the instrumentalities of communication, making the *use* of the
mails or wires as part of a fraudulent scheme an independent
offense quite separate from any other potentially illegal
conduct." <u>Garlick</u>, 240 F.3d at 792 (italics in original).  The

focus of both of these statute has always been upon "the misuse of the instrumentality of communication." United States v. Alston, 609 F.2d 531, 536 (D.C. Cir. 1979). See also United States v. Monostra, 125 F.3d 183, 187 (3rd Cir. 1997)(holding that the mail fraud and wire fraud statutes "are directed at the instrumentalities of fraud."); United States v. Condolon, 600 F.2d 7, 8 (4th Cir. 1979)(gravamen of wire fraud offense is the misuse of interstate communication facilities to execute any scheme to defraud).

Had Congress intended to require an interstate wire communication, it could have done so.  Congress could have passed a statute that read, for example, "[w]hoever, having devised . . . . any scheme . . . to defraud . . . transmits   . . . by means of interstate wire, radio, or television communication . . ." Instead, Congress employed a statutory "term of art" that invoked its powers under categories one and two of the Commerce Clause. Therefore, a strict construction of the wire fraud statute, when considered in light of the statute's legislative history and Congress' intent "to prohibit as much wire fraud as it could constitutionally make unlawful," further solidifies the Government's position, i.e. the legal sufficiency of an intrastate wire communication connected to an interstate telephone system to satisfy the interstate commerce nexus of the wire fraud statute.

8

Third, defendant Dwyer attempts to distinguish United States v. Hilton, 257 F.3d 50 (1st Cir. 2003) and United States v. Gilbert, 181 F.3d 142 (1st Cir. 1999) by arguing that those statutes only require proof of the use of an "instrument of interstate commerce" rather than "an actual interstate communication." See Motion, p. 16. The flaw in this argument is that the terms of the wire fraud statute do not require proof of "an actual interstate communication." Moreover, the idea that the statutes at issue in Hilton and Gilbert are different because those statutes only require proof of the use of an instrument of interstate commerce is meritless. While the wire fraud statute does not expressly use the phrase "instrument of commerce", its reference to any transmission "by means of wire, radio, or television" is a requirement that the transmission be by an instrument of commerce.

Finally, defendant Dwyer cites United States v. Bass, 404 U.S. 336 (1971) as further support for her position. The fallacy in defendant Dwyer's reliance upon Bass is that this case interprets the third category of Commerce Clause authority, which is plainly inapplicable to the Government's position. The felon in possession statute in fact requires proof that a firearm travel from one state to another state because that statute derives its authority from the third category of Commerce Clause authority, a substantial affect upon interstate commerce.

9

The Government presented ample evidence to prove that the intrastate communications were connected to an interstate telephonic system.  Both Thomas Grimes, the former fiscal officer of MCDI, and James Hebert, the president of Checkwriters, Inc., both testified that the facsimile numbers of MCDI and Checkwriters, Inc., which were used to send MCDI's payroll information to Checkwriters, Inc., both received out-of-state facsimiles and sent out-of-state facsimiles.  Therefore, the Government satisfied its burden of showing that the facsimile numbers of MCDI and Checkwriters, Inc. in fact were connected to an interstate telephone system, thus satisfying the interstate commerce nexus post-<u>Lopez</u>.

2.    <u>"In Furtherance" Element Of Wire Fraud</u>

The faxes from MCDI to Checkwriters, Inc. easily furthered the wire fraud scheme.  The use of the wires need only be "`incidental to an essential part of the scheme' . . . `a step in [the] plot.'" <u>Schmuck v. United States</u>, 489 U.S. 705, 711 (1989)(citations omitted).  To be considered `in furtherance of the scheme,' "the scheme's completion or the prevention of its detection must have depended in some way on the [wiring]." <u>United States v. Pacheco-Ortiz</u>, 889 F.2d 301, 305 (1st Cir. 1989)(<u>United States v. Silvano</u>, 812 F.2d 754, 760 (1st Cir. 1987)).

To determine whether or not a wiring furthers the scheme, the First Circuit concerns itself less with

10

> the precise contents of the particular
> [wires] than with the role those [wires]
> played in the execution of the scheme to
> defraud.  As long as the [wires] are
> sufficiently related to the scheme so that
> the execution of the scheme depended on those
> [wires] being sent, the proper nexus is
> established.

Id. at 928-29.

The wire transmission of the false summary payroll sheets was unquestionably "a step in the plot."  In fact, each wire transmission was essential to the wire fraud scheme because the facsimile transmission of the false payroll information caused Checkwriters, Inc. to generate fraudulent payroll checks.  Those fraudulent payroll checks in turn were used by the various defendants for an illegitimate purpose.

There was no requirement that Checkwriters, Inc. itself be defrauded. See Motion, p. 18.  The defendants' use of a third party to complete the wire fraud scheme comports with First Circuit law. See United States v. Bruckman, 874 F.2d 57, 60 (1st Cir. 1989); United States v. Fermin Castillo, 829 F.2d 1194, 1198 (1st Cir. 1987).  "As long as some use of the instrumentality in the course of the endeavor was reasonably to be anticipated, the causation requirement is met." Fermin Castillo, 829 F.2d at 1198. See also United States v. Contenti, 735 F.2d 628, 631 (1st Cir. 1984)(accused guilty if act done "with knowledge that the use . . . will follow in the ordinary course of business, or where [accused] could reasonably foresee that use . . . would

result.").

The argument that "MCDI administrators were aware of and had authorized the payments" deserves scant attention. <u>Motion</u>, p. 18. MCDI administrators had no authority to sanction fraudulent conduct. Moreover, defendant Dwyer and her co-defendants perpetrated a fraud upon MCDI, the entity, and the City of Springfield. Therefore, her co-defendants' knowledge of the fraud proves their guilt; it does not absolve them of their criminal conduct.

### 3.    <u>Intent Element Of Wire Fraud</u>

Defendant Dwyer's argument is nothing more than a recapitulation of her defense presented at trial, a defense that the jury soundly rejected. Taken in a light most favorable to the Government, more than enough evidence existed for the jury to find beyond a reasonable doubt that defendant Dwyer conspired to defraud MCDI and the City of Springfield.

First, the Government admitted MCDI memoranda, including memorandum that referred to false timesheets as "fraudulent", that required all employees to submit accurate timesheets. This put defendant Dwyer squarely on notice of the criminality of her actions. Second, defendant Dwyer knew that Ms. Ortiz' timesheets were false. Defendant Dwyer's own payroll spreadsheets, which stated, "Not deducting $24 . . . due to only working 0 hours. Paid 35 hours per Mr. Phillips", established the falsity of Ms.

Ortiz' timesheets and defendant Dwyer's knowledge of their

falsity.  Third, other witnesses who worked in the MCDI kitchen

testified regarding defendant Dwyer's daily visits to the MCDI

kitchen and Ms. Ortiz' absence from work, all of which further

proved defendant Dwyer's knowledge of the falsity of Ms. Ortiz'

timesheets.  Fourth, defendant Dwyer admitted on cross-

examination that only she, defendant Polimeni and defendant

Phillips knew about Ms. Ortiz' unique arrangement.  Finally,

defendant Dwyer admitted on cross-examination that she knew that

it was a crime to submit inflated timesheets because such conduct

in effect would be stealing from MCDI, and that it was also a

crime to help someone steal from MCDI.  This evidence proved

directly as well as circumstantially that defendant Dwyer

intended to conspire to defraud MCDI and the City of Springfield.

See United States v. Donato-Morales, 382 F.3d 42, 47 (1st Cir.

2004)(specific intent, like any other element, can be proven

through circumstantial evidence); United States v. Spinney, 65

F.3d 231, 234 (1st Cir. 1995)(same).

     As further evidence of defendant Dwyer's intent, the jury

was free to consider the testimony of Dennis Wilson.  Mr. Wilson

testified that defendant Cardaropoli initially worked at the MCDI

Commissary for the first several days, but essentially stopped

showing up for work thereafter.  Mr. Wilson testified that he

initially maintained defendant Cardaropoli's timesheets at the

13

MCDI Commissary, but after a period of several months, defendant Dwyer maintained defendant Cardaropoli's timesheets within her office.  In addition, according to Mr. Wilson, defendant Dwyer supplied Mr. Wilson with defendant Cardaropoli's weekly total number of hours worked.  Mr. Wilson further testified that in approximately August, 2000, defendants Polimeni and Dwyer told him that individuals had begun to complain about defendant Cardaropoli's absences from work, and that they instructed Mr. Wilson to use morning hours on defendant Cardaropoli's timesheets to quell any concerns or suspicions.

Defendant Dwyer argues that she never presented a "following orders" defense, but rather seems to contend that it is legally impossible for a payroll clerk who follows the instructions of her superiors to engage in fraud.  See Motion, pg. 20.  Such a statement is incorrect not only as a matter, but also inaccurate based upon the facts of this case.  Once the Government establishes the existence of a conspiracy, a defendant's connection to a conspiracy "need only be slight, if knowing and willing."  United States v. Guerra-Garcia, 336 F.3d 19, 24 (1st Cir. 2003)(rejecting following orders defense in illegal alien case where defendant had knowledge); United States v. Brandon, 17 F.3d 409, 428 (1st Cir. 1994)(rejecting following orders defense where defendant had knowledge in a fraud case).  Under any name, the "following orders" defense simply is not available where a

14

defendant has knowledge about the existence of fraud and actively
participates in that scheme to defraud.

**C.     Sufficient Evidence Existed To Find Defendant Dwyer
Guilty Of A Conspiracy To Commit Program Fraud.**

The only attack by defendant Dwyer upon her conspiracy
conviction under the program fraud objective of Count One relates
to the threshold monetary amount of $5,000.00.  Once again, more
than sufficient evidence existed for the jury to find this amount
beyond a reasonable doubt.

First, Ms. Ortiz testified that she physically received a
paycheck when she worked.  Ms. Ortiz testified that her last
legitimate endorsement on the back of a payroll check occurred on
June 15, 2000, and that thereafter she never received another
payroll check again.  The jury easily could infer from that
testimony that she never worked again after June 15, 2000.
Second, defendant Dwyer's own payroll spreadsheets documented
that Ms. Ortiz effectively stopped working on June 22, 2000,
further corroborating Ms. Ortiz.  Third, several kitchen workers
testified that Ms. Ortiz only worked in the kitchen for a short
period of time.  Finally, the total of Ms. Ortiz' gross wages
from July 1, 2000 through December 14, 2000 equaled $7,000.00,
easily exceeding the $5,000.00 statutory threshold.[1]

---

[1] This section of the Government's response also serves to
respond to defendant Dwyer's argument that insufficient evidence
existed to convict her of Counts Four and Nine, the substantive
counts charging the fraudulent payroll scheme relating to Ms.

## II.    Taken In A Light Most Favorable To The Government, The Evidence At Trial Sufficed To Prove Defendant Dwyer Guilty Of Wire Fraud In Count Two and Program Fraud In Count Seven.

Defendant Dwyer's argument is again nothing more than a representation of her defense at trial. Defendant Dwyer presented all of these arguments to the jury, which disposed of each one of them by finding defendant Dwyer guilty of Counts Two and Seven. Nonetheless, taken in a light most favorable to the Government, more than enough evidence existed for the jury to find beyond a reasonable doubt that defendant Dwyer engaged in or aided and abetted the commission of wire fraud as charged in Count Two and program fraud as charged in Count Seven.

First, Thomas Grimes testified that MCDI had a policy that you lost "comp time" if you left the employment of MCDI. Second, the Government presented evidence that defendant Phillips refused to compensate Todd Illingsworth for his unearned comp time when he left the employment of MCDI in October, 1998. Third, Barry Metayer testified that defendant Polimeni was upset that Todd Illingsworth would not receive any money for his unearned comp time. Fourth, Dennis Wilson testified that Todd Illingworth initially worked for the first several months, but eventually stopped showing up for work. After Mr. Wilson raised his concerns about Todd Illingsworth's work absences with defendant Polimeni, defendant Dwyer began to hold onto Todd Illingsworth's

───────────────

Ortiz's employment.

16

timesheets within her office.  In addition, according to Mr.
Wilson, defendant Dwyer began to supply Mr. Wilson with Mr.
Illingsworth's total number of hours worked every week.  Fifth,
Mr. Wilson testified that sometime thereafter, defendant Dwyer
stopped presenting Mr. Illingsworth's timesheets to him for
signature.  Finally, both Mr. Grimes and Mr. Wilson testified
about defendant Dwyer's alteration of Todd Illingsworth's
timesheets after the fact.

From this evidence, the jury easily could have concluded
that defendant Dwyer participated in a scheme to circumvent MCDI
policy, pay Todd Illingsworth for overtime hours worked over a
year and a half prior to his employment at the MCDI Commissary,
and do so under the pretense of "comp time."  Moreover, the jury
easily could have concluded that defendant Dwyer participated in
a scheme to defraud both MCDI and the City of Springfield by
knowingly passing fraudulent labor costs onto the City of
Springfield through the Springfield School Department.

Sufficient evidence also existed to find that the payments
to Mr. Illingsworth exceeded the statutory threshold of $5,000.00
under § 666.  Not only did Mr. Wilson testify that Mr.
Illingsworth steadily stopped reporting for work beginning in
approximately September, 1999, but he also testified that he
never saw Mr. Illingsworth again at the Commissary after his car
accident in January, 2000.  The total of Mr. Illingsworth's gross

17

wages from March 3, 2000, when he allegedly reported back to work at the MCDI Commissary, and July 21, 2000, when MCDI laid off Mr. Illingsworth, equaled $5,300.00.  Therefore, the jury was free to consider not only his receipt of fraudulent wages from September, 1999 through January, 2000, but also the $5,300.00 in concluding that the Government had satisfied its burden of proof for the $5,000.00 statutory threshold.[2]

18 U.S.C. § 666(c) does not apply in this context.  In Cornier-Ortiz, 361 F.3d at 36-37 (1st Cir. 2004), the First Circuit had to resolve the "interplay between the bona fide exception and the prohibition against `intentional misapplication.'"  In substance, the First Circuit held that § 666(c) does not trump the intentional misapplication prohibitions of § 666(a)(1)(A).  Id.  Moreover, the First Circuit questioned, albeit in dicta, the applicability of § 666(c) to situations where "`salaries were paid for jobs that were unnecessary or unjustified.'"  Id. at 35 (citing United States v. Mills, 140 F.3d 630, 633-34 (6th Cir. 1998)).  It is difficult to imagine anything more unnecessary or unjustified than payment of wages

_____

[2] This section of the Government's response also serves to respond to defendant Dwyer's argument that the evidence relating to the Todd Illingsworth fraudulent payroll scheme was not sufficient to prove her involvement in the conspiracy. See Motion, pg. 21-23.

18

for work not performed.[3]

### III. Taken In A Light Most Favorable To The Government, The Evidence At Trial Was Sufficient To Prove Defendant Dwyer Guilty Of Counts Ten, Fifteen and Sixteen.

As previously stated, once the government establishes the existence of a conspiracy, a defendant's connection to a conspiracy "need only be slight, if knowing and willing." Guerra-Garcia, 336 F.3d at 24. See also Brandon, 17 F.3d at 428 (1st Cir. 1994)(stating once government establishes conspiracy and defendant's intent to further the conspiracy, "any connection between the defendant and the conspiracy, even a slight one, will be sufficient to establish knowing participation."); United States v. Rengifo, 858 F.2d 800, 808 (1st Cir. 1988)(stating that "at least a slight, though willing and knowing, connection between [the] defendant and [the] conspiracy" is sufficient to prove defendant's guilt).  More than sufficient evidence existed to prove defendant Dwyer's guilt beyond a reasonable doubt on Count Ten.

An endeavor under 18 U.S.C. § 1503 "is less than an attempt." United States v. Russell, 255 U.S. 138, 143 (1921); United States v. Buffalano, 727 F.2d 50, 53 (2nd Cir. 1984). Therefore, various courts of appeals have upheld obstruction of

---

[3] To avoid redundancy, this section of the Government's response also serves to respond to defendant Dwyer's argument that the § 666(c) exception applies to the Gretchen Ortiz fraudulent payroll scheme. See Motion, pg. 27.

justice convictions under 18 U.S.C. § 1503 based upon obstructive

conduct even though the evidence destroyed, fabricated or

secreted had not been subpoenaed by the grand jury. United States

v. Gravely, 840 F.2d 1156, 1160 (4th Cir. 1988); United States v.

McComb, 744 F.2d 555, 559 (7th Cir. 1984); United States v.

Turcotte, 515 F2d 145, 149 (2nd Cir. 1975); United States v.

Platt, 1985 WL 3244 *1 (N.D. Ill 1985); United States v. Fineman,

434 F.Supp. 197, 202 (D.C. Pa. 1977). The standard is whether or

not it is likely that the grand jury will seek the information.

Gravely, 840 F.2d at 1160.

A. Alteration of Documents

Thomas Grimes testified that whenever MCDI received a grand

jury subpoena, he tasked various department heads with responding

to that portion of the grand jury subpoena requesting records

from their department. Mr. Grimes testified that defendant Dwyer

was in charge of gathering records relating to MCDI Baking

Company personnel because defendant Dwyer had been in charge of

the MCDI Baking Company payroll. Second, Mr. Grimes testified

that he told everyone, including defendant Dwyer, that they

should not withhold documents, should not alter documents, and

should turn over what the grand jury wanted. Mr. Grimes

testified that he repeated those instructions "like a mantra."[4]

---

[4] Mr. Grimes' testimony alone established that defendant
Dwyer had knowledge of the grand jury investigation. See Motion,
pg. 29.

20

Third, Mr. Grimes testified that the October, 2001 grand jury subpoena requested records for MCDI Baking Company personnel, such as Todd Illingsworth, Frank Depergola, and others, and that defendant Dwyer would have been responsible for collecting those records.  Fourth, after the October, 2001 grand jury subpoena had been received by MCDI, Mr. Grimes testified that he saw Anna Scala "whiting out" hours on Todd Illingsworth's MCDI Baking Company timesheets while defendant Polimeni stood behind Ms. Scala.  Fifth, Mr. Grimes identified the numbers, which represented hours worked by Todd Illingsworth, that had been written over the "white out" as defendant Dwyer's handwriting. Finally, defendant Dwyer acknowledged on cross-examination that she had written weekly hourly work totals over the "white out," and agreed that the "white out" had to have been applied first before defendant Dwyer could have written the weekly hourly work totals on the timesheets.

Dennis Wilson testified that after he had learned that the FBI had come to MCDI to request records, he arrived at MCDI one day and was instructed by defendant Polimeni to go see Ms. Dwyer. According to Mr. Wilson, Ms. Dwyer presented him with a number of Todd Illingsworth's MCDI Baking Company timesheets and told Mr. Wilson to backdate the timesheets.  In addition, Mr. Wilson testified that defendant Dwyer supplied him with weekly totals for hours worked by Todd Illingsworth, and that he then filled

out the timesheets to arrive at the weekly totals supplied by
defendant Dwyer.

    B. <u>Withholding of Documents</u>

    In addition to requesting documentation relating to Todd
Illingsworth's employment, the October, 2001 grand jury subpoena
also requested documentation regarding the employment of Frank
Depergola and Mark Pandolfi.  Special Agent Wittrock testified
that defendant Dwyer's computerized payroll spreadsheets were not
produced to the grand jury in October, 2001.  Special Agent
Wittrock pointed out that the computerized payroll spreadsheets
had weekly entries for Frank Depergola and Mark Pandolfi that
appeared directly above defendant Dwyer's notes stating, "Not
deducting $24 . . . due to only working 0 hours.  Paid 35 hours
per Mr. Phillips."  Th jury could have inferred that defendant
Dwyer deliberately did not produce her payroll spreadsheets for
fear of exposing Ms. Ortiz' payroll fraud.

    Special Agent Wittrock also testified that in November,
2002, the grand jury issued a subpoena requesting any and all
records relating to Gretchen Ortiz.  The attachment to the grand
jury subpoena, which was admitted into evidence, specifically
requested "loans received and/or forgiven."  Special Agent
Wittrock testified that the copy of a $500.00 MCDI Baking Co.
check, which bore the caption "Housing" and had handwritten
notations indicating an unpaid balance of $403.00, had never been

22

produced pursuant to the grand jury subpoena, but rather had been seized in May, 2003.[5]

Ms. Ortiz testified that defendant Phillips gave her the $500.00 check to use as her first rental payment for an apartment at defendant Phillips' brother's apartment building.  Mr. Grimes identified defendant Dwyer's handwritten notations on the copy of the check.  He further testified that defendant Dwyer was responsible for gathering the records responsive to that portion of the grand jury subpoena.

C. False Statements

On March 6, 2002, Special Agents Kossler and Hedges attempted to interview defendant Dwyer at her residence.  She declined to be interviewed at her residence, but agreed to an interview the next day at MCDI.  Defendant Dwyer testified that she informed defendant Polimeni of the interview that night, and advised defendant Phillips of the interview on the morning of March 7, 2002.

During the interview, defendant Dwyer told Special Agent Kossler, among other things, that she verified the attendance of an employee if she saw the employee in the building.  Regarding

---

[5] Given defendant Dwyer's admission that she knew about the November, 2002 grand jury subpoena, and taking the evidence in a light most favorable to the Government, the jury could have convicted defendant Dwyer of Count Ten based solely upon her willful failure to produce the copy of the check with her handwritten notes tracking the non-payment of Gretchen Ortiz's loan. See Motion, pg. 30.

Ms. Ortiz specifically, defendant Dwyer told Special Agents
Kossler and Hedges that she assumed that Ms. Ortiz worked her
full shift, but could not verify the actual number of hours
worked by Ortiz, and that the only preferential treatment
received by Gretchen Ortiz from the administration about which
the defendant had knowledge was that the defendant had heard
employees complain that Ortiz got to work more hours than other
employees.

Special Agent Kossler also asked defendant Dwyer about loans
made by MCDI to employees.  Defendant Dwyer named three employees
who had received loans.  Despite the fact that defendant Dwyer
had been tracking Ms. Ortiz's loan payments, and that Ms. Ortiz's
loan had been forgiven, defendant Dwyer never disclosed to
Special Agent Kossler that Ms. Ortiz had received a loan and had
never paid the loan back.

The jury easily could have concluded that defendant Dwyer in
fact had actual knowledge that Ms. Ortiz was a no-show employee,
and, therefore, willfully made a false statement to Special
Agents Kossler and Hedges or concocted a false story to conceal
Ms. Ortiz' no-show status from the agents.  First, Ms. Ortiz
testified that she only worked in the MCDI kitchen for a short
period of time and stopped working by June 15, 2000, the date of
the check bearing her last legitimate endorsement.  Second,
several MCDI kitchen employees testified that Ms. Ortiz only

worked for a short period of time and never worked in the MCDI
kitchen thereafter.  Third, Jose Martins, the head of the
maintenance department, testified that he never knew or saw Ms.
Ortiz do any maintenance work.  Fourth, Mr. Grimes and several
MCDI kitchen employees testified that defendant Dwyer went to the
MCDI kitchen on at least a daily basis, thus affording defendant
Dwyer ample opportunity to see that Ms. Ortiz in fact was not
working.  Fifth, defendant Dwyer created computerized payroll
spreadsheets with notes that stated, "Not deducting $24 . . . due
to only working 0 hours.  Paid 35 hours per Mr. Phillips."
Sixth, Ms. Ortiz testified that she moved to Puerto Rico on
November 20, 2000, yet defendant Dwyer issued three more payroll
checks for a full week's wages to Ms. Ortiz.

Based upon that evidence, it was entirely reasonable for the
jury to conclude that defendant Dwyer knew that Ms. Ortiz was a
no-show employee.  Rather than acknowledging that fact, defendant
Dwyer's statements, taken in conjunction with her previous
statement to Special Agent Kossler that she verified an
employee's appearance at work by observing the employee in the
building, made it appear as if Ms. Ortiz actually worked or at
least showed up for work on a daily basis.  It was entirely
reasonable and rational for the jury to conclude that defendant
Dwyer's statement were a deliberate attempt to mislead Special
Agents Kossler and Hedges into believing that Ms. Ortiz actually

worked and divert their attention away from Ms. Ortiz as a possible no-show employee.[6]

Defendant Dwyer appears to attack her conviction on Count Ten in several ways.  First, she seems to claim that the jury's mixed verdicts somehow suggest that she was not guilty of Count Ten.  See Motion, pg. 28-29.  Of course, that argument fails as a matter of law.  The mere fact that there are "acquittals on certain counts of an indictment play[s] no role in the analysis of whether there is sufficient evidence supporting the surviving counts."  United States v. Cianci, 378 F.3d 71, 91 (1st Cir. 2004)(citing Dunn v. United States, 284 U.S. 390, 392-94 (1932); United States v. Powell, 469 U.S. 57, 64-69 (1984)).  In addition, defendant Dwyer's argument is incorrect factually because, for example, defendant Cardaropoli was convicted on Count Eighteen, not acquitted.

Second, defendant Dwyer argues that she did not have actual knowledge of the grand jury investigation.  See Motion, pgs. 29-30  As pointed out above in Section III.A., Mr. Grimes' testimony proved that defendant Dwyer was on notice of the grand jury investigation.

Third, defendant Dwyer claims that she had to know that her

---

[6] This section of the response also serves to respond to defendant Dwyer's argument that the Government did not prove the falsity of her statements in order to convict upon Counts Fifteen and Sixteen. See Motion, pgs. 36-37.

statements would be provided to the grand jury. See Motion, pg. 30.  Once again, this argument is incorrect as a matter of law. The courts have recognized that law enforcement works as the arm of the grand jury. See United States v. Aguilar, 515 U.S. 593, 600 (1995)(stating that § 1503 violations may be predicated upon conduct where law enforcement is acting as the arm of the grand jury).  Therefore, investigations undertaken with the intention of presenting evidence before a grand jury satisfy the element of the due administration of justice under § 1503. United States v. Wren, 363 F.3d 654 (7th Cir. 2003); United States v. Maloney, 71 F.3d 645, 657 (7th Cir. 1995).

In this particular case, by the time of her interview on March 7, 2002, defendant Dwyer already knew that at least one grand jury subpoena had been issued in October, 2001.  Defendant Dwyer testified on cross-examination that she notified defendants Polimeni and Phillips about the March 7, 2002 interview because MCDI administrators had issued a memorandum instructing all MCDI employees to notify their superiors if contacted by investigators had been distributed to all employees.  Finally, Special Agent Kossler specifically informed defendant Dwyer that they were conducting a federal investigation.  Therefore, there can be no question that defendant Dwyer knew about not only the existence of a grand jury investigation, but also that federal investigators were serving as the arm of the grand jury.

Fourth, defendant Dwyer argues that her statements to
Special Agent Kossler were truthful. See Motion, pg. 31.
However, as set forth above, the jury easily could have concluded
that defendant Dwyer actually knew that Ms. Ortiz was a no-show
employee, and therefore, made a false statement to Special Agent
Kossler when she told Special Kossler that she assumed that Ms.
Ortiz worked her full shift, and that she had heard that Ms.
Ortiz worked more hours than other employees.  Defendant Dwyer
did more than just not elaborate.  Defendant Dwyer willfully and
consciously concocted a story that contradicted what she knew.

Finally, defendant Dwyer claims that her statements were not
material, and that there was no evidence that the statements had
the capability of influencing the FBI. See Motion, pg. 35.  The
materiality of the statements, however, was self-evident.
Defendant Dwyer told Special Agent Kossler that she handled the
MCDI Baking Company payroll.  She further explained to Special
Agent Kossler that she verified the attendance of employees by
their presence in the building.  When defendant Dwyer told
Special Agent Kossler that she assumed that Ms. Ortiz worked her
full shift, and further told Agent Kossler that she had heard
that Ms. Ortiz received preferential treatment in the form of
working more hours than other employees, these statements had a
natural tendency to influence Special Agent Kossler in the
investigation.  The statements had the tendency to cause Special

28

Agent Kossler to believe that defendant Dwyer verified Ms. Ortiz's work attendance by visually seeing Ms. Ortiz on a daily basis. Such a belief on the part of Special Agent Kossler could have caused Special Agent not to investigate the allegations of Ms. Ortiz being a no-show employee. The fact that Special Agent Kossler ultimately did not abandon the investigation as it related to Ms. Ortiz is irrelevant. United States v. Sebaggala, 256 F.3d 59, 65 (1st Cir. 2001)(holding that a false statement is material "regardless of whether the agency actually relied upon it")(citing United States v. Corsino, 812 F.2d 26, 31 (1st Cir. 1987)).

As a separate attack upon Count Fifteen, the false statement conviction, defendant Dwyer argues that the court materially amended the indictment when the court instructed the jury that it could find that defendant Dwyer made a false statement by "cover[ing] up a material fact by some trick, scheme, or artifice to defraud." See Motion, pg. 36. "A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecution or court after the grand jury has last passed upon them." United States v. Dubon-Otero, 292 F.3d 1, 4 (1st Cir. 2004). "An amendment of the indictment is considered prejudicial per se and grounds for reversal of a conviction whether it is brought about by a literal alteration of the words of the indictment, a jury instruction

29

which modifies the offense charged in the indictment, or the admission of evidence of an offense not charged by the grand jury." Id.  "A primary objective of the rule against constructive amendment of indictments is to ensure defendants have notice of the charges they must defend against." Id. at 5

There was no constructive amendment of the indictment in this case.  First, the charging language of Count Fifteen nowhere limited the charge to any particular subsection of § 1001, but rather charged defendant Dwyer generally under § 1001.  Second, as defendant Dwyer concedes, the indictment charged defendant Dwyer not only with making a false statement, but also a "fraudulent" statement.  By definition, a fraudulent statement includes not only a direct misrepresentation, but also the knowing concealment of a material fact. See United States v. Arcadipane, 41 F.3d 1, 7 (1st Cir. 1994)(§ 1001 prosecution); United States v. Corsino, 812 F.2d 26, 30 (1st Cir. 1987)(§ 1001 prosecution). See also United States v. Moran, 312 F.3d 480, 489 n.10 (1st Cir. 2002)(fraudulent statement includes direct misrepresentations, half-truths, and knowing concealment of material facts); United States v. Blastos, 258 F.3d 25, 29 (1st Cir. 2001)(same); United States v. Phath, 144 F.3d 146, 149 (1st Cir. 1998)(same).  Therefore, the court's instruction tracked the charging language and the appropriate legal definitions for false and fraudulent statements.

To insure that there was no constructive amendment of the
indictment, the court also specifically instructed the jury that
the false statement at issue was defendant Dwyer stating that
"she assumed that Gretchen Ortiz worked her full shift but could
not verify the actual number of hours worked by Ms. Ortiz, and
that the only preferential treatment received by Ms. Ortiz from
the administration about which Ms. Dwyer had knowledge was that
Ms. Dwyer had heard employees complain that Ortiz got to work
more hours than other employees." See Jury Instructions, pg. 57.
The court's instruction tracked verbatim the false statement
alleged in Count Fifteen.

The Government's theory as charged and as proven was that
defendant Dwyer had actual knowledge that Ms. Ortiz was a no-show
employee, but had deliberately attempted to mislead Special Agent
Kossler into believing that Ms. Ortiz worked legitimately.  The
court's instruction forced the jury either to accept or reject
that theory and no other theory.  The court's instruction
required the jury to find that defendant Dwyer had actual
knowledge of Ms. Ortiz' no-show status, but that her statements
either constituted a direct, false representation or amounted to
a knowing concealment of a material fact, i.e. Ms. Ortiz' no-show
status, by virtue of a false statement.  The Government never
argued, nor did the court's instruction permit, the jury to
conclude that defendant Dwyer had some independent duty to

31

disclose any facts.  Since the court's instruction did not allow
the Government to deviate from its charging language, or the jury
to convict based upon a different theory or under a different
statute, there can be no constructive amendment of the
indictment.

IV.    **Conclusion**

        Based upon the foregoing, the Government respectfully
requests that the court deny defendant Dwyer's Motion for
Attorney, hereby files this response to defendant Dwyer's Motion
for Judgment of Acquittal.

        Filed this ___4___th day of April, 2005.

                                Respectfully submitted,

                                MICHAEL J. SULLIVAN
                                United States Attorney


                                WILLIAM M. WELCH II
                                Assistant United States Attorney

32

CERTIFICATE OF SERVICE

Hampden, ss.                          Springfield, Massachusetts
                                      April 4, 2005


        I, William M. Welch, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing by mailing
said motion to:

David P. Hoose, Esq.
1145 Main Street
Springfield, MA  01101

John Ferrara, Esq.
73 State Street
Suite 101
Springfield, MA  01103

Thomas Rooke, Esq.
73 Chestnut Street
Springfield, MA  01103

Vincent Bongiorni, Esq.
95 State Street
Springfield, MA  01103-2000

                                    WILLIAM M. WELCH II
                                    Assistant United States Attorney

33